**No. 25-1808**

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE FOURTH CIRCUIT**

**GREEN & HEALTHY HOMES INITIATIVE, INC.; MINNEAPOLIS FOUNDATION; PHILANTHROPY NORTHWEST, APPELLEES,**

**v.**

**ENVIRONMENTAL PROTECTION AGENCY; LEE ZELDIN, IN HIS OFFICIAL CAPACITY AS ADMINISTRATOR, U.S. DEPARTMENT OF ENVIRONMENTAL PROTECTION AGENCY, APPELLANT.**

***On Appeal from the United States District Court for the District of Maryland***
***The Honorable Adam B. Abelson, United States District Judge***

# CORRECTED JOINT APPENDIX
# VOLUME I OF III (PAGES 1-603)

MOLISSA H. FARBER
U.S. ATTORNEY'S OFFICE
36 S. Charles Street, 4th Floor
Baltimore, MD 21201
(410) 209-4800

*Counsel for Appellant*

ANDREW D. FREEMAN
JOSHUA N. AUERBACH
NEEL K. LALCHANDANI
BROWN, GOLDSTEIN & LEVY, LLP
120 E. Baltimore Street, Suite 2500
Baltimore, MD 21202
(410) 962-1030

*Counsel for Plaintiff Green & Healthy Homes Initiative, Inc.*

CHARLES ENGLISH, JR.
JONATHAN A. DEMELLA
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1610
(206) 757-8338

*Counsel for Plaintiff Philanthropy Northwest*

LORA A. BRZEZYNSKI
JESSICA C. ABRAHAMS
FAEGRE DRINKER BIDDLE & REATH LLP
1500 K Street, NW, Suite 1100
Washington, DC 20005
(202) 230-5000

*Counsel for Plaintiff The Minneapolis Foundation*

**February 23, 2026**

# TABLE OF CONTENTS
# VOLUME I OF III

District Court Docket Sheet ....................................................................... 1

Complaint for Declaratory and Injunctive Relief (April 2, 2025, ECF No.1)............ .............................................................................................................. 10

Exhibit 1 to Motion for Preliminary Injunction – Declaration of Ruth Ann Norton (April 2, 2025, ECF No. 2-2) .......................................................................... 54

Exhibit 2 to Motion for Preliminary Injunction – Declaration of R. T. Rybak (April 2, 2025, ECF No. 2-14) ....................................................................... 234

Exhibit 3 to Motion for Preliminary Injunction - Declaration of Jill T. Nishi (April 2, 2025, ECF No. 2-24) ....................................................................... 345

Exhibit 1 to Response to Motion for Preliminary Injunction – Second Declaration of Jill T. Nishi (April 24, 2025, ECF No. 26-1) ........................................... 434

Exhibit 2 to Response to Motion for Preliminary Injunction – Supplemental Declaration of R.T. Rybak (April 24, 2025, ECF No. 26-2) ............................ 438

Exhibit 3 to Response to Motion for Preliminary Injunction – Supplemental Declaration of Ruth Ann Norton (April 24, 2025, ECF No. 26-3) ..................... 444

Transcript of Proceedings before Judge Abelson (April 29, 2025) ..................... 449

Paperless Order: Defendants shall file the administrative record (May 2, 2025, ECF No. 29) ..................................................................................................... 584

Exhibit 1 to Notice by Philanthropy Northwest of Further Development (May 13, 2025, ECF No. 32-1) ......................................................................... 586

Exhibit 2 to Notice by Philanthropy Northwest of Further Development (May 13, 2025, ECF No. 32-2) ......................................................................... 589

Exhibit 3 to Notice by Philanthropy Northwest of Further Development (May 13, 2025, ECF No. 32-3) .......... 595

Order setting briefing schedule for Cross Motions for Summary Judgment (May 13, 2025, ECF No. 35) .......... 603

**TABLE OF CONTENTS**
**VOLUME II OF III**

Certified Copy of Administrative Record with Index by Environmental Protection Agency - Part 1 of 2 (May 13, 2025, ECF No. 36-1) .......... 604

**TABLE OF CONTENTS**
**VOLUME III OF III**

Certified Copy of Administrative Record with Index by Environmental Protection Agency - Part 2 of 2 (May 13, 2025, ECF No. 36-1) .......... 1303

Exhibit 1 to Motion for Summary Judgment by Green & Healthy Homes Initiative, Inc., Philanthropy Northwest, The Minneapolis Foundation (May 20, 2025, ECF No. 41-2) .......... 1703

Exhibit 2 to Motion for Summary Judgment by Green & Healthy Homes Initiative, Inc., Philanthropy Northwest, The Minneapolis Foundation (May 20, 2025, ECF No. 41-3) .......... 1724

Exhibit 3 to Motion for Summary Judgment by Green & Healthy Homes Initiative, Inc., Philanthropy Northwest, The Minneapolis Foundation (May 20, 2025, ECF No. 41-4) .......... 1728

Exhibit 4 to Motion for Summary Judgment by Green & Healthy Homes Initiative, Inc., Philanthropy Northwest, The Minneapolis Foundation (May 20, 2025, ECF No. 41-5) .......... 1738

Exhibit 5 to Motion for Summary Judgment by Green & Healthy Homes Initiative, Inc., Philanthropy Northwest, The Minneapolis Foundation (May 20, 2025, ECF No. 41-6) .......... 1743

Exhibit 6 to Motion for Summary Judgment by Green & Healthy Homes Initiative, Inc., Philanthropy Northwest, The Minneapolis Foundation (May 20, 2025, ECF No. 41-7) ....................1784

Transcript of Proceedings before Judge Abelson (May 30, 2025) ....................1809

Memorandum Opinion by Judge Adam B. Abelson (June 17, 2025, ECF No. 56) ....................1900

Order granting [41] Motion for Summary Judgment (June 17, 2025, ECF No. 57) ....................1948

Notice of Appeal by Environmental Protection Agency (July 11, 2025, ECF No. 63) ....................1950

Transmission of Notice of Appeal (July 14, 2025, ECF No. 64) ....................1951

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on February 23, 2026, a copy of the foregoing was electronically served onto all counsel of record through the CM/ECF system.

Dated: February 23, 2026

/s/ *Molissa Farber*
Molissa H. Farber
Assistant United States Attorney

APPEAL,CLOSED

# U.S. District Court
# District of Maryland (Baltimore)
# CIVIL DOCKET FOR CASE #: 1:25-cv-01096-ABA

Green & Healthy Homes Initiative, Inc. et al v. Environmental Protection Agency et al
Assigned to: Judge Adam B Abelson
Case in other court: Fourth Circuit Court of Appeals, 25-01808
Cause: 05:551 Administrative Procedures Act

Date Filed: 04/02/2025
Date Terminated: 06/17/2025
Jury Demand: None
Nature of Suit: 899 Other Statutes: Administrative Procedures Act/Review or Appeal of Agency Decision
Jurisdiction: U.S. Government Defendant

**Plaintiff**

**Green & Healthy Homes Initiative, Inc.** represented by

**Andrew David Freeman**
Brown Goldstein and Levy LLP
120 E Baltimore St Ste 2500
Baltimore, MD 21202-6701
14109621030
Fax: 14103850869
Email: adf@browngold.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Joshua Neal Auerbach**
Brown, Goldstein & Levy
120 E. Baltimore Street, Suite 2500
Baltimore, MD 21202
410-962-1030
Email: jauerbach@browngold.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Neel Lalchandani**
Brown Goldstein & Levy
120 E. Baltimore Street
Ste 2500
Baltimore, MD 21202
410-962-1030
Email: nlalchandani@browngold.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Charles M English , Jr**
Davis Wright Tremaine LLP
1301 K Street NW, Suite 500 East
Washington, DC 20005
12029734200
Fax: 12029734499
Email: chipenglish@dwt.com
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**The Minneapolis Foundation** represented by **Lora A Brzezynski**
Faegre Drinker Biddle & Reath LLP
1500 K St NW
Suite 1100
Washington, DC 20005
2022305375
Fax: 2028428465
Email: lora.brzezynski@faegredrinker.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Charles M English , Jr**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Jessica C Abrahams**
1500 K St., NW
Ste 1100
Washington, DC 20005
202-842-8800
Email: jessica.abrahams@faegredrinker.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Andrew David Freeman**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Philanthropy Northwest** represented by **Charles M English , Jr**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Jonathan A DeMella**
Davis Wright Tremaine LLP
920 Fifth Avenue
Suite 3300
Seattle, WA 98104-1610
206-757-8338
Email: jonathandemella@dwt.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Andrew David Freeman**
(See above for address)
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Environmental Protection Agency** represented by **Molissa Heather Farber**
US Attorney's Office
District of MD
36 S Charles St
4th Fl
Baltimore, MD 21201
4102094862
Fax: 4109622310
Email: molissa.farber@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Ariana Wright Arnold**
DOJ-USAO
U.S. Attorney's Office - District of Maryland
36 S. Charles Street
Ste 4th Floor
Baltimore, MD 21201
410-209-4813
Fax: 410-962-9947
Email: ariana.arnold@usdoj.gov
*ATTORNEY TO BE NOTICED*

**Megan Lynn Micco**
DOJ-USAO
Civil Division
36 S. Charles Street
Suite 400
Baltimore, MD 21201
410-209-4800
Fax: 410-962-0717
Email: megan.micco@usdoj.gov
*ATTORNEY TO BE NOTICED*

**Defendant**

**Lee Zeldin**
*in his official capacity as Administrator, United States Environmental Protection Agency* represented by **Molissa Heather Farber**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Ariana Wright Arnold**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Megan Lynn Micco**
(See above for address)
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 04/02/2025 | 1 | COMPLAINT *for Declaratory and Injunctive Relief* against Environmental Protection Agency, Lee Zeldin ( Filing fee $ 405 receipt number AMDDC-11885996.), filed by Green |

| | | |
|---|---|---|
| | | & Healthy Homes Initiative, Inc., Philanthropy Northwest, The Minneapolis Foundation. (Attachments: # 1 Civil Cover Sheet, # 2 Summons - Environmental Protection Agency, # 3 Summons - Kelly O. Hayes, # 4 Summons - The Hon. Pamela Bondi, Attorney General, # 5 Summons - Lee Zeldin)(Freeman, Andrew) (Entered: 04/02/2025) |
| 04/02/2025 | 2 | MOTION for Preliminary Injunction *Plaintiff's Motion for Preliminary Injunction* by Green & Healthy Homes Initiative, Inc., Philanthropy Northwest, The Minneapolis Foundation (Attachments: # 1 Memorandum in Support of Motion for Preliminary Injunction, # 2 Exhibit 1 - Norton Declaration, # 3 Exhibit 1, Attach. A - EJ TCGM RFA Feb 2023 Initial Announcement, # 4 Exhibit 1, Attach. B - EPA GHHI Letter of TCGM Award 12-13-23, # 5 Exhibit 1, Attach. C - GHHI EPA Region 3 TCGM Cooperative Agreement 5N-95341301-0, # 6 Exhibit 1, Attach. D - EPA ICR Approval Email 8-1-25, # 7 Exhibit 1, Attach. E - 5N- 95341401-2 GHHI Assistance Amendment, # 8 Exhibit 1, Attach. F - EPA Email Termination Notification 2-22-25, # 9 Exhibit 1, Attach. G - Termination_Memo_5N95341301, # 10 Exhibit 1, Attach. H - EPA Assistance Award Amendment OMB Form 95341301-1, # 11 Exhibit 1, Attach. I - Account Profiles, # 12 Exhibit 1, Attach. J - GHHI TCGM Region 3 Advisory Board Stop Work Email Notification, # 13 Exhibit 1, Attach. K - EPA General Terms and Conditions effective October 1, 2023 or later, # 14 Exhibit 2 - Declaration of R.T. Rybak - Minneapolis Foundation, # 15 Exhibit 2, Attach. A - Initial Grant of $8 million 6.24.24, # 16 Exhibit 2, Attach. B - Subsequent Grant of $42 million 9.30.24, # 17 Exhibit 2, Attach. C - Subsequent Grant Amendment 12.20.2024, # 18 Exhibit 2, Attach. D - No Cost Amendment and Termination Letter 2.21.2025, # 19 Exhibit 2, Attach. E - Termination Response 3.5.2025, # 20 Exhibit 2, Attach. F - Request for Extension 3.18.2025, # 21 Exhibit 2, Attach. G - Extension of Time to Submit Dispute 03-19-2025, # 22 Exhibit 2, Attach. H - Confirmation of Suspended Account Status 3.11.2025, # 23 Exhibit 2, Attach. I - EPA Account Status - 04-01-2025 - Suspended, # 24 Exhibit 3 - Declaration of Jill T. Nishi, # 25 Exhibit 3, Attach. A - Initial Grant 5N-02J63801, # 26 Exhibit 3, Attach. B - Subsequent Grant 5N-02J63901, # 27 Exhibit 3, Attach. C - Modification 1 5N-02J63901, # 28 Exhibit 3, Attach. D - 2025.02.22 Termination Letter and Amendment, # 29 Exhibit 3, Attach. E - 2025.03.28 Lockout Screenshot, # 30 Exhibit 3, Attach. F - Philanthropy Northwest Unremibursed Accrued Expenses 2025.03.15, # 31 Text of Proposed Order) (Freeman, Andrew) (Entered: 04/02/2025) |
| 04/02/2025 | 3 | MOTION for Leave to File Excess Pages *Plaintiffs' Motion for Leave to File Excess Pages for Memorandum in Support of Motion for Preliminary Injunction* by Green & Healthy Homes Initiative, Inc., Philanthropy Northwest, The Minneapolis Foundation (Attachments: # 1 Text of Proposed Order)(Freeman, Andrew) (Entered: 04/02/2025) |
| 04/02/2025 | 4 | MOTION to Expedite *Plaintiffs' Motion for Expedited Briefing Schedule* by Green & Healthy Homes Initiative, Inc., Philanthropy Northwest, The Minneapolis Foundation (Attachments: # 1 Text of Proposed Order)(Freeman, Andrew) (Entered: 04/02/2025) |
| 04/02/2025 | 5 | Local Rule 103.3 Disclosure Statement by The Minneapolis Foundation (Brzezynski, Lora) (Entered: 04/02/2025) |
| 04/02/2025 | 6 | Local Rule 103.3 Disclosure Statement by Green & Healthy Homes Initiative, Inc., Philanthropy Northwest, The Minneapolis Foundation identifying Corporate Parent Green & Healthy Homes Initiative, Inc., Other Affiliate Green & Healthy Housing Strategies, Inc., Other Affiliate Coalition Against Child Lead Poisoning, Inc., Other Affiliate Green & Healthy Homes Initiative - Rhode Island for Green & Healthy Homes Initiative, Inc.. (Freeman, Andrew) (Entered: 04/02/2025) |
| 04/02/2025 | 7 | MOTION to Appear Pro Hac Vice for Jessica C. Abrahams (Filing fee $100, receipt number AMDDC-11886024.) by The Minneapolis Foundation(Brzezynski, Lora) (Entered: 04/02/2025) |

| | | |
|---|---|---|
| 04/03/2025 | 8 | MOTION to Appear Pro Hac Vice for Jonathan DeMella (Filing fee $100, receipt number AMDDC-11886806.) by Philanthropy Northwest(English, Charles) (Entered: 04/03/2025) |
| 04/03/2025 | 9 | MOTION to Appear Pro Hac Vice for Jonathan DeMella (Filing fee $100, receipt number AMDDC-11886877.) by Philanthropy Northwest (Attachments: # 1 Exhibit)(English, Charles) (Entered: 04/03/2025) |
| 04/03/2025 | 10 | Local Rule 103.3 Disclosure Statement by Philanthropy Northwest (English, Charles) (Entered: 04/03/2025) |
| 04/03/2025 | 11 | Summons Issued 60 days as to Environmental Protection Agency, Lee Zeldin, U.S. Attorney and U.S. Attorney General. (Attachments: # 1 Lee Zeldin, # 2 Kelly O. Hayes, # 3 Pamela Bondi) (hmls, Deputy Clerk) (Entered: 04/03/2025) |
| 04/03/2025 | 12 | ORDER re: Notice and SCHEDULING a status teleconference on Monday, April 7, 2025, at 3:00 p.m. ET. Signed by Judge Adam B Abelson on 4/3/2025. (hmls, Deputy Clerk) (Entered: 04/03/2025) |
| 04/04/2025 | 13 | PAPERLESS ORDER granting 7 Motion to Appear Pro Hac Vice on behalf of Jessica C Abrahams. Directing attorney Jessica C Abrahams to register for pro hac vice filing in the District of Maryland through PACER at https://pacer.uscourts.gov/ if attorney has not already done so. The *Pro Hac Vice* option must be selected when registering. Signed by Clerk on 4/4/2025. (mh4s, Deputy Clerk) (Entered: 04/04/2025) |
| 04/04/2025 | 14 | QC NOTICE: 8 Motion to Appear Pro Hac Vice filed by Philanthropy Northwest needs to be modified. See attachment for details and corrective actions needed regarding missing or incomplete information. (mh4s, Deputy Clerk) (Entered: 04/04/2025) |
| 04/04/2025 | 15 | PAPERLESS ORDER granting 9 Motion to Appear Pro Hac Vice on behalf of Jonathan A DeMella. Directing attorney Jonathan A DeMella to register for pro hac vice filing in the District of Maryland through PACER at https://pacer.uscourts.gov/ if attorney has not already done so. The *Pro Hac Vice* option must be selected when registering. Signed by Clerk on 4/4/2025. (mh4s, Deputy Clerk) (Entered: 04/04/2025) |
| 04/04/2025 | 16 | NOTICE of Appearance by Molissa Heather Farber on behalf of All Defendants (Farber, Molissa) (Entered: 04/04/2025) |
| 04/04/2025 | 17 | NOTICE by Green & Healthy Homes Initiative, Inc., Philanthropy Northwest, The Minneapolis Foundation re 12 Order *NOTICE SUBMITTED PURSUANT TO COURTS APRIL 3, 2025 ORDER* (Freeman, Andrew) (Entered: 04/04/2025) |
| 04/07/2025 | 18 | SUMMONS Returned Executed by Green & Healthy Homes Initiative, Inc.. Environmental Protection Agency served on 4/4/2025, answer due 4/25/2025. (Attachments: # 1 EPA Summons served on Kelly Hayes)(Lalchandani, Neel) (Entered: 04/07/2025) |
| 04/07/2025 | 19 | SUMMONS Returned Executed by Green & Healthy Homes Initiative, Inc.. Lee Zeldin served on 4/4/2025, answer due 4/25/2025.(Lalchandani, Neel) (Entered: 04/07/2025) |
| 04/07/2025 | 20 | Status Conference held on 4/7/2025 before Judge Adam B Abelson.(Court Reporter: FTR) (jh2s, Deputy Clerk) (Entered: 04/07/2025) |
| 04/07/2025 | 21 | ORDER GRANTING 3 Motion for Leave to File Excess Pages; GRANTING IN PART and DENYING IN PART 4 Motion for an Expedited Briefing Schedule; SCHEDULING Hearing on 2 Motion for Preliminary Injunction for 4/29/2025 at 1:00 p.m. in Courtroom 7D of the Edward A. Garmatz Courthouse. Signed by Judge Adam B Abelson on 4/7/2025. (hmls, Deputy Clerk) (Entered: 04/07/2025) |

| | | |
|---|---|---|
| 04/09/2025 | | Reset Answer Deadline: Environmental Protection Agency's answer due 6/3/2025; Lee Zeldin's answer due 6/3/2025. (hmls, Deputy Clerk) (Entered: 04/09/2025) |
| 04/16/2025 | 22 | RESPONSE in Opposition re 2 MOTION for Preliminary Injunction *Plaintiff's Motion for Preliminary Injunction* filed by Environmental Protection Agency, Lee Zeldin. (Attachments: # 1 Text of Proposed Order, # 2 Exhibit Solutions in Hometown Connections v. Noem)(Farber, Molissa) (Entered: 04/16/2025) |
| 04/23/2025 | 23 | Consent MOTION for Leave to File Excess Pages *FOR REPLY TO DEFENDANTS OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION* by Green & Healthy Homes Initiative, Inc., Philanthropy Northwest, The Minneapolis Foundation (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Text of Proposed Order) (Brzezynski, Lora) (Entered: 04/23/2025) |
| 04/23/2025 | 24 | REPLY to Response to Motion re 2 MOTION for Preliminary Injunction *Plaintiff's Motion for Preliminary Injunction* filed by Green & Healthy Homes Initiative, Inc., Philanthropy Northwest, The Minneapolis Foundation.(Brzezynski, Lora) (Entered: 04/23/2025) |
| 04/24/2025 | 25 | ORDER GRANTING 23 Motion for Leave to File Excess Pages. Signed by Judge Adam B Abelson on 4/24/2025. (hmls, Deputy Clerk) (Entered: 04/24/2025) |
| 04/24/2025 | 26 | REPLY to Response to Motion re 2 MOTION for Preliminary Injunction *Plaintiff's Motion for Preliminary Injunction (CORRECTED TO REFLECT EXHIBITS)* filed by Green & Healthy Homes Initiative, Inc., Philanthropy Northwest, The Minneapolis Foundation. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3)(Brzezynski, Lora) (Entered: 04/24/2025) |
| 04/29/2025 | 27 | Motion Hearing held on 4/29/2025 re 2 MOTION for Preliminary Injunction *Plaintiff's Motion for Preliminary Injunction* filed by The Minneapolis Foundation, Green & Healthy Homes Initiative, Inc., Philanthropy Northwest before Judge Adam B Abelson.(Court Reporter: Nadine Bachmann) (jks, Deputy Clerk) (Entered: 04/29/2025) |
| 05/05/2025 | 28 | NOTICE by Green & Healthy Homes Initiative, Inc., Philanthropy Northwest, The Minneapolis Foundation *OF FURTHER DEVELOPMENT* (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4)(Brzezynski, Lora) (Entered: 05/05/2025) |
| 05/06/2025 | 29 | PAPERLESS ORDER: As ordered at the April 29 hearing, Defendants shall file the administrative record no later than May 13, 2025. Signed by Judge Adam B Abelson on 5/6/2025. (sp6s, Chambers) (Entered: 05/06/2025) |
| 05/09/2025 | 30 | PAPERLESS ORDER: The Court will hold a Zoom status conference on Tuesday, May 13, 2025 at 11:00 A.M. The Zoom link will be circulated to counsel via email. Signed by Judge Adam B Abelson on 5/9/2025. (sp6s, Chambers) (Entered: 05/09/2025) |
| 05/09/2025 | 31 | NOTICE of Appearance by Megan Lynn Micco on behalf of Environmental Protection Agency, Lee Zeldin (Micco, Megan) (Entered: 05/09/2025) |
| 05/13/2025 | 32 | NOTICE by Philanthropy Northwest *of Further Development* (Attachments: # 1 Exhibit, # 2 Exhibit, # 3 Exhibit)(English, Charles) (Entered: 05/13/2025) |
| 05/13/2025 | 33 | Consent MOTION for Leave to File *Amended Proposed Preliminary Injunction* by The Minneapolis Foundation (Attachments: # 1 Attachment Amended Proposed, # 2 Attachment Redline, # 3 Text of Proposed Order)(Brzezynski, Lora) (Entered: 05/13/2025) |
| 05/13/2025 | 34 | Status Conference via zoom held on 5/13/2025 before Judge Adam B Abelson. (Russell Carrick - Courtroom 3A)(Court Reporter: Nadine Bachmann) (rc2s, Deputy Clerk) (Entered: 05/13/2025) |

| | | |
|---|---|---|
| 05/13/2025 | 35 | ORDER SETTING briefing schedule for cross motions for summary judgment. Signed by Judge Adam B Abelson on 5/13/2025. (hmls, Deputy Clerk) (Entered: 05/13/2025) |
| 05/13/2025 | 36 | NOTICE of filing Administrative Record by Environmental Protection Agency, Lee Zeldin (Attachments: # 1 Certified Copy of Administrative Record with Index)(Micco, Megan) (Entered: 05/13/2025) |
| 05/16/2025 | 37 | PAPERLESS ORDER: The Court will hold a motions hearing on any cross motions for summary judgment on May 30, 2025 at 1:30 P.M. in Courtroom 7D of the Baltimore courthouse. Signed by Judge Adam B Abelson on 5/16/2025. (sp6s, Chambers) (Entered: 05/16/2025) |
| 05/16/2025 | 38 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings held on 04/29/2025, before Judge Abelson. Court Reporter N. Bachmann, Telephone number 410-962-4753 nadine_bachmann@mdd.uscourts.gov. Total number of pages filed: 135. Transcript may be viewed at the court public terminal or purchased through the Court Reporter before the deadline for Release of Transcript Restriction. After that date it may be obtained from the Court Reporter or through PACER. Redaction Request due 6/6/2025. Redacted Transcript Deadline set for 6/16/2025. Release of Transcript Restriction set for 8/14/2025.(nb, Court Reporter) (Entered: 05/16/2025) |
| 05/19/2025 | 39 | NOTICE of Appearance by Ariana Wright Arnold on behalf of All Defendants (Arnold, Ariana) (Entered: 05/19/2025) |
| 05/20/2025 | 40 | MOTION Motion to Supplement the Administrative Record by Green & Healthy Homes Initiative, Inc., Philanthropy Northwest, The Minneapolis Foundation (Attachments: # 1 Memorandum in Support, # 2 Exhibit, # 3 Exhibit, # 4 Text of Proposed Order)(English, Charles) (Entered: 05/20/2025) |
| 05/20/2025 | 41 | MOTION for Summary Judgment by Green & Healthy Homes Initiative, Inc., Philanthropy Northwest, The Minneapolis Foundation (Attachments: # 1 Memorandum in Support, # 2 Exhibit 1, # 3 Exhibit 2, # 4 Exhibit 3, # 5 Exhibit 4, # 6 Exhibit 5, # 7 Exhibit 6, # 8 Text of Proposed Order)(Brzezynski, Lora) (Entered: 05/20/2025) |
| 05/20/2025 | 42 | Consent MOTION for Leave to File Excess Pages *FOR MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT* by Green & Healthy Homes Initiative, Inc., Philanthropy Northwest, The Minneapolis Foundation (Attachments: # 1 Text of Proposed Order)(Brzezynski, Lora) (Entered: 05/20/2025) |
| 05/21/2025 | 43 | (FILED IN ERROR - REFILED) MOTION to Dismiss for Lack of Jurisdiction , MOTION to Transfer Case *or in the alternative*, MOTION for Summary Judgment by Environmental Protection Agency, Lee Zeldin(Arnold, Ariana) Modified on 5/21/2025 (hmls). (Entered: 05/21/2025) |
| 05/21/2025 | 44 | Corrected MOTION to Dismiss for Lack of Jurisdiction , MOTION to Transfer Case *or in the alternative*, MOTION for Summary Judgment by Environmental Protection Agency, Lee Zeldin (Attachments: # 1 Memorandum in Support, # 2 Text of Proposed Order) (Arnold, Ariana) (Entered: 05/21/2025) |
| 05/22/2025 | 45 | PAPERLESS ORDER: The consent motion for leave to file excess pages (ECF No. 42) is GRANTED. Signed by Judge Adam B Abelson on 5/22/2025. (sp6s, Chambers) (Entered: 05/22/2025) |
| 05/23/2025 | 46 | RESPONSE in Opposition re 41 MOTION for Summary Judgment filed by Environmental Protection Agency, Lee Zeldin.(Farber, Molissa) (Entered: 05/23/2025) |
| 05/23/2025 | 47 | NOTICE by Environmental Protection Agency, Lee Zeldin re 40 MOTION Motion to Supplement the Administrative Record -- *Defendants do not oppose the motion to* |

| | | |
|---|---|---|
| | | *supplement the administrative record* (Farber, Molissa) (Entered: 05/23/2025) |
| 05/23/2025 | 48 | RESPONSE in Opposition re 44 Corrected MOTION to Dismiss for Lack of Jurisdiction MOTION to Transfer Case *or in the alternative* MOTION for Summary Judgment filed by Green & Healthy Homes Initiative, Inc., Philanthropy Northwest, The Minneapolis Foundation.(Freeman, Andrew) (Entered: 05/23/2025) |
| 05/30/2025 | 49 | NOTICE by Environmental Protection Agency, Lee Zeldin *of Supplemental Authority* (Attachments: # 1 Exhibit Memorandum Opinion, Solutions in Hometown Connections) (Farber, Molissa) (Entered: 05/30/2025) |
| 05/30/2025 | 50 | Motion Hearing held on 5/30/2025 re 44 Corrected MOTION to Dismiss for Lack of Jurisdiction MOTION to Transfer Case *or in the alternative* MOTION for Summary Judgment filed by Environmental Protection Agency, Lee Zeldin, 41 MOTION for Summary Judgment filed by The Minneapolis Foundation, Green & Healthy Homes Initiative, Inc., Philanthropy Northwest before Judge Adam B Abelson. (Russell Carrick - Courtroom 7D)(Court Reporter: Nadine Bachmann) (rc2s, Deputy Clerk) (Entered: 05/30/2025) |
| 05/30/2025 | | PAPERLESS ORDER pursuant to ruling in open court from 5/30/25 motions hearing granting 40 Motion to Supplement the Administrative Record. Signed by Judge Adam B Abelson on 5/30/2025. (rc2s, Deputy Clerk) (Entered: 05/30/2025) |
| 06/04/2025 | 51 | NOTICE by Environmental Protection Agency, Lee Zeldin *of supplemental authority* (Attachments: # 1 Exhibit - Mem. Op., Assoc. for Educ. Fin. and Policy)(Farber, Molissa) (Entered: 06/04/2025) |
| 06/05/2025 | 52 | NOTICE by Environmental Protection Agency, Lee Zeldin *of Supplemental Authority -- Fourth Circuit's Grant of a Stay in Sustainability Institute v. Trump* (Attachments: # 1 Exhibit Fourth Circuit Order Granting Stay)(Farber, Molissa) (Entered: 06/05/2025) |
| 06/09/2025 | 53 | RESPONSE re 51 Notice (Other), 52 Notice (Other) filed by Green & Healthy Homes Initiative, Inc., Philanthropy Northwest, The Minneapolis Foundation.(Freeman, Andrew) (Entered: 06/09/2025) |
| 06/10/2025 | 54 | NOTICE by Green & Healthy Homes Initiative, Inc., Philanthropy Northwest, The Minneapolis Foundation *of Supplemental Authority* (Attachments: # 1 Exhibit 1 - AmeriCorps Opinion.06-05-2025, # 2 Exhibit 2 - AmeriCorps PI.06-05-2025)(Freeman, Andrew) (Entered: 06/10/2025) |
| 06/17/2025 | 55 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings held on 05/30/2025, before Judge Abelson. Court Reporter N. Bachmann, Telephone number 410-962-4753 nadine_bachmann@mdd.uscourts.gov. Total number of pages filed: 91. Transcript may be viewed at the court public terminal or purchased through the Court Reporter before the deadline for Release of Transcript Restriction. After that date it may be obtained from the Court Reporter or through PACER. Redaction Request due 7/8/2025. Redacted Transcript Deadline set for 7/18/2025. Release of Transcript Restriction set for 9/15/2025.(nb, Court Reporter) (Entered: 06/17/2025) |
| 06/17/2025 | 56 | MEMORANDUM OPINION. Signed by Judge Adam B Abelson on 6/17/2025. (hmls, Deputy Clerk) (Entered: 06/17/2025) |
| 06/17/2025 | 57 | ORDER GRANTING 41 Motion for Summary Judgment with respect to its APA claims (Counts 1 and 2); DENYING 44 Cross Motion for Summary Judgment on the same claims and the EPA's terminations of the initial and subsequent grants awarded to the three Plaintiffs are SET ASIDE; Plaintiffs' motion for summary judgment (ECF No. 41) with respect to the constitutional and grant-termination regulation claims (Counts 3, 4, and 5), and Defendants' cross-motion for summary judgment (ECF No. 44), with respect to the |

| | | |
|---|---|---|
| | | same claims, are DENIED as moot; DENYING 44 Motion to Dismiss for Lack of Jurisdiction and Transfer Case to the Court of Federal Claims; DENYING AS MOOT 2 Motion for Preliminary Injunction; DENYING AS MOOT 33 Motion for Leave to File Amended Proposed Preliminary Injunction; Closing Case. Signed by Judge Adam B Abelson on 6/17/2025. (hmls, Deputy Clerk) (Entered: 06/17/2025) |
| 06/27/2025 | 58 | MOTION to Compel *IMMEDIATE COMPLIANCE WITH THE COURTS JUNE 17 ORDER*, MOTION to Expedite *TIME FOR RESPONSE* by Green & Healthy Homes Initiative, Inc., Philanthropy Northwest, The Minneapolis Foundation (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Text of Proposed Order, # 7 Text of Proposed Order)(Brzezynski, Lora) (Entered: 06/27/2025) |
| 06/30/2025 | 59 | PAPERLESS ORDER: Defendants are ORDERED to respond to Plaintiffs' Motion to Compel (ECF No. 58) by Wednesday, July 2, 2025. Plaintiffs may file reply briefs by Tuesday, July 8. A Zoom hearing on the motion will be held on Wednesday, July 9 at 2:30pm ET. Zoom information will be sent to counsel in advance of the hearing. Signed by Judge Adam B Abelson on 6/30/2025. (sp6s, Chambers) (Entered: 06/30/2025) |
| 07/02/2025 | 60 | RESPONSE in Opposition re 58 MOTION to Compel *IMMEDIATE COMPLIANCE WITH THE COURTS JUNE 17 ORDER* MOTION to Expedite *TIME FOR RESPONSE* filed by Environmental Protection Agency, Lee Zeldin.(Farber, Molissa) (Entered: 07/02/2025) |
| 07/08/2025 | 61 | NOTICE by Green & Healthy Homes Initiative, Inc., Philanthropy Northwest, The Minneapolis Foundation re 58 MOTION to Compel *IMMEDIATE COMPLIANCE WITH THE COURTS JUNE 17 ORDER* MOTION to Expedite *TIME FOR RESPONSE to Withdraw* (English, Charles) (Entered: 07/08/2025) |
| 07/08/2025 | 62 | PAPERLESS ORDER: Plaintiffs have filed a notice of withdrawal of their motion to compel. ECF No. 61. It is therefore ORDERED that the motion to compel (ECF No. 58) is DENIED as moot and the July 9, 2025 hearing on the motion is CANCELED. Signed by Judge Adam B Abelson on 7/8/2025. (jl5s, Chambers) (Entered: 07/08/2025) |
| 07/11/2025 | 63 | NOTICE OF APPEAL by Environmental Protection Agency, Lee Zeldin. (Fee Status: Filing Fee Not Paid)(Farber, Molissa) (Entered: 07/11/2025) |
| 07/14/2025 | 64 | Transmission of Notice of Appeal and Docket Sheet to US Court of Appeals re 63 Notice of Appeal. IMPORTANT NOTICE: To access forms which you are required to file with the United States Court of Appeals for the Fourth Circuit please go to http://www.ca4.uscourts.gov and click on Forms & Notices.(slss, Deputy Clerk) (Entered: 07/14/2025) |
| 07/16/2025 | 65 | USCA Case Number 25-1808 for 63 Notice of Appeal filed by Environmental Protection Agency, Lee Zeldin - Case Manager - Paige Ballard.(slss, Deputy Clerk) (Entered: 07/16/2025) |



## PACER Service Center

### Transaction Receipt

| | | | |
|---|---|---|---|
| 09/24/2025 09:35:00 | | | |
| **PACER Login:** | mhfarber | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 1:25-cv-01096-ABA |
| **Billable Pages:** | 9 | **Cost:** | 0.90 |

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
(Northern Division)

**GREEN & HEALTHY HOMES INITIATIVE, INC.** *
2714 Hudson Street
Baltimore, Maryland 21224, *

**THE MINNEAPOLIS FOUNDATION** *
800 CDS Center S. 8th Street
Minneapolis, Minnesota 55402, *

and *

Case No.:

**PHILANTHROPY NORTHWEST** *
600 University Street, Suite 1725
Seattle, Washington 98101, *

Plaintiffs, *

v. *

**ENVIRONMENTAL PROTECTION AGENCY**
1200 Pennsylvania Avenue, N.W. *
Washington, D.C. 20460

*

Also serve on:
Kelly O. Hayes *
United States Attorney for the District of Maryland
36 S. Charles Street, 4th Floor *
Baltimore, MD 21201

*

The Hon. Pamela Bondi, Attorney General
U.S. Department of Justice *
950 Pennsylvania Avenue, NW
Washington, DC 20530-0001 *

and *

**LEE ZELDIN, in his official capacity as** *
**ADMINISTRATOR, UNITED STATES**
**ENVIRONMENTAL PROTECTION AGENCY** *
1200 Pennsylvania Avenue, N.W.,
Washington, D.C. 20460 *

Defendants. *

* * * * * * * * * * * * *

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

## INTRODUCTION

1. Plaintiffs Green & Healthy Homes Initiative, Inc. ("GHHI"), the Minneapolis Foundation, and Philanthropy Northwest (collectively, "Plaintiffs" or the "Plaintiff Organizations") are non-profit organizations located in Baltimore, Minneapolis, and Seattle, respectively. In December 2023, Defendant, the U.S. Environmental Protection Agency ("EPA"), named each of the organizations a Regional Grantmaker under the Agency's Thriving Communities Grantmaking Program, and, in 2024, EPA awarded to each of the Plaintiff Organizations an $8 million "initial grant" intended to facilitate further grantmaking under the Thriving Communities program, as well as to oversee and provide support to Thriving Communities subgrantees. The EPA later awarded to each organization a $52 million "subsequent grant," most of which the organizations are to award to Thriving Communities subgrantees to support community-based environmental protection projects.

2. EPA established the Thriving Communities program at the direction of Congress, which, in amendments to the Clean Air Act codified in 2022 through the enactment of the Inflation Reduction Act, appropriated $3 billion to the EPA for "climate and environmental justice block grants" and mandated that the Agency "shall use" those funds to support activities that monitor, prevent, and remediate pollution and mitigate climate risks in "disadvantaged communities." 42 U.S.C. § 7438.

3. On February 21 and 22, 2025, EPA terminated its Thriving Communities initial grant awards to the three Plaintiff Organizations, issuing to each organization a memorandum containing an identical or nearly identical statement of purported reasons for the Agency's termination decision. That statement provided several vague, unsubstantiated reasons on which the termination decision was based.

4. Specifically, EPA stated that each organization's grant was terminated (1) because EPA has declared it an "Agency priority" to withhold funds "from organizations that promote or take part in diversity, equity and inclusion ('DEI') initiatives [or] 'environmental justice' initiatives"; (2) because the Plaintiff Organizations' grant-funded programs may not be "free from fraud, abuse, waste, or duplication"; *or* (3) because the organization's programs may "otherwise fail to serve the best interests of the United States."

5. Based on the vague, unsubstantiated statement in the termination memoranda, it is not possible to understand the specific reason for the Agency's termination of the initial grants. The Agency did not, in the case of any of the three Plaintiff Organizations, make any determination, identify any evidence, or articulate any reasoning to substantiate any of the identified grounds for termination.

6. In terminating the initial grants, EPA violated a number of federal statutes and regulations, including the Clean Air Act, as amended by the Inflation Reduction Act, and the Executive Branch's own regulations governing federal grants set forth at 2 C.F.R. Part 200. In particular, EPA's actions seek to nullify the Clean Air Act's unambiguous direction to the Agency to use appropriated funds to support environmental protection activities in disadvantaged communities.

7. Moreover, one of the grounds that EPA has identified for terminating the three Plaintiff Organizations' grants—that the Plaintiffs may "promote or take part in" certain types of "initiatives" that the Agency now disfavors— is plainly unconstitutional, in that it infringes on the organizations' First Amendment rights by punishing them for what the EPA perceives to be inappropriate viewpoints on issues of social and environmental concern (albeit without undertaking any examination of the Plaintiff Organizations' actual work or views).

8. Around the time that EPA terminated the Plaintiff Organizations' $8 million initial grants, the Agency also suspended the organizations' access to the $52 million in additional Thriving Communities grant funds from which the organizations are to make subgrant awards to community organizations.

9. The frozen funds are intended to support hundreds of environmental projects in rural, suburban, and urban communities across the Mid-Atlantic, Great Lakes, and Northwest regions. Already, as of the filing of this Complaint, GHHI, the Minneapolis Foundation, and Philanthropy Northwest have collectively awarded more than 100 subgrants in their respective regions to support, among other things, the remediation of lead and toxic chemical contamination in parks and other community venues, the modernization of wastewater treatment processes in rural communities, and reductions in severe wildfire risk in fire-prone areas, among other critical work.

10. Immense and irreparable harm will flow to the Plaintiff Organizations from EPA's actions, and that harm has already begun to accrue as of the filing of this Complaint. If Plaintiffs' grants are not reinstated and their access to funding not immediately restored, among other things, they will have to lay off dozens of staff members. The relationships Plaintiffs have built with partner organizations and community leaders will be severely damaged as a result of Plaintiffs' inability to administer the Thriving Communities program as promised. Meanwhile, the programs themselves would be largely or entirely shuttered, and environmental protection work and investments undertaken in anticipation of Thriving Communities grants by Plaintiffs and by hundreds of non-profit organizations and local and tribal government agencies would be wasted and come to an end.

11. In defiance of congressional direction, and for reasons that are unconstitutional, EPA has placed under threat hundreds of vital programs; has upended months of programmatic and fiscal planning and financial investment by the three Plaintiff Organizations and their non-profit and governmental subgrantees undertaken in reliance on the Agency's grant award; has interfered with the organizations' ongoing operations; and has disrupted the lives of dedicated environmental scientists and engineers, health professionals, educators, and other workers whose plans for the next one to two years focused on projects funded by the Thriving Communities program. Mass cancellation of programs and termination of employment is imminent, and Plaintiffs' organizational missions will be threatened.

12. As discussed below, the Court should exercise its authority under the Administrative Procedure Act ("APA") to set aside EPA's arbitrary, illegal, and unconstitutional actions. To remedy the EPA's unlawful actions and infringement of the Plaintiff Organizations' constitutional rights, the Court should further grant preliminary and permanent injunctive relief directing EPA to immediately reinstate the terminated initial grants and prohibiting the Agency from terminating or suspending any of the Plaintiff Organizations' Thriving Communities grants or freezing any grant funding.

## JURISDICTION AND VENUE

13. Plaintiffs bring this action under the United States Constitution, the Administrative Procedure Act, 5 U.S.C. § 551 *et seq.*, and the Declaratory Judgment Act, 28 U.S.C. § 2201 *et seq.*

14. This Court has subject matter jurisdiction under 28 U.S.C. § 1331 (federal question jurisdiction) and 28 U.S.C. § 1346 (action asserted against United States).

15. Venue is proper in this judicial district under 28 U.S.C. § 1391(e)(1), because a substantial part of the events or omissions giving rise to the claims asserted in this action occurred in the district, and because Plaintiff GHHI resides in the district.

**PARTIES**

16. Plaintiff Green & Healthy Homes Initiative, Inc., formerly the Coalition to End Childhood Lead Poisoning, is a 501(c)(3) non-profit organization based in Baltimore, Maryland. GHHI seeks to protect public health and advance housing stability in economically challenged communities. GHHI is one of the largest healthy housing organizations in the United States. Our work has long focused on addressing the housing-based causes of lead poisoning, asthma, household injury, and energy inefficiency by creating affordable homes that are healthy, safe, and resilient. We provide services directly to families and communities. We also provide advisory services to other organizations focused on the creation of effective and efficient systems to improve public health and economic outcomes.

17. Plaintiff Minneapolis Foundation is a Minnesota nonprofit corporation that is tax-exempt as a public charity described in Section 501(c)(3) of the Internal Revenue Code. It is organized and operated exclusively for charitable and other tax-exempt purposes. The Minneapolis Foundation was established in 1915 and has over a century of experience responding to community needs and administering charitable grantmaking programs. In furtherance of its charitable purposes, the Minneapolis Foundation partners with and provides technical assistance to small nonprofit organizations. The Minneapolis Foundation also facilitates grantmaking by soliciting and accepting funding from private donors and government entities, and administers grant funding to address emerging and ongoing community needs.

18. Plaintiff Philanthropy Northwest is a regional philanthropic network comprising 150 funders across Alaska, Idaho, Montana, Oregon, Washington, and Wyoming with a mission

to "grow philanthropy's capacity to do transformative work toward redistributing resources and power to underinvested communities in the Northwest and beyond." Philanthropy Northwest is a non-partisan organization, and its network includes private, public, and community foundations; corporate philanthropy; and nonprofit and public sector funders supporting urban, rural, and tribal communities. Founded in 1976, Philanthropy Northwest seeks to facilitate philanthropic and cross-sector collaboration to serve and strengthen the region's communities. To effectuate its mission, Philanthropy Northwest manages and distributes pooled philanthropic and/or public resources to organizations serving underinvested communities.

19. Defendant U.S. Environmental Protection Agency is a federal Executive Branch Agency headquartered in Washington D.C.

20. Defendant Lee Zeldin is sued in his official capacity as the Administrator of the U.S. Environmental Protection Agency.

## FACTUAL BACKGROUND

### A. Pursuant to Congressional Direction in the Clean Air Act, EPA Establishes the Thriving Communities Grantmaking Program and Designates the Plaintiff Organizations as Regional Grantmakers.

21. In the Inflation Reduction Act of 2022, Congress amended Part A of the Clean Air Act and appropriated $3 billion to EPA for "climate and environmental justice block grants." 42 U.S.C. § 7438. Congress further mandated that the Administrator of the EPA "shall use" the appropriated amounts "to award grants for periods of up to 3 years" to carry out certain environmental protection activities "that benefit disadvantaged communities." *Id.* § 7438(a)&(b)(1). The activities eligible for support include "community-led air and other pollution monitoring, prevention, and remediation," "investments in low- and zero-emission and resilient technologies and related infrastructure," and "mitigating climate and health risks from urban heat islands, extreme heat, wood heater emissions, and wildfire events." *Id.* § 7438(b)(2).

22. In 2023, EPA established the Thriving Communities Grantmaking Program, which seeks to facilitate the flow of the climate and environmental justice funds appropriated in the Inflation Reduction Act to small non-profit organizations and local and tribal governments, in part by designating a Regional Grantmaker in each of EPA's ten regions. Regional Grantmakers are responsible for awarding grants to subgrantees to support community-based environmental protection projects to be undertaken over periods of one to two years. As EPA explained when it launched the Thriving Communities Program, projects eligible for support include community cleanup projects and environmental job training, as well as projects that monitor or address, for example, linkages between air quality and asthma, effluent discharges from industrial facilities, community food access, stormwater issues and green infrastructure, lead and asbestos contamination, pesticides and other toxic substances, illegal dumping activities, or emergency preparedness and disaster resiliency.

23. In response to a request for applications, GHHI, the Minneapolis Foundation, and Philanthropy Northwest applied to serve as Regional Grantmakers in their respective regions. In December 2023, EPA designated the three organizations as Regional Grantmakers—GHHI for EPA Region 3, which encompasses Delaware, Maryland, Pennsylvania, Virginia, West Virginia, and Washington, D.C., as well as seven federally recognized tribes; Minneapolis Foundation for EPA Region 5, which encompasses Illinois, Indiana, Michigan, Minnesota, Ohio, and Wisconsin, as well as 37 federally recognized tribes; and Philanthropy Northwest for EPA Region 10, which encompasses Alaska, Idaho, Oregon, and Washington, along with 271 federally recognized tribes and tribal villages.

24. In May and June of 2024, EPA awarded each organization an $8 million Thriving Communities "initial grant." EPA designated these initial funds to support the hiring of Thriving

Communities staff, outreach to community-based organizations concerning the Thriving Communities program, the development and administration of a subgrant application process in each region, as well as to provide technical assistance and initial oversight to subgrantees. These grants were to cover work performed by the Plaintiff Organizations for a three-year period.

25. Later, EPA awarded each Plaintiff Organization a Thriving Communities "subsequent grant" in the amount of $52 million. In their role as Regional Grantmakers, the organizations, after administering regional subgrantee application processes, are to use the bulk of the $52 million subsequent grant to award subgrants to support projects undertaken by non-profit organizations and local and tribal governments selected through those application processes.

26. Each of the Thriving Communities grants awarded to the three Plaintiff Organizations is governed by a Cooperative Agreement, and each Cooperative Agreement references General Terms and Conditions and specific regulatory requirements that govern the grants. With respect to the Plaintiff Organizations' $8 million initial grant awards, the applicable General Terms and Conditions allow for unilateral termination of the grants by EPA, but only under two sets of circumstances: first, "[i]f a recipient fails to comply with the terms and conditions of the award including statutory or regulatory requirements"; and second—the provision that EPA has invoked here—"[i]f the award no longer effectuates the program goals or Agency priorities."

27. Importantly, EPA's General Terms and Conditions identify three circumstances when the Agency may terminate an award because it "no longer effectuates the program goals or Agency priorities." These are circumstances when:

i. EPA *obtains evidence* that was not considered in making the award that reveals that specific award objective(s) are *ineffective at achieving program*

*goals* and EPA *determines* that it is in the government's interest to terminate the award;

ii. EPA *obtains evidence* that was not considered in making the award that causes EPA to significantly question the *feasibility of the intended objective(s) of the award* and EPA *determines* that it is in the government's interest to terminate the award;

iii. EPA *determines* that the objectives of the award are no longer consistent with *funding priorities for achieving program goals*.

(Emphasis added.)

28. Thus, under the General Terms and Conditions applicable to the Plaintiff Organizations' initial grant awards, in each circumstance when EPA invokes "program goals or Agency priorities" as the basis for unilateral termination of a grant award, it must "obtain evidence that was not considered in making the award" and/or make a "determin[ation]" supporting its action. Moreover, the General Terms and Conditions nowhere permit EPA simply to declare its adoption of *new* "program goals" or "Agency priorities," least of all goals and priorities that are both unconstitutionally vague and in violation of law, and then unilaterally terminate a grant on that basis. Any discretion reserved by EPA, in its Cooperative Agreements with the Plaintiff Organizations, was limited only to determining that an award no longer effectuates the "program goals" or "Agency priorities" under which EPA awarded the grant in the first place.

29. As further discussed below, the U.S. Office of Management and Budget ("OMB") has promulgated regulations governing federal grant awards, including grant termination by Executive Branch agencies, and EPA acknowledges that it is bound by these regulations. Under the OMB federal award regulations, a federal agency terminating a grant "must provide written notice of termination to the recipient," and this notice must include "the reasons for termination." 2 C.F.R. § 200.341(a). Like EPA's General Terms and Conditions, OMB's regulations anticipate that an Agency may terminate a grant, "to the extent authorized by law, if the award no longer

effectuates the program goals or Agency priorities." *Id.* § 200.340(a)(4). However, the regulations further provide that all grounds for termination must be "*clearly and unambiguously specif[ied]* . . . in the terms and conditions of the Federal award." *Id.* § 200.340(b)(1) (emphasis added).

**B. The Plaintiff Organizations, in Their Roles as Thriving Communities Regional Grantmakers, Begin to Identify and Support Community-Based Environmental Protection Programs in Their Respective Regions.**

30. In reliance on their status as Regional Grantmakers and the terms of the initial grants, GHHI, the Minneapolis Foundation, and Philanthropy Northwest undertook substantial work to develop, and had planned additional work to implement, the Thriving Communities program in their respective regions. Plaintiffs hired new staff, built capacity, developed partnerships, and, in recent months, have reached out to hundreds of groups across their respective regions to offer support for community-based environmental protection work.

31. Because the Thriving Communities program is new (as a result of the 2022 amendments to the Clean Air Act contained in the Inflation Reduction Act), each Plaintiff recruited, hired, and trained multiple new employees to develop and administer the program.

32. GHHI hired nine employees to work full-time under the Thriving Communities program for the three-year period, and it has eight additional staff members who spend at least a portion of their time supporting the program.

33. The Minneapolis Foundation has employed 26 full-or-part-time employee positions allocated to its work under the Thriving Communities program.

34. Philanthropy Northwest has seven staff fully funded by the initial $8 million grant as well as eight staff members who partially contribute their time to the administration of the Thriving Communities program.

35. Plaintiffs have spent considerable time developing infrastructure for the Thriving Communities program in their regions. They conducted outreach, designed the application process, and began reviewing submissions from subgrantees.

36. For instance, Philanthropy Northwest invested a cumulative total of over 8,800 staff hours working on the program in calendar year 2024.

37. Throughout the development phase of the program, Plaintiffs had regular and extensive communications with EPA officials in their respective regions regarding their work under the Thriving Communities program. Plaintiffs worked directly and iteratively with the EPA and received its approval on various components of their grantmaking programs, including public communications, emergency information collection review forms, contracts with partner organizations, conflict-of-interest checks with regional advisory committee members, and quality assurance reviews.

38. Plaintiffs also had substantial work planned over the remainder of their three-year project periods. This planned work includes evaluating applications and awarding subgrants, providing ongoing support to subgrantees as they implement their projects, and ensuring their subgrantees' compliance with reporting and subgrant requirements.

39. In developing their programs, Plaintiffs invested significant time building relationships with community leaders, partner organizations, and prospective subgrantees.

40. Each Plaintiff recruited individuals to join advisory boards to support the Thriving Communities program. For example, The Minneapolis Foundation recruited local community leaders to join its Regional Advisory Committee to conduct outreach to prospective applicants and provide effective technical assistance support to applicants and subgrantees, as well as to assist with finalizing the grant application process, decision-making criteria, and reporting

requirements for grantees. Likewise, Philanthropy Northwest enlisted the support of philanthropic leaders throughout Region 10 to advise on the overall design of the grant making process.

41. As part of the Thriving Communities program, Plaintiffs also built relationships with technical assistance partners in their regions to lend their expertise to subgrantees.

42. GHHI, for example, developed a partnership with Children's National Hospital, which had agreed to serve as technical assistance advisor to subgrantees addressing asthma-related health hazards for children.

43. The Minneapolis Foundation developed a Collaborative for the Great Lakes Thriving Communities Grantmaking Program to streamline application and reporting procedures to more efficiently manage the grantmaking process. Similarly, Philanthropy Northwest formed a Taskforce of community leaders to provide counsel on the grant application to minimize applicant burden.

44. Plaintiffs also spent substantial time educating local communities and organizations in their regions about the Thriving Communities program. To do so, staff members from the Plaintiff Organizations traveled throughout their respective regions, including to meet with local community leaders and conduct outreach sessions detailing the Thriving Communities program.

45. For instance, Philanthropy Northwest conducted 15 presentations at conferences or meetings to general audiences across its region; nine presentations to tribal audiences; nearly 250 one-on-one meetings with prospective or current applicants; and sent 700 postcards across Alaska and Idaho for increased visibility in those states.

46. Each Plaintiff has spent significant time soliciting and reviewing applications by prospective subgrantees. Plaintiffs received hundreds of applications from non-profit organizations and local and tribal governments seeking to monitor or address environmental hazards in their local communities. Plaintiffs have continued to receive applications following EPA's termination of their initial grants, though their capacity to review and evaluate those applications has been impaired by Defendants' actions.

47. Prior to the termination of the initial grant and suspension of subsequent grant funding, GHHI had started awarding subgrants under the Thriving Communities program.

48. As of February 20, 2025, GHHI had awarded subgrants to 63 organizations, consisting of 12 subgrantees in Maryland, 17 in Pennsylvania, 6 in the District of Columbia, 13 in Virginia, 13 in West Virginia, and 2 in Delaware. On or about February 21, 2025, GHHI sent award letters to the 63 subgrantees. These letters notified the subgrantees that they had been selected to receive a grant, the amount of the grant, and the next steps in the process.

49. As of April 1, 2025, the Minneapolis Foundation had received more than 515 applications from prospective subgrantees and had identified over 40 subgrantees ready to receive federal funding as soon as access is made available to the subsequent grant.

50. Similarly, Philanthropy Northwest has reviewed applications and identified 42 subgrantees whose subawards are pending.

### C. Based on Vague and Unsubstantiated of Reasons, EPA Terminates the Plaintiff Organizations' Thriving Communities Initial Grants and Suspends Access to Subsequent Grant Funding, While Declaring it an "Agency Priority" Not to Fund "Organizations that Promote 'DEI' Initiatives or 'Environmental Justice' Initiatives."

51. On February 21 and 22, 2025, EPA terminated the $8 million Thriving Communities initial grants that it had previously awarded to each of the Plaintiff Organizations. EPA effectuated these actions by issuing a termination memorandum to each organization.

Although the memoranda sent to GHHI, the Minneapolis Foundation, and Philanthropy Northwest were purportedly authored by different "EPA Award Officials" assigned to different EPA regional offices, the text of each memorandum is identical or nearly identical to the others. Each memorandum was accompanied by an Assistance Amendment to the prior Cooperative Agreement governing the organization's Thriving Communities initial grant award.

52. The termination memorandum sent to each organization cites the grant regulations at 2 C.F.R. § 200.340 and states that the organization's Thriving Communities initial grant "is terminated in its entirety effective immediately on the grounds that the award no longer effectuates the program goals or Agency priorities." Each memorandum then explains as follows:

> It is a priority of the EPA to eliminate discrimination in all programs . . . . The EPA Administrator has determined that, per the Agency's obligations to the constitutional and statutory law of the United States, this priority includes ensuring that the Agency's grants do not support programs or organizations that promote or take part in diversity, equity, and inclusion ("DEI") initiatives, "environmental justice" initiatives, and conflict with the Agency's policy of prioritizing merit, fairness, and excellence in performing our statutory functions. . . .
>
> The grant specified above provides funding for programs that promote or take part in DEI initiatives or environmental justice initiatives or other initiatives that conflict with the Agency's policy of prioritizing merit, fairness, and excellence in performing our statutory functions; that are not free from fraud, abuse, waste, or duplication; or that otherwise fail to serve the best interests of the United States. The grant is therefore inconsistent with, and no longer effectuates, Agency priorities.

53. The termination memorandum provides no further explanation for the Agency's action. EPA does not give, and has not subsequently given, any content whatsoever to its newly declared "Agency priority" not to fund "environmental justice" and to withhold financial support from "organizations that promote or take part in . . . 'DEI' or 'environmental justice' initiatives." EPA has not explained how it reconciles its "Agency priority" to defund "environmental justice" with the congressional directive in the Clean Air Act that it "shall use" the appropriated funds at issue to award "environmental and climate justice block grants." 42 U.S.C. § 7438. EPA has not

identified any offending "DEI" or "environmental justice" "initiatives" that it believes the Plaintiff Organizations have "promote[d]," or in which it believes the organizations have "take[n] part." EPA has not pointed to any evidence on which a finding of "promoting or taking part in" disfavored "initiatives" could be based. Moreover, EPA has not identified the "constitutional and statutory law of the United States" that it claims forms the basis for its newly declared "Agency priority." The Agency has not even defined the terms "DEI" or "environmental justice."

54. Meanwhile, EPA's references in its termination memoranda to "fraud, waste, abuse or duplication" and "the best interests of the United States" are wholly conclusory and without basis. The Agency says nothing at all to substantiate or explain either of these grounds for terminating the Plaintiff Organizations' initial grant awards.

55. Around the same time that EPA terminated the Plaintiff Organizations' Thriving Communities $8 million initial grants, the Agency also suspended the organizations' access to the $52 million in subsequent grant funds, from which the organizations are to award subgrants to local and tribal government agencies and non-profit organizations to support environmental protection projects in communities throughout their respective regions.

**D. EPA's actions will cause irreparable harm to the Plaintiff Organizations and will jeopardize environmental programs in disadvantaged communities across the country.**

56. GHHI, the Minneapolis Foundation, and Philanthropy Northwest have been, and will continue to be, irreparably harmed by the termination of their grant awards and suspension of access to grant funding.

57. Most imminently, the Plaintiff Organizations will be forced to lay off staff they can no longer pay due to the termination of their initial grants. Plaintiffs have already curtailed their work under the Thriving Communities program and likely will be forced to abandon the

program altogether. Given their inability to fulfill their obligations to partner organizations and subgrantees, Plaintiffs will also suffer serious and irreversible reputational harm.

58. For GHHI, the terminated $8 million grant covered the salaries for staff members working on the Thriving Communities program. If funding is not restored, GHHI will be forced to lay off between 8 and 10 staff members.

59. For the Minneapolis Foundation, the termination of the initial $8 million grant combined with the lack of access to the subsequent grant will result in the loss of 26 full- or part-time positions allocated to the Thriving Communities program across the Minneapolis Foundation and its Collaborative implementing partners. These staff and independent contractors are located across EPA Region 5 and perform a variety of roles supporting the grant program, including on its advisory and review committees, communications teams, compliance functions, evaluations, finance and grants administration, information technology, outreach services, program management and oversight, and technical assistance for subrecipients.

60. For Philanthropy Northwest, the termination of the initial grant and lack of access to the subsequent grant funds will result in the loss of jobs for the seven staff fully funded by the initial grant and likely for additional staff members in the organization.

61. Losing so many staff members will also adversely impact Plaintiffs' ability to carry out their organizational missions and will cause irreparable reputational damage, making it more difficult for them to hire staff in the future. These employees work in essential positions fully funded by the initial grant and have spent months gaining familiarity with the program and EPA requirements, while also building trust with subrecipient applicants and program partners. Losing numerous staff members at once due to the grant termination and suspension of funding

would make it more difficult for the Plaintiff Organizations to recruit and retain employees in the future.

62. In reliance on the promised funding, the Plaintiff Organizations had already engaged in and planned significant work for the remainder of their grant terms. Plaintiffs lack alternate sources of funding to replace the terminated and suspended grant funding. The $8 million initial grants comprise a significant portion of the Plaintiff Organizations' annual budgets, and Plaintiffs are unable to fundraise the same amounts to pay staff and continue their critical work. Plaintiffs do not have alternative grant sources that can be quickly reallocated or deployed to cover the gap, making it impossible to fully absorb the financial impact within the current fiscal period.

63. Plaintiffs have already limited their work under the Thriving Communities program and will have to cease all operations under the program, including their issuance and administration of subgrants, as a result of EPA's termination and suspension of grant funding. The Thriving Communities program is a key initiative for all three Plaintiff Organizations. The sudden and arbitrary nature in which grant funding has been withheld—in the middle of the grant cycles—has upended more than a year of work and disrupted future work.

64. For instance, the termination of essential positions fully funded by the initial grant at the Minneapolis Foundation would make it impossible for the Program to continue as originally designed. As a result of the termination, the Minneapolis Foundation has been forced to halt any new contracts and travel associated with the technical assistance support it provides to applicants, impeding many eligible grant subrecipients in their efforts to successfully apply for or manage any federal funding received under the Thriving Communities program. The loss of this

support would significantly hamper the Minneapolis Foundation's ability to review and process applications from prospective subrecipients.

65. GHHI also directed its technical assistance partners to stop all work in connection with the Thriving Communities program. The loss of this work will have far-reaching consequences. For example, one of GHHI's technical assistance partners, the Children's National Hospital, will be unable to assist subgrantees that are seeking to reduce asthma-related health hazards for children.

66. Likewise, without access to the terminated funding, Philanthropy Northwest will be unable to complete the rigorous award preparation phase. This phase includes kickoff meetings to establish the subgrantee and grantmaker relationship, subgrantee capacity assessment and review of grant and compliance guidelines, financial management and subaward orientation trainings, review and refinement of project workplans and budgets, and establishment of payment and reporting schedules. This process requires hours of work from both the subgrantees and Philanthropy Northwest, all before the subgrant agreements are signed.

67. In addition to the work they have already stopped, the Plaintiff Organizations will be unable to complete the work they had planned for the remainder of the three-year grant period. Because of EPA's termination and suspension of Thriving Communities grant funding, Plaintiffs will be unable to properly vet, award, administer, and monitor the additional $144 million in grantmaking ($48 million from each of the three $52 million grants) to their subgrantees. In short, Plaintiffs will be unable to effectively implement the Thriving Communities program.

68. For example, although the subsequent $52 million grant includes resources available for unhired positions, the termination of the initial grant and continued suspension of

access to the subsequent grant has restricted the Minneapolis Foundation from recruiting and hiring new staff members. Without the ability to hire additional staff members, the Minneapolis Foundation will not have the capacity to review, process, and manage the large number of subgrants that the Thriving Communities Program is intended to support. Taken together, the termination of the initial grant and the lack of access to the subsequent grant account will make it impossible for the Minneapolis Foundation to expend all of the subsequent grant dollars within the allotted grant period over the next two years.

69. Without adequate staffing or funding, the Plaintiff Organizations will not be able to meet their commitments to partner organizations and subgrantees, eroding trust in Plaintiffs and damaging their reputations. Not only will these organizations and subgrantees lose confidence in Plaintiffs' ability to administer the program, but performance by the partner organizations and subgrantees will suffer as a result of the grant terminations and suspension of funding.

70. The reputations that the Plaintiff Organizations have painstakingly built have been and will continue to be damaged by Defendants' actions. If Plaintiffs are wrongly perceived to have engaged in any of the conduct described in the termination memorandum, federal, state, local, philanthropic and private organizations will be hesitant to associate with or support Plaintiffs.

71. For example, the Minneapolis Foundation's fundholder assets account for approximately 75% of its current assets. Any grant termination would make it more difficult to secure future contributions from donors, given the specter of uncertainty raised by such a substantial loss in funding and questions that may arise from the perception that the Minneapolis Foundation could not successfully perform against its grants.

72. The harms caused by Defendants' actions will reverberate throughout the regions the Plaintiff Organizations serve. Due to EPA's termination of the grants and suspension of access to grant funding, Plaintiffs' subgrantees will lose critical funding and support for their planned projects, which will create budget and staffing chaos in those organizations. Many subgrantees have paused hiring program staff or implementation of their planned projects because they lack confidence in Plaintiffs' ability to deliver promised funding.

73. Dozens of subgrantees, who have planned projects including the remediation of lead and asbestos poisoning and the reduction of childhood asthma, will be compromised in their efforts to remedy hazards that negatively impact the health and safety of their communities. Examples from each of Plaintiffs' subgrantees underscore the immediate and irreparable harm caused by the grant terminations.

74. GHHI awarded $280,000 to a nonprofit community development organization in West Virginia. In recent years, storm events in Fort Gay, West Virginia, have caused sewage to overflow into the public drinking water system and local bodies of water. The non-profit had planned to use the subgrant awarded by GHHI to prevent future overflows and contamination of local water sources.

75. GHHI had planned to award approximately $350,000 to a city development authority for a project to remediate lead contamination in a local park on the bank of the Ohio river. Recent testing has confirmed dangerously high levels of lead contamination in the soil of the park campgrounds. Such contamination has been documented to harm the brain and cognitive ability, damage bones and kidneys, and increase cancer risk.

76. The Minneapolis Foundation had planned to award approximately $350,000 to support wastewater treatment processes in two small rural Appalachian communities in Ohio,

each with populations of less than 500. Specifically, the grants are designed to support the use of fixed-film wastewater treatment processes that eliminate the use of blowers common in many treatment processes, aiding the communities in leveraging the same land footprint for wastewater treatment as will be used for energy production itself. The modest energy demand for the pumps can be efficiently served by grid-tied solar panels, meaning the project also involves an environmental job training component by way of a solar installer course.

77. The Minneapolis Foundation had also planned to award approximately $350,000 to a rural, federally recognized tribe to clean up an unregulated dump site in Michigan posing public health concerns due to downgradient drinking-water wells and exposure to contaminated materials. Site assessments show a perched, contaminated aquifer within the dump that could be breached as the dump site erodes further. The subgrant funding is intended to provide access to heavy equipment to begin the removal of exposed hazardous materials constituting an immediate public health threat, allowing the tribe to clean up the dump site and ultimately gain approval for future housing developments in the area.

78. Philanthropy Northwest already selected 42 applications for funding at a cumulative $14.5 million. These selectees include 12 from Alaska, two from Idaho, 12 from Oregon, and 16 from Washington, including eight federally recognized tribes or Alaska Native villages. These entities are spread across remote, rural, and urban areas of each state—from the Seward Peninsula in Alaska to Southwest Idaho to the Oregon Coast to Eastern Washington, and major cities in between. Forty percent of the projects serve rural or remote areas, and projects are well distributed within the four states. These projects were designed to support efforts such as: addressing food security challenges in a remote community by promoting revitalization of Indigenous food systems of harvesting and preservation (Alaska); reducing the risk of severe

wildfires through programs that promote community involvement and preparedness (Idaho); implementing clean energy retrofits to lower household energy costs and protect indoor air quality for low-income households (Oregon); and supporting a tribe's regional emergency management in a remote, highly visited area vulnerable to flooding, severe weather, and earthquakes (Washington).

## CLAIMS FOR RELIEF

### Count I – Administrative Procedure Act
### Arbitrary and Capricious Agency Action –
### Failure to Supply Reasons and Engage in Reasoned Decisionmaking

79. Each foregoing paragraph is incorporated as if restated fully herein.

80. Under the APA, any person adversely affected or aggrieved by final agency action is entitled to judicial review of that action. 5 U.S.C. §§ 702, 704. The APA provides that a reviewing court shall "hold unlawful and set aside Agency action . . . found to be . . . arbitrary and capricious." *Id.* § 706(2)(A).

81. EPA's termination of its Thriving Communities initial grant awards to the Plaintiff Organizations is final "Agency action" for purposes of the APA. *See id.* § 551(6), (13). EPA's suspension of the organizations' access to Thriving Communities grant funds is also final agency action. *See, e.g.*, *Chamblee v. Espy*, 100 F. 3d 15 (4th Cir. 1996).

82. Through its requirement that "arbitrary and capricious" agency action be set aside on judicial review, the APA establishes a fundamental requirement that agencies engage in "reasoned decisionmaking." *See, e.g.*, *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 16 (2020); *see also* 5 U.S.C. § 555(e) (requiring that agencies provide "statement of the grounds" even for informal agency action).

83. In terminating the Plaintiff Organizations' Thriving Communities initial grants and suspending the organizations' access to all Thriving Communities' grant funds, EPA did not

supply a valid statement of reasons for taking these actions. Nor did it engage in reasoned decisionmaking.

84. EPA identified three vague and baseless grounds for its actions: (1) because the grant awards are purportedly inconsistent with EPA's newly-adopted "Agency priority" to withdraw financial support from "organizations that promote or take part in … 'DEI' [or] 'environmental justice' initiatives"; (2) because the organizations' grant-funded programs are purportedly not be "free from fraud, abuse, waste, or duplication"; or (3) because the organizations' programs allegedly "otherwise fail to serve the best interests of the United States." EPA's stated reasons for termination of the grants are so varied and ambiguous that the statement is meaningless. The Agency gave no legitimate reason for its actions.

85. EPA provided no rationale for its actions beyond this vague and unsubstantiated statement. The Agency did not identify any evidence, find any facts, or supply any reasoning that would support any of its three stated reasons for terminating the grants. With respect to EPA's newly adopted "Agency priority" to withhold financial support from "organizations that promote or take part in … 'DEI' [or] 'environmental justice' initiatives," EPA has not identified any offending "initiatives" that it believes the Plaintiff Organizations have "promote[d]," or in which it believes the organizations have "take[n] part." EPA has not pointed to any evidence on which a finding of "promoting or taking part in" disfavored "initiatives" could be based. EPA has not identified the "constitutional and statutory law of the United States" that it claims forms the basis for its newly declared "Agency priority." The Agency has not even defined the terms "DEI" or "environmental justice."

86. Meanwhile, EPA's invocations of "fraud, waste, abuse or duplication" and "the best interests of the United States" are pure boilerplate. The Agency does not supply even a hint of anything that it might be referencing.

87. Simply put, EPA's actions here, in addition to being unlawful and unconstitutional, are a paradigm of arbitrary and capricious Agency action constituting an improper abuse of discretion as those terms are used in the APA.

88. As a result of EPA's arbitrary and capricious actions and the abuse of its discretion, Plaintiff Organizations have suffered and will continue to suffer irreparable injury.

89. The Plaintiff Organizations are entitled to preliminary and permanent relief under the APA, *see* 5 U.S.C. §§ 705, 706, including an order holding unlawful and setting aside EPA's termination of the organizations' Thriving Communities initial grant awards and suspension of the organizations' access to Thriving Communities grant funds.

**Count II – Administrative Procedure Act**
**Agency Action in Excess of Statutory Authority – Clean Air Act**

90. Each foregoing paragraph is incorporated as if restated fully herein.

91. Under the APA, any person adversely affected or aggrieved by final agency action is entitled to judicial review of that action. 5 U.S.C. §§ 702, 704. The APA provides that a reviewing court shall "hold unlawful and set aside agency action . . . found to be . . . in excess of statutory . . . authority." *Id*. § 706(2)(C).

92. EPA's termination of the Thriving Communities initial grants awarded to the Plaintiff Organizations is final "agency action" for purposes of the APA. *See id*. § 551(6), (13). EPA's suspension of the organizations' access to Thriving Communities grant funds is also final agency action. *See, e.g.*, *Chamblee v. Espy*, 100 F. 3d 15 (4th Cir. 1996).

93. In the Inflation Reduction Act amendments to the Clean Air Act, Congress appropriated $3 billion to EPA for "climate and environmental justice block grants." 42 U.S.C. § 7438. The Clean Air Act further directs that the Agency's Administrator "shall use" those amounts "to award grants . . . to carry out activities . . . that benefit disadvantaged communities" by, among other things, monitoring, preventing and remediating pollution and mitigating climate risk. *Id*. § 7438(a) & (b)(1).

94. In terminating the Thriving Communities initial grants that it had previously awarded to the Plaintiff Organizations, EPA stated in each case that its "Agency priorities" no longer include "funding . . . 'environmental justice' initiatives."

95. EPA and Administrator Zeldin had no statutory authority to terminate the grants or suspend access to grant funding on this basis. In the Clean Air Act, Congress did not confer any discretion on the Agency to determine that its own "priorities" no longer match those of Congress and on that basis to decline to fund environmental protection activities that benefit disadvantaged communities. To the contrary, the Clean Air Act unambiguously provides that the EPA and Administrator Zeldin "shall use" appropriated amounts to fund "environmental justice" initiatives. The Agency and its Administrator, in declaring it an "Agency priority" not to fund such initiatives, have acted in defiance of that congressional direction.

96. As a result of the unlawful actions of the EPA and Administrator Zeldin, the Plaintiff Organizations have suffered and will continue to suffer irreparable injury.

97. The Plaintiff Organizations are entitled to preliminary and permanent relief under the APA, *see* 5 U.S.C. §§ 705, 706, including an order holding unlawful and setting aside EPA's termination of the organizations' Thriving Communities initial grant awards and suspension of the organizations' access to grant funds. Under the Declaratory Judgment Act, the organizations

are entitled to a declaration that the Clean Air Act's direction to the EPA to fund "environmental justice" grants precludes the EPA from terminating grants or suspending grant funding because the Agency has adopted a "priority" not to fund such grants. The Plaintiff Organizations are further entitled to an injunction directing EPA and Administrator Zeldin to reinstate the grant awards and prohibiting Defendants from terminating or suspending any of the Plaintiffs' Thriving Communities grants or freezing funding under any of the grants. 28 U.S.C. §§ 2201, 2202.

**Count III – United States Constitution**
**Violation of First and Fifth Amendments**

98. Each foregoing paragraph is incorporated as if restated fully herein.

99. The First Amendment to the United States Constitution prohibits the government from "abridging the freedom of speech . . . or the right of the people . . . to petition the Government for a redress of grievance." It is a "core postulate" of the First Amendment that "[t]he government may not discriminate against speech based on the ideas or opinions it conveys." *Iancu v. Brunetti*, 588 U.S. 388, 393 (2019). Indeed, "[v]iewpoint discrimination is poison to a free society." *Id*. at 399 (Alito, J., concurring).

100. In terminating the Thriving Communities initial grants that it had previously awarded to the Plaintiff Organizations, EPA declared it an "Agency priority" to ensure "that the Agency's grants do not support . . . organizations that promote or take part in diversity, equity, and inclusion ('DEI') initiatives [or] 'environmental justice' initiatives." In so stating, EPA has acknowledged engaging in viewpoint discrimination.

101. The First Amendment prohibits EPA and Administrator Zeldin from terminating grants or suspending grant funding based on their perception that the Plaintiff Organizations "promote" or "take part in" viewpoints with regard to "environmental justice" that the

government now disfavors. Moreover, the First Amendment protects the Plaintiff Organizations' advocacy for and on behalf of disadvantaged communities.

102. The Fifth Amendment prohibits "depriv[ations] of life, liberty, or property without due process of law."

103. In terminating the Plaintiff Organizations' initial grant award and suspending their access to subsequent grant funds without any legitimate reason, EPA and Administrator Zeldin have violated Plaintiffs' due process rights.

104. As a result of the unconstitutional actions of the EPA and Administrator Zeldin, the Plaintiff Organizations have suffered and will continue to suffer irreparable injury.

105. Under the Declaratory Judgment Act, the Plaintiff Organizations are entitled to a declaration that EPA's actions infringe the organizations' constitutional rights and are therefore unlawful. The Plaintiff Organizations are further entitled to an injunction directing EPA and Administrator Zeldin to reinstate the grant awards and prohibiting Defendants from terminating or suspending any of the organizations' Thriving Communities grants or freezing funding under any of the grants. 28 U.S.C. §§ 2201, 2202.

**Count IV – Administrative Procedure Act**
**Agency Action Contrary to Constitutional Right**

106. Each foregoing paragraph is incorporated as if restated fully herein.

107. Under the APA, any person adversely affected or aggrieved by final agency action is entitled to judicial review of that action. 5 U.S.C. §§ 702, 704. The APA provides that a reviewing court shall "hold unlawful and set aside agency action . . . found to be . . . contrary to constitutional right." *Id.* § 706(2)(B).

108. EPA's termination of the Thriving Communities initial grants awarded to the Plaintiff Organizations is final "agency action" for purposes of the APA. *See id.* § 551(6), (13).

EPA's suspension of the organizations' access to Thriving Communities grant funds is also final agency action. *See, e.g.*, *Chamblee v. Espy*, 100 F. 3d 15 (4th Cir. 1996).

109. In terminating the Plaintiffs' Thriving Communities initial grants, EPA stated that it was doing so to ensure "that the Agency's grants do not support . . . organizations that promote or take part in diversity, equity, and inclusion ('DEI') initiatives [or] 'environmental justice' initiatives." In so stating, EPA has acknowledged engaging in viewpoint discrimination.

110. The agencies' actions are unconstitutional. The First Amendment prohibits EPA and Administrator Zeldin from terminating grants or suspending access to grant funds based on their perception that the Plaintiff Organizations "promote" or "take part in" viewpoints with regard to "environmental justice" that the government disfavors. Moreover, the First Amendment protects the Plaintiff Organizations' advocacy for and on behalf of disadvantaged communities.

111. As a result of the unconstitutional actions of the EPA and Administrator Zeldin, the Plaintiff Organizations have suffered and will continue to suffer irreparable injury.

112. The Plaintiff Organizations are entitled to preliminary and permanent relief under the APA, *see* 5 U.S.C. §§ 705, 706, including an order holding unlawful and setting aside EPA's termination of the organizations' Thriving Communities initial grants and suspension of their access to Thriving Communities grant funds.

**Count V – Administrative Procedure Act**
**Agency Action Not in Accordance with Law or Regulation and Without Observance of Procedure Required by Law — Violations of Federal Award Regulations, *Accardi* Doctrine**

113. Each foregoing paragraph is incorporated as if restated fully herein.

114. Under the APA, any person adversely affected or aggrieved by final agency action is entitled to judicial review of that action. 5 U.S.C. §§ 702, 704. The APA provides that a reviewing court shall "hold unlawful and set aside agency action . . . found to be . . . not in

accordance with law" or "without observance of procedure required by law." *Id.* § 706(2)(A)&(D).

115. EPA's termination of Plaintiffs' Thriving Communities initial grants is final "agency action" for purposes of the APA. *See id.* § 551(6), (13).

116. When the government adopts regulations with the force and effect of law, it must abide by those regulations. *See United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260 (1954). With respect to federal grants, OMB has adopted regulations limiting the circumstances under which a federal agency may terminate a grant award. *See* 2 C.F.R. §§ 200.340, .341. EPA acknowledges that it is bound by these regulations.

117. The federal award regulations provide that an agency terminating a grant "must provide written notice of termination to the recipient," and that such notice must "include the reasons for termination." *Id.* § 200.341(a). In terminating the Plaintiff Organizations' Thriving Communities initial grants, EPA failed to adhere to this regulatory requirement. The Agency failed to provide a meaningful statement of its "reasons for termination." EPA's reasons for terminating the Plaintiffs' initial grants are unconstitutionally vague and unsubstantiated.

118. The applicable regulations permit an agency to terminate a grant award "*pursuant to terms and conditions of the Federal award*, including, to the extent authorized by law, if an award no longer effectuates program goals or Agency priorities." *Id.* § 200.340(a)(4) (emphasis added). However, the agency must "*clearly and unambiguously specify all termination provisions* in the terms and conditions of the Federal award." *Id.* § 200.340(b) (emphasis added).

119. In the case of Plaintiffs' Thriving Communities initial grants, the General Terms and Conditions, which incorporate 2 C.F.R. Part 200, identify three specific circumstances when EPA may terminate an award because it "no longer effectuates program goals or Agency

priorities." In each identified circumstance, the Agency must "obtain[] evidence" and/or make a "determin[ation]" supporting a particular conclusion concerning the award's effectuation of "program goals or Agency priorities." Nowhere do the General Terms and Conditions contemplate, let alone "clearly and unambiguously specify," that the EPA may terminate an award based on its identification of new "Agency priorities or program goals."

120. Here, in terminating the Plaintiffs' Thriving Communities initial grants, EPA in each case purported to invoke its authority under 2 C.F.R. § 200.340(a)(4) to terminate an award that "no longer effectuates . . . Agency priorities." However, EPA did not adhere to that regulation, both because it failed to abide by procedures described in the grant award's "terms and conditions," *id.*, and because it relied on grounds for termination that were not "clearly and unambiguously specif[ied] . . . in the terms and conditions," *id.* § 200.340(b).

121. With regard to procedure, the applicable General Terms and Conditions require EPA to "obtain evidence" or make a "determination" prior to terminating the grants on the basis of "program goals" or "Agency priorities," but here EPA has not identified any evidence or made any determination that supports grant termination. In particular, and even setting aside the unconstitutionality of EPA's adoption of an "Agency priority" to withhold financial support from organizations that "promote or take part in diversity, equity, and inclusion ('DEI') initiatives [or] 'environmental justice' initiatives," EPA has not obtained any evidence, nor has it made any determination, that the Plaintiff Organizations promote or take part in such initiatives. Because EPA failed here to adhere to "the terms and conditions of the federal award," 2 C.F.R. § 200.340(a)(4), its actions were without observance of procedure required by law.

122. With regard to the specification of grounds for termination, the General Terms and Conditions refer exclusively to EPA's unilateral termination of an award based on evidence or a

determination that the award no longer effectuates the "program goals or Agency priorities" under which the grant was awarded in the first place. No reader of the General Terms and Conditions would understand that these "environmental justice" grant awards could be terminated because of the Agency's adoption of a sweeping new "priority" to deny financial support to organizations that advocate for "environmental justice" or for disadvantaged communities or for other disfavored viewpoints on social issues. Indeed, if EPA were correct that it could unilaterally terminate an "environmental justice" grant award merely by declaring it an "Agency priority" *not* to fund "environmental justice" grant awards, then it would have been meaningless to include termination provisions in the terms and conditions for the grant: there would be no limits on EPA's rights to terminate the award. In any event, the applicable terms and conditions do not "clearly and unambiguously specify" the possibility of such unilateral termination, 2 C.F.R. § 200.340(b), and EPA's actions are therefore contrary to law.

123. As a result of the failure of the EPA and Administrator Zeldin to follow the executive branch's own regulations governing the termination of grant awards, Plaintiff Organizations have suffered and will continue to suffer irreparable injury.

124. The Plaintiff Organizations are entitled to preliminary and permanent relief under the APA, *see* 5 U.S.C. §§ 705, 706, including that EPA's termination of the organizations' Thriving Communities initial grant awards be held unlawful and set aside. Under the Declaratory Judgment Act, the organizations are further entitled to a declaration that EPA failed to adhere to federal award regulations in terminating the grants and that its actions are therefore unlawful, as well as an injunction directing EPA and Administrator Zeldin to reinstate the grant awards and prohibiting the Agency from terminating or suspending any of the organizations' Thriving Communities grants or freezing funding under any of the grants. 28 U.S.C. §§ 2201, 2202.

## PRAYER FOR RELIEF

Plaintiffs request that the Court:

A. Pursuant to the Administrative Procedure Act, 5 U.S.C. § 705, postpone the effective date of the EPA's termination of Plaintiffs' Thriving Communities initial grant awards, pending final judicial review;

B. Pursuant to the Administrative Procedure Act, 5 U.S.C. § 706, hold unlawful and set aside, after judicial review, the EPA's termination of the Plaintiffs' Thriving Communities grants and suspension of access to grant funding on the grounds that the Agency's action was arbitrary and capricious, in excess of statutory authority, contrary to constitutional right, not in accordance with law, and without observance of procedure required by law;

C. Pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, declare that the EPA's termination of Plaintiffs' Thriving Communities initial grant awards is unlawful, because the Clean Air Act's direction that the EPA "shall" use appropriated funds for "environmental justice" grants precludes the Agency from declaring it an "Agency priority" not to fund such grants, because the Agency's actions infringe Plaintiffs' rights under the First and Fifth Amendments to the U.S. Constitution, and because the Agency's actions are not in accordance with applicable regulations governing the termination of federal grant awards;

D. Pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2202, grant preliminary and permanent injunctive relief directing EPA and Administrator Zeldin to reinstate Plaintiffs' Thriving Communities initial grant awards and prohibiting the Agency from terminating or suspending any of the organizations' Thriving Communities grants or freezing funding under any of the grants;

E. Award to Plaintiffs their attorneys' fees and costs; and

F. Grant such other relief as the Court deems just and proper.

Dated: April 2, 2025

Respectfully submitted,

Andrew D. Freeman (Bar No. 03867)
Joshua N. Auerbach (Bar No. 26108)
Neel K. Lalchandani (Bar No. 20291)
Brown, Goldstein & Levy, LLP
120 E. Baltimore Street, Suite 2500
Baltimore, MD 21202
Phone: 410-962-1030
Fax: 410-385-0869
adf@browngold.com
jauerbach@browngold.com
nkl@browngold.com

*Attorneys for Plaintiff Green & Healthy Homes Initiative, Inc.*

Jessica C. Abrahams
(*pro hac vice* forthcoming)
Lora Brzezynski (Bar No. 17837)
Faegre Drinker Biddle & Reath LLP
1500 K Street NW, Suite 1100
Washington, DC 20005
Phone: 202-230-5000
Fax: 202-842-8465
jessica.abrahams@faegredrinker.com
lora.brzezynski@faegredrinker.com

*Attorneys for Plaintiff*
*The Minneapolis Foundation*

Jonathan A. DeMella
(*pro hac vice* forthcoming)
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1610
Phone: 206-757-8338
Fax: 206-757-7338
jonathandemella@dwt.com

Charles M. English, Jr. (Bar No. 03621)
Davis Wright Tremaine LLP
1301 K Street NW, Suite 500 East
Washington, DC 20005
Phone: 202-973-4200
chipenglish@dwt.com

*Attorneys for Plaintiff*
*Philanthropy Northwest*

JS 44 (Rev. 04/21)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

**I. (a) PLAINTIFFS**

GREEN & HEALTHY HOMES INITIATIVE, INC., et al.

**(b)** County of Residence of First Listed Plaintiff: Baltimore City, Md.
*(EXCEPT IN U.S. PLAINTIFF CASES)*

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Andrew D. Freeman, Brown Goldstein & Levy, 120 E. Baltimore Street, Suite 2500; 410-962-1030 (see attached for complete list of attorneys)

**DEFENDANTS**

ENVIRONMENTAL PROTECTION AGENCY, et al.

County of Residence of First Listed Defendant: Washington, D.C.
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

Attorneys *(If Known)*

**II. BASIS OF JURISDICTION** *(Place an "X" in One Box Only)*

- ☐ 1 U.S. Government Plaintiff
- ☐ 3 Federal Question *(U.S. Government Not a Party)*
- ☒ 2 U.S. Government Defendant
- ☐ 4 Diversity *(Indicate Citizenship of Parties in Item III)*

**III. CITIZENSHIP OF PRINCIPAL PARTIES** *(Place an "X" in One Box for Plaintiff and One Box for Defendant)* *(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. NATURE OF SUIT** *(Place an "X" in One Box Only)* Click here for: Nature of Suit Code Descriptions.

**CONTRACT**
- ☐ 110 Insurance
- ☐ 120 Marine
- ☐ 130 Miller Act
- ☐ 140 Negotiable Instrument
- ☐ 150 Recovery of Overpayment & Enforcement of Judgment
- ☐ 151 Medicare Act
- ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans)
- ☐ 153 Recovery of Overpayment of Veteran's Benefits
- ☐ 160 Stockholders' Suits
- ☐ 190 Other Contract
- ☐ 195 Contract Product Liability
- ☐ 196 Franchise

**TORTS**

PERSONAL INJURY
- ☐ 310 Airplane
- ☐ 315 Airplane Product Liability
- ☐ 320 Assault, Libel & Slander
- ☐ 330 Federal Employers' Liability
- ☐ 340 Marine
- ☐ 345 Marine Product Liability
- ☐ 350 Motor Vehicle
- ☐ 355 Motor Vehicle Product Liability
- ☐ 360 Other Personal Injury
- ☐ 362 Personal Injury - Medical Malpractice

PERSONAL INJURY
- ☐ 365 Personal Injury - Product Liability
- ☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability
- ☐ 368 Asbestos Personal Injury Product Liability

PERSONAL PROPERTY
- ☐ 370 Other Fraud
- ☐ 371 Truth in Lending
- ☐ 380 Other Personal Property Damage
- ☐ 385 Property Damage Product Liability

**FORFEITURE/PENALTY**
- ☐ 625 Drug Related Seizure of Property 21 USC 881
- ☐ 690 Other

**LABOR**
- ☐ 710 Fair Labor Standards Act
- ☐ 720 Labor/Management Relations
- ☐ 740 Railway Labor Act
- ☐ 751 Family and Medical Leave Act
- ☐ 790 Other Labor Litigation
- ☐ 791 Employee Retirement Income Security Act

**IMMIGRATION**
- ☐ 462 Naturalization Application
- ☐ 465 Other Immigration Actions

**BANKRUPTCY**
- ☐ 422 Appeal 28 USC 158
- ☐ 423 Withdrawal 28 USC 157

**INTELLECTUAL PROPERTY RIGHTS**
- ☐ 820 Copyrights
- ☐ 830 Patent
- ☐ 835 Patent - Abbreviated New Drug Application
- ☐ 840 Trademark
- ☐ 880 Defend Trade Secrets Act of 2016

**SOCIAL SECURITY**
- ☐ 861 HIA (1395ff)
- ☐ 862 Black Lung (923)
- ☐ 863 DIWC/DIWW (405(g))
- ☐ 864 SSID Title XVI
- ☐ 865 RSI (405(g))

**FEDERAL TAX SUITS**
- ☐ 870 Taxes (U.S. Plaintiff or Defendant)
- ☐ 871 IRS—Third Party 26 USC 7609

**OTHER STATUTES**
- ☐ 375 False Claims Act
- ☐ 376 Qui Tam (31 USC 3729(a))
- ☐ 400 State Reapportionment
- ☐ 410 Antitrust
- ☐ 430 Banks and Banking
- ☐ 450 Commerce
- ☐ 460 Deportation
- ☐ 470 Racketeer Influenced and Corrupt Organizations
- ☐ 480 Consumer Credit (15 USC 1681 or 1692)
- ☐ 485 Telephone Consumer Protection Act
- ☐ 490 Cable/Sat TV
- ☐ 850 Securities/Commodities/ Exchange
- ☐ 890 Other Statutory Actions
- ☐ 891 Agricultural Acts
- ☐ 893 Environmental Matters
- ☐ 895 Freedom of Information Act
- ☐ 896 Arbitration
- ☒ 899 Administrative Procedure Act/Review or Appeal of Agency Decision
- ☐ 950 Constitutionality of State Statutes

**REAL PROPERTY**
- ☐ 210 Land Condemnation
- ☐ 220 Foreclosure
- ☐ 230 Rent Lease & Ejectment
- ☐ 240 Torts to Land
- ☐ 245 Tort Product Liability
- ☐ 290 All Other Real Property

**CIVIL RIGHTS**
- ☐ 440 Other Civil Rights
- ☐ 441 Voting
- ☐ 442 Employment
- ☐ 443 Housing/ Accommodations
- ☐ 445 Amer. w/Disabilities - Employment
- ☐ 446 Amer. w/Disabilities - Other
- ☐ 448 Education

**PRISONER PETITIONS**

Habeas Corpus:
- ☐ 463 Alien Detainee
- ☐ 510 Motions to Vacate Sentence
- ☐ 530 General
- ☐ 535 Death Penalty

Other:
- ☐ 540 Mandamus & Other
- ☐ 550 Civil Rights
- ☐ 555 Prison Condition
- ☐ 560 Civil Detainee - Conditions of Confinement

**V. ORIGIN** *(Place an "X" in One Box Only)*

- ☒ 1 Original Proceeding
- ☐ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from Another District *(specify)*
- ☐ 6 Multidistrict Litigation - Transfer
- ☐ 8 Multidistrict Litigation - Direct File

**VI. CAUSE OF ACTION**

Cite the U.S. Civil Statute under which you are filing ***(Do not cite jurisdictional statutes unless diversity)***:
5 U.S.C. § 551 et seq.

Brief description of cause:
Violation of Administrative Procedure Action & United States Constitution

**VII. REQUESTED IN COMPLAINT:** ☐ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.
**DEMAND $**
CHECK YES only if demanded in complaint:
**JURY DEMAND:** ☐ Yes ☒ No

**VIII. RELATED CASE(S) IF ANY** *(See instructions)*:
JUDGE ____ DOCKET NUMBER ____

DATE: Apr 2, 2025
SIGNATURE OF ATTORNEY OF RECORD: /s/ Andrew D. Freeman (Bar No. 03867)

**FOR OFFICE USE ONLY**

RECEIPT # ____ AMOUNT ____ APPLYING IFP ____ JUDGE ____ MAG. JUDGE ____

# PLAINTIFFS' COUNSEL

**1) Attorneys for Plaintiff Green & Healthy Homes Initiative, Inc.**

Andrew D. Freeman (Bar No. 03867)
Joshua N. Auerbach (Bar No. 26108)
Neel K. Lalchandani (Bar No. 20291)
Brown, Goldstein & Levy, LLP
120 E. Baltimore Street, Suite 2500
Baltimore, MD 21202
Phone: 410-962-1030
Fax: 410-385-0869
adf@browngold.com
jauerbach@browngold.com
nkl@browngold.com

**2) Attorneys for Plaintiff The Minneapolis Foundation**

Jessica C. Abrahams (*pro hac vice* forthcoming)
Lora Brzezynski (Bar No. 17837)
Faegre Drinker Biddle & Reath LLP
1500 K Street NW, Suite 1100
Washington, DC 20005
Phone: 202-230-5000
Fax: 202-842-8465
jessica.abrahams@faegredrinker.com
lora.brzezynski@faegredrinker.com

**3) Attorneys for Plaintiff Philanthropy Northwest**

Jonathan A. DeMella (*pro hac vice* forthcoming)
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1610
Phone: 206-757-8338
Fax: 206-757-7338
jonathandemella@dwt.com

Charles M. English, Jr. (Bar No. 03621)
Davis Wright Tremaine LLP
1301 K Street NW, Suite 500 East
Washington, DC 20005
Phone: 202-973-4200
chipenglish@dwt.com

AO 440 (Rev. 06/12) Summons in a Civil Action

# UNITED STATES DISTRICT COURT

for the

District of Maryland

GREEN & HEALTH HOMES INIATIVE, INC., et al.

*Plaintiff(s)*

v.

ENVIRONMENTAL PROTECTION AGENCY, et al.

*Defendant(s)*

Civil Action No.

**SUMMONS IN A CIVIL ACTION**

To: *(Defendant's name and address)* Environmental Protection Agency
1200 Pennsylvania Avenue, N.W.
Washington, D.C. 20460

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure. The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are: Andrew D. Freeman
Brown, Goldstein & Levy, LLP
120 East Baltimore Street, Suite 2500
Baltimore, Maryland 21202

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

*CLERK OF COURT*

Date: 04/02/2025

*Signature of Clerk or Deputy Clerk*

Civil Action No.

## PROOF OF SERVICE

***(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))***

This summons for *(name of individual and title, if any)* ______________________
was received by me on *(date)* ______________ .

❒ I personally served the summons on the individual at *(place)* ______________________
______________________ on *(date)* ______________ ; or

❒ I left the summons at the individual's residence or usual place of abode with *(name)* ______________
______________________ , a person of suitable age and discretion who resides there,
on *(date)* ______________ , and mailed a copy to the individual's last known address; or

❒ I served the summons on *(name of individual)* ______________________ , who is
designated by law to accept service of process on behalf of *(name of organization)* ______________
______________________ on *(date)* ______________ ; or

❒ I returned the summons unexecuted because ______________________ ; or

❒ Other *(specify)*:

My fees are $ __________ for travel and $ __________ for services, for a total of $ 0.00 .

I declare under penalty of perjury that this information is true.

Date: ______________

______________________
*Server's signature*

______________________
*Printed name and title*

______________________
*Server's address*

Additional information regarding attempted service, etc:

AO 440 (Rev. 06/12) Summons in a Civil Action

# UNITED STATES DISTRICT COURT

for the

District of Maryland

| | |
|---|---|
| GREEN & HEALTH HOMES INIATIVE, INC., et al. | |
| *Plaintiff(s)* | |
| v. | Civil Action No. |
| ENVIRONMENTAL PROTECTION AGENCY, et al. | |
| *Defendant(s)* | |

**SUMMONS IN A CIVIL ACTION**

To: *(Defendant's name and address)* Environmental Protection Agency
Kelly O. Hayes
United States Attorney for the District of Maryland
36 S. Charles St., 4th Floor
Baltimore, MD 21201

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure. The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:

Andrew D. Freeman
Brown, Goldstein & Levy, LLP
120 East Baltimore Street, Suite 2500
Baltimore, Maryland 21202

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

*CLERK OF COURT*

Date: 04/02/2025

*Signature of Clerk or Deputy Clerk*

Civil Action No.

**PROOF OF SERVICE**

***(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))***

This summons for *(name of individual and title, if any)* ______________________

was received by me on *(date)* ______________ .

❒ I personally served the summons on the individual at *(place)* ______________________

______________________ on *(date)* ______________ ; or

❒ I left the summons at the individual's residence or usual place of abode with *(name)* ______________

______________________ , a person of suitable age and discretion who resides there,

on *(date)* ______________ , and mailed a copy to the individual's last known address; or

❒ I served the summons on *(name of individual)* ______________________ , who is

designated by law to accept service of process on behalf of *(name of organization)* ______________

______________________ on *(date)* ______________ ; or

❒ I returned the summons unexecuted because ______________________ ; or

❒ Other *(specify)*:

My fees are $ ________ for travel and $ ________ for services, for a total of $ 0.00 .

I declare under penalty of perjury that this information is true.

Date: ______________

______________________
*Server's signature*

______________________
*Printed name and title*

______________________
*Server's address*

Additional information regarding attempted service, etc:

AO 440 (Rev. 06/12) Summons in a Civil Action

# UNITED STATES DISTRICT COURT

for the

District of Maryland

GREEN & HEALTH HOMES INIATIVE, INC., et al.

*Plaintiff(s)*

v.

ENVIRONMENTAL PROTECTION AGENCY, et al.

*Defendant(s)*

Civil Action No.

**SUMMONS IN A CIVIL ACTION**

To: *(Defendant's name and address)* Environmental Protection Agency
The Hon. Pamela Bondi, Attorney General
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530-0001

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure. The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:

Andrew D. Freeman
Brown, Goldstein & Levy, LLP
120 East Baltimore Street, Suite 2500
Baltimore, Maryland 21202

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

*CLERK OF COURT*

Date: 04/02/2025

*Signature of Clerk or Deputy Clerk*

Civil Action No.

**PROOF OF SERVICE**

***(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))***

This summons for *(name of individual and title, if any)* ______________________

was received by me on *(date)* ______________ .

❐ I personally served the summons on the individual at *(place)* ______________________

______________________ on *(date)* ______________ ; or

❐ I left the summons at the individual's residence or usual place of abode with *(name)* ______________

______________________ , a person of suitable age and discretion who resides there,

on *(date)* ______________ , and mailed a copy to the individual's last known address; or

❐ I served the summons on *(name of individual)* ______________________ , who is

designated by law to accept service of process on behalf of *(name of organization)* ______________

______________________ on *(date)* ______________ ; or

❐ I returned the summons unexecuted because ______________________ ; or

❐ Other *(specify)*:

My fees are $ __________ for travel and $ __________ for services, for a total of $ 0.00 .

I declare under penalty of perjury that this information is true.

Date: ______________

______________________
*Server's signature*

______________________
*Printed name and title*

______________________
*Server's address*

Additional information regarding attempted service, etc:

# UNITED STATES DISTRICT COURT

for the

District of Maryland

| | | |
|---|---|---|
| GREEN & HEALTH HOMES INIATIVE, INC., et al. | ) | |
| *Plaintiff(s)* | ) | |
| v. | ) | Civil Action No. |
| ENVIRONMENTAL PROTECTION AGENCY, et al. | ) | |
| *Defendant(s)* | ) | |

**SUMMONS IN A CIVIL ACTION**

To: *(Defendant's name and address)* Lee Zeldin, in his official capacity as
Administrator, United States Environmental Protection Agency
1200 Pennsylvannia Avenue, N.W.
Washington, D.C. 20460

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure. The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are: Andrew D. Freeman
Brown, Goldstein & Levy, LLP
120 East Baltimore Street, Suite 2500
Baltimore, Maryland 21202

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

*CLERK OF COURT*

Date: 04/02/2025

*Signature of Clerk or Deputy Clerk*

Civil Action No.

## PROOF OF SERVICE

***(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))***

This summons for *(name of individual and title, if any)* ______________________
was received by me on *(date)* ______________ .

❒ I personally served the summons on the individual at *(place)* ______________________
______________________ on *(date)* ______________ ; or

❒ I left the summons at the individual's residence or usual place of abode with *(name)* ______________
______________________ , a person of suitable age and discretion who resides there,
on *(date)* ______________ , and mailed a copy to the individual's last known address; or

❒ I served the summons on *(name of individual)* ______________________ , who is
designated by law to accept service of process on behalf of *(name of organization)* ______________
______________________ on *(date)* ______________ ; or

❒ I returned the summons unexecuted because ______________________ ; or

❒ Other *(specify)*:

My fees are $ __________ for travel and $ __________ for services, for a total of $ 0.00 .

I declare under penalty of perjury that this information is true.

Date: ______________

______________________
*Server's signature*

______________________
*Printed name and title*

______________________
*Server's address*

Additional information regarding attempted service, etc:

# EXHIBIT 1

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
(Northern Division)

| | |
|---|---|
| GREEN & HEALTHY HOMES INITIATIVE, INC., ET AL.<br><br>Plaintiffs,<br><br>v.<br><br>ENVIRONMENTAL PROTECTION AGENCY, ET AL.<br><br>Defendants. | Civil Action No. |

**DECLARATION OF RUTH ANN NORTON**

I, Ruth Ann Norton, am over the age of 18 and am competent to testify. I declare as follows:

1. I am President and Chief Executive Officer of Green & Healthy Homes Initiative, Inc. ("GHHI"). Formerly known as the Coalition to End Childhood Lead Poisoning, GHHI is a 501(c)(3) non-profit organization based in Baltimore, Maryland. GHHI seeks to protect public health and advance housing stability in economically challenged communities. GHHI is one of the largest healthy housing organizations in the United States. Our work has long focused on addressing the housing-based causes of lead poisoning, asthma, household injury, and energy inefficiency by creating affordable homes that are healthy, safe, and resilient. We provide services directly to families and communities. We also provide advisory services to other organizations focused on the creation of effective and efficient systems to improve public health and economic outcomes.

2. In December 2023, the Environmental Protection Agency ("EPA") designated GHHI to serve as the Regional Grantmaker for Region 3 under EPA's Thriving Communities

Grantmaking Program. EPA awarded GHHI an $8 million "initial grant" to facilitate further grantmaking under the program and, later, a $52 million "subsequent grant," the majority of which GHHI is to award to subgrantees to support community-based environmental protection projects. In late February 2025, EPA terminated GHHI's initial grant. Around the same time, EPA suspended GHHI's access to the $52 million in subsequent grant funding from which GHHI is to make subgrant awards to community organizations.

3. I provide this declaration to detail GHHI's involvement with the Thriving Communities program, EPA's sudden discontinuation of GHHI's grant funding, and the irreparable harms that GHHI will suffer as a result of EPA's actions.

4. On January 10, 2023, EPA invited applications for its Thriving Communities Grantmaking Program. EPA subsequently amended the Request for Application. A copy of EPA's Request for Applications Amendment dated May 19, 2023, is enclosed as **Attachment A**.

5. GHHI understood that the purpose of the Thriving Communities Grantmaking Program is to facilitate the flow of funds to community-based non-profit organizations and local and tribal government agencies for critical projects to address environmental conditions, risks, and hazards that negatively impact the health and safety of our communities. Under the program, EPA designated Regional Grantmakers in ten regions across the country. Regional Grantmakers are responsible for developing and implementing an application process and awarding grants to subgrantees to support community-based environmental health projects over periods of one to two years. Regional Grantmakers are also responsible for a vital function, to monitor the use of the funds to ensure full compliance with all applicable laws and regulations.

6. In the summer of 2023, GHHI applied to serve as the Regional Grantmaker for EPA Region 3, which encompasses Delaware, Maryland, Pennsylvania, Virginia, West Virginia,

and Washington D.C., as well as seven federally recognized tribes. In 2023, GHHI expended significant time preparing its application materials, which included numerous forms, a projected workplan, letters of commitment from proposed partners, and an itemized budget.

7. On December 13, 2023, GHHI received notice that it had been selected as a Regional Grantmaker for Region 3. A copy of EPA's December 13, 2023, letter is enclosed as **Attachment B**.

8. Upon being selected as a Regional Grantmaker, EPA awarded GHHI an $8 million Thriving Communities initial grant. This funding was to support GHHI's hiring of dedicated Thriving Communities staff, outreach to prospective subgrantees, and development and administration of an application and evaluation process, as well as to provide oversight and technical assistance to grant applicants and grantees. As the Regional Grantmaker for Region 3, GHHI planned to award $48 million in subgrants to more than 200 subgrantee organizations.

9. GHHI's $8 million initial grant was governed by a Cooperative Agreement (Grant Number: 5N-95341301), which identified the project period as May 1, 2024 through April 30, 2027. A copy of the Cooperative Agreement is enclosed as **Attachment C**.

10. In reliance on being designated the Regional Grantmaker for Region 3, GHHI undertook substantial work to build out the Thriving Communities program. This work included outreach to potential subgrantee organizations and communities, design of a competitive application and evaluation process, and creation of tracking and reporting systems that subgrantees could use.

11. GHHI hired nine employees to work full-time on the Thriving Communities program, while also deploying existing staff to support the program. Those hired included: senior management, compliance, quality assurance, and grants management personnel, program officers

to interface with subgrantees, a senior accountant, and public engagement and administrative staff to execute the project in full compliance with all terms and conditions. Other GHHI employees, including the organization's senior leadership, also dedicated a great deal of time to applying for the Thriving Communities grant and, upon award, building, staffing and properly administering the program. Those dedicating a significant proportion of their time to the Thriving Communities program include the organization's General Counsel and Senior Technical Advisor, Senior Vice President of Policy and Innovation, and Director of Data, Evaluation, and Learning. Since our selection as a Regional Grantmaker in 2023, I have spent about 35% of my own time on our implementation of the Thriving Communities program. Since the termination of GHHI's $8 million grant, I have spent over 60% of my time on the Thriving Communities program.

12. Over the past year, in accordance with EPA guidance, GHHI has conducted over 30 in-person outreach events throughout Region 3, as well as numerous conference calls and webinars. We have engaged in a broad social media campaign to inform and engage communities (including non-profits, local governments, tribal communities, and universities) about the unique and important opportunities offered by the Thriving Communities program.

13. GHHI developed materials, which were then vetted and approved by EPA, to communicate the goals of the program and to educate prospective subgrantees about the application process. Among other materials, GHHI developed a Thriving Communities website; applications and web-based portals for submission of applications; and training materials to guide prospective applicants through the process (including webinars explaining the program, FAQ's and a video training prospective subgrantees on using the application portal).

14. In furtherance of EPA goals, GHHI also built relationships with partner organizations and community leaders throughout the region. For instance, GHHI recruited members of an Advisory Board to help with the review and selection of subgrantees. GHHI selected Advisory Board members based on their experience, expertise, and community perspective on environmental health, safety issues and community services.

15. GHHI also built relationships with technical assistance partners to lend their expertise to support subgrantees in implementing their grant projects. For instance, one of GHHI's technical assistance partners, the Children's National Hospital, was to serve as a resource to subgrantees on prevention strategies with the goal of reducing asthma and other health conditions that negatively affect children and burden the health systems. GHHI also brought on the Virginia Poverty Law Center and Howard University as technical assistance partners.

16. GHHI planned to compensate Advisory Board members and technical assistance partners with funds from the $8 million initial grant.

17. Throughout the program development phase, GHHI had extensive written communications and weekly meetings with EPA officials regarding all aspects of its Thriving Communities program to ensure compliance with program goals. EPA officials frequently praised GHHI's work and communicated that GHHI had met its obligations and milestones under the terms of the grant and was a demonstrated organizational leader on the Grantmaking Program.

18. EPA officials approved GHHI's work at several points, including its Quality Management Plan and Request for Applications. In August 2024, EPA authorized GHHI to

proceed with its application process for Thriving Communities subgrant awards. A copy of an August 2, 2024, e-mail conveying that authorization is enclosed as **Attachment D**.

19. On September 4, 2024, EPA awarded GHHI a Thriving Communities subsequent grant. EPA amended the subsequent grant on December 27, 2024, to reflect an amount of $52 million. GHHI is required to award the majority of these additional grant funds ($48 million of the $52 million) as subgrants to support projects undertaken by non-profit organizations and local and tribal governments selected through GHHI's Thriving Communities subgrant application process. A copy of the Assistance Amendment reflecting the $52 million subsequent grant is enclosed as **Attachment E.**

20. On February 20, 2025, GHHI selected an initial 63 organizations to receive subgrants for their planned projects consisting of 12 subgrantees in Maryland, 17 in Pennsylvania, 6 in the District of Columbia, 13 in Virginia, 13 in West Virginia, and 2 in Delaware. The total grant award amount from this initial phase is $19,185,964.

21. On or around February 21, 2025, GHHI sent award letters to the 63 subgrantees. These letters notified the subgrantees that they had been selected to receive a grant, the amount of the grant, and the next steps in the process.

22. The next morning, I received an e-mail from Kelly Sherwood, EPA's Acting Grants Management Officer, with the subject line "Termination of EPA Assistance Award: 5N-95341301." The e-mail from Ms. Sherwood attached two documents: a termination memorandum and an Assistance Amendment to the Thriving Communities initial grant, both dated February 21, 2025 (though sent and received on February 22, 2025). A copy of the e-mail is enclosed as **Attachment F**.

23. The termination memorandum states that the organization's Thriving Communities initial grant award "is terminated in its entirety effective immediately on the grounds that the award no longer effectuates the program goals or agency priorities." A copy of the termination memorandum is enclosed as **Attachment G**.

24. The Assistance Amendment to the Thriving Communities initial grant states that that "[t]his amendment is stop work; terminate the agreement; reduce performance period duration; curtail scope of work; and waive certain reporting requirements." A copy of the Assistance Amendment dated February 21, 2025 (and received the following day) is enclosed as **Attachment H**.

25. Around the time that EPA terminated GHHI's Thriving Communities $8 million initial grant, EPA also suspended GHHI's access to the EPA ASAP payment portal for the $8 million grant and the $52 million subsequent grant from which GHHI was to make subgrant awards to community organizations. GHHI's access remains suspended for both grants and GHHI is incapable of making payments to its subgrantees. A copy of GHHI's profiles on the Automated Standard Application for Payments system showing the status of GHHI's Thriving Communities grants as "suspended" are enclosed as **Attachment I**.

26. GHHI had no notice or indication prior to EPA's sudden discontinuation of its Thriving Communities grant funding. GHHI had relied and acted upon its expectation and understanding that EPA would fulfill its commitment to provide the Thriving Communities grant funding it had awarded to GHHI. At the time that EPA discontinued grant funding, GHHI was more than nine months into the three-year project period. GHHI had hired staff, developed its budget, launched its fully public subgrant application process and planned work based on the

award of the terminated grant. GHHI had already awarded dozens of subgrants and was well underway in evaluating hundreds of additional applications.

27. EPA's sudden termination of GHHI's Thriving Communities initial grant and suspension of its subsequent grant funding has already caused immediate and significant harm to GHHI, its partner organizations, and subgrantees across the region. If the funding is not restored, those harms will become increasingly severe.

28. Most imminently, GHHI will be forced to lay off staff as early as this month. GHHI has hired nine full-time employees specifically to work on the Thriving Communities program. GHHI was funding these positions through the $8 million initial grant, and it planned to do so for the three-year duration of the program. GHHI has eight additional employees whose work is funded in part by Thriving Communities grant funding. GHHI will have to lay off at least 10 staff members (given that the grant funded, either fully or partially, 17 employees). GHHI will have to lay off these staff members in the coming weeks if funding is not restored. GHHI has already developed plans to restructure the organization and lay off staff. At present, GHHI is dipping into its reserves to continue paying its employees. This is not a sustainable solution.

29. The termination and suspension of funding has interfered with GHHI's work, both under the Thriving Communities program and in other programmatic areas. Immediately following discontinuation of GHHI's Thriving Communities grant funding, GHHI cancelled events that advance the program, including an event to announce the awarding of subgrants in West Virginia. GHHI has been forced to halt all in-person trainings and marketing events to promote the grant application process, including efforts planned in remote, rural, and tribal communities. Without adequate staffing or funding, GHHI will be forced to stop its review and

processing of subgrant applications; its processing of subgrantee advances; and its monitoring and compliance oversight of subgrantees.

30. Simply put, if GHHI's grants and access to grant funding are not restored in short order, GHHI will be forced to shut down the Thriving Communities program. Moreover, if we were forced to shut down the program, we could not simply restart at some point in the future. Even if our Thriving Communities grants were restored in full one year from now, GHHI could not simply rehire all the people that it let go and resume the programmatic work at the point where that work stopped. By then, GHHI will have lost the talented employees who spent more than a year learning EPA's requirements and developing the program, the relationships with partner and subgrantee organizations that it has worked hard to develop, and the awareness of and enthusiasm for the Thriving Communities program that it generated through an extended campaign of outreach in communities across the Mid-Atlantic region.

31. In addition to the impact on GHHI's work under the Thriving Communities program, the discontinuation of grant funding will cause irreparable harm to GHHI as an organization and to its work in other programmatic areas. The diversion of GHHI's resources to cover salaries for GHHI employees working under the Thriving Communities program means that GHHI has fewer resources available to support its other projects. Thus far, GHHI has spent funds to cover salaries that it hoped to use for community education regarding lead poisoning, as well as for our Whole Homes Program, which incorporates energy efficiency improvements into projects remediating health and safety hazards in the homes of low-income families and seniors. EPA's actions are forcing GHHI to bleed funds and represent an existential threat to our organization's ability to continue its decades-long record improving the health and safety of local communities.

32. GHHI's partners have also been harmed by the discontinuation of grant funding. Our partners, including Children's National Hospital, Howard University, and the Virginia Poverty Law Center, hired staff and planned work to provide technical assistance to subgrantees in reliance on our partnerships. As a result of EPA's actions, however, GHHI had no choice but to direct its partners to immediately stop work.

33. On Monday February 24, 2025, I sent e-mails to our Technical Assistance Partners asking them to immediately stop work. That same day, I sent a substantially similar e-mail to the members of our Thriving Communities Advisory Board. A representative example of those e-mails is enclosed as **Attachment J.**

34. The discontinuation of Thriving Communities grant funding has also upended GHHI's budget and planned work. The $8 million Thriving Communities initial grant represents a sizeable portion of GHHI's budget. We had relied on EPA to fulfill its obligations under the grant and had planned our work through 2027 accordingly. Because of our commitment to EPA and Thriving Communities since December 2023, we have also declined other opportunities to expand our programs and our work. GHHI does not have access to alternate funds to replace the discontinued funding, as we do not have the ability to fundraise millions of dollars in the next few weeks to continue paying the Thriving Communities staff and our partners.

35. GHHI, as an organization, will suffer serious harm to its reputation due to EPA's actions. GHHI spent more than a year building relationships with community leaders, partner organizations, non-profits, local governments, and philanthropic and civic organizations in communities across the country in connection with the Thriving Communities program. Each of these organizations relied on GHHI's status as a Regional Grantmaker and its commitment to develop and administer the program. With the grant money frozen, however, GHHI cannot fulfill

its obligations under the program. The relationships and trust that GHHI painstakingly built with other organizations and leaders are likely to erode as a result.

36. The damage to GHHI's reputation will be particularly severe given that it already announced an initial round of subgrantee awards. If the funding is not restored, GHHI will have to inform these subgrantee organizations that it will no longer be able to fund their planned projects.

37. GHHI has operated for 32 years as a non-political, non-partisan organization dedicated to reducing lead poisoning and environmental hazards in communities. GHHI has made and will make all grant award decisions based solely upon the merits of the applicants and their project applications in accordance with all applicable guidance from the EPA. None of GHHI's grant award decisions or other grant program decision-making or actions are predicated or influenced by political factors but are instead based upon the grant requirements, GHHI's grant agreements with EPA, and other federal requirements.

38. In its memorandum terminating our Thriving Communities initial grant, EPA stated that our grant award might be "inconsistent with" its "Agency priority" of not funding "programs or organizations that promote or take part in . . . 'DEI' initiatives [or] 'environmental justice' initiatives.'" This statement places GHHI in an impossible situation. We do not know what if any GHHI "initiatives" EPA is referencing. EPA has not provided a definition of the terms "DEI" or "environmental justice," nor has it identified any GHHI initiatives that it has found to be objectionable. Nonetheless, it appears that, to continue partnering with EPA on this project and other initiatives such as the implementation of the 2018 EPA Federal Lead Action Plan, we would be required to evaluate our programs and eliminate any that EPA might characterize as "DEI" or "environmental justice." It puts an unfair and profound burden on our

organization for us to be forced to choose between, on the one hand, retaining programs that we embraced because they improve public health, the environment and access to housing in all of our communities but that EPA might somehow find objectionable and, on the other hand, preserving the opportunity to work with EPA in the future.

39. EPA's actions will damage GHHI's reputation for reliability, quality and performance. Subgrant applicants and subgrantees, after having responded to our extensive public outreach concerning the Thriving Communities program, will question GHHI's ability to deliver on its commitments. Further, EPA's unjustified cancellation of GHHI's grant award may compromise GHHI's ability to secure other federal, state, local, philanthropic and private funding. EPA states in its memorandum terminating GHHI's Thriving Communities initial grant (albeit without any specificity or evidence whatsoever) that our work might not be "free from fraud, waste, abuse and duplication." If GHHI is wrongly perceived to have engaged in such conduct, other funders will be hesitant to support GHHI's work.

40. EPA's sudden discontinuation of GHHI's grant funding has also caused confusion among GHHI's partner organizations and subgrantees and has disrupted their work and planning. It is my understanding that a number of our partner organizations and subgrantees have paused implementation of their planned work and projects because of uncertainty about promised funding.

41. The purpose of the Thriving Communities program is to address serious environmental, health and safety issues in our communities. As a result of EPA's actions, subgrantees will be unable to complete their projects, which will result in negative public health outcomes in our communities. This will cause profound harm regionwide, as exemplified by the

projects that were awarded funding in GHHI's first round of Thriving Communities subgrant awards.

42. GHHI awarded $280,000 in its first round of subgrant awards to a nonprofit community development organization in Wayne County, West Virginia. In recent years, storm events have caused sewage to overflow into a town's public drinking water system and local bodies of water. Our subgrantee organization had planned to use its subgrant awarded to prevent future overflows and contamination of local water sources.

43. GHHI awarded approximately $350,000 to a city development authority in Wetzel County, West Virginia for a project to remediate lead contamination in a local park on the bank of the Ohio River. Recent testing has confirmed dangerously high levels of lead contamination in the soil of the park's campgrounds. Such contamination has been documented to harm the brain and cognitive ability, to damage bones and kidneys, and to increase the risk for cancer.

44. GHHI awarded $350,000 to a small city in Delaware County, Pennsylvania, to remediate lead exposure and poor indoor air quality in at least 17 homes, with a particular focus on those with children and pregnant women. The city also planned to use the subgrant award to distribute high-efficiency air purifiers to households with occupants who suffer from asthma.

45. These are just a few examples of projects planned by subgrantees in reliance on the Thriving Communities program. Other subgrantees planned projects to stop stormwater waste from flowing into drinking water sources, improve air quality, remove lead in soil in parks and playgrounds, and remediate asbestos, lead and radon hazards in homes.

46. If the funding is not immediately restored, hundreds of subgrantees will not be able to complete their projects, and GHHI's programs will suffer, as will communities and people across the region that GHHI seeks to serve.

I declare under the penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Date: April 2, 2025

DocuSigned by:
Ruth Ann Norton
6171FEFD32CD49A...

Ruth Ann Norton

# Attachment A

**AGENCY:** **U. S. ENVIRONMENTAL PROTECTION AGENCY (EPA)**

**Office of Environmental Justice and External Civil Rights (OEJECR)**

**TITLE:** **Environmental Justice Thriving Communities Grantmaking Program (EJ TCGM)**

**ACTION:** **REQUEST FOR APPLICATIONS (RFA)**

**TYPE:** **INITIAL ANNOUNCEMENT**

**FUNDING OPPORTUNITY NO: EPA-R-OEJECR-OCS-23-03**

**ASSISTANCE LISTING NO. 66.615**

**DATES:** **ANNOUNCEMENT DATE: February 23, 2023**
**CLOSING DATE: May 31, 2023**

**DEADLINE:** Application packages must be submitted on or before **May 31, 2023, at 11:59 PM (Eastern Time)** through Grants.gov. Applications received after the closing date and time will not be considered for funding.

**Note -** Prior to naming a contractor (including consultants) or subrecipient in your application as a "partner", please carefully review Section IV.d, "Contracts and Subawards", of EPA's Announcement Clauses that are incorporated by reference in this announcement (See Section I.G). EPA expects recipients of funding to comply with competitive procurement contracting requirements as well as EPA's rule on Participation by Disadvantaged Business Enterprises in EPA Programs in 40 CFR Part 33. The Agency does not accept justifications for sole source contracts for services or products available in the commercial marketplace based on a contractor's role in preparing an application.

## FUNDING ANNOUNCEMENT CONTENTS BY SECTION

**I.** Funding Opportunity Description
**II.** Award Information
**III.** Eligibility Information
**IV.** Application and Submission Information
**V.** Application Review Information
**VI.** Award Administration Information
**VII.** Agency Contacts
**VIII.** Other Information /Appendices
- Optional EJ TCGM Itemized Budget Sheet Template

# I. FUNDING OPPORTUNITY DESCRIPTION

## A. Executive Orders and Definitions

EPA is issuing this solicitation to request applications for the design and management of a new Environmental Justice (EJ) competitive pass-through program where EPA will competitively select multiple pass-through entities to provide grant funds via subawards to community-based nonprofit organizations and other eligible subrecipient groups representing underserved and disadvantaged communities. The definition of the term *Pass-through entity* in 2 CFR 200.1 provides that a pass-through entity is a non-Federal entity that provides a subaward to a subrecipient to carry out part of a federal program. The EPA provides extensive guidance to pass-through entities in the EPA Subaward Policy and related materials available on the EPA internet website.

EPA plans to award cooperative agreement(s) to pass-through entities (referred to as **Grantmakers** by the program) who will collaborate with EPA to design and build their own processes to receive and evaluate competitive community project applications from communities for **EJ Thriving Communities Subgrant activities**. These activities consist of assessment, planning, and/or project development activities addressing local environmental and/or public health issues. Grantmakers will provide **EJ Thriving Communities Subgrants** (i.e., subawards) to **Eligible Subrecipients**.

For regulatory purposes, the "Subgrants" referred to in this Notice of Funding Opportunity will be *Subawards* consistent with the definition of that term in 2 CFR 200.1 and comply with EPA's Subaward Policy. Grantmakers will be *Pass-through entities* as that term is defined in 2 CFR 200.1 and used throughout 2 CFR Parts 200 and 1500 as well as EPA's Subaward Policy. Eligible Subrecipients are those entities who are eligible to receive pass-through grant funding from a Grantmaker. These awards will help transform disadvantaged and underserved communities into healthy, thriving communities capable of addressing the environmental and public health challenges they have historically faced, as well as current and future challenges. Additionally, these awards are part of the Federal Partnership supporting the Thriving Communities Network initially funded through the environmental Consolidated Appropriations Act of 2022.

This competition is being launched in order to meet the goals and objectives of two Executive Orders (EO 14008 and EO 13985) issued by the Biden Administration that demonstrate the EPA's and Administration's commitment to achieving environmental justice and embedding environmental justice into Agency programs.

Executive Order 14008, Tackling the Climate Crisis at Home and Abroad, issued on January 27, 2021, affirmed the Administration's commitment to advancing environmental justice (EJ) by

creating the Justice40 Initiative. The Justice40 Initiative[1] establishes a goal that 40% of the overall benefits of certain federal investments—including those in climate change; clean energy and energy efficiency; clean transit; affordable and sustainable housing; training and workforce development; the remediation and reduction of legacy pollution; and the development of critical clean water infrastructure—flow to disadvantaged communities[2]. In addition, Section 219 of the Executive Order stressed that environmental and economic justice are key considerations to factor into governmental decision-making and that transforming disadvantaged communities—historically marginalized, underserved, and overburdened—into healthy, thriving communities, and undertaking robust actions to mitigate climate change while preparing for the impacts of climate change across rural, urban, and Tribal areas are governmental priorities. The Executive Order also called for making environmental justice part of Agency missions by developing programs, policies, and activities to address the disproportionately high and adverse human health, environmental, climate-related and other cumulative impacts on disadvantaged communities, as well as the accompanying economic challenges of such impacts.

Complementing Executive Order 14008, is Executive Order 13985, Advancing Racial Equity And Support For Underserved Communities Through The Federal Government, issued on January 20, 2021, which stated that the federal government should pursue a comprehensive approach to advancing equity for all, including people of color and others who have been historically underserved, marginalized, and adversely affected by persistent poverty and inequality

"Environmental justice", which is the common theme of these two Executive Orders, is defined by the EPA as the ***fair treatment*** and ***meaningful involvement*** of all people regardless of race, color, national origin, or income with respect to the development, implementation, and enforcement of environmental laws, regulations, and policies. ***Fair treatment*** means that no one group of people, including racial, ethnic, or socioeconomic groups, should bear a disproportionate share of the negative environmental consequences resulting from industrial, municipal, and commercial operations or the execution of federal, state, local, and tribal environmental programs and policies.

***Meaningful involvement*** means that:

- People have an opportunity to participate in decisions about activities that may affect their environment and/or health;
- The public's contribution can influence the regulatory agency's decision;
- Community concerns will be considered in the decision-making process; and
- Decision makers will seek out and facilitate the involvement of those potentially affected.

[1] Further information on J40 can be found in OMB's interim implementation guidance for the Justice40 Initiative (M-21-28).

[2] [2] EPA is currently in the process of defining the term "disadvantaged communities."

The underserved and disadvantaged communities for which these projects are focused on include, as defined by Executive Order 13985, "populations sharing a particular characteristic, as well as geographic communities, that have been systematically denied a full opportunity to participate in aspects of economic, social, and civic life…". This includes communities such as Black, Latino, and Indigenous and Native American persons, Asian Americans and Pacific Islanders and other persons of color; children, the elderly, members of religious minorities; lesbian, gay, bisexual, transgender, and queer (LGBTQ+) persons; persons with disabilities; persons who live in rural areas; and persons otherwise adversely affected by persistent poverty or inequality. For purposes of this RFA, "underserved communities" also includes "environmentally overburdened communities" (that is, communities adversely and disproportionately affected by environmental, climate and human health harms and risks including remote, rural, and urban communities), and disadvantaged communities.

**Community-based Nonprofit Organizations (CBOs)**
For this RFA, the EJ Grants program defines a "community-based nonprofit organization" (CBO) as a *public or private nonprofit organization that supports and/or represents a community and/or certain populations within a community through engagement, education, and other related services provided to individual community residents and community stakeholders. A "community" can be characterized by a particular geographic area and/or by the relationships among members with similar interests and can be characterized as part of a broader national or regional community where organizations can be focused on the needs of urban, rural, and/or tribal areas, farmworkers, displaced workers, children with high levels of lead, people with asthma, subsistence fishers, and other similar groups.*

## B. Background and Objectives

The mission of the EPA is to protect human health and the environment for all people with an emphasis on assisting those communities adversely and disproportionately affected by environmental, climate, and human health harms and risks. Under the Consolidated Appropriations Act, 2022, and the Consolidated Appropriations Act, 2023, EPA received significant investments for environmental justice and in the health, equity, and resilience of these, and all communities, to address past, current, and future environmental health and justice challenges. Additionally, the 2022 Inflation Reduction Act (IRA) created the Environmental and Climate Justice block grant program in section 138 of the Clean Air Act (CAA) and provided EPA with $2.8 billion in grant funding for the program for projects to benefit disadvantaged communities. To maximize these significant investments, new and innovative strategies and approaches for issues such as community engagement and participation in environmental programs, equitable distribution of financial resources, capacity-building and outreach, and technical assistance and training to enhance access to financial assistance[3] opportunities and promote effective grants management and performance, are necessary. This is especially true for underserved and disadvantaged communities that have, and continue to be, plagued by environmental pollution and health, and environmental justice, challenges.

[3] Financial assistance includes grants and cooperative agreements. Cooperative agreements will be awarded under this RFA, but the terms are used interchangeably in the RFA.

One such strategy is to alleviate much of the burden the federal grants process places on small, resource-constrained **community-based nonprofit organizations (CBOs)** supporting underserved communities and marginalized populations. The federal grants registration and application submission process can be a significant barrier to entry for those communities and CBOs who are most in need. Additionally, the awards process (i.e., the time it takes for a successful federal applicant to actually receive the funding) can be very time-consuming in which the awarded funding may not be made available to grantees for 6 months or more. Underserved communities and organizations need access to funds and resources quickly, and a lengthy awards process can significantly impact the long-term sustainability of a CBO. By increasing the access CBOs have to funding, as well as reducing the burden of the federal grants application process, underserved communities will be better positioned to advance and address environmental justice issues nationwide. This will lead to progress towards achieving the objectives of Executive Orders 13985 and 14008.

Historically, underserved communities have been disproportionately burdened by environmental hazards and health consequences and have faced environmental and energy justice challenges. These communities are often exposed to unhealthy land uses, poor air and water quality, dilapidated housing that leads to lead exposure, and other environmental threats that drive health disparities. Many of these communities are also surrounded by social inequities such as job insecurity, underemployment, linguistic isolation, underperforming schools, noise pollution, crowded homes, face high energy burden or fossil fuel dependence, and lack access to healthy foods and transportation. In addition, they often lack adequate resources and experience to navigate complex Federal grant application and award making processes and have been limited in their ability to have meaningful access to, and participation in, governmental decision-making processes that affect them, including those relating to environmental health and justice. The combination of environmental risks and social inequities creates a cumulative, disproportionate impact that hinders optimal environmental health and justice particularly for these communities.

Consistent with EPA's mission and Administration priorities, including those set forth in Executive Orders 13985 and 14008, and using funding available for environmental justice, and other potential funding as available and appropriate, EPA is seeking applications from eligible entities as described in Section III to become an Environmental Justice Thriving Communities Grantmaker. EPA is making available up to approximately **$550 million** total for the EJ TCGM program. EPA expects to make up to 11 awards for the Grantmakers.

**History of EJ Small Grants Program** - The EJ Small Grants program (assistance listing 66.604) is the Agency's longest standing environmental justice grants program specifically designed to address the needs of underserved communities and marginalized groups through the provision of direct funding to address local environmental and/or public health issues impacting communities. Historically, the Agency has managed the EJ Small Grants directly which necessitated that grassroots groups and capacity-constrained organizations navigate the federal SAM.gov and Grants.gov process to apply for small funds. EPA has determined that a pass-through model will be a more effective approach to providing smaller funding amounts to communities for the initial development of their environmental justice projects. The pass-through model removes the requirement of applying through the federal grants process and decreases the amount of time it takes to award federal funds. The competition to select the pass-

through entities (Grantmakers) is issued under assistance listing 66.615, Environmental Justice Thriving Communities Grantmaking Program. Moving forward, much of the assessment, planning, and project development work formerly conducted under the EJ Small Grants program will now be managed by the Grantmakers under the new EJ Thriving Communities Subgrants program.

**EJ Small Grants Program → New EJ Thriving Communities Subgrants Program** - The Grantmakers will design and manage the new EJ Thriving Communities Subgrants program, in collaboration with EPA, as a pass-through competitive subaward program. The Agency provides extensive guidance to pass-through entities in the EPA Subaward Policy and related materials. EPA will award cooperative agreements with Grantmakers who will collaborate with EPA to design and build their own processes to receive and evaluate competitive community project applications from communities for EJ Thriving Communities Subgrants for projects and capacity building efforts addressing local environmental and public health issues.

The EJ Thriving Communities Subgrant application process will be separate from the federal grants application process. Applications for the Grantmaker awards should include a clear description of the proposed streamlined process for competitively receiving, evaluating, selecting and awarding subgrants, working with EPA to monitor performance as well as a plan for managing these transactions in compliance with regulatory requirements. EPA will evaluate applicant proposals describing this process under the Section V evaluation factors.

The pass-through entities (Grantmakers) that administer the cooperative agreement and subgrants will be accountable to EPA for proper expenditure of the funds, reporting on the overall progress and deliverables of the program, providing regular status reports and updates on the progress of all subgrants and will serve as the main point of contact for all subrecipients. As provided in 2 CFR 200.332, subrecipients are accountable to the pass-through entity for completing workplan and project deliverables including proper use of EPA funding. Subrecipients receiving an EJ Thriving Communities Subgrant will also be expected to provide regular project reports to their Grantmaker which will be shared with EPA. EJ Thriving Communities Subgrants will be available for three distinct phases of community-readiness: Phase I subgrants will be for one-year up to $150,000 assessment projects, Phase II subgrants will be for 1-2 year up to $250,000 planning projects, and Phase III subgrants are for two-year up to $350,000 project development projects. Applications should address how these phases will be carried out.

**NOTE:** This RFA is **not** for applicants to apply for an EJ Small Grant directly from EPA. This RFA is a competition to select the pass-through entities who will manage their own EJ Thriving Communities Subgrants program in collaboration with EPA over the next 3 years. Those applicants seeking funds to conduct a community project in a specific community may **not** apply to this competition.

**Priority for applications from Minority-Serving Institutions (MSIs)** - EPA recognizes the important and historic role Minority-Serving Institutions (MSIs) serve in supporting communities, especially underserved communities around the nation. For this reason, EPA strongly encourages all eligible applicants identified in Section III, including Minority Serving

Institutions (MSIs), as well as university business schools and business programs, to apply to become a Grantmaker under this opportunity.

For purposes of this RFA, the following are considered MSIs:

1. Historically Black Colleges and Universities, as defined by the Higher Education Act (20 U.S.C. § 1061(2)). A list of these schools can be found at Historically Black Colleges and Universities.
2. Tribal Colleges and Universities (TCUs), as defined by the Higher Education Act (20 U.S.C. § 1059c(b)(3) and (d)(1)). A list of these schools can be found at American Indian Tribally Controlled Colleges and Universities.
3. Hispanic-Serving Institutions (HSIs), as defined by the Higher Education Act (20 U.S.C. § 1101a(a)(5)). A list of these schools can be found at Hispanic-Serving Institutions.
4. Asian American and Native American Pacific Islander-Serving Institutions; (AANAPISIs), as defined by the Higher Education Act (20 U.S.C. § 1059g(b)(2)). A list of these schools can be found at Asian American and Native American Pacific Islander-Serving Institutions; and
5. Predominately Black Institutions (PBIs), as defined by the Higher Education Act of 2008, 20 U.S.C. 1059e(b)(6). A list of these schools can be found at Predominately Black Institutions.

The Grantmakers will be responsible for the following key activities and applicants should address them in their applications:

1) Designing a competitive application submission and evaluation process for community projects addressing local environmental and public health issues. The process must include an open call for applications where applicants can submit applications by established deadlines. The process should include a range of submission options including approaches accessible to communities and CBOs without reliable access to internet services and significantly minimize the burden on applying entities (as compared to the federal grant application process). The process should minimize the "time to award" for entities selected to receive subaward funding and the competitive application process should be up and running as quickly as possible. **NOTE** –As part of EPA's substantial involvement, EPA staff may collaborate with Grantmakers on the preliminary design of the submission and evaluation process, the development of evaluation criteria, and, where capacity allows, EPA staff may, at the request of the Grantmakers, be included as reviewers of applications. However, the final decisions on the submission, evaluation process/criteria, and selection of subrecipients will be made by the pass-through entity, rather than by EPA, provided statutory, regulatory, and Subaward Policy requirements are met.
2) Developing communications plans and conducting outreach activities (e.g., hosting conference calls and webinars and conducting in-person outreach events to notify communities) to reach all disadvantaged and underserved communities to the maximal extent practical, especially urban, rural, and remote communities. Outreach activities should be focused on making potential Eligible subrecipients aware of the availability of the EJ Thriving Communities Subgrant funding, deadlines for submitting applications, tutorials to understand the application and subawards process, and opportunities to ask

questions. Applicants should also describe the processes and approaches to coordinate directly with the Regional and/or National Environmental Justice Thriving Communities Technical Assistance Centers (TCTACs), Brownfields Technical Assistance Centers, and EPA Environmental Finance Centers as it relates to outreach and communications.

3) Developing an efficient subgrant process to make funds available to selected applicants quickly, monitoring progress of fund expenditures in compliance with federal regulations, terms and conditions of cooperative agreements, and ensuring that all funds received by the pass-through entities are expended within the 3-year project period per the requirements of section 138(b)(1) of the CAA.
4) Designing and implementing a project management process, in collaboration with EPA, which includes quality project oversight for funding subrecipients and a tracking and reporting process that reduces reporting burden on community recipients.
5) Providing technical support to subrecipients to assist in data collection, tracking, evaluation, and reporting of information in alignment with achieving project outputs and outcomes. Applicants should consider including plans to coordinate with the Environmental Justice Thriving Communities Technical Assistance Centers (TCTACs) to help address technical support and assistance needs of subrecipients.
6) Managing the subgrant application in-take processes, evaluations, subgrants awarding process, subgrant oversight/management and project tracking for communities and/or subgrant funding recipients in one or more Geographic Areas. Details defining the Geographic Areas mentioned above are provided in Section I.D.4.
7) Developing an approach to the Grantmaker role demonstrating participatory governance where one or more community-based nonprofit organizations is involved in the design and decision-making of the subgrants program. Example participatory governance activities could include advisory bodies composed of community-based nonprofit organizations that oversee and provide advice on the development of the subaward process. The participatory governance framework should describe controls for ensuring that representatives of community-based nonprofit organizations involved in the design and decision-making for the subgrants program do not have relationships with organizations competing for subgrants or receiving noncompetitive funding that create actual or apparent conflicts of interest. Note that Grantmakers may compensate representatives of community-based organizations who participate in the governance process with stipends to the extent permissible in EPA's Guidance on Participant Support Costs.
8) Developing an approach, after discussions with the EPA project officer, to provide a limited number of noncompetitive EJ Thriving Communities Subgrants for severely capacity-constrained communities and CBOs where these entities can receive funding and support from the Grantmakers without submitting a competitive application. The applicant's approach will include determining criteria to identify these severely capacity-constrained communities and CBOs. Grantmakers, rather than EPA, will select all subrecipients.
9) Disseminating EJ Thriving Communities Subgrant project results, feedback, and success stories through publicly available means.
10) Collaboratively working with EPA environmental justice staff, federal technical assistance providers (such as the Environmental Justice Thriving Communities Technical Assistance Centers), the Environmental Finance Centers, Technical Assistance for

Brownfields) and other federal grants programs to provide guidance and support to communities seeking to address longstanding environmental injustices impacting their communities.

11) Other activities the successful applicant proposes to carry out and EPA agrees to fund that further the purpose of this Funding Opportunity.

EPA will make awards to up to 11 Grantmakers that coordinate nationwide coverage to provide support and funding opportunities to **Eligible Subrecipients** (i.e., those entities who are eligible to receive an EJ Thriving Communities Subgrant from a Grantmaker). The Grantmakers will serve as the contact for Eligible Subrecipients interested in applying for EJ Thriving Communities Subgrants and will be the contact for subrecipients of the EJ Thriving Communities Subgrants. As stated above, EJ Thriving Communities Subgrants will be available for three distinct phases:

Phase I = Assessment projects for up to $150,000 for a one-year project period
Phase II = Planning projects for up to $250,000 for a 1-2 year project period, and
Phase III = Project Development projects for up to $350,000 for a two-year project period.

Eligible Subrecipients are as follows:

- Nonprofit organizations
- Community-based and grassroots nonprofit organizations
- Philanthropic and civic organizations with nonprofit status
- Tribal governments (both federally recognized and state-recognized) and intertribal consortia (i.e., a partnership between two or more tribes that work together to achieve a common objective.)
- Native American Organizations (includes Indian groups, cooperatives, nonprofit corporations, partnerships, and associations that have the authority to enter into legally binding agreements)
- Puerto Rico
- US Territories
- Freely Associated States (FAS) – including local governmental entities and local non-profit organizations in the Federated States of Micronesia, the Republic of the Marshall Islands, and Palau

Ineligible Subrecipients include:

- Individuals
- For profit businesses
- State governments

**The Grantmakers will manage three phases of EJ Thriving Communities Subgrants**

Applicants must address all three phases in their applications. Phase I, Phase II, and Phase III Subgrants may address a wide range of environmental issues and consist of a variety of project types including (but not limited to) the following:

- Air quality & asthma
- Fence line air quality monitoring
- Monitoring of effluent discharges from industrial facilities
- Water quality & sampling
- Small cleanup projects
- Improving food access to reduce vehicle miles traveled
- Stormwater issues and green infrastructure
- Lead and asbestos contamination
- Pesticides and other toxic substances
- Healthy homes that are energy/water use efficient and not subject to indoor air pollution
- Illegal dumping activities, such as education, outreach, and small-scale clean-ups
- Emergency preparedness and disaster resiliency
- Environmental job training for occupations that reduce greenhouse gases and other air pollutants
- Environmental justice training for youth

Applicants who do not intend to make subawards under all three phases must include an explanation describing the reasoning behind the decision to focus on a subset of phases.

**Phase I: Assessment**
Communities must gather information, assess, and understand the problem(s) before they can thoroughly develop a plan and then implement those plans to address and eventually resolve the problem(s). The Phase I EJ Thriving Communities Subgrants (managed by the Grantmakers) will be available for severely capacity-constrained community-based organizations and/or "entry-level" applicants to assist them during the initial steps of their work to address specific issues impacting them locally by conducting assessments of environmental and public health concerns. Typically, Phase I EJ Thriving Communities Subgrants will be for up to $150,000 each for a one-year project period. Phase I projects can address multiple environmental issues (e.g., air quality, water contamination, toxic substances, etc.). The following is a list of the types of activities which may be considered by the Grantmakers for Phase I EJ Thriving Communities Subgrants. It is provided for illustrative purposes only and is not all inclusive.

- research (that is incidental to the project design)
- sampling
- testing
- monitoring
- investigations
- surveys and studies
- public education

**Fixed Amount Subawards for Phase I and Noncompetitive Subawards** - Successful Grantmakers may, but are not required to, use fixed amount subawards to fund all or part of the $150,000 Phase I competitive planning subawards and must use fixed amount subawards for any noncompetitive $75,000 subawards provided to **severely** capacity-constrained community based nonprofit organizations with limited capacity to carry out Federally

funded projects. (See Section I.D.1.c of the RFA for more details on the noncompetitive fixed amount subawards).

As provided in 2 CFR 200.1 *Fixed amount awards* are a type of subaward:

[U]nder which . . . a pass-through entity provides a specific level of support without regard to actual costs incurred under the [subaward]. This type of [subaward] reduces some of the administrative burden and record-keeping requirements for both the [subrecipient] . . . [and] pass-through entity. Accountability is based primarily on performance and results.

Additional information on fixed amount awards is available in 2 CFR 200.201(b) and 2 CFR 200.333. Section 9.0 of EPA's Subaward Policy describes types of fixed amount subawards that EPA will approve. For example, EPA may approve fixed amount awards for training, community meetings or report development that are funded on a milestone completion or unit price basis. Note also that subawards for Phase I competitive planning subawards may be structured to include fixed amount components (e.g., per trainee fees for completed training courses or lump sum payments to conduct community meetings) and cost reimbursement payments for subrecipient program staff compensation as long as the fixed amounts do not duplicate payments made on a cost-reimbursement basis.

Applicants should describe what types of activities they will allow subrecipients to carry out under fixed amount subawards and their approach to pricing those agreements. EPA Project Officers will work with successful applicants to facilitate approval for fixed amount subawards, the process for which can be found in section E of EPA's Subaward Frequent Questions. Any EPA cooperative agreement that includes fixed amount subawards will include a term and condition that specifies the regulatory requirements that EPA has waived pursuant to 2 CFR 200.102(c).

**Phase II: Planning**

The Phase II EJ Thriving Communities Subgrants (managed by the Grantmakers) will be available for community-based organizations and other Eligible Subrecipients who already have a strong understanding of their local environmental and/or public health issues and are ready to formulate a community-wide plan to address those issues. Developing key cooperative partnerships with community stakeholders is an essential part of developing a community-wide plan and later implementing that plan. Therefore, partnership development will be a key aspect of the Phase II subgrants. Typically, a Phase II EJ Thriving Communities Subgrant will be for up to $250,000 each for a 1 to 2-year project period. Phase II project activities can address multiple environmental issues (e.g., air quality, water contamination, toxic substances) and should also include plan formulation and partnership development activities to address those environmental issues. The following is a list of the types of activities which may be considered by the Grantmakers for a Phase II EJ Thriving Communities Subgrant. It is provided for illustrative purposes only and is not all inclusive.

- Planning
- Partnership-building

- Public outreach and education
- Coordination with community stakeholders to address environmental issues
- Training activities for community organizations and community members
- Projects and activities to spur community involvement (e.g., cleanups of vacant lots)
- Smaller land purchases and acquisitions that require less than half of the total amount of subgrant funding

**Phase III: Project Development**

The Phase III EJ Thriving Communities Subgrants (managed by the Grantmakers) will be available for community-based nonprofit organizations and other Eligible Subrecipients who already have a strong understanding of their local environmental and/or public health issues, have already formulated a community-wide plan addressing those issues, and/or are now ready to develop the technical aspects of the project (i.e., implement the project on the ground). Developing key cooperative partnerships with community stakeholders is an essential part of developing a community-wide plan and later implementing that plan. Therefore, partnership development will be a key aspect of the Phase III subgrants as well. Typically, a Phase III EJ Thriving Communities Subgrant will be for up to $350,000 each for a 2-year project period. Phase III projects can address multiple environmental issues (e.g., air quality, water contamination, toxic substances). The following is a list of the types of activities which may be considered by the Grantmakers for a Phase III EJ Thriving Communities Subgrant. It is provided for illustrative purposes only and is not all inclusive.

- Project Development
- Blueprints for construction or cleanup projects, schematics, and technical development
- Work to get permits in place directly related to an environmental project
- Smaller land purchases and acquisitions that require less than half of the total amount of subgrant funding
- Implementation of project plans
- Public outreach and education

To find the latest information about the EJ TCGM program, visit the following link:

https://www.epa.gov/environmentaljustice/environmental-justice-thriving-communities-grantmaking-program

**C. Authority**

Congress provided EPA with both funding and expanded authority to further environmental justice through financial assistance programs in the Consolidated Appropriations Act, 2022 (Public Law 117-103) and Consolidated Appropriation Act, 2023 (Public Law 117-238), which provided funding for environmental justice implementation and training grants. EPA has statutory authority to award cooperative agreements to eligible entities to stand-up programs and

processes to build the capacity of underserved communities and CBOs. EPA interprets the term "training" in these statutes to include capacity building activities such as technical assistance.

Additionally, in the IRA Congress codified the Environmental and Climate Justice Block grant program at CAA 138 and appropriated $2.8 billion for grants authorized by CAA 138(b). Eligible activities are described in CAA 138(b)(2) and include: (A) community-led air and other pollution monitoring, prevention, and remediation, and investments in low- and zero-emission and resilient technologies and related infrastructure and workforce development that help reduce greenhouse gas emissions and other air pollutants; (B) mitigating climate and health risks from urban heat islands, extreme heat, wood heater emissions, and wildfire events; (C) climate resiliency and adaptation; (D) reducing indoor toxics and indoor air pollution; or (E) facilitating engagement of disadvantaged communities in State and Federal advisory groups, workshops, rulemakings, and other public processes. EPA interprets the term "community-led air and other pollution monitoring, prevention and remediation . . ." in CAA 138(b)(2)(A) to allow EPA to fund activities to address water pollution, drinking water contamination, pesticide contamination, toxic substance contamination, solid and hazardous waste contamination, and hazardous substance contamination as well as air pollution.

## D. Responsibilities of the EJ Thriving Communities Grantmakers

The awards under this RFA will be for the pass-through subgrant program in which the EPA will award cooperative agreements for up to 11 pass-through entities (known as Grantmakers) who will collaborate with EPA to design application in-take, community outreach, application evaluation, subawards, and project tracking processes for projects proposed by Eligible Subrecipients for EJ Thriving Communities Subgrants for community projects and capacity-building efforts for CBOs. Grantmakers will make final decisions. Consistent with the objectives of this RFA, applicants should describe in their applications and workplan (See Section IV), and will be evaluated based on, the quality of their plans to carry out an EJ Thriving Communities Subgrant program. Eligible Subrecipients, especially from underserved communities and urban, rural, and remote communities, will be made aware of, and can access, the redesigned application, subaward, and project management processes. Applicants will also be evaluated on their plan and approach for competing the subawards to ensure it is designed to result in awards to a diverse group of subrecipients to meet the objectives of this RFA. Applicants are strongly encouraged to include the following activities, and any others they deem relevant, in their applications to meet the objectives of this RFA:

### 1. Development of Application Submission, Evaluation, and Subgrant Processes

Applicants should describe their plan and approach to make funds available to Eligible Subrecipients, particularly from underserved communities, communities in urban, remote and rural areas, and those with the highest degree of burden and capacity constraints, as well as increasing awareness of the existence of the Grantmaker and the availability of EJ Thriving

Communities Subgrants. Information disseminated through outreach efforts should include at a minimum:

a. Designing a competitive application submission and evaluation process for community projects addressing local environmental and public health issues. The process should include an open call for applications on a "rolling basis" where applicants can submit applications when the applicants are ready. The process should be accessible to communities and CBOs without reliable access to internet services and significantly reduce the burden on applying entities (as compared to the federal grants process).

b. Development of an efficient subgrants process. Overall, the application, evaluation, and subgrant processes should minimize the "time to award" for entities selected to receive subaward funding. **EJ TCGM applicants should design their subaward process so that the average time it takes for applications to be submitted, evaluated, and awarded is under 6 months (at a minimum).** This timeframe will greatly benefit under-resourced CBOs and in some cases may be the difference between a CBO remaining in operation or dissolving. Additionally, the Grantmakers must develop a plan to ensure that all funds awarded to them are expended within 36 months of receipt of the initial award as required by CAA 138(b)(1) which limits project periods to 3 years. Thus, each applicant to the EJ TCGM program should make clear how they propose to make their subaward process efficient and effective in getting the maximal amount of funding to communities within the required timeframe. **NOTE -** For applicants applying to be a Regional Grantmaker (see geographic coverage details in Section I.D.4), the application **must** demonstrate that a minimum of 80% of the total funds proposed to be awarded to the Regional Grantmaker pass through to Eligible Subrecipients. Any application or submitted budget for a Regional Grantmaker award that does not demonstrate this 80% requirement will be deemed ineligible. This requirement does not apply for those applicants applying to be a National Grantmaker, as the National Grantmaker has additional coordination responsibilities in addition to subaward capabilities.

c. Reserving a limited number of noncompetitive EJ Thriving Communities Subgrants for severely capacity-constrained communities and CBOs where these entities can receive funding and support from a Grantmaker without submitting a competitive application. These noncompetitive small subawards should be for a fixed amount of $75,000 each and should be awarded in compliance with Section 9.0 of EPA's Subaward Policy which describes types of fixed amount subawards that EPA will approve. As provided in the EPA Subaward Policy, EPA staff will not direct, recommend, or suggest that pass-through entities provide subawards to particular entities.

d. Grantmakers should put policies in place that limit the number of times a particular Eligible Subrecipient can receive an EJ Thriving Communities Subgrant within a certain period of time. For example, a pass-through entity may decide that an Eligible Small Subrecipient may not receive more than two EJ Thriving Communities Subgrants within the 3-year period of performance for the Grantmaker or a shorter interval as deemed appropriate by the pass-through entity.

## 2. Communications Planning and Outreach Activities

Applicants should demonstrate how they will provide substantive communication and conduct outreach to Eligible Subrecipients from underserved communities, communities in remote and rural areas, and community stakeholders with the highest degree of burden and capacity constraints to facilitate their full participation in the new EJ Thriving Communities Subgrants Program. This should include describing the process and approach to coordinate directly with the Regional and/or national EJ Thriving Communities Technical Assistance Center (TCTAC). Communications and outreach activities may include:

a. Hosting pre-application conference calls, webinars, and/or in-person meetings accessible to all underserved communities to the maximum extent practicable, especially urban, rural, and remote communities, making them aware of the availability of the EJ Thriving Communities Subgrant funding, deadlines for submitting applications, guidance to aid in understanding the Grantmaker's application and subawards process, and to give potential Eligible Subrecipients opportunities to ask questions.
b. Developing mass mailers, online listservs, websites, printed materials, as well as conducting site visits and/or in-person workshops to communicate the goals and availability of the EJ Thriving Communities Subgrant funding.
c. Ensuring communications and communication materials are available in multiple languages reflective of the needs in the target service area. Applicants should describe how they will provide translation and other interpretive services to make the information and funding available to those not fluent in English or that have limited English proficiency.
d. Any other outreach and communications activities the Grantmaker believes will be effective in facilitating the participation of underserved communities, urban, rural and remote communities, and capacity constrained CBOs in funding programs for environmental justice and in the environmental decision-making process.

## 3. Development of a Project Management Tracking and Reporting System

Applicants should describe their plan, approach, and process for project management including oversight for funding subrecipients and a system to track all projects and subrecipients of subaward funding and manage the subawards in compliance with the requirements specified in 2 CFR 200.332 and EPA's Establishing and Managing Subawards Term and Condition. Appendix D of EPA's Subaward Policy provides an optional template for a subaward agreement that meets regulatory requirements. Applicants should include a plan to develop a sophisticated system to monitor progress for each funding subrecipient and relay this information to EPA as required by the reporting terms and conditions of their EPA award. Additionally, applicants should describe their plan for subrecipient reporting, including how frequently reports will be required, the level of detail and format of those reports, and how those reports will be submitted by subrecipients. Applicants should also identify a process for engaging EPA assistance should any subrecipient require additional technical support to meet project deadlines or achieve progress. Applicants

should prioritize the goals of reducing burden on subrecipients while still providing reasonable and quality oversight as they are developing their plans for subrecipient reporting.

### 4. Grantmaker Geographic Coverage

As stated in Sections I and II, EPA intends to award up to 11 cooperative agreements under this RFA for up to approximately $50 million each to be funded incrementally over a 3-year period of performance. EPA plans to award approximately 10 Regional Grantmaker awards and one nationwide award to a National Grantmaker who will provide coordination services for the Regional Grantmakers and fill gaps in coverage. Applicants can submit up to two applications under this RFA as long as each application is for a different Geographic Area, e.g., one for Regional Geographic Area #1 and one for Regional Geographic Area #2. Applicants may also submit one application for a Regional Geographic Area and another application for the National Geographic Area. Each application must be separately submitted through www.grants.gov. If an applicant submits more than two applications, EPA staff will contact the applicant to identify which two applications EPA will consider. If an applicant submits two applications and is selected for two awards, EPA may, if appropriate, combine those selections into one award (See Section VI.D). Any questions about submitting multiple applications should be directed to the contact identified in Section VII prior to application submission. The geographic areas are:

- **Regional Geographic Area #1** includes *EPA Region 1* (CT, ME, MA, NH, RI, VT, and 10 tribal nations)
- **Regional Geographic Area #2** includes EPA *Region 2* (NJ, NY, PR, VI, and 8 federally recognized Indian Nations)
- **Regional Geographic Area #3** includes *EPA Region 3* (DE, DC, MD, PA, VA, WV, and 7 federally recognized tribes)
- **Regional Geographic Area #4** includes *EPA Region 4* (AL, FL, GA, KY, MS, NC, SC, TN, and 6 tribes)
- **Regional Geographic Area #5** includes *EPA Region 5* (IL, IN, MI, MN, OH, WI, and 35 tribes)
- **Regional Geographic Area #6** includes EPA *Region 6* (AR, LA, NM, OK, TX, and 66 tribal nations)
- **Regional Geographic Area #7** includes *EPA Region 7* (IA, KS, NE, MO, and 9 tribal nations)
- **Regional Geographic Area #8** includes *EPA Region* 8 (CO, MT, ND, SD, UT, WY, and 28 Tribal Nations)
- **Regional Geographic Area #9** includes *EPA Region 9* (AZ, CA, HI, NV, American Samoa, Commonwealth of the Northern Mariana Islands, Federated States of Micronesia, Guam, Marshall Islands, Republic of Palau, and 148 tribes)
- **Regional Geographic Area #10** includes *EPA Region 10* (AK, ID, OR, WA, and 271 native tribes)
- **National Geographic Area**

Applicants should design an approach to ensure that EJ Thriving Communities Subgrants are available to Eligible Subrecipients throughout the entire geographic area they are applying under, including to rural and remote areas.

Please note that the amount of funding provided to selected applicants will be commensurate with the level and amount of EJ Thriving Communities Subgrants to be provided under the award. Those selected applicants providing less EJ Thriving Communities Subgrants may receive lower amounts of funding than recipients providing greater amounts or serving a larger geographic area. **NOTE -** All applicants are encouraged to submit a project budget of $50 million.

**Applications for National Geographic Area Coverage** – EPA is also interested in receiving applications for Grantmakers who will provide a number of subgrants nationwide to fill gaps and potential needs that other Grantmakers may not have the ability to cover. This nationwide service may especially be necessary in areas of the country where it may be more difficult to reach communities through more traditional channels. Potential areas of concern are remote areas of Alaska, rural areas of the U.S. Territories, areas along the US-Mexico Border, and remote parts of the contiguous United States. In addition to demonstrating how they will provide EJ Thriving Communities Subgrants to areas of the country where gaps may occur, applicants interested in being a National Grantmaker should demonstrate how they will coordinate services amongst the 10 Regional Grantmakers. These coordination services should include plans and approaches for project management, including oversight for funding subrecipients and a system to coordinate project tracking and reporting efforts between the Regional Grantmakers, National Grantmaker, and EPA. National applicants should have the ability to identify patterns related to community needs across regional geographic areas, synthesize best practices for all regional Grantmakers, and develop tools, databases, platforms, and/or clearinghouses to facilitate connecting Eligible Subrecipients to their Regional Grantmaker. Applicants for National Grantmaker awards may also propose approaches (e.g., periodic virtual meetings) to coordinate services by the Regional Grantmakers to promote consistency and achieve efficiencies, as well as provide common services such as training, technical assistance, and outreach tools to the 10 Regional Grantmakers.

Applicants selected for award in a particular geographic area may also provide with EPA's approval EJ Thriving Communities Subgrants to Eligible Subrecipients in other geographical areas. For example, a recipient may provide a subgrant to a CBO in a remote area outside its geographic area if it is uniquely qualified or has unique insight in working with that remote community, as determined by the EPA Project Officer. The final scope of work that EPA's Project Officer negotiates with successful applicants will specify the terms under which recipients may provide subgrants outside of their geographic areas.

Accordingly, it is expected that there will be multiple awards resulting from this competition and providing assistance outside of the geographic area of an award may be necessary. Applicants should describe how they would provide coverage outside the geographic area of their award, collaborate with other Grantmakers and federal, state, and local grant and subgrant programs to avoid duplication of effort, and share best practices among Grantmakers to maximize the value of the EJ Thriving Communities Subgrants provided to Eligible Subrecipients as envisioned by

this RFA. This may include such things as including links on their Grantmaker website to help prospective and existing Eligible Subrecipients determine which Grantmaker to access, and how to do so. Additionally, as provided in EPA's General Terms and Conditions "Copyrighted Material and Data" (a link to which can be found in Section VI of EPA's solicitation provisions- see Section I.G), EPA may authorize all Grantmakers to use copyrighted works or other data developed with Agency funds by other Grantmakers when such use promotes efficient and effective use of Federal grant funds.

**REMINDER** - For applicants applying to be a Regional Grantmaker, the application **must** demonstrate that a minimum of 80% of the total funds proposed to be awarded to the Regional Grantmaker pass through to Eligible Subrecipients. Any application or submitted budget for a Regional Grantmaker award that does not demonstrate this 80% requirement will be deemed ineligible. This requirement does not apply for those applicants applying to be a National Grantmaker, as the National Grantmaker has additional coordination responsibilities in addition to subaward capabilities.

**5. Grantmaker Results, Success Stories, and Feedback**

To facilitate program effectiveness, applicants should describe an approach for documenting and measuring the success of their role as a pass-through entity (Grantmaker) and the success of the subrecipients receiving EJ Thriving Communities Subgrants. Grantmakers may include information on success stories attesting to the accessibility of the subaward application process, the ease of use to submit an application, the outreach conducted to make communities aware of the program, aggregated environmental and public health improvements, and more. A success story is generally one that demonstrates a subrecipient's project that successfully addresses longstanding environmental justice issues in a community.

Applicants should also describe an approach for seeking feedback on their Grantmaker from Eligible Subrecipients and prospective subrecipients, that includes their satisfaction with the Grantmaker and the subgrant program, ideas on ways to make the Grantmaker and subaward process more effective and what steps the applicant will take to address the feedback to improve their role as a pass-through entity. Applicants should make a concerted effort to obtain relevant feedback on their role as a Grantmaker from underserved communities and communities in urban, rural, and remote areas.

**Note about Surveys** - If the applicant intends to use EPA funds to develop and administer surveys or other information collections subject to 5 CFR Part 1320 for feedback, compliance with the OMB regulations implementing Paperwork Reduction Act (PRA) by EPA will be necessary. Compliance with the OMB PRA regulations will require a considerable amount of time. Therefore, EPA strongly encourages applicants to obtain other sources of funds to develop and administer surveys related to their Grantmaker activities.

**E. Ineligible Activities**

The following are examples of ineligible activities under the awards to be made from this RFA[4]

- Lobbying as restricted in 2 CFR 200.450.
- Legal advice, services, or representation
- Travel for federal employees
- Costs for other activities that are unallowable under 2 CFR Part 200, Subpart E.

## F. EPA Strategic Plan Linkage and Anticipated Outputs, Outcomes and Performance Measures

This announcement supports key priorities of the Administration as detailed in Executive Order 13985 signed by President Biden on January 20, 2021 titled, ***Advancing Racial Equity and Support for Underserved Communities Through the Federal Government,*** and Executive Order 14008 signed by President Biden on January 27, 2021, titled ***Tackling the Climate Crisis at Home and Abroad***. Specifically, the projects selected under this RFA will support the federal government's efforts to advance racial equity and environmental justice, address health outcome disparities, and support underserved communities.

In addition, pursuant to Section 6a of EPA Order 5700.7, "Environmental Results under EPA Assistance Agreements," (see https://www.epa.gov/grants/epa-order-57007a1-epas-policy-environmental-results-under-epa-assistance-agreements), EPA must link assistance agreements to the Agency's Strategic Plan. EPA's current Strategic Plan for 2022-2026 is available at: https://www.epa.gov/planandbudget/strategicplan.

The activities to be funded under this RFA support the FY 2022-2026 EPA Strategic Plan. Awards made under this RFA will support Goal 2 (Take Decisive Action to Advance Environmental Justice and Civil Rights), Objective 2.1, (Promote Environmental Justice and Civil Rights at the Federal, Tribal, State, and Local Levels) of the Strategic Plan which states that: *"Building Community Capacity and Climate Resilience and Maximizing Benefits to Overburdened and Underserved Communities: EPA will increase support for community-led action by providing unprecedented investments and benefits directly to communities with environmental justice concerns and by integrating equity throughout Agency programs."* Applicants should explain in their application how their Grantmaker proposal will further this goal and objective and they will be evaluated on this under the evaluation criteria in Section V.A.

EPA Order 5700.7 also requires that applicants adequately describe environmental outputs and outcomes to be achieved under assistance agreements. An important aspect of the EJ TCGM program will be to document the capacity built and other changes achieved by both the subrecipients and the Grantmakers themselves, including sharing information about subrecipient successes and lessons learned, as well as the ability of the Grantmakers to respond to and meet the needs of communities most impacted by environmental injustices. Organizations applying to be Grantmakers must incorporate program evaluation activities from the outset of their program

[4] This is not an exhaustive list of ineligible activities. All activities receiving EPA and DOE funding are subject to requirements for cost allowability in applicable regulations including limitations on consultant fees in 2 CFR Part 1500. Additionally, only activities described in the EPA approved scope of work are eligible for funding.

design and implementation to meaningfully document and measure their progress towards meeting project goals. Specific statements must be included that describe the environmental results of the proposed project in terms of well-defined outputs and, to the maximum extent practicable, well-defined outcomes that will demonstrate how the project will contribute to the goals and objectives described above.

1. **Outputs.** The term "output" means an environmental activity, effort, and/or associated work product related to an environmental goal and objective that will be produced or provided over a period or by a specified date. Outputs may be quantitative or qualitative but must be measurable during an assistance agreement funding period. Examples of expected outputs from projects may include the following:

- The total number of Phase I applications received annually
- The total number of Phase II applications received annually
- The total number of Phase III applications received annually
- The total number of subawards made annually, including geographic distribution throughout the Regional Geographic Area and/or National Geographic Area
- Documented outreach efforts (e.g., webinars, in-person workshops, conference presentations) undertaken by an Grantmaker to make Eligible Subrecipients, especially in underserved communities and communities in urban, remote and rural areas aware of their services, including geographic distribution throughout the Regional Geographic Area and/or National Geographic Area
- Methods and tools developed by a Grantmaker to ensure that their subaward program is accessible to Eligible Subrecipients, especially in underserved communities and communities in remote and rural areas.
- Reports on feedback received from those who submit EJ Thriving Communities Subgrant applications and those who receive a subaward to improve the efficiency and effectiveness of the Grantmaker's subaward program.
- Reports on program oversight, management and evaluations for measuring the success of a Grantmaker in meeting the objectives of this RFA as described above.
- Number of improvements made to an Grantmaker's subaward program based on feedback from Eligible Subrecipients.
- Aggregated environmental and/or public health improvements in Regional Geographic Area serviced by the Grantmaker.
- Any other appropriate and relevant outputs identified by applicants that contribute to the objectives of this RFA.

2. **Outcomes.** The term "outcome" means the result, effect or consequence that will occur from carrying out an environmental program or activity that relates to an environmental or programmatic goal or objective. Outcomes may be environmental, behavioral, health-related, or programmatic in nature; must be quantitative; and may not necessarily be achievable within an assistance agreement funding period. Additionally, outcomes should be organized by expected time period (short-term, intermediate, and long-term). Short-term outcomes refer

to changes in knowledge or attitudes and usually occur during the project period. Intermediate outcomes refer to changes in behaviors and actions due to the knowledge acquired and are usually measured within several months after the end of the project. Long-term outcomes refer to changes in conditions and are measured a year or several years after project completion. Short-term, intermediate, and long-term outcomes are related and build on one another. EPA encourages recipients to identify outcomes wherever possible because they lead to environmental and/or public health improvement more clearly than outputs. Examples of expected outcomes from projects may include the following:

- Increase in number of residents who know how to access local air quality information
- Increase in number of communities who have access to reliable data specifically about the environment issues impacting their community
- Increase in number of communities with a community-wide plan in place to tackle environmental and public health issues
- Increase in partnerships between community stakeholders
- The reduction of waterborne pollutants in local waterbodies and/or increase in fish populations.
- The increased ongoing communication to the underserved communities resulting in measurable risk reduction related to a specific environmental issue and communities' participation directly in that risk reduction.
- Improved public health (e.g., lead, asthma, etc.) in community through taking actions that reduce exposure to environmental risks
- Increased greenspace, green infrastructure and/or approaches to address extreme weather and flooding

1. **Short-term** (change in knowledge) – Increase in number of residents that know about indoor asthma triggers (during project)

2. **Intermediate** (change in behavior) – Increase in number of residents that install and routinely check their home indoor air monitor (6 - 12 months after project)

3. **Long-term** (change in conditions) – Reduction in asthma rates among community residents (2+ years after project)

**3. <u>Performance Measurement Plan.</u>** Applicants should describe how they plan to track and monitor their project performance and progress throughout the performance period including their success in meeting the expected outputs and outcomes. Outputs and outcomes are critical components of an applicant's overall plan for measuring their project's performance. Applicants will be evaluated on the quality of their overall performance measurement plan including the proposed outputs, outcomes, and associated timeframes for achieving those results. Generally, higher quality performance measurement plans include specific target metrics where possible for both outputs and outcomes. The applicant's performance measurement plan will help gather insights, will be the mechanism to track successful progress, output and outcome strategies, and will provide the basis for developing lessons learned to inform future recipients.

The following questions are also useful to consider when developing output and outcome measures of quantitative and qualitative results:

- What are the measurable short term and longer term results the Grantmaker will achieve?
- How will the Grantmaker track "time-to-award" and maximize efficiency to make subawards?
- How does the Grantmaker measure progress in achieving the expected results (including outputs and outcomes) and how will the approach use resources effectively and efficiently?
- How will the Grantmaker provide project management and oversight on funded subaward projects? How will EPA be informed and involved?
- Are the projected outputs and outcomes specific and detailed? Are specific target measures included where possible? Are target measures reasonable and achievable within the project period and for the funding amount?

**G. Additional Provisions for Applicants Incorporated into the Announcement**

Additional provisions that apply to sections III, IV, V, and VI of this RFA and/or awards made under this RFA, can be found at EPA Announcement Clauses. These provisions are important for applying to this RFA and applicants must review them when preparing applications for this RFA. If you are unable to access these provisions electronically at the website above, please contact the EPA point of contact listed in this RFA (usually in Section VII) to obtain the provisions.

## II. AWARD INFORMATION (back to *Contents by Section*)

**A. Funding Availability**

EPA anticipates awarding a total of approximately $550 million in funding under this RFA. EPA expects to make up to 11 incrementally funded awards with periods of performance of three years with total funding of approximately up to $50 million per award, with up to approximately $16.5 million budgeted for each year. There will be one award for each Regional Geographic Area detailed in Section I.D.4 plus one award for a National Grantmaker. Depending on funding availability, the quality of applications, satisfactory progress, and other applicable considerations. The specific number of awards and the amounts may vary from these estimates. For example, if an applicant submits two applications, one for Regional Geographic Area #1 and one for Regional Geographic Area #2 and is selected for award to cover both geographic areas, then EPA may combine both awards into one award to that single entity.

For application submission purposes, applicants should prepare budgets for up to $50 million over three years with up to approximately $16.5 million budgeted for each year. The amount of incremental funding available in subsequent years will depend on funding availability, satisfactory progress, and other applicable considerations with the understanding that EPA's Project Officer will negotiate the amount of the final budget based on these considerations.

**B. Number, Type, and Period of Performance of Anticipated Awards**

It is anticipated that up to 11 awards will be incrementally funded under this RFA, one for reach Geographic Area. The awards for selected proposals will be in the form of cooperative agreements because the EJ TCGM program requires substantial involvement and interaction between the applicant and EPA. Although EPA will negotiate precise terms and conditions relating to substantial involvement as part of the award process, the anticipated substantial federal involvement for these projects may include:

- Collaboration on the development of Evaluation Criteria to be used to evaluate applications from Eligible Subrecipients although Grantmakers will make the final decisions.
- EPA staff participation in competitive selection panels or reviewing proposal submissions at the request of Grantmakers to the extent permissible in section 10.0(b) of the EPA Subaward Policy
- Close monitoring of the recipient's performance to verify the results proposed by the applicant;
- Collaboration during the performance of the scope of work;
- In accordance with the Procurement Standards in 2 CFR Part 200, review of proposed procurements;
- Reviewing qualifications of key personnel (EPA will not select employees or contractors employed by the award recipient); and
- Review and comment on the content of printed or electronic publications and/or education, outreach and training tools and materials prepared (the final decision on the content of reports rests with the recipient).
- EPA staff participation in monitoring performance and/or providing technical support for subrecipients that require additional technical assistance to meet project and/or workplan deliverables

EPA does not have the authority to select employees or contractors employed by the recipient or subrecipients. The final decision on the content of reports rests with the recipient.

Applicants should plan for the period of performance of three years with awards to begin on **November 1, 2023**. All awards are subject to the availability of funds, the quality of the applications submitted, and other applicable considerations.

In appropriate circumstances, EPA reserves the right to partially fund applications by funding discrete portions of the proposed projects. If EPA decides to partially fund an application, it will do so in a manner that does not prejudice any applicant or affect the basis upon which the application was evaluated and selected for award, thereby maintaining the integrity of the competition and selection process.

EPA also reserves the right to make additional awards under this RFA, consistent with Agency policy and guidance, if additional funding becomes available after the original selections are made. Any additional selections for awards will be made no later than 6 months after the original selection decisions. Additional and future funding for awards under this RFA is contingent on the availability of future appropriations.

## III. ELIGIBILITY INFORMATION (back to *Contents by Section*)

**Note: Additional provisions that apply to this section can be found at EPA Announcement Clauses.**

### A. Eligible Applicants

The entities eligible to apply under this assistance listing and serve as an EJ Thriving Communities Grantmaker are as follows:

- a community-based nonprofit organization (includes philanthropic organizations and community foundations); or
- a partnership of community-based nonprofit organizations*
- a partnership between*— a federally recognized tribal government and a community-based nonprofit organization
- a partnership between*— an institution of higher education and a community-based nonprofit organization;

### B. Partnerships

Below are several terms defining the multiple relationships that will be managed through the Grantmaker awards. Applicants should use these terms in their applications to define the types of relationships and collaborations that will play a part in their work as a Grantmaker:

- **Statutory Partnerships***: For the purposes of the Environmental and Climate Justice Block Grants programs authorized by section 138 of the Clean Air Act and other funding available under this RFA, a "statutory partnership" is defined as a formal relationship between two or more community based nonprofit organizations (CBOs), or between an Indian tribe and a CBO…or between an institution of higher education and a CBO that is memorialized in writing and is legally binding under applicable law. This formal relationship must include a subaward to a partnering CBO. Therefore, an applying organization that is not itself a community-based nonprofit organization must provide a subaward to one or more community-based nonprofit organization(s) to be eligible to receive a Grantmaker award.

  The statutory partnership agreement must be signed by both parties and specify which member of the partnership will enter into the assistance agreement with EPA for the purposes of accountability for the proper expenditure of federal funds, performance of the assistance agreement, liability for claims for recovery of unallowable costs incurred under the agreement and must specify roles in performing the proposed scope of work for the assistance agreement. For purposes of this RFA, the direct recipient of the EPA funds must be a CBO, federally recognized tribe, or institution of higher education and the

CBO partners must receive the funds from the direct recipient as subawards if the CBO will not be the direct recipient of funding from EPA. Thus, a statutory partnership must include a subaward agreement from the direct recipient of EPA funds to the partnering CBO(s). As a policy matter, the statutory partnership agreement must also at a minimum specify the roles and responsibilities of each statutory partner (direct recipient and subrecipient) in the overall project.

The statutory partnership agreement must be documented in the application with a **signed Letter of Commitment** from the community-based nonprofit organization who will receive funding directly from EPA or the subaward. Additionally, signed Letters of Commitment from the partnering CBO(s) must indicate a subaward agreement is planned to establish the statutory partnership. The statutory partnership agreement must also at a minimum specify other roles and responsibilities of each partner, including how the priority environmental and public health issues of the disadvantaged communities being served by the partnership are identified and selected for projects and activities, as well as the role of community leaders in the decision-making processes and implementation of the proposed Grantmaker projects for funding. **NOTE** – Applicants are not required to include the final statutory partnership agreement as a part of their initial application but must include the necessary details as expressed above if a subaward is present. EPA will require that applicants selected for funding consideration provide copies of the executed final statutory partnership agreement to EPA's Project Officer for submission to the EPA Award Official prior to award. Multiple statutory partnerships with CBOs are encouraged.

- **Collaborative Pass-through Relationships**: These relationships are subawards to other nonprofits (non-CBOs), units of government, institutions of higher education, and/or medical service providers not covered by a statutory partnership (as defined above). The Grantmaker will utilize these collaborative pass-through relationships to assist in the direct development and implementation of the EJ Thriving Communities Subgrants program. Subawards to local governmental entities and hospitals to assist the Grantmaker in its outreach to local communities is an example of these types of collaborative pass-through relationships. **NOTE**- These collaborative pass-through relationships are not the same as the EJ Thriving Communities Subgrants that each Grantmaker will make directly to Eligible Subrecipients throughout the 3-year project period. The subgrants are denoted with the term subgrants and are for the explicit purpose of Eligible Subrecipients performing direct work in communities addressing Assessment (Phase I), Planning (Phase II), and/or Project Development (Phase III) needs.

- **Procurement Relationships:** These relationships are for the acquisition of goods and services from for-profit firms and individual consultants. All procurement relationships must be established in compliance with the competitive requirements in 2 CFR Part 200 and 2 CFR Part 1500 as interpreted in the Best Practice Guide for Procuring Services, Supplies, and Equipment Under EPA Assistance Agreements.

- **Program Participants**: These are individuals receiving stipends, travel assistance or subsidies/rebates for purchasing services/products for environmental stewardship.

Workshop participants and focus groups are examples of program participants as are representatives of community-based organizations who participate in the governance process described above.

- **Collaborative In-Kind Relationships**: These relationships are agreements between entities to cooperate to achieve common goals/objectives that do not involve transfers of EPA funds.

For this RFA, the EJ Grants program defines a "community-based nonprofit organization" (CBO) as a *public or private nonprofit organization that supports and/or represents a community and/or certain populations within a community through engagement, education, and other related services provided to individual community residents and community stakeholders. A "community" can be characterized by a particular geographic area and/or by the relationships among members with similar interests and can be characterized as part of a broader national or regional community where organizations can be focused on the needs of urban, rural, and/or tribal areas, farmworkers, displaced workers, children with high levels of lead, people with asthma, subsistence fishers, and other similar groups.*

Consistent with the definition of *Nonprofit organization at* 2 CFR 200.1, the term "nonprofit organization means any corporation, trust, association, cooperative, or other organization that is operated mainly for scientific, educational, service, charitable, or similar purpose in the public interest and is not organized primarily for profit; and uses net proceeds to maintain, improve, or expand the operation of the organization**.** ***Institutions of Higher Education*** **as defined in 2 CFR 200.1 may only apply for funding in statutory partnership with one or more community-based nonprofit organizations as required by section 138(b)(3) of the Clean Air Act.** For-profit colleges, universities, trade schools, and hospitals are ineligible. Eligible nonprofit organizations may, but are not required to be, exempt from taxation under section 501 of the Internal Revenue Code. Workforce Investment Boards and organized Labor Unions that meet these criteria may be eligible community-based nonprofit organizations if they qualify based on criteria specified in the Notice of Funding Opportunity.

Nonprofit organizations described in Section 501(c)(4) of the Internal Revenue Code that engage in lobbying activities as defined in Section 3 of the Lobbying Disclosure Act of 1995 are not eligible to apply. For-profit organizations or proprietary trade schools are also not eligible to apply.

The following entities are **INELIGIBLE** to receive an award to be a Grantmaker (i.e., pass-through entity) under this RFA:

- state and local governments and their agencies and instrumentalities;
- US Territories and possessions
- hospitals;

- quasi-governmental entities (e.g., water districts, utilities);[5]
- for-profit businesses
- International organizations
- Individuals

## C. Cost Sharing or Matching Funds

No cost-sharing or matching is required as a condition of eligibility under this competition.

## D. Threshold Eligibility Criteria

All applications must meet the eligibility requirements described in Sections III.A., B., C., and D. to be considered eligible for award. Applicants deemed ineligible for funding consideration as a result of the threshold eligibility review will be notified within 15 calendar days of the ineligibility determination.

1. Applications must substantially comply with the application submission instructions and requirements set forth in Section IV of this RFA or else they will be rejected. However, where a page limit is expressed in Section IV with respect to the application or parts thereof, pages in excess of the page limitation will not be reviewed. In addition to any page limitations, applicants are advised that readability is of paramount importance and should take precedence with respect to such things as font type and size.

2. Initial applications must be submitted through Grants.gov as stated in Section IV of this RFA (except in the limited circumstances where another mode of submission is specifically allowed for as explained in Section IV) on or before the application submission deadline published in Section IV of this RFA. Applicants are responsible for following the submission instructions in Section IV of this RFA to ensure that their application is properly and timely submitted. Please note that applicants experiencing technical issues with submitting through Grants.gov should follow the instructions provided in the Section IV.A grants.gov instructions, which includes both the requirement to contact Grants.gov and email a full application to EPA prior to the deadline.

3. Applications submitted outside of Grants.gov will be deemed ineligible without further consideration unless the applicant can clearly demonstrate that it was due to EPA mishandling or technical problems associated with Grants.gov or SAM.gov. An applicant's failure to timely submit their application through Grants.gov because they did not timely or properly register in SAM.gov or Grants.gov will not be considered an acceptable reason to consider a submission

[5] Generally, a quasi-governmental entity is one that: (1) has a close association with the government agency, but is not considered a part of the government agency; (2) was created by the government agency, but is exempt from certain legal and administrative requirements imposed on government agencies; or (3) was not created by the government agency but performs a public purpose and is significantly supported financially by the government agency.

outside of Grants.gov. Applicants should confirm receipt of their application with Jacob Burney, Burney.Jacob@epa.gov as soon as possible after submission —failure to do so may result in your application not being reviewed

**DO NOT WAIT! Register in SAM.gov and Grants.gov as soon as possible. Finalizing these registrations could take a month or more. You do not want a late registration to prevent you from being able to properly and timely submit your application through Grants.gov.**

4. Applications must be written in English only. Applications written in languages other than English will be deemed ineligible for funding.

5. **Minimum Percentage of Funds that must pass through to Communities**: For an application for a Regional Geographic Area to be deemed eligible, it must demonstrate that a minimum of 80% of the total funds proposed to be awarded to the Grantmaker pass through to Eligible Subrecipients. Any Regional Geographic Area application and/or related submitted budget that does not demonstrate this will be deemed ineligible. For example, a $50 million award must have a minimum of $40 million budgeted for Eligible Subrecipients. **Subaward funds must be accounted for in the "Other Costs" budget category.**

**NOTE** – For applications submitted for the National Geographic Area Grantmaker, the 80% minimum percentage of funds passing through to communities is **not** applicable. The National Grantmaker will be responsible for coordination services amongst all regional Grantmakers, as well as providing a number of subgrants to fill gaps. Therefore, it is in EPA's interest to allow those applying to be National Grantmakers to utilize more flexibility in how they allocate their proposed funding between subawards and coordination services.

5. Ineligible Activities: If an application is submitted that includes any ineligible tasks or activities, including but not limited to those described in Section I.E, that portion of the application will be ineligible for funding and may, depending on the extent to which it affects the application, render the entire application ineligible for funding. Subawards made to 501(c)(4) nonprofit organizations that lobby are not allowed.

6. Each application must be for one of the geographic areas listed in Section I and should include coverage for the **entire** geographic area. Applications that do not address one of the geographic areas or address more than one geographic area will be deemed ineligible.

7. Multiple Applications: Applicants can submit up to two applications under this RFA so long as each application is separately submitted and is for a different geographic area(s) (e.g., an applicant cannot submit two applications for geographic area 1). If an applicant submits more than 2 applications, EPA staff will contact the applicant to identify which 2 applications EPA will consider. Notwithstanding the above, an applicant may be a partner on another application from another eligible organization.

8. Applicants must address all three phases of subgrants in their applications as described in I.B. Applicants who do not intend to make subgrants under all three phases must include an explanation describing the reasoning behind the decision to focus on a subset of phases.

## IV. APPLICATION AND SUBMISSION INFORMATION (back to *Contents by Section*)

**Note: Additional provisions that apply to this section can be found at EPA Announcement Clauses.**

### A. Requirement to Submit through Grants.gov and Limited Exception Procedures

1. Requirement to Submit Through Grants.gov and Limited Exception Procedures
Applicants must apply electronically through Grants.gov under this RFA based on the grants.gov instructions below. If your organization has no access to the internet or access is very limited, you may request an exception from applying through Grants.gov for the remainder of this calendar year by following the procedures outlined here. Please note that your request must be received at least 15 calendar days before the application due date to allow enough time to negotiate alternative submission methods. Issues with submissions with respect to this RFA only are addressed in section 3, *Technical Issues with Submission*, below.

2. Submission Instructions
   a. SAM.gov (System for Award Management) Registration Instructions

   Organizations applying to this funding opportunity must have an active SAM.gov registration. If you have never done business with the Federal Government, you will need to register your organization in SAM.gov. If you do not have a SAM.gov account, then you will need to create an account using login.gov[6] to complete your SAM.gov registration. SAM.gov registration is FREE. The process for entity registration includes obtaining an Unique Entity ID (UEI), a 12-character alphanumeric ID assigned an entity by SAM.gov, and requires assertions, representations and certifications, and other information about your organization. Please review the Entity Registration Checklist for details on this process.

   If you have done business with the Federal Government previously, you can check your entity status using your government issued UEI to determine if your registration is active. SAM.gov requires you renew your registration every 365 days to keep it active.

   Please note that SAM.gov registration is different than obtaining a UEI only. Obtaining an UEI only validates your organization's legal business name and address. Please review the Frequently Asked Question on the difference for additional details.

   Organizations should ensure that their SAM.gov registration includes a current e-Business

[6] Login.gov a secure sign in service used by the public to sign into Federal Agency systems including SAM.gov and Grants.gov. For help with login.gov accounts you should visit http://login.gov/help.

(EBiz) point of contact name and email address. The EBiz point of contact is critical for Grants.gov Registration and system functionality.

Contact the Federal Service Desk for help with your SAM.gov account, to resolve technical issues or chat with a help desk agent: (866) 606-8220. The Federal Service desk hours of operation are Monday – Friday 8am – 8pm ET.

b. Grants.gov Registration Instructions
Once your SAM.gov account is active, you must register in Grants.gov. Grants.gov will electronically receive your organization information, such as e-Business (EBiz) point of contact email address and UEI. Organizations applying to this funding opportunity must have an active Grants.gov registration. Grants.gov registration is FREE. If you have never applied for a federal grant before, please review the Grants.gov Applicant Registration instructions. As part of the Grants.gov registration process, the EBiz point of contact is the only person that can affiliate and assign applicant roles to members of an organization. In addition, at least one person must be assigned as an Authorized Organization Representative (AOR). Only person(s) with the AOR role can submit applications in Grants.gov. Please review the Intro to Grants.gov-Understanding User Roles and Learning Workspace – User Roles and Workspace Actions for details on this important process.

Please note that this process can take a month or more for new registrants. Applicants must ensure that all registration requirements are met in order to apply for this opportunity through Grants.gov and should ensure that all such requirements have been met well in advance of the application submission deadline.

Contact Grants.gov for assistance at 1-800-518-4726 or support@grants.gov to resolve technical issues with Grants.gov. Applicants who are outside the U.S. at the time of submittal and are not able to access the toll-free number may reach a Grants.gov representative by calling 606-545-5035. The Grants.gov Support Center is available 24 hours a day 7 days a week, excluding federal holidays.

c. Application Submission Process
To begin the application process under this RFA, go to Grants.gov and click the red "Apply" button at the top of the view grant opportunity page associated with this opportunity.

The electronic submission of your application to this RFA must be made by an official representative of your organization who is registered with Grants.gov and is authorized to sign applications for Federal financial assistance. If the submit button is grayed out, it may be because you do not have the appropriate role to submit in your organization. Contact your organization's EBiz point of contact or contact Grants.gov for assistance at 1-800-518-4726 or support@grants.gov

Applicants need to ensure that the Authorized Organization Representative (AOR) who submits the application through Grants.gov and whose UEI is listed on the application is an AOR for the applicant listed on the application. Additionally, the UEI listed on the

application must be registered to the applicant organization's SAM.gov account. If not, the application may be deemed ineligible.

Application Submission Deadline
Your organization's AOR must submit your complete application package electronically to EPA through Grants.gov no later than **May 31, 2023**, at 11:59 PM ET. Please allow for enough time to successfully submit your application and allow for unexpected errors that may require you to resubmit.

Applications submitted through Grants.gov will be time and date stamped electronically. Please note that successful submission of your application through Grants.gov does not necessarily mean your application is eligible for award. Any application submitted after the application deadline time and date deadline will be deemed ineligible and not be considered.

3.Technical Issues with Submission

If applicants experience technical issues during the submission of an application that they are unable to resolve, follow these procedures **before** the application deadline date:

a. Contact the Grants.gov Support Center **before** the application deadline date.

b. Document the Grants.gov ticket/case number.

c. Send an email with **EPA-OEJECR-OCS-23-03** in the subject line to burney.jacob@epa.gov **before** the application deadline time and include the following information:
1. Grants.gov ticket/case number(s)
2. Description of the issue
3. The entire application package in PDF format

Without this information, EPA may not be able to consider applications submitted outside of Grants.gov. Any application submitted after the application deadline will be deemed ineligible and **not** be considered.

Please note that successful submission through Grants.gov or email does not necessarily mean your application is eligible for award.

EPA will make decisions concerning acceptance of each application submitted outside of Grants.gov on a case-by-case basis. EPA will only consider accepting applications that were unable to submit through Grants.gov due to Grants.gov or relevant SAM.gov system issues or for unforeseen exigent circumstances, such as extreme weather interfering with internet access. Failure of an applicant to submit the application prior to the application submission deadline time and date because they did not properly or timely register in SAM.gov or Grants.gov is not an acceptable reason to justify acceptance of an application outside of Grants.gov.

4. Application Materials

**The following forms and documents are required under this RFA:**

**Mandatory Documents:**

1. Application for Federal Assistance (SF-424)
2. Budget Information for Non-Construction Programs (SF-424A)
3. EPA Key Contacts Form 5700-54
4. EPA Form 4700-4 Preaward Compliance Review Report (Please see these Useful Tips for completing this form)
5. Project Narrative Attachment Form: Use this to submit your Workplan, prepared as described in Section IV.B below. Please note the page limit that applies to the Workplan identified below.
6. Use the Other Attachments Form for the following additional mandatory documents:

- Itemized Budget Sheet (See below in Section IV.B.2 and optional template in Appendix A)
- Partnership Letters of Commitment (unless you are proposing a project with no partners) (See Section IV.B.1 below)
- Resumes of the Project Manager (PM) and other key personnel (See Section IV.B.3 below)
- Sample Draft EJ Thriving Communities Subgrant Project Proposal Guidance Sheet

Note: The "Other Attachments Form" is listed under the mandatory documents but should be used to attach both the mandatory documents listed above in 6 as well as any optional documents under 6.

**B. Content and Form of Application Submission**

The forms and documents required as part of the application submission are described in Section IV.A above. Below are the instructions for the Workplan and several other application documents.

**1. Workplan:** The Workplan is one of the most important parts of the application package and describes the work to be performed during the performance period. Under this RFA, applicants must submit a Workplan for a federal award that addresses how the applicant's Grantmaker will meet the objectives of this RFA, perform the activities and provide the services described in Section I of the RFA (the Eligible Services), and ensure that it addresses the evaluation criteria in Section V.A and any applicable threshold eligibility criteria in Section III. The Workplan must not exceed (25) single-spaced typewritten pages and be on letter size pages (8 1/2 X 11 inches). Any pages beyond twenty-five (25) pages will not be read by the review panel. It is recommended that applicants use a standard font (e.g., Times New Roman, Calibri, and Arial) and a 12-point font size. While these guidelines establish the acceptable type size requirements, applicants are advised that readability is of paramount importance and should take precedence in selection of an appropriate font for use in the application. Other attachments such as resumes, partnership letters, itemized budget template, sample draft subaward recipient proposal templates, and information on endowment size and/or yearly

organizational budget can be submitted as attachments and are not included in the 25-page Workplan limit.

Workplans must address the information described above. Make sure they also include the following information which is part of the 25-page Workplan page limit:

**a. Project Summary Page** – Recommended not to exceed one page and include:

- Project Title
- Project Geographic Area-See Section I.D.4
- Applicant Information (name, address, main contact information)
- Brief Description of Applicant Organization -- Provide a brief description of the applicant's organization, including its mission and key ongoing projects/activities in which it is involved.
- Is your organization a qualifying Minority Serving Institution? (Yes/No) See Section III.A.
- List of Community-based Nonprofit Partners (if applicable)
- Project Abstract -- Brief description of the main objective, activities, and outputs/outcomes of the project, including the specific geographic areas of focus.

**b. Partnerships, Collaborations, Participatory Governance, and Letters of Commitment (See evaluation factor V.A.1.c)**

Given the nature of this program and the requirements under CAA 138, partnerships and collaborations with other interested stakeholders in performance of the project will likely be necessary and, for certain entities, required to carry out the role of an Grantmaker. If an applicant is eligible without partners and believes they can effectively serve in the role of a Grantmaker without partners, then they must be able to convincingly demonstrate in their application how they can effectively perform the role of a Grantmaker without any partners or collaboration.

All letters of commitment for partnerships and collaborations must be submitted by the applicant with its application package by the submission deadline. The letters of commitment must be included as other attachments in the grants.gov application package (Section IV.A) and are not subject to the 25-page workplan limit. The letters of commitment should include information about the role and activities each partner will play in establishment and operation of the Grantmaker as well as any resources the partner will provide. The letters of commitment must be signed by the partnering organizations. Do not include generic letters of support or recommendation. Regardless of the source, generic letters of support will not be considered in evaluating applications. If no letters of commitment are included, then it will be assumed the applicant has no partners and they must demonstrate how they can effectively perform the project and operate as an Grantmaker without partners or collaboration.

For-profit organizations are not eligible for subawards under this grant program but may receive procurement contracts. Any contracts for services or products funded with EPA financial

assistance must be awarded under the competitive procurement procedures of 2 CFR Part 200 and/or 2 CFR Part 1500, as applicable. The regulations at 2 CFR 1500.10 contain limitations on the extent to which EPA funds may be used to compensate individual consultants. Refer to the Best Practice Guide for Procuring Services, Supplies, and Equipment Under EPA Assistance Agreements for guidance on competitive procurement requirements and consultant compensation. **Do not name a procurement contractor (including a consultant) as a "partner" or otherwise in your application unless the contractor has been selected in compliance with competitive procurement requirements.**

Note: If you intend to fund a named or unnamed partner's participation in the project your application must describe how the proposed financial transaction complies with applicable requirements in 2 CFR Part 200, EPA's Subaward Policy, the Best Practice Guide for Procuring Services, Supplies, and Equipment Under EPA Assistance Agreements or EPA Guidance on Participant Support Costs. Note that naming a contractor (including a consultant) as a "partner" does not relieve the applicant from complying with competitive procurement requirements. EPA does not accept sole source contract justifications for professional services (including environmental consulting services and consulting services on preparing grant applications) that are available in the commercial marketplace.

**c. Schedule of Activities**

Applicants are strongly encouraged to include a table in the application to represent the timeframes for the initiation and completion of project activities. See Criteria 2.a. in Section V.

**d. Past Performance**

Submit a list of federally and/or non-federally funded assistance agreements that your organization performed within the last three years. Assistance agreements include grants and cooperative agreements, but not contracts. **NOTE** – The funding amount of each assistance agreement, as well as the purpose of each assistance agreement should be included. **Applicants are encouraged to list agreements similar in size, scope, and/or purpose to the Grantmaker awards**. List no more than 5 agreements. For the agreements you list, describe:

i. Whether, and how, you were able to successfully complete and manage those agreements and
ii. Your history of meeting the reporting requirements under those agreements including whether you adequately and timely reported on your progress towards achieving the expected outputs and outcomes of those agreements (and if not, explain why not) and whether you submitted acceptable final technical reports under the agreements.

In evaluating applicants under these factors in Section V.A, EPA will consider the information provided by the applicant and may also consider relevant information from other sources, including information from EPA files and from current/prior grantors (e.g., to verify and/or supplement the information provided by the applicant). If your organization does not have any available past performance experience related to federal and/or non-federal assistance agreements, you should state this explicitly in your application (e.g., *Our organization has no*

*past grants experience*.) Including this statement will ensure you receive a neutral score for these factors (a neutral score is half of the total points available in a subset of possible points). However, if you do not provide any response for these items, you may receive a score of 0 for these factors.

**2. Itemized Budget Template (Optional template available in Appendix A):** Provide a detailed budget and estimated funding amount for each project component/activity. Identify the requested federal dollars. Applicants should budget for up to $50 million total with approximately $16.5 million per year over 3 years. Keep in mind that EPA reserves the right to partially fund applications by funding discrete portions of the proposed projects. Clearly explain how the funds will be used. Applicants must itemize costs related to personnel, fringe benefits, contractual costs, travel, equipment, supplies, other direct costs, indirect costs, and total costs. All subaward funding, including a minimum of 80% of total funding allocated for Eligible Subrecipients, should be located under the "other" category (this requirement is not applicable for those applying to be National Grantmakers). This section provides an opportunity for narrative description of the budget or aspects of the budget such as other costs and contractual costs. Provide itemized costs with sufficient detail for EPA to determine the reasonableness and allowability of costs for each workplan component/activity. Where necessary, your itemized budget sheet should include a budget narrative to make it clear how you determined/calculated the costs for each budget category.

In accordance with 2 CFR 200.414(f), recipients that do not have a current negotiated indirect cost rate under 10% are eligible for a de minimis rate of 10% of modified total direct costs for all Federal awards. Please see EPA's IDC Policy: https://www.epa.gov/sites/default/files/2021-04/documents/indirect-cost-policy-for-recipients-of-epa-assistance-agreements.pdf for full details. Note that as provided in 2 CFR 200.332 subrecipients who do not have current negotiated indirect cost rates may also use the 10% rate but that pass-through entities may not force subrecipients to use the 10% rate rather than their negotiated rate.

Total estimated costs in the itemized budget template should reflect federal funding only. Applicants are permitted to attach the itemized budget template as an "Other Attachment" to their application and it will not count against the 25-page workplan limit. Applicants will not be penalized if they choose not to use the budget template.

**3. Resumes of the Project Manager (PM) and Other Key Personnel:** Applicants should attach a resume or curricula vitae (CV) for the PM and other key personnel named on the Key Contacts List. These are not subject to the Workplan page limit although individual resumes should not exceed 2 pages in length.

**4. Sample Draft EJ Thriving Communities Subgrant Project Proposal Guidance Sheet**: Applicants should attach a sample draft project proposal guidance sheet to illustrate what information may be requested from potential subrecipient applicants for projects. These are not subject to the Workplan page limit and total guidance sheet should not exceed 10 pages in length. **NOTE** - Page length of subrecipient proposals will likely depend on which phase of

subgrants the Eligible Subrecipient is applying for. For example, Eligible Subrecipients applying for Phase I (Assessment - 150,000) subgrants will likely have shorter proposals than those applying for the Phase III (Project Development - $350,000) subgrants.

### C. Pre-Application Webinars and Frequently Asked Questions

Applicants are invited to participate in webinars with EPA to address questions about the Grantmaker Program and this RFA. Interested persons may access the webinars listed in the table below. Additional information including a Frequently Asked Questions (FAQs) document, webinar links, and webinar recordings can be found at the following website: https://www.epa.gov/environmentaljustice/environmental-justice-communities-pass-through-funder-program

Currently, as shown in the table below, there will be two webinars in November 2022. Webinar dates and times may be subject to change, so please refer to the web links in this section to have the most up-to-date information:

| Date | Time (Eastern Time) | Zoom Webinar Information |
|---|---|---|
| March 16, 2023<br><br>(EJ TCGM Live Webinar) | 2:00pm - 4:00pm ET | **Zoom Webinar Format** - Applicants may ask general questions about this RFA. Additional information about the structure of this webinar and log-in information can be found at the link below:<br><br>https://www.epa.gov/environmentaljustice/environmental-justice-thriving-communities-grantmaking-program |

A recording of the webinar will be posted at the link above along with presented materials. If necessary, EPA may schedule additional webinars. In accordance with EPA's Assistance Agreement Competition Policy (EPA Order 5700.5A1), EPA staff will not meet with individual applicants to discuss draft applications, provide informal comments on draft applications, or provide advice to applicants on how to respond to ranking criteria.

Applicants are responsible for the contents of their applications. However, consistent with the provisions in the announcement, EPA will respond to questions from individual applicants regarding threshold eligibility criteria, administrative issues related to the submission of the application, and requests for clarification about the announcement. In addition, EPA will respond to questions about whether a proposed project appears to meet the criteria for eligibility for consideration for these awards.

## V. APPLICATION REVIEW INFORMATION (back to *Contents by Section*)

**Note: Additional provisions that apply to this section can be found at EPA Announcement Clauses.**

## A. Merit Evaluation Criteria

Eligible applications that pass the threshold eligibility review described in Section III.C will be reviewed and scored by a review panel(s) comprised of EPA staff and subject matter experts using the criterion below. The maximum total number of points is 100. Please note that certain sections are worth more points than others.

Applicants must ensure that their Workplan and application materials address the evaluation criteria below. Applications will be scored based on how well they address the following ranking criteria:

| Criteria | Category | Evaluation Criteria | Total Points 100 |
|---|---|---|---|
| 1.0 | **Program Objectives**<br>Under this criterion, applications will be evaluated based on the extent and quality to which they address program objectives (Section I of the RFA) by demonstrating: | | **44** |
| | | | |

| | | | |
|---|---|---|---|
| a. | **Program Design: Community Application In-take and Evaluation Processes** | How well the applicant designs the processes described in Section I of the RFA to operate as a Grantmaker. This includes evaluating:<br><br>• The applicant's plan and approach for designing competitive community application in-take and evaluation processes and ensuring those processes include submission options accessible to all Eligible Subrecipients throughout the entire geographic area covered. Applicants should describe how they plan to compete and evaluate applications received for both the Phase I (Assessment), Phase II (Planning), and Phase III (Project Development) subgrants. Applicants should also describe how they will make clear the three different phases of subgrants available to Eligible Subrecipients. Applicants should describe their plan to provide an open call for applications where Eligible Subrecipients can submit applications to the pass-through entity when they are ready. **(8 points)**<br><br>• The applicant's plan and approach to develop a timely and efficient subaward process where all EJ Thriving Communities Subgrants can be awarded to selected subrecipients efficiently and effectively. **(4 points)**<br><br>• The applicant's approach to managing awarded subawards including developing a Project Management Tracking and Reporting System for all subrecipient funding and projects and ensuring that subawards are managed in compliance with 2 CFR 200.332 and EPA's Establishing and Managing Subawards General Term and Condition. **(4 points)**<br><br>• How the applicant will obtain, and incorporate as appropriate, feedback from Eligible Subrecipients and prospective subrecipients including those from underserved communities, including urban, rural and remote communities on the effectiveness of the pass-through entity and ways to improve the subaward program **(2 points)**<br><br>• How the applicant will make the subaward process described in Section I accessible to those not fluent in English **(2 points)** | 20 |

| Criteria | Category | Evaluation Criteria | Total Points 100 |
|---|---|---|---|
| b. | **Outreach to Underserved, Urban, Rural, Remote, Tribal and Capacity Constrained Communities throughout the Geographic Area** | The applicant's approach for ensuring that the subaward process described in Section I is accessible to underserved communities, communities in urban, remote and rural areas, and community stakeholders with the highest degree of burden and capacity constraints throughout the entire Geographic Area (see Section I.4.D) the applicant is applying to cover. This includes evaluating the quality and extent of the applicant's plan and approach for making these communities and community stakeholders aware of the existence of the Grantmaker and the subgrants program, how to access them, and how the program can be used to address local environmental and public health issues impacting underserved communities and marginalized populations throughout the Geographic Area. Applicants will also be evaluated on their plan to ensure that subgrants are equitably distributed and on their plan for ensuring that diversity, equity, inclusion, and accessibility (DEIA) are highly prioritized elements in their outreach plans.<br>**(6 points)**<br><br>**NOTE:** Under this criterion an applicant will only score well if they demonstrate how all the entities described above, including communities in urban, rural and remote areas, will be made aware of the Grantmaker and the subgrants program and how to access them. Applications that focus on outreach and accessibility solely to, for example, underserved communities in metropolitan areas, will not score as well as applications that address all the communities and community stakeholders identified above. | 6 |

| | | | |
|---|---|---|---|
| c. | **Partnerships / Collaboration / Participatory Governance / Letters of Commitment** | How the proposed project for the Grantmaker includes collaboration with one or more community-based nonprofit organization partners (where required by the IRA statute) and other partners to operate an efficient and effective subgrants program to meet the objectives of this RFA and address environmental justice challenges facing Eligible Subrecipients and specifically underserved communities and communities in urban, rural, and remote areas throughout the Geographic Area. Applicants will be evaluated on the degree to which their proposed Grantmaker application demonstrates participatory governance where one or more community-based nonprofit organizations is involved in the design and decision-making of the subgrants program. Example participatory governance activities could include advisory bodies composed of community-based nonprofit organizations that oversee and provide thought partnership on the development of the subgrants process subject to policies that prevent actual or apparent conflicts of interest in the selection of subrecipients. This criteria will evaluate the planned roles of each partner listed in the application, how each partner will contribute to the effectiveness of the project**,** what resources and/or expertise each partner brings to the project**,** how the partner has a vested interest in working with this partnership (other than just getting income from a sub-award or contract), and the strength of the overall participatory governance approach. **(6 points)**<br><br>Eligible Applicants who do not propose partnerships or collaborations with others will be evaluated based on how well they demonstrate that they can effectively and efficiently perform the project and operate a pass-through subaward program on their own without any collaborating partners.<br><br>The quality of the letters of commitment submitted with the application. The letters will be evaluated with respect to whether they explain the partners' role with the Grantmaker and how it contributes towards the effectiveness of the pass-through subgrants program, what resources (funding, in-kind, technical assistance, support, expertise, etc.) the partners are bringing to the effort, how their participation will be financed, their interest in the pass-through subgrants program, and their expertise/experience in helping underserved communities and communities in urban, rural and remote areas. Generic letters of support that do not commit an organization or individual to specific activities will not be evaluated. **(2 points)** | 8 |

| Criteria | Category | Evaluation Criteria | Total Points 100 |
|---|---|---|---|
| | | **NOTE -** If no letters are submitted and the applicant proposes to perform the activities of the Grantmaker without any partners, they will be evaluated based on how well they demonstrate that they can effectively and efficiently perform the project and operate a pass-through subgrants program on their own without partners. | |
| d. | **Applicant's Historical Connection to Underserved Communities throughout the Geographic Area** | The applicant will be evaluated on:<br><br>• Their past and current work, collaborations, and relationships with underserved communities and communities in urban, rural and remote areas throughout the Geographic Area to address community challenges. The description should include some of the results of those efforts, and any current programs and initiatives the applicant is currently involved with to address the concerns of underserved communities and populations. **(4 points)** | 4 |
| e. | **Noncompetitive Fixed Amount Subawards and Limiting number of subawards to a single entity** | The applicant will be evaluated on:<br><br>• Their plan to reserve a limited number of fixed amount subawards for severely capacity constrained Eligible Subrecipients who may not be able to submit competitive grant applications. Applicants should describe the scope of these projects and the types of activities that these subawards will fund **(2 points)**<br><br>• Policies and procedures they plan to develop that will limit the number of EJ Thriving Communities Subgrants that a single entity may receive within a certain time period with the goal being to achieve the highest diversity and number of different subrecipients possible **(2 points)** | 4 |

| Criteria | Category | Evaluation Criteria | Total Points 100 |
|---|---|---|---|
| f. | **Project Linkages** | The extent and quality to which the proposed project activities support and advance EPA Strategic Plan Goal 2 (Take Decisive Action to Advance Environmental Justice and Civil Rights), Objective 2.1, (Promote Environmental Justice and Civil Rights at the Federal, Tribal, State, and Local Levels) **(2 points)**<br><br>Refer to link Below:<br>https://www.epa.gov/planandbudget/strategicplan | 2 |

| Criteria | Category | Evaluation Criteria | Total Points 100 |
|---|---|---|---|
| 2. | **Project Activities / Milestone Schedule / Detailed Itemized Budget Sheet and Budget Narrative**<br>Under this criterion, applications will be evaluated based on the extent and quality to which they: | | **14** |
| a. | Schedule of Activities | Provide a clearly articulated and realistic schedule, including timeframes to initiate and perform project activities, and describe the plan and approach for establishing the subaward program to ensure that the Eligible Subrecipients, especially underserved communities and communities in rural and remote areas, will be able to start applying for EJ Thriving Communities Subgrants and receiving funds as expeditiously as possible following award of the pass-through entity's cooperative agreement. **(4 points)**<br><br>Including a table in the application to represent the timeframes for the initiation and completion of project activities is strongly recommended. | 4 |

| **Criteria** | **Category** | **Evaluation Criteria** | **Total Points 100** |
|---|---|---|---|
| b. | Detailed Itemized Budget Sheet, Budget Narrative, and Cost Effectiveness of Budget/Project | Demonstrate the reasonableness of the budget and allowability of the costs for each component/activity of the project. In addition, EPA will evaluate the cost effectiveness of the budget/project in terms of maximizing to the greatest extent practicable the delivery of funding and assistance to Eligible Subrecipients and prospective subrecipients, and specifically to underserved communities and communities in urban, rural and remote areas. **(10 points)**<br><br>**NOTE –** A minimum of 80% of total EPA funding for Regional Grantmaker applications must be subawarded to Eligible Subrecipients. If an applicant does not meet this threshold, then the application will be deemed ineligible. This percentage requirement does **not** apply to those applicants applying to be a National Grantmaker.<br><br>*Applicants are permitted to attach the itemized budget sheet as an "Other Attachment" to their application so it will not count against the 25-page workplan limit. However, the budget narrative should be included in the body of the 25-page workplan and provide clear, explanatory detail about the itemized costs in the attached budget sheet. Both the itemized budget sheet and budget narrative should be specific and clear.* | 10 |
| 3. | **Environmental Justice Results— Outputs, Outcomes, and Performance Measurement Plan.** Under this criterion, applications will be evaluated based on the extent and quality to which: | | **6** |
| a. | Environmental Justice Results- Outputs/ Outcomes | The applicant describes an effective plan for tracking and measuring their progress in achieving the expected project outcomes and outputs including those identified in Section I, and the expected project outputs and outcomes identified in the application are effective in achieving the program objectives listed in Section I of the RFA. **(6 points)** | 6 |
| 4. | **Programmatic Capability**<br>Under this criterion, applications will be evaluated based on the applicant's ability to successfully complete and manage the proposed project considering: | | **24** |

| Criteria | Category | Evaluation Criteria | Total Points 100 |
|---|---|---|---|
| a. | Organizational experience (of the applying organization) | Their organizational experience related to performing the activities described in Section I, or similar activities. The description should include any past instances where the applying organization stood up and/or managed their own Federal, State, or Tribal subaward program or similar programs funded privately. The description should include how long those programs lasted, as well as the results and effectiveness of those programs. | 12 |
| b. | Staff Experience / Qualifications | Whether they demonstrate they have the resources and staff (e.g., project manager and other key personnel) with the knowledge, expertise, and skills to efficiently and effectively establish and operate the pass-through subaward program | 6 |
| c. | Expenditure of Awarded Grant Funds | Their approach, procedures, and controls for ensuring that subgrants will be awarded to subrecipients in a timely and efficient manner and that all grant funds awarded to the Grantmaker will also be expended in a timely and efficient manner while ensuring all costs are eligible and allowable. All funds must be expended within the statutorily mandated 3-year performance period. The applicant should provide a comprehensive description of what systems they currently have and/or will develop to move funding through their accounting systems and to Eligible Subrecipients quickly and in compliance with EPA's Subaward Policy and the Automated Standard Application Payments (ASAP) and Proper Payment Draw Down General Term and Condition of EPA Financial Assistance Agreements. | 6 |
| 5. | **Past Performance**<br>Under this criterion, applicants will be evaluated based on their ability to successfully complete and manage the proposed project based on their past performance with respect to the agreements listed by the applicant in the Workplan as required under Section IV.B. | | **12** |

| Criteria | Category | Evaluation Criteria | Total Points 100 |
|---|---|---|---|
| a. | List of Federally funded and/or Non-federally funded Assistance Agreements and Reporting History | Applicants will be evaluated based on their ability to successfully complete and manage the proposed project taking into account their:<br><br>• Past performance in successfully completing and managing the assistance agreements identified in response to Section IV.B. **(6 points)**<br><br>• History of meeting the reporting requirements under the assistance agreements identified in response to Section IV.B including whether the applicant submitted acceptable final technical reports under those agreements and the extent to which the applicant adequately and timely reported on their progress towards achieving the expected outputs and outcomes under those agreements and if such progress was not being made whether the applicant adequately reported why not. **(6 points)**<br><br>NOTE - The focus of this criterion is on the applicant's past performance, not that of any partners, subrecipients, contractors, etc. who may be assisting the applicant with performance of the project as a Grantmaker. In evaluating applicants under these factors, EPA will consider the information provided by the applicant and may also consider relevant information from other sources, including information from EPA files and from current/prior grantors. **If you do not have any relevant or available past performance related to federal or non-federal grants, you should state this explicitly in your application (e.g., our organization has no relevant past grants experience.)** Including this statement will ensure you receive a neutral score for these factors (a neutral score is half of the total points available in a subset of possible points). Failure to include this statement may result in your receiving a score of receive a score of 0 for these factors. | 12 |

## B. Review and Selection Process

Applications will be reviewed and scored under the following process:

**1. Threshold Eligibility Review Process** – All applications will be evaluated for eligibility using the threshold eligibility criteria described in Section III.C by EPA Office of Environmental Justice and External Civil Rights (OEJECR) staff.

**2. Review Panel and Evaluation Process** –Review panel(s) will review, score, and rank all eligible applications that pass the threshold eligibility review based on the merit evaluation criteria listed above. The review panel(s) will include EPA staff and may include external subject matter experts. After the evaluation process, the review panel(s) may participate in a conference call with subject matter experts before final selection recommendations, rankings, and evaluation results are presented to the Selection Official from OEJECR. The purpose of this call is to provide an opportunity for the review panel(s) to incorporate expertise outside of the reviewer panel. Any changes to the evaluations or scoring as a result of the call will be documented and will only be based on the evaluation criteria above.

**3. Final Selection Process and Other Factors** – The review panel will present final rankings and selection recommendations to the Selection Official, who will then make the final selections for award. In addition to this information, the Selection Official may also consider any of the following "other factors" in making final selection decisions from among the high-ranking applications:

- Priority for applications from Minority Serving Institutions (MSIs)
- EPA and OEJECR Programmatic Priorities.
- Availability of funds.

Accordingly, in making the final funding decisions, the Selection Official will consider the review panel rankings and recommendations, subject matter experts' input based on their call with the review panel(s) and may also consider the other factors identified above including input from other government agencies and departments as described above. The "other factors" may only be considered by the Selection Official when determining final selections after the scoring and ranking process is complete.

## C. Anticipated Announcements and Award Dates

Below is a tentative schedule of important dates for the EJ TCGM program and this RFA. Please note that the dates are tentative and subject to change.

| Date | Activity |
|---|---|
| February 23, 2023 | RFA issued and open competition period begins. |
| March 16, 2023 | Pre-application Assistance Webinar |
| May 31, 2023 | Open competition closes. Applications must be submitted through Grants.gov on or before 11:59 p.m. (ET) on May 31, 2023. Applications received after this date will not be reviewed. |
| June 2023 | EPA will review applications for threshold eligibility purposes (Section III). Ineligible applicants will be notified via email with details regarding ineligibility. Notification to ineligible applicants will be sent via email to the |

| | |
|---|---|
| | contact identified on the submitted SF424 providing brief explanations on the reason(s) for ineligibility. Ineligible applicants may request a debriefing within 15 days of receipt of the correspondence (See debriefing and disputes clause in Section VI.l and m of the EPA Announcement Clauses referenced in Section I.G.) |
| July '23 – Sep. '23 | EPA review panel(s) review, score, and rank eligible applications. EPA will make the final selections for awards. All applicants will be notified of the selection results by mail and/or email. |
| October 2023 | OEJECR will release a national announcement for selections. |
| Oct. '23 – Nov. '23 | Headquarters/Regional offices will request any additional application documentation from selected applicants. Awards will be made by headquarters and/or regional grant offices as determined to be appropriate. |
| Nov. '23 – Dec. '23 | Post-award coordination calls with awardees/selectees to coordinate Grantmaker coverage |

## VI. AWARD ADMINISTRATION INFORMATION(back to *Contents by Section*)

**Note: Additional provisions that apply to this section can be found at EPA Announcement Clauses.**

### A. Award Notices

EPA anticipates notification of selected applicants will be made via telephone or electronic or postal mail by the end of September 2023. The notification will be sent to the original signer of the application or the project contact listed in the application. This notification, which informs the applicant that its application has been selected and is being recommended for award, is not an authorization to begin work. The official notification of an award will be made by the appropriate EPA Award Official. Applicants are cautioned that only a grants officer is authorized to bind the Government to the expenditure of funds; selection does not guarantee an award will be made. For example, statutory authorization, funding or other issues discovered during the award process may affect the ability of EPA to make an award to an applicant. The award notice, signed by an EPA grants officer, is the authorizing document and will be provided through electronic or postal mail.

The successful applicant may be requested to prepare and submit additional documents and forms which must be approved by EPA before the grant can officially be awarded. The time between notification of selection and award of a grant can take up to 90 days or longer.

### B. Administrative and National Policy Requirements

This award is subject to the requirements of the Uniform Administrative Requirements, Cost Principles and Audit Requirements for Federal Awards; Title 2 CFR, Parts 200 and 1500. EPA also has programmatic regulations located in 40 CFR Chapter 1 Subchapter B.

A listing and description of general EPA regulations applicable to the award of assistance agreements may be viewed at: https://www.epa.gov/grants/epa-policies-and-guidance-grants.

## C. Reporting and Plans

### 1. Progress Report/Final Report Requirement.

The applicant's project manager will be required to submit quarterly progress reports for each 12-month reporting period throughout the duration of the agreement to update the EPA Project Officer on project progress. The project manager will also be required to have, at a minimum, quarterly calls/meetings with the EPA Project Officer to discuss progress. Precise terms and conditions, including frequency of calls/meetings, will be negotiated by EPA staff as part of the award process. The project manager will also be required to submit a Final Technical Report for EPA approval within 120 days after the end of the 12-month project period. A Financial Status Report is also required and will be described in the award agreement. The EPA may collect, review, and disseminate those final reports that can serve as models for future projects. Many applicants may find it useful to document their progress using various media. This may include, but is not limited to the use of videos, blogs and other forms of social media.

### 2. Justice40 Reporting

The activities to be performed under the awards are expected to contribute to the President's goal that 40% of the overall project benefits flow to disadvantaged communities (the Justice40 Initiative - See Section I.A). Recipients, therefore, will be expected to report on certain metrics to demonstrate to what extent the activities contribute to the 40% goal. The award will include appropriate terms and conditions to this effect.

### 3. Quality Assurance – Management Plans (QMP) and Project Plans (QAPP)

**Quality Management Plan** (QMP): To ensure that environmental information and data is collected within EPA guidelines, the recipient may need to complete a Quality Management Plan. The applying organization would need to provide training and oversight of quality assurance. This may include writing quality assurance project plans for subawardees or ensuring that subawardees are trained and can effectively manage environmental data collection within EPA guidelines. The QMP requires that the recipient (i.e., the Grantmaker), provide technical assistance, training, and oversight for quality assurance.
**Quality Assurance Project Plans** (QAPP): Quality assurance is sometimes applicable to assistance projects (see 2 CFR 1500.12). Quality assurance requirements apply to the collection of environmental data. Environmental data are any measurements or information that describe environmental processes, location, or conditions; ecological or health effects and consequences; or the performance of environmental technology. Environmental data include information collected directly from measurements, produced from models, and compiled from other sources, such as databases or literature. Once the award is made, if a Quality

Assurance Project Plan is required for the project, the applicant will have to draft a QAPP prior to beginning work on the project. You must reserve time and financial resources in the beginning of your project in order to prepare your QAPP and include the cost for developing your QAPP in your Detailed Budget. Selected applicants cannot begin data collection until EPA approves the QAPP. **NOTE** - EPA Project Officers will work with all selected Grantmakers on quality assurance requirements.

### D. Combining Applications Into One Award

If an applicant submits multiple applications under this competition, and is selected for multiple awards, EPA may award a single assistance agreement that combines the separate applications.

## VII. AGENCY CONTACTS (back to *Contents by Section*)

| **Main Contacts** | **Email** | **Phone** |
|---|---|---|
| ***Office of Environmental Justice and External Civil Rights*** | | |
| Jacob Burney, OEJECR, EJ Grants Division Director | Burney.Jacob@epa.gov | 202-564-2907 |

## VIII. OTHER INFORMATION AND APPENDICES (back to *Contents by Section*)

A – Optional Grantmaker Detailed Itemized Budget Sheet Template

## APPENDIX A

# Optional Grantmaker Detailed Itemized Budget Sheet Template

*Note—EPA provides detailed guidance on how to characterize costs for budgeting purposes as well as a budget detail example in the agency's* *Interim General Budget Development Guidance for Applicants and Recipients of EPA Financial Assistance*. *For a sample Itemized Budget Sheet refer to:* *https://www.epa.gov/grants/rain-2019-g02*

| Year 1 of 3 | Description | Total |
|---|---|---|
| Personnel | | |
| Fringe Benefits | | |
| Travel | | |
| Equipment | | |
| Supplies | | |
| Contractual | | |
| Other (including subawards) | | |
| Indirect Charges<br><br>(Note that as provided in the definition of *Modified total direct costs* in 2 CFR 200.1 indirect cost rates | | |

| | | |
|---|---|---|
| may only be applied to the first $25,000 of subawards.) | | |
| | | Total Year 1 Budgeted Costs = $16,500,000 |

| Year 2 of 3 | Description | Total |
|---|---|---|
| Personnel | | |
| Fringe Benefits | | |
| Travel | | |
| Equipment | | |
| Supplies | | |
| Contractual | | |
| Other (including subawards) | | |

| | | |
|---|---|---|
| Indirect Charges<br><br>(Note that as provided in the definition of *Modified total direct costs* in 2 CFR 200.1 indirect cost rates may only be applied to the first $25,000 of subawards.) | | |
| | | Total Year 2 Budgeted Costs = $16,500,000 |

| Year 3 of 3 | Description | Total |
|---|---|---|
| Personnel | | |
| Fringe Benefits | | |
| Travel | | |
| Equipment | | |
| Supplies | | |
| Contractual | | |
| Other (including subawards) | | |

| | | |
|---|---|---|
| Indirect Charges<br>(Note that as provided in the definition of *Modified total direct costs* in 2 CFR 200.1 indirect cost rates may only be applied to the first $25,000 of subawards.) | | |
| | | Total Year 3 Budgeted Costs = $17,000,000 |

| Overall Combined Budget (All Years) | Description | Total |
|---|---|---|
| Personnel | | |
| Fringe Benefits | | |
| Travel | | |
| Equipment | | |
| Supplies | | |
| Contractual | | |

| | | |
|---|---|---|
| Other (including subawards) | | |
| Indirect Charges<br><br>(Note that as provided in the definition of *Modified total direct costs* in 2 CFR 200.1 indirect cost rates may only be applied to the first $25,000 of subawards.) | | |
| | | Total Budgeted Costs (All Years) = $50,000,000 |

# Attachment B

Total Pages:(131 of 608)

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY
WASHINGTON, D C. 20460
Office of Environmental Justice and External Civil Rights

December 13, 2023

Ruth Ann Norton
Green & Healthy Homes Initiative Inc.

RE: 2023 Environmental Justice EPA-R-OEJECR-OCS-23-03
Environmental Justice Thriving Communities Grantmaking Program, Green & Healthy Homes Initiative Inc.

Dear Ruth Ann Norton,

Congratulations! Your organization has been selected to receive an EPA award under the FY 2023 Environmental Justice Funding Opportunity (opportunity # EPA-R-OEJECR-OCS-23-03). Your organization has been selected to receive approximately $50,000,000 in grant funding to serve as the EPA Region 3 Grantmaker providing access to subgrant funding to potential subgrant applicants and issuing and administering subgrants to subgrantees throughout EPA Region 3. NOTE: 11 organizations are being selected to serve as EJ Thriving Communities Grantmakers. Please note that this is NOT an official award document, and only EPA's Office of Grants and Debarment can issue an award offer to you. If you wish to be considered for award, you are required to do the following:

**Workplan Negotiation Discussion**: During the coming weeks, your assigned EPA Project Officer(s) will have multiple discussions with your organization via conference call, Zoom, or Microsoft Teams. During these calls we will go over your budget, workplan, performance measures, and activity timeline. You will be contacted shortly to set up the date and time for the initial discussion. As previously stated, it will be necessary to have multiple calls to finalize negotiations.

Failure to respond timely during the negotiation period may result in your project no longer being considered for an award.

If you have any questions, please feel free to contact Marisa Valdez at valdez.marisa@epa.gov; or 202-940-6233 or Jacob Burney at burney.jacob@epa.gov

Burney, Jacob
Digitally signed by Burney, Jacob
Date: 2023.12.13 11:30:57 -05'00'

Regards,
Jacob Burney
Division Director
Grants Management Division
Office of Environmental Justice and External Civil Rights

Pg: 131 of 608 Filed: 02/23/2026 Doc: 28-1 USCA4 Appeal: 25-1808

# Attachment C

# U.S. ENVIRONMENTAL PROTECTION AGENCY

## Cooperative Agreement

| | |
|---|---|
| **GRANT NUMBER (FAIN):** 95341301<br>**MODIFICATION NUMBER:** 0<br>**PROGRAM CODE:** 5N | **DATE OF AWARD**<br>05/03/2024 |
| **TYPE OF ACTION**<br>New | **MAILING DATE**<br>05/08/2024 |
| **PAYMENT METHOD:**<br>ASAP | **ACH#**<br>33743 |

| | |
|---|---|
| **RECIPIENT TYPE:**<br>Not for Profit | **Send Payment Request to:**<br>Contact EPA RTPFC at: rtpfc-grants@epa.gov |
| **RECIPIENT:** | **PAYEE:** |
| GREEN & HEALTHY HOMES INITIATIVE INC<br>2714 Hudson Street<br>Baltimore, MD 21224-4716<br>**EIN:** 52-1786577 | GREEN & HEALTHY HOMES INITIATIVE INC<br>2714 Hudson Street<br>Baltimore, MD 21224-4716 |

| PROJECT MANAGER | EPA PROJECT OFFICER | EPA GRANT SPECIALIST |
|---|---|---|
| Ruth Ann Norton<br>Green & Healthy Homes Initiative Inc<br>2714 Hudson Street<br>Baltimore, MD 21224-4716<br>**Email:** ranorton@ghhi.org<br>**Phone:** 410-534-6477 | Grace Gontarek<br>Four Penn Center, 1600 John F. Kennedy Boulevard, 3EJ20<br>Philadelphia, PA 19103-2852<br>**Email:** Gontarek.Grace@epa.gov<br>**Phone:** 215-814-2759 | Vanessa Davies<br>Grants Management Section, 3MD22<br>Four Penn Center, 1600 John F. Kennedy Boulevard<br>Philadelphia, PA 19103-2852<br>**Email:** Davies.Vanessa@epa.gov<br>**Phone:** 215-814-2801 |

**PROJECT TITLE AND DESCRIPTION**

TCGM Initial Award - Green & Healthy Homes Initiative will act as pass-through entity for EPA's EJ Thriving Communities Grantmaking Program, R3 GM

See Attachment 1 for project description.

| BUDGET PERIOD | PROJECT PERIOD | TOTAL BUDGET PERIOD COST | TOTAL PROJECT PERIOD COST |
|---|---|---|---|
| 05/01/2024 - 04/30/2027 | 05/01/2024 - 04/30/2027 | $ 8,000,000.00 | $ 8,000,000.00 |

## NOTICE OF AWARD

Based on your Application dated 04/16/2024 including all modifications and amendments, the United States acting by and through the US Environmental Protection Agency (EPA) hereby awards $ 8,000,000.00. EPA agrees to cost-share 100.00% of all approved budget period costs incurred, up to and not exceeding total federal funding of $ 8,000,000.00. Recipient's signature is not required on this agreement. The recipient demonstrates its commitment to carry out this award by either: 1) drawing down funds within 21 days after the EPA award or amendment mailing date; or 2) not filing a notice of disagreement with the award terms and conditions within 21 days after the EPA award or amendment mailing date. If the recipient disagrees with the terms and conditions specified in this award, the authorized representative of the recipient must furnish a notice of disagreement to the EPA Award Official within 21 days after the EPA award or amendment mailing date. In case of disagreement, and until the disagreement is resolved, the recipient should not draw down on the funds provided by this award/amendment, and any costs incurred by the recipient are at its own risk. This agreement is subject to applicable EPA regulatory and statutory provisions, all terms and conditions of this agreement and any attachments.

| ISSUING OFFICE (GRANTS MANAGEMENT OFFICE) | AWARD APPROVAL OFFICE |
|---|---|
| **ORGANIZATION / ADDRESS** | **ORGANIZATION / ADDRESS** |
| U.S. EPA, Region 3, US EPA Region 3, 3MD22<br>Four Penn Center, 1600 John F. Kennedy Boulevard<br>Philadelphia, PA 19103-2852 | U.S. EPA, Region 3, EJ, Comm.Hlth and Env.Rev.Div (3EJ00)<br>R3 - Region 3<br>Four Penn Center, 1600 John F. Kennedy Boulevard<br>Philadelphia, PA 19103-2852 |

**THE UNITED STATES OF AMERICA BY THE U.S. ENVIRONMENTAL PROTECTION AGENCY**

| | |
|---|---|
| **Digital signature applied by EPA Award Official for** Catharine McManus - Mission Support Division, Director<br>**by** Lisa White - Award Official Delegate | **DATE**<br>05/03/2024 |

# EPA Funding Information

| FUNDS | FORMER AWARD | THIS ACTION | AMENDED TOTAL |
|---|---|---|---|
| EPA Amount This Action | $ 0 | $ 8,000,000 | $ 8,000,000 |
| EPA In-Kind Amount | $ 0 | $ 0 | $ 0 |
| Unexpended Prior Year Balance | $ 0 | $ 0 | $ 0 |
| Other Federal Funds | $ 0 | $ 0 | $ 0 |
| Recipient Contribution | $ 0 | $ 0 | $ 0 |
| State Contribution | $ 0 | $ 0 | $ 0 |
| Local Contribution | $ 0 | $ 0 | $ 0 |
| Other Contribution | $ 0 | $ 0 | $ 0 |
| Allowable Project Cost | $ 0 | $ 8,000,000 | $ 8,000,000 |

| Assistance Program (CFDA) | Statutory Authority | Regulatory Authority |
|---|---|---|
| 66.615 - Environmental Justice Thriving Communities Grantmaking Program (EJ TCGM) | Clean Air Act: Sec. 138 | 2 CFR 200, 2 CFR 1500 and 40 CFR 33 |

| Fiscal | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Site Name | Req No | FY | Approp. Code | Budget Organization | PRC | Object Class | Site/Project | Cost Organization | Obligation / Deobligation |
| - | 24124WB139 | 2226 | BSF5 | WF | 000W57XK1 | 4183 | - | - | $ 8,000,000 |
| | | | | | | | | | $ 8,000,000 |

Budget Summary Page

| Table A - Object Class Category (Non-Construction) | Total Approved Allowable Budget Period Cost |
|---|---|
| 1. Personnel | $ 3,994,606 |
| 2. Fringe Benefits | $ 878,813 |
| 3. Travel | $ 278,955 |
| 4. Equipment | $ 0 |
| 5. Supplies | $ 66,883 |
| 6. Contractual | $ 337,056 |
| 7. Construction | $ 0 |
| 8. Other | $ 1,166,604 |
| 9. Total Direct Charges | $ 6,722,917 |
| 10. Indirect Costs: 0.00 % Base SEE Condition 18 of the Administrative General Terms and Conditions | $ 1,277,083 |
| 11. Total (Share: Recipient 0.00 % Federal 100.00 %) | $ 8,000,000 |
| 12. Total Approved Assistance Amount | $ 8,000,000 |
| 13. Program Income | $ 0 |
| 14. Total EPA Amount Awarded This Action | $ 8,000,000 |
| 15. Total EPA Amount Awarded To Date | $ 8,000,000 |

# Attachment 1 - Project Description

This agreement provides funding under the Inflation Reduction Act (IRA) to Green & Healthy Homes Initiative (GHHI). The recipient will serve as the Region 3 Grantmaker for EPA's Thriving Communities Grantmaker program. GHHI plans to use a strong participatory governance framework to build capacity in underserved areas across the Mid-Atlantic region. GHHI's communication plan recognizes the need to reach diverse audiences using wide-ranging delivery methods and partners to leverage best practices in outreach and implementation. Moreover, GHHI will engage communities through a stakeholder Advisory Board, statutory partnerships, and mechanisms for providing direct feedback to adapt frequently to the needs of communities, particularly those from disadvantaged or underserved areas. Collectively, this project will design competitive application in-take and evaluation processes, subaward processes, outreach, and support for communities throughout Region 3.

The activities in the initial award phase include finalizing application materials for all three subrecipient phases, assembling the review team and ensuring representation of diverse communities. In the initial award, the Grantmaker will develop the outreach plan prior to application intake process, partner with Region 3 TCTAC for education and recruitment efforts, conduct webinars, conference calls, and meetings in underserved areas to promote and explain the program. Finally, potential candidates will be identified for $75K non-competitive subawards in this phase. The anticipated deliverables include utilizing partner networks to distribute RFA announcements, hold webinars, conference calls, and outreach events, conduct office hours to support potential applicants, and engaging expertise of Advisory Board and Technical Assistance Statutory Partners to oversee pre-application process. The expected outcomes include development of a transparent, equitable, engaging application process for the subsequent award subrecipients, with proper guidance from statutory partners and an Advisory Board. The intended beneficiaries include communities in underserved areas across Region 3. Subaward: Children's National Hospital - Will provide technical assistance replicable tools to inform the efforts of grantees under GHHI's proposed EPA Region 3 Thriving Communities program: (i) a registry of nearly all the pediatric patients with asthma in the immediate DC region; and (ii) a healthy housing map which overlays at-risk pediatric asthma morbidity and asthma-related health hazards reported at multi-family housing complexes in DC. Children's National will also leverage its network to conduct outreach and promote EPA's TC Program awareness and support applicant outreach. Subaward amount calculated at $91.95 per hour, based on best estimate of number of hours to fulfill activities. Total cost of $109,000 = 54.50% X $200,000.

Subaward: Howard University - Will support GHHI's Thriving Communities RFA outreach as well as project implementation. Will also provide technical assistance through the Howard University School of Law and Environmental Justice Center, as well as the School of Architecture and Thurgood Marshall Civil Rights Center. Subaward amount calculated at a $91.95 per hour rate, based on best estimate of number of hours to fulfill activities. Subaward amount calculated at a $91.95 per hour rate, based on best estimate of number of hours to fulfill activities. Total cost of $172,500 = $300,000 X 57.50%.

Subaward: Virginia Poverty Law Center - Will support outreach as well as project implementation. Will also provide technical assistance. Subaward amount calculated at a $91.95 per hour rate, based on best estimate of number of hours to fulfill activities. Total cost of $78,000 = $78,000 X 100%.

Subaward: Delaware State University - Will support outreach as well as project implementation. Will also provide technical assistance. Subaward amount calculated at an $91.95 per hour rate, based on best estimate of number of hours to fulfill activities Total cost of $78,000 = $78,000 X 100%.

## Administrative Conditions

The recipient agrees to comply with the current EPA general terms and conditions available at: https://www.epa.gov/grants/epa-general-terms-and-conditions-effective-october-1-2023-or-later.

These terms and conditions are in addition to the assurances and certifications made as a part of the award and the terms, conditions, or restrictions cited throughout the award.

The EPA repository for the general terms and conditions by year can be found at: https://www.epa.gov/grants/grant-terms-and-conditions#general.

### A. Correspondence

The terms and conditions of this agreement require the submittal of reports, specific requests for approval, or notifications to EPA. Unless otherwise noted, all such correspondence should be sent to the following email addresses:

- Federal Financial Reports (SF-425): rtpfc-grants@epa.gov with a copy to the Grant Specialist of record

- MBE/WBE reports (EPA Form 5700-52A): R3_MBE-WBE_Reports@epa.gov with a copy to the Grant Specialist of record

- All other forms/certifications/assurances, Indirect Cost Rate Agreements, Requests for Extensions of the Budget and Project Period, Amendment Requests, Requests for other Prior Approvals, updates to recipient information (including email addresses, changes in contact information or changes in authorized representatives) and other notifications: Grant Specialist and Project Officer of record

- Payment requests (if applicable): rtpfc-grants@epa.gov

- Quality Assurance documents, workplan revisions, equipment lists, programmatic reports and deliverables: Project Officer of record

### B. Pre-Award Costs

In accordance with 2 CFR 1500.9, the recipient may charge otherwise allowable pre-award costs (both Federal and non-Federal matching shares) incurred from May 1, 2024 to the actual award date provided that such costs were contained in the approved application and all costs are incurred within the approved budget period.

### C. Pre-Award Administrative Capability

Green & Healthy Homes Initiative Inc's pre-award certification review was initiated, but is not completed. EPA's policy for awarding financial assistance in excess of $200,000 to non-profit organizations requires an Administrative Capability Assessment review of the recipient's administrative and financial managment systems to be completed **prior** to the recipient drawing down any EPA funds per EPA Order 5700.8. Because EPA has not yet completed the review, Green & Healthy Homes Initiative Inc is precluded from drawing down funds under this assistance agreement until EPA provides written

confirmation of the completion of the assessment with satisfactory results. Please note, any costs incurred prior to EPA approval are at Green & Healthy Homes Initiative Inc's own risk. If Green & Healthy Homes Initiative Inc fails to respond or is unable to satisfactorily address all identified deficiences within 90 days of the award date of this assistance agreement or within any extension of time granted by EPA, the agreement may be terminated. Noncompliance with this term and condition may result in adverse action by EPA per 2 CFR 200.339.

# Programmatic Conditions

**Environmental Justice Thriving Communities Grantmaking (TCGM) Program Cooperative Agreement Terms and Conditions**

## A. Performance Reporting and Final Performance Report

**Performance Reports – Content**

In accordance with 2 CFR 200.329, the recipient agrees to submit performance reports that include brief information on each of the following areas: 1) A comparison of actual accomplishments to the outputs/outcomes established in the assistance agreement work plan for the period; 2) The reasons why established outputs/outcomes were not met; and 3) other pertinent information, including, when appropriate, analysis and explanation of cost overruns or high unit costs. This description may include overall best practices and/or lessons learned over the project performance period, and attachments and links for materials that may be helpful to other Environmental Grants recipients or similar organizations (e.g., tip sheets, “how-to” sheets, communication materials, outreach materials, web tools, etc).

These reports shall cover work status, work progress, difficulties encountered, preliminary data results and a statement of activity anticipated during the subsequent reporting period, including a description of equipment, techniques, and materials to be used or evaluated. A discussion of expenditures along with a comparison of the percentage of the project completed to the project schedule and an explanation of significant discrepancies shall be included in the report. The report shall also include any changes of key personnel concerned with the project.

Additionally, the recipient agrees to inform EPA as soon as possible about problems, delays, or adverse conditions that which will materially impair the ability to meet the outputs/outcomes specified in the assistance agreement work plan.

**Performance Reports - Frequency**

The recipient agrees to submit quarterly performance reports electronically to the EPA Project Officer within 30 days after the reporting period (every three months). The reporting periods are **5/1/24-7/31/24, 8/1/24-10/31/24, 11/1/24-1/31/25, 2/1/25-4/30/25, 5/1/25-7/31/25, 8/1/25-10/31/25, 11/1/25-1/31/26, 2/1/26-4/30/26, 5/1/26-7/31/26, 8/1/26-10/31/26, 11/1/2601/31/27, 2/1/27-4/30/27**

The recipient must submit the final performance report no later than 120 calendar days after the end date of the period of performance. The final report shall document project activities over the entire project period.

**EPA Subaward Policy Appendix C: Model Programmatic Subaward Reporting Requirement**

The recipient must report on its subaward monitoring activities under 2 CFR 200.332(d). Examples of items that must be reported if the pass-through entity has the information available are: 1. Summaries of results of reviews of financial and programmatic reports. 2. Summaries of findings from site visits and/or desk reviews to ensure effective subrecipient performance. 3. Environmental results the subrecipient achieved. 4. Summaries of audit findings and related pass-through entity management decisions. 5. Actions the pass-through entity has taken to correct deficiencies such as those specified at 2 CFR 200.332(e), 2 CFR 200.208 and 2 CFR 200.339.

**B. EJ Grant Recipient Workshops (Virtual and/or In-Person)**

All EJTCGM recipients will be required to attend at least one EJ Grantee training workshop hosted by your EPA Region. These trainings will assist all current EPA EJ grant recipients with strategic planning and project management of their cooperative agreements, as well as afford recipients opportunities to learn from their peers and other experts. Recipients will need to identify at least one authorized official to participate. Virtual workshops will utilize webinar technology that can be accessed via personal computer. A conference call line will be available for any recipient who does not have the technical capability (i.e. slow internet connection) to access the webinar. Your EPA Project Officer will keep you informed of the dates of the workshops. Each EPA Regional Office will tailor their workshop agenda to the environmental needs and priorities of workshop participants and local communities in the region. Workshops may include a mix of current and former EJ grant recipients, local community stakeholders, other EPA and federal program personnel, and other attendees. Workshop attendees will come together to provide perspective, insight, and lessons learned regarding environmental justice issues plaguing their communities and ways to address them. Recipients will need to identify at least one authorized representative to participate. Recipients are permitted to use awarded funds to pay for travel to the workshops.

**C. Review and Oversight**

1. Products - The recipient agrees that any product (e.g., publication, outreach materials, training manuals) produced through this assistance agreement and made available for public view must be first reviewed by the EPA Project Officer for comment before release. The recipient shall make all final decisions on the product content.

2. Monthly Calls - The recipient shall consult with the EPA Project Officer on a monthly basis to obtain input on program activities and products produced. However, the recipient should make all final decisions on project implementation and product content. It is at the EPA Project Officer's discretion to determine any change to the frequency with which calls are held.

3. Prior Approval - Any proposed changes to the project must be submitted in writing to the EPA Project Officer and Grant Specialist for EPA approval prior to implementation. The recipient incurs costs at its own risk if it fails to obtain written approval before implementing any changes.

**D. Post-Project Period Follow-up and Engagement**

For no less than one year after completion of the project, the recipient agrees to periodically update its designated EPA Project Officer on current community-based and environmental justice work the recipient is performing and how/if that work relates to its now completed EJTCGM project. These periodic updates may include (but are not limited to) recent local media reports, additional grant funding received, new initiatives, and developing partnerships. The EPA EJ Grants program is invested in the long-term success of each EJ Grant recipient and its long-term impact on addressing the disproportionate environmental and public health impacts plaguing their communities. These post-project period updates allow the EJ Grants program to provide past recipients with additional guidance about applicable funding opportunities, potential collaborations, and technical assistance that may assist recipients in their future work.* The periodic updates also allow the program to track best practices that lead to greater project sustainability and long-term community revitalization for impacted community residents. The frequency of these periodic updates will be by mutual agreement and will be discussed with the recipient before the end of the project period. Recipients are also encouraged to continue providing updates and engaging

with their EPA Project Officers beyond the additional year after the end of the project.

*NOTE – Compliance with this term & condition will not give the recipient priority during future EPA EJ grant competitions and is not a guarantee for future EPA grant funding. Additionally, the recipient agrees not to submit a claim for compensation to EPA for providing these updates.

## E. Cybersecurity

### Cybersecurity Grant Condition for Other Recipients, Including Intertribal Consortia

(a) The recipient agrees that when collecting and managing environmental data under this assistance agreement, it will protect the data by following all applicable State or Tribal law cybersecurity requirements.

(b) (1) EPA must ensure that any connections between the recipient's network or information system and EPA networks used by the recipient to transfer data under this agreement, are secure. For purposes of this Section, a connection is defined as a dedicated persistent interface between an Agency IT system and an external IT system for the purpose of transferring information. Transitory, user-controlled connections such as website browsing are excluded from this definition.

If the recipient's connections as defined above do not go through the Environmental Information Exchange Network or EPA's Central Data Exchange, the recipient agrees to contact the EPA Project Officer (PO) no later than 90 days after the date of this award and work with the designated Regional/Headquarters Information Security Officer to ensure that the connections meet EPA security requirements, including entering into Interconnection Service Agreements as appropriate. This condition does not apply to manual entry of data by the recipient into systems operated and used by EPA's regulatory programs for the submission of reporting and/or compliance data.

(2) The recipient agrees that any subawards it makes under this agreement will require the subrecipient to comply with the requirements in (b)(1) if the subrecipient's network or information system is connected to EPA networks to transfer data to the Agency using systems other than the Environmental Information Exchange Network or EPA's Central Data Exchange. The recipient will be in compliance with this condition: by including this requirement in subaward agreements; and during subrecipient monitoring deemed necessary by the recipient under 2 CFR 200.332(d), by inquiring whether the subrecipient has contacted the EPA Project Officer. Nothing in this condition requires the recipient to contact the EPA Project Officer on behalf of a subrecipient or to be involved in the negotiation of an Interconnection Service Agreement between the subrecipient and EPA.

## F. Competency Policy

### Competency of Organizations Generating Environmental Measurement Data

In accordance with Agency Policy Directive Number FEM-2012-02, Policy to Assure the Competency of Organizations Generating Environmental Measurement Data under Agency-Funded Assistance Agreements,

Recipient agrees, by entering into this agreement, that it has demonstrated competency prior to award, or alternatively, where a pre-award demonstration of competency is not practicable, Recipient agrees to demonstrate competency prior to carrying out any activities under the award involving the generation or

use of environmental data. Recipient shall maintain competency for the duration of the project period of this agreement and this will be documented during the annual reporting process. A copy of the Policy is available online at https://www.epa.gov/sites/production/files/2015-03/documents/competency-policy-aaia-new.pdf or a copy may also be requested by contacting the EPA Project Officer for this award.

## G. Procurement Terms and Conditions

**The recipient agrees to conduct all procurement actions under this assistance agreement in accordance with the procurement standards set forth in Title 2 CFR, Parts 200.317 through 200.327, 2 CFR Part 1500 and 40 CFR Part 33. EPA provides additional guidance on complying with these requirements in the Best Practice Guide for Procuring Services, Supplies, and Equipment Under EPA Assistance Agreements which is available at https://www.epa.gov/grants/best-practice-guide-procuring-services-supplies-and-equipment-under-epa-assistance. Any costs incurred by the recipient under contracts and/or small purchases that EPA determines to be in noncompliance with EPA procurement standards shall be unallowable for Federal reimbursement.**

**As provided by 2 CFR 200.310 recipients must ensure that subrecipients acquire insurance to protect against loss, damage and theft if a subaward includes cost for equipment. Costs for such insurance are allowable under this agreement.**

## H. Geospatial Data Standards

All geospatial data created must be consistent with Federal Geographic Data Committee (FGDC) endorsed standards. Information on these standards may be found at https://www.fgdc.gov/.

## I. Use of Logos

If the EPA logo is appearing along with logos from other participating entities on websites, outreach materials, or reports, it must **not** be prominently displayed to imply that any of the recipient or subrecipient's activities are being conducted by the EPA. Instead, the EPA logo should be accompanied with a statement indicating that Green & Healthy Homes Initiative Inc received financial support from the EPA under an Assistance Agreement. More information is available at: https://www.epa.gov/stylebook/using-epa-seal-and-logo#policy

## J. Paperwork Reduction Act

The scope of work for this cooperative agreement includes a survey or other information collection of identical information from 10 or more parties. As provided by 5 CFR 1320.3(d), EPA is a sponsor of the information collection for purposes of obtaining approval from the Office of Management and Budget for collecting information. The recipient agrees to assist EPA in complying with OMB procedures at 5 CFR Part 1320 for obtaining Information Collection Request authorization. The recipient may not collect information until EPA obtains OMB approval. The Project Officer will advise the recipient when information collection may begin.

## K. Substantial Involvement

EPA will be substantially involved in this agreement. Substantial involvement by the EPA Project Officer may include:

1.) Monthly telephone calls and other monitoring,

2.) Reviewing project phases and providing approval to continue to the next phase,

3.) Reviewing and commenting on any documents, web content, or other materials developed under this agreement (the recipient will make final decisions on these matters),

4.) Approving substantive terms included in contracts or subawards (EPA's Project Officer will not suggest, recommend or direct the recipient to select any particular contractor or subrecipient except to the extent permitted in Section 10 of EPA's Subaward Policy).

5.) Reviewing and commenting on the programmatic progress reports.

6.) Consultation regarding the selection of key personnel (EPA's involvement is limited to reviewing the technical qualifications of key personnel and the recipient will make the final decisions on selection. EPA's Project Officer will not suggest, recommend or direct the recipient to select any individual).

7.) Collaboration with EPA on designing and implementing a project management process, which includes quality project oversight for funding subrecipients and a tracking and reporting process that reduces reporting burden on community recipients.

8.) Collaboration on the preliminary design of the subaward competition, the submission and evaluation process, and the development of evaluation criteria. However, final decisions on the submission, evaluation process/criteria, and selection of subrecipients will be made by the recipient, rather than by EPA, provided statutory, regulatory, and EPA's Subaward Policy requirements are met.

9.) EPA Project Officer must review and approve the subaward agreements with any Collaborating Entities that will assist in the direct development and implementation of the EJ Thriving Communities Subgrants program, including subawards to other nonprofits (non-Community Based Organizations), units of government, institutions of higher education, and/or medical service providers not covered by a statutory partnership to assist the Grantmaker by creating a local subaward competition or outreach to local communities.

10.) In addition to the requirements in EPA's General Term and Condition “Disclosing Conflict of Interests,” the recipient must submit a Conflict-of-Interest (COI) plan for approval by EPA's Project Officer for preventing, neutralizing, or mitigating conflicts of interest that may arise within the participatory governance framework of the project. The plan should describe controls for ensuring that representatives of community-based nonprofit organizations involved in the design and decision-making for the subawards program do not have relationships with organizations competing for subawards or receiving noncompetitive funding that create actual or apparent conflicts of interest. Example participatory governance activities could include advisory bodies composed of community-based nonprofit organizations that oversee and provide thought partnership on the development of the subaward process.

11.) Joint operational involvement, participation, and/or collaboration between EPA and the recipient.

12.) Review of proposed procurements in accordance with the Procurement Standards in 2 CFR Part 200.

13.) EPA staff participation in monitoring performance and/or providing technical support for subrecipients that require additional technical assistance to meet project and/or workplan deliverables.

14.) Joint operational involvement, participation, and/or collaboration between EPA and the recipient.

**L. National Programmatic Term and Condition for Fellowship, Internship Programs and Similar Programs Supported by EPA Financial Assistance**

1. EPA funds for this program may only be used for participant support cost payments, scholarships, tuition remission and other forms of student aid for citizens of the United States, its territories, or possessions, or for individuals lawfully admitted to the United States for permanent residence.

2. The recipient and program participants are responsible for taxes, if any, on payments made to or on behalf of individuals participating in this program that are allowable as participant support costs under 2 CFR 200.1 or 2 CFR 200.456 and scholarships and other forms of student aid such as tuition remission under 2 CFR 200.466. EPA encourages recipients and program participants to consult their tax advisers, the U.S. Internal Revenue Service, or state and local tax authorities regarding the taxability of stipends, tuition remission and other payments. However, EPA does not provide advice on tax issues relating to these payments.

3. Participant support cost payments, scholarships, and other forms of student aid such as tuition remission are lower tiered covered Nonprocurement transactions for the purposes of 2 CFR 180.300 and EPA's Suspension and Debarment Term and Condition. Recipients, therefore, may not make participant support cost payments to individuals who are excluded from participation in Federal Nonprocurement programs under 2 CFR Part 180. Recipients are responsible for checking the eligibility of program participants in the System for Award Management (SAM) or obtaining eligibility certifications from the program participants.

See EPA Guidance on Participant Support Costs.

**M. Initial Award Statutory Partnership Agreements -**

**Note: Letters of Commitment submitted with the application needed to be finalized prior to the submission of the Subsequent Award.**

Statutory Partnerships (SP): EPA requires that applicants selected for funding consideration provide copies of the executed final statutory partnership agreement to EPA's Project Officer for submission to the EPA Award Official prior to Subsequent Award.

Partnering community-based organizations who submitted a signed Letter of Commitment during the application phase, as a policy matter, must also at a minimum specify their roles and responsibilities as a statutory partner (direct recipient and subrecipient) in the overall project, and finalize role and financial commitment from the direct recipient before receiving EPA funds. The statutory partnership agreement must be signed by both parties and specify which member of the partnership will enter into the assistance agreement with EPA for the purposes of accountability for the proper expenditure of federal funds, performance of the assistance agreement, liability for claims for recovery of unallowable costs incurred under the agreement and must specify roles in performing the proposed scope of work for the assistance agreement. Executed Statutory Partnership Agreements will be submitted to EPA's Project Officer, the EPA Grants Management Officer or the EPA Award Official will issue written notification that

this condition has been satisfied and that the recipient is authorized to draw down TCGM funds for the Initial Award in accordance with the standards described in the EPA General Term and Condition for the Automated Standard Application Payments (ASAP) and Proper Payment Draw Down during the initial award.

# Attachment D

USCA4 Appeal: 25-1808 Doc: 28-1 Filed: 02/23/2026 Pg: 147 of 608 Total Pages:(147 of 608)

**Wes Stewart**

**From:** Valdez, Marisa (she/her/hers) <Valdez.Marisa@epa.gov>
**Sent:** Friday, August 2, 2024 9:26 AM
**To:** Iyer, Aarti (she/her/hers); Ruth Ann Norton; Gontarek, Grace
**Cc:** Wes Stewart; Abbey Cofsky
**Subject:** [EXTERNAL] RE: E-ICR Approval! OMB Number Required for Documents

**This message originated outside of GHHI.**

**Very exciting**, thank you GHHI for paving the way with your enthusiasm and dedication!! Looking forward to seeing the link to the website and sending people your way 😊

**BIG THANK YOU** to Aarti for keeping us on track. We could not have received this approval without her immense contribution of coaching, technical assistance, and incredible creativity and patience.

Wishing you all a nice Friday and weekend if I don't see you in our scheduled meeting later today.

Best,
Marisa

--

Marisa Valdez
Special Advisor for Implementation | PM, TC Grantmakers
Grants Management Division
Office of Community Support
Office of Environmental Justice and External Civil Rights
US Environmental Protection Agency
Office 202.940.6233
Valdez.Marisa@epa.gov

**From:** Iyer, Aarti (she/her/hers) <Iyer.Aarti@epa.gov>
**Sent:** Friday, August 2, 2024 8:21 AM
**To:** ranorton@ghhi.org; Gontarek, Grace <Gontarek.Grace@epa.gov>
**Cc:** Valdez, Marisa (she/her/hers) <Valdez.Marisa@epa.gov>; Wes Stewart <gwstewart@ghhi.org>; Abbey Cofsky <ACofsky@ghhi.org>
**Subject:** RE: E-ICR Approval! OMB Number Required for Documents

Hi Ruth Ann,

Just to confirm: once you have revised the OMB Control Number and Burden Calculation Statement in all your application forms/templates, you are authorized (under the Paperwork Reduction Act) to start sharing them with the public and open your call for applications/proposals.

Thank you so much – GHHI Team and Grace – for contributing to the TCGM Program's successful first Emergency ICR submission. Do reach out if you have any questions or need further information. Good luck!

--Aarti

Total Pages:(148 of 608)
USCA4 Appeal: 25-1808 Doc: 28-1 Filed: 02/23/2026 Pg: 148 of 608

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

Aarti Iyer, PhD (she/her)
Social Scientist
Evidence & Evaluation Team
Office of the Chief Financial Officer
U.S. Environmental Protection Agency
iyer.aarti@epa.gov

Call or chat with me on Microsoft Teams

**From:** Ruth Ann Norton <ranorton@ghhi.org>
**Sent:** Thursday, August 1, 2024 9:23 PM
**To:** Gontarek, Grace <Gontarek.Grace@epa.gov>
**Cc:** Valdez, Marisa (she/her/hers) <Valdez.Marisa@epa.gov>; Iyer, Aarti (she/her/hers) <Iyer.Aarti@epa.gov>; Wes Stewart <gwstewart@ghhi.org>; Abbey Cofsky <ACofsky@ghhi.org>
**Subject:** Re: E-ICR Approval! OMB Number Required for Documents

**Caution:** This email originated from outside EPA, please exercise additional caution when deciding whether to open attachments or click on provided links.

We hope to will have these to you by Friday. Thank you to all for the review.

Thank you.

Ruth Ann

**Ruth Ann Norton** | President & CEO
Green & Healthy Homes Initiative
2714 Hudson Street, Baltimore, MD 21224
(P) 410.534.6477 | (M) 443.463.6343 | (F) 410.534.6475 | **ranorton@ghhi.org**
**website** | **e-newsletter** | **facebook** | **twitter** | **linkedin** | **donate**

---

**From:** Gontarek, Grace <Gontarek.Grace@epa.gov>
**Sent:** Thursday, August 1, 2024 4:52:15 PM
**To:** Abbey Cofsky <ACofsky@ghhi.org>; Ruth Ann Norton <ranorton@ghhi.org>
**Cc:** Valdez, Marisa (she/her/hers) <Valdez.Marisa@epa.gov>; Iyer, Aarti (she/her/hers) <Iyer.Aarti@epa.gov>
**Subject:** [EXTERNAL] E-ICR Approval! OMB Number Required for Documents

**This message originated outside of GHHI.**

---

Hi,

Congratulations again on E-ICR approval granted this morning! Woohoo!

Now that approval has been given, the forms need to be updated with the OMB Control number. **OMB Control Number = 2090-0035, Expiration Date = 12/31/2024**

GHHI needs to do two things:
~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

Please update the control number and expiration date at the top of each form (replacing placeholder text with the number and exact date

In the Burden Statement paragraph on the first page of each form, update the control number (replace the placeholder text)

Best regards,
Grace

**Grace Gontarek** ***(she/her)*** **|** *Environmental Protection Specialist*
U.S. EPA Region 3 | EJ, Community Health, & Environmental Review Division
Communities & Technical Assistance Branch 2 (3EJ20)
Phone: 215.814.2759

# Attachment E

| U.S. ENVIRONMENTAL PROTECTION AGENCY<br>Assistance Amendment | GRANT NUMBER (FAIN): 95341401<br>MODIFICATION NUMBER: 2<br>PROGRAM CODE: 5N | DATE OF AWARD<br>12/27/2024 |
|---|---|---|
| | TYPE OF ACTION<br>Augmentation: Increase | MAILING DATE<br>01/02/2025 |
| | PAYMENT METHOD:<br>ASAP | ACH#<br>33743 |

| RECIPIENT TYPE: | Send Payment Request to: |
|---|---|
| Not for Profit | Contact EPA RTPFC at: rtpfc-grants@epa.gov |
| **RECIPIENT:** | **PAYEE:** |
| GREEN & HEALTHY HOMES INITIATIVE INC<br>2714 Hudson Street<br>Baltimore, MD 21224-4716<br>**EIN:** 52-1786577 | Green & Healthy Homes Initiative Inc<br>2714 Hudson Street<br>Baltimore, MD 21224-4716 |

| PROJECT MANAGER | EPA PROJECT OFFICER | EPA GRANT SPECIALIST |
|---|---|---|
| Ruth Ann Norton<br>2714 Hudson Street<br>Baltimore, MD 21224-4716<br>**Email:** ranorton@ghhi.org<br>**Phone:** 410-534-6477 | Grace Gontarek<br>Four Penn Center, 1600 John F. Kennedy Boulevard, 3EJ20<br>Philadelphia, PA 19103-2852<br>**Email:** Gontarek.Grace@epa.gov<br>**Phone:** 215-814-2759 | Vanessa Davies<br>Grants Management Section, 3MD22<br>Four Penn Center, 1600 John F. Kennedy Boulevard<br>Philadelphia, PA 19103-2852<br>**Email:** Davies.Vanessa@epa.gov<br>**Phone:** 215-814-2801 |

**PROJECT TITLE AND EXPLANATION OF CHANGES**

TCGM Subsequent Award - Green & Healthy Homes Initiative will act as pass-through entity for EPA's EJ Thriving Communities Grantmaking Program, R3 GM

This amendment records an increase in federal funds by $10,000,000, bringing the total budget and project costs to $52,000,000, fully funding this award, and the amendment updates the terms and conditions of the award. The Grantmaker will apply the 80/20 rule to the supplemental funding with 20% of the additional funding going to address additional Quality Assurance costs, Human Subjects Review costs, as well as provide funding for additional meaningful outreach and gap filling in remote, rural and hard-to-reach areas, while 80% will be used as required to increase the Grantmaker's capacity to make a larger volume of subgrants.

| BUDGET PERIOD | PROJECT PERIOD | TOTAL BUDGET PERIOD COST | TOTAL PROJECT PERIOD COST |
|---|---|---|---|
| 08/01/2024 - 07/31/2027 | 08/01/2024 - 07/31/2027 | $ 52,000,000.00 | $ 52,000,000.00 |

## NOTICE OF AWARD

Based on your Application dated 12/09/2024 including all modifications and amendments, the United States acting by and through the US Environmental Protection Agency (EPA) hereby awards $ 10,000,000.00. EPA agrees to cost-share 100.00% of all approved budget period costs incurred, up to and not exceeding total federal funding of $ 52,000,000.00. Recipient's signature is not required on this agreement. The recipient demonstrates its commitment to carry out this award by either: 1) drawing down funds within 21 days after the EPA award or amendment mailing date; or 2) not filing a notice of disagreement with the award terms and conditions within 21 days after the EPA award or amendment mailing date. If the recipient disagrees with the terms and conditions specified in this award, the authorized representative of the recipient must furnish a notice of disagreement to the EPA Award Official within 21 days after the EPA award or amendment mailing date. In case of disagreement, and until the disagreement is resolved, the recipient should not draw down on the funds provided by this award/amendment, and any costs incurred by the recipient are at its own risk. This agreement is subject to applicable EPA regulatory and statutory provisions, all terms and conditions of this agreement and any attachments.

| ISSUING OFFICE (GRANTS MANAGEMENT OFFICE) | AWARD APPROVAL OFFICE |
|---|---|
| **ORGANIZATION / ADDRESS** | **ORGANIZATION / ADDRESS** |
| U.S. EPA, Region 3, US EPA Region 3, 3MD22<br>Four Penn Center, 1600 John F. Kennedy Boulevard<br>Philadelphia, PA 19103-2852 | U.S. EPA, Region 3, EJ, Comm.Hlth and Env.Rev.Div (3EJ00)<br>R3 - Region 3<br>Four Penn Center, 1600 John F. Kennedy Boulevard<br>Philadelphia, PA 19103-2852 |

**THE UNITED STATES OF AMERICA BY THE U.S. ENVIRONMENTAL PROTECTION AGENCY**

| | DATE |
|---|---|
| **Digital signature applied by EPA Award Official** Catharine McManus - Mission Support Division, Director | 12/27/2024 |

# EPA Funding Information

| FUNDS | FORMER AWARD | THIS ACTION | AMENDED TOTAL |
|---|---|---|---|
| EPA Amount This Action | $ 42,000,000 | $ 10,000,000 | $ 52,000,000 |
| EPA In-Kind Amount | $ 0 | $ 0 | $ 0 |
| Unexpended Prior Year Balance | $ 0 | $ 0 | $ 0 |
| Other Federal Funds | $ 0 | $ 0 | $ 0 |
| Recipient Contribution | $ 0 | $ 0 | $ 0 |
| State Contribution | $ 0 | $ 0 | $ 0 |
| Local Contribution | $ 0 | $ 0 | $ 0 |
| Other Contribution | $ 0 | $ 0 | $ 0 |
| Allowable Project Cost | $ 42,000,000 | $ 10,000,000 | $ 52,000,000 |

| Assistance Program (CFDA) | Statutory Authority | Regulatory Authority |
|---|---|---|
| 66.615 - Environmental Justice Thriving Communities Grantmaking Program (EJ TCGM) | Clean Air Act: Sec. 138 | 2 CFR 200, 2 CFR 1500 and 40 CFR 33 |

**Fiscal**

| Site Name | Req No | FY | Approp. Code | Budget Organization | PRC | Object Class | Site/Project | Cost Organization | Obligation / Deobligation |
|---|---|---|---|---|---|---|---|---|---|
| - | 25125WB087 | 2226 | BSF5 | WF | 000W57XK1 | 4140 | - | - | $ 10,000,000 |
| | | | | | | | | | $ 10,000,000 |

Budget Summary Page

| Table A - Object Class Category (Non-Construction) | Total Approved Allowable Budget Period Cost |
|---|---|
| 1. Personnel | $ 1,258,663 |
| 2. Fringe Benefits | $ 276,905 |
| 3. Travel | $ 278,955 |
| 4. Equipment | $ 0 |
| 5. Supplies | $ 5,814 |
| 6. Contractual | $ 7,199 |
| 7. Construction | $ 0 |
| 8. Other | $ 48,675,548 |
| 9. Total Direct Charges | $ 50,503,084 |
| 10. Indirect Costs: 0.00 % Base SEE Condition 18 of the Administrative General Terms and Conditions | $ 1,496,916 |
| 11. Total (Share: Recipient 0.00 % Federal 100.00 %) | $ 52,000,000 |
| 12. Total Approved Assistance Amount | $ 52,000,000 |
| 13. Program Income | $ 0 |
| 14. Total EPA Amount Awarded This Action | $ 10,000,000 |
| 15. Total EPA Amount Awarded To Date | $ 52,000,000 |

## Administrative Conditions

The General Terms and Conditions of this agreement are updated in accordance with the link below. However, these updated conditions apply solely to the funds added with this amendment and any previously awarded funds not yet disbursed by the recipient as of the award date of this amendment. The General Terms and Conditions cited in the original award or prior funded amendments remain in effect for funds disbursed by the recipient prior to the award date of this amendment.

The recipient agrees to comply with the current EPA general terms and conditions available at: https://www.epa.gov/grants/epa-general-terms-and-conditions-effective-october-1-2024-or-later.

These terms and conditions are binding for disbursements and are in addition to or modify the assurances and certifications made as a part of the award and the terms, conditions, or restrictions cited throughout the award.

The EPA repository for the general terms and conditions by year can be found at: https://www.epa.gov/grants/grant-terms-and-conditions#general.

All other Administrative Terms and Conditions remain unchanged.

# Programmatic Conditions

## A. Eligibility Requirements for Subgrants

Subgrant eligibility

Grantmakers have flexibility to determine certain priorities for eligible subrecipients and activities that best meet the needs of their respective regions, in consultation with EPA. However, eligibility must fall within the following statutory and policy parameters:

Eligible Subrecipients are as follows:

- Nonprofit organizations
- Community-based and grassroots nonprofit organizations
- Philanthropic and civic organizations with nonprofit status
- Tribal governments (both federally recognized and state-recognized) and intertribal consortia (i. e., a partnership between two or more tribes that work together to achieve a common objective.)
- Native American Organizations (includes Indian groups, cooperatives, nonprofit corporations, partnerships, and associations that have the authority to enter into legally binding agreements)
- Local governments (as defined by 2 CFR 200.1 – includes cities, towns, municipalities, and counties, public housing authorities and councils of government)
- Institutions of higher education (e.g., private and public universities and colleges, including community colleges)
- Puerto Rico
- US Territories

Ineligible Subrecipients include:

- Individuals
- For-profit businesses, unless EPA's Award Official makes an exception based on factors such as those described in Appendix A of EPA's Subaward Policy.
- State governments
- Foreign entities of concern.

The term “foreign entity of concern” means a foreign entity that is—

(A) designated as a foreign terrorist organization by the Secretary of State under section 1189(a) of Title 8;

(B) included on the list of specially designated nationals and blocked persons maintained by the Office of Foreign Assets Control of the Department of the Treasury (commonly known as the “SDN list”);

(C) owned by, controlled by, or subject to the jurisdiction or direction of a government of a foreign country that is a covered nation (as defined in section 4872(d)(2) of Title 10); or

(D) alleged by the Attorney General to have been involved in activities for which a conviction was obtained under (i) chapter 37 of title 18 (commonly known as the “Espionage Act”); (ii) section 951 or 1030 of title 18; (iii) chapter 90 of title 18 (commonly known as the “Economic Espionage Act of 1996”); (iv) the Arms Export Control Act ( 22 U.S.C. 2751 et seq.); (v) section 224, 225, 226, 227, or 236 of the Atomic Energy Act of 1954 ( 42 U.S.C. 2274 , 2275, 2276, 2277, and 2284); (vi) the Export Control Reform Act of 2018 ( 50 U.S.C. 4801 et seq.); or (vii) the International Emergency Economic Powers Act ( 50 U.S.C. 1701 et seq.).

Eligible Beneficiaries

As required by Clean Air Act Section 138 (CAA 138), codified at 42 U.S.C. 7438, activities carried out by the Grantmaker or funded by Grantmaker subawards must benefit disadvantaged communities, defined by the EPA Administrator as any community that meets at least one of the following characteristics:

- Identified as disadvantaged by the Climate and Economic Justice Screening Tool (CEJST);
- Any census block group that is at or about the 90th percentile for any of EJScreen's Supplemental Indexes when compared to the nation or state; and / or
- Any geographic area within Tribal lands as included in EJScreen, which include:
  - Alaska Native Allotments
  - Alaska Native Villages
  - American Indian Reservations
  - American Indian Off-reservation Trust Lands
  - Oklahoma Tribal Statistical Areas

Eligible activities

Grantmakers may engage in and fund only those activities that are authorized by CAA 138, which include:

- Community-led air and other pollution monitoring, prevention, and remediation, and investments in low- and zero emission and resilient technologies and related infrastructure;
- Workforce development that help reduce greenhouse gas emissions and other air pollutants;
- Mitigating climate and health risks from urban heat islands, extreme heat, wood heater emissions, and wildfire events;
- Climate resiliency and adaptation;
- Reducing indoor toxics and indoor air pollution; or
- Facilitating engagement of disadvantaged communities in State and Federal advisory groups, workshops, rulemakings, and other public processes.

Ineligible activities

Ineligible activities include, but are not limited to:

- Any activity that violates applicable federal civil rights statutes prohibiting discrimination, including

but not limited to Title VI of the Civil Rights Act of 1964, Section 504 of the Rehabilitation Act of 1973, the Age Discrimination Act of 1975, section 504 of the Rehabilitation Act of 1973, Title IX of the Education Amendments of 1972, Federal Water Pollution Control Act Amendments of 1972, and implementing EPA regulations.

- Lobbying, as defined at 2 CFR 200.450;
- Defense and prosecution of criminal and civil proceedings, claims, appeals and patent infringements, as defined at 2 CFR 200.435;
- Carrying out protests, demonstrations, boycotts, or disinvestment campaigns; and
- Any activity to encourage actions that violate Federal, state or local law including, but not limited to, provisions relating to unlawful assembly, trespass, inciting violence, and failing to obey the lawful orders of law enforcement personnel.

## B. Establishing and Managing Subawards

Grantmakers are required to distribute eighty percent of their fifty-million-dollar award in three years through competitive and non-competitive subgrants to be completed within the project period of the subsequent award. These awards should be to eligible subrecipients to carry out activities described in the Notice of Funding Opportunity that benefit disadvantaged communities as defined by the Administrator, in accordance with Clean Air Act 138(b)(1). Grantmakers making pass-through subawards must comply with applicable provisions of 2 CFR Part 200 and the EPA Subaward Policy. As a pass-through entity, the recipient agrees to:

1) Be responsible for selecting subrecipients and as appropriate conducting subaward competitions using a system for properly differentiating between subrecipients and procurement contractors under the standards at 2 CFR 200.331 and EPA's supplemental guidance in Appendix A of the EPA Subaward Policy.

(a) For-profit organizations and individual consultants, in almost all cases, are not eligible subrecipients under EPA financial assistance programs and the pass-through entity must obtain prior written approval from EPA's Award Official for subawards to these entities unless the EPA-approved budget and work plan for this agreement contain a precise description of such subawards.

(b) Stipends and travel assistance for trainees (including interns) and similar individuals who are not are not employees of the pass-through entity must be classified as participant support costs rather than subawards as provided in 2 CFR 200.1 Participant support costs, 2 CFR 200.1 Subaward, and EPA's Guidance on Participant Support Costs.

(c) Subsidies, rebates and similar payments to participants in EPA funded programs to encourage environmental stewardship are also classified as Participant support costs as provided in 2 CFR 1500.1 and EPA's Guidance on Participant Support Costs.

2) Establish and follow a system that ensures all subaward agreements are in writing and contain all of the elements required by 2 CFR 200.332(a). EPA has developed a template for subaward agreements that is available in Appendix D of the EPA Subaward Policy.

3) Prior to making subawards, ensure that each subrecipient has a “Unique Entity Identifier (UEI).” The UEI is required by 2 CFR Part 25 and 2 CFR 200.332(a)(1). Subrecipients are not required to complete

full System for Award Management (SAM) registration to obtain a UEI. Information regarding obtaining a UEI is available at the SAM Internet site: https://www.sam.gov/SAM/ and in EPA's General Term and Condition "System for Award Management and Universal Identifier Requirements" of the pass-through entity's agreement with the EPA.

4) Ensure that subrecipients are aware that they are subject to the same requirements as those that apply to the pass-through entity's EPA award as required by 2 CFR 200.332(b)(2). These requirements include, among others:

(a) Title VI of the Civil Rights Act and other Federal statutes and regulations prohibiting discrimination in Federal financial assistance programs, as applicable.

(b) Reporting Subawards and Executive Compensation under Federal Funding Accountability and Transparency Act (FFATA) set forth in the General Condition passthrough entity's agreement with EPA entitled "Reporting Subawards and Executive Compensation." Page 8 of 42

(c) Limitations on individual consultant fees as set forth in 2 CFR 1500.10 and the General Condition of the pass-through entity's agreement with EPA entitled "Consultant Fee Cap."

(d) EPA's prohibition on paying management fees as set forth in General Condition of the pass-through entity's agreement with EPA entitled "Management Fees."

(e) The Procurement Standards in 2 CFR Part 200 including those requiring competition when the subrecipient acquires goods and services from contractors (including consultants). EPA provides general information on other statutes, regulations and Executive Orders on the Grants internet site at www.epa.gov/grants. Many Federal requirements are agreement or program specific and EPA encourages pass-through entities to review the terms of their assistance agreement carefully and consult with their EPA Project Officer for advice if necessary.

5) Ensure, for states and other public recipients, that subawards are not conditioned in a manner that would disadvantage applicants for subawards based on their religious character.

6) Establish and follow a system for evaluating subrecipient risks of noncompliance with Federal statutes, regulations and the terms and conditions of the subaward as required by 2 CFR 200.332(c) and document the evaluation. Risk factors may include: (a) Prior experience with same or similar subawards (b) Results of previous audits; (c) Whether new or substantially changed personnel or systems, and; (d) Extent and results of Federal awarding agency or the pass-through entity's monitoring

7) Establish and follow a process for deciding whether to impose additional requirements on subrecipients based on risk factors as required by 2 CFR 200.332(d). Examples of additional requirements authorized by 2 CFR 200.208 include:

(a) Requiring payments as reimbursements rather than advance payments;

(b) Withholding authority to proceed to the next phase until receipt of evidence of acceptable performance within a given period of performance;

(c) Requiring additional, more detailed financial reports;

(d) Requiring additional project monitoring;

(e) Requiring the non-Federal entity to obtain technical or management assistance, and

(f) Establishing additional prior approvals

8) Establish and follow a system for monitoring subrecipient performance that includes the elements required by 2 CFR 200.332(e) and report the results of the monitoring in performance reports as provided in the reporting terms and conditions of this agreement.

9) Establish and maintain an accounting system which ensures compliance with the $50,000 limitation on Modified Total Direct Costs per subaward, if applicable, for the purposes of distributing indirect costs. Recipients with Federally approved indirect cost rates that use a different basis for distributing indirect costs to subawards must comply with their Indirect Cost Rate Agreement.

10) Work with EPA's Project Officer to obtain the written consent of EPA's Office of International and Tribal Affairs (OITA), prior to awarding a subaward to a foreign or international organization, or a subaward to be performed in a foreign country even if that subaward is described in a proposed scope of work.

11) Obtain written approval from EPA's Award Official for any subawards that are not described in the approved work plan in accordance with 2 CFR 200.308.

12) Obtain the written approval of EPA's Award Official prior to awarding a subaward to an individual if the EPA-approved scope of work does not include a description of subawards to individuals.

13) Establish and follow written procedures under 2 CFR 200.302(b)(7) for determining that subaward costs are allowable in accordance with 2 CFR Part 200, Subpart E and the terms and conditions of this award. These procedures may provide for allowability determinations on a pre-award basis, through ongoing monitoring of costs that subrecipients incur, or a combination of both approaches provided the pass-through entity documents its determinations.

14) Establish and maintain a system under 2 CFR 200.332(e)(3) and 2 CFR 200.521 for issuing management decisions for audits of subrecipients that relate to Federal awards. However, the recipient remains accountable to EPA for ensuring that unallowable subaward costs initially paid by EPA are reimbursed or mitigated through offset with allowable costs whether the recipient recovers those costs from the subrecipient or not.

15) As provided in 2 CFR 200.333, pass-through entities must obtain EPA approval to make fixed amount subawards. EPA is restricting the use of fixed amount subawards to a limited number of situations that are authorized in official EPA pilot projects. Recipients should consult with their EPA Project Officer regarding the status of these pilot projects. By accepting this award, the recipient is certifying that it either has systems in place to comply with the requirements described in Items 1 through 14 above or will refrain from making subawards until the systems are designed and implemented.

**C. Performance Reporting and Final Performance Report**

**Performance Reporting – Content**

In accordance with 2 CFR 200.329, the recipient agrees to submit performance reports that include brief information on each of the following areas: 1) A comparison of actual accomplishments to the outputs/outcomes established in the assistance agreement work plan for the period; 2) The reasons why established outputs/outcomes were not met; and 3) other pertinent information, including, when appropriate, analysis and explanation of cost overruns or high unit costs. This description may include overall best practices and/or lessons learned over the project performance period, and attachments and links for materials that may be helpful to other Environmental Grants recipients or similar organizations (e.g., tip sheets, "how-to" sheets, communication materials, outreach materials, web tools, etc.).

These reports shall cover work status, work progress, difficulties encountered, preliminary data results and a statement of activity anticipated during the subsequent reporting period, including a description of equipment, techniques, and materials to be used or evaluated. A discussion of cumulative and period comparison of project budget and expenditures, coupled with a comparison of the percentage of the project completed and in relation to project schedule and an explanation(s) of significant discrepancies must be included in the report. The report shall also include any changes of key personnel concerned with the project.

Additionally, the recipient agrees to inform EPA within 30 calendar days about problems, delays, or adverse conditions that may materially impair the ability to meet the outputs/outcomes specified in the assistance agreement work plan.

**Performance Reporting - Frequency**

The recipient agrees to submit quarterly performance reports electronically to the EPA Project Officer on the designated quarterly due date(s). If **due date falls on a federal holiday or weekend, it is due the following business day.** The period end and due dates are listed in the below table.

| PERIOD ENDING | QUARTERLY DUE DATES |
|---|---|
| September 30 | October 31 |
| December 31 | January 31 |
| March 31 | April 30 |
| June 30 | July 31 |

The first quarterly report is due at the end of the first full quarter following the execution of the agreement, unless the recipient has incurred pre-award costs. If the recipient is authorized to incur pre-award costs, the grant performance period begins on the date costs were first incurred, and the recipient would provide a quarterly performance report following the end of the first full quarter after that date. Quarterly reports will continue thereafter and throughout the remainder of the performance period. The recipient must submit the final performance report no later than 120 calendar days after the end date of the period of performance as identified in this agreement. The final report must document all project activities occurring during the Period of Performance and as outlined in the executed agreement. However, please be advised that the statutory three-year performance period for this grant program may not be extended. Any costs incurred after the end of the performance period are the responsibility of the recipient and may not be charged to the grant.

**Subaward Performance Reporting**

The recipient must report on its subaward monitoring activities under 2 CFR 200.332(e). Pass-through entity monitoring of the subrecipient must include:

1. Review of financial and programmatic reports.

2. Follow-up on action plans noting findings/deficiencies identified from site visits and/or desk reviews to ensure effective subrecipient performance.

3. Quantitative environmental results the subrecipient achieved, the place of performance (eg Census Trace ID, zip code, latitude and longitude) and a narrative discussion of any qualitative improvements of environmental conditions in the target community.

4. Summaries of audit findings and related pass-through-entity management decisions.

5. Any disagreements or potential challenges with subrecipients that may interfere with the completion of subgrant performance, and actions the pass-through entity has taken to mitigate them.

6. Actions the pass-through entity has taken to correct deficiencies such as those specified at 2 CFR 200.332(f), 2 CFR 200.208 and the 2 CFR Part 200.339 Remedies for Noncompliance.

7. Summaries of collaborative governance activities and impacts with communities, project partners, and Technical Assistance providers (TCTACs, contractors, etc.) including outreach, engagement, and implementation of feedback.

8. Quantity of, the place of performance, and qualitative summaries of capacity building activities for severely capacity-constrained communities.

9. Summaries of reach in underserved communities, communities in urban, remote, and rural areas, and community stakeholders with the highest degree of burden and capacity constraints throughout the entire Geographic Area.

**Subaward Performance Reporting on Milestones of Activities for Fixed-Amount Awards**

Grantmakers have limited reporting requirements for fixed-amount subawards to severely capacity-constrained organizations. The recipient must at minimum report on subrecipients' fixed-amount subaward milestones via the quarterly performance reports, as well as any other reporting requirements agreed upon by the Grantmaker and the fixed-amount subaward recipient, as described in the Fixed Amount Subaward memo. Fixed Amount Subaward Performance reporting will be in accordance with **applicable requirements specified in 2 CFR Parts 200 and 1500, which will apply to fixed-amount subawards absent a case-specific exception requested by a Grantmaker, concurred by the OEJECR Project Officer and approved by OGD. Note:** Each Grantmaker will define “Severely Capacity Constrained.” Grantmakers will also design policies and procedures to limit the number of EJ Thriving Communities Subgrants that a single entity may receive within a specified time period to maximize the diversity and breadth of subrecipients.

**Examples of Fixed Amount Subaward Performance reporting include but are not limited to:**

1. Monitoring plans paid on a milestone basis with an initial amount paid prior to the development of the plan, followed by a second payment upon completion of the draft plan, with a final payment when the plan is complete.

2. Lump sum payments for equipment purchases (e.g. air monitoring devices) based on invoices provided by the subrecipient.

3. Upfront costs of no more than 25%, except with permission of the Project Officer, with subsequent milestone-based payments. For example, sampling projects paid on a milestone basis with 25% for upfront expenses, 25% for data collection, 25% for data analysis, 25% for final report completion.

**Fixed-Amount Subaward Monitoring and Compliance**

**As provided in 2 CFR 200.102(c), the Award Official is authorized to waive or modify the following regulatory requirements for subrecipients receiving fixed-amount subawards:**

1. Competition requirements specified in 2 CFR Part 200 and Part 1500 with the exception of the statutory consultant fee cap implemented at 2 CFR 1500.10.

2. Records required to document personnel compensation under 2 CFR 200.430 and 2 CFR 200.431.

3. Financial requirements at 2 CFR 200.302(b) with the exception of accounting records and documentation required to demonstrate achievement of agreed upon milestones such as invoices for equipment or facility rental, fees paid, stipends earned, and similar fixed-amount transactions.

4. Internal controls described at 2 CFR 200.303 with the exception of an internal control protocol for ensuring that fixed-amount subrecipients only request payment from the pass-through entities upon completion of agreed upon milestones.

5. Property standards in 2 CFR Part 200 with the exception of 2 CFR 200.315 as implemented in EPA's General Term and Condition Data and Copyrighted Materials relating to EPA's “Federal Purpose” license in data and written materials produced with EPA funds.

6. Subrecipient and contractor determinations in 2 CFR 200.331 and corresponding provisions of the EPA Subaward Policy.

7. Indirect costs authorized by 2 CFR 200.332(b)(4). Fixed amount subrecipients do not incur indirect costs.

8. Reports on real or personal property required when closing out a subaward specified in 2 CFR 200.344(g).

**D. Pass-through Entities**

The pass-through entities must have pricing procedures that prevent subrecipients from “profiting” from fixed-amount subawards by precluding payments for “management fees” or other amounts in excess of anticipated costs for the activity. Grantmakers will use the following methods to ensure compliance for tracking and monitoring activities:

1. Establishing the content of periodic and final performance and financial reports for each fixed-amount subaward.

2. Obtaining a budget description of planned expenditures to be refunded if an activity or event does not take place, a report or analysis is not completed, or the subrecipient does not otherwise perform as promised.

3. Certification in writing to the pass-through entity at the end of the fixed-amount subaward that the project or activity was completed, or the level of effort was expended. If the required level of activity or effort was not carried out, the amount of the fixed-amount subaward must be adjusted and any excess funds refunded.

4. Requiring prior written approval of the pass-through entity for any changes in principal investigator, project leader, project partner, or scope of effort.

**E. Review and Oversight**

1. Work Product - The recipient agrees that any product (e.g., publication, outreach materials, training manuals) produced through this assistance agreement and made available for public view must be first reviewed by the EPA Project Officer for comment before release. The recipient shall make all final decisions on the product content.

2. Monthly Calls - The recipient shall consult with the EPA Project Officer on a monthly basis to obtain input on program activities and products produced. However, the recipient should make all final decisions on project implementation and product content. The EPA Project Officer has discretion to change the frequency with which calls are held.

3. Prior Approval - Any proposed changes to the project must be submitted in writing to the EPA Project Officer and Grant Specialist for EPA approval prior to implementation. The recipient incurs costs at its own risk if it fails to obtain written approval before implementing any changes.

**F. Post-Project Period Follow-up and Engagement**

For no less than one year after completion of the project, the recipient agrees to periodically update its designated EPA Project Officer on current community-based and environmental justice work the recipient is performing and how/if that work relates to its now completed EJ TCGM project. These periodic updates may include (but are not limited to) recent local media reports, additional grant funding received, new initiatives, and developing partnerships. The EPA EJ Grants program is invested in the long-term success of each EJ Grant recipient and its long-term impact on addressing the disproportionate environmental and public health impacts plaguing their communities. These post-project period updates allow the EJ Grants program to provide past recipients with additional guidance about applicable funding opportunities, potential collaborations, and technical assistance that may assist recipients in their future work. Periodic updates also allow the program to track best practices that lead to greater project sustainability and long-term community revitalization for impacted community residents. The frequency of these periodic updates will be by mutual agreement and will be discussed with the recipient before the end of the project period. Recipients are also encouraged to continue providing updates and engaging with their EPA Project Officers beyond the additional year after the end of the project.

*NOTE – Compliance with this term & condition will not give the recipient priority during future EPA EJ

grant competitions and is not a guarantee for future EPA grant funding. Additionally, the recipient agrees not to submit a claim for compensation to EPA for providing these updates. Project Officers are encouraged to engage with their Grantmakers to fulfill post-period follow-up, but are not to document non-compliance.

**G. Cybersecurity**

(a) The recipient agrees that when collecting and managing environmental data under this assistance agreement, it will protect the data by following all applicable State or Tribal law cybersecurity requirements.

(b) (1) EPA must ensure that any connections between the recipient's network or information system and EPA networks used by the recipient to transfer data under this agreement, are secure. For purposes of this Section, a connection is defined as a dedicated persistent interface between an Agency IT system and an external IT system for the purpose of transferring information. Transitory, user-controlled connections such as website browsing are excluded from this definition.

If the recipient's connections as defined above do not go through the Environmental Information Exchange Network or EPA's Central Data Exchange, the recipient agrees to contact the EPA Project Officer (PO) no later than 90 days after the date of this award and work with the designated Regional/Headquarters Information Security Officer to ensure that the connections meet EPA security requirements, including entering into Interconnection Service Agreements as appropriate. This condition does not apply to manual entry of data by the recipient into systems operated and used by EPA's regulatory programs for the submission of reporting and/or compliance data.

(2) The recipient agrees that any subawards it makes under this agreement will require the subrecipient to comply with the requirements in (b)(1) if the subrecipient's network or information system is connected to EPA networks to transfer data to the Agency using systems other than the Environmental Information Exchange Network or EPA's Central Data Exchange. The recipient will be in compliance with this condition: by including this requirement in subaward agreements; and during subrecipient monitoring deemed necessary by the recipient under 2 CFR 200.332(d), by inquiring whether the subrecipient has contacted the EPA Project Officer. Nothing in this condition requires the recipient to contact the EPA Project Officer on behalf of a subrecipient or to be involved in the negotiation of an Interconnection Service Agreement between the subrecipient and EPA.

**H. Competency Policy**

**Competency of Organizations Generating Environmental Measurement Data**

In accordance with Agency Policy Directive Number FEM-2012-02, Policy to Assure the Competency of Organizations Generating Environmental Measurement Data under Agency-Funded Assistance Agreements,

Recipient agrees, by entering into this agreement, that it has demonstrated competency prior to award, or alternatively, where a pre-award demonstration of competency is not practicable, Recipient agrees to demonstrate competency prior to carrying out any activities under the award involving the generation or use of environmental data. Recipient shall maintain competency for the duration of the project period of this agreement and this will be documented during the annual reporting process. A copy of the Policy is available online at https://www.epa.gov/sites/production/files/2015-03/documents/competency-policy-

aaia-new.pdf or a copy may also be requested by contacting the EPA Project Officer for this award.

**I. Procurement Terms and Conditions**

The recipient agrees to conduct all procurement actions under this assistance agreement in accordance with the procurement standards set forth in Title 2 CFR, Parts 200.317 through 200.327, 2 CFR Part 1500 and 40 CFR Part 33. EPA provides additional guidance on complying with these requirements in the Best Practice Guide for Procuring Services, Supplies, and Equipment Under EPA Assistance Agreements which is available at https://www.epa.gov/grants/best-practice-guide-procuring-services-supplies-and-equipment-under-epa-assistance. Any costs incurred by the recipient under contracts and/or small purchases that EPA determines to be in noncompliance with EPA procurement standards shall be unallowable for Federal reimbursement.

As provided by 2 CFR 200.310 recipients must ensure that subrecipients acquire insurance equal to the amount of the purchased items to protect against loss, damage and theft if a subaward includes cost for equipment. Costs for such insurance are allowable under this agreement.

**J. Signage Required**

1. Signage Requirements

a. Investing in America Emblem: The recipient will ensure that a sign is placed at construction sites supported in whole or in part by this award displaying the official Investing in America emblem and must identify the project as a “project funded by President Biden's Inflation Reduction Act” as applicable. The sign must be placed at construction sites in an easily visible location that can be directly linked to the work taking place and must be maintained in good condition throughout the construction period. The recipient will ensure compliance with the guidelines and design specifications provided by EPA for using the official Investing in America emblem available at: https://www.epa.gov/invest/investingamerica-signage.

b. Procuring Signs: Consistent with section 6002 of RCRA, 42 U.S.C. 6962, and 2 CFR 200.323, recipients are encouraged to use recycled or recovered materials when procuring signs. Signage costs are considered an allowable cost under this assistance agreement provided that the costs associated with signage are reasonable. Additionally, to increase public awareness of projects serving communities where English is not the predominant language, recipients are encouraged to translate the language on signs (excluding the official Investing in America emblem or EPA logo or seal) into the appropriate non-English language(s). The costs of such translation are allowable, provided the costs are reasonable.

2. Public or Media Events EPA encourages the recipient to notify the EPA Project Officer listed in this award document of public or media events publicizing the accomplishment of significant events related to construction projects as a result of this agreement and provide the opportunity for attendance and participation by federal representatives with at least ten (10) working days' notice.

**K. Geospatial Data Standards**

All geospatial data created must be consistent with Federal Geographic Data Committee (FGDC) endorsed standards. Information on these standards may be found at https://www.fgdc.gov/.

**L. Quality Assurance**

Authority: Quality Assurance applies to all assistance agreements involving environmental information as defined in 2 C.F.R. § 1500.12 Quality Assurance.

The recipient shall ensure that subawards involving environmental information issued under this agreement include appropriate quality requirements for the work. The recipient shall ensure sub-award recipients develop and implement the Quality Assurance (QA) planning documents in accordance with this term and condition; and/or ensure sub-award recipients implement all applicable approved QA planning documents. In consultation with your Project Officer and the Regional Quality Assurance Manager, select the appropriate plan based on the following options to implement in the Subsequent Award:

NOTE: The Grantmaker will need to develop a management strategy for receiving, reviewing and assisting applicants with QMP or QAPP needs. The Grantmakers' management strategy will need to be submitted for approval to the assigned Project Officer and the Regional Quality Assurance office official before the Funding Recommendation is submitted and finalized before applications for the Thriving communities subgrants are released.

**1. Quality Management Plan (QMP)**

a. Prior to beginning environmental information operations, the recipient must:

i. Develop a QMP,

ii. Prepare the QMP in accordance with the current version of EPA's Quality Management Plan (QMP) Standard. Submit the document for EPA review,

iii. Complete required training for approving QAPPs in collaboration with the region or in place of the region, and

iv. Obtain EPA Quality Assurance Manager or designee (hereafter referred to as QAM) approval.

b. The recipient must submit the QMP within 60 days after grant award.

c. The recipient must review their approved QMP at least annually. These documented reviews shall be made available to the sponsoring EPA organization if requested. When necessary, the recipient shall revise its QMP to incorporate minor changes and notify the EPA PO and QAM of the changes. If significant changes have been made to the Quality Program that affect the performance of environmental information operations, it may be necessary to re-submit the entire QMP for re-approval. In general, a copy of any QMP revision(s) made during the year should be submitted to the EPA PO and QAM in writing when such changes occur. Conditions requiring the revision and resubmittal of an approved QMP can be found in section 6 of EPA's Quality Management Plan (QMP) Standard.

**2. Quality Assurance Project Plan (QAPP)**

a. Prior to beginning environmental information operations, the recipient must:

i. Develop a QAPP template for subrecipient use,

ii. Prepare QAPP in accordance with the current version of EPA's Quality Assurance Project Plan

(QAPP) Standard,

iii. Submit the document for EPA review, and

iv. Obtain EPA Quality Assurance Manager or designee (hereafter referred to as QAM) approval.

b. The recipient must submit the QAPP at least 60 days after grant award, and prior to the start of any environmental information collection activities.

c. The recipient shall notify the PO and QAM when substantive changes are needed to the QAPP. EPA may require the QAPP be updated and re-submitted for approval.

d. The recipient must review their approved QAPP at least annually. The results of the QAPP review and any revisions must be submitted to the PO and the QAM at least annually and may also be submitted when changes occur.

**For Reference:**

• Quality Management Plan (QMP) Standard and EPA's Quality Assurance Project Plan (QAPP) Standard; contain quality specifications for EPA and non-EPA organizations and definitions applicable to these terms and conditions.

• EPA QA/G-5: *Guidance for Quality Assurance Project Plans*.

• (QAM and/or PO may insert QA references that inform or assist the recipient here).

• EPA's Quality Program website has a list of QA managers, and Non-EPA Organizations Quality Specifications.

• The Office of Grants and Debarment Implementation of Quality Assurance Requirements for Organizations Receiving EPA Financial Assistance.

**M. Human Subjects Research Review Process**

(a) *Applications involving human subjects.* (1) Protecting the rights, safety, and welfare of human subjects involved in research supported by EPA grants is the responsibility of the institution which receives or is accountable to EPA for the funds awarded for the support of the project.

(2) Institutions engaged in research involving human subjects, with the exception of research eligible for exemption under 40 CFR 26.104, must submit to EPA for review, approval, and official acceptance, written evidence of a Federal wide Assurance (FWA) on file with the U.S. Department of Health and Human Services (HHS) or other agency that their institution will comply with regulatory provisions in the Common Rule (codified by EPA at as 40 CFR 26 Part A).

(3) Applicants must provide documentation with each proposal of research involving human subjects that it has been reviewed in accordance with the institution's assurance and in compliance with the Common Rule. Review and approval by the EPA Human Subject Research Review Official (HSRRO) to determine compliance with 40 CFR 26 and EPA Order 1000.17 (series) must occur before research involving human subjects may commence.

## N. Program Income

In accordance with 2 CFR Part 200.307(b) and 2 CFR 1500.8(b), the recipient is hereby authorized to retain program income earned during the project period. All program income must be used for the purposes and under the conditions of this Federal award. Income used after the period of performance may be subject to a closeout agreement.

The recipient agrees to use the following method for applying income:

1. Addition. Program income is added to the total allowable costs, increasing the overall total amound of the award. Program income must be used for the original purpose of the award and under the conditions of the assistance agreement.

The recipient must provide as part of its ***quarterly*** performance report, a description of how program income is being used. Further, a report on the amount of program income earned during the award period must be submitted with the quarterly Federal Financial Report, Standard Form 425.

## O. Use of Logos and Icons

**Programmatic guidance for the appropriate use of the icons and logos either together, with other partner icons or individually will be provided.**

If the EPA logo is appearing along with logos from other participating entities on websites, outreach materials, or reports, it must **not** be prominently displayed to imply that any of the recipient or subrecipient's activities are being conducted by the EPA. Instead, the EPA logo should be accompanied with a statement indicating that Green and Healthy Homes Initiative received financial support from the EPA under an Assistance Agreement. More information is available at: https://www.epa.gov/stylebook/using-epa-seal-and-logo#policy

### Grantmaker Icon

**The Thriving Communities Grantmaking Program (TCGM) Icon will be designed by the EPA with Grantmaker input and approved by the EPA PROTRAC process** , used to monitor the concept proposal, development, review and approval of EPA print, infographics, audio, video and social media content/products for internal and external release, as well as Esri Products (Story Maps and Hub sites) for external publishing only. PROTRAC ensures all content created is consistent, appropriate and in alignment with current agency messages, and follows EPA branding guidelines.**. The icon will represent the “programmatic identity” of the Grantmaker program, and may be used alone or in conjunction with the EPA and grant recipient's logos' or individual Grantmaker's logo. . The approved TCGM programmatic icon must remain intact and unmodified.** Modifying icons to specifically identify a program office or region are not permitted. NOTE: Icons must be updated or removed per current agency policy/ guidelines.

## P. Paperwork Reduction Act

(a) The scope of work for this cooperative agreement includes a survey or other information collection of identical information from 10 or more parties. As provided by 5 CFR 1320.3(d), EPA is a sponsor of the information collection for purposes of obtaining approval from the Office of Management and Budget for collecting information. The recipient agrees to assist EPA in complying with OMB procedures at 5 CFR

Part 1320 for obtaining Information Collection Request authorization. The recipient may not collect information until EPA obtains OMB approval. The Project Officer will advise the recipient when information collection may begin.

**Q. Substantial Involvement**

EPA will be substantially involved in this agreement. Substantial involvement by the EPA Project Officer may include:

1. Monthly telephone calls and other monitoring,

2. Review project phases and provide approval to continue to the next phase,

3. Review and comment on any documents, web content, or other materials developed under this agreement (the recipient will make final decisions on these matters),

4. Approve substantive terms included in contracts or subawards (EPA's Project Officer will not suggest, recommend, or direct the recipient to select any particular contractor or subrecipient except to the extent permitted in Section 10 of EPA's Subaward Policy).

5. Review and comment on the programmatic progress reports.

6. Consultation regarding the selection of key personnel (EPA's involvement is limited to reviewing the technical qualifications of key personnel and the recipient will make the final decisions on selection. EPA's Project Officer will not suggest, recommend, or direct the recipient to select any individual).

7. Collaboration with EPA on designing and implementing a project management process, which includes quality project oversight for funding subrecipients and a tracking and reporting process that reduces reporting burden on community recipients.

8. Collaboration on the preliminary design of the subaward competition, the submission and evaluation process, and the development of evaluation criteria. However, final decisions on the submission, evaluation process/criteria, and selection of subrecipients will be made by the recipient, rather than by EPA, provided statutory, regulatory, and EPA's Subaward Policy requirements are met.

9. EPA Project Officer must review and approve the subaward agreements with any Collaborating Entities that will assist in the direct development and implementation of the EJ Thriving Communities Subgrants program, including subawards to other nonprofits (non-Community Based Organizations), units of government, institutions of higher education, and/or medical service providers not covered by a statutory partnership to assist the Grantmaker by creating a local subaward competition or outreach to local communities.

10. In addition to the requirements in EPA's General Term and Condition "Disclosing Conflict of Interests," the recipient must submit a Conflict-of-Interest (COI) plan for approval by EPA's Project Officer for preventing, neutralizing, or mitigating conflicts of interest that may arise within the participatory governance framework of the project. The plan should describe controls for ensuring that representatives of community-based nonprofit organizations involved in the design and decision-making for the subawards program do not have relationships with organizations competing for subawards or receiving

noncompetitive funding that create actual or apparent conflicts of interest. Example participatory governance activities could include advisory bodies composed of community-based nonprofit organizations that oversee and provide thought partnership on the development of the subaward process.

11. If a Conflict of Interest is Identified by the EPA, the Conflict-of-Interest Mitigation Plan will need to be approved by the Project Officer, in consultation with the Grant Specialist.

12. Joint operational involvement, participation, and/or collaboration between EPA and the recipient.

13. Review of proposed procurements in accordance with the Procurement Standards in 2 CFR Part 200.

14. EPA staff participation in monitoring performance and/or providing technical support for subrecipients that require additional technical assistance to meet project and/or workplan deliverables.

15. Joint operational involvement, participation, and/or collaboration between EPA and the recipient.

16. Informally referred to as the “Cap Amount Award Policy” and discussed on page 15 of the NOFO, Grantmakers should put policies in place that limit the number of times a particular Eligible Subrecipient can receive an EJ Thriving Communities Subgrant within a certain period of time. For example, a pass-through entity may decide that a recipient may not receive more than two EJ Thriving Communities Subgrants within the 3-year period of performance or a shorter interval as deemed appropriate by the pass-through entity. This plan will need to be approved by the Project Officer.

17. Prior to making subawards, Grantmakers can work with their PO's to identify instructions and guidance on subaward policies to ensure that the burden on the Tier 1-3 and fixed amount award Subawardees is minimized. This includes resources such as the gmc_subaward_policy_appendix_d_subaward_agreement_template.pdf (epa.gov) (EPA does not mandate the use of this template. Pass-through entities may use their own form of subaward agreements provided the requirements of 2 CFR 200.331(a) are met.) And requirements that flow down to subgrantees such as “Unique Entity Identifier” (UEI) as required by 2 CFR Part 25 and 2 CFR 200.332 (b)(1).

**R. National Programmatic Term and Condition for Fellowship, Internship Programs and Similar Programs Supported by EPA Financial Assistance**

1. EPA funds for this program may only be used for participant support cost payments, scholarships, tuition remission and other forms of student aid for citizens of the United States, its territories, or possessions, or for individuals lawfully admitted to the United States for permanent residence.

2. The recipient and program participants are responsible for taxes, if any, on payments made to or on behalf of individuals participating in this program that are allowable as participant support costs under 2 CFR 200.1 or 2 CFR 200.456 and scholarships and other forms of student aid such as tuition remission under 2 CFR 200.466. EPA encourages recipients and program participants to consult their tax advisers, the U.S. Internal Revenue Service, or state and local tax authorities regarding the taxability of stipends, tuition remission and other payments. However, EPA does not provide advice on tax issues relating to these payments.

3. Participant support cost payments, scholarships, and other forms of student aid such as tuition remission are lower tiered covered Nonprocurement transactions for the purposes of 2 CFR 180.300 and EPA's Suspension and Debarment Term and Condition. Recipients, therefore, may not make participant support cost payments to individuals who are excluded from participation in Federal Nonprocurement programs under 2 CFR Part 180. Recipients are responsible for checking the eligibility of program participants in the System for Award Management (SAM) or obtaining eligibility certifications from the program participants.

See EPA Guidance on Participant Support Costs.

**S. Subsequent Award Statutory Partnership Agreements Letters of Commitment submitted with the application needed to be finalized prior to the submission of the Subsequent Award.** EPA requires that applicants selected for funding consideration provide copies of the executed final statutory partnership agreement to EPA's Project Officer for submission to the EPA Award Official prior to issuance of the Subsequent Award.

Any letters of commitment submitted in the application should be finalized into a final signed statutory agreement, which should include any updated stakeholder roles and responsibilities or revised award amounts. The statutory partnership agreement must be signed by all relevant parties and specify which member of the partnership will enter into the assistance agreement with EPA for the purposes of accountability for the proper expenditure of federal funds, performance of the assistance agreement, liability for claims for recovery of unallowable costs incurred under the agreement and must specify roles in performing the proposed scope of work for the assistance agreement. Executed Statutory Partnership Agreements will be submitted to EPA's Project Officer. The EPA Grants Management Officer or the EPA Award Official will issue written notification that this condition has been satisfied and that the recipient is authorized to draw down TCGM funds for the Subsequent Award in accordance with the standards described in the EPA General Term and Condition for the Automated Standard Application Payments (ASAP) and Proper Payment Draw Down during the initial award.

**T. Record Retention**

In accordance with 2 CFR § 200.334, recipients and subrecipients must retain for a period of three years all programmatic, financial, statistical, and all other records required under the terms of the agreement, unless a dispute or lawsuit has ensued. If a dispute or lawsuit has been initiated, all records must be retained for the duration of the dispute, until the matter is resolved and dispositioned, and for three years thereafter.

**U. Environmental Justice Thriving Communities Grantmaking Program Davis-Bacon Labor Standards**

As provided in Section 314 of the Clean Air Act (42 USC § 7614) (DBRA), Davis-Bacon Act (42 USC §§ 3141-3144) labor standards apply to grants and cooperative agreements made under the Greenhouse Gas Reduction Fund. Accordingly, all laborers and mechanics employed by contractors or subcontractors on projects assisted under this award agreement shall be paid wages at rates not less than those prevailing for the same type of work on similar construction in the locality as determined by the Secretary of Labor in accordance with 40 USC Subtitle II, Part A, Chapter 31, Subchapter IV (Wage Rate Requirements).

Therefore, the pass-through entity must create a Davis-Bacon subgrant compliance plan to ensure that any entity that receives financial assistance complies with Davis-Bacon labor requirements where

construction work is financed in whole or in part with such financial assistance.

If the recipient encounters a situation that presents uncertainties regarding DBRA applicability under this assistance agreement, the recipient must discuss the situation with the EPA Project Officer before authorizing work on the project.

In the event that a periodic project site visit, audit, or routine communication with subrecipient, program beneficiary, contractor, or subcontractor determines any instances of non-compliance or potential non-compliance with Davis-Bacon, the recipient agrees to discuss the situation with the EPA Project Officer for possible referral to DOL for guidance or enforcement action.

Note, the use of the term project in this term and condition is distinct from the use of the term project within the definition of qualified project under Clean Air Act Section 134(c)(3), which is broader and includes “any project, activity, or technology.” 40 CFR 30.103 defines construction as “erection, alteration, or repair (including dredging, excavating, and painting) of buildings, structures, or other improvements to real property, and activities in response to a release or a threat of a release of a hazardous substance into the environment, or activities to prevent the introduction of a hazardous substance into a water supply.”

**1. Program Applicability**

a. Program Name: Environmental Justice Thriving Communities Grantmaking Program

b. Statute requiring compliance with Davis-Bacon: Clean Air Act Section 314, Labor Standards, codified as 42 U.S.C. § 7614.

c. Activities subject to Davis-Bacon: Activities subject to Davis-Bacon include certain construction costs and contractual costs. Construction costs may include:

> i. Building and / or upgrading existing structures and sites to improve community use while reducing GHG emissions and / or improving climate resilience;
>
> ii. Implementing structural and non-structural retrofits to enhance the resilience of community-serving buildings (e.g., raise the building elevation to reduce flood risk, improve cooling systems and / or insulation to reduce extreme heat risk);
>
> iii. Install energy efficiency measures such as insulation, double or triple glazed windows, “cool roofs” that reflect sunlight, and energy management systems in public buildings;
>
> iv. Remediating or mitigating harmful substances in buildings, including lead, mercury, pesticides, radon, mold, PCBs (caulk, flooring, etc.), lead-based paint, asbestos, and other toxic substances;
>
> v. Installing, upgrading, or replacing HVAC and / or filtration systems that improve indoor quality in schools, community-serving buildings, and single-and-multifamily homes;
>
> vi. Targeted water infrastructure upgrades, including replacing private-side lead lines in homes, childcare facilities, schools, or other community-serving buildings; septic to sewer conversions; and installing water fountains at schools and parks; and

vii. Other activities described in the EPA Disadvantaged Business Enterprise (DBE) rule's definition of *Construction* at 40 CFR 33.103, as well as related architectural or engineering services.

With very few exceptions, recipients carry out construction projects by hiring contractors which typically include a general contractor and an architectural or engineering firm for design work and in some cases purchasing equipment for installation at the site. Hiring general contractors and other contractors performing activities described in the EPA Disadvantaged Business Enterprise (DBE) rule's definition of Construction at 40 CFR 33.103 will be categorized as "Construction."

d. Prevailing Wage Classification: Building

**2. Davis-Bacon and Related Acts**

Davis-Bacon and Related Acts (DBRA) is a collection of labor standards provisions administered by the Department of Labor, that are applicable to grants involving construction. These labor standards include the:

- Davis-Bacon Act, which requires payment of prevailing wage rates for laborers and mechanics on construction contracts of $2,000 or more;
- Copeland "Anti-Kickback" Act, which prohibits a contractor or subcontractor from inducing an employee into giving up any part of the compensation to which he or she is entitled; and
- Contract Work Hours and Safety Standards Act, which requires overtime wages to be paid for over 40 hours of work per week, under contracts in excess of $100,000.

**3. Recipient Responsibilities When Entering Into and Managing Contracts:**

a. Solicitation and Contract Requirements:

i. Include the Correct Wage Determinations in Bid Solicitations and Contracts: Recipients are responsible for complying with the procedures provided in 29 CFR 1.6 when soliciting bids and awarding contracts.

ii. Include DBRA Requirements in All Contracts: Include the following text on all contracts under this grant:

1. "By accepting this contract, the contractor acknowledges and agrees to the terms provided in the DBRA Requirements for Contractors and Subcontractors Under EPA Grants."

b. After Award of Contract:

i. Approve and Submit Requests for Additional Wages Rates: Work with contractors to request additional wage rates if required for contracts under this grant, as provided in 29 CFR 5.5(a)(1)(iii).

ii. Provide Oversight of Contractors to Ensure Compliance with DBRA Provisions: Ensure contractor compliance with the terms of the contract, as required by 29 CFR 5.6.

**4. Recipient Responsibilities When Establishing and Managing Additional Subawards:**

a. Include DBRA Requirements in All Subawards (including Loans):

i. Include the following text on all subawards under this grant:

1. "By accepting this award, the EPA subrecipient acknowledges and agrees to the terms and conditions provided in the DBRA Requirements for EPA Subrecipients."

b. Provide Oversight to Ensure Compliance with DBRA Provisions: Recipients are responsible for oversight of subrecipients and must ensure subrecipients comply with the requirements in 29 CFR 5.6.

5. The contract clauses set forth in this Term & Condition, along with the correct wage determinations, will be considered to be a part of every prime contract covered by Davis-Bacon and Related Acts (see 29 CFR 5.1), and will be effective by operation of law, whether or not they are included or incorporated by reference into such contract, unless the Department of Labor grants a variance, tolerance, or exemption. Where the clauses and applicable wage determinations are effective by operation of law under this paragraph, the prime contractor must be compensated for any resulting increase in wages in accordance with applicable law.

**V. Participation in an EPA-Sponsored Program Evaluation**

As a condition of the receipt of the award under a NOFO, the recipient is required to cooperate with all EPA staff, contractors, or designated Recipients performing research or evaluation studies funded by EPA, if directed to do so by the Project Officer.

**W. Land Acquisition**

Land acquisition must comply with the Uniform Relocation Act and Federal Highway Administration's implementing regulations at 49 CFR Part 24 which requires grantees to follow certain procedures for acquiring property for grant purposes, such as notice, negotiation, and appraisal requirements.

**X. Termination**

Notwithstanding the General Term and Condition "Termination", EPA maintains the right to terminate the Assistance Agreement only as specified in 2 CFR 200.339 and the version of 2 CFR 200.340 applicable to EPA grants as of July 1, 2024 pursuant to 89 FR 55262 (July 3, 2024) , when the noncompliance with the terms and conditions is substantial such that effective performance of the Assistance Agreement is materially impaired or there is adequate evidence of waste, fraud, or abuse, prompting adverse action by EPA per 2 CFR 200.339, through either a partial or full termination. In accordance with 2 CFR 200.341, EPA will provide the Recipient notice of termination.

If EPA partially or fully terminates the Assistance Agreement, EPA must (1) de-obligate uncommitted funds and re-obligate them to another Eligible Recipient to effectuate the objectives of Section 138 of the Clean Air Act, 42 USC § 7434 within 90 days of the de-obligation and (2) amend the Recipient's Assistance Agreement to reflect the reduced amount, based on the de-obligation.

**The following condition Y. has been added.**

**Y. Statutory Partnership**

The recipient must seek prior written approval from the Award Official if it wants to change the statutory partner for this grant from the entity identified in the selected application documented in the Partnership Agreement. Due to the competitive nature of the Thriving Communities Grantmaking program, EPA approval will only be povided in very limited circumstances at EPA's sole discretion and will not be subject to dispute from the recipient. EPA approval is necessary to ensure that any proposed new statutory partner is an eligible subrecipient with comparable qualifications/expertise/experience to the original statutory partner such that performance of the grant will not be adversely impacted.

Requests for approval must be sent, along with any requested documentation, to the EPA Award Official who will consult with the EPA Project Officer. EPA decides in its sole discretion whether to consider and/or approve the request.

# Attachment F

**From:** Sherwood, Kelly <Sherwood.Kelly@epa.gov>
**Sent:** Saturday, February 22, 2025 7:45:03 AM
**To:** Ruth Ann Norton <ranorton@ghhi.org>
**Cc:** Davies, Vanessa <Davies.Vanessa@epa.gov>; Gontarek, Grace <Gontarek.Grace@epa.gov>; RTPFC-Grants <RTPFC-Grants@epa.gov>; Abbey Cofsky <ACofsky_@ghhi.org>
**Subject:** [EXTERNAL] Termination of EPA Assistance Award: 5N-95341301

**This message originated outside of GHHI.**

---

RE: Termination of EPA Assistance Award
Dear EPA Grant Recipient:

Attached is your Termination of Award from the U.S. Environmental Protection Agency. The Federal Award Identification Number (FAIN) is on your agreement on the top of page one and in the subject line of this message. Please use this number in communicating with EPA about this grant.

Please carefully review the assistance agreement and the terms and conditions.

We recommend you forward the award document to any other personnel in your organization requiring information about the award. The recipient's signature is not required on this agreement.

For information regarding payments and financial reports, please refer to the following website at https://www.epa.gov/financial/grants. Additionally, the RTP Finance Center's email address is rtpfc-grants@epa.gov.

If you have any questions, please contact Lisa White, Region 3, at white.lisa@epa.gov

Sincerely,

Kelly Sherwood
Acting Grants Management Officer
215-814-5163
Sherwood.kelly@epa.gov

Attachments:
Official EPA Award Document
Termination Memo

# Attachment G

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY

OFFICE OF MISSION SUPPORT
WASHINGTON, D.C. 20460

February 21, 2025

**MEMORANDUM**

**SUBJECT:** Termination of EPA Assistance Agreement 5N-95341301 under 2 CFR 200.340

**FROM:** Catharine McManus
EPA Award Official

McManus, Catharine Digitally signed by McManus, Catharine Date: 2025.02.21 15:50:48 -05'00'

**TO:** Ruth Ann Norton, President & CEO
Green & Healthy Homes Initiative, Inc

The purpose of this communication is to notify you that the U.S. Environmental Protection Agency (EPA) is hereby terminating Assistance Agreement No. 5N-95341301 awarded to Green & Healthy Homes Initiative, Inc. In accordance with 2 CFR 200.340(a)(2) (effective August 13, 2020 – September 30, 2024) and the Termination term and condition contained in the EPA General Terms and Conditions effective August 13, 2020 – September 30, 2024, EPA Assistance Agreement 5N-95341301 is terminated in its entirety effective immediately on the grounds that the award no longer effectuates the program goals or agency priorities. The objectives of the award are no longer consistent with EPA funding priorities.

It is a priority of the EPA to eliminate discrimination in all programs throughout the United States. The EPA Administrator has determined that, per the Agency's obligations to the constitutional and statutory law of the United States, this priority includes ensuring that the Agency's grants do not support programs or organizations that promote or take part in diversity, equity, and inclusion ("DEI") initiatives, "environmental justice" initiatives, and conflict with the Agency's policy of prioritizing merit, fairness, and excellence in performing our statutory functions. In addition to complying with the civil rights laws, it is vital that the Agency assess whether all grant payments are free from fraud, abuse, waste, and duplication, as well as to assess whether current grants are in the best interests of the United States.

The grant specified above provides funding for programs that promote or take part in DEI initiatives or environmental justice initiatives or other initiatives that conflict with the Agency's policy of prioritizing merit, fairness, and excellence in performing our statutory functions; that are not free from fraud, abuse, waste, or duplication; or that otherwise fail to serve the best interests of the United States. The grant is therefore inconsistent with, and no longer effectuates, Agency priorities.

The process for closeout is generally outlined in 2 CFR 200.344. EPA is clarifying what reports are required and what reports are waived below. Other requirements are still in effect if applicable to your grant.

EPA is requiring the following closeout reports due within 120 days of closeout (2 CFR 200.344a:)

- Final Federal Financial Report, SF-425
- Final Technical Report

- Other programmatic reports identified in your terms and conditions

As part of this termination, EPA is waiving the following closeout reports:

- Property Report, SF-428
- Final Minority Business Enterprise/Woman Business Enterprise Utilization Under Federal Grants and Cooperative Agreements, EPA Form 5700-52A

The recipient may request payment from the Automated Standard Application Payments (ASAP) system for allowable costs incurred up to the date of this memo provided that such costs were contained in the approved workplan. Costs incurred by you after this termination are allowable only if (a) those costs were properly incurred by you before the effective date of this termination, and not in anticipation of it; and (b) those costs would be allowable if your federal award was not suspended or expired normally at the end of the period of performance in which the termination takes effect. *See* 2 C.F.R. § 200.343. You are encouraged to carefully review and discharge your closeout responsibilities set forth in 2 C.F.R. § 200.344-45 and your award agreement. Those responsibilities include, but are not limited to, your obligation to "promptly refund any unobligated funds" that have been paid out but "are not authorized to be retained." *See* 2 C.F.R. § 200.344(g).

Also, per 2 CFR 200.472, a recipient may use grant funds to properly closeout their grant including reasonable and necessary costs that might occur after the date of this memo. If the recipient drew down funds from ASAP for costs beyond the termination date or for costs that exceed the amount necessary to properly closeout their grant, the recipient must contact RTPFC at rtpfc-grants@epa.gov for instructions on how to return the excess funds.

The EPA Grants Management Office has issued an amendment to the agreement to document the termination.

If you wish to dispute this termination decision, the Disputes Decision Official (DDO), rose.kenneth@epa.gov must receive the Dispute no later than 30 calendar days from the date this termination notice is electronically sent to you. Disputes must be sent electronically by email to the DDO, with a copy to the EPA Award Official, mcmanus.catharine@epa.gov within the 30-day period stated above. The Dispute submitted to the DDO must include: (1) A copy of the disputed Agency Decision; (2) A detailed statement of the specific legal and factual grounds for the Dispute, including copies of any supporting documents; (3) The specific remedy or relief you seek under the Dispute; and (4) The name and contact information, including email address, of your designated point of contact for the Dispute. *See* 2 CFR 1500.15

The requirements on post-closeout adjustments and continuing responsibilities, including audit and record retention requirements, at 2 CFR 200.345 remain in effect.

ATTACHMENT
Amendment Document

cc: Vanessa Davies
Grace Gontarek
Abbey Cofsky

# Attachment H

| U.S. ENVIRONMENTAL PROTECTION AGENCY<br>Assistance Amendment | GRANT NUMBER (FAIN): 95341301<br>MODIFICATION NUMBER: 1<br>PROGRAM CODE: 5N | DATE OF AWARD<br>02/21/2025 |
|---|---|---|
| | TYPE OF ACTION<br>No Cost Amendment | MAILING DATE<br>02/21/2025 |
| | PAYMENT METHOD:<br>ASAP | ACH#<br>33743 |

| RECIPIENT TYPE:<br>Not for Profit | Send Payment Request to:<br>Contact EPA RTPFC at: rtpfc-grants@epa.gov |
|---|---|
| **RECIPIENT:** | **PAYEE:** |
| GREEN & HEALTHY HOMES INITIATIVE INC<br>2714 Hudson Street<br>Baltimore, MD 21224-4716<br>**EIN:** 52-1786577 | GREEN & HEALTHY HOMES INITIATIVE INC<br>2714 Hudson Street<br>Baltimore, MD 21224-4716 |

| PROJECT MANAGER | EPA PROJECT OFFICER | EPA GRANT SPECIALIST |
|---|---|---|
| Abbey Cofsky<br>Green & Healthy Homes Initiative Inc<br>2714 Hudson Street<br>Baltimore, MD 21224-4716<br>**Email:** ACofsky@ghhi.org<br>**Phone:** 410-534-6447 | Grace Gontarek<br>Four Penn Center, 1600 John F. Kennedy Boulevard, 3EJ20<br>**Email:** Gontarek.Grace@epa.gov<br>**Phone:** 215-814-2759 | Vanessa Davies<br>3MD22<br>Four Penn Center, 1600 John F. Kennedy Boulevard<br>Philadelphia, PA 19103-2852<br>**Email:** Davies.Vanessa@epa.gov<br>**Phone:** 215-814-2801 |

**PROJECT TITLE AND EXPLANATION OF CHANGES**

TCGM Initial Award - Green & Healthy Homes Initiative will act as pass-through entity for EPA's EJ Thriving Communities Grantmaking Program, R3 GM

This amendment is to stop work; terminate the agreement; reduce performance period duration; curtail scope of work; and waive certain reporting requirements. Administrative terms and conditions are added.

Per 2 CFR 200.340 and the Termination General Terms and Conditions of this agreement, EPA is terminating this award. Your organization shall immediately stop work and take all reasonable steps to minimize the incurrence of costs otherwise allocable to the assistance agreement. See terms and conditions.

| BUDGET PERIOD | PROJECT PERIOD | TOTAL BUDGET PERIOD COST | TOTAL PROJECT PERIOD COST |
|---|---|---|---|
| 05/01/2024 - 02/21/2025 | 05/01/2024 - 02/21/2025 | $ 8,000,000.00 | $ 8,000,000.00 |

## NOTICE OF AWARD

Based on your Application dated 04/16/2024 including all modifications and amendments, the United States acting by and through the US Environmental Protection Agency (EPA) hereby awards $ 0.00. EPA agrees to cost-share 100.00% of all approved budget period costs incurred, up to and not exceeding total federal funding of $ 8,000,000.00. Recipient's signature is not required on this agreement. The recipient demonstrates its commitment to carry out this award by either: 1) drawing down funds within 21 days after the EPA award or amendment mailing date; or 2) not filing a notice of disagreement with the award terms and conditions within 21 days after the EPA award or amendment mailing date. If the recipient disagrees with the terms and conditions specified in this award, the authorized representative of the recipient must furnish a notice of disagreement to the EPA Award Official within 21 days after the EPA award or amendment mailing date. In case of disagreement, and until the disagreement is resolved, the recipient should not draw down on the funds provided by this award/amendment, and any costs incurred by the recipient are at its own risk. This agreement is subject to applicable EPA regulatory and statutory provisions, all terms and conditions of this agreement and any attachments.

| ISSUING OFFICE (GRANTS MANAGEMENT OFFICE) | AWARD APPROVAL OFFICE |
|---|---|
| **ORGANIZATION / ADDRESS** | **ORGANIZATION / ADDRESS** |
| U.S. EPA, Region 3, US EPA Region 3, 3MD22<br>Four Penn Center, 1600 John F. Kennedy Boulevard<br>Philadelphia, PA 19103-2852 | U.S. EPA, Region 3, EJ, Comm.Hlth and Env.Rev.Div (3EJ00)<br>R3 - Region 3<br>Four Penn Center, 1600 John F. Kennedy Boulevard<br>Philadelphia, PA 19103-2852 |

**THE UNITED STATES OF AMERICA BY THE U.S. ENVIRONMENTAL PROTECTION AGENCY**

| **Digital signature applied by EPA Award Official** Catharine McManus - Deputy Regional Administrator | DATE<br>02/21/2025 |
|---|---|

# EPA Funding Information

| FUNDS | FORMER AWARD | THIS ACTION | AMENDED TOTAL |
|---|---|---|---|
| EPA Amount This Action | $ 8,000,000 | $ 0 | $ 8,000,000 |
| EPA In-Kind Amount | $ 0 | $ 0 | $ 0 |
| Unexpended Prior Year Balance | $ 0 | $ 0 | $ 0 |
| Other Federal Funds | $ 0 | $ 0 | $ 0 |
| Recipient Contribution | $ 0 | $ 0 | $ 0 |
| State Contribution | $ 0 | $ 0 | $ 0 |
| Local Contribution | $ 0 | $ 0 | $ 0 |
| Other Contribution | $ 0 | $ 0 | $ 0 |
| Allowable Project Cost | $ 8,000,000 | $ 0 | $ 8,000,000 |

| Assistance Program | Statutory Authority | Regulatory Authority |
|---|---|---|
| 66.615 - Environmental Justice Thriving Communities Grantmaking Program (EJ TCGM) | Clean Air Act: Sec. 138 | 2 CFR 200, 2 CFR 1500 and 40 CFR 33 |

Budget Summary Page

| Table A - Object Class Category (Non-Construction) | Total Approved Allowable Budget Period Cost |
|---|---|
| 1. Personnel | $ 3,994,606 |
| 2. Fringe Benefits | $ 878,813 |
| 3. Travel | $ 278,955 |
| 4. Equipment | $ 0 |
| 5. Supplies | $ 66,883 |
| 6. Contractual | $ 337,056 |
| 7. Construction | $ 0 |
| 8. Other | $ 1,166,604 |
| 9. Total Direct Charges | $ 6,722,917 |
| 10. Indirect Costs: 0.00 % Base SEE Condition 18 of the Administrative General Terms and Conditions | $ 1,277,083 |
| 11. Total (Share: Recipient 0.00 % Federal 100.00 %) | $ 8,000,000 |
| 12. Total Approved Assistance Amount | $ 8,000,000 |
| 13. Program Income | $ 0 |
| 14. Total EPA Amount Awarded This Action | $ 0 |
| 15. Total EPA Amount Awarded To Date | $ 8,000,000 |

# Administrative Conditions

## UNILATERAL TERMINATION

1. The Agency is asserting its right under 2 CFR 200.340 and the Termination General Term and Condition of this agreement to unilaterally terminate this award. This amendment serves as required notice under 2 CFR 200.341.

2. Consistent with 2 CFR 200.343 Effect of suspension and termination, costs to the recipient or subrecipient resulting from financial obligations incurred by the recipient or subrecipient after the termination of a Federal award are not allowable. Costs after termination are allowable if:

a. The costs result from financial obligations which were properly incurred by the recipient or subrecipient before the effective date of suspension or termination, and not in anticipation of it; and

b. The costs would be allowable if the Federal award was not suspended or expired normally at the end of the period of performance in which the termination takes effect.

c. The costs are reasonable and necessary termination costs consistent with 2 CFR 200.472.

3. Federal Financial Reporting (FFR) General Terms and Conditions is still in full force and effect. EPA recipients must submit the SF-425 no later than 120 calendar days after the end date of the period of performance of the award.

4. Programmatic Terms and Conditions. Performance reporting is still in full force and effect. The recipient must submit the final report no later than 120 calendar days after the period of performance.

In accordance with 2 CFR 200.329, the recipient agrees to submit performance reports that include information on each of the following areas:

a. A comparison of accomplishments to the outputs/outcomes established in the assistance agreement work plan for the reporting period;

b. Explanations on why established outputs/outcomes were not met; and

c. Additional information, analysis, and explanation of cost overruns or high-than-expected-unit costs.

5. Waiver of Reports

The following reports are waived:

a. Utilization of Disadvantaged Business Enterprises General Terms and Conditions, EPA Form 5700-52A.

b. Tangible Personal Property Report, SF-428, General Terms and Conditions.

6. Record Retention

Access to Records, 2 CFR 200.337, is still in full force and effect. The termination of this award does not affect the right of EPA to disallow costs and recover funds on the basis of a later audit or other reviews. Information regarding record retention, property disposition in accordance with EPA regulations, and other frequently asked questions can be accessed at https://www.epa.gov/grants/frequent-questions-about-closeouts.

# Programmatic Conditions

All Programmatic Conditions Remain the Same

# Attachment I

SENSITIVE BUT UNCLASSIFIED

ASAP.gov Automated Standard Application for Payments
BUREAU OF THE FISCAL SERVICE

# Account Profile Inquiry

Date: 03/21/2025
Time: 8:33 AM

**ALC/Region:** 68128933

**Agency Short Name:** RTP-Grants

**Account ID:** 5N95341301

**Recipient ID:** 2452459

**Recipient Short Name:** GHHI

## Inquiry Results:

### ACCOUNT DETAILS

| | |
|---|---|
| **Requestor ID** | 2452459 |
| **Account ID** | 5N95341301 |
| **Account Description** | EJ THRIVING COMMUNITIES |
| **1031/LOC Account** | No |
| **Account Type** | Regular Account |
| **Group ID** | 33743 |
| **Control Account** | No |
| **Account Status Indicator** | Suspended |
| **Available Balance** | $6,821,156.78 |
| **Create Date** | 05/06/2024 |
| **Begin Date** | 05/01/2024 |
| **Performance Period End Date** | 02/24/2025 |
| **End Date** | 02/24/2025 |
| **TAS Distribution Method** | Percentage by Account |
| **Allow Book Entry Adjustment** | Yes |
| **Allow Warehoused Payments** | Yes |
| **CMIA Indicator** | No |

### CUMULATIVE AUTHORIZATIONS

| | |
|---|---|
| **Cumulative Authorized Amount** | $8,000,000.00 |

### GRANT DETAILS

| | |
|---|---|
| **Grant** | Yes |
| **Federal Award Identification Number (FAIN)** | 5N95341301 |
| **CFDA Number** | 66615.000 |
| **Total Estimated Grant Amount** | $0.00 |

### AGENCY PAYMENT REVIEW

| | |
|---|---|
| **Agency Review** | No |
| **Threshold Amount** | |
| **Reason for Review** | |

### DRAW AMOUNTS

| | |
|---|---|
| **Max Total Draw Amount** | |
| **Max Daily Draw Amount** | |
| **Max Monthly Draw Amount** | |
| **Max Quarterly Draw Amount** | |

### AUTOMATED AUTHORIZATION RENEWALS

| | |
|---|---|
| **Authorized Renewal Amount** | $0.00 |
| **Certified Date** | |
| **Renewal Frequency** | |
| **Pending Renewal Frequency** | |
| **Pending Automated Renewal Amount** | $0.00 |

JA0184

| | |
|---|---|
| **Cumulative Authorized Amount Reset Period :** | **Rollover Reset Quarter :** |
| **Annual Reset Month :** | **Default Action :** |

**1 of 1**

**SENSITIVE BUT UNCLASSIFIED**

SENSITIVE BUT UNCLASSIFIED

ASAP.gov
Automated Standard Application for Payments
BUREAU OF THE FISCAL SERVICE

# Account Profile Inquiry

Date: 03/21/2025
Time: 8:33 AM

**ALC/Region:** 68128933

**Agency Short Name:** RTP-Grants

**Account ID:** 5N95341401

**Recipient ID:** 2452459

**Recipient Short Name:** GHHI

## Inquiry Results:

### ACCOUNT DETAILS

| | |
|---|---|
| **Requestor ID** | 2452459 |
| **Account ID** | 5N95341401 |
| **Account Description** | TCGM SUBSEQUENT |
| **1031/LOC Account** | No |
| **Account Type** | Regular Account |
| **Group ID** | 33743 |
| **Control Account** | No |
| **Account Status Indicator** | Suspended |
| **Available Balance** | $51,963,237.48 |
| **Create Date** | 09/05/2024 |
| **Begin Date** | 08/01/2024 |
| **Performance Period End Date** | 07/31/2027 |
| **End Date** | 12/01/2027 |
| **TAS Distribution Method** | Percentage by Account |
| **Allow Book Entry Adjustment** | Yes |
| **Allow Warehoused Payments** | Yes |
| **CMIA Indicator** | No |

### CUMULATIVE AUTHORIZATIONS

| | |
|---|---|
| **Cumulative Authorized Amount** | $52,000,000.00 |

### GRANT DETAILS

| | |
|---|---|
| **Grant** | Yes |
| **Federal Award Identification Number (FAIN)** | 5N95341401 |
| **CFDA Number** | 66615.000 |
| **Total Estimated Grant Amount** | $0.00 |

### AGENCY PAYMENT REVIEW

| | |
|---|---|
| **Agency Review** | No |
| **Threshold Amount** | |
| **Reason for Review** | |

### DRAW AMOUNTS

| | |
|---|---|
| **Max Total Draw Amount** | |
| **Max Daily Draw Amount** | |
| **Max Monthly Draw Amount** | |
| **Max Quarterly Draw Amount** | |

### AUTOMATED AUTHORIZATION RENEWALS

| | |
|---|---|
| **Authorized Renewal Amount** | $0.00 |
| **Certified Date** | |
| **Renewal Frequency** | |
| **Pending Renewal Frequency** | |
| **Pending Automated Renewal Amount** | $0.00 |

| | |
|---|---|
| **Cumulative Authorized Amount Reset Period :** | **Rollover Reset Quarter :** |
| **Annual Reset Month :** | **Default Action :** |

**1 of 1**

**SENSITIVE BUT UNCLASSIFIED**

# Attachment J

USCA4 Appeal: 25-1808 Doc: 28-1 Filed: 02/23/2026 Pg: 194 of 608 Total Pages:(194 of 608)

**Wes Stewart**

**From:** Ruth Ann Norton
**Sent:** Sunday, February 23, 2025 2:05 PM
**To:** Adria Crutchfield; Baylen Campbell; Carmera Thomas-Wilhite; Katie Levesque; LaTricea Adams; Maria Matos; Michelle Naccarati-Chapkis; Queen Zakia Shabazz (Gmail); Savannah Baber; Wandra Ashley-williams
**Cc:** Andrea Brown; Wes Stewart
**Subject:** Confidential and Protected Communication - EPA Thriving Communities

**Follow Up Flag:** Flag for follow up
**Flag Status:** Flagged

Dear TCGM Region 3 Advisory Board,

***Please note that this is a confidential and privileged communication please do not copy or share this communication.***

I have the difficult task to report to you that at 7:45 AM Saturday Morning February 22, 2025, GHHI received a notice of Termination and Cancellation for its $8 million EPA Cooperative Agreement for Thriving Communities from EPA Region 3 as authorized by Catharine McManus of the EPA. This Agreement supported all activities for the Advisory Board. Therefore, I am required to inform you that you must cease and desist all activities as an Advisory Board member for this Agreement.

Please note that we are not dissolving the Advisory Board as GHHI weighs its options to appeal or litigate this matter.

Please promptly submit invoices for all work and hours under our Agreement with your organization through 3:50 PM February 21, 2025 (the date and time EPA made this effective – even though they did not share until 7:45 AM Saturday February 22, 2025). If you incurred any time between the 21st and today, please let us know offline and we will look at our limited options to address.

We are deeply grateful to each of you. We again ask you not to talk publicly about this matter and allow GHHI to respond to any and all inquiries.

I will report that we continue to work under the $52 million Cooperative Agreement and are currently issuing Award letters to grants you have graciously reviewed and recommended based on data and merit for the need of the particular communities.

GHHI is working to do all it can to maintain the work and will look to provide future updates. Should you have any questions, please send them to the attention of Andrea Brown or me. While all staff remain with GHHI at this time, we ask you to refrain from communications with them so as to not violate any aspect of our obligations under the contracts or termination notices of the EPA. Thank you.

**Ruth Ann Norton** | President & CEO
Green & Healthy Homes Initiative
2714 Hudson Street, Baltimore, MD 21224
(P) 410.534.6477 | (M) 443.463.6343 | (F) 410.534.6475 | ranorton@ghhi.org
website | e-newsletter | facebook | twitter | linkedin | donate

**************************************************************************************************************

This e-mail and any attachments within are intended solely for the use of the addressee and may contain privileged, confidential, copyrighted, trademarked or other legally protected information. If you are not the intended recipient (even if the e-mail address above is yours), **you may not use, copy or retransmit it.** *If you have received this by mistake* ***please notify me*** *by return e-mail, then delete. Thank you.*

**************************************************************************************************************************

# Attachment K

Environmental Protection Agency

# General Terms and Conditions

*Effective October 1, 2023*

**Revision History:**

The Environmental Protection Agency's General Terms and Conditions ***are published and become effective October 1st at the start of the federal fiscal year.*** Any additions, revisions, or changes to the terms and conditions after October 1 will be summarized below.

| T&C Number | Effective Date | Description of Changes |
|---|---|---|
| #48 | October 23, 2023 | Implements new Office of Management and Budget (OMB) guidance on the Buy America preference for infrastructure projects. |
| #5 | January 12, 2024 | Removed the customer service line for Research Triangle Park Finance Center (RTPFC). |
| #8 | May 21, 2024 | Added clarifying guidance on Subawards to Federal Agencies. |
| #33 | May 21, 2024 | Updated in accordance with 40 CFR 26 and EPA Order 1000.17A for human subjects research. |

**Table of Contents**

Preface ..... 2
Financial Information ..... 3
Selected Items of Cost ..... 5
Reporting and Additional Post-Award Requirements ..... 10
Programmatic General Terms and Conditions ..... 25
Public Policy Requirements ..... 33

**Preface**

1. **Introduction**
   (a) The recipient and any sub-recipient must comply with the applicable EPA general terms and conditions outlined below. These terms and conditions are in addition to the assurances and certifications made as part of the award and terms, conditions, and restrictions reflected on the official assistance award document. Recipients **must** review their official award document for additional administrative and programmatic requirements. Failure to comply with the general terms and conditions outlined below and those directly reflected on the official assistance award document may result in enforcement actions as outlined in 2 CFR 200.339 and 2 CFR 200.340.
   (b) If the EPA General Terms and Conditions have been revised, EPA will update the terms and conditions when it provides additional funding (incremental or supplemental) prior to the end of the period of performance of this agreement. The recipient must comply with the revised terms and conditions after the effective date of the EPA action that leads to the revision. Revised terms and conditions do not apply to the recipient's expenditures of EPA funds or activities the recipient carries out prior to the effective date of the EPA action. EPA will inform the recipient of revised terms and conditions in the action adding additional funds.

2. **Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards**
   This award is subject to the requirements of the Uniform Administrative Requirements, Cost Principles and Audit Requirements for Federal Awards; Title 2 CFR Part 200 and 2 CFR Part 1500. 2 CFR 1500.2, Adoption of 2 CFR Part 200, states the Environmental Protection Agency adopts the Office of Management and Budget (OMB) guidance Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards to Non-Federal Entities (subparts A through F of 2 CFR Part 200), as supplemented by 2 CFR Part 1500, as the Environmental Protection Agency (EPA) policies and procedures for financial assistance administration. 2 CFR Part 1500 satisfies the requirements of 2 CFR 200.110(a) and gives regulatory effect to the OMB guidance as supplemented by 2 CFR Part 1500. This award is also subject to applicable requirements contained in EPA programmatic regulations located in 40 CFR Chapter 1 Subchapter B.

   **2.1 Effective Date and Incremental or Supplemental Funding.** Consistent with the OMB Frequently Asked Questions at https://cfo.gov/cofar on Effective Date and Incremental Funding, any new funding through an amendment (supplemental or incremental) on or after December 26, 2014, and any unobligated balances (defined at 2 CFR 200.1) remaining on the award at the time of the amendment, will be subject to the requirements of the Uniform Administrative Requirements, Cost Principles and Audit Requirements (2 CFR Parts 200 and 1500).

3. **Termination**
   Consistent with 2 CFR 200.340, EPA may unilaterally terminate this award in whole or in part:
   (a) If a recipient fails to comply with the terms and conditions of the award including statutory or regulatory requirements; or

**(b)** If the award no longer effectuates the program goals or agency priorities. Situations in which EPA may terminate an award under this provision include when:

- **i.** EPA obtains evidence that was not considered in making the award that reveals that specific award objective(s) are ineffective at achieving program goals and EPA determines that it is in the government's interest to terminate the award;
- **ii.** EPA obtains evidence that was not considered in making the award that causes EPA to significantly question the feasibility of the intended objective(s) of the award and EPA determines that it is in the government's interest to terminate the award;
- **iii.** EPA determines that the objectives of the award are no longer consistent with funding priorities for achieving program goals.

**Financial Information**

**4. Reimbursement Limitation**

EPA's financial obligations to the recipient are limited by the amount of federal funding awarded to date as reflected on the award document. If the recipient incurs costs in anticipation of receiving additional funds from EPA, it does so at its own risk. See 2 CFR 1500.9.

**5. Automated Standard Application Payments (ASAP) and Proper Payment Draw Down**

**Electronic Payments.** Recipients must be enrolled or enroll in the Automated Standard Application for Payments (ASAP) system to receive payments under EPA financial assistance agreements unless:

- EPA grants a recipient-specific exception;
- The assistance program has received a waiver from this requirement;
- The recipient is exempt from this requirement under 31 CFR 208.4; or,
- The recipient is a fellowship recipient pursuant to 40 CFR Part 46.

EPA will not make payments to recipients until the ASAP enrollment requirement is met unless the recipients fall under one of the above categories. Recipients may request exceptions using the procedures below but only EPA programs may obtain waivers. To enroll in ASAP, complete the ASAP Initiate Enrollment Form located at: https://www.epa.gov/financial/forms and email it to rtpfc-grants@epa.gov or mail it to:

US Environmental Protection Agency
RTP-Finance Center (Mail Code AA216-01)
4930 Page Rd.
Durham, NC 27711

Under this payment mechanism, the recipient initiates an electronic payment request online via ASAP, which is approved or rejected based on the amount of available funds authorized by EPA in the recipient's ASAP account. Approved payments are credited to the account at the financial institution of the recipient organization set up by the recipient during the ASAP enrollment process. Additional information concerning ASAP and enrollment can be obtained by contacting the EPA

Research Triangle Park Finance Center (RTPFC), at rtpfc-grants@epa.gov, or by visiting: https://www.fiscal.treasury.gov/asap/.

EPA will grant exceptions to the ASAP enrollment requirement only in situations in which the recipient demonstrates to EPA that receiving payment via ASAP places an undue administrative or financial management burden on the recipient or EPA determines that granting the waiver is in the public interest. Recipients may request an exception to the requirement by following the procedures specified in RAIN-2018-G06-R.

**Proper Payment Drawdown (for recipients other than states)**

**(a)** As required by 2 CFR 200.305(b), the recipient must draw funds from ASAP only for the minimum amounts needed for actual and immediate cash requirements to pay employees, contractors, subrecipients or to satisfy other obligations for allowable costs under this assistance agreement. The timing and amounts of the drawdowns must be as close as administratively feasible to actual disbursements of EPA funds. Disbursement within 5 business days of drawdown will comply with this requirement and the recipient agrees to meet this standard when performing this award.

**(b)** Recipients may not retain more than 5% of the amount drawn down, or $1,000 whichever is less, 5 business days after drawdown to materially comply with the standard. Any EPA funds subject to this paragraph that remain undisbursed after 5 business days must be fully disbursed within 15 business days of draw down or be returned to EPA.

**(c)** If the recipient draws down EPA funds in excess of that allowed by paragraph b., the recipient must contact rtpfc-grants@epa.gov for instructions on whether to return the funds to EPA. Recipients must comply with the requirements at 2 CFR 200.305(b)(8) and (9) regarding depositing advances of Federal funds in interest bearing accounts.

**(d)** Returning Funds: Pay.gov is the preferred mechanism to return funds. It is free, secure, paperless, expedient, and does not require the recipient/vendor to create an account. Contact RTPFC-Grants at rtpfc-grants@epa.gov to obtain complete instructions. Additional information is available at the Pay.gov website. Information on how to repay EPA via check is available at https://www.epa.gov/financial/makepayment. Instructions on how to return funds to EPA electronically via ASAP are available at https://www.fiscal.treasury.gov/asap/.

**(e)** Failure on the part of the recipient to materially comply with this condition may, in addition to EPA recovery of the un-disbursed portions of the drawn down funds, lead to changing the payment method from advance payment to a reimbursable basis. EPA may also take other remedies for noncompliance under 2 CFR 200.208 and/or 2 CFR 200.339.

**(f)** If the recipient believes that there are extraordinary circumstances that prevent it from complying with the 5-business day disbursement requirement throughout the performance period of this agreement, recipients may request an exception to the requirement by following the procedures specified in RAIN-2018-G06-R. EPA will grant exceptions to the 5-business day disbursement requirement only if the recipient demonstrates that compliance places an undue

administrative or financial management burden or EPA determines that granting the exception is in the public interest.

**Proper Payment Drawdown for State Recipients**

In accordance with 2 CFR 200.305(a), payments are governed by Treasury-State Cash Management Improvement Act (CMIA) agreements and default procedures codified at 31 CFR Part 205, Subparts A and B and Treasury Financial Manual (TFM) 4A-2000, "Overall Disbursing Rules for All Federal Agencies" unless a program specific regulation (e.g. 40 CFR 35.3160 or 40 CFR 35.3560) provides otherwise. Pursuant to 31 CFR Part 205, Subpart A—*Rules Applicable to Federal Assistance Programs Included in a Treasury-State Agreement,* States follow their Treasury-State CMIA Agreement for major Federal programs listed in the agreement. For those programs not listed as major in the Treasury-State agreement, the State follows the default procedures in 31 CFR Part 205, Subpart B—Rules Applicable to Federal Assistance Programs Not Included in a Treasury-State Agreement, which directs State recipients to draw-down and disburse Federal financial assistance funds in anticipation of immediate cash needs of the State for work under the award. States must comply with 2 CFR 200.302(a) in reconciling costs incurred and charged to EPA financial assistance agreements at time of close out unless a program specific regulation provides otherwise.

**Selected Items of Cost**

6. **Prohibition on Certain Telecommunications and Video Surveillance Services or Equipment**
This term and condition implements 2 CFR 200.216 and is effective for obligations and expenditures of EPA financial assistance funding on or after 8/13/2020.

As required by 2 CFR 200.216, EPA recipients and subrecipients, including borrowers under EPA funded revolving loan fund programs, are prohibited from obligating or expending loan or grant funds to procure or obtain; extend or renew a contract to procure or obtain; or enter into a contract (or extend or renew a contract) to procure or obtain equipment, services, or systems that use covered telecommunications equipment or services as a substantial or essential component of any system, or as critical technology as part of any system. As described in Public Law 115-232, section 889, covered telecommunications equipment is telecommunications equipment produced by Huawei Technologies Company or ZTE Corporation (or any subsidiary or affiliate of such entities).

Recipients, subrecipients, and borrowers also may not use EPA funds to purchase:
**(a)** For the purpose of public safety, security of government facilities, physical security surveillance of critical infrastructure, and other national security purposes, video surveillance and telecommunications equipment produced by Hytera Communications Corporation, Hangzhou Hikvision Digital Technology Company, or Dahua Technology Company (or any subsidiary or affiliate of such entities).
**(b)** Telecommunications or video surveillance services provided by such entities or using such equipment.

**(c)** Telecommunications or video surveillance equipment or services produced or provided by an entity that the Secretary of Defense, in consultation with the Director of the National Intelligence or the Director of the Federal Bureau of Investigation, reasonably believes to be an entity owned or controlled by, or otherwise connected to, the government of a covered foreign country.

Consistent with 2 CFR 200.471, costs incurred for telecommunications and video surveillance services or equipment such as phones, internet, video surveillance, and cloud servers are allowable except for the following circumstances:

**(a)** Obligating or expending EPA funds for covered telecommunications and video surveillance services or equipment or services as described in 2 CFR 200.216 to:

- **(1)** Procure or obtain, extend or renew a contract to procure or obtain;
- **(2)** Enter into a contract (or extend or renew a contract) to procure; or
- **(3)** Obtain the equipment, services, or systems.

Certain prohibited equipment, systems, or services, including equipment, systems, or services produced or provided by entities identified in section 889, are recorded in the System for Award Management exclusion list.

**7. Consultant Cap**

EPA participation in the salary rate (excluding overhead) paid to individual consultants retained by recipients or by a recipient's contractors or subcontractors shall be limited to the maximum daily rate for a Level IV of the Executive Schedule, available at: https://www.opm.gov/policy-data-oversight/pay-leave/salaries-wages/, to be adjusted annually. This limit applies to consultation services of designated individuals with specialized skills who are paid at a daily or hourly rate. This rate does not include transportation and subsistence costs for travel performed (the recipient will pay these in accordance with their normal travel reimbursement practices).

Information on how to calculate the maximum daily rate and the daily pay limitation is available at the Office Of Personnel Management's Fact Sheet: How to Compute Rates of Pay and Fact Sheet: Expert and Consultant Pay. Specifically, to determine the maximum daily rate, follow these steps:

- **(1)** Divide the Level IV salary by 2087 to determine the hourly rate. Rates must be rounded to the nearest cent, counting one-half cent and over as the next higher cent (e.g., round $18.845 to $18.85).
- **(2)** Multiply the hourly rate by 8 hours. The product is the maximum daily rate.

Contracts and subcontracts with firms for services that are awarded using the procurement requirements in Subpart D of 2 CFR Part 200 are not affected by this limitation unless the terms of the contract provide the recipient with responsibility for the selection, direction and control of the individuals who will be providing services under the contract at an hourly or daily rate of compensation. See 2 CFR 1500.10.

**8. Establishing and Managing Subawards**

If the recipient chooses to pass funds from this assistance agreement to other entities, the recipient must comply with applicable provisions of 2 CFR Part 200 and the EPA Subaward Policy.

**Subawards to Federal Agencies – Clarity on Applicable EPA Terms and Conditions:** If the subrecipient is federal agency, the only provisions of the EPA General Terms and Conditions implementing 2 CFR Part 200 on subawards that apply are: (1) the requirement for the federal agency to obtain a Unique Entity Identifier (UEI) in accordance with 2 CFR Part 25 as described in Item 3 below and (2) the requirement for the recipient to report on first-tier subawards as described in EPA General Term and Condition 15.1, "Reporting of first tier subawards."

As provided within 2 CFR 200.101(a)(2), all other provisions of 2 CFR Part 200, Subparts A through E, do not apply to subawards with federal agencies. Transactions between the recipient and the federal agency subrecipient will be governed by the federal agency subrecipient's cost reimbursement agreement with the recipient.

As a pass-through entity, the recipient agrees to:

**1)** Be responsible for selecting subrecipients and as appropriate conducting subaward competitions using a system for properly differentiating between subrecipients and procurement contractors under the standards at 2 CFR 200.331 and EPA's supplemental guidance in Appendix A of the EPA Subaward Policy.
   - **(a)** For-profit organizations and individual consultants, in almost all cases, are not eligible subrecipients under EPA financial assistance programs and the pass-through entity must obtain prior written approval from EPA's Award Official for subawards to these entities unless the EPA- approved budget and work plan for this agreement contain a precise description of such subawards.
   - **(b)** Stipends and travel assistance for trainees (including interns) and similar individuals who are not are not employees of the pass-through entity must be classified as participant support costs rather than subawards as provided in 2 CFR 200.1 *Participant support costs*, 2 CFR 200.1 *Subaward*, and EPA's Guidance on Participant Support Costs.
   - **(c)** Subsidies, rebates and similar payments to participants in EPA funded programs to encourage environmental stewardship are also classified as *Participant support costs* as provided in 2 CFR 1500.1 and EPA's Guidance on Participant Support Costs.

**2)** Establish and follow a system that ensures all subaward agreements are in writing and contain all of the elements required by 2 CFR 200.332(a). EPA has developed a template for subaward agreements that is available in Appendix D of the EPA Subaward Policy.

**3)** Prior to making subawards, ensure that each subrecipient has a "Unique Entity Identifier (UEI)." The UEI is required by 2 CFR Part 25 and 2 CFR 200.332(a)(1). Subrecipients are not required to complete full System for Award Management (SAM) registration to obtain a UEI. Information regarding obtaining a UEI is available at the SAM Internet site: https://www.sam.gov/SAM/ and

in EPA's General Term and Condition "**System for Award Management and Universal Identifier Requirements"** of the pass-through entity's agreement with the EPA.

**4)** Ensure that subrecipients are aware that they are subject to the same requirements as those that apply to the pass-through entity's EPA award as required by 2 CFR 200.332(a)(2). These requirements include, among others:
   **(a)** Title VI of the Civil Rights Act and other Federal statutes and regulations prohibiting discrimination in Federal financial assistance programs, as applicable.
   **(b)** Reporting Subawards and Executive Compensation under Federal Funding Accountability and Transparency Act (FFATA) set forth in the General Condition pass-through entity's agreement with EPA entitled **"Reporting Subawards and Executive Compensation."**
   **(c)** Limitations on individual consultant fees as set forth in 2 CFR 1500.10 and the General Condition of the pass-through entity's agreement with EPA entitled **"Consultant Fee Cap."**
   **(d)** EPA's prohibition on paying management fees as set forth in General Condition of the pass-through entity's agreement with EPA entitled "**Management Fees**.**"**
   **(e)** The Procurement Standards in 2 CFR Part 200 including those requiring competition when the subrecipient acquires goods and services from contractors (including consultants).

EPA provides general information on other statutes, regulations, and Executive Orders on the Grants internet site at https://www.epa.gov/grants/epa-subaward-cross-cutter-requirements. Many Federal requirements are agreement or program specific, and EPA encourages pass-through entities to review the terms of their assistance agreement carefully and consult with their EPA Project Officer for advice if necessary.

**5)** Ensure, for states and other public recipients, that subawards are not conditioned in a manner that would disadvantage applicants for subawards based on their religious character.

**6)** Establish and follow a system for evaluating subrecipient risks of noncompliance with Federal statutes, regulations and the terms and conditions of the subaward as required by 2 CFR 200.332(b) and document the evaluation. Risk factors may include:
   **(a)** Prior experience with same or similar subawards
   **(b)** Results of previous audits;
   **(c)** Whether new or substantially changed personnel or systems, and;
   **(d)** Extent and results of Federal awarding agency or the pass-through entity's monitoring

**7)** Establish and follow a process for deciding whether to impose additional requirements on subrecipients based on risk factors as required by 2 CFR 200.332(c). Examples of additional requirements authorized by 2 CFR 200.208 include:
   **(a)** Requiring payments as reimbursements rather than advance payments;
   **(b)** Withholding authority to proceed to the next phase until receipt of evidence of acceptable performance within a given period of performance;

(c) Requiring additional, more detailed financial reports;
(d) Requiring additional project monitoring;
(e) Requiring the non-Federal entity to obtain technical or management assistance, and
(f) Establishing additional prior approvals

**8)** Establish and follow a system for monitoring subrecipient performance that includes the elements required by 2 CFR 200.332(d) and report the results of the monitoring in performance reports as provided in the reporting terms and conditions of this agreement.

**9)** Establish and maintain an accounting system which ensures compliance with the $25,000 limitation at 2 CFR 200.1, Modified Total Direct Costs, if applicable, on including subaward costs in *Modified Total Direct Costs* for the purposes of distributing indirect costs. Recipients with Federally approved indirect cost rates that use a different basis for distributing indirect costs to subawards must comply with their Indirect Cost Rate Agreement.

**10)** Work with EPA's Project Officer to obtain the written consent of EPA's Office of International and Tribal Affairs (OITA), prior to awarding a subaward to a foreign or international organization, or a subaward to be performed in a foreign country even if that subaward is described in a proposed scope of work.

**11)** Obtain written approval from EPA's Award Official for any subawards that are not described in the approved work plan in accordance with 2 CFR 200.308.

**12)** Obtain the written approval of EPA's Award Official prior to awarding a subaward to an individual if the EPA-approved scope of work does not include a description of subawards to individuals.

**13)** Establish and follow written procedures under 2 CFR 200.302(b)(7) for determining that subaward costs are allowable in accordance with 2 CFR Part 200, Subpart E and the terms and conditions of this award. These procedures may provide for allowability determinations on a pre-award basis, through ongoing monitoring of costs that subrecipients incur, or a combination of both approaches provided the pass-through entity documents its determinations.

**14)** Establish and maintain a system under 2 CFR 200.332(d)(3) and 2 CFR 200.521 for issuing management decisions for audits of subrecipients that relate to Federal awards. However, the recipient remains accountable to EPA for ensuring that unallowable subaward costs initially paid by EPA are reimbursed or mitigated through offset with allowable costs whether the recipient recovers those costs from the subrecipient or not.

**15)** As provided in 2 CFR 200.333, pass-through entities must obtain EPA approval to make fixed amount subawards. EPA is restricting the use of fixed amount subawards to a limited number of situations that are authorized in official EPA pilot projects. Recipients should consult with their EPA Project Officer regarding the status of these pilot projects.

By accepting this award, the recipient is certifying that it either has systems in place to comply with the requirements described in Items 1 through 14 above or will refrain from making subawards until the systems are designed and implemented.

**9. Management Fees**

Management Fees or similar charges in excess of the direct costs and approved indirect rates are not allowable. The term "management fees or similar charges" refers to expenses added to the direct costs in order to accumulate and reserve funds for ongoing business expenses; unforeseen liabilities; or for other similar costs which are not allowable under this assistance agreement. Management fees or similar charges may not be used to improve or expand the project funded under this agreement, except to the extent authorized as a direct cost of carrying out the scope of work.

**10. Federal Employee Costs**

The recipient understands that none of the funds for this project (including funds contributed by the recipient as cost sharing) may be used to pay for the travel of Federal employees or for other costs associated with Federal participation in this project unless a Federal agency will be providing services to the recipient as authorized by a Federal statute.

**11. Foreign Travel**

**EPA policy requires that all foreign travel must be approved by its Office of International and Tribal Affairs.** The recipient agrees to obtain prior EPA approval before using funds available under this agreement for international travel unless the trip(s) are already described in the EPA approved budget for this agreement. Foreign travel includes trips to Mexico and Canada but does not include trips to Puerto Rico, the U.S. Territories or possessions. Recipients that request post-award approval to travel frequently to Mexico and Canada by motor vehicle (e.g., for sampling or meetings) may describe their proposed travel in general terms in their request for EPA approval. Requests for prior approval must be submitted to the Project Officer for this agreement.

**12. The Fly America Act and Foreign Travel**

The recipient understands that all foreign travel **funded under this assistance agreement** must comply with the Fly America Act. All travel must be on U.S. air carriers certified under 49 U.S.C. Section 40118, to the extent that service by such carriers is available even if foreign air carrier costs are less than the American air carrier.

**13. Union Organizing**

Grant funds may not be used to support or oppose union organizing, whether directly or as an offset for other funds.

**Reporting and Additional Post-Award Requirements**

**14. System for Award Management and Universal Identifier Requirements**

**14.1** **Requirement for System for Award Management (SAM)** Unless exempted from this requirement under 2 CFR 25.110, the recipient must maintain current information in the SAM. This includes information on the recipient's immediate and highest-level owner and subsidiaries, as well as on all the recipient's predecessors that have been

awarded a Federal contract or Federal financial assistance within the last three years, if applicable, until the submittal of the final financial report required under this award or receipt of the final payment, whichever is later. This requires that the recipient reviews and updates the information at least annually after the initial registration, and more frequently if required by changes in the information or another award term.

**14.2** **Requirement for Unique Entity Identifier.** If the recipient is authorized to make subawards under this award, the recipient:

- **a.** Must notify potential subrecipients that no entity (see definition in paragraph 14.3 of this award term) may receive a subaward unless the entity has provided its Unique Entity Identifier.
- **b.** May not make a subaward to an entity unless the entity has provided its Unique Entity Identifier. Subrecipients are not required to obtain an active SAM registration but must obtain a Unique Entity Identifier.

**14.3** **Definitions.** For the Purpose of this award term:

- **a.** **System for Award Management (SAM)** means the Federal repository into which an entity must provide information required for the conduct of business as a recipient. Additional information about registration procedures may be found at the SAM Internet site: https://www.sam.gov/SAM/.
- **b.** **Unique Entity Identifier** means the identifier assigned by SAM to uniquely identify business entities
- **c.** **Entity** includes non-Federal entities as defined as 2 CFR 200.1 and also includes all of the following:
  - **14.3.c.1.** A foreign organization;
  - **14.3.c.2.** A foreign public entity;
  - **14.3.c.3.** A domestic for-profit organization; and
  - **14.3.c.4.** A domestic or foreign for-profit organization; and
  - **14.3.c.5**. A Federal agency.
- **d.** **Subaward** is defined at 2 CFR 200.1
- **e.** **Subrecipient** is defined at 2 CFR 200.1

**15. Reporting Subawards and Executive Compensation**

**15.1** **Reporting of first tier subawards.**

- **a.** **Applicability**. Unless the recipient is exempt as provided in paragraph 15.4. of this award term, the recipient must report each action that obligates $30,000 or more in Federal funds for a subaward to a non-Federal entity or Federal agency (see definitions in paragraph 15.5 of this award term).
- **b.** **Where and When to Report.** (1) The recipient must report each obligating action described in paragraph 15.1.a of this award term at the System for Award Management (SAM.gov) (2) For subaward information, report no later than the end of the month following the month in which the obligation was made. (For example, if the obligation was made on any date during the month of November

of a given year, the obligation must be reported by no later than December 31 of that year.)

c. **What to Report.** The recipient must report the information about each obligating action as described in the submission instructions available at: https://www.sam.gov/SAM/.

**15.2 Reporting Total Compensation of Recipient Executives.**

a. **Applicability and What to Report.** The recipient must report total compensation for each of their five most highly compensated executives for the preceding completed fiscal year, if:

**15.2.a.1.** The total Federal funding authorized to date under this award is $30,000 or more;

**15.2.a.2.** In the preceding fiscal year, the recipient received: (i.) 80 percent or more of their annual gross revenues from Federal procurement contracts (and subcontracts) and Federal financial assistance subject to the Transparency Act, as defined at 2 CFR 170.320 (and subawards); (ii.) and $25,000,000 or more in annual gross revenues from Federal procurement contracts (and subcontracts) and Federal financial assistance subject to the Transparency Act, as defined at 2 CFR 170.320 (and subawards); and

**15.2.a.3.** The public does not have access to information about the compensation of the executives through periodic reports filed under section 13(a) or 15(d) of the Securities Exchange Act of 1934 (15 U.S.C. 78m(a), 78o(d)) or section 6104 of the Internal Revenue Code of 1986. (To determine if the public has access to the compensation information, see the U.S. Security and Exchange Commission total compensation filings at: http:// www.sec.gov/answers/execomp.htm.)

b. **Where and When to Report.** The recipient must report executive total compensation described in paragraph 15.2.a of this award term: (i.) As part of the registration System for Award Management profile available at https://www.sam.gov/SAM/ (ii.) By the end of the month following the month in which this award is made, and annually thereafter.

**15.3 Reporting Total Compensation of Subrecipient Executives.**

a. **Applicability and What to Report**. Unless exempt as provided in paragraph 15.4. of this award term, for each first-tier non-Federal entity subrecipient under this award, the recipient shall report the names and total compensation of each of the subrecipient's five most highly compensated executives for the subrecipient's preceding completed fiscal year, if:

**15.3.a.1.** In the subrecipient's preceding fiscal year, the subrecipient received: (i.) 80 percent or more of its annual gross revenues from Federal procurement contracts (and subcontracts) and Federal financial assistance subject to the Transparency Act, as defined at 2 CFR 170.320 (and subawards); and (ii.) $25,000,000 or more in annual gross revenues from Federal

procurement contracts (and subcontracts), and Federal financial assistance subject to the Transparency Act (and subawards); and

**15.3.a.2.** The public does not have access to information about the compensation of the executives through periodic reports filed under section 13(a) or 15(d) of the Securities Exchange Act of 1934 (15 U.S.C. 78m(a), 78o(d)) or section 6104 of the Internal Revenue Code of 1986. (To determine if the public has access to the compensation information, see the U.S. Security and Exchange Commission total compensation filings at: http:// www.sec.gov/answers/execomp.htm.)

**b. Where and When to Report.** The recipient must report subrecipient executive total compensation described in paragraph 15.3.a. of this award term:

**15.3.b.1.** To the recipient.

**15.3.b.2**. By the end of the month following the month during which the recipient makes the subaward. For example, if a subaward is obligated on any date during the month of October of a given year (i.e., between October 1 and 31), the recipient must report any required compensation information of the subrecipient by November 30 of that year.

**15.4 Exemptions**

**a.** If, in the previous tax year, the recipient had gross income, from all sources, under $300,000, the recipient is exempt from the requirements to report:

**15.4.a.1.** (i) subawards, and (ii) the total compensation of the five most highly compensated executives of any subrecipient.

**15.5 Definitions.** For purposes of this award term:

**a. Federal Agency** means a Federal agency as defined at 5 U.S.C. 551(1) and further clarified by 5 U.S.C 552(f).

**b. Non-Federal entity** means all of the following, as defined in 2 CFR Part 25: (i.) A Governmental organization, which is a State, local government, or Indian tribe; (ii.) A foreign public entity; (iii.) A domestic or foreign nonprofit organization; and (iv.) A domestic or foreign for-profit organization.

**c. Executive** means officers, managing partners, or any other employees in management positions.

**d. Subaward:**

**15.5.d.1.** This term means a legal instrument to provide support for the performance of any portion of the substantive project or program for which you received this award and that you as the recipient award to an eligible subrecipient.

**15.5.d.2.** The term does not include procurement of property and services needed to carry out the project or program (for further explanation, see 2 CFR 200.331).

**15.5.d.3.** A subaward may be provided through any legal agreement, including an agreement that the recipient or a subrecipient considers a contract.

e. **Subrecipient** means a non-Federal entity or Federal agency that:

**15.5.e.1.** Receives a subaward from the recipient under this award; and

**15.5.e.2.** Is accountable to the recipient for the use of the Federal funds provided by the subaward.

f. **Total compensation** means the cash and noncash dollar value earned by the executive during the recipient's or subrecipient's preceding fiscal year and includes the following (for more information see 17 CFR 229.402(c)(2)):

**15.5.f.1.** Salary and bonus.

**15.5.f.2.** Awards of stock, stock options and stock appreciation rights. Use the dollar amount recognized for financial statement reporting purposes with respect to the fiscal year in accordance with the Statement of Financial Accounting Standards No. 123 (Revised 2004) (FAS 123R), Shared Based Payments.

**15.5.f.3.** Earnings for services under non-equity incentive plans. This does not include group life, health, hospitalization or medical reimbursement plans that do not discriminate in favor of executives and are available generally to all salaried employees.

**15.5.f.4.** Change in pension value. This is the change in present value of defined benefit and actuarial pension plans.

**15.5.f.5**. Above-market earnings on deferred compensation which is not tax-qualified.

**15.5.f.6.** Other compensation, if the aggregate value of all such other compensation (e.g., severance, termination payments, value of life insurance paid on behalf of the employee, perquisites, or property) for the executive exceeds $10,000.

**16. Recipient Integrity and Performance Matters – Reporting of Matters Related to Recipient Integrity and Performance**

**16.1 General Reporting Requirement**

If the total value of your currently active grants, cooperative agreements, and procurement contracts from all Federal awarding agencies exceeds $10,000,000 for any period of time during the period of performance of this Federal award, then you as the recipient during that period of time must maintain the currency of information reported to the System for Award Management (SAM) that is made available in the designated integrity and performance system (currently the responsibility/qualification information) about civil, criminal, or administrative proceedings described in paragraph 2 of this award term and condition. This is a statutory requirement under section 872 of Public Law 110-417, as amended (41 U.S.C. 2313). As required by section 3010 of Public Law 111-212, all information posted in the designated integrity and performance system on or after April 15, 2011, except past performance reviews required for Federal procurement contracts, will be publicly available.

**16.2 Proceedings About Which You Must Report**

Submit the information required about each proceeding that:

- **a.** Is in connection with the award or performance of a grant, cooperative agreement, or procurement contract from the Federal Government;
- **b.** Reached its final disposition during the most recent five-year period; and
- **c.** Is one of the following:

**16.2.c.1.** A criminal proceeding that resulted in a conviction, as defined in paragraph 5 of this award term and condition;

**16.2.c.2.** A civil proceeding that resulted in a finding of fault and liability and payment of a monetary fine, penalty, reimbursement, restitution, or damages of $5,000 or more;

**16.2.c.3.** An administrative proceeding, as defined in paragraph 5. of this award term and condition, that resulted in a finding of fault and liability and your payment of either a monetary fine or penalty of $5,000 or more or reimbursement, restitution, or damages in excess of $100,000; or

**16.2.c.4.** Any other criminal, civil, or administrative proceeding if:

**16.2.c.4.1.** It could have led to an outcome described in paragraph 16.2.c.1, 16.2.c.2, or 16.2.c.3 of this award term and condition;

**16.2.c.4.2.** It had a different disposition arrived at by consent or compromise with an acknowledgment of fault on your part; and

**16.2.c.4.3.** The requirement in this award term and condition to disclose information about the proceeding does not conflict with applicable laws and regulations.

**16.3 Reporting Procedures**

Enter in SAM Entity Management area the information that SAM requires about each proceeding described in paragraph 2 of this award term and condition. You do not need to submit the information a second time under assistance awards that you received if you already provided the information through SAM because you were required to do so under Federal procurement contracts that you were awarded.

**16.4 Reporting Frequency**

During any period of time when you are subject to the requirement in paragraph 16.1 of this award term and condition, you must report proceedings information through SAM for the most recent five-year period, either to report new information about any proceeding(s) that you have not reported previously or affirm that there is no new information to report. Recipients that have Federal contract, grant, and cooperative agreement awards with a cumulative total value greater than $10,000,000 must disclose semiannually any information about the criminal, civil, and administrative proceedings.

**16.5 Definitions**

For purposes of this award term and condition:

- **a.** Administrative proceeding means a non-judicial process that is adjudicatory in nature in order to make a determination of fault or liability (*e.g.,* Securities and Exchange Commission Administrative proceedings, Civilian Board of Contract

Appeals proceedings, and Armed Services Board of Contract Appeals proceedings). This includes proceedings at the Federal and State level but only in connection with performance of a Federal contract or grant. It does not include audits, site visits, corrective plans, or inspection of deliverables.

**b.** Conviction, for purposes of this award term and condition, means a judgment or conviction of a criminal offense by any court of competent jurisdiction, whether entered upon a verdict or a plea, and includes a conviction entered upon a plea of nolo contendere.

**c.** Total value of currently active grants, cooperative agreements, and procurement contracts includes –

**16.5.c.1.** Only the Federal share of the funding under any Federal award with a recipient cost share or match; and

**16.5.c.2.** The value of all expected funding increments under a Federal award and options, even if not yet exercised.

**17. Federal Financial Reporting (FFR)**

Pursuant to 2 CFR 200.328 and 2 CFR 200.344, EPA recipients must submit the Federal Financial Report (SF-425) at least annually and no more frequently than quarterly. EPA's standard reporting frequency is annual unless an EPA Region has included an additional term and condition specifying greater reporting frequency within this award document. EPA recipients must submit the SF-425 no later than 30 calendar days after the end of each specified reporting period for quarterly and semi-annual reports and 90 calendar days for annual reports. Final reports are due no later than 120 calendar days after the end date of the period of performance of the award. Extension of reporting due dates may be approved by EPA when requested and justified by the recipient. The FFR form is available on the internet at: https://www.epa.gov/grants/sf-425-federal-financial-report. All FFRs must be submitted to the Research Triangle Park Finance Center (RTPFC) via email at rtpfc-grants@epa.gov or mail it to:

US Environmental Protection Agency
RTP-Finance Center (Mail Code AA216-01)
4930 Page Rd.
Durham, NC 27703

The RTPFC will make adjustments as necessary, to obligated funds after reviewing and accepting a final Federal Financial Report. Recipients will be notified and instructed by EPA if they must complete any additional forms for the closeout of the assistance agreement.

**18. Indirect Cost Rate Agreements**

This term and condition provides requirements for recipients using EPA funds for indirect costs and applies to all EPA assistance agreements unless there are statutory or regulatory limits on IDCs. See also EPA's Indirect Cost Policy for Recipients of EPA Assistance Agreements (IDC Policy).

In order for the assistance agreement recipient to use EPA funding for indirect costs, the IDC category of the recipient's assistance agreement award budget must include an amount for IDCs and at least one of the following must apply:

- With the exception of "exempt" agencies and Institutions of Higher Education as noted below, all recipients must have one of the following current (not expired) IDC rates, including IDC rates that have been extended by the cognizant agency:
  - Provisional
  - Final
  - Fixed rate with carry-forward
  - Predetermined
  - 10% *de minimis* rate of modified total direct costs authorized by 2 CFR 200.414(f)
  - EPA-approved use of an expired fixed rate with carry-forward on an exception basis, as detailed in section 6.4.a. of the IDC Policy
- "Exempt" state of local governmental departments or agencies are agencies that receive up to and including $35,000,000 in Federal funding per the department or agency's fiscal year and must have an IDC rate proposal developed in accordance with 2 CFR Part 200, Appendix VII, with documentation maintained and available for audit.
- Institutions of Higher Education must use the IDC rate in place at the time of award for the life of the assistance agreement (unless the rate was provisional at time of award, in which case the rate will change once it becomes final). As provided by 2 CFR Part 200, Appendix III(C)(7), the term "life of the assistance agreement", means each competitive segment of the project. Additional information is available in the regulation.

IDCs incurred during any period of the assistance agreement that are not covered by the provisions above are not allowable costs and must not be drawn down by the recipient. Recipients may budget for IDCs if they have submitted a proposed IDC rate to their cognizant Federal agency or requested an exception from EPA under subsection 6.4 of the IDC Policy. However, recipients may not draw down IDCs until their rate is approved, if applicable, or EPA grants an exception. IDC drawdowns must comply with the indirect rate corresponding to the period during which the costs were incurred.

This term and condition does not govern indirect rates for subrecipients or recipient procurement contractors under EPA assistance agreements. Pass-through entities are required to comply with 2 CFR 200.332(a)(4)(i) and (ii) when establishing indirect cost rates for subawards.

**19. Audit Requirements**

In accordance with 2 CFR 200.501(a), the recipient hereby agrees to obtain a single audit from an independent auditor, if their organization expends $750,000 or more in total Federal funds in their fiscal year for that year.

The recipient must submit the form SF-SAC and a Single Audit Report Package within 9 months of the end of the recipient's fiscal year or 30 days after receiving the report from an independent

auditor. The SF-SAC and a Single Audit Report Package MUST be submitted using the Federal Audit Clearinghouse's Internet Data Entry System available at: https://facides.census.gov/.

For complete information on how to accomplish the single audit submissions, the recipient will need to visit the Federal Audit Clearinghouse Web site: https://facweb.census.gov/

**20. Closeout Requirements**

Reports required for closeout of the assistance agreement must be submitted in accordance with this agreement. Submission requirements and frequently asked questions can also be found at: https://www.epa.gov/grants/frequent-questions-about-closeouts

**21. Suspension and Debarment**

Recipient shall fully comply with Subpart C of 2 C.F.R. Part 180 entitled, "Responsibilities of Participants Regarding Transactions Doing Business With Other Persons," as implemented and supplemented by 2 C.F.R. Part 1532. Recipient is responsible for ensuring that any lower tier covered transaction, as described in Subpart B of 2 C.F.R. Part 180, entitled "Covered Transactions," and 2 C.F.R. § 1532.220, includes a term or condition requiring compliance with 2 C.F.R. Part 180, Subpart C. Recipient is responsible for further requiring the inclusion of a similar term and condition in any subsequent lower tier covered transactions. Recipient acknowledges that failing to disclose the information required under 2 C.F.R. § 180.335 to the EPA office that is entering into the transaction with the recipient may result in the delay or negation of this assistance agreement, or pursuance of administrative remedies, including suspension and debarment. Recipients may access the System for Award Management (SAM) exclusion list at https://sam.gov/SAM/ to determine whether an entity or individual is presently excluded or disqualified.

**22. Representation by Corporations Regarding Delinquent Tax Liability or a Felony Conviction under any Federal Law**

This award is subject to the provisions contained in an appropriations act(s) which prohibits the Federal Government from entering into a contract, memorandum of understanding, or cooperative agreement with, make a grant to, or provide a loan or loan guarantee to any corporation having a delinquent Federal tax liability or a felony conviction under any Federal law, unless the agency has considered suspension or debarment of the corporation and has made a determination that this further action is not necessary to protect the interests of the Government. A "corporation" is a legal entity that is separate and distinct from the entities that own, manage, or control it. It is organized and incorporated under the jurisdictional authority of a governmental body, such as a State or the District of Columbia. A corporation may be a for-profit or non-profit organization.

As required by the appropriations act(s) prohibitions, the Government will not enter into a contract, memorandum of understanding, or cooperative agreement with, make a grant to, or provide a loan or loan guarantee with any corporation that — (1) Has any unpaid Federal tax liability that has been assessed, for which all judicial and administrative remedies have been exhausted or have lapsed, and that is not being paid in a timely manner pursuant to an agreement with the authority

responsible for collecting the tax liability, where the awarding agency is aware of the unpaid tax liability, unless an agency has considered suspension or debarment of the corporation and made a determination that suspension or debarment is not necessary to protect the interests of the Government; or (2) Was convicted of a felony criminal violation under any Federal law within the preceding 24 months, where the awarding agency is aware of the conviction, unless an agency has considered suspension or debarment of the corporation and made a determination that this action is not necessary to protect the interests of the Government.

By accepting this award, the recipient represents that it is not a corporation that has any unpaid Federal tax liability that has been assessed, for which all judicial and administrative remedies have been exhausted or have lapsed, and that is not being paid in a timely manner pursuant to an agreement with the authority responsible for collecting the tax liability; and it is not a corporation that was convicted of a felony criminal violation under a Federal law within the preceding 24 months.

Alternatively, by accepting this award, the recipient represents that it disclosed unpaid Federal tax liability information and/or Federal felony conviction information to the EPA. The recipient may accept this award if the EPA Suspension and Debarment Official has considered suspension or debarment of the corporation based on tax liabilities and/or Federal felony convictions and determined that suspension or debarment is not necessary to protect the Government's interests.

If the recipient fails to comply with this term and condition, EPA will annul this agreement and may recover any funds the recipient has expended in violation of the appropriations act(s) prohibition(s). The EPA may also pursue other administrative remedies as outlined in 2 CFR 200.339 and 2 CFR 200.340 and may also pursue suspension and debarment.

**23. Disclosing Conflict of Interest**

**23.1 For Award to Non-Federal Entities and Individuals (other than states and fellowship recipients under 40 CFR Part 46)**

As required by 2 CFR 200.112, EPA has established a policy (COI Policy) for disclosure of conflicts of interest (COI) that may affect EPA financial assistance awards. EPA's COI Policy is posted at https://www.epa.gov/grants/epas-financial-assistance-conflict-interest-policy. The posted version of EPA's COI Policy is applicable to new funding (initial awards, supplemental and incremental funding) awarded on or after October 1, 2015.

For competitive awards, recipients must disclose any competition related COI described in section 4.0(a) of the COI Policy that are discovered after award to the EPA Grants Specialist listed on the Assistance Agreement/Amendment within 30 calendar days of discovery of the COI. The Grants Specialist will respond to any such disclosure within 30 calendar days.

EPA's COI Policy requires that recipients have systems in place to address, resolve and disclose to EPA COIs described in sections 4.0(b), (c) and/or (d) of the COI Policy that affect any contract or subaward regardless of amount funded under this award. The recipient's COI Point of Contact for the award must disclose any COI to the EPA Grants Specialist listed on the Assistance Agreement/Amendment within 30 calendar days of the discovery of the potential COI and their approach for resolving the COI.

EPA's COI Policy requires that subrecipients have systems in place to address, resolve and disclose COI's described in section 4.0(b)(c) and (d) of the COI Policy regardless of the amount of the transaction. Recipients who are pass-through entities as defined at 2 CFR 200.1 must require that subrecipients being considered for or receiving subawards disclose COI to the pass-through entities in a manner that, at a minimum, is in accordance with sections 5.0(d) and 7.0(c) of EPA's COI Policy. Pass-through entities must disclose the subrecipient COI along with the approach for resolving the COI to the EPA Grants Specialist listed on the Assistance Agreement/Amendment within 30 calendar days of receiving notification of the COI by the subrecipient.

EPA only requires that recipients and subrecipients disclose COI's that are discovered under their systems for addressing and resolving COI. If recipients or subrecipients do not discover a COI, they do not need to advise EPA or the pass-through entity of the absence of a COI.

Upon notice from the recipient of a potential COI and the approach for resolving it, the Agency will then make a determination regarding the effectiveness of these measures within 30 days of receipt of the recipient's notice unless a longer period is necessary due to the complexity of the matter. Recipients may not request payment from EPA for costs for transactions subject to the COI pending notification of EPA's determination. Failure to disclose a COI may result in cost disallowances.

Disclosure of potential COI will not necessarily result in EPA disallowing costs, with the exception of procurement contracts that the Agency determines violate 2 CFR 200.318(c)(1) or (2), provided the recipient notifies EPA of measures the recipient or subrecipient has taken to eliminate, neutralize or mitigate the conflict of interest when making the disclosure.

**23.2 For Awards to States Including State Universities that are State Agencies or Instrumentalities**

As required by 2 CFR 200.112, EPA has established a policy (COI Policy) for disclosure of conflicts of interest (COI) that may affect EPA financial assistance awards. EPA's COI Policy is posted at: https://www.epa.gov/grants/epas-financial-assistance-conflict-interest-policy. The posted version of EPA's COI Policy is applicable to new funding

(initial awards, supplemental, incremental funding) awarded on or after October 1, 2015.

For competitive awards, recipients must disclose any competition related COI described in section 4.0(a) of the COI Policy that are discovered after award to the EPA Grants Specialist listed on the Assistance Agreement/Amendment within 30 calendar days of discovery of the COI. The Grants Specialist will respond to any such disclosure within 30 calendar days.

States including state universities that are state agencies and instrumentalities receiving funding from EPA are only required to disclose subrecipient COI as a pass-through entity as defined by 2 CFR 200.1. Any other COI are subject to state laws, regulations, and policies. EPA's COI Policy requires that subrecipients have systems in place to address, resolve and disclose COIs described in section 4.0(b)(c) and (d) of the COI Policy that arise after EPA made the award regardless of the amount of the transaction. States who are pass-through entities as defined at 2 CFR 200.1 must require that subrecipients being considered for or receiving subawards disclose COI to the state in a manner that, as a minimum, in accordance with sections 5.0(d) and 7.0(c) of EPA's COI Policy. States must disclose the subrecipient COI along with the approach for resolving the COI to the EPA Grants Specialist listed on the Assistance Agreement/Amendment within 30 calendar days of receiving notification of the COI by the subrecipient.

EPA only requires that subrecipients disclose COI's to state pass-through entities that are discovered under their systems for addressing, resolving, and disclosing COI. If subrecipients do not discover a COI, they do not need to advise state pass-through entities of the absence of a COI.
Upon receiving notice of a potential COI and the approach for resolving it, the Agency will make a determination regarding the effectiveness of these measures within 30 days of receipt of the state's notice of a subrecipient COI unless a longer period is necessary due to the complexity of the matter. States may not request payment from EPA for costs for transactions subject to the COI pending notification of EPA's determination. A subrecipient's failure to disclose a COI to the state and EPA may result in cost disallowances.

Disclosure of potential subrecipient COI will not necessarily result in EPA disallowing costs, with the exception of procurement contracts that the Agency determines violate 2 CFR 200.318(c)(1) or (2), provided the subrecipient has taken measures that EPA and the state agree eliminate, neutralize or mitigate the conflict of interest.

**24. Transfer of Funds**

**24.1 Transfer of Funds**

**Applicable to all assistance agreements other than Continuing Environmental Program Grants subject to 40 CFR 35.114 and 40 CFR 35.514 when EPA's share of the total project costs exceeds the Simplified Acquisition Threshold. Simplified Acquisition Threshold is defined at 2 CFR 200.1 and is currently set at $250,000 but the amount is subject to adjustment.**

(1) As provided at 2 CFR 200.308(f), the recipient must obtain prior approval from EPA's Grants Management Officer if the cumulative amount of funding transfers among direct budget categories or programs, functions and activities exceeds 10% of the total budget. Recipients must submit requests for prior approval to the Grant Specialist and Grants Management Officer with a copy to the Project Officer for this agreement.

(2) Recipients must notify EPA's Grant Specialist and Project Officer of cumulative funding transfers among direct budget categories or programs, functions and activities that do not exceed 10% of the total budget for the agreement. Prior approval by EPA's Grant Management Officer is required if the transfer involves any of the items listed in 2 CFR 200.407 that EPA did not previously approve at time of award or in response to a previous post-award request by the recipient.

**24.2 Post-Award Changes for Continuing Environmental Program Grants**

**Applicable to Continuing Environmental Program Grants subject to 40 CFR 35.114 and 40 CFR 35.514 when EPA's share of the total project costs exceeds the Simplified Acquisition Threshold. Simplified Acquisition Threshold is defined at 2 CFR 200.1 and is currently set at $250,000 but the amount is subject to adjustment.**

To determine if a post-award change in work plan commitments is significant and requires prior written approval for the purposes of 40 CFR §35.114(a) or 40 CFR §35.514(a), the recipient agrees to consult the EPA Project Officer (PO) before making the change. The term work plan commitments is defined at 40 CFR §35.102. If the PO determines the change is significant, the recipient cannot make the change without prior written approval by the EPA Award Official or Grants Management Officer.

The recipient must obtain written approval from the EPA Award Official prior to transferring funds from one budget category to another if the EPA Award Official determines that such transfer significantly changes work plan commitment(s). All transfers must be reported in required performance reports. In addition, unless approved with the budget at the time of award, Continuing Environmental Program (CEP) recipients must also obtain prior written approval from the EPA Award Official or Grants Management Officer to use EPA funds for directly charging compensation for administrative and clerical personnel under 2 CFR 200.413(c) and the General Provisions for Selected Items of Cost allowability at 2 CFR 200.420 through 2 CFR 200.476 as supplemented by EPA's Guidance on Selected Items of Cost. The recipient is not required to obtain prior written approval from the EPA Award Official for other items requiring prior EPA approval listed in 2 CFR §§ 200.407.

**25. Electronic/Digital Signatures on Financial Assistance Agreement Form(s)/Document(s)**

Throughout the life of this assistance agreement, the recipient agrees to ensure that any form(s)/document(s) required to be signed by the recipient and submitted to EPA through any means including but not limited to hard copy via U.S. mail or express mail, hand delivery or through electronic means such as e-mail are: (1) signed by the individual identified on the form/document, and (2) the signer has the authority to sign the form/document for the recipient. Submission of any signed form(s)/document(s) is subject to any provisions of law on making false statements (e.g., 18 U.S.C. 1001).

**26. Extension of Project/Budget Period Expiration Date**

EPA has not exercised the waiver option to allow automatic one-time extensions for non-research grants under 2 CFR 200.308(e)(2). Therefore, if a no-cost time extension is necessary to extend the period of availability of funds, the recipient must submit a written request to the EPA prior to the budget/project period expiration dates. **The written request must include:** a justification describing the need for additional time, an estimated date of completion, and a revised schedule for project completion including updated milestone target dates for the approved workplan activities. In addition, if there are overdue reports required by the general, administrative, and/or programmatic terms and conditions of this assistance agreement, the recipient must ensure that they are submitted along with or prior to submitting the no-cost time extension request.

**27. Utilization of Disadvantaged Business Enterprises**

**General Compliance, 40 CFR, Part 33**

The recipient agrees to comply with the requirements of EPA's Disadvantaged Business Enterprise (DBE) Program for procurement activities under assistance agreements, contained in 40 CFR, Part 33.

The following text provides updates to 40 CFR, Part 33 based upon the associated class exception or highlights a requirement.

1) **EPA MBE/WBE CERTIFICATION, 40 CFR, Part 33, Subpart B**
   EPA no longer certifies entities as Minority-Owned Business Entities (MBEs) or Women-Owned Business Entities (WBEs) pursuant to a class exception issued in October 2019. The class exception was authorized pursuant to the authority in 2 CFR, Section 1500.4(b).
2) **SIX GOOD FAITH EFFORTS, 40 CFR, Part 33, Subpart C**
   Pursuant to 40 CFR Section 33.301, the recipient agrees to make good faith efforts whenever procuring construction, equipment, services and supplies under an EPA financial assistance agreement, and to require that sub-recipients, loan recipients, and prime contractors also comply. Records documenting compliance with the six good faith efforts shall be retained. The specific six good faith efforts can be found at: 40 CFR Section 33.301 (a)-(f).

   However, in EPA assistance agreements that are for the benefit of Native Americans, the recipient must solicit and recruit Native American organizations and Native American-owned

economic enterprises and give them preference in the award process prior to undertaking the six good faith efforts (40 CFR Section 33.304). If recruiting efforts are unsuccessful, the recipient must follow the six good faith efforts.

3) **CONTRACT ADMINISTRATION PROVISIONS, 40 CFR, Section 33.302**
The recipient agrees to comply with the contract administration provisions of 40 CFR Section 33.302 (a)-(d) and (i).

4) **BIDDERS LIST, 40 CFR Section 33.501(b) and (c)**
Recipients of a Continuing Environmental Program Grant or other annual reporting grant, agree to create and maintain a bidders list. Recipients of an EPA financial assistance agreement to capitalize a revolving loan fund also agree to require entities receiving identified loans to create and maintain a bidders list if the recipient of the loan is subject to, or chooses to follow, competitive bidding requirements. Please see 40 CFR Section 33.501 (b) and (c) for specific requirements and exemptions.

5) **FAIR SHARE OBJECTIVES, 40 CFR, Part 33, Subpart D**
In June 2023, EPA reinstated the requirements under 40 CFR, Part 33, Subpart D. Unless the recipient is exempted from these requirements as outlined in 40 CFR 33.411, the recipient agrees to submit fair share objectives for EPA approval within 120 days of acceptance of this award, and, once approved, apply them to procurements under this award in accordance with Subpart D. See RAIN-2023-G02 for information on EPA's reinstatement of the fair share objectives.

6) **MBE/WBE REPORTING, 40 CFR, Part 33, Subpart E**
When required, the recipient agrees to complete and submit a "MBE/WBE Utilization Under Federal Grants and Cooperative Agreements" report (EPA Form 5700-52A) on an annual basis. The current EPA Form 5700-52A can be found at the EPA Grantee Forms Page at https://www.epa.gov/system/files/documents/2021-08/epa_form_5700_52a.pdf .

Reporting is required for assistance agreements where funds are budgeted for procuring construction, equipment, services and supplies (including funds budgeted for direct procurement by the recipient or procurement under subawards or loans in the "Other" category) with a cumulative total that exceed the Simplified Acquisition Threshold (SAT) (currently, $250,000 however the threshold will be automatically revised whenever the SAT is adjusted; See 2 CFR Section 200.1), including amendments and/or modifications. When reporting is required, all procurement actions are reportable, not just the portion which exceeds the SAT.

**Annual reports are due by October 30th of each year. Final reports are due 120 days after the end of the project period.**

This provision represents an approved exception from the MBE/WBE reporting requirements as described in 40 CFR Section 33.502.

7) **MBE/WBE RECORDKEEPING, 40 CFR, Part 33, Subpart E**

The recipient agrees to comply with all recordkeeping requirements as stipulated in 40 CFR Part 33, Subpart E including creating and maintain a bidders list, when required. Any document created as a record to demonstrate compliance with any requirements of 40 CFR Part 33 must be maintained pursuant to the requirements stated in this Subpart.

**Programmatic General Terms and Conditions**

**28. Sufficient Progress**

EPA will measure sufficient progress by examining the performance required under the workplan in conjunction with the milestone schedule, the time remaining for performance within the project period and/or the availability of funds necessary to complete the project. EPA may terminate the assistance agreement for failure to ensure reasonable completion of the project within the project period.

**29. Copyrighted Material and Data**

In accordance with 2 CFR 200.315, EPA has the right to reproduce, publish, use and authorize others to reproduce, publish and use copyrighted works or other data developed under this assistance agreement for Federal purposes.

Examples of a Federal purpose include but are not limited to: (1) Use by EPA and other Federal employees for official Government purposes; (2) Use by Federal contractors performing specific tasks for [i.e., authorized by] the Government; (3) Publication in EPA documents provided the document does not disclose trade secrets (e.g. software codes) and the work is properly attributed to the recipient through citation or otherwise; (4) Reproduction of documents for inclusion in Federal depositories; (5) Use by State, tribal and local governments that carry out delegated Federal environmental programs as "co-regulators" or act as official partners with EPA to carry out a national environmental program within their jurisdiction and; (6) Limited use by other grantees to carry out Federal grants provided the use is consistent with the terms of EPA's authorization to the other grantee to use the copyrighted works or other data.
Under Item 6, the grantee acknowledges that EPA may authorize another grantee(s) to use the copyrighted works or other data developed under this grant as a result of:

- The selection of another grantee by EPA to perform a project that will involve the use of the copyrighted works or other data, or
- Termination or expiration of this agreement.

In addition, EPA may authorize another grantee to use copyrighted works or other data developed with Agency funds provided under this grant to perform another grant when such use promotes efficient and effective use of Federal grant funds.

**30. Patents and Inventions**

Rights to inventions made under this assistance agreement are subject to federal patent and licensing regulations, which are codified at Title 37 CFR Part 401 and Title 35 USC Sections 200-212.

Pursuant to the Bayh-Dole Act (set forth in 35 USC 200-212), EPA retains the right to a worldwide, nonexclusive, nontransferable, irrevocable, paid-up license to practice the invention owned by the assistance agreement holder, as defined in the Act. To streamline the invention reporting process and to facilitate compliance with the Bayh-Dole Act, the recipient must utilize the Interagency Edison extramural invention reporting system at https://www.nist.gov/iedison. Annual utilization reports must be submitted through the system. The recipient is required to notify the Project Officer identified on the award document when an invention report, patent report, or utilization report is filed at https://www.nist.gov/iedison. EPA elects not to require the recipient to provide a report prior to the close-out of a funding agreement listing all subject inventions or stating that there were none.

In accordance with Executive Order 12591, as amended, government owned and operated laboratories can enter into cooperative research and development agreements with other federal laboratories, state and local governments, universities, and the private sector, and license, assign, or waive rights to intellectual property "developed by the laboratory either under such cooperative research or development agreements and from within individual laboratories."

**31. Acknowledgement Requirements for Non-ORD Assistance Agreements**

The recipient agrees that any reports, documents, publications, or other materials developed for public distribution supported by this assistance agreement shall contain the following statement: "This project has been funded wholly or in part by the United States Environmental Protection Agency under assistance agreement (number) to (recipient). The contents of this document do not necessarily reflect the views and policies of the Environmental Protection Agency, nor does the EPA endorse trade names or recommend the use of commercial products mentioned in this document."

Recipients of EPA Office of Research Development (ORD) research awards must follow the acknowledgement requirements outlined in the research T&Cs available at: https://www.nsf.gov/awards/managing/rtc.jsp. In accordance with the Research Terms and Conditions Overlay to the Uniform Administrative Requirements, Cost Principles and Audit Requirements for Federal Awards (Uniform Guidance), 2 CFR §200, recipients of EPA ORD research must abide by the research T&Cs.

**32. Electronic and Information Technology Accessibility**

Recipients are subject to the program accessibility provisions of Section 504 of the Rehabilitation Act, codified in 40 CFR Part 7, which includes an obligation to provide individuals with disabilities reasonable accommodations and an equal and effective opportunity to benefit from or participate in a program, including those offered through electronic and information technology ("EIT"). In compliance with Section 504, EIT systems or products funded by this award must be designed to meet the diverse needs of users (e.g., U.S. public, recipient personnel) without barriers or diminished function or quality. Systems shall include usability features or functions that accommodate the needs of persons with disabilities, including those who use assistive technology.

At this time, the EPA will consider a recipient's websites, interactive tools, and other EIT as being in compliance with Section 504 if such technologies meet standards established under Section 508 of the Rehabilitation Act, codified at 36 CFR Part 1194. While Section 508 does not apply directly to grant recipients, we encourage recipients to follow either the 508 guidelines or other comparable guidelines that concern accessibility to EIT for individuals with disabilities.

Recipients may wish to consult the latest Section 508 guidelines issued by the U.S. Access Board or W3C's Web Content Accessibility Guidelines (WCAG) 2.0 (see https://www.access-board.gov/about/policy/accessibility.html).

**33. Human Subjects**

Human subjects research is any activity that meets the regulatory definitions of both research AND human subject. Research is a systematic investigation, including research development, testing and evaluation, designed to develop or contribute to generalizable knowledge. Human subject means a living individual about whom an investigator (whether professional or student) conducting research: (i) Obtains information or biospecimens through intervention or interaction with the individual, and uses, studies, or analyzes the information or biospecimens; or (ii) Obtains, uses, studies, analyzes, or generates identifiable private information or identifiable biospecimens 40 CFR 26.102(e)(l).

No research involving human subjects shall be conducted under this agreement without prior written approval of the EPA Human Subject Research Review Official (HSRRO) to proceed with that research. If engaged in human subjects' research as part of this agreement, the recipient agrees to comply with all applicable provisions of EPA Regulation 40 CFR 26 (Protection of Human Subjects). This includes, at Subpart A, the Basic Federal Policy for the Protection of Human Research Subjects, also known as the Common Rule. It also includes, at Subparts B, C, and D, prohibitions and additional protections for children, nursing women, pregnant women, and fetuses in research conducted or supported by EPA.

The recipient further agrees to comply with EPA's procedures for oversight of the recipient's compliance with 40 CFR 26, as given in EPA Order 1000.17A (Policy and Procedures on Protection of Human Research Subjects in EPA Conducted or Supported Research). As per this order, no human subject may be involved in any research conducted under this assistance agreement, including recruitment, until the research has been approved or determined to be exempt by the EPA HSRRO after review of the approval or exemption determination of the Institutional Review Board(s) (IRB(s)) with jurisdiction over the research under 40 CFR 26.

For HSRRO approval, the recipient must forward to the Project Officer: (1) copies of all documents upon which the IRB(s) with jurisdiction based their approval(s) or exemption determination(s), (2) copies of the IRB approval or exemption determination letter(s), (3) copy of the IRB-approved consent forms and subject recruitment materials, if applicable, and (4) copies of all supplementary IRB correspondence.

Following the initial approvals indicated above, the recipient must, as part of the annual report(s), provide evidence of continuing review and approval of the research by the IRB(s) with jurisdiction, as required by 40 CFR 26.109(e). Materials submitted to the IRB(s) for their continuing review and approval are to be provided to the EPA HSRRO via the Project Officer upon IRB approval. During the course of the research, investigators must promptly report any unanticipated problems involving risk to subjects or others according to requirements set forth by the IRB. In addition, any event that is significant enough to result in the removal of the subject from the study should also be reported to the EPA HSRRO via the Project Officer, even if the event is not reportable to the IRB of record.

**34. Animal Subjects**

The recipient agrees to comply with the Animal Welfare Act of 1966 (P.L. 89-544), as amended, 7 USC 2131- 2156. Recipient also agrees to abide by the "U.S. Government Principles for the Utilization and Care of Vertebrate Animals used in Testing, Research, and Training." (Federal Register 50(97): 20864-20865. May 20,1985). The nine principles can be viewed at https://olaw.nih.gov/policies-laws/phs-policy.htm. For additional information about the Principles, the recipient should consult the *Guide for the Care and Use of Laboratory Animals,* prepared by the Institute of Laboratory Animal Resources, National Research Council.

**35. Light Refreshments and/or Meals**

**(a) APPLICABLE TO ALL AGREEMENTS EXCEPT STATE CONTINUING ENVIRONMENTAL PROGRAMS (AS DESCRIBED BELOW):**

Unless the event(s) and all of its components are described in the approved workplan, the recipient agrees to obtain prior approval from EPA for the use of grant funds for light refreshments and/or meals served at meetings, conferences, training workshops and outreach activities (events). The recipient must send requests for approval to the EPA Project Officer and include:

**(1)** An estimated budget and description for the light refreshments, meals, and/or beverages to be served at the event(s)
**(2)** A description of the purpose, agenda, location, length, and timing for the event, and
**(3)** An estimated number of participants in the event and a description of their roles

Costs for light refreshments and meals for recipient staff meetings and similar day-to-day activities are not allowable under EPA assistance agreements.

Recipients may address questions about whether costs for light refreshments, and meals for events may be allowable to the recipient's EPA Project Officer; however, the Agency Award Official or Grant Management Officer will make final determinations on allowability. Agency policy prohibits the use of EPA funds for receptions, banquets and similar activities that take place after normal business hours unless the recipient has provided a justification that has been expressly approved by EPA's Award Official or Grants Management Officer.

EPA funding for meals, light refreshments, and space rental may not be used for any portion of an event where alcohol is served, purchased, or otherwise available as part of the event or meeting, even if EPA funds are not used to purchase the alcohol.

Note: U.S. General Services Administration regulations define light refreshments for morning, afternoon, or evening breaks to include, but not be limited to, coffee, tea, milk, juice, soft drinks, donuts, bagels, fruit, pretzels, cookies, chips, or muffins. (41 CFR 301-74.7)

**(b) FOR STATE CONTINUING ENVIROMENTAL PROGRAM GRANT RECIPIENTS EXCLUDING STATE UNIVERSITIES:**

If the state maintains systems capable of complying with federal grant regulations at 2 CFR 200.432 and 2 CFR 200.438, EPA has waived the prior approval requirements for the use of EPA funds for light refreshments and/or meals served at meetings, conferences, and training, as described above. The state may follow its own procedures without requesting prior approval from EPA. However, notwithstanding state policies, EPA funds may not be used for (1) evening receptions, or (2) other evening events (with the exception of working meetings). Examples of working meetings include those evening events in which small groups discuss technical subjects on the basis of a structured agenda or there are presentations being conducted by experts. EPA funds for meals, light refreshments, and space rental may not be used for any portion of an event (including evening working meetings) where alcohol is served, purchased, or otherwise available as part of the event or meeting, even if EPA funds are not used to purchase the alcohol.

By accepting this award, the state is certifying that it has systems in place (including internal controls) to comply with the requirements described above.

**36. Tangible Personal Property**

**36.1** Reporting pursuant to 2 CFR 200.312 and 2 CFR 200.314, property reports, if applicable, are required for Federally-owned property in the custody of a non-Federal entity upon completion of the Federal award or when the property is no longer needed. Additionally, upon termination or completion of the project, residual unused supplies with a total aggregate fair market value exceeding $5,000 not needed for any other Federally-sponsored programs or projects must be reported. For Superfund awards under Subpart O, refer to 40 CFR 35.6340 and 40 CFR 35.6660 for property reporting requirements. Recipients should utilize the Tangible Personal Property Report form series (SF-428) to report tangible personal property.

**36.2 Disposition**

**36.2.1. Most Recipients.** Consistent with 2 CFR 200.313, unless instructed otherwise on the official award document, this award term, or at closeout, the recipient may keep the equipment and continue to use it on the project originally funded through this assistance agreement or on other federally funded projects whether or not the project or program continues to be supported by Federal funds.

**36.2.2. State Agencies.** Per 2 CFR 200.313(b), state agencies may manage and dispose of equipment acquired under this assistance agreement in accordance with state laws and procedures.

**36.2.3. Superfund Recipients.** Equipment purchased under Superfund projects is subject to specific disposal options in accordance with 40 CFR Part 35.6345.

**37. Dual Use Research of Concern (DURC)**

The recipient agrees to conduct all life science research* in compliance with *EPA's Order on the Policy and Procedures for Managing Dual Use Research of Concern* (EPA DURC Order) and *United States Government Policy for Institutional Oversight of Life Sciences Dual Use Research of Concern (iDURC Policy).* If the recipient is an institution within the United States that receives funding through this agreement, or from any other source, the recipient agrees to comply with the iDURC Policy if they conduct or sponsor research involving any of the agents or toxins identified in Section 6.2.1 of the iDURC Policy. If the institution is outside the United States and receives funding through this agreement to conduct or sponsor research involving any of those same agents or toxins, the recipient agrees to comply with the iDURC Policy. The recipient agrees to provide any additional information that may be requested by EPA regarding DURC and iDURC. The recipient agrees to immediately notify the EPA Project Officer should the project use or introduce use of any of the agents or toxins identified in the iDURC Policy. The recipient's Institution/Organization must also comply with USG iDURC policy and EPA DURC Order and will inform the appropriate government agency if funded by such agency of research with the agents or toxins identified in Section 6.2.1 of the iDURC Policy. If privately funded the recipient agrees to notify the National Institutes of Health at DURC@od.nih.gov.

* "*Life Sciences Research,*" for purposes of the EPA DURC Order, and based on the definition of research in 40 CFR §26.102(d), is a systematic investigation designed to develop or contribute to generalizable knowledge involving living organisms (e.g., microbes, human beings, animals, and plants) and their products. EPA does not consider the following activities to be research: routine product testing, quality control, mapping, collection of general-purpose statistics, routine monitoring and evaluation of an operational program, observational studies, and the training of scientific and technical personnel. [Note: This is consistent with Office of Management and Budget Circular A-11.]

**38. Research Misconduct**

In accordance with 2 CFR 200.329, the recipient agrees to notify the EPA Project Officer in writing about research misconduct involving research activities that are supported in whole or in part with EPA funds under this project. EPA defines research misconduct as fabrication, falsification, or plagiarism in proposing, performing, or reviewing research, or in reporting research results [65 FR 76262. I], or ordering, advising or suggesting that subordinates engage in research misconduct. The recipient agrees to:

(1) Immediately notify the EPA Project Officer who will then inform the EPA Office of Inspector General (OIG) if, at any time, an allegation of research misconduct falls into one of the categories listed below:

- **A.** Public health of safety is at risk
- **B.** Agency resources or interests are threatened
- **C.** Circumstances where research activities should be suspended
- **D.** There is a reasonable indication of possible violations of civil or criminal law
- **E.** Federal action is required to protect the interests of those involved in the investigation
- **F.** The research entity believes that the inquiry or investigation may be made public prematurely so that appropriate steps can be taken to safeguard evidence and protect the rights of those involved
- **G.** Circumstances where the research community or public should be informed. [65 FR 76263.III]

(2) Report other allegations to the OIG when they have conducted an inquiry and determined that there is sufficient evidence to proceed with an investigation. [65 FR 76263. III]

**39. Scientific Integrity Terms and Conditions**

The recipient agrees to comply with EPA's Scientific Integrity Policy when conducting, supervising, and communicating science and when using or applying the results of science. For purposes of this award condition scientific activities include, but are not limited to, computer modelling, economic analysis, field sampling, laboratory experimentation, demonstrating new technology, statistical analysis, and writing a review article on a scientific issue. The recipient agrees to:

**39.1 Scientific Products**

**39.1.1.** Produce scientific products of the highest quality, rigor, and objectivity, by adhering to applicable EPA information quality guidelines, quality policy, and peer review policy.

**39.1.2.** Prohibit all recipient employees, contractors, and program participants, including scientists, managers, and other recipient leadership, from suppressing, altering, or otherwise impeding the timely release of scientific findings or conclusions.

**39.1.3.** Adhere to EPA's Peer Review Handbook, 4th Edition, for the peer review of scientific and technical work products generated through EPA grants or cooperative agreements which, by definition, are not primarily for EPA's direct use or benefit.

**39.2 Scientific Findings**

**39.2.1.** Require that reviews regarding the content of a scientific product that are conducted by the project manager and other recipient managers and the broader management chain be based only on scientific quality considerations, e.g., the methods used are clear and appropriate, the presentation of results and conclusions is impartial.

**39.2.2.** Ensure scientific findings are generated and disseminated in a timely and transparent manner, including scientific research performed by employees, contractors, and program participants, who assist with developing or applying the results of scientific activities.

**39.2.3.** Include, when communicating scientific findings, an explication of underlying assumptions, accurate contextualization of uncertainties, and a description of the probabilities associated with both optimistic and pessimistic projections, if applicable.

**39.2.4.** Document the use of independent validation of scientific methods.

**39.2.5.** Document any independent review of the recipient's scientific facilities and testing activities, as occurs with accreditation by a nationally or internationally recognized sanctioning body.

**39.2.6.** Make scientific information available online in open formats in a timely manner, including access to data and non-proprietary models.

**39.3 Scientific Misconduct**

**39.3.1.** Prohibit intimidation or coercion of scientists to alter scientific data, findings, or professional opinions or non-scientific influence of scientific advisory boards. In addition, recipient employees, contractors, and program participants, including scientists, managers, and other leadership, shall not knowingly misrepresent, exaggerate, or downplay areas of scientific uncertainty.

**39.3.2.** Prohibit retaliation or other punitive actions toward recipient employees who uncover or report allegations of scientific and research misconduct, or who express a differing scientific opinion. Employees who have allegedly engaged in scientific or research misconduct shall be afforded the due process protections provided by law, regulation, and applicable collective bargaining agreements, prior to any action. Recipients shall ensure that all employees and contractors of the recipient shall be familiar with these protections and avoid the appearance of retaliatory actions.

**39.3.3.** Require all recipient employees, contractors, and program participants to act honestly and refrain from acts of research misconduct, including publication or reporting, as described in EPA's Policy and Procedures for Addressing Research Misconduct, Section 9.C. Research misconduct does not include honest error or differences of opinion. While EPA retains the ultimate oversight authority for EPA-supported research, grant recipients conducting research bear primary responsibility for prevention and detection of research misconduct and for the inquiry, investigation, and adjudication of research misconduct alleged to have occurred in association with their own institution.

**39.3.4.** Take the actions required on the part of the recipient described in EPA's Policy and Procedures for Addressing Research Misconduct, Sections 6 through 9, when research misconduct is suspected or found.

**39.4 Additional Resources**

For more information about the Scientific Integrity Policy, an introductory video can be accessed at: https://youtu.be/FQJCy8BXXq8. A training video is available at: https://youtu.be/Zc0T7fooot8.

**40. Post-Award Disclosure of Current and Pending Support on Research Grants**

The recipient is required to notify EPA if there has been a change in support for the principal investigator and/or major co-investigators listed on EPA Key Contacts Form, EPA Form 5700-54, since submission of its application or the last reporting period in the performance report. If there has been a change, the recipient must report the change within 30 calendar days to the EPA Project Officer. The information should also be included in the next due performance report. EPA may consult with the Principal Investigator and the Authorized Representative, to determine the impact

of the new information on the EPA-funded research grant and, where necessary, take appropriate action.

If the recipient discovers that an investigator on an active EPA research grant failed to disclose current and pending support information or provided inaccurate information as part of the proposal submission process, it must provide the revised current and pending support information to the EPA Project Officer within 30 calendar days of the identification of the undisclosed or inaccurate current and pending support information.

**Public Policy Requirements**

**41. Civil Rights Obligations**

This term and condition incorporates by reference the signed assurance provided by the recipient's authorized representative on: 1) EPA Form 4700-4, "Preaward Compliance Review Report for All Applicants and Recipients Requesting EPA Financial Assistance"; and 2) Certifications and Representations in Sam.gov or Standard Form 424D, as applicable.

These assurances and this term and condition obligate the recipient to comply fully with applicable civil rights statutes and implementing federal and EPA regulations.

**(a) Statutory Requirements**

**i.** In carrying out this agreement, the recipient must comply with:

**1)** Title VI of the Civil Rights Act of 1964, which prohibits discrimination based on race, color, and national origin, including limited English proficiency (LEP), by entities receiving Federal financial assistance.

**2)** Section 504 of the Rehabilitation Act of 1973, which prohibits discrimination against persons with disabilities by entities receiving Federal financial assistance; and

**3)** The Age Discrimination Act of 1975, which prohibits age discrimination by entities receiving Federal financial assistance.

**ii.** If the recipient is an education program or activity (e.g., school, college, or university) or if the recipient is conducting an education program or activity under this agreement, it must also comply with:

**1)** Title IX of the Education Amendments of 1972, which prohibits discrimination on the basis of sex in education programs and activities operated by entities receiving Federal financial assistance. For further information about your compliance obligations regarding Title IX, see 40 CFR Part 5 and https://www.justice.gov/crt/title-ix

**iii.** If this agreement is funded with financial assistance under the Clean Water Act (CWA), the recipient must also comply with:

**1)** Section 13 of the Federal Water Pollution Control Act Amendments of 1972, which prohibits discrimination on the basis of sex in CWA-funded programs or activities.

**(b) Regulatory Requirements**

**i.** The recipient agrees to comply with all applicable EPA civil rights regulations, including:

1) For Title IX obligations, 40 C.F.R. Part 5; and
2) For Title VI, Section 504, Age Discrimination Act, and Section 13 obligations, 40 CFR Part7.
3) For statutory and national policy requirements, including those prohibiting discrimination and those described in Executive Order 13798 promoting free speech and religious freedom, 2 CFR 200.300.
4) As noted on the EPA Form 4700-4 signed by the recipient's authorized representative, these regulations establish specific requirements including maintaining compliance information, establishing grievance procedures, designating a Civil Rights Coordinator, and providing notices of non-discrimination.

**(c) TITLE VI – LEP, Public Participation and Affirmative Compliance Obligation**

i. As a recipient of EPA financial assistance, you are required by Title VI of the Civil Rights Act to provide meaningful access to LEP individuals. In implementing that requirement, the recipient agrees to use as a guide the Office of Civil Rights (OCR) document entitled "Guidance to Environmental Protection Agency Financial Assistance Recipients Regarding Title VI Prohibition Against National Origin Discrimination Affecting Limited English Proficient Persons." The guidance can be found at: https://www.federalregister.gov/documents/2004/06/25/04-14464/guidance-to-environmental-protection-agency-financial-assistance-recipients-regarding-title-vi.

ii. If the recipient is administering permitting programs under this agreement, the recipient agrees to use as a guide OCR's Title VI Public Involvement Guidance for EPA Assistance Recipients Administering Environmental Permitting Programs. The Guidance can be found at: https://www.govinfo.gov/content/pkg/FR-2006-03-21/pdf/06-2691.pdf.

iii. In accepting this assistance agreement, the recipient acknowledges it has an affirmative obligation to implement effective Title VI compliance programs and ensure that its actions do not involve discriminatory treatment and do not have discriminatory effects even when facially neutral. The recipient must be prepared to demonstrate to EPA that such compliance programs exist and are being implemented or to otherwise demonstrate how it is meeting its Title VI obligations.

**42. Drug-Free Workplace**

The recipient organization of this EPA assistance agreement must make an ongoing, good faith effort to maintain a drug-free workplace pursuant to the specific requirements set forth in Title 2 CFR Part 1536 Subpart B. Additionally, in accordance with these regulations, the recipient organization must identify all known workplaces under its federal awards and keep this information on file during the performance of the award.

Those recipients who are individuals must comply with the drug-free provisions set forth in Title 2 CFR Part 1536 Subpart C.

The consequences for violating this condition are detailed under Title 2 CFR Part 1536 Subpart E. Recipients can access the Code of Federal Regulations (CFR) Title 2 Part 1536 at www.ecfr.gov/.

**43. Hotel-Motel Fire Safety**

Pursuant to USC 2225a, the recipient agrees to ensure that all space for conferences, meetings, conventions, or training seminars funded in whole or in part with federal funds complies with the protection and control guidelines of the Hotel and Motel Fire Safety Act (PL 101-391, as amended). Recipients may search the Hotel-Motel National Master List at https://apps.usfa.fema.gov/hotel/ to see if a property is in compliance, or to find other information about the Act.

**44. Lobbying Restrictions**

a) **This assistance agreement is subject to lobbying restrictions as described below. Applicable to all assistance agreements:**

   i. The chief executive officer of this recipient agency shall ensure that no grant funds awarded under this assistance agreement are used to engage in lobbying of the Federal Government or in litigation against the U.S. unless authorized under existing law. The recipient shall abide by the Cost Principles available at 2 CFR Part 200 which generally prohibits the use of federal grant funds for litigation against the U.S. or for lobbying or other political activities.

   ii. The recipient agrees to comply with Title 40 CFR Part 34, New Restrictions on Lobbying. The recipient shall include the language of this provision in award documents for all subawards exceeding $100,000 and require that subrecipients submit certification and disclosure forms accordingly.

   iii. In accordance with the Byrd Anti-Lobbying Amendment, any recipient who makes a prohibited expenditure under Title 40 CFR Part 34 or fails to file the required certification or lobbying forms shall be subject to a civil penalty of not less than $10,000 and not more than $100,000 for each such expenditure.

   iv. Contracts awarded by a recipient shall contain, when applicable, the anti-lobbying provision as stipulated in the Appendix II to Part 200—Contract Provisions for Non-Federal Entity Contracts Under Federal Awards.

   v. By accepting this award, the recipient affirms that it is not a nonprofit organization described in Section 501(c)(4) of the Internal Revenue Code of 1986 as required by Section 18 of the Lobbying Disclosure Act; or that it is a nonprofit organization described in Section 501(c)(4) of the Code but does not and will not engage in lobbying activities as defined in Section 3 of the Lobbying Disclosure Act. Nonprofit organizations exempt from taxation under section 501(c)(4) of the Internal Revenue Code that engage in lobbying activities are ineligible for EPA subawards.

b) **Applicable to assistance agreements when the amount of the award is over $100,000:**

   i. By accepting this award, the recipient certifies, to the best of its knowledge and belief that:

      1) No Federal appropriated funds have been or will be paid, by or on behalf of the recipient, to any person for influencing or attempting to influence an officer or employee of any agency, a Member of Congress, an officer or employee of Congress, or an employee of a Member of Congress in connection with the awarding of any Federal contract, the making of any Federal grant, the making of any Federal loan,

the entering into of any cooperative agreement, and the extension, continuation, renewal, amendment, or modification of any Federal contract, grant, loan, or cooperative agreement.

**2)** If any funds other than Federal appropriated funds have been paid or will be paid to any person for influencing or attempting to influence an officer or employee of any agency, a Member of Congress, or any employee of a Member of Congress in connection with this Federal grant or cooperative agreement, the recipient shall complete and submit the linked Standard Form -- LLL, "Disclosure Form to Report Lobbying," in accordance with its instructions.

**3)** The recipient shall require that the language of this certification be included in the award documents for all subawards exceeding $100,000 at all tiers (including subcontracts, subgrants, and contracts under grants, loans, and cooperative agreements) and that all subrecipients shall certify and disclose accordingly.

**ii.** This certification is a material representation of fact upon which reliance was placed when this transaction was made or entered into. Submission of this certification is a prerequisite for making or entering into this transaction imposed by Section 1352, Title 31, U.S. Code. Any person who fails to file the required certification shall be subject to a civil penalty of not less than $10,000 and not more than $100,000 for each failure.

**45. Recycled Paper**

When directed to provide paper documents, the recipient agrees to use recycled paper and double-sided printing for all reports which are prepared as a part of this agreement and delivered to EPA. This requirement does not apply to reports prepared on forms supplied by EPA.

**46. Resource Conservation and Recovery Act**

Consistent with goals of section 6002 of RCRA (42 U.S.C. 6962), State and local institutions of higher education, hospitals and non-profit organization recipients agree to give preference in procurement programs to the purchase of specific products containing recycled materials, as identified in 40 CFR Part 247.

Consistent with section 6002 of RCRA (42 U.S.C. 6962) and 2 CFR 200.323, State agencies or agencies of a political subdivision of a State and its contractors are required to purchase certain items made from recycled materials, as identified in 40 CFR Part 247, when the purchase price exceeds $10,000 during the course of a fiscal year or where the quantity of such items acquired in the course of the preceding fiscal year was $10,000 or more. Pursuant to 40 CFR 247.2 (d), the recipient may decide not to procure such items if they are not reasonably available in a reasonable period of time; fail to meet reasonable performance standards; or are only available at an unreasonable price.

**47. Trafficking in Persons**

**a) Provisions applicable to a recipient that is a private entity.**

**i.** The recipient, the recipient's employees, subrecipients under this award, and subrecipients' employees may not –

**1)** Engage in severe forms of trafficking in persons during the period of time that the award is in effect;

**2)** Procure a commercial sex act during the period of time that the award is an effect; or

**3)** Use forced labor in performance of the award or subawards under the award.

**ii.** We as the Federal awarding agency may unilaterally terminate this award, without penalty, if the recipient or a subrecipient that is a private entity –

**1)** Is determined to have violated a prohibition in paragraph a of this award term; or

**2)** Has an employee who is determined by the agency official authorized to terminate the award to have violated a prohibition in paragraph a of this award term through conduct that is either –

**a.** Associated with performance under this award; or

**b.** Imputed to the recipient or subrecipient using the standards and due process for imputing the conduct of an individual to an organization that are provided in 2 CFR Part 180, ‘‘OMB Guidelines to Agencies on Governmentwide Debarment and Suspension (Non- procurement),’’ as implemented by our Agency at 2 CFR Part 1532.

**b) Provision applicable to a recipient other than a private entity.** EPA may unilaterally terminate this award, without penalty, if a subrecipient that is a private entity –

**i.** Is determined to have violated an applicable prohibition in paragraph a. of this award term; or

**ii.** Has an employee who is determined by the agency official authorized to terminate the award to have violated an applicable prohibition in paragraph a of this award term through conduct that is either

**1)** Associated with performance under this award; or

**2)** Imputed to the subrecipient using the standards and due process for imputing the conduct of an individual to an organization that are provided in 2 CFR Part 180, ‘‘OMB Guidelines to Agencies on Governmentwide Debarment and Suspension (Nonprocurement),” as implemented by EPA at 2 CFR Part 1532.

**c) Provisions applicable to any recipient**

**i.** The recipient must inform the EPA immediately of any information received from any source alleging a violation of a prohibition in paragraph a of this award term.

**ii.** Our right to terminate unilaterally that is described in paragraph a and b:

**1)** Implements section 106(g) of the Trafficking Victims Protection Act of 2000 (TVPA), as amended (22 U.S.C. 7104(g)), and

**2)** Is in addition to all other remedies for noncompliance that are available to us under this award.

**iii.** The recipient must include the requirements of paragraph a of this award term in any subaward made to a private entity.

**d) Definitions.** For purposes of this award term:

**i.** “Employee” means either:

**1)** An individual employed by you or a subrecipient who is engaged in the performance of the project or program under this award; or

**2)** Another person engaged in the performance of the project or program under this award and not compensated by you including, but not limited to, a volunteer or individual whose services are contributed by a third party as an in-kind contribution toward cost sharing or matching requirements.

**ii.** "Forced Labor" means labor obtained by any of the following methods: the recruitment, harboring, transportation, provision, or obtaining of a person for labor or services, through the use of force, fraud, or coercion for the purpose of subjection to involuntary servitude, peonage, debt bondage, or slavery.

**iii.** "Private Entity"

**1)** Means any entity other than a State, local government, Indian tribe, or foreign public entity, as those terms are defined in 2 CFR 175.25.

**2)** Includes:

**a.** A nonprofit organization, including any nonprofit institution of higher education, hospital, or tribal organization other than one included in the definition of Indian tribe at 2 CFR 175.25(b).

**b.** A for-profit organization

**iv.** "Severe forms of trafficking in persons," ''commercial sex act,'' and ''coercion'' have the meanings given at section 103 of the TVPA, as amended (22 U.S.C. 7102).

**48. Build America, Buy America – Required Use of American Iron, Steel, Manufactured Products, and Construction Materials (effective October 23, 2023, and forward)**

***Buy America Preference*.** Recipients of an award of Federal financial assistance from a program for infrastructure are hereby notified that none of the funds provided under this award may be used for an infrastructure project unless:

**(1)** All iron and steel used in the project are produced in the United States—this means all manufacturing processes, from the initial melting stage through the application of coatings, occurred in the United States;
**(2)** All manufactured products used in the project are produced in the United States— this means the manufactured product was manufactured in the United States; and the cost of the components of the manufactured product that are mined, produced, or manufactured in the United States is greater than 55 percent of the total cost of all components of the manufactured product, unless another standard that meets or exceeds this standard has been established under applicable law or regulation for determining the minimum amount of domestic content of the manufactured product; and
**(3)** All construction materials are manufactured in the United States—this means that all manufacturing processes for the construction material occurred in the United States. The construction material standards are listed below.

***Incorporation into an infrastructure project.*** The Buy America Preference only applies to articles, materials, and supplies that are consumed in, incorporated into, or affixed to an infrastructure project. As such, it does not apply to tools, equipment, and supplies, such as temporary scaffolding, brought to the construction site and removed at or before the completion of the infrastructure project. Nor does a Buy America Preference apply to equipment and furnishings, such as movable chairs, desks, and portable computer equipment, that are used at or within the finished infrastructure project, but are not an integral part of the structure or permanently affixed to the infrastructure project.

***Categorization of articles, materials, and supplies.*** An article, material, or supply should only be classified into one of the following categories: (i) Iron or steel products; (ii) Manufactured products; (iii) Construction materials; or (iv) Section 70917(c) materials. An article, material, or supply should not be considered to fall into multiple categories. In some cases, an article, material, or supply may not fall under any of the categories listed in this paragraph. The classification of an article, material, or supply as falling into one of the categories listed in this paragraph must be made based on its status at the time it is brought to the work site for incorporation into an infrastructure project. In general, the work site is the location of the infrastructure project at which the iron, steel, manufactured products, and construction materials will be incorporated.

***Application of the Buy America Preference by category.*** An article, material, or supply incorporated into an infrastructure project must meet the Buy America Preference for only the single category in which it is classified.

***Determining the cost of components for manufactured products***. In determining whether the cost of components for manufactured products is greater than 55 percent of the total cost of all components, use the following instructions:

> **(a)** For components purchased by the manufacturer, the acquisition cost, including transportation costs to the place of incorporation into the manufactured product (whether or not such costs are paid to a domestic firm), and any applicable duty (whether or not a duty-free entry certificate is issued); or
> **(b)** For components manufactured by the manufacturer, all costs associated with the manufacture of the component, including transportation costs as described in paragraph (a), plus allocable overhead costs, but excluding profit. Cost of components does not include any costs associated with the manufacture of the manufactured product.

***Construction material standards.*** The Buy America Preference applies to the following construction materials incorporated into infrastructure projects. Each construction material is followed by a standard for the material to be considered "produced in the United States." Except as specifically provided, only a single standard should be applied to a single construction material.

**(1)** Non-ferrous metals. All manufacturing processes, from initial smelting or melting through final shaping, coating, and assembly, occurred in the United States.
**(2)** Plastic and polymer-based products. All manufacturing processes, from initial combination of constituent plastic or polymer-based inputs, or, where applicable, constituent composite materials, until the item is in its final form, occurred in the United States.
**(3)** Glass. All manufacturing processes, from initial batching and melting of raw materials through annealing, cooling, and cutting, occurred in the United States.
**(4)** Fiber optic cable (including drop cable). All manufacturing processes, from the initial ribboning (if applicable), through buffering, fiber stranding and jacketing, occurred in the United States. All manufacturing processes also include the standards for glass and optical fiber, but not for non-ferrous metals, plastic and polymer-based products, or any others.
**(5)** Optical fiber. All manufacturing processes, from the initial preform fabrication stage through the completion of the draw, occurred in the United States.
**(6)** Lumber. All manufacturing processes, from initial debarking through treatment and planing, occurred in the United States.
**(7)** Drywall. All manufacturing processes, from initial blending of mined or synthetic gypsum plaster and additives through cutting and drying of sandwiched panels, occurred in the United States.
**(8)** Engineered wood. All manufacturing processes from the initial combination of constituent materials until the wood product is in its final form, occurred in the United States.

***Waivers.*** When supported by rationale provided in IIJA §70914, the recipient may submit a waiver request in writing to EPA. Recipients should request guidance on the submission instructions of an EPA waiver request from the EPA Project Officer for this agreement. A list of approved EPA waivers (general applicability and project specific) is available on the EPA Build America, Buy America website.

EPA may waive the application of the Buy America Preference when it has determined that one of the following exceptions applies:
**(1)** applying the Buy America Preference would be inconsistent with the public interest;
**(2)** the types of iron, steel, manufactured products, or construction materials are not produced in the United States in sufficient and reasonably available quantities or of a satisfactory quality; or
**(3)** the inclusion of iron, steel, manufactured products, or construction materials produced in the United States will increase the cost of the overall project by more than 25 percent.

For questions regarding the Build America, Buy America Act requirements for this assistance agreement or to determine if there is an approved waiver in place, please contact the EPA Project Officer for this agreement.

***Definitions.*** For legal definitions and sourcing requirements, the recipient must consult the EPA Build America, Buy America website, 2 CFR Part 184, and the Office of Management and Budget's (OMB)

Memorandum M-24-02 Implementation Guidance on Application of Buy America Preference in Federal Financial Assistance Programs for Infrastructure.

**49. Required Certifications and Consequences of Fraud**

Per 2 CFR 200.415(a) Required Certifications, to assure that expenditures are proper and in accordance with the terms and conditions of the Federal award and approved project budgets, the financial reports or vouchers requesting payment under the agreement will include a certification that must be signed by an official who is authorized to legally bind the recipient which reads as follows:

"By signing this report, I certify to the best of my knowledge and belief that the report is true, complete, and accurate, and the expenditures, disbursements and cash receipts are for the purposes and objectives set forth in the terms and conditions of the Federal award. I am aware that any false, fictitious, or fraudulent information, or the omission of any material fact, may subject me to criminal, civil or administrative penalties for fraud, false statements, false claims or otherwise. (U.S. Code Title 18, Section 1001 and Title 31, Sections 3729-3730 and 3801-3812)."

**50. Reporting Waste, Fraud and Abuse**

Consistent 2 CFR 200.113, the recipient and any subrecipients must report, in a timely manner, any violations of Federal criminal law involving fraud, bribery, or gratuity violations potentially affecting this award to the EPA Project Officer and the EPA Office of Inspector General (OIG) Hotline. The methods to contact the OIG hotline are (1) online submission via the EPA OIG Hotline Complaint Form; (2) email to OIG_Hotline@epa.gov; (3) phone 1-888-546-8740; or (4) mail directed to Environmental Protection Agency, Office of Inspector General, 1200 Pennsylvania Avenue, N.W. (2410T), Washington, DC 20460.

To support awareness of the OIG hotline, recipients and/or subrecipients receiving an EPA award or subaward of $1,000,000 or more must display EPA OIG Hotline posters in facilities where the work is performed under the grant. EPA OIG Hotline posters may be downloaded or printed or may be obtained by contacting the OIG at 1- 888-546-8740. Recipients and subrecipients need not comply with this requirement if they have established a mechanism, such as a hotline, by which employees may report suspected instances of improper conduct and have provided instructions that encourage employees to make such reports.

**51. Whistleblower Protections**

This award is subject is to whistleblower protections, including the protections established at 41 U.S.C. 4712 providing that an employee of the recipient or a subrecipient may not be discharged, demoted, or otherwise discriminated against as a reprisal for disclosing to a covered person or body information that the employee reasonably believes is evidence of gross mismanagement of a Federal grant or subaward, a gross waste of Federal funds, an abuse of authority relating to a Federal grant or subaward, a substantial and specific danger to public health or safety, or a violation

of law, rule, or regulation related to a Federal grant or subaward. These covered persons or bodies include:

- **a.** A member of Congress or representative of a committee of Congress.
- **b.** An Inspector General.
- **c.** The Government Accountability Office.
- **d.** A Federal employee responsible for contract or grant oversight or management at the relevant agency.
- **e.** An authorized official of the Department of Justice or other law enforcement agency.
- **f.** A court of grand jury.
- **g.** A management official or other employee of the contractor, subcontractor, or grantee who has the responsibility to investigate, discover, or address misconduct.

Consistent with 41 U.S.C. 4712(d), the recipient and subrecipients shall inform their employees in writing, in the predominant language of the workforce or organization, of employee whistleblower rights and protections under 41 U.S.C. 4712. Additional information about whistleblower protections, including protections for such employees may be found at the EPA Office of Inspector General's Whistleblower Protection page.

**52. Access to Records**

In accordance with 2 CFR 200.337, EPA and the EPA Office of Inspector General (OIG) have the right to access any documents, papers, or other records, including electronic records, of the recipient and subrecipient which are pertinent to this award in order to make audits, examinations, excerpts, and transcripts. This right of access also includes timely and reasonable access to the recipient and subrecipient's personnel for the purpose of interview and discussion related to such documents. This right of access shall continue as long as the records are retained.

# EXHIBIT 2

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
(Northern Division)

**GREEN & HEALTH HOMES INITIATIVE, INC., ET AL.** *

Plaintiffs, *

v. *

**ENVIRONMENTAL PROTECTION AGENCY, ET AL.** *

Case No.:

Defendants. *

* * * * * * * * * * * *

**Declaration of R.T. Rybak**
**President & Chief Executive Officer**
**The Minneapolis Foundation**

R.T. Rybak declares as follows:

1. I am the President and Chief Executive Officer of the Minneapolis Foundation. The Minneapolis Foundation is a Minnesota nonprofit corporation that is tax-exempt as a public charity described in Section 501(c)(3) of the Internal Revenue Code. It is organized and operated exclusively for charitable and other tax-exempt purposes.

2. As President and Chief Executive Officer, I hold leadership responsibility and ultimate accountability for the strategic direction of the Minneapolis Foundation and its grantmaking and programmatic activities. Since mid-2023, the Minneapolis Foundation has been involved with the Environmental Protection Agency's ("EPA") Thriving Community Grantmaking Program (the "Program" or "Thriving Communities Program").

3. As originally conceived by EPA, the Thriving Communities Program provided funding to regional grantmakers through two separate grants; an "initial" grant, and a "subsequent" grant. On June 24, 2024, the Minneapolis Foundation received its initial $8 million grant (the "initial grant"). [Attachment A.] As described further below, this initial grant was intended to fund the Minneapolis Foundation and its partner organizations in their efforts to develop a comprehensive process for making sub-grants as part of the administration of the Thriving Communities Program in EPA Region 5. This included funding the development of the procedures associated with the application, review and approval of the applications, and ongoing supervision of subawards. On September 30, 2024, the Minneapolis Foundation was awarded a $42 million "subsequent grant" which was intended to fund both disbursements to subrecipients as well as the Minneapolis Foundation's continuing administration of the Thriving Communities Program (the "subsequent grant"). [Attachment B.] On December 20, 2024, the EPA amended this grant, increasing the Minneapolis Foundation's funding by $10 million, and the total subsequent grant award funding to $52 million. [Attachment C.] As a result of this amendment, the Minneapolis Foundation was awarded two grants with combined funding of $60 million.

4. On February 21, 2025, the Minneapolis Foundation received an unexpected and unfounded notice of termination of its Thriving Communities Program $8 million initial grant award from the EPA. On or before March 9, 2025, the EPA suspended access to the subsequent grant account without notice, leaving the Minneapolis Foundation with no ability to access these funds for disbursements to subrecipients in fulfillment of the Thriving Communities Program.

5. I have personal knowledge of the matters set forth in this declaration or have knowledge of the matters based on my review of information and records gathered by my staff at my direction.

6. I am providing this declaration to explain the irreparable harms and adverse effects to the Minneapolis Foundation resulting from the termination of the $8 million initial grant, along with the suspension of access to the $52 million grant account. As detailed in this declaration, this harm will be immediate and irreparable to the Minneapolis Foundation's staffing, reputation, and collaborating partners. It will also irreparably harm the Minneapolis Foundation's ability to fulfill its obligations under the Thriving Community Program as originally conceived, resulting in further harm to the communities the Thriving Communities Program was originally intended to serve.

7. The Minneapolis Foundation was established in 1915, and has over a century of experience responding to community needs and administering charitable grantmaking programs. In furtherance of its charitable purposes, the Minneapolis Foundation engages in activities that include, but are not limited to, administering charitable grantmaking programs, providing technical assistance to small nonprofit organizations, and convening funders and community members to address emerging and ongoing community needs. The Minneapolis Foundation solicits and accepts contributions from individuals as well as grants from private and public sources that are used to directly further its charitable programs and positively impact the community.

8. In June 2023, the Minneapolis Foundation applied to serve as a "regional grantmaker" in response to the EPA's Request for Proposals for the Thriving Communities Program. As part of this application, the Minneapolis Foundation coordinated with the EPA to develop a workplan and budget that aligned with the requirements and objectives of the Thriving Communities Program. The Minneapolis Foundation was subsequently selected by the EPA as the regional grantmaker for EPA Region 5, which is comprised of Illinois, Indiana, Michigan,

Minnesota, Ohio, Wisconsin, and 37 federally recognized Tribes throughout the Great Lakes Region. As envisioned by the EPA, the Thriving Communities Program was designed to promote fairness in the allocation of federal dollars, ensuring that communities have access to federal funds to address issues related to public health, safety, and environmental remediation.

9. The Minneapolis Foundation was awarded the $8 million initial grant from the EPA on June 24, 2024. The purpose of this initial grant was to support the administrative work necessary to develop, operate, manage, and oversee an intermediary grantmaking program. The EPA designated these initial funds to support the hiring of staff, outreach to community-based organizations concerning the Thriving Communities Program, the development and administration of a sub-grant application process in EPA Region 5, as well as to provide technical assistance and initial oversight to subrecipients. These grants were to cover work performed by the Minneapolis Foundation for a three-year period. Consistent with its workplan for the $8 million initial grant, the Minneapolis Foundation has taken substantial steps to undertake the administration of the initial grant, including:

a. Cultivating a skilled team of staff to manage the Thriving Communities Program. Specifically, the Minneapolis Foundation employed 26 full- or part-time positions allocated to the Thriving Communities Program located across Illinois, Michigan, Minnesota, and Wisconsin. These staff and independent contractors are located across EPA Region 5 and perform a variety of roles supporting the grant program, including on the advisory and review committees, communications teams, compliance functions, evaluations, finance and grants administration, information technology, outreach services, program management and oversight, and technical assistance teams for subrecipients.

b. Establishing the Collaborative for the Great Lakes Thriving Communities Grantmaking Program ("the Collaborative"), a cohort of partner organizations that are working with the Minneapolis Foundation to streamline the application and reporting procedures and efficiently manage the grantmaking process. Each organization has a significant track record of making impactful grants to small community-based organizations across EPA Region 5.

c. Recruiting local community leaders to join advisory boards to join its Regional Advisory Committee to guide plans for outreach to prospective applicants and inform how technical assistance support is provided to applicants and subrecipients, as well as to assist with finalizing the grant application process, decision-making criteria, and reporting requirements for grantees. Their primary role is to review and recommend grants for funding.

d. Engaging in frequent and extensive communications with EPA officials regarding the development of this intermediary grantmaking program, particularly with regard to programmatic milestones and materials.

e. Monitoring and responding to questions from prospective applicants, which are submitted by email, phone, or through the grantmaking portal. Frequently, questions require time to investigate by researching what is allowable under the terms of the grant or the applicable laws or regulations.

f. Working with the EPA and other experts to host webinars and office hours for prospective applicants and recipients.

g. Developing and updating public-facing materials for the website (e.g., sample budgets, frequently asked questions, tutorial documents, etc.), and connecting

prospective applicants with other resources like the Thriving Communities Technical Assistance Centers or separate state and local support networks.

h. Coordinating with the EPA and receiving pre-approval on public communications, emergency information collection review forms, contracts with partner organizations, conflict of interest checks with regional advisory committee members, and quality assurance plans and processes.

10. The Minneapolis Foundation was awarded the $52 million subsequent grant for the purpose of disbursing up to $48 million in federal funding, targeting rural communities, urban centers, and tribal communities across Illinois, Indiana, Michigan, Minnesota, Ohio, Wisconsin, and 37 federally recognized Tribes throughout the Great Lakes Region. The goal of this grantmaking is to elevate community-led innovation and strengthen community-based groups by breaking down obstacles to federal funding. Projects funded through the Thriving Communities Program could include, but are not limited to, small local cleanups, local preparedness for environmental disasters, environmental workforce development programs for local jobs, air quality and asthma related projects, healthy homes programs, efforts to increase access to affordable and healthy food, and projects addressing illegal dumping.

11. Since receiving the initial and subsequent grant, representatives from the Minneapolis Foundation met with the EPA Region 5 EPA Project Officer more than twenty times to discuss the Thriving Communities Program, covering topics that included, but were certainly not limited to, record retention, reporting requirements, EPA technical support available to subrecipients, human subject research protocols, capacity building for subrecipients, permitted expenses, and the structure of sub-grants under the Program. Minneapolis Foundation staff members also attended weekly office hours with representatives from the EPA headquarters,

engaging in conversations with other regional grantmakers and EPA officials on issues such as structuring awards and developing internal processes and partnerships to provide technical assistance on issues such as quality assurance and human subject research. Collectively, these EPA interactions account for hundreds of hours of Minneapolis Foundation staff time. The EPA was continuously involved in providing support and feedback and shaping the grantmaking program that was being developed by the Minneapolis Foundation.

12. In October 2024, the Minneapolis Foundation's assigned EPA Project Officer attended the first day of a two-day retreat that was organized by the Minneapolis Foundation and its statutory partners to discuss program objectives, operational components of the grantmaking process, programmatic requirements, and a shared vision for the work. During this retreat, the EPA Project Officer expressed support for the Program and answered questions from the Minneapolis Foundation and its partners on grantmaking requirements and procedures.

13. Beginning on February 4, 2025, the Minneapolis Foundation became aware that it was suddenly, and without warning, notice or explanation, cut off from its access to the Automated Standard Application for Payments or "ASAP" account from the $8 million initial grant. The Minneapolis Foundation was unable to access the funds as the account status was noted as "suspended." The Minneapolis Foundation immediately notified its EPA Region 5 Program Officer and requested urgent reinstatement of its ASAP account.

14. On February 7, 2025, the Minneapolis Foundation's initial grant funds and access to its ASAP account was reinstated. The suspension was back in place on February 11, 2025, and once again the Minneapolis Foundation notified its EPA Project Officer.

15. On February 21, 2025, the Minneapolis Foundation was notified via receipt of a grant amendment that the $8 million initial grant had been terminated. The Minneapolis

Foundation also received a February 21, 2025 memorandum from its EPA Award Official formally notifying the Minneapolis Foundation of the termination. Among other things, the memorandum stated that the grant was being terminated in accordance with 2 CFR 200.340(a)(2) because "the award no longer effectuates the program goals or agency priorities. The objectives of the award are no longer consistent with EPA funding priorities." Specifically, EPA asserted that the grant "provides funding for programs that promote or take part in DEI initiatives or environmental justice initiatives or other initiatives that conflict with the Agency's policy of prioritizing merit, fairness, and excellence in performing our statutory functions; that are not free from fraud, abuse, waste, or duplication; or that otherwise fail to serve the best interests of the United States." [Attachment D.]

16. On March 5, 2025, the Minneapolis Foundation requested recission of its initial grant termination based on the February 21, 2025, U.S. District Court for the District of Maryland ruling blocking such action in *Nat'l Ass'n of Diversity Officers in Higher Education v. Trump*. [Attachment E.]

17. On March 18, 2025, the Minneapolis Foundation requested a 30-day extension of time to file a Dispute to the Termination. [Attachment F.] This extension request was granted by the EPA on March 19, 2025. [Attachment G.]

18. On March 9 and March 11, 2025, when attempting to draw down funds from the subsequent $52 million grant through the ASAP system, the Minneapolis Foundation was unable to access this account and received a system notification indicating that the account was suspended. [Attachment H.] Access has remained suspended during each attempt to draw down funds from ASAP since then, including on the date of this declaration. [Attachment I.] With the $8 million initial grant terminated and access to the $52 million subsequent grant suspended, in

effect the Minneapolis Foundation has no access to any of its legally obligated Thriving Community Program grant funds.

19. Despite the termination of the initial grant and suspension of access to the subsequent grant, EPA has continued to provide support and make approvals associated with the Minneapolis Foundation's administration of the Thriving Communities Program. Specifically, the EPA Region 5 Program Officer attended the Minneapolis Foundation's subrecipient office hours to discuss grant requirements on March 19, 2025. EPA provided further guidance and approval of the Minneapolis Foundation's quality assurance plan, subaward templates, and human subject research review process. Following termination of the initial grant, EPA also approved a modification to the workplan and budget for the subsequent award on March 21, 2025, further highlighting EPA's continued support for the Thriving Communities Program and the Minneapolis Foundation's role in administering these grants.

20. The termination of the $8 million initial grant and account suspension for the $52 million subsequent grant has materially impeded the Minneapolis Foundation's ability to move forward with the Thriving Communities Program and to make awards in response to the hundreds of communities that have requested financial assistance under the Program by submitting applications to the Minneapolis Foundation. It will irreparably harm the Minneapolis Foundation and its ability to fulfill its obligations under the Thriving Community Program as originally conceived, resulting in further harm to the communities the Thriving Communities Program was originally intended to serve.

21. The termination of the initial grant and the suspension of access to the subsequent account will cause irreparable harm to the Minneapolis Foundation and its staff. Without reinstatement of the initial grant and access to the $52 million, the Minneapolis Foundation will

no longer have funding for the 26 individuals who are employed by the Minneapolis Foundation and its statutory partners in locations across Illinois, Michigan, Minnesota, and Wisconsin to directly administer the Thriving Communities Program. These employees and independent contractors perform a variety of roles supporting the Program, including communications, compliance functions, evaluations, finance and grants administration, information technology, outreach services, program management and oversight, and technical assistance for subrecipients. The Minneapolis Foundation has already advanced approximately $300,000 of its own funds to support staffing while access to the grants has been suspended. After another three weeks of suspension, continuation of the current staffing structure will not be financially viable.

22. Losing such a significant number of staff members will likely cause reputational damage to the Minneapolis Foundation and will make it more difficult to hire staff in the future. Many staff members working under the Thriving Communities Program have spent months gaining familiarity with the program and EPA requirements, while also building trust with potential applicants, applicants, subrecipients, and program partners. Staff are highly skilled individuals that would be difficult to replace, particularly if they seek positions that do not involve federal funding streams subject to termination uncertainty. Any attempts to rehire these staff members would require significant time and expenses, both for the Minneapolis Foundation and for the staff members themselves. Resource constraints and competition across the nonprofit sector make it particularly difficult and burdensome to hire and retain qualified staff and consultants, even under the best conditions. Losing a significant number of staff members at once due to the grant termination or lack of access to the grant accounts would make the process of hiring top talent even more difficult going forward, jeopardizing our organization's ability to effectively carry out our mission.

23. The terminations of essential positions fully funded by the initial grant – such as the program director, finance associate, grants associate, and outreach directors – would make it impossible for the Thriving Communities Program to continue. The Minneapolis Foundation has received over 300 requests for technical assistance from applicants that represent nonprofits, local governments, academia, and Tribal governments. Without grant funding to support trained and experienced staff and independent consultants to provide technical assistance, prospective applicants will not be able to successfully apply for and manage federal grant dollars under the Thriving Communities Program. Additionally, the process of re-hiring and onboarding staff would likely take at least two (and up to four) months, significantly delaying the ability to manage and operationalize the subsequent grant. This process would also place a substantial burden on our Senior Vice President of Impact, Grants Administration team, and Finance team, impeding those team members from continuing their other critical work in service of our organization.

24. The termination of the initial grant and the suspension of access to the subsequent account will cause irreparable harm to Minneapolis Foundation's statutory partners in the Collaborative. These partner organizations have undertaken obligations to support the administration of the Thriving Communities Program. This includes dedicating staff and resources to the program, for which there is no other source for reimbursable costs, and for which these partner organizations bear the burden of these financial obligations. The Minneapolis Foundation's statutory partners were included in its competitive application to serve as the EPA Region 5 grantmaker and have been identified with particularity in the Minneapolis Foundation's plans, budgets, and reports submitted to and approved by the EPA. These statutory partners are critical to the success of the Thriving Communities Program in EPA Region 5. The

initial grant award includes pass-through funding to these organizations totaling over $4.5 million to support their staff in helping design the grantmaking program and application process, leading community outreach, and providing technical assistance to applicants. The Minneapolis Foundation cannot fulfill its obligation to these statutory partners without access to the grant funds.

25. As a result of the grant termination and the suspension of access to the grant accounts, the Minneapolis Foundation has already directed its statutory partners not to conduct travel or enter into any new contracts related to providing technical assistance for the Program. These statutory partners are vital to conducting outreach to all types of communities and delivering responsive and effective assistance to applicants, so the Minneapolis Foundation has strived to keep their work going temporarily with its own dollars, but this is not a viable long-term solution, and it will need to discontinue all such funding within three weeks if the grant funding is not promptly reinstated.

26. The termination of the initial grant and the suspension of access to the subsequent account will cause irreparable harm to the Minneapolis Foundation's reputation in the community and among charitable nonprofits more broadly. The Minneapolis Foundation is 110 years old and represents a trusted financial resource and community partner in Minneapolis. It plays a significant role in the community by pooling funds from individuals, corporations, and governmental entities to distribute grants, loans, and investments towards the betterment of the communities it serves. The Minneapolis Foundation's fundholder assets account for approximately 75% of its current assets, and it is fortunate to have experienced significant asset growth in recent years. However, any grant termination would make it more difficult to secure future contributions from donors, given the specter of uncertainty raised by such a substantial

loss in funding and questions that may arise from the perception that it was not able to successfully accomplish the originally funded program, as originally publicized in the community. The disruption of the grantmaking program could also adversely impact the Minneapolis Foundation's reputation as a trusted and competent grantmaker, if it were unable to fulfill its obligations under the Thriving Communities Program.

27. The termination of the initial grant and the suspension of access to the subsequent account will cause irreparable harm to the Minneapolis Foundation's ability to administer the Thriving Communities Program as originally intended. The initial $8 million was designed, in part, to provide the Minneapolis Foundation with the funds needed to provide capacity building assistance to subrecipients so they have the skills and support needed to administer funded projects in a manner that adheres to the complex requirements associated with receipt and use of federal funds. The termination of the initial grant and the continued suspension of the Minneapolis Foundation's access to the subsequent grant account will severely limit its ability to deliver this technical assistance and support.

28. Providing this grantmaking support is particularly crucial to the success of the Program. This assistance takes several forms, including monitoring and responding to questions from prospective applicants, working with EPA and other experts to host webinars and office hours, developing and updating public-facing materials for the Program website (e.g., sample budgets, frequently asked questions, tutorial videos and documents, etc.), and connecting prospective applicants with other resources like the Thriving Communities Technical Assistance Centers or separate state and local support networks.

29. Requests from prospective applicants and subrecipients have run the gamut, ranging from questions about how to register for and acquire Unique Entity Identifier numbers

for the federal System for Award Management, how to meet budget formatting and reporting requirements, how to comply with EPA guidelines regarding construction-related activities, and other areas related to accessing and managing federal funds. The Minneapolis Foundation's technical assistance and capacity-building efforts aid subrecipients in effectively carrying out their projects, providing long-lasting, significant benefits to the communities they serve.

30. The termination of the initial grant and the suspension of access to the subsequent account will cause irreparable harm to the communities that would have received funding from the Minneapolis Foundation pursuant to the Thriving Communities Program. The Minneapolis Foundation has already received more than 515 applications from prospective subrecipients that are seeking funding for community projects. These community organizations have invested time and resources to compete for and secure federal funding through the Thriving Communities Program. In total, the Minneapolis Foundation anticipates that it will award over 200 subawards, providing support to communities in Illinois, Indiana, Michigan, Minnesota, Ohio, Wisconsin, and 37 federally recognized Tribes throughout the Great Lakes Region. As of the date of the declaration, there are over 40 subrecipients that are ready to receive federal funding as soon as access is made available. Every day of delay harms their ability to do the work and provide direct benefits to their community.

31. For example, the Minneapolis Foundation plans to award approximately $350,000 to support wastewater treatment processes in two small rural Appalachian communities in Ohio, each with populations of less than 500. This grant would support the use of a fixed-film wastewater treatment processes that will eliminate the use of blowers common in many treatment processes, aiding these communities in leveraging the same land footprint for wastewater treatment as will be used for energy production itself. The modest energy demand for the pumps

can be efficiently served by grid-tied solar panels, meaning the project also would involve an environmental job training component by way of a solar installer course.

32. These small rural communities lack experience managing federal infrastructure projects and will require technical assistance to effectively implement their projects, including support with budgeting and complying with federal grant requirements. The $8 million initial grant allows the Minneapolis Foundation to ensure that these communities have the technical capacity to successfully implement the Thriving Communities Program, while also building the capacity of these communities to efficiently manage private and public grant funds in the future.

33. Other subrecipients are slated to receive funding to perform vital, urgent projects necessary to ensure public health and safety. For example, the Minneapolis Foundation also plans to award approximately $350,000 to a rural, federally recognized tribe to clean up an unregulated dump site in Michigan posing public health concerns such as downgradient drinking water wells and exposure to contaminated materials. Site assessments show a perched, contaminated aquifer within the dump, which could be breached as the dump site erodes further. The grant funding is intended to provide access to heavy equipment to begin the removal of exposed hazardous materials constituting an immediate public health threat, allowing the tribe to clean up the dump site and ultimately gain approval for future housing developments in the area, catalyzing significant economic and community benefits over the long term.

34. It is necessary that communities safely, efficiently, and thoroughly manage projects related to contaminated dump sites, given the potential long-term and downstream effects associated with dangerous levels of pollution. Whether by offering guidelines to comply with federal reporting requirements or protocols for complying with EPA construction-related

guidelines, the Minneapolis Foundation's technical assistance and grant administration processes directly support these goals.

35. The anticipated sub-grants will provide critical resources and infrastructure to communities, especially rural communities, and it is essential that sub-grant performance succeed. The $8 million initial grant provides the necessary financial resources to the Minneapolis Foundation so that it can, in turn, assist and support the subrecipients as required. Absent this support, many of the communities targeted under the Thriving Communities Program may ultimately be denied the critical resources envisioned by the sub-grants because they cannot comply with the burdensome requirements associated with the receipt and administration of federal funds. A loss of access to the ASAP account for the $52 million subsequent grant puts a freeze on the entire Thriving Communities Program, depriving these communities from the federal funding they need to accomplish these critical projects that will improve public health and address environmental issues.

36. As described in this declaration, the termination of the $8 million initial grant and the continued suspension of access to the grant accounts will prevent the Minneapolis Foundation from fulfilling its charitable mission and the purpose of the Thriving Communities Program. Not only will the Minneapolis Foundation be irreparably harmed, but so too will the communities that would have received grants to support public health and environmental projects.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on April 2, 2025

R.T. Rybak

# Attachment A

| U.S. ENVIRONMENTAL PROTECTION AGENCY<br>Cooperative Agreement | GRANT NUMBER (FAIN): 00E03682<br>MODIFICATION NUMBER: 0<br>PROGRAM CODE: 5N | DATE OF AWARD<br>06/24/2024 |
|---|---|---|
| | TYPE OF ACTION<br>New | MAILING DATE<br>06/27/2024 |
| | PAYMENT METHOD:<br>ASAP | ACH#<br>PEND |

| RECIPIENT TYPE:<br>Not for Profit | Send Payment Request to:<br>Contact EPA RTPFC at: rtpfc-grants@epa.gov |
|---|---|
| **RECIPIENT:** | **PAYEE:** |
| MINNEAPOLIS FOUNDATION<br>80 S 8TH ST 800 IDS CENTER<br>MINNEAPOLIS, MN 55402<br>**EIN:** 41-6029402 | MINNEAPOLIS FOUNDATION<br>80 S 8TH STREET 800 IDS Center<br>Minneapolis, MN 55402 |

| PROJECT MANAGER | EPA PROJECT OFFICER | EPA GRANT SPECIALIST |
|---|---|---|
| Jo-Anne Stately<br>80 S EIGHTH ST 800 IDS CENTER<br>MINNEAPOLIS, MN 55402<br>**Email:** jstately@mplsfoundation.org<br>**Phone:** 612-672-3878 | Cristina Presmanes<br>77 West Jackson Blvd., RM-19J<br>Chicago, IL 60604-3507<br>**Email:** Presmanes.Cristina@epa.gov<br>**Phone:** 312-353-8205 | Mauricio Lobato<br>Assistance Section, MA-10J<br>77 West Jackson Blvd.<br>Chicago, IL 60604-3507<br>**Email:** lobato.mauricio@epa.gov<br>**Phone:** 312-353-2515 |

**PROJECT TITLE AND DESCRIPTION**

The Minneapolis Foundation TCGM Grant 1

See Attachment 1 for project description.

| BUDGET PERIOD | PROJECT PERIOD | TOTAL BUDGET PERIOD COST | TOTAL PROJECT PERIOD COST |
|---|---|---|---|
| 04/01/2024 - 03/31/2027 | 04/01/2024 - 03/31/2027 | $ 8,000,000.00 | $ 8,000,000.00 |

## NOTICE OF AWARD

Based on your Application dated 05/02/2024 including all modifications and amendments, the United States acting by and through the US Environmental Protection Agency (EPA) hereby awards $ 8,000,000.00. EPA agrees to cost-share 100.00% of all approved budget period costs incurred, up to and not exceeding total federal funding of $ 8,000,000.00. Recipient's signature is not required on this agreement. The recipient demonstrates its commitment to carry out this award by either: 1) drawing down funds within 21 days after the EPA award or amendment mailing date; or 2) not filing a notice of disagreement with the award terms and conditions within 21 days after the EPA award or amendment mailing date. If the recipient disagrees with the terms and conditions specified in this award, the authorized representative of the recipient must furnish a notice of disagreement to the EPA Award Official within 21 days after the EPA award or amendment mailing date. In case of disagreement, and until the disagreement is resolved, the recipient should not draw down on the funds provided by this award/amendment, and any costs incurred by the recipient are at its own risk. This agreement is subject to applicable EPA regulatory and statutory provisions, all terms and conditions of this agreement and any attachments.

| ISSUING OFFICE (GRANTS MANAGEMENT OFFICE) | AWARD APPROVAL OFFICE |
|---|---|
| **ORGANIZATION / ADDRESS** | **ORGANIZATION / ADDRESS** |
| U.S. EPA, Region 5, U.S. EPA Region 5<br>Mail Code MCG10J 77 West Jackson Blvd.<br>Chicago, IL 60604-3507 | U.S. EPA, Region 5, Office of Environmental Justice, Community Health, and Environmental Review Division<br>OEJECR - Office of Environmental Justice and External Civil Rights<br>77 West Jackson Blvd., R-19J<br>Chicago, IL 60604-3507 |

**THE UNITED STATES OF AMERICA BY THE U.S. ENVIRONMENTAL PROTECTION AGENCY**

| Digital signature | DATE |
|---|---|
| **Digital signature applied by EPA Award Official for** Sheila Dolan - Manager, Acquisition and Assistance Branch<br>**by** Robert Fields - Award Official Delegate | 06/24/2024 |

# EPA Funding Information

| FUNDS | FORMER AWARD | THIS ACTION | AMENDED TOTAL |
|---|---|---|---|
| EPA Amount This Action | $ 0 | $ 8,000,000 | $ 8,000,000 |
| EPA In-Kind Amount | $ 0 | $ 0 | $ 0 |
| Unexpended Prior Year Balance | $ 0 | $ 0 | $ 0 |
| Other Federal Funds | $ 0 | $ 0 | $ 0 |
| Recipient Contribution | $ 0 | $ 0 | $ 0 |
| State Contribution | $ 0 | $ 0 | $ 0 |
| Local Contribution | $ 0 | $ 0 | $ 0 |
| Other Contribution | $ 0 | $ 0 | $ 0 |
| Allowable Project Cost | $ 0 | $ 8,000,000 | $ 8,000,000 |

| Assistance Program (CFDA) | Statutory Authority | Regulatory Authority |
|---|---|---|
| 66.615 - Environmental Justice Thriving Communities Grantmaking Program (EJ TCGM) | Clean Air Act: Sec. 138 | 2 CFR 200, 2 CFR 1500 and 40 CFR 33 |

**Fiscal**

| Site Name | Req No | FY | Approp. Code | Budget Organization | PRC | Object Class | Site/Project | Cost Organization | Obligation / Deobligation |
|---|---|---|---|---|---|---|---|---|---|
| - | 24124WB193 | 2226 | BSF5 | WF | 000W57XK1 | 4183 | - | - | $ 8,000,000 |
| | | | | | | | | | $ 8,000,000 |

Budget Summary Page

| Table A - Object Class Category (Non-Construction) | Total Approved Allowable Budget Period Cost |
|---|---|
| 1. Personnel | $ 2,959,368 |
| 2. Fringe Benefits | $ 887,810 |
| 3. Travel | $ 172,701 |
| 4. Equipment | $ 0 |
| 5. Supplies | $ 40,360 |
| 6. Contractual | $ 1,578,842 |
| 7. Construction | $ 0 |
| 8. Other | $ 1,800,000 |
| 9. Total Direct Charges | $ 7,439,081 |
| 10. Indirect Costs: 0.00 % Base See Table B | $ 560,919 |
| 11. Total (Share: Recipient 0.00 % Federal 100.00 %) | $ 8,000,000 |
| 12. Total Approved Assistance Amount | $ 8,000,000 |
| 13. Program Income | $ 0 |
| 14. Total EPA Amount Awarded This Action | $ 8,000,000 |
| 15. Total EPA Amount Awarded To Date | $ 8,000,000 |

Table B Budget Worksheet #1

| Table B - Program Element Classification (Non-construction) | Total Approved Allowable Budget Period Cost |
|---|---|
| 1. 4/1/2024 - 3/31/2027 - 10% De Minimis Rate - Modified Total Direct Costs. | $ 0 |
| 2. | $ 0 |
| 3. | $ 0 |
| 4. | $ 0 |
| 5. | $ 0 |
| 6. | $ 0 |
| 7. | $ 0 |
| 8. | $ 0 |
| 9. | $ 0 |
| 10. | $ 0 |
| 11. Total (Share: Recip % Fed %) | $ 0 |
| 12. Total Approved Assistance Amount | $ 0 |

## Attachment 1 - Project Description

This agreement provides funding under the Inflation Reduction Act (IRA) to The Minneapolis Foundation. This is a Regional Grantmaker. The Minneapolis Foundation, partnered along with the NDN Collective, will institute a grantmaking program within the Region 5 states. This award will be used to develop the administrative and programmatic strength needed to award over 200 grants within Region 5, targeting areas such as rural communities, urban centers and tribal communities.

The Minneapolis Foundation will develop a Quality Management Plan, create an application to support the grantmaking program, train their statutory partner on EPA requirements, identify and recruit 10 Regional Community Advisory Committee (RAC) members, and perform outreach in their targeted communities using these funds. The Minneapolis Foundation will use the money associated with this award to build up their grant making capacity and to cover administrative costs associated with grantmaking for the next three years.

The activities in the Initial Award Phase include partnering with the NDN collective and using The Minneapolis Foundation's projects (Midwest EJ Network and RE-AMP) to outreach specific communities in tribal governments, urban EJ areas and rural/remote EJ areas. Additionally, The Minneapolis Foundation and their partners will recruit 10 resident advisory committee consultants to help draft the request for funding and review applications. These 10 RAC consultants will be recruited throughout Region 5 and be comprised of individuals from different community organizations, local communities and other partnership types. RAC members along with The Minneapolis Foundation and NDN Collective will work collaboratively to create and review applications addressing the specific needs of disadvantaged communities within the Region 5 states. Various partners have experience with participatory governance and The Minneapolis Foundation will expand on those relationships through their collaboration with other community organizations. The anticipated deliverables include developing an online platform for collecting applications and reporting, training statutory partners in Quality Assurance, monitoring type and amount of outreach in different community types, keeping application decisions no more than 5 months from application submission, and monitoring applicant satisfaction with the application process.

The expected outcomes include short term outcomes such as increasing the number of disadvantaged community residents that have knowledge and skills about engaging in EJ, public health or climate change issues in their communities, increasing the number of disadvantaged community members with reliable access to environmental data and increasing grass-root led collaborations and partnerships working to improved environmental quality and public health in disadvantaged communities. Intermediate outcomes include increasing the number of communities that have capacity to collect, analyze and share environmental data, reduce public exposure to toxins and pollutants in areas that were restores or cleaned up and increased number of CBOs with increased capacity in terms of funding, staff and skills. Long term outcomes include increased access to healthy and affordable drinking water, improved resiliency in disadvantaged communities as related to climate impacts such as urban heat island effects and flooding and improved health outcomes from improved access to healthy foods.

The intended beneficiaries include local communities, grass-root CBOs and disadvantaged communities.

NDN Collective will collaboratively oversee and monitor all aspects of program implementation, paying particular attention to compliance with EPA and federal requirements along with the Minneapolis Foundation. Using a consensus decision-making model, NDN Collective and the Minneapolis Foundation will identify RAC members, participate in RAC meetings as non-voting participants, and oversee implementation of RAC decisions and recommendations. This partnership will also serve as decision

makers for administrative decisions that need to be made on an immediate basis. Additionally, NDN collective provides critical knowledge of Indigenous practice, customs and knowledge to support targeted outreach to tribal communities.

# Administrative Conditions

## General Terms and Conditions

The recipient agrees to comply with the current EPA general terms and conditions available at: https://www.epa.gov/grants/epa-general-terms-and-conditions-effective-october-1-2023-or-later.

These terms and conditions are in addition to the assurances and certifications made as a part of the award and the terms, conditions, or restrictions cited throughout the award.

The EPA repository for the general terms and conditions by year can be found at: https://www.epa.gov/grants/grant-terms-and-conditions#general.

## A. Correspondence Condition

The terms and conditions of this agreement require the submittal of reports, specific requests for approval, or notifications to EPA. Unless otherwise noted, all such correspondence should be sent to the following email addresses:

- Federal Financial Reports (SF-425): rtpfc-grants@epa.gov and lobato.mauricio@epa.gov
- MBE/WBE reports (EPA Form 5700-52A): region5closeouts@epa.gov **and Mauricio Lobato at** lobato.mauricio@epa.gov
- All other forms/certifications/assurances, Indirect Cost Rate Agreements, Requests for Extensions of the Budget and Project Period, Amendment Requests, Requests for other Prior Approvals, updates to recipient information (including email addresses, changes in contact information or changes in authorized representatives) and other notifications: **Cristina Presmanes at** presmanes.cristina@epa.gov **and Mauricio Lobato at** lobato.mauricio@epa.gov
- Payment requests (if applicable): **Cristina Presmanes at** presmanes.cristina@epa.gov
- Quality Assurance documents, workplan revisions, equipment lists, programmatic reports and deliverables: **Cristina Presmanes at** presmanes.cristina@epa.gov

## B. Pre-award Costs

In accordance with 2 CFR 1500.9, the grantee may charge pre-award costs (both Federal and non-Federal matching shares) incurred from **4/1/2024** to the actual award date provided that such costs were contained in the approved application and all costs are incurred within the approved budget period.

## C. New Recipient Training Requirement

The recipient agrees to complete the EPA Grants Management Training for Applicants and Recipients and the How to Develop a Budget training within 90 calendar days of the date of award of this agreement. The recipient must notify the Grant Specialist via email when the required training is complete. For additional information on this training requirement, the recipient should refer to RAIN-2024-G01.

# Programmatic Conditions

**Environmental Justice Thriving Communities Grantmaking (TCGM) Program Cooperative Agreement Terms and Conditions**

## A. PERFORMANCE REPORTING AND FINAL PERFORMANCE REPORT

**Performance Reports – Content**

In accordance with 2 CFR 200.329, the recipient agrees to submit performance reports that include brief information on each of the following areas: 1) A comparison of actual accomplishments to the outputs/outcomes established in the assistance agreement work plan for the period; 2) The reasons why established outputs/outcomes were not met; and 3) other pertinent information, including, when appropriate, analysis and explanation of cost overruns or high unit costs. This description may include overall best practices and/or lessons learned over the project performance period, and attachments and links for materials that may be helpful to other Environmental Grants recipients or similar organizations (e.g., tip sheets, "how-to" sheets, communication materials, outreach materials, web tools, etc).

These reports shall cover work status, work progress, difficulties encountered, preliminary data results and a statement of activity anticipated during the subsequent reporting period, including a description of equipment, techniques, and materials to be used or evaluated. A discussion of expenditures along with a comparison of the percentage of the project completed to the project schedule and an explanation of significant discrepancies shall be included in the report. The report shall also include any changes of key personnel concerned with the project.

Additionally, the recipient agrees to inform EPA as soon as possible about problems, delays, or adverse conditions that which will materially impair the ability to meet the outputs/outcomes specified in the assistance agreement work plan.

**Performance Reports - Frequency**

The recipient agrees to submit quarterly performance reports electronically to the EPA Project Officer within 30 days after the reporting period (every three months). The reporting periods are ***April 1, 2024 – June 30, 2024; July 1, 2024 – September 30, 2024; October 1 2024 – December 31, 2024; January 1, 2025 – March 31, 2025; April 1, 2025 – June 30, 2025; July 1, 2025 – September 30, 2025; October 1, 2025 – December 31, 2025; January 1, 2026 – March 31, 2026.***

The recipient must submit the final performance report no later than 120 calendar days after the end date of the period of performance. The final report shall document project activities over the entire project period.

**Subaward Performance Reporting**

The recipient must report on its subaward monitoring activities under 2 CFR 200.332(d). Examples of items that must be reported if the pass-through entity has the information available are:

1. Summaries financial and programmatic reports.

2. Summaries of findings from site visits and/or desk reviews to ensure effective subrecipient

performance.

3. Environmental results the subrecipient achieved, including a narrative discussion of impacts of program on improvement of environmental conditions in the target community.

4. Summaries of audit findings and related pass-through-entity management decisions.

5. Any disagreements or potential challenges with subrecipients that may interfere with the completion of subgrant performance, and actions the pass-through entity has taken to mitigate them.

6. Actions the pass-through entity has taken to correct deficiencies such as those specified at 2 CFR 200.332(e), 2 CFR 200.208 and the 2 CFR Part 200.339 Remedies for Noncompliance.

7. Summaries of collaborative governance activities and impacts with communities, project partners, and Technical Assistance providers (TCTACs, contractors, etc.) including outreach, engagement, and implementation of feedback.

8. Summaries of capacity building activities for severely capacity constrained communities.

9. Summaries of reach in underserved communities, communities in urban, remote and rural areas, and community stakeholders with the highest degree of burden and capacity constraints throughout the entire Geographic Area.

### B. EJ Grant Recipient Workshops (Virtual and/or In-Person)

All EJTCGM recipients will be required to attend at least one EJ Grantee training workshop hosted by your EPA Region. These trainings will assist all current EPA EJ grant recipients with strategic planning and project management of their cooperative agreements, as well as afford recipients opportunities to learn from their peers and other experts. Recipients will need to identify at least one authorized official to participate. Virtual workshops will utilize webinar technology that can be accessed via personal computer. A conference call line will be available for any recipient who does not have the technical capability (i.e. slow internet connection) to access the webinar. Your EPA Project Officer will keep you informed of the dates of the workshops. Each EPA Regional Office will tailor their workshop agenda to the environmental needs and priorities of workshop participants and local communities in the region. Workshops may include a mix of current and former EJ grant recipients, local community stakeholders, other EPA and federal program personnel, and other attendees. Workshop attendees will come together to provide perspective, insight, and lessons learned regarding environmental justice issues plaguing their communities and ways to address them. Recipients will need to identify at least one authorized representative to participate. Recipients are permitted to use awarded funds to pay for travel to the workshops.

### C. Review and Oversight

1. Products - The recipient agrees that any product (e.g., publication, outreach materials, training manuals) produced through this assistance agreement and made available for public view must be first reviewed by the EPA Project Officer for comment before release. The recipient shall make all final decisions on the product content.

2. Monthly Calls - The recipient shall consult with the EPA Project Officer on a monthly basis to obtain

input on program activities and products produced. However, the recipient should make all final decisions on project implementation and product content. It is at the EPA Project Officer's discretion to determine any change to the frequency with which calls are held.

3. Prior Approval - Any proposed changes to the project must be submitted in writing to the EPA Project Officer and Grant Specialist for EPA approval prior to implementation. The recipient incurs costs at its own risk if it fails to obtain written approval before implementing any changes.

## D. Post-Project Period Follow-up and Engagement

For no less than one year after completion of the project, the recipient agrees to periodically update its designated EPA Project Officer on current community-based and environmental justice work the recipient is performing and how/if that work relates to its now completed EJTCGM project. These periodic updates may include (but are not limited to) recent local media reports, additional grant funding received, new initiatives, and developing partnerships. The EPA EJ Grants program is invested in the long-term success of each EJ Grant recipient and its long-term impact on addressing the disproportionate environmental and public health impacts plaguing their communities. These post-project period updates allow the EJ Grants program to provide past recipients with additional guidance about applicable funding opportunities, potential collaborations, and technical assistance that may assist recipients in their future work.* The periodic updates also allow the program to track best practices that lead to greater project sustainability and long-term community revitalization for impacted community residents. The frequency of these periodic updates will be by mutual agreement and will be discussed with the recipient before the end of the project period. Recipients are also encouraged to continue providing updates and engaging with their EPA Project Officers beyond the additional year after the end of the project.

*NOTE – Compliance with this term & condition will not give the recipient priority during future EPA EJ grant competitions and is not a guarantee for future EPA grant funding. Additionally, the recipient agrees not to submit a claim for compensation to EPA for providing these updates.

## E. Cybersecurity Condition

### Cybersecurity Grant Condition for Other Recipients, Including Intertribal Consortia

(a) The recipient agrees that when collecting and managing environmental data under this assistance agreement, it will protect the data by following all applicable State or Tribal law cybersecurity requirements.

(b) (1) EPA must ensure that any connections between the recipient's network or information system and EPA networks used by the recipient to transfer data under this agreement, are secure. For purposes of this Section, a connection is defined as a dedicated persistent interface between an Agency IT system and an external IT system for the purpose of transferring information. Transitory, user-controlled connections such as website browsing are excluded from this definition.

If the recipient's connections as defined above do not go through the Environmental Information Exchange Network or EPA's Central Data Exchange, the recipient agrees to contact the EPA Project Officer (PO) no later than 90 days after the date of this award and work with the designated Regional/Headquarters Information Security Officer to ensure that the connections meet EPA security requirements, including entering into Interconnection Service Agreements as appropriate. This condition does not apply to manual entry of data by the recipient into systems operated and used by EPA's

regulatory programs for the submission of reporting and/or compliance data.

(2) The recipient agrees that any subawards it makes under this agreement will require the subrecipient to comply with the requirements in (b)(1) if the subrecipient's network or information system is connected to EPA networks to transfer data to the Agency using systems other than the Environmental Information Exchange Network or EPA's Central Data Exchange. The recipient will be in compliance with this condition: by including this requirement in subaward agreements; and during subrecipient monitoring deemed necessary by the recipient under 2 CFR 200.332(d), by inquiring whether the subrecipient has contacted the EPA Project Officer. Nothing in this condition requires the recipient to contact the EPA Project Officer on behalf of a subrecipient or to be involved in the negotiation of an Interconnection Service Agreement between the subrecipient and EPA.

## F. Competency Policy

### Competency of Organizations Generating Environmental Measurement Data

In accordance with Agency Policy Directive Number FEM-2012-02, Policy to Assure the Competency of Organizations Generating Environmental Measurement Data under Agency-Funded Assistance Agreements,

Recipient agrees, by entering into this agreement, that it has demonstrated competency prior to award, or alternatively, where a pre-award demonstration of competency is not practicable, Recipient agrees to demonstrate competency prior to carrying out any activities under the award involving the generation or use of environmental data. Recipient shall maintain competency for the duration of the project period of this agreement and this will be documented during the annual reporting process. A copy of the Policy is available online at https://www.epa.gov/sites/production/files/2015-03/documents/competency-policy-aaia-new.pdf or a copy may also be requested by contacting the EPA Project Officer for this award.

## G. Procurement Terms and Conditions

**The recipient agrees to conduct all procurement actions under this assistance agreement in accordance with the procurement standards set forth in Title 2 CFR, Parts 200.317 through 200.327, 2 CFR Part 1500 and 40 CFR Part 33. EPA provides additional guidance on complying with these requirements in the Best Practice Guide for Procuring Services, Supplies, and Equipment Under EPA Assistance Agreements which is available at https://www.epa.gov/grants/best-practice-guide-procuring-services-supplies-and-equipment-under-epa-assistance. Any costs incurred by the recipient under contracts and/or small purchases that EPA determines to be in noncompliance with EPA procurement standards shall be unallowable for Federal reimbursement.**

**As provided by 2 CFR 200.310 recipients must ensure that subrecipients acquire insurance to protect against loss, damage and theft if a subaward includes cost for equipment. Costs for such insurance are allowable under this agreement.**

## H. Quality Assurance

Authority: Quality Assurance applies to all assistance agreements involving environmental information as defined in 2 C.F.R. § 1500.12 Quality Assurance.

The recipient shall ensure that subawards involving environmental information issued under this

agreement include appropriate quality requirements for the work. The recipient shall ensure sub-award recipients develop and implement the Quality Assurance (QA) planning documentation in accordance with this term and condition; and/or ensure sub-award recipients implement all applicable approved QA planning documents. **In consultation with your Project Officer and the Regional Quality Assurance Manager, select the appropriate plan based on the following options to implement in the Subsequent Award:**

**NOTE: The following selections are example plans to be determined before the Subsequent Award is made.**

**1. Quality Management Plan (QMP)**

a. Prior to beginning environmental information operations, the recipient must:

Option 1

i. Develop a QMP,

ii. Prepare the QMP in accordance with the current version of EPA's Quality Management Plan (QMP) Standard. Submit the document for EPA review,

Iii. Complete required training for approving QAPPs in collaboration with the region or in place of the region, and

iv. Obtain EPA Quality Assurance Manager or designee (hereafter referred to as QAM) approval.

b. The recipient must submit the QMP within [30] days after grant award, and/or no more than [ 90] days after grant award.

c. The recipient must review their approved QMP at least annually. These documented reviews shall be made available to the sponsoring EPA organization if requested. When necessary, the recipient shall revise its QMP to incorporate minor changes and notify the EPA PO and QAM of the changes. If significant changes have been made to the Quality Program that affect the performance of environmental information operations, it may be necessary to re-submit the entire QMP for re-approval. In general, a copy of any QMP revision(s) made during the year should be submitted to the EPA PO and QAM in writing when such changes occur. Conditions requiring the revision and resubmittal of an approved QMP can be found in section 6 of EPA's Quality Management Plan (QMP) Standard.

**For Reference:**

• Quality Management Plan (QMP) Standard and EPA's Quality Assurance Project Plan (QAPP) Standard; contain quality specifications for EPA and non-EPA organizations and definitions applicable to these terms and conditions.

• EPA QA/G-5: *Guidance for Quality Assurance Project Plans*.

• EPA's Quality Program website has a list of QA managers, and Non-EPA Organizations Quality Specifications.

• The Office of Grants and Debarment Implementation of Quality Assurance Requirements for Organizations Receiving EPA Financial Assistance.

### I. Use of Logos

If the EPA logo is appearing along with logos from other participating entities on websites, outreach materials, or reports, it must **not** be prominently displayed to imply that any of the recipient or subrecipient's activities are being conducted by the EPA. Instead, the EPA logo should be accompanied with a statement indicating that The Minneapolis Foundation received financial support from the EPA under an Assistance Agreement. More information is available at: https://www.epa.gov/stylebook/using-epa-seal-and-logo#policy

### J. Paperwork Reduction Act

The scope of work for this cooperative agreement includes a survey or other information collection of identical information from 10 or more parties. As provided by 5 CFR 1320.3(d), EPA is a sponsor of the information collection for purposes of obtaining approval from the Office of Management and Budget for collecting information. The recipient agrees to assist EPA in complying with OMB procedures at 5 CFR Part 1320 for obtaining Information Collection Request authorization. The recipient may not collect information until EPA obtains OMB approval. The Project Officer will advise the recipient when information collection may begin.

### K. Substantial Involvement

EPA will be substantially involved in this agreement. Substantial involvement by the EPA Project Officer may include:

1.) Monthly telephone calls and other monitoring,

2.) Reviewing project phases and providing approval to continue to the next phase,

3.) Reviewing and commenting on any documents, web content, or other materials developed under this agreement (the recipient will make final decisions on these matters),

4.) Approving substantive terms included in contracts or subawards (EPA's Project Officer will not suggest, recommend or direct the recipient to select any particular contractor or subrecipient except to the extent permitted in Section 10 of EPA's Subaward Policy).

5.) Reviewing and commenting on the programmatic progress reports.

6.) Consultation regarding the selection of key personnel (EPA's involvement is limited to reviewing the technical qualifications of key personnel and the recipient will make the final decisions on selection. EPA's Project Officer will not suggest, recommend or direct the recipient to select any individual).

7.) Collaboration with EPA on designing and implementing a project management process, which includes quality project oversight for funding subrecipients and a tracking and reporting process that reduces reporting burden on community recipients.

8.) Collaboration on the preliminary design of the subaward competition, the submission and evaluation process, and the development of evaluation criteria. However, final decisions on the submission, evaluation process/criteria, and selection of subrecipients will be made by the recipient, rather than by EPA, provided statutory, regulatory, and EPA's Subaward Policy requirements are met.

9.) EPA Project Officer must review and approve the subaward agreements with any Collaborating Entities that will assist in the direct development and implementation of the EJ Thriving Communities Subgrants program, including subawards to other nonprofits (non-Community Based Organizations), units of government, institutions of higher education, and/or medical service providers not covered by a statutory partnership to assist the Grantmaker by creating a local subaward competition or outreach to local communities.

10.) In addition to the requirements in EPA's General Term and Condition "Disclosing Conflict of Interests," the recipient must submit a Conflict-of-Interest (COI) plan for approval by EPA's Project Officer for preventing, neutralizing, or mitigating conflicts of interest that may arise within the participatory governance framework of the project. The plan should describe controls for ensuring that representatives of community-based nonprofit organizations involved in the design and decision-making for the subawards program do not have relationships with organizations competing for subawards or receiving noncompetitive funding that create actual or apparent conflicts of interest. Example participatory governance activities could include advisory bodies composed of community-based nonprofit organizations that oversee and provide thought partnership on the development of the subaward process.

11.) Joint operational involvement, participation, and/or collaboration between EPA and the recipient.

12.) Review of proposed procurements in accordance with the Procurement Standards in 2 CFR Part 200.

13.) EPA staff participation in monitoring performance and/or providing technical support for subrecipients that require additional technical assistance to meet project and/or workplan deliverables.

14.) Joint operational involvement, participation, and/or collaboration between EPA and the recipient.

**L. Initial Award Statutory Partnership Agreements -**

**Note: Letters of Commitment submitted with the application needed to be finalized prior to the submission of the Subsequent Award.**

Statutory Partnerships (SP): EPA requires that applicants selected for funding consideration provide copies of the executed final statutory partnership agreement to EPA's Project Officer for submission to the EPA Award Official prior to Subsequent Award.

Partnering community-based organizations who submitted a signed Letter of Commitment during the application phase, as a policy matter, must also at a minimum specify their roles and responsibilities as a statutory partner (direct recipient and subrecipient) in the overall project, and finalize role and financial commitment from the direct recipient before receiving EPA funds. The statutory partnership agreement must be signed by both parties and specify which member of the partnership will enter into the assistance agreement with EPA for the purposes of accountability for the proper expenditure of federal funds, performance of the assistance agreement, liability for claims for recovery of unallowable costs

incurred under the agreement and must specify roles in performing the proposed scope of work for the assistance agreement. Executed Statutory Partnership Agreements will be submitted to EPA's Project Officer, the EPA Grants Management Officer or the EPA Award Official will issue written notification that this condition has been satisfied and that the recipient is authorized to draw down TCGM funds for the Initial Award in accordance with the standards described in the EPA General Term and Condition for the Automated Standard Application Payments (ASAP) and Proper Payment Draw Down during the initial award.

# Attachment B

# U.S. ENVIRONMENTAL PROTECTION AGENCY

## Cooperative Agreement

| | |
|---|---|
| GRANT NUMBER (FAIN): 01E03682<br>MODIFICATION NUMBER: 0<br>PROGRAM CODE: 5N | DATE OF AWARD<br>09/30/2024 |
| TYPE OF ACTION<br>New | MAILING DATE<br>10/03/2024 |
| PAYMENT METHOD:<br>ASAP | ACH#<br>51232 |

| | |
|---|---|
| **RECIPIENT TYPE:**<br>Not for Profit | **Send Payment Request to:**<br>Contact EPA RTPFC at: rtpfc-grants@epa.gov |
| **RECIPIENT:** | **PAYEE:** |
| MINNEAPOLIS FOUNDATION<br>800 IDS CENTER 80 S 8TH ST<br>MINNEAPOLIS, MN 55402<br>**EIN:** 41-6029402 | MINNEAPOLIS FOUNDATION<br>80 S 8TH STREET 800 IDS Center<br>Minneapolis, MN 55402 |

| PROJECT MANAGER | EPA PROJECT OFFICER | EPA GRANT SPECIALIST |
|---|---|---|
| Jo-Anne Stately<br>80 S. 8th Street<br>800 IDS Center<br>Minneapolis, MN 55402-2100<br>**Email:** jstately@mplsfoundation.org<br>**Phone:** 612-672-3878 | Cristina Presmanes<br>77 West Jackson Blvd., RM-19J<br>Chicago, IL 60604-3507<br>**Email:** Presmanes.Cristina@epa.gov<br>**Phone:** 312-353-8205 | Mauricio Lobato<br>Assistance Section, MA-10J<br>77 West Jackson Blvd.<br>Chicago, IL 60604-3507<br>**Email:** lobato.mauricio@epa.gov<br>**Phone:** 312-353-2515 |

**PROJECT TITLE AND DESCRIPTION**

Grantmaker - Subsequent Award

See Attachment 1 for project description.

| BUDGET PERIOD | PROJECT PERIOD | TOTAL BUDGET PERIOD COST | TOTAL PROJECT PERIOD COST |
|---|---|---|---|
| 10/01/2024 - 09/30/2027 | 10/01/2024 - 09/30/2027 | $ 42,000,000.00 | $ 42,000,000.00 |

## NOTICE OF AWARD

Based on your Application dated 08/09/2024 including all modifications and amendments, the United States acting by and through the US Environmental Protection Agency (EPA) hereby awards $ 42,000,000.00. EPA agrees to cost-share 100.00% of all approved budget period costs incurred, up to and not exceeding total federal funding of $ 42,000,000.00. Recipient's signature is not required on this agreement. The recipient demonstrates its commitment to carry out this award by either: 1) drawing down funds within 21 days after the EPA award or amendment mailing date; or 2) not filing a notice of disagreement with the award terms and conditions within 21 days after the EPA award or amendment mailing date. If the recipient disagrees with the terms and conditions specified in this award, the authorized representative of the recipient must furnish a notice of disagreement to the EPA Award Official within 21 days after the EPA award or amendment mailing date. In case of disagreement, and until the disagreement is resolved, the recipient should not draw down on the funds provided by this award/amendment, and any costs incurred by the recipient are at its own risk. This agreement is subject to applicable EPA regulatory and statutory provisions, all terms and conditions of this agreement and any attachments.

| ISSUING OFFICE (GRANTS MANAGEMENT OFFICE) | AWARD APPROVAL OFFICE |
|---|---|
| **ORGANIZATION / ADDRESS** | **ORGANIZATION / ADDRESS** |
| U.S. EPA, Region 5, U.S. EPA Region 5<br>Mail Code MCG10J 77 West Jackson Blvd.<br>Chicago, IL 60604-3507 | U.S. EPA, Region 5, Office of Environmental Justice, Community Health, and Environmental Review Division<br>R5 - Region 5<br>77 West Jackson Blvd., R-19J<br>Chicago, IL 60604-3507 |

**THE UNITED STATES OF AMERICA BY THE U.S. ENVIRONMENTAL PROTECTION AGENCY**

| | |
|---|---|
| **Digital signature applied by EPA Award Official for** Sheila Dolan - Manager, Acquisition and Assistance Branch<br>**by** Robert Fields - Award Official Delegate | DATE<br>09/30/2024 |

# EPA Funding Information

| FUNDS | FORMER AWARD | THIS ACTION | AMENDED TOTAL |
|---|---|---|---|
| EPA Amount This Action | $ 0 | $ 42,000,000 | $ 42,000,000 |
| EPA In-Kind Amount | $ 0 | $ 0 | $ 0 |
| Unexpended Prior Year Balance | $ 0 | $ 0 | $ 0 |
| Other Federal Funds | $ 0 | $ 0 | $ 0 |
| Recipient Contribution | $ 0 | $ 0 | $ 0 |
| State Contribution | $ 0 | $ 0 | $ 0 |
| Local Contribution | $ 0 | $ 0 | $ 0 |
| Other Contribution | $ 0 | $ 0 | $ 0 |
| Allowable Project Cost | $ 0 | $ 42,000,000 | $ 42,000,000 |

| Assistance Program (CFDA) | Statutory Authority | Regulatory Authority |
|---|---|---|
| 66.615 - Environmental Justice Thriving Communities Grantmaking Program (EJ TCGM) | Clean Air Act: Sec. 138 | 2 CFR 200, 2 CFR 1500 and 40 CFR 33 |

**Fiscal**

| Site Name | Req No | FY | Approp. Code | Budget Organization | PRC | Object Class | Site/Project | Cost Organization | Obligation / Deobligation |
|---|---|---|---|---|---|---|---|---|---|
| - | 24124WB249 | 2226 | BSF5 | WF | 000W57XK1 | 4140 | - | - | $ 42,000,000 |
| | | | | | | | | | $ 42,000,000 |

Budget Summary Page

| Table A - Object Class Category (Non-Construction) | Total Approved Allowable Budget Period Cost |
|---|---|
| 1. Personnel | $ 440,212 |
| 2. Fringe Benefits | $ 132,063 |
| 3. Travel | $ 0 |
| 4. Equipment | $ 0 |
| 5. Supplies | $ 0 |
| 6. Contractual | $ 987,763 |
| 7. Construction | $ 0 |
| 8. Other | $ 40,000,000 |
| 9. Total Direct Charges | $ 41,560,038 |
| 10. Indirect Costs: 0.00 % Base See Table B | $ 439,962 |
| 11. Total (Share: Recipient 0.00 % Federal 100.00 %) | $ 42,000,000 |
| 12. Total Approved Assistance Amount | $ 42,000,000 |
| 13. Program Income | $ 0 |
| 14. Total EPA Amount Awarded This Action | $ 42,000,000 |
| 15. Total EPA Amount Awarded To Date | $ 42,000,000 |

Table B Budget Worksheet #1

| Table B - Program Element Classification (Non-construction) | Total Approved Allowable Budget Period Cost |
|---|---|
| 1. 10/1/2024 - 9/30/2027 - 10% De Minimis Rate - Modified Total Direct Costs. | $ 0 |
| 2. | $ 0 |
| 3. | $ 0 |
| 4. | $ 0 |
| 5. | $ 0 |
| 6. | $ 0 |
| 7. | $ 0 |
| 8. | $ 0 |
| 9. | $ 0 |
| 10. | $ 0 |
| 11. Total (Share: Recip % Fed %) | $ 0 |
| 12. Total Approved Assistance Amount | $ 0 |

# Attachment 1 - Project Description

This agreement provides funding under the Inflation Reduction Act (IRA) to The Minneapolis Foundation. The recipient is Regional Grantmaker. The Minneapolis Foundation will work with their partner, the NDN Collective, to redistribute $40 million in grant funding to communities within Region 5. They anticipate awarding 206 grants over the project period with 30% of awards allocated to tribes and indigenous groups, 25% to rural and remote Environmental Justice (EJ) communities, and 45% to urban EJ Communities. The additional $2 million in funding will be used for operating costs such as administrative costs, hiring contractual support and other overhead. Additionally, a portion of this $2 million will be allocated for personnel to support the subawardees as project officers, where their assigned tasks will include acting as liaisons between the EPA PO and the subawardee, conducting routine check-ins and closeouts of awarded grants. The purpose of this award is to fund the subsequent award for the pass-through entity The Minneapolis Foundation.

The activities in the Subsequent Award Phase include reviewing and finalizing an application for tier 1 (competitive and noncompetitive), tier 2 and tier 3 awards; providing specific contractual support to adhere to EPA requirements for Quality Assurance and Human Subjects Research; providing outreach to target communities so they are aware of funding opportunities; monitoring each of the estimated 206 awards to assure compliance with the Thriving Communities Grantmaking Program; and conducting a virtual townhall meeting to solicit feedback on the program. The Great Lakes Grantmaking Program (Comprised of the Minneapolis Foundation and their partner, NDN Collective) intends to use the allocated funds to open applications during the month of October, 2024. Prior to the start of their grantmaking program, they intend to have a draft version of their Quality Management Plan (QMP) submitted to the Regional Quality Assurance Manager, as well as versions of the Conflict of Interest forms and cap amount award policy. Currently, their workplan includes the definitions they will be using to differentiate the three award tiers under this program as well as their definition for severely capacity constrained.

The anticipated deliverables for the subsequent award only, include awarding an estimated 206 subgrants through this grant program. Current goals include that 30% of these awards go to tribal and indigenous communities; 25% to rural and remote environmental justice communities (with populations less than 50,000); and 45% of awards to urban environmental justice communities (with populations over 50,000). It is anticipated that year one will have 83 subgrants awarded across all tiers, year two will have 85 subgrants awarded across all tiers, and year three will have 38 subgrants awarded across tiers I and II. Year three will exclude tier III grants due to the strict IRA timeline for the Thriving Communities Grantmaking Program.

The expected outcomes include increased community awareness of key environmental justice issues; increased numbers of disadvantaged community members who have access to reliable data; increased number of communities with access to a cleaner environment; increases in grass-root let collaborations and partnerships focused on environmental quality; decreasing the energy burden for individual community members; increasing the capacity and number of community based organizations; increasing community capacity to collect, analyze and share environmental data; reducing cumulative impacts on disadvantaged communities through improvements in local policy making, permitting, siting and other community-led decision; reduced public exposures to various toxins or pollutions; and improved areas for various community and wildlife use.

The intended beneficiaries include tribal and indigenous communities; rural and remote communities; urban communities; local residents of disadvantaged communities; smaller CBOs in need of capacity

building; and local governments in disadvantaged communities. Disadvantaged communities are defined by the IRA disadvantaged communities map. Subawards will be given across three grant tiers, for a total estimate of 206 subawards. The intent is to distribute them 30% to indigenous and Tribal communities, 25% to Rural and Remote Environmental Justice Communities, and 45% to Urban environmental justice communities. Subgrants will be awarded in one of three tiers, either competitively or noncompetitively, depending on the capacity of the organization and the type of grant.

Tier 1 grants will be assessment grants, covering topics such as air, water and soil data collection as well as other assessment types of activities. Tier 2 grants will be planning grants, focused on planning, partnership agreements and other similar activities. Tier 3 grants will be project development grants, including activities such as gathering work permits and implementing project plans.

Current estimated award distribution by tier and year include:

Year 1: 83 awards, Tier 1 (competitive): 20 awards, Tier 1 (noncompetitive): 18 awards, Tier 2: 26 awards, Tier 3: 19 awards

Year 2: 85 awards, Tier 1 (competitive): 20 awards, Tier 1 (noncompetitive): 18 awards, Tier 2: 27 awards, Tier 3: 20 awards

Year 3: 38 awards, Tier 1 (competitive): 21 awards, Tier 1 (noncompetitive): 18 awards, Tier 2: 21 awards, Tier 3: 0 awards

# Administrative Conditions

## General Terms and Conditions

The recipient agrees to comply with the current EPA general terms and conditions available at: https://www.epa.gov/grants/epa-general-terms-and-conditions-effective-october-1-2023-or-later.

These terms and conditions are in addition to the assurances and certifications made as a part of the award and the terms, conditions, or restrictions cited throughout the award.

The EPA repository for the general terms and conditions by year can be found at: https://www.epa.gov/grants/grant-terms-and-conditions#general.

## A. Correspondence Condition

The terms and conditions of this agreement require the submittal of reports, specific requests for approval, or notifications to EPA. Unless otherwise noted, all such correspondence should be sent to the following email addresses:

- Federal Financial Reports (SF-425): rtpfc-grants@epa.gov and lobato.mauricio@epa.gov
- MBE/WBE reports (EPA Form 5700-52A): region5closeouts@epa.gov **and Mauricio Lobato at** lobato.mauricio@epa.gov
- All other forms/certifications/assurances, Indirect Cost Rate Agreements, Requests for Extensions of the Budget and Project Period, Amendment Requests, Requests for other Prior Approvals, updates to recipient information (including email addresses, changes in contact information or changes in authorized representatives) and other notifications: **Cristina Presmanes at** presmanes.cristina@epa.gov **and Mauricio Lobato at** lobato.mauricio@epa.gov
- Payment requests (if applicable): **Cristina Presmanes at** presmanes.cristina@epa.gov
- Quality Assurance documents, workplan revisions, equipment lists, programmatic reports and deliverables: **Cristina Presmanes at** presmanes.cristina@epa.gov

## Programmatic Conditions

**Environmental Justice Thriving Communities Grantmaking (TCGM) Program Cooperative Agreement Terms and Conditions - SUBSEQUENT AWARD**

### A. Eligibility Requirements for Subgrants

Subgrant eligibility

Grantmakers have flexibility to determine certain priorities for eligible subrecipients and activities that best meet the needs of their respective regions, in consultation with EPA. However, eligibility must fall within the following statutory and policy parameters:

Eligible Subrecipients are as follows:

- Nonprofit organizations
- Community-based and grassroots nonprofit organizations
- Philanthropic and civic organizations with nonprofit status
- Tribal governments (both federally recognized and state-recognized) and intertribal consortia (i. e., a partnership between two or more tribes that work together to achieve a common objective.)
- Native American Organizations (includes Indian groups, cooperatives, nonprofit corporations, partnerships, and associations that have the authority to enter into legally binding agreements)
- Local governments (as defined by 2 CFR 200.1 – includes cities, towns, municipalities, and counties, public housing authorities and councils of government)
- Institutions of higher education (e.g., private and public universities and colleges, including community colleges)
- Puerto Rico
- US Territories

Ineligible Subrecipients include:

- Individuals
- For-profit businesses, unless EPA's Award Official makes an exception based on factors such as those described in Appendix A of EPA's Subaward Policy.
- State governments
- Foreign entities of concern.

The term “foreign entity of concern” means a foreign entity that is—

(A) designated as a foreign terrorist organization by the Secretary of State under section 1189(a) of Title 8;

(B) included on the list of specially designated nationals and blocked persons maintained by the Office of Foreign Assets Control of the Department of the Treasury (commonly known as the “SDN list”);

(C) owned by, controlled by, or subject to the jurisdiction or direction of a government of a foreign country that is a covered nation (as defined in section 4872(d)(2) of Title 10); or

(D) alleged by the Attorney General to have been involved in activities for which a conviction was obtained under (i) chapter 37 of title 18 (commonly known as the “Espionage Act”); (ii) section 951 or 1030 of title 18; (iii) chapter 90 of title 18 (commonly known as the “Economic Espionage Act of 1996”); (iv) the Arms Export Control Act ( 22 U.S.C. 2751 et seq.); (v) section 224, 225, 226, 227, or 236 of the Atomic Energy Act of 1954 ( 42 U.S.C. 2274 , 2275, 2276, 2277, and 2284); (vi) the Export Control Reform Act of 2018 ( 50 U.S.C. 4801 et seq.); or (vii) the International Emergency Economic Powers Act ( 50 U.S.C. 1701 et seq.).

Eligible Beneficiaries

As required by Clean Air Act Section 138 (CAA 138), codified at 42 U.S.C. 7438, activities carried out by the Grantmaker or funded by Grantmaker subawards must benefit disadvantaged communities, defined by the EPA Administrator as any community that meets at least one of the following characteristics:

- Identified as disadvantaged by the Climate and Economic Justice Screening Tool (CEJST);
- Any census block group that is at or about the 90th percentile for any of EJScreen's Supplemental Indexes when compared to the nation or state; and / or
- Any geographic area within Tribal lands as included in EJScreen, which include:
    - Alaska Native Allotments
    - Alaska Native Villages
    - American Indian Reservations
    - American Indian Off-reservation Trust Lands
    - Oklahoma Tribal Statistical Areas

Eligible activities

Grantmakers may engage in and fund only those activities that are authorized by CAA 138, which include:

- Community-led air and other pollution monitoring, prevention, and remediation, and investments in low- and zero emission and resilient technologies and related infrastructure;
- Workforce development that help reduce greenhouse gas emissions and other air pollutants;
- Mitigating climate and health risks from urban heat islands, extreme heat, wood heater emissions, and wildfire events;
- Climate resiliency and adaptation;
- Reducing indoor toxics and indoor air pollution; or
- Facilitating engagement of disadvantaged communities in State and Federal advisory groups, workshops, rulemakings, and other public processes.

Ineligible activities

Ineligible activities include, but are not limited to:

- Any activity that violates applicable federal civil rights statutes prohibiting discrimination, including but not limited to Title VI of the Civil Rights Act of 1964, Section 504 of the Rehabilitation Act of 1973, the Age Discrimination Act of 1975, section 504 of the Rehabilitation Act of 1973, Title IX of the Education Amendments of 1972, Federal Water Pollution Control Act Amendments of 1972, and implementing EPA regulations.
- Lobbying, as defined at 2 CFR 200.450;
- Defense and prosecution of criminal and civil proceedings, claims, appeals and patent infringements, as defined at 2 CFR 200.435;
- Carrying out protests, demonstrations, boycotts, or disinvestment campaigns; and
- Any activity to encourage actions that violate Federal, state or local law including, but not limited to, provisions relating to unlawful assembly, trespass, inciting violence, and failing to obey the lawful orders of law enforcement personnel.

## B. Establishing and Managing Subawards

Grantmakers making pass-through subawards must comply with applicable provisions of 2 CFR Part 200 and the EPA Subaward Policy. As a pass-through entity, the recipient agrees to:

1) Be responsible for selecting subrecipients and as appropriate conducting subaward competitions using a system for properly differentiating between subrecipients and procurement contractors under the standards at 2 CFR 200.331 and EPA's supplemental guidance in Appendix A of the EPA Subaward Policy.

(a) For-profit organizations and individual consultants, in almost all cases, are not eligible subrecipients under EPA financial assistance programs and the pass-through entity must obtain prior written approval from EPA's Award Official for subawards to these entities unless the EPA-approved budget and work plan for this agreement contain a precise description of such subawards.

(b) Stipends and travel assistance for trainees (including interns) and similar individuals who are not are not employees of the pass-through entity must be classified as participant support costs rather than subawards as provided in 2 CFR 200.1 Participant support costs, 2 CFR 200.1 Subaward, and EPA's Guidance on Participant Support Costs.

(c) Subsidies, rebates and similar payments to participants in EPA funded programs to encourage environmental stewardship are also classified as Participant support costs as provided in 2 CFR 1500.1 and EPA's Guidance on Participant Support Costs.

2) Establish and follow a system that ensures all subaward agreements are in writing and contain all of the elements required by 2 CFR 200.332(a). EPA has developed a template for subaward agreements that is available in Appendix D of the EPA Subaward Policy.

3) Prior to making subawards, ensure that each subrecipient has a “Unique Entity Identifier (UEI).” The UEI is required by 2 CFR Part 25 and 2 CFR 200.332(a)(1). Subrecipients are not required to complete full System for Award Management (SAM) registration to obtain a UEI. Information regarding obtaining a UEI is available at the SAM Internet site: https://www.sam.gov/SAM/ and in EPA's General Term and

Condition “System for Award Management and Universal Identifier Requirements” of the pass-through entity's agreement with the EPA.

4) Ensure that subrecipients are aware that they are subject to the same requirements as those that apply to the pass-through entity's EPA award as required by 2 CFR 200.332(a)(2). These requirements include, among others:

(a) Title VI of the Civil Rights Act and other Federal statutes and regulations prohibiting discrimination in Federal financial assistance programs, as applicable.

(b) Reporting Subawards and Executive Compensation under Federal Funding Accountability and Transparency Act (FFATA) set forth in the General Condition passthrough entity's agreement with EPA entitled “Reporting Subawards and Executive Compensation.” Page 8 of 42

(c) Limitations on individual consultant fees as set forth in 2 CFR 1500.10 and the General Condition of the pass-through entity's agreement with EPA entitled “Consultant Fee Cap.”

(d) EPA's prohibition on paying management fees as set forth in General Condition of the pass-through entity's agreement with EPA entitled “Management Fees.”

(e) The Procurement Standards in 2 CFR Part 200 including those requiring competition when the subrecipient acquires goods and services from contractors (including consultants). EPA provides general information on other statutes, regulations and Executive Orders on the Grants internet site at www.epa.gov/grants. Many Federal requirements are agreement or program specific and EPA encourages pass-through entities to review the terms of their assistance agreement carefully and consult with their EPA Project Officer for advice if necessary.

5) Ensure, for states and other public recipients, that subawards are not conditioned in a manner that would disadvantage applicants for subawards based on their religious character.

6) Establish and follow a system for evaluating subrecipient risks of noncompliance with Federal statutes, regulations and the terms and conditions of the subaward as required by 2 CFR 200.332(b) and document the evaluation. Risk factors may include: (a) Prior experience with same or similar subawards (b) Results of previous audits; (c) Whether new or substantially changed personnel or systems, and; (d) Extent and results of Federal awarding agency or the pass-through entity's monitoring

7) Establish and follow a process for deciding whether to impose additional requirements on subrecipients based on risk factors as required by 2 CFR 200.332(c). Examples of additional requirements authorized by 2 CFR 200.208 include:

(a) Requiring payments as reimbursements rather than advance payments;

(b) Withholding authority to proceed to the next phase until receipt of evidence of acceptable performance within a given period of performance;

(c) Requiring additional, more detailed financial reports;

(d) Requiring additional project monitoring;

(e) Requiring the non-Federal entity to obtain technical or management assistance, and

(f) Establishing additional prior approvals

8) Establish and follow a system for monitoring subrecipient performance that includes the elements required by 2 CFR 200.332(d) and report the results of the monitoring in performance reports as provided in the reporting terms and conditions of this agreement.

9) Establish and maintain an accounting system which ensures compliance with the $25,000 limitation at 2 CFR 200.1, Modified Total Direct Costs, if applicable, on including subaward costs in Modified Total Direct Costs for the purposes of distributing indirect costs. Recipients with Federally approved indirect cost rates that use a different basis for distributing indirect costs to subawards must comply with their Indirect Cost Rate Agreement.

10) Work with EPA's Project Officer to obtain the written consent of EPA's Office of International and Tribal Affairs (OITA), prior to awarding a subaward to a foreign or international organization, or a subaward to be performed in a foreign country even if that subaward is described in a proposed scope of work.

11) Obtain written approval from EPA's Award Official for any subawards that are not described in the approved work plan in accordance with 2 CFR 200.308.

12) Obtain the written approval of EPA's Award Official prior to awarding a subaward to an individual if the EPA-approved scope of work does not include a description of subawards to individuals.

13) Establish and follow written procedures under 2 CFR 200.302(b)(7) for determining that subaward costs are allowable in accordance with 2 CFR Part 200, Subpart E and the terms and conditions of this award. These procedures may provide for allowability determinations on a pre-award basis, through ongoing monitoring of costs that subrecipients incur, or a combination of both approaches provided the pass-through entity documents its determinations.

14) Establish and maintain a system under 2 CFR 200.332(d)(3) and 2 CFR 200.521 for issuing management decisions for audits of subrecipients that relate to Federal awards. However, the recipient remains accountable to EPA for ensuring that unallowable subaward costs initially paid by EPA are reimbursed or mitigated through offset with allowable costs whether the recipient recovers those costs from the subrecipient or not.

15) As provided in 2 CFR 200.333, pass-through entities must obtain EPA approval to make fixed amount subawards. EPA is restricting the use of fixed amount subawards to a limited number of situations that are authorized in official EPA pilot projects. Recipients should consult with their EPA Project Officer regarding the status of these pilot projects. By accepting this award, the recipient is certifying that it either has systems in place to comply with the requirements described in Items 1 through 14 above or will refrain from making subawards until the systems are designed and implemented.

## C. PERFORMANCE REPORTING AND FINAL PERFORMANCE REPORT

### Performance Reporting – Content

In accordance with 2 CFR 200.329, the recipient agrees to submit performance reports that include brief

information on each of the following areas: 1) A comparison of actual accomplishments to the outputs/outcomes established in the assistance agreement work plan for the period; 2) The reasons why established outputs/outcomes were not met; and 3) other pertinent information, including, when appropriate, analysis and explanation of cost overruns or high unit costs. This description may include overall best practices and/or lessons learned over the project performance period, and attachments and links for materials that may be helpful to other Environmental Grants recipients or similar organizations (e.g., tip sheets, "how-to" sheets, communication materials, outreach materials, web tools, etc.).

These reports shall cover work status, work progress, difficulties encountered, preliminary data results and a statement of activity anticipated during the subsequent reporting period, including a description of equipment, techniques, and materials to be used or evaluated. A discussion of cumulative and period comparison of project budget and expenditures, coupled with a comparison of the percentage of the project completed and in relation to project schedule and an explanation(s) of significant discrepancies must be included in the report. The report shall also include any changes of key personnel concerned with the project.

Additionally, the recipient agrees to inform EPA within 30 calendar days about problems, delays, or adverse conditions that may materially impair the ability to meet the outputs/outcomes specified in the assistance agreement work plan.

**Performance Reporting - Frequency**

The recipient agrees to submit quarterly performance reports electronically to the EPA Project Officer on the designated quarterly due date(s). If **due date falls on a federal holiday or weekend, it is due the following business day.** The period end and due dates are listed in the below table.

| PERIOD ENDING | QUARTERLY DUE DATES |
|---|---|
| September 30 | October 31 |
| December 31 | January 31 |
| March 31 | April 30 |
| June 30 | July 31 |

The first quarterly report is due at the end of the first full quarter following the execution of the agreement, unless the recipient has incurred pre-award costs. If the recipient is authorized to incur pre-award costs, the grant performance period begins on the date costs were first incurred, and the recipient would provide a quarterly performance report following the end of the first full quarter after that date. Quarterly reports will continue thereafter and throughout the remainder of the performance period. The recipient must submit the final performance report no later than 120 calendar days after the end date of the period of performance as identified in this agreement. The final report must document all project activities occurring during the Period of Performance and as outlined in the executed agreement. However, please be advised that the statutory three-year performance period for this grant program may not be extended. Any costs incurred after the end of the performance period are the responsibility of the recipient and may not be charged to the grant.

**Subaward Performance Reporting**

The recipient must report on its subaward monitoring activities under 2 CFR 200.332(d). Pass-through entity monitoring of the subrecipient must include:

1. Review of financial and programmatic reports.

2. Follow-up on action plans noting findings/deficiencies identified from site visits and/or desk reviews to ensure effective subrecipient performance.

3. Environmental results the subrecipient achieved, including a narrative discussion of any improvements of environmental conditions in the target community.

4. Summaries of audit findings and related pass-through-entity management decisions.

5. Any disagreements or potential challenges with subrecipients that may interfere with the completion of subgrant performance, and actions the pass-through entity has taken to mitigate them.

6. Actions the pass-through entity has taken to correct deficiencies such as those specified at 2 CFR 200.332(e), 2 CFR 200.208 and the 2 CFR Part 200.339 Remedies for Noncompliance.

7. Summaries of collaborative governance activities and impacts with communities, project partners, and Technical Assistance providers (TCTACs, contractors, etc.) including outreach, engagement, and implementation of feedback.

8. Summaries of capacity building activities for severely capacity-constrained communities.

9. Summaries of reach in underserved communities, communities in urban, remote, and rural areas, and community stakeholders with the highest degree of burden and capacity constraints throughout the entire Geographic Area.

**Subaward Performance Reporting on Milestones of Activities for Fixed-Amount Awards**

Grantmakers have limited reporting requirements for fixed-amount subawards to severely capacity-constrained organizations. The recipient must at minimum report on subrecipients' fixed-amount subaward milestones via the quarterly performance reports, as well as any other reporting requirements agreed upon by the Grantmaker and the fixed-amount subaward recipient, as described in the Fixed Amount Subaward memo. Fixed Amount Subaward Performance reporting will be in accordance with **applicable requirements specified in 2 CFR Parts 200 and 1500, which will apply to fixed-amount subawards absent a case-specific exception requested by a Grantmaker, concurred by the OEJECR Project Officer and approved by OGD. Note:** Each Grantmaker will define “Severely Capacity Constrained.” Grantmakers will also design policies and procedures to limit the number of EJ Thriving Communities Subgrants that a single entity may receive within a specified time period to maximize the diversity and breadth of subrecipients.

**Examples of Fixed Amount Subaward Performance reporting include but are not limited to:**

1. Monitoring plans paid on a milestone basis with an initial amount paid prior to the development of the plan, followed by a second payment upon completion of the draft plan, with a final payment when the plan is complete.

2. Lump sum payments for equipment purchases (e.g. air monitoring devices) based on invoices provided by the subrecipient.

3. Upfront costs of no more than 25%, except with permission of the Project Officer, with subsequent milestone-based payments. For example, sampling projects paid on a milestone basis with 25% for upfront expenses, 25% for data collection, 25% for data analysis, 25% for final report completion.

**Fixed-Amount Subaward Monitoring and Compliance**

**As provided in 2 CFR 200.102(c), the Award Official is authorized to waive or modify the following regulatory requirements for subrecipients receiving fixed-amount subawards:**

1. Competition requirements specified in 2 CFR Part 200 and Part 1500 with the exception of the statutory consultant fee cap implemented at 2 CFR 1500.10.

2. Records required to document personnel compensation under 2 CFR 200.430 and 2 CFR 200.431.

3. Financial requirements at 2 CFR 200.302(b) with the exception of accounting records and documentation required to demonstrate achievement of agreed upon milestones such as invoices for equipment or facility rental, fees paid, stipends earned, and similar fixed-amount transactions.

4. Internal controls described at 2 CFR 200.303 with the exception of an internal control protocol for ensuring that fixed-amount subrecipients only request payment from the pass-through entities upon completion of agreed upon milestones.

5. Property standards in 2 CFR Part 200 with the exception of 2 CFR 200.315 as implemented in EPA's General Term and Condition Data and Copyrighted Materials relating to EPA's "Federal Purpose" license in data and written materials produced with EPA funds.

6. Subrecipient and contractor determinations in 2 CFR 200.331 and corresponding provisions of the EPA Subaward Policy.

7. Indirect costs authorized by 2 CFR 200.332(a)(4). Fixed amount subrecipients do not incur indirect costs.

8. Reports on real or personal property required when closing out a subaward specified in 2 CFR 200.344(f).

## D. PASS-THROUGH ENTITIES

The pass-through entities must have pricing procedures that prevent subrecipients from "profiting" from fixed-amount subawards by precluding payments for "management fees" or other amounts in excess of anticipated costs for the activity. Grantmakers will use the following methods to ensure compliance for tracking and monitoring activities:

1. Establishing the content of periodic and final performance and financial reports for each fixed-amount subaward.

2. Obtaining a budget description of planned expenditures to be refunded if an activity or event does not

take place, a report or analysis is not completed, or the subrecipient does not otherwise perform as promised.

3. Certification in writing to the pass-through entity at the end of the fixed-amount subaward that the project or activity was completed, or the level of effort was expended. If the required level of activity or effort was not carried out, the amount of the fixed-amount subaward must be adjusted and any excess funds refunded.

4. Requiring prior written approval of the pass-through entity for any changes in principal investigator, project leader, project partner, or scope of effort.

**E. Review and Oversight**

1. Work Product - The recipient agrees that any product (e.g., publication, outreach materials, training manuals) produced through this assistance agreement and made available for public view must be first reviewed by the EPA Project Officer for comment before release. The recipient shall make all final decisions on the product content.

2. Monthly Calls - The recipient shall consult with the EPA Project Officer on a monthly basis to obtain input on program activities and products produced. However, the recipient should make all final decisions on project implementation and product content. The EPA Project Officer has discretion to change the frequency with which calls are held.

3. Prior Approval - Any proposed changes to the project must be submitted in writing to the EPA Project Officer and Grant Specialist for EPA approval prior to implementation. The recipient incurs costs at its own risk if it fails to obtain written approval before implementing any changes.

**F. Post-Project Period Follow-up and Engagement**

For no less than one year after completion of the project, the recipient agrees to periodically update its designated EPA Project Officer on current community-based and environmental justice work the recipient is performing and how/if that work relates to its now completed EJ TCGM project. These periodic updates may include (but are not limited to) recent local media reports, additional grant funding received, new initiatives, and developing partnerships. The EPA EJ Grants program is invested in the long-term success of each EJ Grant recipient and its long-term impact on addressing the disproportionate environmental and public health impacts plaguing their communities. These post-project period updates allow the EJ Grants program to provide past recipients with additional guidance about applicable funding opportunities, potential collaborations, and technical assistance that may assist recipients in their future work. Periodic updates also allow the program to track best practices that lead to greater project sustainability and long-term community revitalization for impacted community residents. The frequency of these periodic updates will be by mutual agreement and will be discussed with the recipient before the end of the project period. Recipients are also encouraged to continue providing updates and engaging with their EPA Project Officers beyond the additional year after the end of the project.

*NOTE – Compliance with this term & condition will not give the recipient priority during future EPA EJ grant competitions and is not a guarantee for future EPA grant funding. Additionally, the recipient agrees not to submit a claim for compensation to EPA for providing these updates. Project Officers are encouraged to engage with their Grantmakers to fulfill post-period follow-up, but are not to document non-compliance.

**G. Cybersecurity Condition**

(a) The recipient agrees that when collecting and managing environmental data under this assistance agreement, it will protect the data by following all applicable State or Tribal law cybersecurity requirements.

(b) (1) EPA must ensure that any connections between the recipient's network or information system and EPA networks used by the recipient to transfer data under this agreement, are secure. For purposes of this Section, a connection is defined as a dedicated persistent interface between an Agency IT system and an external IT system for the purpose of transferring information. Transitory, user-controlled connections such as website browsing are excluded from this definition.

If the recipient's connections as defined above do not go through the Environmental Information Exchange Network or EPA's Central Data Exchange, the recipient agrees to contact the EPA Project Officer (PO) no later than 90 days after the date of this award and work with the designated Regional/Headquarters Information Security Officer to ensure that the connections meet EPA security requirements, including entering into Interconnection Service Agreements as appropriate. This condition does not apply to manual entry of data by the recipient into systems operated and used by EPA's regulatory programs for the submission of reporting and/or compliance data.

(2) The recipient agrees that any subawards it makes under this agreement will require the subrecipient to comply with the requirements in (b)(1) if the subrecipient's network or information system is connected to EPA networks to transfer data to the Agency using systems other than the Environmental Information Exchange Network or EPA's Central Data Exchange. The recipient will be in compliance with this condition: by including this requirement in subaward agreements; and during subrecipient monitoring deemed necessary by the recipient under 2 CFR 200.332(d), by inquiring whether the subrecipient has contacted the EPA Project Officer. Nothing in this condition requires the recipient to contact the EPA Project Officer on behalf of a subrecipient or to be involved in the negotiation of an Interconnection Service Agreement between the subrecipient and EPA.

**H. Competency Policy**

**Competency of Organizations Generating Environmental Measurement Data**

In accordance with Agency Policy Directive Number FEM-2012-02, Policy to Assure the Competency of Organizations Generating Environmental Measurement Data under Agency-Funded Assistance Agreements,

Recipient agrees, by entering into this agreement, that it has demonstrated competency prior to award, or alternatively, where a pre-award demonstration of competency is not practicable, Recipient agrees to demonstrate competency prior to carrying out any activities under the award involving the generation or use of environmental data. Recipient shall maintain competency for the duration of the project period of this agreement and this will be documented during the annual reporting process. A copy of the Policy is available online at https://www.epa.gov/sites/production/files/2015-03/documents/competency-policy-aaia-new.pdf or a copy may also be requested by contacting the EPA Project Officer for this award.

**I. Procurement Terms and Conditions**

The recipient agrees to conduct all procurement actions under this assistance agreement in accordance

with the procurement standards set forth in Title 2 CFR, Parts 200.317 through 200.327, 2 CFR Part 1500 and 40 CFR Part 33. EPA provides additional guidance on complying with these requirements in the Best Practice Guide for Procuring Services, Supplies, and Equipment Under EPA Assistance Agreements which is available at https://www.epa.gov/grants/best-practice-guide-procuring-services-supplies-and-equipment-under-epa-assistance. Any costs incurred by the recipient under contracts and/or small purchases that EPA determines to be in noncompliance with EPA procurement standards shall be unallowable for Federal reimbursement.

As provided by 2 CFR 200.310 recipients must ensure that subrecipients acquire insurance equal to the amount of the purchased items to protect against loss, damage and theft if a subaward includes cost for equipment. Costs for such insurance are allowable under this agreement.

**J. Signage Required**

1. Signage Requirements

a. Investing in America Emblem: The recipient will ensure that a sign is placed at construction sites supported in whole or in part by this award displaying the official Investing in America emblem and must identify the project as a “project funded by President Biden's Inflation Reduction Act” as applicable. The sign must be placed at construction sites in an easily visible location that can be directly linked to the work taking place and must be maintained in good condition throughout the construction period. The recipient will ensure compliance with the guidelines and design specifications provided by EPA for using the official Investing in America emblem available at: https://www.epa.gov/invest/investingamerica-signage.

b. Procuring Signs: Consistent with section 6002 of RCRA, 42 U.S.C. 6962, and 2 CFR 200.323, recipients are encouraged to use recycled or recovered materials when procuring signs. Signage costs are considered an allowable cost under this assistance agreement provided that the costs associated with signage are reasonable. Additionally, to increase public awareness of projects serving communities where English is not the predominant language, recipients are encouraged to translate the language on signs (excluding the official Investing in America emblem or EPA logo or seal) into the appropriate non-English language(s). The costs of such translation are allowable, provided the costs are reasonable.

2. Public or Media Events EPA encourages the recipient to notify the EPA Project Officer listed in this award document of public or media events publicizing the accomplishment of significant events related to construction projects as a result of this agreement and provide the opportunity for attendance and participation by federal representatives with at least ten (10) working days' notice.

**K. Geospatial Data Standards**

All geospatial data created must be consistent with Federal Geographic Data Committee (FGDC) endorsed standards. Information on these standards may be found at https://www.fgdc.gov/.

**L. Quality Assurance**

Authority: Quality Assurance applies to all assistance agreements involving environmental information as defined in 2 C.F.R. § 1500.12 Quality Assurance.

The recipient shall ensure that subawards involving environmental information issued under this

agreement include appropriate quality requirements for the work. The recipient shall ensure sub-award recipients develop and implement a Quality Assurance (QA) planning document in accordance with this term and condition; and/or ensure sub-award recipients implement all applicable approved QA planning documents. In consultation with your Project Officer and the Regional Quality Assurance Manager, select the appropriate plan based on the following options to implement in the Subsequent Award:

NOTE: The Grantmaker will need to develop a management strategy for receiving, reviewing and assisting applicants with QMP or QAPP needs. The Grantmakers' management strategy will need to be submitted for approval to the assigned Project Officer and the Regional Quality Assurance office official before the Funding Recommendation is submitted and finalized before applications for the Thriving communities subgrants are released.

[Project Officer will need to remove all options that will not apply to the Grantmaker Quality Management Plan]

**1. Quality Management Plan (QMP)**

a. Prior to beginning environmental information operations, the recipient must:

i. Submit a previously EPA-approved and current QMP,

ii. The EPA Quality Assurance Manager or designee (hereafter referred to as QAM) will notify the recipient and EPA Project Officer (PO) in writing if the QMP is acceptable for this agreement.

b. The recipient must submit the QMP within 30 days after grant award, and/or no more than 90 days after grant award.

c. The recipient must review their approved QMP at least annually. These documented reviews shall be made available to the sponsoring EPA organization if requested. When necessary, the recipient shall revise its QMP to incorporate minor changes and notify the EPA PO and QAM of the changes. If significant changes have been made to the Quality Program that affect the performance of environmental information operations, it may be necessary to re-submit the entire QMP for re-approval. In general, a copy of any QMP revision(s) made during the year should be submitted to the EPA PO and QAM in writing when such changes occur. Conditions requiring the revision and resubmittal of an approved QMP can be found in section 6 of EPA's Quality Management Plan (QMP) Standard.

**For Reference:**

• Quality Management Plan (QMP) Standard and EPA's Quality Assurance Project Plan (QAPP) Standard; contain quality specifications for EPA and non-EPA organizations and definitions applicable to these terms and conditions.

• EPA QA/G-5: *Guidance for Quality Assurance Project Plans*.

• (QAM and/or PO may insert QA references that inform or assist the recipient here).

• EPA's Quality Program website has a list of QA managers, and Non-EPA Organizations Quality Specifications.

• The Office of Grants and Debarment Implementation of Quality Assurance Requirements for Organizations Receiving EPA Financial Assistance.

**M. Human Subjects Research Review Process**

(a) *Applications involving human subjects.* (1) Protecting the rights, safety, and welfare of human subjects involved in research supported by EPA grants is the responsibility of the institution which receives or is accountable to EPA for the funds awarded for the support of the project.

(2) Institutions engaged in research involving human subjects, with the exception of research eligible for exemption under 40 CFR 26.104, must submit to EPA for review, approval, and official acceptance, written evidence of a Federal wide Assurance (FWA) on file with the U.S. Department of Health and Human Services (HHS) or other agency that their institution will comply with regulatory provisions in the Common Rule (codified by EPA at as 40 CFR 26 Part A).

(3) Applicants must provide documentation with each proposal of research involving human subjects that it has been reviewed in accordance with the institution's assurance and in compliance with the Common Rule. Review and approval by the EPA Human Subject Research Review Official (HSRRO) to determine compliance with 40 CFR 26 and EPA Order 1000.17 (series) must occur before research involving human subjects may commence.

**O. Use of Logos and Icons**

**Programmatic guidance for the appropriate use of the icons and logos either together, with other partner icons or individually will be provided.**

If the EPA logo is appearing along with logos from other participating entities on websites, outreach materials, or reports, it must **not** be prominently displayed to imply that any of the recipient or subrecipient's activities are being conducted by the EPA. Instead, the EPA logo should be accompanied with a statement indicating that the Minneapolis Foundation received financial support from the EPA under an Assistance Agreement. More information is available at: https://www.epa.gov/stylebook/using-epa-seal-and-logo#policy

**Grantmaker Icon**

**The Thriving Communities Grantmaking Program (TCGM) Icon will be designed by the EPA with Grantmaker input and approved by the EPA PROTRAC process** , used to monitor the concept proposal, development, review and approval of EPA print, infographics, audio, video and social media content/products for internal and external release, as well as Esri Products (Story Maps and Hub sites) for external publishing only. PROTRAC ensures all content created is consistent, appropriate and in alignment with current agency messages, and follows EPA branding guidelines.. **The icon will represent the "programmatic identity" of the Grantmaker program, and may be used alone or in conjunction with the EPA and grant recipient's logos' or individual Grantmaker's logo. . The approved TCGM programmatic icon must remain intact and unmodified.** Modifying icons to specifically identify a program office or region are not permitted. NOTE: Icons must be updated or removed per current agency policy/ guidelines.

**P. Paperwork Reduction Act**

(a) The scope of work for this cooperative agreement includes a survey or other information collection of identical information from 10 or more parties. As provided by 5 CFR 1320.3(d), EPA is a sponsor of the information collection for purposes of obtaining approval from the Office of Management and Budget for collecting information. The recipient agrees to assist EPA in complying with OMB procedures at 5 CFR Part 1320 for obtaining Information Collection Request authorization. The recipient may not collect information until EPA obtains OMB approval. The Project Officer will advise the recipient when information collection may begin.

**Q. Substantial Involvement**

EPA will be substantially involved in this agreement. Substantial involvement by the EPA Project Officer may include:

1. Monthly telephone calls and other monitoring,

2. Review project phases and provide approval to continue to the next phase,

3. Review and comment on any documents, web content, or other materials developed under this agreement (the recipient will make final decisions on these matters),

4. Approve substantive terms included in contracts or subawards (EPA's Project Officer will not suggest, recommend, or direct the recipient to select any particular contractor or subrecipient except to the extent permitted in Section 10 of EPA's Subaward Policy).

5. Review and comment on the programmatic progress reports.

6. Consultation regarding the selection of key personnel (EPA's involvement is limited to reviewing the technical qualifications of key personnel and the recipient will make the final decisions on selection. EPA's Project Officer will not suggest, recommend, or direct the recipient to select any individual).

7. Collaboration with EPA on designing and implementing a project management process, which includes quality project oversight for funding subrecipients and a tracking and reporting process that reduces reporting burden on community recipients.

8. Collaboration on the preliminary design of the subaward competition, the submission and evaluation process, and the development of evaluation criteria. However, final decisions on the submission, evaluation process/criteria, and selection of subrecipients will be made by the recipient, rather than by EPA, provided statutory, regulatory, and EPA's Subaward Policy requirements are met.

9. EPA Project Officer must review and approve the subaward agreements with any Collaborating Entities that will assist in the direct development and implementation of the EJ Thriving Communities Subgrants program, including subawards to other nonprofits (non-Community Based Organizations), units of government, institutions of higher education, and/or medical service providers not covered by a statutory partnership to assist the Grantmaker by creating a local subaward competition or outreach to local communities.

10. In addition to the requirements in EPA's General Term and Condition “Disclosing Conflict of Interests,” the recipient must submit a Conflict-of-Interest (COI) plan for approval by EPA's Project Officer

for preventing, neutralizing, or mitigating conflicts of interest that may arise within the participatory governance framework of the project. The plan should describe controls for ensuring that representatives of community-based nonprofit organizations involved in the design and decision-making for the subawards program do not have relationships with organizations competing for subawards or receiving noncompetitive funding that create actual or apparent conflicts of interest. Example participatory governance activities could include advisory bodies composed of community-based nonprofit organizations that oversee and provide thought partnership on the development of the subaward process.

11. If a Conflict of Interest is Identified by the EPA, the Conflict-of-Interest Mitigation Plan will need to be approved by the Project Officer, in consultation with the Grant Specialist.

12. Joint operational involvement, participation, and/or collaboration between EPA and the recipient.

13. Review of proposed procurements in accordance with the Procurement Standards in 2 CFR Part 200.

14. EPA staff participation in monitoring performance and/or providing technical support for subrecipients that require additional technical assistance to meet project and/or workplan deliverables.

15. Joint operational involvement, participation, and/or collaboration between EPA and the recipient.

16. Informally referred to as the “Cap Amount Award Policy” and discussed on page 15 of the NOFO, Grantmakers should put policies in place that limit the number of times a particular Eligible Subrecipient can receive an EJ Thriving Communities Subgrant within a certain period of time. For example, a pass-through entity may decide that a recipient may not receive more than two EJ Thriving Communities Subgrants within the 3-year period of performance or a shorter interval as deemed appropriate by the pass-through entity. This plan will need to be approved by the Project Officer.

17. Prior to making subawards, Grantmakers can work with their PO's to identify instructions and guidance on subaward policies to ensure that the burden on the Tier 1-3 and fixed amount award Subawardees is minimized. This includes resources such as the gmc_subaward_policy_appendix_d_subaward_agreement_template.pdf (epa.gov) (EPA does not mandate the use of this template. Pass-through entities may use their own form of subaward agreements provided the requirements of 2 CFR 200.331(a) are met.) And requirements that flow down to subgrantees such as “Unique Entity Identifier” (UEI) as required by 2 CFR Part 25 and 2 CFR 200.332 (a)(1).

**R. National Programmatic Term and Condition for Fellowship, Internship Programs and Similar Programs Supported by EPA Financial Assistance**

1. EPA funds for this program may only be used for participant support cost payments, scholarships, tuition remission and other forms of student aid for citizens of the United States, its territories, or possessions, or for individuals lawfully admitted to the United States for permanent residence.

2. The recipient and program participants are responsible for taxes, if any, on payments made to or on behalf of individuals participating in this program that are allowable as participant support costs under 2 CFR 200.1 or 2 CFR 200.456 and scholarships and other forms of student aid such as tuition remission under 2 CFR 200.466. EPA encourages recipients and program participants to consult their tax advisers,

the U.S. Internal Revenue Service, or state and local tax authorities regarding the taxability of stipends, tuition remission and other payments. However, EPA does not provide advice on tax issues relating to these payments.

3. Participant support cost payments, scholarships, and other forms of student aid such as tuition remission are lower tiered covered Nonprocurement transactions for the purposes of 2 CFR 180.300 and EPA's Suspension and Debarment Term and Condition. Recipients, therefore, may not make participant support cost payments to individuals who are excluded from participation in Federal Nonprocurement programs under 2 CFR Part 180. Recipients are responsible for checking the eligibility of program participants in the System for Award Management (SAM) or obtaining eligibility certifications from the program participants.

See EPA Guidance on Participant Support Costs.

**S. Subsequent Award Statutory Partnership Agreements Letters of Commitment submitted with the application needed to be finalized prior to the submission of the Subsequent Award.** EPA requires that applicants selected for funding consideration provide copies of the executed final statutory partnership agreement to EPA's Project Officer for submission to the EPA Award Official prior to issuance of the Subsequent Award.

Any letters of commitment submitted in the application should be finalized into a final signed statutory agreement, which should include any updated stakeholder roles and responsibilities or revised award amounts. The statutory partnership agreement must be signed by all relevant parties and specify which member of the partnership will enter into the assistance agreement with EPA for the purposes of accountability for the proper expenditure of federal funds, performance of the assistance agreement, liability for claims for recovery of unallowable costs incurred under the agreement and must specify roles in performing the proposed scope of work for the assistance agreement. Executed Statutory Partnership Agreements will be submitted to EPA's Project Officer. The EPA Grants Management Officer or the EPA Award Official will issue written notification that this condition has been satisfied and that the recipient is authorized to draw down TCGM funds for the Subsequent Award in accordance with the standards described in the EPA General Term and Condition for the Automated Standard Application Payments (ASAP) and Proper Payment Draw Down during the initial award.

**T. Record Retention**

In accordance with 2 CFR § 200.334, recipients and subrecipients must retain for a period of three years all programmatic, financial, statistical, and all other records required under the terms of the agreement, unless a dispute or lawsuit has ensued. If a dispute or lawsuit has been initiated, all records must be retained for the duration of the dispute, until the matter is resolved and dispositioned, and for three years thereafter.

**U. Environmental Justice Thriving Communities Grantmaking Program Davis-Bacon Labor Standards**

As provided in Section 314 of the Clean Air Act (42 USC § 7614) (DBRA), Davis-Bacon Act (42 USC §§ 3141-3144) labor standards apply to grants and cooperative agreements made under the Greenhouse Gas Reduction Fund. Accordingly, all laborers and mechanics employed by contractors or subcontractors on projects assisted under this award agreement shall be paid wages at rates not less than those prevailing for the same type of work on similar construction in the locality as determined by the Secretary of Labor in accordance with 40 USC Subtitle II, Part A, Chapter 31, Subchapter IV (Wage

Rate Requirements).

Therefore, the pass-through entity must create a Davis-Bacon subgrant compliance plan to ensure that any entity that receives financial assistance complies with Davis-Bacon labor requirements where construction work is financed in whole or in part with such financial assistance.

If the recipient encounters a situation that presents uncertainties regarding DBRA applicability under this assistance agreement, the recipient must discuss the situation with the EPA Project Officer before authorizing work on the project.

In the event that a periodic project site visit, audit, or routine communication with subrecipient, program beneficiary, contractor, or subcontractor determines any instances of non-compliance or potential non-compliance with Davis-Bacon, the recipient agrees to discuss the situation with the EPA Project Officer for possible referral to DOL for guidance or enforcement action.

Note, the use of the term project in this term and condition is distinct from the use of the term project within the definition of qualified project under Clean Air Act Section 134(c)(3), which is broader and includes “any project, activity, or technology.” 40 CFR 30.103 defines construction as “erection, alteration, or repair (including dredging, excavating, and painting) of buildings, structures, or other improvements to real property, and activities in response to a release or a threat of a release of a hazardous substance into the environment, or activities to prevent the introduction of a hazardous substance into a water supply.”

**1. Program Applicability**

a. Program Name: Environmental Justice Thriving Communities Grantmaking Program

b. Statute requiring compliance with Davis-Bacon: Clean Air Act Section 314, Labor Standards, codified as 42 U.S.C. § 7614.

c. Activities subject to Davis-Bacon: Activities subject to Davis-Bacon include certain construction costs and contractual costs. Construction costs may include:

i. Building and / or upgrading existing structures and sites to improve community use while reducing GHG emissions and / or improving climate resilience;

ii. Implementing structural and non-structural retrofits to enhance the resilience of community-serving buildings (e.g., raise the building elevation to reduce flood risk, improve cooling systems and / or insulation to reduce extreme heat risk);

iii. Install energy efficiency measures such as insulation, double or triple glazed windows, “cool roofs” that reflect sunlight, and energy management systems in public buildings;

iv. Remediating or mitigating harmful substances in buildings, including lead, mercury, pesticides, radon, mold, PCBs (caulk, flooring, etc.), lead-based paint, asbestos, and other toxic substances;

v. Installing, upgrading, or replacing HVAC and / or filtration systems that improve indoor quality in schools, community-serving buildings, and single-and-multifamily homes;

vi. Targeted water infrastructure upgrades, including replacing private-side lead lines in homes, childcare facilities, schools, or other community-serving buildings; septic to sewer conversions; and installing water fountains at schools and parks; and

vii. Other activities described in the EPA Disadvantaged Business Enterprise (DBE) rule's definition of *Construction* at 40 CFR 33.103, as well as related architectural or engineering services.

With very few exceptions, recipients carry out construction projects by hiring contractors which typically include a general contractor and an architectural or engineering firm for design work and in some cases purchasing equipment for installation at the site. Hiring general contractors and other contractors performing activities described in the EPA Disadvantaged Business Enterprise (DBE) rule's definition of Construction at 40 CFR 33.103 will be categorized as "Construction."

d. Prevailing Wage Classification: Building

**2. Davis-Bacon and Related Acts**

Davis-Bacon and Related Acts (DBRA) is a collection of labor standards provisions administered by the Department of Labor, that are applicable to grants involving construction. These labor standards include the:

- Davis-Bacon Act, which requires payment of prevailing wage rates for laborers and mechanics on construction contracts of $2,000 or more;
- Copeland "Anti-Kickback" Act, which prohibits a contractor or subcontractor from inducing an employee into giving up any part of the compensation to which he or she is entitled; and
- Contract Work Hours and Safety Standards Act, which requires overtime wages to be paid for over 40 hours of work per week, under contracts in excess of $100,000.

**3. Recipient Responsibilities When Entering Into and Managing Contracts:**

a. Solicitation and Contract Requirements:

i. Include the Correct Wage Determinations in Bid Solicitations and Contracts: Recipients are responsible for complying with the procedures provided in 29 CFR 1.6 when soliciting bids and awarding contracts.

ii. Include DBRA Requirements in All Contracts: Include the following text on all contracts under this grant:

1. "By accepting this contract, the contractor acknowledges and agrees to the terms provided in the DBRA Requirements for Contractors and Subcontractors Under EPA Grants."

b. After Award of Contract:

i. Approve and Submit Requests for Additional Wages Rates: Work with contractors to request additional wage rates if required for contracts under this grant, as provided in 29 CFR 5.5(a)(1)(iii).

ii. Provide Oversight of Contractors to Ensure Compliance with DBRA Provisions: Ensure contractor compliance with the terms of the contract, as required by 29 CFR 5.6.

**4. Recipient Responsibilities When Establishing and Managing Additional Subawards:**

a. Include DBRA Requirements in All Subawards (including Loans):

i. Include the following text on all subawards under this grant:

1. "By accepting this award, the EPA subrecipient acknowledges and agrees to the terms and conditions provided in the DBRA Requirements for EPA Subrecipients."

b. Provide Oversight to Ensure Compliance with DBRA Provisions: Recipients are responsible for oversight of subrecipients and must ensure subrecipients comply with the requirements in 29 CFR 5.6.

5. The contract clauses set forth in this Term & Condition, along with the correct wage determinations, will be considered to be a part of every prime contract covered by Davis-Bacon and Related Acts (see 29 CFR 5.1), and will be effective by operation of law, whether or not they are included or incorporated by reference into such contract, unless the Department of Labor grants a variance, tolerance, or exemption. Where the clauses and applicable wage determinations are effective by operation of law under this paragraph, the prime contractor must be compensated for any resulting increase in wages in accordance with applicable law.

**V. Participation in an EPA-Sponsored Program Evaluation.**

As a condition of the receipt of the award under a NOFO, the recipient is required to cooperate with all EPA staff, contractors, or designated Recipients performing research or evaluation studies funded by EPA, if directed to do so by the Project Officer.

**W. Land Acquisition**

Land acquisition must comply with the Uniform Relocation Act and Federal Highway Administration's implementing regulations at 49 CFR Part 24 which requires grantees to follow certain procedures for acquiring property for grant purposes, such as notice, negotiation, and appraisal requirements.

**X. Termination**

Notwithstanding the General Term and Condition "Termination", EPA maintains the right to terminate the Assistance Agreement only as specified in 2 CFR 200.339 and the version of 2 CFR 200.340 applicable to EPA grants as of July 1, 2024 pursuant to 89 FR 55262 (July 3, 2024) , when the noncompliance with the terms and conditions is substantial such that effective performance of the Assistance Agreement is materially impaired or there is adequate evidence of waste, fraud, or abuse, prompting adverse action by EPA per 2 CFR 200.339, through either a partial or full termination. In accordance with 2 CFR 200.341, EPA will provide the Recipient notice of termination.

If EPA partially or fully terminates the Assistance Agreement, EPA must (1) de-obligate uncommitted funds and re-obligate them to another Eligible Recipient to effectuate the objectives of Section 138 of the Clean Air Act, 42 USC § 7434 within 90 days of the de-obligation and (2) amend the Recipient's Assistance Agreement to reflect the reduced amount, based on the de-obligation.

# Attachment C

# U.S. ENVIRONMENTAL PROTECTION AGENCY

## Assistance Amendment

| | |
|---|---|
| **GRANT NUMBER (FAIN):** 01E03682<br>**MODIFICATION NUMBER:** 1<br>**PROGRAM CODE:** 5N | **DATE OF AWARD**<br>12/20/2024 |
| **TYPE OF ACTION**<br>Revision: Scope & Increase | **MAILING DATE**<br>12/26/2024 |
| **PAYMENT METHOD:**<br>ASAP | **ACH#**<br>51232 |

| | |
|---|---|
| **RECIPIENT TYPE:**<br>Not for Profit | **Send Payment Request to:**<br>Contact EPA RTPFC at: rtpfc-grants@epa.gov |
| **RECIPIENT:** | **PAYEE:** |
| MINNEAPOLIS FOUNDATION<br>800 IDS CENTER 80 S 8TH ST<br>800 IDS Tower<br>MINNEAPOLIS, MN 55402<br>**EIN:** 41-6029402 | MINNEAPOLIS FOUNDATION<br>80 S 8TH STREET 800 IDS Center<br>Minneapolis, MN 55402 |

| PROJECT MANAGER | EPA PROJECT OFFICER | EPA GRANT SPECIALIST |
|---|---|---|
| Jo-Anne Stately<br>80 S. 8th Street<br>800 IDS Center<br>Minneapolis, MN 55402-2100<br>**Email:** jstately@mplsfoundation.org<br>**Phone:** 612-672-3878 | Cristina Presmanes<br>77 West Jackson Blvd., RM-19J<br>Chicago, IL 60604-3507<br>**Email:** Presmanes.Cristina@epa.gov<br>**Phone:** 312-353-8205 | Mauricio Lobato<br>Assistance Section, MA-10J<br>77 West Jackson Blvd.<br>Chicago, IL 60604-3507<br>**Email:** lobato.mauricio@epa.gov<br>**Phone:** 312-353-2515 |

**PROJECT TITLE AND EXPLANATION OF CHANGES**

Environmental Justice Thriving Communities Grantmaker Program (EJ TCGM)

See Attachment 1 for project description.

| BUDGET PERIOD | PROJECT PERIOD | TOTAL BUDGET PERIOD COST | TOTAL PROJECT PERIOD COST |
|---|---|---|---|
| 10/01/2024 - 09/30/2027 | 10/01/2024 - 09/30/2027 | $ 52,000,000.00 | $ 52,000,000.00 |

## NOTICE OF AWARD

Based on your Application dated 12/06/2024 including all modifications and amendments, the United States acting by and through the US Environmental Protection Agency (EPA) hereby awards $ 10,000,000.00. EPA agrees to cost-share 100.00% of all approved budget period costs incurred, up to and not exceeding total federal funding of $ 52,000,000.00. Recipient's signature is not required on this agreement. The recipient demonstrates its commitment to carry out this award by either: 1) drawing down funds within 21 days after the EPA award or amendment mailing date; or 2) not filing a notice of disagreement with the award terms and conditions within 21 days after the EPA award or amendment mailing date. If the recipient disagrees with the terms and conditions specified in this award, the authorized representative of the recipient must furnish a notice of disagreement to the EPA Award Official within 21 days after the EPA award or amendment mailing date. In case of disagreement, and until the disagreement is resolved, the recipient should not draw down on the funds provided by this award/amendment, and any costs incurred by the recipient are at its own risk. This agreement is subject to applicable EPA regulatory and statutory provisions, all terms and conditions of this agreement and any attachments.

| ISSUING OFFICE (GRANTS MANAGEMENT OFFICE) | AWARD APPROVAL OFFICE |
|---|---|
| **ORGANIZATION / ADDRESS** | **ORGANIZATION / ADDRESS** |
| U.S. EPA, Region 5, U.S. EPA Region 5<br>Mail Code MCG10J 77 West Jackson Blvd.<br>Chicago, IL 60604-3507 | U.S. EPA, Region 5, Office of Environmental Justice, Community Health, and Environmental Review Division<br>OEJECR - Office of Environmental Justice and External Civil Rights<br>77 West Jackson Blvd., R-19J<br>Chicago, IL 60604-3507 |

**THE UNITED STATES OF AMERICA BY THE U.S. ENVIRONMENTAL PROTECTION AGENCY**

| | |
|---|---|
| **Digital signature applied by EPA Award Official for** Sheila Dolan - Manager, Acquisition and Assistance Branch<br>**by** Robert Fields - Award Official Delegate | **DATE**<br>12/20/2024 |

# EPA Funding Information

| FUNDS | FORMER AWARD | THIS ACTION | AMENDED TOTAL |
|---|---|---|---|
| EPA Amount This Action | $ 42,000,000 | $ 10,000,000 | $ 52,000,000 |
| EPA In-Kind Amount | $ 0 | $ 0 | $ 0 |
| Unexpended Prior Year Balance | $ 0 | $ 0 | $ 0 |
| Other Federal Funds | $ 0 | $ 0 | $ 0 |
| Recipient Contribution | $ 0 | $ 0 | $ 0 |
| State Contribution | $ 0 | $ 0 | $ 0 |
| Local Contribution | $ 0 | $ 0 | $ 0 |
| Other Contribution | $ 0 | $ 0 | $ 0 |
| Allowable Project Cost | $ 42,000,000 | $ 10,000,000 | $ 52,000,000 |

| Assistance Program (CFDA) | Statutory Authority | Regulatory Authority |
|---|---|---|
| 66.615 - Environmental Justice Thriving Communities Grantmaking Program (EJ TCGM) | Clean Air Act: Sec. 138 | 2 CFR 200, 2 CFR 1500 and 40 CFR 33 |

| Fiscal | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Site Name | Req No | FY | Approp. Code | Budget Organization | PRC | Object Class | Site/Project | Cost Organization | Obligation / Deobligation |
| - | 25125WB129 | 2226 | BSF5 | WF | 000W57XK1 | 4140 | - | - | $ 10,000,000 |
| | | | | | | | | | $ 10,000,000 |

Budget Summary Page

| Table A - Object Class Category (Non-Construction) | Total Approved Allowable Budget Period Cost |
|---|---|
| 1. Personnel | $ 686,424 |
| 2. Fringe Benefits | $ 203,465 |
| 3. Travel | $ 0 |
| 4. Equipment | $ 0 |
| 5. Supplies | $ 0 |
| 6. Contractual | $ 1,907,106 |
| 7. Construction | $ 0 |
| 8. Other | $ 48,300,000 |
| 9. Total Direct Charges | $ 51,096,995 |
| 10. Indirect Costs: 0.00 % Base See Table B | $ 903,005 |
| 11. Total (Share: Recipient 0.00 % Federal 100.00 %) | $ 52,000,000 |
| 12. Total Approved Assistance Amount | $ 52,000,000 |
| 13. Program Income | $ 0 |
| 14. Total EPA Amount Awarded This Action | $ 10,000,000 |
| 15. Total EPA Amount Awarded To Date | $ 52,000,000 |

Table B Budget Worksheet #1

| Table B - Program Element Classification (Non-construction) | Total Approved Allowable Budget Period Cost |
|---|---|
| 1. 10/1/2024 - 9/30/2027 - 15% De Minimis Rate - Modified Total Direct Costs. | $ 0 |
| 2. | $ 0 |
| 3. | $ 0 |
| 4. | $ 0 |
| 5. | $ 0 |
| 6. | $ 0 |
| 7. | $ 0 |
| 8. | $ 0 |
| 9. | $ 0 |
| 10. | $ 0 |
| 11. Total (Share: Recip % Fed %) | $ 0 |
| 12. Total Approved Assistance Amount | $ 0 |

# Attachment 1 - Project Description

This agreement provides funding under the Inflation Reduction Act (IRA) to The Minneapolis Foundation. The recipient is a Regional Grantmaker. This proposed funding request is for a supplemental grant of $10 million for a project duration of 36 months to implement the Environmental Justice Thriving Communities Grantmaking Program (TCGM) in Region 5. Of the additional $10 million, $8 million will be redistributed as follows: Tribes and Indigenous groups and communities: $4 million of sub-grant dollars, through 17 grants across all tiers. This includes 3 non-competitive sub-grants for severely capacity constrained eligible subrecipients. [NDN Collective will lead communications, outreach, and support to this constituency]. $4 million of sub-grant dollars, through 17 grants across all tiers. This includes 3 non-competitive sub-grants for severely capacity constrained eligible subrecipients. [TMF's RE-AMP Project will lead communications, outreach, and support to this constituency.] The additional $2 million will be used to support administrative costs including personnel and contractors to support crosscutter regulation, human subjects research and hiring a project officer to support the quality assurance process. The purpose of this award is to fund a supplemental $10 Million to the Grantmaker subsequent award for the pass-through entity The Minneapolis Foundation.

The activities in the supplemental Award Phase include of the $10 million in supplemental funding, activities will include subgranting $8 million dollars as follows:

Year 1 (anticipated Grant 2 period): Fall 2024-Summer 2025. Proposed supplemental grantmaking total is $4 million. Expect to award 17 sub-grants across all three tiers. We anticipate making decisions in: Winter 2025; Spring 2025; and Summer/Fall 2025. Year 2 (anticipated Grant 2 period): Fall 2025-Summer 2026. Proposed supplemental grantmaking total is $4 million. We expect to award 17 sub-grants across all three tiers. We anticipate making decisions in: Fall 2025/Winter 2026; Spring 2026; and Summer 2026.

Additional funds will be used to hire an additional project officer to support the new grant load and to assist with quality assurance requirements, a human subjects research contractor and two technical assistance contractors to focus on crosscutting.

The intended deliverables are an additional 36 grants distributed as follows:

Year 1 (anticipated Grant 2 period): Fall 2024-Summer 2025 . Proposed supplemental grantmaking total is $4 million. Expect to award 17 sub-grants across all three tiers. We anticipate making decisions in: Winter 2025; Spring 2025; and Summer/Fall 2025.

Year 2 (anticipated Grant 2 period): Fall 2025-Summer 2026. Proposed supplemental grantmaking total is $4 million. We expect to award 17 sub-grants across all three tiers. We anticipate making decisions in: Fall 2025/Winter 2026; Spring 2026; and Summer 2026.

Expected outcomes include providing grants to support a cleaner environment, increase community resiliency to environmental stressors, and to build capacity for smaller organizations. Intended beneficiaries for the supplemental $10 million include communities urban, tribal, and remote communities located within the IRA disadvantaged communities map.

Of the $10 million in supplemental funding, $8 million will be subgranted across three tiers to tribal and indigenous communities; and to remote and rural communities, with $4 million allocated to each for 34 additional subgrant awards in addition to those given with the $40 million in the subsequent award.

Additionally, 3 subawards (one per year) will be awarded to NDN collective for the additional support and coordination needed to manage the addition $4 million in subgrants to indigenous and tribal nations.

This Supplemental amendment obligates federal funding in the amount of $10,000,000 and increases total project costs to $52,000,000. This supplemental award is to support Human Subjects Research, Crosscutters, Quality Assurance and to also subgrant $8 million dollars to disadvantaged communities within Region 5.

The revised workplan activities are in accordance with Clean Air Act: Sec. 138 guidelines.

This action updates the Administrative and Programmatic terms and conditions of the Assistance Agreement.

# Administrative Conditions

**The Following Administrative Term and Condition Has Been Updated:**

**General Terms and Conditions**

The General Terms and Conditions of this agreement are updated in accordance with the link below. This amendment incorporates the October 2024 revisions to 2 CFR 200. These updated General Terms and Conditions and regulations apply to activities on or after the date of this amendment and to all previously awarded funds not yet disbursed by the recipient as of the award date of this amendment. The General Terms and Conditions cited in the original award or prior funded amendments remain in effect for funds disbursed by the recipient prior to the award date of this amendment.

The recipient agrees to comply with the current EPA general terms and conditions available at: https://www.epa.gov/system/files/documents/2024-10/fy_2025_epa_general_terms_and_conditions_effective_october_1_2024_or_later.pdf

These terms and conditions are binding for disbursements and are in addition to or modify the assurances and certifications made as a part of the award and the terms, conditions, or restrictions cited throughout the award.

The EPA repository for the general terms and conditions by year can be found at: https://www.epa.gov/grants/grant-terms-and-conditions#general.

**All Other Administrative Terms and Conditions Remain the Same**

# Programmatic Conditions

**The Following Programmatic Terms and Conditions Have Been Updated:**

**ENVIRONMENTAL JUSTICE THRIVING COMMUNITIES GRANTMAKING (TCGM) PROGRAM COOPERATIVE AGREEMENT TERMS AND CONDITIONS - SUBSEQUENT AWARD**

1. **Eligibility Requirements for Subgrants**

Subgrant eligibility

Grantmakers have flexibility to determine certain priorities for eligible subrecipients and activities that best meet the needs of their respective regions, in consultation with EPA. However, eligibility must fall within the following statutory and policy parameters:

Eligible Subrecipients are as follows:

- 
    - Nonprofit organizations
    - Community-based and grassroots nonprofit organizations
    - Philanthropic and civic organizations with nonprofit status
    - Tribal governments (both federally recognized and state-recognized) and intertribal consortia (i.e., a partnership between two or more tribes that work together to achieve a common objective.)
    - Native American Organizations (includes Indian groups, cooperatives, nonprofit corporations, partnerships, and associations that have the authority to enter into legally binding agreements)
    - Local governments (as defined by 2 CFR 200.1 – includes cities, towns, municipalities, and counties, public housing authorities and councils of government)
    - Institutions of higher education (e.g., private and public universities and colleges, including community colleges)
    - Puerto Rico
    - US Territories

Ineligible Subrecipients include:

- 
    - Individuals
    - For-profit businesses, unless EPA's Award Official makes an exception based on factors such as those described in Appendix A of EPA's Subaward Policy.
    - State governments
    - Foreign entities of concern.

The term “foreign entity of concern” means a foreign entity that is—

1.

1.

1. designated as a foreign terrorist organization by the Secretary of State under section 1189(a) of Title 8;

1.

1.

2. included on the list of specially designated nationals and blocked persons maintained by the Office of Foreign Assets Control of the Department of the Treasury (commonly known as the "SDN list");
3. owned by, controlled by, or subject to the jurisdiction or direction of a government of a foreign country that is a covered nation (as defined in section 4872(d)(2) of Title 10); or
4. alleged by the Attorney General to have been involved in activities for which

a conviction was obtained under (i) chapter 37 of title 18 (commonly known as the "Espionage Act"); (ii) section 951 or 1030 of title 18; (iii) chapter 90 of title 18 (commonly known as the "Economic Espionage Act of 1996"); (iv) the Arms Export Control Act ( 22 U.S.C. 2751 et seq.); (v) section 224, 225, 226, 227, or 236 of the

Atomic Energy Act of 1954 ( 42 U.S.C. 2274 , 2275, 2276, 2277, and 2284); (vi) the Export Control Reform Act of 2018 ( 50 U.S.C. 4801 et seq.); or (vii) the International Emergency Economic Powers Act ( 50 U.S.C. 1701 et seq.).

Eligible Beneficiaries

As required by Clean Air Act Section 138 (CAA 138), codified at 42 U.S.C. 7438, activities carried out by the Grantmaker or funded by Grantmaker subawards must benefit disadvantaged communities, defined by the EPA Administrator as any community that meets at least one of the following characteristics:

- Identified as disadvantaged by the Climate and Economic Justice Screening Tool (CEJST);
- Any census block group that is at or about the 90th percentile for any of EJScreen's Supplemental Indexes when compared to the nation or state; and / or
- Any geographic area within Tribal lands as included in EJScreen, which include:
    - Alaska Native Allotments
    - Alaska Native Villages
    - American Indian Reservations
    - American Indian Off-reservation Trust Lands
    - Oklahoma Tribal Statistical Areas Eligible activities

Grantmakers may engage in and fund only those activities that are authorized by CAA 138, which include:

- Community-led air and other pollution monitoring, prevention, and remediation, and investments

in low- and zero emission and resilient technologies and related infrastructure;

- Workforce development that help reduce greenhouse gas emissions and other air pollutants;
- Mitigating climate and health risks from urban heat islands, extreme heat, wood heater emissions, and wildfire events;
- Climate resiliency and adaptation;
- Reducing indoor toxics and indoor air pollution; or
- Facilitating engagement of disadvantaged communities in State and Federal advisory groups, workshops, rulemakings, and other public processes.

<u>Ineligible activities</u>

Ineligible activities include, but are not limited to:

- Any activity that violates applicable federal civil rights statutes prohibiting discrimination, including but not limited to Title VI of the Civil Rights Act of 1964, Section 504 of the Rehabilitation Act of 1973, the Age Discrimination Act of 1975, section 504 of the Rehabilitation Act of 1973, Title IX of the Education Amendments of 1972, Federal Water Pollution Control Act Amendments of 1972, and implementing EPA regulations.
- Lobbying, as defined at 2 CFR 200.450;
- Defense and prosecution of criminal and civil proceedings, claims, appeals and patent infringements, as defined at 2 CFR 200.435;
- Carrying out protests, demonstrations, boycotts, or disinvestment campaigns; and
- Any activity to encourage actions that violate Federal, state or local law including, but not limited to, provisions relating to unlawful assembly, trespass, inciting violence, and failing to obey the lawful orders of law enforcement personnel.

2. Establishing and Managing Subawards

Grantmakers are required to distribute eighty percent of their fifty-million-dollar award in three years through competitive and non-competitive subgrants to be completed within the project period of the subsequent award. These awards should be to eligible subrecipients to carry out activities described in the Notice of Funding Opportunity that benefit disadvantaged communities as defined by the Administrator, in accordance with Clean Air Act 138(b)(1) . Grantmakers making pass-through subawards must comply with applicable provisions of 2 CFR Part 200 and the EPA Subaward Policy. As a pass-through entity, the recipient agrees to:

1. Be responsible for selecting subrecipients and as appropriate conducting subaward competitions using a system for properly differentiating between subrecipients and procurement contractors under the standards at 2 CFR 200.331 and EPA's supplemental guidance in Appendix A of the EPA Subaward Policy.
    1. For-profit organizations and individual consultants, in almost all cases, are not eligible subrecipients under EPA financial assistance programs and the pass-through entity must obtain prior written approval from EPA's Award Official for subawards to these entities

unless the EPA- approved budget and work plan for this agreement contain a precise description of such subawards.

2. Stipends and travel assistance for trainees (including interns) and similar individuals who are not employees of the pass-through entity must be classified as participant support costs rather than subawards, as defined at 2 CFR 200.1 and described in EPA's Guidance on Participant Support Costs.
3. Subsidies, rebates and similar payments to participants in EPA funded programs to encourage environmental stewardship are also classified as participant support costs as provided in 2 CFR 1500.1 and EPA's Guidance on Participant Support Costs.

2. Establish and follow a system that ensures all subaward agreements are in writing and contain all of the elements required by 2 CFR 200.332(b). EPA has developed a template for subaward agreements that is available in Appendix D of the EPA Subaward Policy.

3. Prior to making subawards, ensure that each subrecipient has a “Unique Entity Identifier (UEI).” The UEI is required by 2 CFR Part 25 and 2 CFR 200.332(b)(1). Subrecipients are not required to complete full

System for Award Management (SAM) registration to obtain a UEI. Information on how to obtain a UEI is available at the SAM Internet site: https://www.sam.gov/SAM/ and in EPA's General Term and Condition “System for Award Management and Universal Identifier Requirements” of the pass-through entity's agreement with the EPA.

4. Ensure that subrecipients are aware that they are subject to the same cross-cutting legal and policy requirements as the Grantmaker's award as required by 2 CFR 200.332(b)(2). These requirements include, among others:
    4. Title VI of the Civil Rights Act and other Federal statutes and regulations prohibiting discrimination in Federal financial assistance programs, as applicable.
    5. Reporting Subawards and Executive Compensation under Federal Funding Accountability and Transparency Act (FFATA) set forth in the General Condition passthrough entity's agreement with EPA entitled “Reporting Subawards and Executive Compensation.” Page 8 of 42
    6. Limitations on individual consultant fees as set forth in 2 CFR 1500.10 and the General Condition of the pass-through entity's agreement with EPA entitled “Consultant Fee Cap.”
    7. EPA's prohibition on paying management fees as set forth in General Condition of the pass-through entity's agreement with EPA entitled “Management Fees.”

1.

5. The Procurement Standards in 2 CFR Part 200 including those requiring competition when the subrecipient acquires goods and services from contractors (including consultants). EPA provides general information on other statutes, regulations and Executive Orders on the Grants internet site at www.epa.gov/grants. Many Federal requirements are agreement or program specific and EPA encourages pass-through entities to review the terms of their assistance agreement carefully and consult with their EPA Project Officer for advice if necessary.

5. Ensure, for states and other public recipients, that subawards are not conditioned in a manner that would disadvantage applicants for subawards based on their religious character.

6. Establish and follow a system for evaluating subrecipient's risks of noncompliance or fraud as required by 2 CFR 200.332(c) and document the evaluation. When evaluating a subrecipient's risk, a passthrough entity should consider the following: (a) Prior experience with same or similar subawards

(b) Results of previous audits; (c) Whether new or substantially changed personnel or systems, and; (d) Extent and results of any Federal agency or the pass-through entity's monitoring

7. Establish and follow a process for deciding whether to impose additional requirements on subrecipients based on risk factors as required by 2 CFR 200.332(d). Examples of additional requirements authorized by 2 CFR 200.208 include:
    7. Requiring payments as reimbursements rather than advance payments;
    8. Withholding authority to proceed to the next phase until receipt of evidence of acceptable performance within a given period of performance;
    9. Requiring additional, more detailed financial reports;
    10. Requiring additional project monitoring;
    11. Requiring the non-Federal entity to obtain technical or management assistance, and
    12. Establishing additional prior approvals

8. Establish and follow a system for monitoring subrecipient performance that includes the elements required by 2 CFR 200.332(e) and report the results of the monitoring in performance reports as provided in the reporting terms and conditions of this agreement.

9. Establish and maintain an accounting system which ensures compliance with the $50,000 limitation on Modified Total Direct Costs per subaward, if applicable, for the purposes of distributing indirect costs. Recipients with Federally approved indirect cost rates that use a different basis for distributing indirect costs to subawards must comply with their Indirect Cost

Rate Agreement.

10. Work with EPA's Project Officer to obtain the written consent of EPA's Office of International and Tribal Affairs (OITA), prior to awarding a subaward to a foreign or international organization, or a subaward to be performed in a foreign country even if that subaward is described in a proposed scope of work.

11. Obtain written approval from EPA's Award Official for any subawards that are not described in the approved work plan in accordance with 2 CFR 200.308.

12. Obtain the written approval of EPA's Award Official prior to awarding a subaward to an individual if the EPA-approved scope of work does not include a description of subawards to individuals.

13. Establish and follow written procedures under 2 CFR 200.302(b)(7) for determining that subaward costs are allowable in accordance with 2 CFR Part 200, Subpart E and the terms and conditions of this award. These procedures may provide for allowability determinations on a pre-award basis, through ongoing monitoring of costs that subrecipients incur, or a combination of both approaches provided the pass-through entity documents its determinations.

14. Establish and maintain a system under 2 CFR 200.332(e)(3) and 2 CFR 200.521 for issuing management decisions for audits of subrecipients that relate to Federal awards. However, the recipient remains accountable to EPA for ensuring that unallowable subaward costs initially paid by EPA are reimbursed or mitigated through offset with allowable costs whether the recipient recovers those costs from the subrecipient or not.

15. As provided in 2 CFR 200.333, pass-through entities must obtain EPA approval to make fixed amount subawards. EPA is restricting the use of fixed amount subawards to a limited number of situations that are authorized in official EPA pilot projects. Recipients should consult with their EPA Project Officer regarding the status of these pilot projects. By accepting this award, the recipient is certifying that it either has systems in place to comply with the requirements described in Items 1 through 14 above or will refrain from making subawards until the systems are designed and implemented.

3. PERFORMANCE REPORTING AND FINAL PERFORMANCE REPORT

**Performance Reporting – Content**

In accordance with 2 CFR 200.329, the recipient agrees to submit performance reports that include brief information on each of the following areas: 1) A comparison of actual accomplishments to the outputs/outcomes established in the assistance agreement work plan for the period; 2) The reasons why established outputs/outcomes were not met; and 3) other pertinent information, including, when appropriate, analysis and explanation of cost overruns or high unit costs. This description may include overall best practices and/or lessons learned over the project performance period, and attachments and links for materials that may be helpful to other Environmental Grants recipients or similar organizations (e.g., tip sheets, “how-to” sheets, communication materials, outreach materials, web tools, etc.).

These reports shall cover work status, work progress, difficulties encountered, preliminary data results and a statement of activity anticipated during the subsequent reporting period, including a description of equipment, techniques, and materials to be used or evaluated. A discussion of cumulative and period comparison of project budget and expenditures, coupled with a comparison of the percentage of the project completed and in relation to project schedule and an explanation(s) of significant discrepancies must be included in the report. The report shall also include any changes of key personnel concerned with the project.

Additionally, the recipient agrees to inform EPA within 30 calendar days about problems, delays, or adverse conditions that may materially impair the ability to meet the outputs/outcomes specified in the assistance agreement work plan.

Performance Reporting - Frequency

The recipient agrees to submit quarterly performance reports electronically to the EPA Project Officer on the designated quarterly due date(s). If due date falls on a federal holiday or weekend, it is due the following business day**.** The period end and due dates are listed in the below table.

| **Period Ending** | **Quarterly Due Dates** |
|---|---|
| September 30 | October 31 |
| December 31 | January 31 |
| March 31 | April 30 |
| June 30 | July 31 |

The first quarterly report is due at the end of the first full quarter following the execution of the agreement, unless the recipient has incurred pre-award costs. If the recipient is authorized to incur pre-award costs, the grant performance period begins on the date costs were first incurred, and the recipient would provide a quarterly performance report following the end of the first full quarter after that date. Quarterly reports will continue thereafter and throughout the remainder of the performance period. The recipient must submit the final performance report no later than 120 calendar days after the end date of the period of performance as identified in this agreement. The final report must document all project activities occurring during the Period of Performance and as outlined in the executed agreement. However, please be advised that the statutory three-year performance period for this grant program may not be extended. Any costs incurred after the end of the performance period are the responsibility of the

recipient and may not be charged to the grant.

Subaward Performance Reporting

The recipient must report on its subaward monitoring activities under 2 CFR 200.332(e). Pass-through entity monitoring of the subrecipient must include:

1. Review of financial and programmatic reports.
2. Follow-up on action plans noting findings/deficiencies identified from site visits and/or desk reviews to ensure effective subrecipient performance.
3. Quantitative environmental results the subrecipient achieved, the place of performance (eg. Census Tract ID, zip code, latitude / longitude) and a narrative discussion of any qualitative improvements of environmental conditions in the target community.
4. Summaries of audit findings and related pass-through-entity management decisions.
5. Any disagreements or potential challenges with subrecipients that may interfere with the completion of subgrant performance, and actions the pass-through entity has taken to mitigate them.
6. Actions the pass-through entity has taken to correct deficiencies such as those specified at 2 CFR 200.332(f), 2 CFR 200.208 and the 2 CFR Part 200.339 Remedies for Noncompliance.
7. Summaries of collaborative governance activities and impacts with communities, project partners, and Technical Assistance providers (TCTACs, contractors, etc.) including quantitative measures and place of performance of outreach, engagement, and implementation of feedback.
8. Quantity of, the place of performance and qualitative summaries of capacity building activities for severely capacity-constrained communities.
9. Summaries of reach in underserved communities, communities in urban, remote, and rural areas, and community stakeholders with the highest degree of burden and capacity constraints throughout the entire Geographic Area.

Subaward Performance Reporting on Milestones of Activities for Fixed-Amount Awards

Grantmakers have limited reporting requirements for fixed-amount subawards. The recipient must at minimum report on subrecipients' fixed-amount subaward milestones via the quarterly performance reports, as well as any other reporting requirements agreed upon by the Grantmaker and the fixed-amount subaward recipient, as described in the Fixed Amount Subaward memo. Fixed Amount Subaward Performance reporting will be in accordance with **applicable requirements specified in 2 CFR Parts 200 and 1500, which will apply to fixed-amount subawards absent a case-specific exception requested by a Grantmaker, concurred by the OEJECR Project Officer and approved by OGD. Note:** Each Grantmaker will define “Severely Capacity Constrained.” Grantmakers will also design policies and procedures to limit the number of EJ Thriving Communities Subgrants that a single entity may receive within a specified time period to maximize the diversity and breadth of subrecipients.

Examples of Fixed Amount Subaward Performance reporting include but are not limited to:

1. Monitoring plans paid on a milestone basis with an initial amount paid prior to the development of the plan, followed by a second payment upon completion of the draft plan, with a final payment when the plan is complete.

2. Lump sum payments for equipment purchases (e.g. air monitoring devices) based on invoices provided by the subrecipient.

3. Upfront costs of no more than 25%, except with permission of the Project Officer, with subsequent milestone-based payments. For example, sampling projects paid on a milestone basis with 25% for upfront expenses, 25% for data collection, 25% for data analysis, 25% for final report completion.

Fixed-Amount Subaward Monitoring and Compliance

**As provided in 2 CFR 200.102(c), the Award Official is authorized to waive or modify the following regulatory requirements for subrecipients receiving fixed-amount subawards:**

1.
    1. Competition requirements specified in 2 CFR Part 200 and Part 1500 with the exception of the statutory consultant fee cap implemented at 2 CFR 1500.10.
    2. Records required to document personnel compensation under 2 CFR 200.430 and 2 CFR 200.431.
    3. Financial requirements at 2 CFR 200.302(b) with the exception of accounting records and documentation required to demonstrate achievement of agreed upon milestones such as invoices for equipment or facility rental, fees paid, stipends earned, and similar fixed-amount transactions.
    4. Internal controls described at 2 CFR 200.303 with the exception of an internal control protocol for ensuring that fixed-amount subrecipients only request payment from the pass-through entities upon completion of agreed upon milestones.
    5. Property standards in 2 CFR Part 200 with the exception of 2 CFR 200.315 as implemented in EPA's General Term and Condition Data and Copyrighted Materials relating to EPA's “Federal Purpose” license in data and written materials produced with EPA funds.
    6. Subrecipient and contractor determinations in 2 CFR 200.331 and corresponding provisions of the EPA Subaward Policy.
    7. Indirect costs authorized by 2 CFR 200.332(b)(4). Fixed amount subrecipients do not incur indirect costs.
    8. Reports on real or personal property required when closing out a subaward specified in 2 CFR 200.344(g).

4. The pass-through entities must have pricing procedures that prevent subrecipients from “profiting” from fixed-amount subawards by precluding payments for “management fees” or other amounts in excess of anticipated costs for the activity. Grantmakers will use the following

methods to ensure compliance for tracking and monitoring activities:

1. Establishing the content of periodic and final performance and financial reports for each fixed-amount subaward.
2. Obtaining a budget description of planned expenditures to be refunded if an activity or event does not take place, a report or analysis is not completed, or the subrecipient does not otherwise perform as promised.
3. Certification in writing to the pass-through entity at the end of the fixed-amount subaward that the project or activity was completed, or the level of effort was expended. If the required level of activity or effort was not carried out, the amount of the fixed-amount subaward must be adjusted and any excess funds refunded.
4. Requiring prior written approval of the pass-through entity for any changes in principal investigator, project leader, project partner, or scope of effort.

5. Review and Oversight

1. Work Product - The recipient agrees that any product (e.g., publication, outreach materials, training manuals) produced through this assistance agreement and made available for public view must be first reviewed by the EPA Project Officer for comment before release. The recipient shall make all final decisions on the product content.
2. Monthly Calls - The recipient shall consult with the EPA Project Officer on a monthly basis to obtain input on program activities and products produced. However, the recipient should make all final decisions on project implementation and product content. The EPA Project Officer has discretion to change the frequency with which calls are held.
3. Prior Approval - Any proposed changes to the project must be submitted in writing to the EPA Project Officer and Grant Specialist for EPA approval prior to implementation. The recipient incurs costs at its own risk if it fails to obtain written approval before implementing any changes.

6. Post-Project Period Follow-up and Engagement

For no less than one year after completion of the project, the recipient agrees to periodically update its designated EPA Project Officer on current community-based and environmental justice work the recipient is performing and how/if that work relates to its now completed EJ TCGM project. These periodic updates may include (but are not limited to) recent local media reports, additional grant funding received, new initiatives, and developing partnerships. The EPA EJ Grants program is invested in the long-term success of each EJ Grant recipient and its long-term impact on addressing the disproportionate environmental and public health impacts plaguing their communities. These post- project period updates allow the EJ Grants program to provide past recipients with additional guidance about applicable funding

opportunities, potential collaborations, and technical assistance that may assist recipients in their future work. Periodic updates also allow the program to track best practices that lead to greater project sustainability and long-term community revitalization for impacted community residents. The frequency of these periodic updates will be by mutual agreement and will be discussed with the recipient before the end of the project period. Recipients are also encouraged to continue providing updates and engaging with their EPA Project Officers beyond the additional year after the end of the project.

*NOTE – Compliance with this term & condition will not give the recipient priority during future EPA EJ grant competitions and is not a guarantee for future EPA grant funding. Additionally, the recipient agrees not to submit a claim for compensation to EPA for providing these updates. Project Officers are encouraged to engage with their Grantmakers to fulfill post-period follow-up, but are not to document non-compliance.

7. Cybersecurity Condition

1. The recipient agrees that when collecting and managing environmental data under this assistance agreement, it will protect the data by following all applicable State or Tribal law cybersecurity requirements.

2. (1) EPA must ensure that any connections between the recipient's network or information system and EPA networks used by the recipient to transfer data under this agreement, are secure. For purposes of this Section, a connection is defined as a dedicated persistent interface between an Agency IT system

and an external IT system for the purpose of transferring information. Transitory, user-controlled connections such as website browsing are excluded from this definition.

If the recipient's connections as defined above do not go through the Environmental Information Exchange Network or EPA's Central Data Exchange, the recipient agrees to contact the EPA Project Officer (PO) no later than 90 days after the date of this award and work with the designated Regional/Headquarters Information Security Officer to ensure that the connections meet EPA security requirements, including entering into Interconnection Service Agreements as appropriate. This condition does not apply to manual entry of data by the recipient into systems operated and used by EPA's regulatory programs for the submission of reporting and/or compliance data.

(2) The recipient agrees that any subawards it makes under this agreement will require the subrecipient to comply with the requirements in (b)(1) if the subrecipient's network or information system is connected to EPA networks to transfer data to the Agency using systems other than the Environmental Information Exchange Network or EPA's Central Data Exchange. The recipient will be in compliance with this condition: by including this requirement in subaward agreements; and during subrecipient monitoring

deemed necessary by the recipient under 2 CFR 200.332(e), by inquiring whether the subrecipient has contacted the EPA Project Officer. Nothing in this condition requires the recipient to contact the EPA Project Officer on behalf of a subrecipient or to be involved in the negotiation of an Interconnection Service Agreement between the subrecipient and EPA.

8. Competency Policy

**Competency of Organizations Generating Environmental Measurement Data**

In accordance with Agency Policy Directive Number FEM-2012-02, Policy to Assure the Competency of Organizations Generating Environmental Measurement Data under Agency-Funded Assistance Agreements, Recipient agrees, by entering into this agreement, that it has demonstrated competency prior to award, or alternatively, where a pre-award demonstration of competency is not practicable, Recipient agrees to demonstrate competency prior to carrying out any activities under the award involving the generation or use of environmental data. Recipient shall maintain competency for the duration of the project period of this agreement and this will be documented during the annual reporting process. A copy of the Policy is available online

at https://www.epa.gov/sites/production/files/2015-03/documents/competency-policy-aaia-new.pdf or a copy may also be requested by contacting the EPA Project Officer for this award.

1. Procurement Terms and Conditions

The recipient agrees to conduct all procurement actions under this assistance agreement in accordance with the procurement standards set forth in Title 2 CFR, Parts 200.317 through 200.327, 2 CFR Part 1500 and 40 CFR Part 33. EPA provides additional guidance on complying with these requirements in the Best Practice Guide for Procuring Services, Supplies, and Equipment Under EPA Assistance Agreements which is available at https://www.epa.gov/grants/best-practice-guide-procuring-services-supplies-and- equipment-under-epa-assistance. Any costs incurred by the recipient under contracts and/or small purchases that EPA determines to be in noncompliance with EPA procurement standards shall be unallowable for Federal reimbursement.

As provided by 2 CFR 200.310 recipients or subrecipient must ensure that subrecipients acquire insurance equal to the amount of the purchased items to protect against loss, damage and theft if a subaward includes cost for equipment. Costs for such insurance are allowable under this agreement.

10. Geospatial Data Standards

All geospatial data created must be consistent with Federal Geographic Data Committee (FGDC) endorsed standards. Information on these standards may be found at https://www.fgdc.gov/.

11. Quality Assurance

Authority: Quality Assurance applies to all assistance agreements involving environmental information as defined in 2 C.F.R. § 1500.12 Quality Assurance.

The recipient shall ensure that subawards involving environmental information issued under this agreement include appropriate quality requirements for the work. The recipient shall ensure sub-award

recipients develop and implement a Quality Assurance (QA) planning document in accordance with this term and condition; and/or ensure sub-award recipients implement all applicable approved QA planning documents. In consultation with your Project Officer and the Regional Quality Assurance Manager, select the appropriate plan based on the following options to implement in the Subsequent Award:

NOTE: The Grantmaker will need to develop a management strategy for receiving, reviewing and assisting applicants with QMP or QAPP needs. .

1. Quality Management Plan (QMP)

1.

   1. Prior to beginning environmental information operations, the recipient must:

1.

   1. Submit a previously EPA-approved and current QMP,

1.

   2. The EPA Quality Assurance Manager or designee (hereafter referred to as QAM) will notify the recipient and EPA Project Officer (PO) in writing if the QMP is acceptable for this agreement.

1.

   2. The recipient must submit the QMP within 30 days after grant award, and/or no more than 90 days after grant award.

1.

3. The recipient must review their approved QMP at least annually. These documented reviews shall be made available to the sponsoring EPA organization if requested. When necessary, the recipient shall revise its QMP to incorporate minor changes and notify the EPA PO and QAM of the changes. If significant changes have been made to the Quality Program that affect the performance of environmental information operations, it may be necessary to re-submit the entire QMP for re-approval

In general, a copy of any QMP revision(s) made during the year should be submitted to the EPA PO and QAM in writing when such changes occur. Conditions requiring the revision and resubmittal of an approved QMP can be found in section 6 of EPA's Quality Management Plan (QMP) Standard.

For Reference:

- Quality Management Plan (QMP) Standard and EPA's Quality Assurance Project Plan (QAPP) Standard; contain quality specifications for EPA and non-EPA organizations and definitions applicable to these terms and conditions.

- EPA QA/G-5: *Guidance for Quality Assurance Project Plans.*

- (QAM and/or PO may insert QA references that inform or assist the recipient here).

- EPA's Quality Program website has a list of QA managers, and Non-EPA Organizations Quality Specifications.

- The Office of Grants and Debarment Implementation of Quality Assurance Requirements for Organizations Receiving EPA Financial Assistance.

L. Human Subjects Research Review Process

(a) *Applications involving human subjects.* (1) Protecting the rights, safety, and welfare of human subjects involved in research supported by EPA grants is the responsibility of the institution which receives or is accountable to EPA for the funds awarded for the support of the project.

2. Institutions engaged in research involving human subjects, with the exception of research eligible for exemption under 40 CFR 26.104, must submit to EPA for review, approval, and official acceptance, written evidence of a Federal wide Assurance (FWA) on file with the U.S. Department of Health and Human Services (HHS) or other agency that their institution will comply

with regulatory provisions in the Common Rule (codified by EPA at as 40 CFR 26 Part A).

3. Applicants must provide documentation with each proposal of research involving human subjects that it has been reviewed in accordance with the institution's assurance and in compliance with the Common Rule. Review and approval by the EPA Human Subject Research Review Official (HSRRO) to determine compliance with 40 CFR 26 and EPA Order 1000.17 (series) must occur before research involving human subjects may commence.

M. Program Income

In accordance with 2 CFR 200.307(b) and 2 CFR 1500.8(b), the recipient is hereby authorized to retain program income earned during the project period.

Project Officers must choose one or more of the options below per their approval in the Finding Recommendation and delete the options not applicable. The default use of the program income under 2 CFR 1500.8(b) is “Addition.”

The recipient agrees to use the following method for applying income:

1. Addition. Program income is added to the total allowable costs, increasing the overall total amount of the award. Program income must be used for the original purpose of the award and under the conditions of the assistance agreement.

Note: During budget negotiations program offices may authorize the recipient to deduct costs incurred in generating program income from gross program income to determine net program income as provided at 2 CFR 200.307(d). In these cases the program income T&C must include the following additional statement:

In accordance with 2 CFR 200.307(d) costs incidental to generating program income may be deducted from gross income to determine program income, provided these costs have not been charged to the EPA award. The recipient must retain adequate accounting records to document that any costs deducted from program income comply with regulatory requirements. Further, the recipient must report program income on the Federal Financial Report, SF425. The recipient should refer to the General Terms and Conditions “Federal Financial Reporting (FFR)” for more information on the SF 425.

14. Use of Logos and Icons

**Programmatic guidance for the appropriate use of the icons and logos either together, with other partner icons or individually will be provided.**

If the EPA logo is appearing along with logos from other participating entities on websites, outreach materials, or reports, it must **not** be prominently displayed to imply that any of the recipient or subrecipient's activities are being conducted by the EPA. Instead, the EPA logo should be accompanied with a statement indicating that the The Minneapolis Foundation received financial support from the EPA under an Assistance Agreement. More information is available

at: https://www.epa.gov/stylebook/using-epa-seal-and-logo#policy

Grantmaker Icon

The Thriving Communities Grantmaking Program (TCGM) Icon will be designed by the EPA with Grantmaker input and approved by the EPA PROTRAC process , used to monitor the concept proposal, development, review and approval of EPA print, infographics, audio, video and social media content/products for internal and external release, as well as Esri Products (Story Maps and Hub sites) for external publishing only. PROTRAC ensures all content created is consistent, appropriate and in alignment with current agency messages, and follows EPA branding guidelines. The icon will represent the "programmatic identity" of the Grantmaker program, and may be used alone or in conjunction with the EPA and grant recipient's logos' or individual Grantmaker's logo. The approved TCGM programmatic icon must remain intact and unmodified. Modifying icons to specifically identify a program office or

region are not permitted. NOTE: Icons must be updated or removed per current agency policy/ guidelines.

**O. Paperwork Reduction Act**

(a) The scope of work for this cooperative agreement includes a survey or other information collection of identical information from 10 or more parties. As provided by 5 CFR 1320.3(d), EPA is a sponsor of the information collection for purposes of obtaining approval from the Office of Management and Budget for collecting information. The recipient agrees to assist EPA in complying with OMB procedures at 5 CFR Part 1320 for obtaining Information Collection Request authorization. The recipient may not collect information until EPA obtains OMB approval. The Project Officer will advise the recipient when information collection may begin.

16. **Substantial Involvement**

EPA will be substantially involved in this agreement however, final decisions rest with the recipient. Substantial involvement by the EPA Project Officer may include:

1. Monthly telephone calls and other monitoring,
2. Review project phases and provide approval to continue to the next phase,
3. Review and comment on any documents, web content, or other materials developed under this agreement (the recipient will make final decisions on these matters),
4. Approve substantive terms included in contracts or subawards (EPA's Project Officer will not suggest, recommend, or direct the recipient to select any particular contractor or subrecipient except to the extent permitted in Section 10 of EPA's Subaward Policy).
5. Review and comment on the programmatic progress reports.

6. Consultation regarding the selection of key personnel (EPA's involvement is limited to reviewing the technical qualifications of key personnel and the recipient will make the final decisions on selection. EPA's Project Officer will not suggest, recommend, or direct the recipient to select any individual).

7. Collaboration with EPA on designing and implementing a project management process, which includes quality project oversight for funding subrecipients and a tracking and reporting process that reduces reporting burden on community recipients.
8. Collaboration on the preliminary design of the subaward competition, the submission and evaluation process, and the development of evaluation criteria. However, final decisions on the submission, evaluation process/criteria, and selection of subrecipients will be made by the recipient, rather than by EPA, provided statutory, regulatory, and EPA's Subaward Policy requirements are met.
9. EPA Project Officer must review and approve the subaward agreements with any Collaborating Entities that will assist in the direct development and implementation of the EJ Thriving Communities Subgrants program, including subawards to other nonprofits (non-Community Based Organizations), units of government, institutions of higher education, and/or medical service providers not covered by a statutory partnership to assist the Grantmaker by creating a local subaward competition or outreach to local communities.
10. In addition to the requirements in EPA's General Term and Condition "Disclosing Conflict of Interests," the recipient must submit a Conflict-of-Interest (COI) plan for approval by EPA's Project Officer for preventing, neutralizing, or mitigating conflicts of interest that may arise within the participatory governance framework of the project. The plan should describe controls for ensuring that representatives of community-based nonprofit organizations involved in the design and decision-making for the subawards program do not have relationships with organizations competing for subawards or receiving noncompetitive funding that create actual or apparent conflicts of interest. Example participatory governance activities could include advisory bodies composed of community-based nonprofit organizations that oversee and provide thought partnership on the development of the subaward process.
11. If a Conflict of Interest is Identified by the EPA, the Conflict-of-Interest Mitigation Plan will need to be approved by the Project Officer, in consultation with the Grant Specialist.
12. Joint operational involvement, participation, and/or collaboration between EPA and the recipient.
13. Review of proposed procurements in accordance with the Procurement Standards in 2 CFR Part 200.
14. EPA staff participation in monitoring performance and/or providing technical support for subrecipients that require additional technical assistance to meet project and/or workplan deliverables.
15. Joint operational involvement, participation, and/or collaboration between EPA and the recipient.
16. Informally referred to as the "Cap Amount Award Policy" and discussed on page 15 of the NOFO, Grantmakers should put policies in place that limit the number of times a particular Eligible Subrecipient can receive an EJ Thriving Communities Subgrant within a certain period of time. For example, a pass-through entity may decide that a recipient may not receive more than two EJ Thriving Communities Subgrants within the 3-year period of performance or a shorter interval as deemed appropriate by the pass-through entity. This plan will need to be approved by the Project Officer.
17. Prior to making subawards, Grantmakers can work with their Project Officers to identify instructions and guidance on subaward policies to ensure that the burden on the Tier 1-3 and

fixed-amount award Subrecipients is minimized. This includes resources such as the gmc_subaward_policy_appendix_d_subaward_agreement_template.pdf (epa.gov) (EPA does not mandate the use of this template. Pass-through entities may use their own form of subaward agreements

provided the requirements of 2 CFR 200.332(a) and 2 CFR 200.332(b) are met.) And requirements that flow down to subgrantees such as "Unique Entity Identifier" (UEI) as required by 2 CFR Part 25 and 2 CFR 200.332(b)(1).

17. National Programmatic Term and Condition for Fellowship, Internship Programs and Similar Programs Supported by EPA Financial Assistance

1. EPA funds for this program may only be used for participant support cost payments, scholarships, tuition remission and other forms of student aid for citizens of the United States, its territories, or possessions, or for individuals lawfully admitted to the United States for permanent residence.

2. The recipient and program participants are responsible for taxes, if any, on payments made to or on behalf of individuals participating in this program that are allowable as participant support costs under 2 CFR 200.1 or 2 CFR 200.456 and scholarships and other forms of student aid such as tuition remission under 2 CFR 200.466. EPA encourages recipients and program participants to consult their tax advisers, the U.S. Internal Revenue Service, or state and local tax authorities regarding the taxability of stipends, tuition remission and other payments. However, EPA does not provide advice on tax issues relating to these payments.

3. Participant support cost payments, scholarships, and other forms of student aid such as tuition remission are lower tiered covered Non-procurement transactions for the purposes of 2 CFR

180.300 and EPA's Suspension and Debarment Term and Condition. Recipients, therefore, may not make participant support cost payments to individuals who are excluded from participation in Federal Non- procurement programs under 2 CFR Part 180. Recipients are responsible for checking the eligibility of program participants in the System for Award Management (SAM) or obtaining eligibility certifications from the program participants.

See EPA Guidance on Participant Support Costs.

18. **Subsequent Award Statutory Partnership Agreements Letters of Commitment submitted with the application needed to be finalized prior to the submission of the Subsequent Award.** EPA requires that applicants selected for funding consideration provide copies of the executed final statutory partnership agreement to EPA's Project Officer for submission to the EPA Award Official prior to issuance of the Subsequent Award.

Any letters of commitment submitted in the application should be finalized into a final signed statutory agreement, which should include any updated stakeholder roles and responsibilities or revised award amounts. The statutory partnership agreement must be signed by all relevant parties and specify which member of the partnership will enter into the assistance agreement with EPA for the purposes of accountability for the proper expenditure of federal funds, performance of the assistance agreement, liability for claims for recovery of unallowable costs incurred under the agreement and must specify roles in performing the proposed scope of work for the assistance agreement. Executed Statutory Partnership Agreements will be submitted to EPA's Project Officer. The EPA Grants Management Officer or the EPA Award Official will issue written notification that this condition has been satisfied and that the recipient is authorized to draw down TCGM funds for the Subsequent Award in accordance with the

standards described in the EPA General Term and Condition for the Automated Standard Application Payments (ASAP) and Proper Payment Draw Down during the initial award.

19. Record Retention

In accordance with 2 CFR § 200.334, recipients and subrecipients must retain for a period of three years all programmatic, financial, statistical, and all other records required under the terms of the agreement, unless a dispute or lawsuit has ensued. If a dispute or lawsuit has been initiated, all records must be retained for the duration of the dispute, until the matter is resolved and dispositioned, and for three years thereafter.

20. **Environmental Justice Thriving Communities Grantmaking Program Davis-Bacon Labor Standards**

As provided in Section 314 of the Clean Air Act (42 USC § 7614) (DBRA), Davis-Bacon Act (42 USC §§ 3141-3144) labor standards apply to grants and cooperative agreements made under the Greenhouse Gas Reduction Fund. Accordingly, all laborers and mechanics employed by contractors or subcontractors on projects assisted under this award agreement shall be paid wages at rates not less than those prevailing for the same type of work on similar construction in the locality as determined by the Secretary of Labor in accordance with 40 USC Subtitle II, Part A, Chapter 31, Subchapter IV (Wage Rate Requirements).

Therefore, the pass-through entity must create a Davis-Bacon subgrant compliance plan to ensure that any entity that receives financial assistance complies with Davis-Bacon labor requirements where construction work is financed in whole or in part with such financial assistance.

If the recipient encounters a situation that presents uncertainties regarding DBRA applicability under this assistance agreement, the recipient must discuss the situation with the EPA Project Officer before authorizing work on the project.

In the event that a periodic project site visit, audit, or routine communication with subrecipient, program beneficiary, contractor, or subcontractor determines any instances of non-compliance or potential non-

compliance with Davis-Bacon, the recipient agrees to discuss the situation with the EPA Project Officer for possible referral to DOL for guidance or enforcement action.

Note, the use of the term project in this term and condition is distinct from the use of the term project within the definition of qualified project under Clean Air Act Section 134(c)(3), which is broader and includes "any project, activity, or technology." 40 CFR 30.103 defines construction as "erection, alteration, or repair (including dredging, excavating, and painting) of buildings, structures, or other improvements to real property, and activities in response to a release or a threat of a release of a hazardous substance into the environment, or activities to prevent the introduction of a hazardous substance into a water supply."

1. Program Applicability
    1. Program Name: Environmental Justice Thriving Communities Grantmaking Program
    2. Statute requiring compliance with Davis-Bacon: Clean Air Act Section 314, Labor Standards, codified as 42 U.S.C. § 7614.

1.

    3. Activities subject to Davis-Bacon: Activities subject to Davis-Bacon include certain construction costs and contractual costs. Construction costs may include:
        3. Building and / or upgrading existing structures and sites to improve community use while reducing GHG emissions and / or improving climate resilience;
        4. Implementing structural and non-structural retrofits to enhance the resilience of community-serving buildings (e.g., raise the building elevation to reduce flood risk, improve cooling systems and / or insulation to reduce extreme heat risk);
        5. Install energy efficiency measures such as insulation, double or triple glazed windows, "cool roofs" that reflect sunlight, and energy management systems in public buildings;
        6. Remediating or mitigating harmful substances in buildings, including lead, mercury, pesticides, radon, mold, PCBs (caulk, flooring, etc.), lead-based paint, asbestos, and other toxic substances;
        7. Installing, upgrading, or replacing HVAC and / or filtration systems that improve indoor quality in schools, community-serving buildings, and single-and- multifamily homes;
        8. Targeted water infrastructure upgrades, including replacing private-side lead lines in homes, childcare facilities, schools, or other community-serving buildings; septic to sewer conversions; and installing water fountains at schools and parks; and
        9. Other activities described in the EPA Disadvantaged Business Enterprise (DBE) rule's definition of *Construction* at 40 CFR 33.103, as well as related architectural or engineering services.

With very few exceptions, recipients carry out construction projects by hiring contractors which typically include a general contractor and an architectural or engineering firm for design work and in some cases purchasing equipment for installation at the site. Hiring general contractors and other contractors performing activities described in the EPA Disadvantaged Business Enterprise (DBE) rule's definition of

Construction at 40 CFR 33.103 will be categorized as “Construction.”

1.
    4. Prevailing Wage Classification: Building

2. Davis-Bacon and Related Acts

Davis-Bacon and Related Acts (DBRA) is a collection of labor standards provisions administered by the Department of Labor, that are applicable to grants involving construction. These labor standards include the:

- Davis-Bacon Act, which requires payment of prevailing wage rates for laborers and mechanics on construction contracts of $2,000 or more;
- Copeland “Anti-Kickback” Act, which prohibits a contractor or subcontractor from inducing an employee into giving up any part of the compensation to which he or she is entitled; and
- Contract Work Hours and Safety Standards Act, which requires overtime wages to be paid for over 40 hours of work per week, under contracts in excess of $100,000.

3. Recipient Responsibilities When Entering Into and Managing Contracts:
    3. Solicitation and Contract Requirements:
        3. Include the Correct Wage Determinations in Bid Solicitations and Contracts: Recipients are responsible for complying with the procedures provided in 29 CFR 1.6 when soliciting bids and awarding contracts.
        4. Include DBRA Requirements in All Contracts: Include the following text on all contracts under this grant:
            3. “By accepting this contract, the contractor acknowledges and agrees to the terms provided in the DBRA Requirements for Contractors and Subcontractors Under EPA Grants.”
    4. After Award of Contract:
        3. Approve and Submit Requests for Additional Wages Rates: Work with contractors to request additional wage rates if required for contracts under this grant, as provided in 29 CFR 5.5(a)(1)(iii).
        4. Provide Oversight of Contractors to Ensure Compliance with DBRA Provisions: Ensure contractor compliance with the terms of the contract, as required by 29 CFR 5.6.

4. Recipient Responsibilities When Establishing and Managing Additional Subawards:
    4. Include DBRA Requirements in All Subawards (including Loans):

4. Include the following text on all subawards under this grant:
    4. "By accepting this award, the EPA subrecipient acknowledges and agrees to the terms and conditions provided in the DBRA Requirements for EPA Subrecipients."
5. Provide Oversight to Ensure Compliance with DBRA Provisions: Recipients are responsible for oversight of subrecipients and must ensure subrecipients comply with the requirements in 29 CFR 5.6.

5. The contract clauses set forth in this Term & Condition, along with the correct wage determinations, will be considered to be a part of every prime contract covered by Davis-Bacon and Related Acts (see 29 CFR 5.1), and will be effective by operation of law, whether or not they are included or incorporated by reference into such contract, unless the Department of Labor grants a variance, tolerance, or exemption. Where the clauses and applicable wage determinations are effective by operation of law under this paragraph, the prime contractor must be compensated for any resulting increase in wages in accordance with applicable law.

21. Participation in an EPA-Sponsored Program Evaluation.

As a condition of the receipt of the award under a NOFO, the recipient is required to cooperate with all EPA staff, contractors, or designated Recipients performing research or evaluation studies funded by EPA, if directed to do so by the Project Officer.

5. Land Acquisition

Land acquisition must comply with the Uniform Relocation Act and Federal Highway Administration's implementing regulations at 49 CFR Part 24 which requires grantees to follow certain procedures for acquiring property for grant purposes, such as notice, negotiation, and appraisal requirements.

23. Termination

Notwithstanding the General Term and Condition "Termination," EPA maintains the right to terminate the Assistance Agreement only as specified in 2 CFR 200.339 and the version of 2 CFR 200.340 applicable to EPA grants as of July 1, 2024 pursuant to 89 FR 55262 (July 3, 2024), when the noncompliance with the terms and conditions is substantial such that effective performance of the Assistance Agreement is materially impaired or there is adequate evidence of waste, fraud, or abuse, prompting adverse action by EPA per 2 CFR 200.339, through either a partial or full termination. In accordance with 2 CFR 200.341, EPA will provide the Recipient notice of termination.

If EPA partially or fully terminates the Assistance Agreement, EPA must (1) de-obligate uncommitted funds and re-obligate them to another Eligible Recipient to effectuate the objectives of Section 138 of the Clean Air Act, 42 USC § 7434 within 90 days of the de-obligation and (2) amend the Recipient's Assistance Agreement to reflect the reduced amount, based on the de-obligation.

**The Following Programmatic Term and Condition Has Been Removed:**

**Signage Required**

**All Other Programmatic Terms and Conditions Remain the Same**

# Attachment D

OFFICE OF MISSION SUPPORT
WASHINGTON, D.C. 20460

February 21, 2025

**MEMORANDUM**

**SUBJECT:** Termination of EPA Assistance Agreement 5N00E03682-1 under 2 CFR 200.340

**FROM:** EPA Award Official

**TO:** Greg Wenz, Chief Financial Officer
The Minneapolis Foundation

The purpose of this communication is to notify you that the U.S. Environmental Protection Agency (EPA) is hereby terminating Assistance Agreement No. 5N00E03682-1 awarded to The Minneapolis Foundation. In accordance with 2 CFR 200.340(a)(2) (effective August 13, 2020 – September 30, 2024) and the Termination term and condition contained in the EPA General Terms and Conditions effective August 13, 2020 – September 30, 2024, EPA Assistance Agreement 5N00E03682-1 is terminated in its entirety effective immediately on the grounds that the award no longer effectuates the program goals or agency priorities. The objectives of the award are no longer consistent with EPA funding priorities.

It is a priority of the EPA to eliminate discrimination in all programs throughout the United States. The EPA Administrator has determined that, per the Agency's obligations to the constitutional and statutory law of the United States, this priority includes ensuring that the Agency's grants do not support programs or organizations that promote or take part in diversity, equity, and inclusion ("DEI") initiatives, "environmental justice" initiatives, and conflict with the Agency's policy of prioritizing merit, fairness, and excellence in performing our statutory functions. In addition to complying with the civil rights laws, it is vital that the Agency assess whether all grant payments are free from fraud, abuse, waste, and duplication, as well as to assess whether current grants are in the best interests of the United States.

The grant specified above provides funding for programs that promote or take part in DEI initiatives or environmental justice initiatives or other initiatives that conflict with the Agency's policy of prioritizing merit, fairness, and excellence in performing our statutory functions; that are not free from fraud, abuse, waste, or duplication; or that otherwise fail to serve the best interests of the United States. The grant is therefore inconsistent with, and no longer effectuates, Agency priorities.

The process for closeout is generally outlined in 2 CFR 200.344. EPA is clarifying what reports are required and what reports are waived below. Other requirements are still in effect if applicable to your grant.

EPA is requiring the following closeout reports due within 120 days of closeout (2 CFR 200.344a:)

- Final Federal Financial Report, SF-425
- Final Technical Report
- Other programmatic reports identified in your terms and conditions

As part of this termination, EPA is waiving the following closeout reports:

- Property Report, SF-428
- Final Minority Business Enterprise/Woman Business Enterprise Utilization Under Federal Grants and Cooperative Agreements, EPA Form 5700-52A

The recipient may request payment from the Automated Standard Application Payments (ASAP) system for allowable costs incurred up to the date of this memo provided that such costs were contained in the approved workplan. Costs incurred by you after this termination are allowable only if (a) those costs were properly incurred by you before the effective date of this termination, and not in anticipation of it; and (b) those costs would be allowable if your federal award was not suspended or expired normally at the end of the period of performance in which the termination takes effect. *See* 2 C.F.R. § 200.343. You are encouraged to carefully review and discharge your closeout responsibilities set forth in 2 C.F.R. § 200.344-45 and your award agreement. Those responsibilities include, but are not limited to, your obligation to "promptly refund any unobligated funds" that have been paid out but "are not authorized to be retained." *See* 2 C.F.R. § 200.344(g).

Also, per 2 CFR 200.472, a recipient may use grant funds to properly closeout their grant including reasonable and necessary costs that might occur after the date of this memo. If the recipient drew down funds from ASAP for costs beyond the termination date or for costs that exceed the amount necessary to properly closeout their grant, the recipient must contact RTPFC at rtpfc-grants@epa.gov for instructions on how to return the excess funds.

The EPA Grants Management Office has issued an amendment to the agreement to document the termination.

If you wish to dispute this termination decision, the Disputes Decision Official (DDO), coyle.ann@epa.gov, must receive the Dispute no later than 30 calendar days from the date this termination notice is electronically sent to you. Disputes must be sent electronically by email to the DDO, with a copy to the EPA Award Official, dolan.sheila@epa.gov within the 30-day period stated above. The Dispute submitted to the DDO must include: (1) A copy of the disputed Agency Decision; (2) A detailed statement of the specific legal and factual grounds for the Dispute, including copies of any supporting documents; (3) The specific remedy or relief you seek under the Dispute; and (4) The name and contact information, including email address, of your designated point of contact for the Dispute. *See* 2 CFR 1500.15

The requirements on post-closeout adjustments and continuing responsibilities, including audit and record retention requirements, at 2 CFR 200.345 remain in effect.

ATTACHMENT
Amendment Document

cc: Mauricio Lobato, EPA Grant Specialist
Cristina Presmanes, EPA Project Officer
Office of Environmental Justice, Community Health, and Environmental Review Division

# U.S. ENVIRONMENTAL PROTECTION AGENCY

## Assistance Amendment

| | |
|---|---|
| **GRANT NUMBER (FAIN):** 00E03682<br>**MODIFICATION NUMBER:** 1<br>**PROGRAM CODE:** 5N | **DATE OF AWARD**<br>02/21/2025 |
| **TYPE OF ACTION**<br>No Cost Amendment | **MAILING DATE**<br>02/21/2025 |
| **PAYMENT METHOD:**<br>ASAP | **ACH#**<br>PEND |

| | |
|---|---|
| **RECIPIENT TYPE:**<br>Not for Profit | **Send Payment Request to:**<br>Contact EPA RTPFC at: rtpfc-grants@epa.gov |
| **RECIPIENT:**<br>MINNEAPOLIS FOUNDATION<br>80 S 8TH ST 800 IDS CENTER<br>MINNEAPOLIS, MN 55402<br>**EIN:** 41-6029402 | **PAYEE:**<br>MINNEAPOLIS FOUNDATION<br>80 S 8TH STREET 800 IDS Center<br>Minneapolis, MN 55402 |

| PROJECT MANAGER | EPA PROJECT OFFICER | EPA GRANT SPECIALIST |
|---|---|---|
| Jo-Anne Stately<br>80 S EIGHTH ST 800 IDS CENTER<br>MINNEAPOLIS, MN 55402<br>**Email:** jstately@mplsfoundation.org<br>**Phone:** 612-672-3878 | Cristina Presmanes<br>77 West Jackson Blvd., RM-19J<br>Chicago, IL 60604-3507<br>**Email:** Presmanes.Cristina@epa.gov<br>**Phone:** 312-353-8205 | Mauricio Lobato<br>Assistance Section 1, MA-10J<br>77 West Jackson Blvd.<br>Chicago, IL 60604<br>**Email:** lobato.mauricio@epa.gov<br>**Phone:** 312-353-2515 |

**PROJECT TITLE AND EXPLANATION OF CHANGES**

The Minneapolis Foundation TCGM Grant 1

See Attachment 1 for project description.

| BUDGET PERIOD | PROJECT PERIOD | TOTAL BUDGET PERIOD COST | TOTAL PROJECT PERIOD COST |
|---|---|---|---|
| 04/01/2024 - 02/21/2025 | 04/01/2024 - 02/21/2025 | $ 8,000,000.00 | $ 8,000,000.00 |

## NOTICE OF AWARD

Based on your Application dated 02/21/2025 including all modifications and amendments, the United States acting by and through the US Environmental Protection Agency (EPA) hereby awards $ 0.00. EPA agrees to cost-share 100.00% of all approved budget period costs incurred, up to and not exceeding total federal funding of $ 8,000,000.00. Recipient's signature is not required on this agreement. The recipient demonstrates its commitment to carry out this award by either: 1) drawing down funds within 21 days after the EPA award or amendment mailing date; or 2) not filing a notice of disagreement with the award terms and conditions within 21 days after the EPA award or amendment mailing date. If the recipient disagrees with the terms and conditions specified in this award, the authorized representative of the recipient must furnish a notice of disagreement to the EPA Award Official within 21 days after the EPA award or amendment mailing date. In case of disagreement, and until the disagreement is resolved, the recipient should not draw down on the funds provided by this award/amendment, and any costs incurred by the recipient are at its own risk. This agreement is subject to applicable EPA regulatory and statutory provisions, all terms and conditions of this agreement and any attachments.

| ISSUING OFFICE (GRANTS MANAGEMENT OFFICE) | AWARD APPROVAL OFFICE |
|---|---|
| **ORGANIZATION / ADDRESS** | **ORGANIZATION / ADDRESS** |
| U.S. EPA, Region 5, U.S. EPA Region 5<br>Mail Code MCG10J 77 West Jackson Blvd.<br>Chicago, IL 60604-3507 | U.S. EPA, Region 5, Office of Environmental Justice, Community Health, and Environmental Review Division<br>OEJECR - Office of Environmental Justice and External Civil Rights<br>77 West Jackson Blvd., R-19J<br>Chicago, IL 60604-3507 |

**THE UNITED STATES OF AMERICA BY THE U.S. ENVIRONMENTAL PROTECTION AGENCY**

| | |
|---|---|
| **Digital signature applied by EPA Award Official for** Sheila Dolan - Manager, Acquisition and Assistance Branch<br>**by** Robert Fields - Award Official Delegate | **DATE**<br>02/21/2025 |

# Attachment E

MINNEAPOLIS FOUNDATION

612.672.3878

800 IDS Center
80 S 8th Street
Minneapolis, MN 55402

March 5, 2025

Dear Robert Fields, *Section Supervisor Assistance Section* 1/GMO/, Ann Coyle, *Disputes Decision Official,* and Sheila Dolan, *EPA Award Official:*

On February 21, 2025, the Minneapolis Foundation received a notice terminating Assistance Agreement No. 5N00E03682-1 (Grant) awarded to it by the U.S. Environmental Protection Agency (EPA).

In the notice, the EPA asserted the Grant was being terminated because it "provides funding for programs that promote or take part in DEI initiatives or environmental justice initiatives or other initiatives that conflict with the Agency's policy of prioritizing merit, fairness, and excellence in performing our statutory functions; that are not free from fraud, abuse, waste, or duplication; or that otherwise fail to serve the best interests of the United States." As such and according to the notice, "[t]he grant is therefore inconsistent with, and no longer effectuates, Agency priorities."

Putting aside that it remains unclear the scope and definition of the initiatives that have been deemed inconsistent with Agency priorities, given the nationwide preliminary injunction issued on Friday, February 21, 2025, by Judge Abelson in *Nat'l Ass'n of Diversity Officers in Higher Education v. Trump*, __ F. Supp. 3d __, 2025 WL 573764 (D. Md. Feb. 21, 2025), ***the Minneapolis Foundation assumes the termination notice was issued in error.***

Specifically, the nationwide preliminary injunction prohibits until further notice the enforcement of Executive Order (EO) provisions that (1) directed all executive agencies to "terminate … 'equity-related' grants or contracts," (2) directed all executive agencies to "include in every contract or grant award" a certification, enforceable through the False Claims Act, that the contractor and grantee "does not operate any programs promoting DEI that violate any applicable Federal anti-discrimination laws," and (3) directed the U.S. Attorney General to take "appropriate measures to encourage the private sector to end illegal discrimination and preferences, including DEI," "deter" such "programs or principles" and "identify … potential civil compliance investigations" to accomplish such "deter[rence]."

As such, the stated basis for termination of the Grant is no longer valid or proper. In fact, the Judge's order specifically precludes the EPA from terminating the Grant while the injunction remains in effect.

Accordingly, we expect that the EPA will promptly rescind the termination notice and reinstate our grant to comply with the Court's order so that we may continue to fulfill the important goals of our grant.

To the extent that EPA is unwilling to take such action, we intend to pursue all legal and administrative remedies available to us. We also plan to submit a request for equitable adjustment to cover costs associated with the improper termination and suspension of work.

We look forward to hearing back and hope to receive an immediate modification to the Grant rescinding the termination notice.

Our official contact for this notice and communication is Jo-Anne Stately, Senior Vice President of Impact jstatey@mplsfoundation.org

Sincerely,



R.T. Rybak
President & CEO
Minneapolis Foundation

c.c. Christina Presmanes, EPA Project Officer
Mauricio Lobato, EPA Grant Specialist

# Attachment F

MINNEAPOLIS FOUNDATION

612.672.3878

800 IDS Center
80 S 8th Street
Minneapolis, MN 55402

March 18, 2025

**VIA EMAIL**

Ms. Ann Coyle
EPA Regional Judicial Officer
Ann.Coyle@epa.gov

**Re: Request for Extension of Time to Submit Dispute Regarding Termination of EPA Assistance Agreement 5N00E03682-1**

Dear Ms. Coyle,

In accordance with 2 CFR 1500.15(a), the Minneapolis Foundation respectfully and timely requests an extension of 30 calendar days to submit a Notice of Dispute in connection with the Termination of EPA Assistance Agreement 5N00E03682-1. This Request for Extension does not constitute a Notice of Dispute.

Attached to this letter is a copy of the EPA's "No Cost Amendment" and accompanying letter dated February 21, 2025 (the "Termination Notice"), notifying the Minneapolis Foundation that the U.S. Environmental Protection Agency ("EPA" or "Agency") is unilaterally terminating the above-referenced EPA Assistance Agreement. The Termination Notice represents the disputed Agency Decision in this matter.

On March 14, 2025, the Minneapolis Foundation timely filed with the EPA Award Official a Notice of Disagreement, pursuant to the 21-day timeline prescribed in the No Cost Amendment. This Notice of Disagreement did not constitute a Notice of Dispute. In that correspondence, the Minneapolis Foundation expressly reserved the right to separately file a Notice of Dispute, for which the Minneapolis Foundation is now requesting an extension.

**Request for Extension**

Under 2 CFR 1500.15, an Affected Entity (i.e., an entity that applies for and/or receives federal financial assistance from the EPA, including non-profit organizations) may dispute an Agency Decision by electronically submitting a Dispute to the Disputes Decision Official ("DDO") identified in the Agency Decision. Under 2 CFR 1500.15(a), the DDO must receive the Dispute no later than 30 calendar days from the date the Agency Decision is electronically sent to the Affected Entity. However, an Affected Entity is permitted to submit a written request for extension to the DDO before the expiration of the 30-day period. Under 2 CFR 1500.15(a), the

DDO "may grant a one-time extension of up to 30 calendar days when justified by the situation, which may include the unusual complexity of the Dispute or because of exigent circumstances."

The Minneapolis Foundation respectfully submits that the ongoing lawsuits related to federal grant terminations demonstrate the "unusual complexity" of this Dispute and constitute exigent circumstances warranting an extension. Specifically, in *Nat'l Ass'n of Diversity Officers in Higher Education v. Trump*, __ F. Supp. 3d __, 2025 WL 573764 (D. Md. Feb. 21, 2025), the Court issued a nationwide preliminary injunction against the termination of grants and contracts for the reasons proffered in the Agency Decision (i.e., enjoining the enforcement of Executive Order provisions that directed all executive agencies to "terminate … 'equity-related' grants or contracts"). However, on March 14, 2025, the United States Court of Appeals for the Fourth Circuit stayed the preliminary injunction in the *Diversity Officers* case. *See Nat'l Ass'n of Diversity Officers in Higher Educ. v. Trump*, No. 25-1189, ECF No./Doc. No. 29 (4th Cir. Mar. 24, 2025). Meanwhile, in *National Council of Non-Profits et al v. Office of Management and Budget et al,* No. 1:2025-cv-00239 (D.D.C. 2025), the Court issued a nationwide preliminary injunction against the freeze on funds associated with all existing government grants and contracts implemented by the Office of Management and Budget (OMB) in its memorandum dated January 27, 2025. Copies of these decisions and orders are attached to this letter for your convenience.

The uncertainty associated with these ongoing lawsuits, each of which may impact this Dispute, demonstrates the "unusual complexity" of this Dispute and justifies an extension of time to submit a formal Notice of Dispute under 2 CFR 1500.15(a).

We appreciate your consideration of this request. Given that the deadline for the submission of the Dispute is quickly approaching, we ask for a reply as soon as possible.

Sincerely,

Jo-Anne Stately

Jo-Anne Stately

c.c. Cristina Presmanes, EPA Project Officer; Sheila Dolan, EPA Award Official

# Attachment G

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY

REGION 5

CHICAGO, IL 60604

March 19, 2025

**B EMA**

o-Anne Stately
Senior Vice President of Impact
Minneapolis Foundation
jstately@mplsfoundation.org

RE: Request for an Extension of Time to Submit a Dispute regarding EPA's Termination of Assistance Agreement 5N00E03 82-1

Dear Ms. Stately:

This letter responds to the Minneapolis Foundation's request for an extension of time to initiate a dispute regarding EPA's termination of Assistance Agreement 5N00E03 82-1 and clarifies my letter dated March 18, 2025.

As noted in yesterday's letter, EPA appears to have issued the termination notice on February 21, 2025, and I received communications from you related to the termination notice on March 5 and , 2025.[1] On March 18, 2025, you submitted a request for an extension of time to dispute EPA's termination of Assistance Agreement 5N00E03 82-1. In the request, you explained the unusual complexity and exigent circumstances justifying your request.

Pursuant to 2 C.F.R. § 1500.15(a), a DDO may grant a one-time extension of up to 30 calendar days when justified by the situation, which may include the unusual complexity of the dispute or because of exigent circumstances. In your request for an extension of time, you explained the ongoing federal lawsuits regarding federal grant terminations are unusual and exigent circumstances that justify your request. Pursuant to this section, and for good cause shown, I am granting you a 30-day extension of time by which you must initiate any dispute of EPA's termination of Assistance Agreement 5N00E03 82-1. The deadline by which I must electronically receive your dispute is April 22, 2025.

Sincerely,

ANN COYLE
Digitally signed by ANN COYLE
Date: 2025.03.19 14:05:41 -05'00'

Ann . Coyle
Dispute Decision Official
U.S. EPA Region 5

cc by email: Sheila Dolan, EPA Award Official
Mauricio obato, EPA Grant Specialist
Cristina Presmanes, EPA Project Officer
Puja akhani, Office of Regional Counsel

---

[1] On March 14, you submitted a Notice of Disagreement letter to EPA regarding the "No Cost Amendment" to Assistance Agreement 5N00E03 82-1 EPA issued simultaneously with the termination notice. In my haste to acknowledge the Foundation had timely disputed EPA's termination notice, and despite your clear statement to the contrary, I did not realize the Notice of Disagreement was not a misnamed dispute.

# Attachment H

ASAP.gov
Automated Standard Application for Payments
BUREAU OF THE FISCAL SERVICE

# Account Profile Inquiry

Date: 03/11/2025
Time: 9:45 AM

**ALC/Region:**
68128933

**Agency Short Name:**
RTP-Grants

**Account ID:**
5N00E03682

**Recipient ID:**
2724154

**Recipient Short Name:**
MPLS FDN

**Inquiry Results:**

## ACCOUNT DETAILS

| | |
|---|---|
| **Requestor ID** | 2724154 |
| **Account ID** | 5N00E03682 |
| **Account Description** | FOUNDATION TCGM GRANT 1 |
| **1031/LOC Account** | No |
| **Account Type** | Regular Account |
| **Group ID** | 51232 |
| **Control Account** | No |
| **Account Status Indicator** | Suspended |
| **Available Balance** | $6,776,964.53 |
| **Create Date** | 07/16/2024 |
| **Begin Date** | 04/01/2024 |
| **Performance Period End Date** | 02/24/2025 |
| **End Date** | 06/21/2025 |
| **TAS Distribution Method** | Percentage by Account |
| **Allow Book Entry Adjustment** | Yes |
| **Allow Warehoused Payments** | Yes |
| **CMIA Indicator** | No |

## CUMULATIVE AUTHORIZATIONS

| | |
|---|---|
| **Cumulative Authorized Amount** | $8,000,000.00 |
| **Cumulative Authorized Amount Reset Period** | |
| **Annual Reset Month** | |

## GRANT DETAILS

| | |
|---|---|
| **Grant** | Yes |
| **Federal Award Identification Number (FAIN)** | 5N00E03682 |
| **CFDA Number** | 66615.000 |
| **Total Estimated Grant Amount** | $0.00 |

## AGENCY PAYMENT REVIEW

| | |
|---|---|
| **Agency Review** | No |
| **Threshold Amount** | |
| **Reason for Review** | |

## DRAW AMOUNTS

| | |
|---|---|
| **Max Total Draw Amount** | |
| **Max Daily Draw Amount** | |
| **Max Monthly Draw Amount** | |
| **Max Quarterly Draw Amount** | |

## AUTOMATED AUTHORIZATION RENEWALS

| | |
|---|---|
| **Authorized Renewal Amount** | $0.00 |
| **Certified Date** | |
| **Renewal Frequency** | |
| **Pending Renewal Frequency** | |
| **Pending Automated Renewal Amount** | $0.00 |
| **Rollover Reset Quarter** | |
| **Default Action** | |

SENSITIVE BUT UNCLASSIFIED

ASAP.gov
Automated Standard Application for Payments
BUREAU OF THE FISCAL SERVICE

# Account Profile Inquiry

Date: 03/11/2025
Time: 9:45 AM

**ALC/Region:**
68128933

**Agency Short Name:**
RTP-Grants

**Account ID:**
5N01E03682

**Recipient ID:**
2724154

**Recipient Short Name:**
MPLS FDN

**Inquiry Results:**

## ACCOUNT DETAILS

| | |
|---|---|
| **Requestor ID** | 2724154 |
| **Account ID** | 5N01E03682 |
| **Account Description** | GRANTMAKER - SUBSEQUENT AWARD |
| **1031/LOC Account** | No |
| **Account Type** | Regular Account |
| **Group ID** | 51232 |
| **Control Account** | No |
| **Account Status Indicator** | Suspended |
| **Available Balance** | $52,000,000.00 |
| **Create Date** | 09/30/2024 |
| **Begin Date** | 10/01/2024 |
| **Performance Period End Date** | 09/30/2027 |
| **End Date** | 01/31/2028 |
| **TAS Distribution Method** | Percentage by Account |
| **Allow Book Entry Adjustment** | Yes |
| **Allow Warehoused Payments** | Yes |
| **CMIA Indicator** | No |

## CUMULATIVE AUTHORIZATIONS

| | |
|---|---|
| **Cumulative Authorized Amount** | $52,000,000.00 |
| **Cumulative Authorized Amount Reset Period** | |
| **Annual Reset Month** | |

## GRANT DETAILS

| | |
|---|---|
| **Grant** | Yes |
| **Federal Award Identification Number (FAIN)** | 5N01E03682 |
| **CFDA Number** | 66615.000 |
| **Total Estimated Grant Amount** | $0.00 |

## AGENCY PAYMENT REVIEW

| | |
|---|---|
| **Agency Review** | No |
| **Threshold Amount** | |
| **Reason for Review** | |

## DRAW AMOUNTS

| | |
|---|---|
| **Max Total Draw Amount** | |
| **Max Daily Draw Amount** | |
| **Max Monthly Draw Amount** | |
| **Max Quarterly Draw Amount** | |

## AUTOMATED AUTHORIZATION RENEWALS

| | |
|---|---|
| **Authorized Renewal Amount** | $0.00 |
| **Certified Date** | |
| **Renewal Frequency** | |
| **Pending Renewal Frequency** | |
| **Pending Automated Renewal Amount** | $0.00 |
| **Rollover Reset Quarter** | |
| **Default Action** | |



SENSITIVE BUT UNCLASSIFIED

# Attachment I

ASAP.gov
Automated Standard Application for Payments
BUREAU OF THE FISCAL SERVICE

# Account Profile Inquiry

Date: 04/01/2025
Time: 8:19 AM

**ALC/Region:**
68128933

**Agency Short Name:**
RTP-Grants

**Account ID:**
5N01E03682

**Recipient ID:**
2724154

**Recipient Short Name:**
MPLS FDN

**Inquiry Results:**

## ACCOUNT DETAILS

| | |
|---|---|
| Requestor ID | 2724154 |
| Account ID | 5N01E03682 |
| Account Description | GRANTMAKER - SUBSEQUENT AWARD |
| 1031/LOC Account | No |
| Account Type | Regular Account |
| Group ID | 51232 |
| Control Account | No |
| Account Status Indicator | Suspended |
| Available Balance | $52,000,000.00 |
| Create Date | 09/30/2024 |
| Begin Date | 10/01/2024 |
| Performance Period End Date | 09/30/2027 |
| End Date | 01/31/2028 |
| TAS Distribution Method | Percentage by Account |
| Allow Book Entry Adjustment | Yes |
| Allow Warehoused Payments | Yes |
| CMIA Indicator | No |

## CUMULATIVE AUTHORIZATIONS

| | |
|---|---|
| Cumulative Authorized Amount | $52,000,000.00 |
| Cumulative Authorized Amount Reset Period | |
| Annual Reset Month | |

## GRANT DETAILS

| | |
|---|---|
| Grant | Yes |
| Federal Award Identification Number (FAIN) | 5N01E03682 |
| CFDA Number | 66615.000 |
| Total Estimated Grant Amount | $0.00 |

## AGENCY PAYMENT REVIEW

| | |
|---|---|
| Agency Review | No |
| Threshold Amount | |
| Reason for Review | |

## DRAW AMOUNTS

| | |
|---|---|
| Max Total Draw Amount | |
| Max Daily Draw Amount | |
| Max Monthly Draw Amount | |
| Max Quarterly Draw Amount | |

## AUTOMATED AUTHORIZATION RENEWALS

| | |
|---|---|
| Authorized Renewal Amount | $0.00 |
| Certified Date | |
| Renewal Frequency | |
| Pending Renewal Frequency | |
| Pending Automated Renewal Amount | $0.00 |
| Rollover Reset Quarter | |
| Default Action | |

ASAP.gov Automated Standard Application for Payments
BUREAU OF THE FISCAL SERVICE

# Account Profile Inquiry

Date: 04/01/2025
Time: 8:19 AM

**ALC/Region:** 68128933

**Agency Short Name:** RTP-Grants

**Account ID:** 5N00E03682

**Recipient ID:** 2724154

**Recipient Short Name:** MPLS FDN

**Inquiry Results:**

## ACCOUNT DETAILS

| | |
|---|---|
| Requestor ID | 2724154 |
| Account ID | 5N00E03682 |
| Account Description | FOUNDATION TCGM GRANT 1 |
| 1031/LOC Account | No |
| Account Type | Regular Account |
| Group ID | 51232 |
| Control Account | No |
| Account Status Indicator | Suspended |
| Available Balance | $6,776,964.53 |
| Create Date | 07/16/2024 |
| Begin Date | 04/01/2024 |
| Performance Period End Date | 02/24/2025 |
| End Date | 06/21/2025 |
| TAS Distribution Method | Percentage by Account |
| Allow Book Entry Adjustment | Yes |
| Allow Warehoused Payments | Yes |
| CMIA Indicator | No |

## CUMULATIVE AUTHORIZATIONS

| | |
|---|---|
| Cumulative Authorized Amount | $8,000,000.00 |
| Cumulative Authorized Amount Reset Period | |
| Annual Reset Month | |

## GRANT DETAILS

| | |
|---|---|
| Grant | Yes |
| Federal Award Identification Number (FAIN) | 5N00E03682 |
| CFDA Number | 66615.000 |
| Total Estimated Grant Amount | $0.00 |

## AGENCY PAYMENT REVIEW

| | |
|---|---|
| Agency Review | No |
| Threshold Amount | |
| Reason for Review | |

## DRAW AMOUNTS

| | |
|---|---|
| Max Total Draw Amount | |
| Max Daily Draw Amount | |
| Max Monthly Draw Amount | |
| Max Quarterly Draw Amount | |

## AUTOMATED AUTHORIZATION RENEWALS

| | |
|---|---|
| Authorized Renewal Amount | $0.00 |
| Certified Date | |
| Renewal Frequency | |
| Pending Renewal Frequency | |
| Pending Automated Renewal Amount | $0.00 |
| Rollover Reset Quarter | |
| Default Action | |

# EXHIBIT 3

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
(Northern Division)

**GREEN & HEALTHY HOMES INITIATIVE, INC.**
2714 Hudson Street
Baltimore, Maryland 21224, *

*

**THE MINNEAPOLIS FOUNDATION**
800 CDS Center S. 8th Street *
Minneapolis, Minnesota 55402

*

Case No.:

& *

**PHILANTHROPY NORTHWEST** *
600 University Street, Suite 1725
Seattle, Washington 98101 *

Plaintiffs, *

v. *

**ENVIRONMENTAL PROTECTION AGENCY**
1200 Pennsylvania Avenue, N.W.
Washington, DC 20460

**Serve on:**
xxx,

&

**LEE ZELDIN, in his official capacity as ADMINISTRATOR, UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**
1200 Pennsylvania Avenue, N.W.

Defendants.

* * * * * * * * * * * *

**DECLARATION OF JILL T. NISHI**

I, JILL T. NISHI, declare as follows:

1. I am Chief Executive Officer of Philanthropy Northwest. I have served in this capacity since July 2022. As CEO, I hold leadership responsibility and ultimate accountability for the strategic direction of the organization, its financial sustainability, and the delivery of programs and services to our network, including our role as a grant making intermediary for both philanthropic and public funders. Since the Spring of 2023, I have been intimately involved with the Environmental Protection Agency's ("EPA") Thriving Communities Program (the "Program" or "Thriving Communities Program")—from the development of our proposal to serve as the EPA Region 10 grantmaker, to our successful selection and subsequent pre-award work in collaboration with our EPA project officer, to the design of our grantmaking program and its ultimate implementation.

2. As originally conceived by EPA, funding for regional grantmakers was awarded through two separate grants, an "initial" grant, and a "subsequent" grant. On June 14, 2024, Philanthropy Northwest received its initial $8 million grant. Attachment A. As I describe further below, this initial grant was intended to fund Philanthropy Northwest and its partners organizations for initial Program work including design of the grantmaking program, application process, community outreach, applicant support, reviewer training, and selection process. On October 30, 2024, Philanthropy Northwest was awarded a $42 million "subsequent grant," which was intended to fund both disbursements to subrecipients as well as Philanthropy Northwest's closeout of the program upon its conclusion. Attachment B. On December 20, 2024, EPA amended the subsequent grant, increasing Philanthropy Northwest's Program funding by $10 million, and increasing Philanthropy Northwest's total subsequent award funding to $52 million. Attachment C. As a result of this amendment, Philanthropy Northwest was awarded two grants with combined funding of $60 million, with $48 million anticipated for disbursement to subrecipients, and $12 million anticipated to fund Philanthropy Northwest's administration of the Program.

3. On February 22, 2024, Philanthropy Northwest received an unexpected and unfounded notice of termination of our Thriving Communities $8 million initial grant award from the EPA (the "initial grant"), leaving us no ability to reimburse ourselves for incurred costs to administer the program. Attachment D. And as of March 7, 2025, EPA suspended our subsequent $52 million Thriving Communities grant (the "subsequent grant") without notice, leaving us no ability to access these funds for disbursement to the successful sub-recipients. Attachment E. For the reasons stated, I have personal knowledge of the facts and information in this Declaration.

4. This termination of funding, without any substantive basis, has disrupted and undermined an inordinate investment of staff and organizational time and resources over the last two years. At present, the termination places a significant and continuing undue burden and unsustainable financial strain on Philanthropy Northwest as we seek to maintain our commitment to administer the Program without any assurance of cost reimbursement on behalf of the communities we seek to serve. In addition, the abrupt disruption to the Program poses imminent job loss and undeserved strain and personal stress to staff who are rightfully concerned and worried about their future employment. Finally, non-profit organizations, local governments, and federally recognized tribal nations serving both urban and rural communities across the states of Alaska, Idaho, Oregon, and Washington, who have invested time and resources to apply and compete for these resources, risk losing congressionally authorized and legally obligated funds intended to improve the environment and health for their respective communities.

5. I provide this Declaration to describe the irreparable harm that Philanthropy Northwest will experience should the termination of the initial grant not be rescinded and should the funding for the subsequent grant not be immediately restored. As detailed herein, the harm will be immediate and irreparable to Philanthropy Northwest's: reputation, staffing, and workforce; ability to manage its grants and relationships with sub-recipients; and ability to fulfill our obligations in the Program as originally conceived; as well as to the underserved communities the Program is intended to serve.

6. Philanthropy Northwest is a regional philanthropic network comprising 150 funders across Alaska, Idaho, Montana, Oregon, Washington, and Wyoming with a mission to "grow

philanthropy's capacity to do transformative work toward redistributing resources and power to underinvested communities in the Northwest and beyond." Philanthropy Northwest is a non-partisan organization and its network includes private, public, and community foundations; corporate philanthropy; and nonprofit and public sector funders supporting urban, rural, and tribal communities. Founded in 1976, Philanthropy Northwest seeks to facilitate philanthropic and cross-sector collaboration to serve and strengthen the region's communities. To effectuate its mission, Philanthropy Northwest is committed to its role in managing and distributing pooled philanthropic and/or public resources to organizations serving underinvested communities.

7. In June 2023, Philanthropy Northwest applied to serve as a "regional grantmaker" in response to EPA's Request for Proposals for the Thriving Communities Grantmaking Program.

8. Consistent with the Program's purpose and structure, Philanthropy Northwest proposed to design a competitive application and submission process, award subgrants, implement a monitoring and reporting system, and provide resources and support to prospective applicants with historically very limited access to federal funds, in collaboration with EPA. Philanthropy Northwest proposed to support the efficient and timely distribution of federal funds to eligible sub-recipients and committed to distributing 80% of our total $60 million award (in subgrants ranging from $75,000 to $350,000) with at least 15% committed to support rural communities (and ultimately representing 40% of round 1 selected applications). Applicants eligible to receive this subgrant funding are community-based nonprofits, local governments, institutions of higher education, and Native American organizations planning to address environmental issues with assessment, planning, or development activities.

9. Philanthropy Northwest is uniquely positioned to serve as the regional grantmaker for the Program in Region 10, which encompasses Alaska, Idaho, Oregon, Washington, and 271 Native tribes. With Philanthropy Northwest's longstanding organizational partners across these four states in urban and rural and tribal communities, Philanthropy Northwest proposed an approach that would leverage the deep community relationships of our network and our previous success with the rapid disbursal of public funds during the COVID-19 pandemic to move the Thriving Communities resources expeditiously and

efficiently across Region 10. Philanthropy Northwest designed a program to center community expertise in a participatory grantmaking process designed around the principles of simplicity, inclusivity, effectiveness, and accessibility. With ultimate oversight and accountability held by Philanthropy Northwest, this approach reduces the applicant burden of applying for federal funding, engages the community, and creates legitimacy and agency over the process and decisions affecting communities.

10. Following a robust review process, EPA notified Philanthropy Northwest of our selection as the Region 10 grantmaker on December 13, 2023. EPA's review of our application included an upfront eligibility screening, followed by a technical and programmatic review. The programmatic review included an assessment of Philanthropy Northwest's proposed program design for application in-take and evaluation; outreach to underserved urban, rural, remote, tribal, and capacity-constrained communities; proposed partnerships and collaborations; and Philanthropy Northwest's historical connection to underserved communities, programmatic capability, and past performance.

11. The Project commenced on March 1, 2024, with pre-award work necessary to establish and receive EPA approval of Philanthropy Northwest's program design and development of its grantmaking infrastructure.

12. Philanthropy Northwest worked closely with the EPA in performing—to the EPA's satisfaction and approval—extensive work through June 2024 to establish its eligibility and capacity to successfully execute the grant. This included the development and approval of Philanthropy Northwest's workplan and budget tied to the initial grant award; establishment of a procurement policy; recruitment and convening of advisory partners to support the design of the grantmaking program and application; recruitment of new staff for the Program; and scoping and initiating the process to secure bids for contractual support for services and systems.

13. On June 14, 2024, following the pre-award work, Philanthropy Northwest ultimately received its formal cooperative agreement and was awarded the $8 million initial grant.

14. Prior to receiving our initial grant award, Philanthropy Northwest invested over 1,500 staff hours in the Thriving Communities Program from January 1 to May 30, 2024, and a cumulative total

of over 8,800 staff hours in calendar year 2024. Throughout 2024, Philanthropy Northwest invested significantly in building infrastructure to support successful implementation of the Program, including: updating policies and procedures to federal government standards; establishing recruitment processes for the Thriving Communities staff positions; and determining the selection criteria and procurement processes for new grant management systems, financial management systems, and professional services. The time required for these activities necessitated Philanthropy Northwest forgoing other intermediary grantmaking and project opportunities, and prioritizing staff, particularly leadership staff, time and effort to develop the infrastructure, support the relationships, and manage activities specific to the Program. This prioritization negatively impacted Philanthropy Northwest's ability to support business development and other mission-supporting activities but was done based on the contracted obligation and expectation that all costs necessary to implement the Thriving Communities Program would be reimbursed.

15. The objective of the initial grant award is to support the administrative work necessary to develop, implement, and monitor an intermediary grantmaking program that reduces the administrative burden to applicants and ultimate sub-recipients who implement the projects while fulfilling the complex requirements of federal funding.

16. Specifically, the initial $8 million grant award was approved and intended to fund a variety of costs related to the Program. These included:

a. Philanthropy Northwest staffing, including salaries as well as the fringe benefits;

   i. The creation of seven full-time positions for the program: director of grantmaking; three program officers strategically located throughout the region; two grant administrators; and a manager of communications and outreach;

   ii. Coverage for levels of effort on the program for seven other existing Philanthropy Northwest staff: CEO (5%); vice president of people, operations, and finance (25%); chief of staff/executive sponsor (50%); director of community partnerships (50%); vice president of marketing and communications (5%); vice president of program strategies (5%); and director of people and

operations (5%). The grant also was intended to fund a significant level of effort for the director of finance and grants administration (80%) position to be hired.

b. A travel budget aligned with GSA and/or Department of Defense per diem rates for localities in Region 10. The travel budget was intended to cover such activities as promoting more efficient and accessible outreach to prospective applicants by the program team across the region, including conferences and summits where eligible applicants would be present, as well as travel for the Thriving Communities team to convene in-person at Philanthropy Northwest's headquarters for program planning and related meetings;

c. Supporting community volunteers across Region 10 who support the grantmaking process through honoraria (applicable to the Task Force of community leaders across Region 10 with environmental experience who advised on the application design as well as peer reviewers who review and score applications) and financial support for reviewers who need transportation, access to technology, or other accommodations to participate in the review meetings;

d. Pass-through funds for two statutory partners to contribute staffing capacity and expertise necessary to administer the program;

e. Contractual costs for communications agency support; translation of core documents; reviewer training; implementation of systems for data management, finance, and grants management; a grants systems analyst; and recruitment for the new positions on the Thriving Communities staff team; and

f. Additional critical resources to operationalize the Program, including: grant management system; nonprofit budgeting software; project management subscription; advertising, paid media, and physical outreach collateral and; supplies for staff.

17. Importantly, the initial $8 million grant was awarded in anticipation of the $52 million subsequent grant that EPA awarded to Philanthropy Northwest (as amended) on December 20, 2024. As

noted above, the purpose of this $52 million subsequent grant award was to fund $48 million in disbursements to the Program's sub-recipients serving communities and tribes, as well as Philanthropy Northwest's closeout of the program upon its conclusion.

18. Beginning on January 28, 2025, Philanthropy Northwest was suddenly, and without warning or notice or explanation, deprived of the already approved initial $8 million grant funds.

19. On both January 28 and 31, 2025, Philanthropy Northwest attempted a drawdown of its initial grant funds from the Automated Standard Application for Payments or "ASAP" account. Philanthropy Northwest was unable to access the funds as the account status was noted as "suspended." Philanthropy Northwest immediately notified its EPA Region 10 project officers. On February 4, 2025, Philanthropy Northwest again notified its Region 10 project officers and requested urgent reinstatement of its ASAP account, noting unsuccessful attempts on February 3 and 4 to draw down funds for payroll. Subsequent requests for reinstatement were made on February 5, February 6, February 10, and February 14, 2025.

20. On February 7, 2025, Philanthropy Northwest's initial grant funds and access to its ASAP account was reinstated.

21. On February 10, 2025, Philanthropy Northwest's initial grant funds and access to its ASAP account was again withdrawn without notice or explanation.

22. On February 22, 2025, Philanthropy Northwest was notified of the termination of its initial grant.

23. On February 27, 2025, Philanthropy Northwest requested recission of its initial grant termination based on the February 21, 2025, U.S. District Court for the District of Maryland ruling blocking such action. Philanthropy Northwest requested an Agency response by March 4, 2025.

24. On March 4, 2025, the EPA acknowledged receipt of the February 27 request for recission and indicated a response would be provided by March 11.

25. On March 7, 2025 Philanthropy Northwest acknowledged EPA's March 4 communication and requested response by close of business. Later that day, the EPA confirmed the

February 22, 2025 termination and indicated that Philanthropy Northwest may be able to secure a 30-day extension to dispute the decision. Philanthropy Northwest requested the 30-day extension, and the extension request was granted by the EPA on March 19, 2025.

26. On March 7, when attempting to draw down funds from the subsequent $52 million grant through the ASAP system, Philanthropy Northwest was unable to access this account and received a system notification indicating that the account was suspended. With the initial $8 million initial grant terminated and the $52 million subsequent grant suspended, in effect Philanthropy Northwest has had no access to any of our legally obligated Thriving Communities grant funds since March 7, 2025.

27. The absence of the grant funding has harmed Philanthropy Northwest, and the harm will be both immediate and irreparable if the initial grant is not reinstated. The termination of the initial grant and lack of access to the subsequent grant not only will result in the loss of jobs for the seven staff fully funded by the initial grant, but also causes a significant loss of funding to Philanthropy Northwest as an organization through the loss of grant funds that offset the salaries of eight staff who partially contribute their time to the administration of the Thriving Communities Program. The annual cost of salaries dependent on the initial award are $1.04 million.

28. On a weekly basis, Philanthropy Northwest is carrying approximately $21,000 in salary costs to continue to administer the Program and on average $50,000 in non-salary costs for professional fees, travel, and participant support costs. Due to the termination of the "initial grant," as of March 20, 2025, Philanthropy Northwest is carrying $220,000 in costs that should be covered by the award through reimbursement from the initial award. With each passing day and no access to funding, Philanthropy Northwest carries the burden of managing its cash flow and relying on overall enterprise resources, including unrestricted operating reserves to bear these costs. Current projections indicate that termination of the initial grant will lead to Philanthropy Northwest operating at a $500,000 deficit by the end of 2025. Philanthropy Northwest projects we can continue to cover the costs of these salaries from our operating reserve for no more than eight additional weeks as of March 24, 2025. Attachment F.

29. In addition to these direct costs, Philanthropy Northwest's indirect costs are impacted by the termination of the grant. These indirect costs are captured on an annual basis over the Program's three years (more than $1 million annually), and Philanthropy Northwest's dependence on these costs to operate are a going concern. The loss of this substantial funding will force a downsizing of the organization and loss of non-Thriving Communities program staff, likely disrupting and diminishing Philanthropy Northwest's other extensive program activities.

30. Furthermore, senior staff have spent an inordinate amount of time and resources evaluating scenarios to continue administering and manage ongoing costs to implement the Thriving Communities Program and fulfill its program obligations to the EPA, partner organizations, and importantly to prospective and successful applications in the face of increasing uncertainty, inability to access funding, and financial risk to the organization. This time, and the continuation of this allocation of resources to combat the effects of the terminated grant, diverts critical resources from Philanthropy Northwest's work and operations, irreparably harming the organization.

31. Emotional harm is also being inflicted to staff resulting from the termination of the grant. Staff are aware the initial grant has been terminated and the organization is covering costs pending reinstatement of the grant and access to the subsequent grant award funds, creating concern about impacts to partners and communities engaged with the Program, anxiety over potential job loss, and high uncertainty and stress while staff continue to fully operationalize the program. This anxiety has significantly and detrimentally affected organizational morale and culture.

32. As a consequence of the initial grant termination, Philanthropy Northwest is forced to consider imminent and significant staff restructuring scenarios to enable the organization to operate on a smaller budget with fewer employees. The employees Philanthropy Northwest would lose include individuals with unique expertise and valuable relationships critical to meeting the organization's mission.

33. In addition, the loss of the planned-for revenue will have an impact on Philanthropy Northwest's non-Thriving Communities program implementation. The financial requirement to

restructure staff requires significant time, as does management of organizational culture and morale following the restructure. The reduction in workforce will also limit Philanthropy Northwest's capacity to engage in its mission critical work supporting the philanthropic sector to be responsive to community needs through opportunities for convening and learning.

34. Finally, the loss of the grant is irreparable in itself as it cannot be recovered.

35. Given the grant-funding cycle and timeline, Philanthropy Northwest cannot make up for the loss of this grant with other sources of funding. A typical grantmaking cycle to secure a large philanthropic grant is 12–24 months, requires significant time investment, and depends on alignment of organizational capacity with specific goals and objectives of the grant. Philanthropy Northwest does not have alternative grant sources that can be quickly reallocated or deployed to cover the gap, making it impossible to fully absorb the financial impact within the current fiscal period.

36. In addition to the irreparable harm to Philanthropy Northwest, the loss of this grant directly impacts Philanthropy Northwest's partner organizations, including two statutory partners. These partner organizations have undertaken organizational obligations to support the administration of the Thriving Communities Program. This includes dedicating staff and resources to the program, for which there is no source for reimbursable costs, and for which these partner organizations bear the burden of these financial obligations.

37. Philanthropy Northwest's two statutory partners were included in Philanthropy Northwest's competitive application to serve as the Region 10 grantmaker and have been identified with particularity in Philanthropy Northwest's plans, budgets, and reports submitted to and approved by the EPA. These statutory partners are critical to the success of the Program in Region 10. The initial grant award includes pass-through funding to both organizations totaling $1.1 million to support their staff to contribute to the design of the grantmaking program, application, community outreach, reviewer training, and the review process. Philanthropy Northwest cannot fulfill its obligation to these statutory partners without access to grant funds.

38. The termination of the initial grant and suspension of subsequent grant funding has also directly impacted the community organizations who have invested time and resources to compete for and secure federal funding through the Thriving Communities Program. The termination and suspension of funding continue to cause direct and imminent harm to the communities who are the intended beneficiaries of these funds and programs. The lack of access to grant funds risks delaying and possibly preventing organizations throughout Region 10 from being able to access the congressionally appropriated funding intended to support implementation of critical environmental projects in communities throughout Alaska, Idaho, Oregon, and Washington.

39. Community organizations across four states and tribal nations selected for funding are at risk of losing these resources to undertake projects to address ongoing and imminent environmental challenges impacting their communities – challenges that this grant was intended to address. As of today's date, Philanthropy Northwest has completed the first round of sub-recipient selections; these selections focused on Type III (project development) grants. The application period for Round 1 closed in December 2024, and peer reviewers conducted their evaluation and scoring of the 132 applications in January and February 2025. These applications included 26 from Alaska, two from Idaho, 45 from Oregon, and 59 from Washington. Among them were applications from 13 federally recognized tribes or Alaska Native villages.

40. On February 28, 2025, Philanthropy Northwest selected 42 applications for funding at a cumulative $14.5 million. These selectees include 12 from Alaska, two from Idaho, 12 from Oregon, and 16 from Washington, including eight federally recognized tribes or Alaska Native villages among them. These entities are spread across remote, rural, and urban areas of each state—from the Seward Peninsula in Alaska, to Southwest Idaho, to the Oregon Coast, to Eastern Washington, and major cities in between. Forty percent of the projects serve rural or remote areas, and projects are well distributed within the four states. Projects will support efforts such as: addressing food security challenges in a remote community by promoting revitalization of Indigenous food systems of harvesting and preservation (Alaska); reducing the risk of severe wildfires through programs that promote community involvement and preparedness

(Idaho); implementing clean energy retrofits to lower household energy costs and protect indoor air quality for low-income households (Oregon); and supporting a tribe's regional emergency management in a remote, highly visited area vulnerable to flooding, severe weather, and earthquakes (WA).

41. Philanthropy Northwest's selectees and its EPA Thriving Communities program officers and grant administrators are currently undergoing a rigorous award preparation phase. This phase includes kickoff meetings to establish the sub-recipient and grantmaker relationship, sub-recipient capacity assessment and review of grant and compliance guidelines, financial management and subaward orientation trainings, review and refinement of project workplans and budgets, and establishment of payment and reporting schedules. This process requires hours of work from both the sub-recipients and Philanthropy Northwest, all before the sub-grant agreements are signed. In addition, Philanthropy Northwest works closely with its EPA project officer and Region 10 Quality Assurance Manager to determine pre-award sub-recipient quality assurance requirements for proposed work involving the collection, production, evaluation, or use of environmental data.

42. In order to finalize the sub-awards, Philanthropy Northwest cannot curtail its staffing of the program without significantly impairing the quality and thoroughness of this work and its responsibilities to these selectees, despite the termination of the initial grant that was to fund these very activities. In fact, EPA is forcing Philanthropy Northwest to self-fund and perform this work, in part because EPA terminated the $8 million initial grant and then suspended, or froze, funding for the $52 million subsequent grant since at least March 7, 2025. I have personally written to EPA program officials on no less than four separate occasions requesting a release of the subsequent grant funds and have not received a response.

43. In addition to the already selected awardees, Philanthropy Northwest closed its application period—for all grant types—in February 2025 and has a third round of applications scheduled to close on March 31, 2025. The second round concluded with 400 total applications—88 from Alaska, 28 from Idaho, 135 from Oregon, and 149 from Washington—requesting a cumulative $116 million. While Philanthropy Northwest is currently funding review of the applications using our own reserve

funds, we cannot properly complete the award preparation phase and make sub-awards to these organizations, nor ultimately monitor the awards to ensure compliance, without the initial grant funding and access to the subsequent grant.

44. Consistent with our participatory grantmaking approach, Philanthropy Northwest has recruited, selected, and provided orientation training for more than 110 volunteer community members from all four states to be peer reviewers who will evaluate and score these applications. Supporting these individuals is predicated upon the initial grant funds, which are now rescinded. Upon conclusion of their work, estimated to be around 25 hours per person over two months, peer reviewers will receive an honorarium drawn from the initial grant. In order to be able to prepare applications for review and facilitate the review process, Philanthropy Northwest cannot curtail its staffing of the program or its commitment to compensate the peer reviewers without significantly impairing the thoroughness and integrity of this work and its responsibilities to the applicants and peer reviewers, despite the termination of the initial grant. Given our active engagement of community members who have invested their time and expertise in our grantmaking process, the inability to disburse grants to successful sub-recipients poses significant reputational risk to Philanthropy Northwest.

45. Region 10 communities are directly impacted by the termination of the grant. Philanthropy Northwest is currently conducting the final application round of the Thriving Communities Program, with the application period closing on March 31, 2025. In total, Philanthropy Northwest expects to make at least 160 sub-awards within Region 10. Already, funding requests have vastly exceeded the total amount available for Region 10 Thriving Communities grants, underscoring the strong need for resources to improve the environmental conditions, health, and well-being of communities across the region. This Project provided the opportunity for leaders from and intimately familiar with these needs to shape the design, outreach, and mechanisms for a grant program that would most effectively, efficiently, and equitably support their communities.

46. The termination of the initial grant places undue burden on and threatens to debilitate Philanthropy Northwest's ability to deliver on the commitment to facilitate disbursement of these

resources across the region and to effectuate goals of the EPA—specifically Pillar 1 of the agency's *Powering the Great American Comeback Initiative* to ensure "Clean Air, Land, and Water for Every American." Not only will this impact the very communities expressly intended to be served through these EPA grants, but it will irreparably harm Philanthropy Northwest's reputation should Philanthropy Northwest not be able to fulfill its role within in the Thriving Communities Program due to the lack of funding for administration and management of the grants.

47. Philanthropy Northwest has consistently understood that the initial and subsequent awards were intended to operate in tandem, and that the funds under both awards would serve the same EPA policies and priorities in furtherance of the same Thriving Communities Program goals. Consequently, unless and until EPA rescinds the termination of the initial grant and restores funding under both the initial and subsequent grants, Philanthropy Northwest will not be able to administer the Program and perform the obligations specified in the two awards—at least as the Program was originally conceived—and Philanthropy Northwest will continue to suffer the significant and irreparable harm I describe above.

I declare under penalty of perjury under the laws of the United States of America, pursuant to 28 U.S.C. 1746 that the foregoing is true and correct to the best of my knowledge.

Executed this 31st day of March, 2025 in Seattle, Washington.

Jill T. Nishi
Chief Executive Officer
Philanthropy Northwest

# Attachment A

# U.S. ENVIRONMENTAL PROTECTION AGENCY

## Cooperative Agreement

| | |
|---|---|
| GRANT NUMBER (FAIN): 02J63801<br>MODIFICATION NUMBER: 0<br>PROGRAM CODE: 5N | DATE OF AWARD<br>06/14/2024 |
| TYPE OF ACTION<br>New | MAILING DATE<br>06/20/2024 |
| PAYMENT METHOD:<br>ASAP | ACH#<br>PEND |

| | |
|---|---|
| **RECIPIENT TYPE:**<br>Not for Profit | **Send Payment Request to:**<br>rtpfc-grants@epa.gov |
| **RECIPIENT:** | **PAYEE:** |
| PHILANTHROPY NORTHWEST<br>600 UNIVERSITY ST STE 1725<br>SEATTLE, WA 98101-4120<br>**EIN:** 91-1110995 | PHILANTHROPY NORTHWEST<br>600 UNIVERSITY ST STE 1725<br>SEATTLE, WA 98101-4120 |

| PROJECT MANAGER | EPA PROJECT OFFICER | EPA GRANT SPECIALIST |
|---|---|---|
| Meredith Higashi<br>600 University St, Suite 1725<br>Seattle, WA 98101-4120<br>**Email:** dcrystal@philanthropnw.org<br>**Phone:** 206-443-8436 | Martha Tomlinson<br>1200 Sixth Ave, Suite 155<br>Seattle, WA 98101-3144<br>**Email:** Tomlinson.MarthaScott@epa.gov<br>**Phone:** 206-553-8696 | Lacey Davidson<br>1200 6th Ave., Suite 155<br>Seattle, WA 98101-3144<br>**Email:** davidson.lacey@epa.gov<br>**Phone:** 206-553-0758 |

**PROJECT TITLE AND DESCRIPTION**

Northwest Network for Environmental Justice-Initial Award

See Attachment 1 for project description.

| BUDGET PERIOD | PROJECT PERIOD | TOTAL BUDGET PERIOD COST | TOTAL PROJECT PERIOD COST |
|---|---|---|---|
| 03/01/2024 - 02/28/2027 | 03/01/2024 - 02/28/2027 | $ 8,000,000.00 | $ 8,000,000.00 |

## NOTICE OF AWARD

Based on your Application dated 06/28/2023 including all modifications and amendments, the United States acting by and through the US Environmental Protection Agency (EPA) hereby awards $ 8,000,000.00. EPA agrees to cost-share 100.00% of all approved budget period costs incurred, up to and not exceeding total federal funding of $ 8,000,000.00. Recipient's signature is not required on this agreement. The recipient demonstrates its commitment to carry out this award by either: 1) drawing down funds within 21 days after the EPA award or amendment mailing date; or 2) not filing a notice of disagreement with the award terms and conditions within 21 days after the EPA award or amendment mailing date. If the recipient disagrees with the terms and conditions specified in this award, the authorized representative of the recipient must furnish a notice of disagreement to the EPA Award Official within 21 days after the EPA award or amendment mailing date. In case of disagreement, and until the disagreement is resolved, the recipient should not draw down on the funds provided by this award/amendment, and any costs incurred by the recipient are at its own risk. This agreement is subject to applicable EPA regulatory and statutory provisions, all terms and conditions of this agreement and any attachments.

| ISSUING OFFICE (GRANTS MANAGEMENT OFFICE) | AWARD APPROVAL OFFICE |
|---|---|
| **ORGANIZATION / ADDRESS** | **ORGANIZATION / ADDRESS** |
| U.S. EPA, Region 10, EPA Region 10<br>Mail Code: 17-C04, 1200 Sixth Avenue, Suite 155<br>Seattle, WA 98101 | U.S. EPA, Region 10, Mission Support Division<br>R10 - Region 10<br>1200 Sixth Ave, Suite 155<br>Seattle, WA 98101-3144 |

**THE UNITED STATES OF AMERICA BY THE U.S. ENVIRONMENTAL PROTECTION AGENCY**

| | |
|---|---|
| **Digital signature applied by EPA Award Official** Andrea Manion - Grants Management Officer | DATE<br>06/14/2024 |

# EPA Funding Information

| FUNDS | FORMER AWARD | THIS ACTION | AMENDED TOTAL |
|---|---|---|---|
| EPA Amount This Action | $ 0 | $ 8,000,000 | $ 8,000,000 |
| EPA In-Kind Amount | $ 0 | $ 0 | $ 0 |
| Unexpended Prior Year Balance | $ 0 | $ 0 | $ 0 |
| Other Federal Funds | $ 0 | $ 0 | $ 0 |
| Recipient Contribution | $ 0 | $ 0 | $ 0 |
| State Contribution | $ 0 | $ 0 | $ 0 |
| Local Contribution | $ 0 | $ 0 | $ 0 |
| Other Contribution | $ 0 | $ 0 | $ 0 |
| Allowable Project Cost | $ 0 | $ 8,000,000 | $ 8,000,000 |

| Assistance Program (CFDA) | Statutory Authority | Regulatory Authority |
|---|---|---|
| 66.615 - Environmental Justice Thriving Communities Grantmaking Program (EJ TCGM) | Clean Air Act: Sec. 138 | 2 CFR 200, 2 CFR 1500 and 40 CFR 33 |

| Fiscal | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Site Name | Req No | FY | Approp. Code | Budget Organization | PRC | Object Class | Site/Project | Cost Organization | Obligation / Deobligation |
| - | 24124WB183 | 2226 | BSF5 | WF | 000W57XK1 | 4183 | - | - | $ 8,000,000 |
| | | | | | | | | | $ 8,000,000 |

Budget Summary Page

| Table A - Object Class Category (Non-Construction) | Total Approved Allowable Budget Period Cost |
|---|---|
| 1. Personnel | $ 3,228,715 |
| 2. Fringe Benefits | $ 742,595 |
| 3. Travel | $ 639,075 |
| 4. Equipment | $ 0 |
| 5. Supplies | $ 28,700 |
| 6. Contractual | $ 897,698 |
| 7. Construction | $ 0 |
| 8. Other | $ 1,855,321 |
| 9. Total Direct Charges | $ 7,392,104 |
| 10. Indirect Costs: 0.00 % Base | $ 607,896 |
| 11. Total (Share: Recipient 0.00 % Federal 100.00 %) | $ 8,000,000 |
| 12. Total Approved Assistance Amount | $ 8,000,000 |
| 13. Program Income | $ 0 |
| 14. Total EPA Amount Awarded This Action | $ 8,000,000 |
| 15. Total EPA Amount Awarded To Date | $ 8,000,000 |

# Attachment 1 - Project Description

This agreement provides funding under the Inflation Reduction Act (IRA) to Philanthropy Northwest (PNW) as a Regional Grantmaker. The recipient, along with partners, will use the initial award to establish and support the accessibility and equitable distribution of Environmental Justice Thriving Communities resources to historically underserved communities to improve environmental and community health and wellbeing through a pass-through subgrant program. Woven throughout the structure is a deliberate and intentional process to center community members in decision-making. During the project period, PNW's participatory governance approach will convene three groups: the Advisory Group, the Task Force and Peer Review Group, comprised of partners and community members. These groups will guide overall program development and implementation, help design applications and scoring rubrics, establish metrics for project outcomes, and evaluate applications. PNW will undertake strategic, targeted, and intentional outreach to ensure potential applicants throughout Region 10 are aware of the funding opportunity and encouraged to apply. The outreach strategy will include in-person events, webinars, a partner outreach toolkit, paid digital advertising, and regional-specific messaging. Additionally, four main systems will be used to support the efficient and effective grant award, disbursement, tracking, adjustment, and full expenditure: an easy-to-use grant application platform, a customized project and grants management system, and accounting software for financial management. PNW’s plan for EPA’s Environmental Justice Thriving Communities Grantmaking Program is anchored in PNW’s core goal to disburse program funds expeditiously and equitably through the design and implementation of a simplified grantmaking process that: centers community voice and participatory grantmaking; leverages the knowledge and relationships of our partners; and addresses environmental justice issues for communities most in need.The activities in the Initial Award Phase include the following: recruit members and convene meetings of the Advisory Board, Task Force, and Peer Review group; co-design the grantmaking program including the application, evaluation criteria, and metrics; develop outreach strategy; launch project website; implement outreach activities such as in-person events, webinars, messaging toolkit, and media placements; establish project management tools including application portal, grants management system, and financial management system; establish a process for quality assurance project management with EPA regional office; develop and offer trainings for reviewers and subgrantees; provide technical assistance to applicants and subgrantees. The anticipated deliverables include established Advisory Board, Task Force, and Peer Review group comprised of partners and community members; project website; an outreach toolkit; simplified grant application; customized grants management system; established financial management system; developed financial management and data reporting training for subgrantees.

The expected outcomes include a grantmaking process established with participatory governance and an accessible grantmaking process.

The intended beneficiaries include historically underserved communities in Region 10 which includes Alaska, Idaho, Oregon, Washington, and 271 Tribal Nations.

This award will include subawards to three different entities. The subawards will support the design of the grantmaking program, expertise on data sovereignty for Tribal communities, outreach and communications to Tribal communities and other partners about the program, application review, access to a application platform, application reviewer scoring tool, technical assistance with the application, grants management including the review process, reporting requirements, and communications with grantees.

# Administrative Conditions

### General Terms and Conditions

The recipient agrees to comply with the current EPA general terms and conditions available at: https://www.epa.gov/grants/epa-general-terms-and-conditions-effective-october-1-2023-or-later.

These terms and conditions are in addition to the assurances and certifications made as a part of the award and the terms, conditions, or restrictions cited throughout the award.

The EPA repository for the general terms and conditions by year can be found at: https://www.epa.gov/grants/grant-terms-and-conditions#general.

### A. Correspondence Condition

The terms and conditions of this agreement require the submittal of reports, specific requests for approval, or notifications to EPA. Unless otherwise noted, all such correspondence should be sent to the following email addresses:

- Federal Financial Reports (SF-425): rtpfc-grants@epa.gov
- MBE/WBE reports (EPA Form 5700-52A): R10grants@epa.gov
- All other forms/certifications/assurances, Indirect Cost Rate Agreements, Requests for Extensions of the Budget and Project Period, Amendment Requests, Requests for other Prior Approvals, updates to recipient information (including email addresses, changes in contact information or changes in authorized representatives) and other notifications: R10 grants@epa.gov
- Requests for Extensions of the Budget and Project Period, Quality Assurance documents, workplan revisions, equipment lists, programmatic reports and deliverables, Amendment Requests, Requests for other Prior Approvals: Tomlinson.MarthaScott@epa.gov
- Administrative questions and issues: davidson.lacey@epa.gov

### B. Pre-Award Costs

In accordance with 2 CFR 1500.9, the recipient may charge otherwise allowable pre-award costs (both Federal and non-Federal matching shares) incurred from **03/01/2024** to the actual award date provided that such costs were contained in the approved application and all costs are incurred within the approved budget period.

### C. New Recipient Training Requirement (ADDED 3/5/2024)

The recipient agrees to complete the EPA Grants Management Training for Applicants and Recipients and the How to Develop a Budget training within 90 calendar days of the date of award of this agreement.

The recipient must notify the Grant Specialist via email when the required training is complete.

For additional information on this training requirement, the recipient should refer to RAIN-2024-G01.

# Programmatic Conditions

**Environmental Justice Thriving Communities Grantmaking (TCGM) Program Cooperative Agreement Terms and Conditions**

## A. PERFORMANCE REPORTING AND FINAL PERFORMANCE REPORT

**Performance Reports – Content**

In accordance with 2 CFR 200.329, the recipient agrees to submit performance reports that include brief information on each of the following areas: 1) A comparison of actual accomplishments to the outputs/outcomes established in the assistance agreement work plan for the period; 2) The reasons why established outputs/outcomes were not met; and 3) other pertinent information, including, when appropriate, analysis and explanation of cost overruns or high unit costs. This description may include overall best practices and/or lessons learned over the project performance period, and attachments and links for materials that may be helpful to other Environmental Grants recipients or similar organizations (e.g., tip sheets, “how-to” sheets, communication materials, outreach materials, web tools, etc).

These reports shall cover work status, work progress, difficulties encountered, preliminary data results and a statement of activity anticipated during the subsequent reporting period, including a description of equipment, techniques, and materials to be used or evaluated. A discussion of expenditures along with a comparison of the percentage of the project completed to the project schedule and an explanation of significant discrepancies shall be included in the report. The report shall also include any changes of key personnel concerned with the project.

Additionally, the recipient agrees to inform EPA as soon as possible about problems, delays, or adverse conditions that which will materially impair the ability to meet the outputs/outcomes specified in the assistance agreement work plan.

**Performance Reports - Frequency**

The recipient agrees to submit quarterly performance reports electronically to the EPA Project Officer within 30 days after the reporting period (every three months). The reporting periods are March 1st to May 31st, June 1st to August 31st, September 1st to November 30th, and December 1st to February 28th each project year. Quarterly reports will be due on January 1st, April 1st, July 1st, and October 1st of each project year. The first report is due October 1, 2024 and will include any completed pre-award activities.

The recipient must submit the final performance report no later than 120 calendar days after the end date of the period of performance. The final report shall document project activities over the entire project period.

**Subaward Performance Reporting**

The recipient must report on its subaward monitoring activities under 2 CFR 200.332(d). Examples of items that must be reported if the pass-through entity has the information available are:

1. Summaries financial and programmatic reports.

2. Summaries of findings from site visits and/or desk reviews to ensure effective subrecipient performance.

3. Environmental results the subrecipient achieved, including a narrative discussion of impacts of program on improvement of environmental conditions in the target community.

4. Summaries of audit findings and related pass-through-entity management decisions.

5. Any disagreements or potential challenges with subrecipients that may interfere with the completion of subgrant performance, and actions the pass-through entity has taken to mitigate them.

6. Actions the pass-through entity has taken to correct deficiencies such as those specified at 2 CFR 200.332(e), 2 CFR 200.208 and the 2 CFR Part 200.339 Remedies for Noncompliance.

7. Summaries of collaborative governance activities and impacts with communities, project partners, and Technical Assistance providers (TCTACs, contractors, etc.) including outreach, engagement, and implementation of feedback.

8. Summaries of capacity building activities for severely capacity constrained communities.

9. Summaries of reach in underserved communities, communities in urban, remote and rural areas, and community stakeholders with the highest degree of burden and capacity constraints throughout the entire Geographic Area.

**B. EJ Grant Recipient Workshops (Virtual and/or In-Person)**

All EJTCGM recipients will be required to attend at least one EJ Grantee training workshop hosted by your EPA Region. These trainings will assist all current EPA EJ grant recipients with strategic planning and project management of their cooperative agreements, as well as afford recipients opportunities to learn from their peers and other experts. Recipients will need to identify at least one authorized official to participate. Virtual workshops will utilize webinar technology that can be accessed via personal computer. A conference call line will be available for any recipient who does not have the technical capability (i.e. slow internet connection) to access the webinar. Your EPA Project Officer will keep you informed of the dates of the workshops. Each EPA Regional Office will tailor their workshop agenda to the environmental needs and priorities of workshop participants and local communities in the region. Workshops may include a mix of current and former EJ grant recipients, local community stakeholders, other EPA and federal program personnel, and other attendees. Workshop attendees will come together to provide perspective, insight, and lessons learned regarding environmental justice issues plaguing their communities and ways to address them. Recipients will need to identify at least one authorized representative to participate. Recipients are permitted to use awarded funds to pay for travel to the workshops.

**C. Review and Oversight**

1. Products - The recipient agrees that any product (e.g., publication, outreach materials, training manuals) produced through this assistance agreement and made available for public view must be first reviewed by the EPA Project Officer for comment before release. The recipient shall make all final decisions on the product content.

2. Monthly Calls - The recipient shall consult with the EPA Project Officer on a monthly basis to obtain input on program activities and products produced. However, the recipient should make all final decisions on project implementation and product content. It is at the EPA Project Officer's discretion to determine any change to the frequency with which calls are held.

3. Prior Approval - Any proposed changes to the project must be submitted in writing to the EPA Project Officer and Grant Specialist for EPA approval prior to implementation. The recipient incurs costs at its own risk if it fails to obtain written approval before implementing any changes.

**D. Post-Project Period Follow-up and Engagement**

For no less than one year after completion of the project, the recipient agrees to periodically update its designated EPA Project Officer on current community-based and environmental justice work the recipient is performing and how/if that work relates to its now completed EJTCGM project. These periodic updates may include (but are not limited to) recent local media reports, additional grant funding received, new initiatives, and developing partnerships. The EPA EJ Grants program is invested in the long-term success of each EJ Grant recipient and its long-term impact on addressing the disproportionate environmental and public health impacts plaguing their communities. These post-project period updates allow the EJ Grants program to provide past recipients with additional guidance about applicable funding opportunities, potential collaborations, and technical assistance that may assist recipients in their future work.* The periodic updates also allow the program to track best practices that lead to greater project sustainability and long-term community revitalization for impacted community residents. The frequency of these periodic updates will be by mutual agreement and will be discussed with the recipient before the end of the project period. Recipients are also encouraged to continue providing updates and engaging with their EPA Project Officers beyond the additional year after the end of the project.

*NOTE – Compliance with this term & condition will not give the recipient priority during future EPA EJ grant competitions and is not a guarantee for future EPA grant funding. Additionally, the recipient agrees not to submit a claim for compensation to EPA for providing these updates.

**E. Cybersecurity Condition**

**Cybersecurity Grant Condition for Other Recipients, Including Intertribal Consortia**

(a) The recipient agrees that when collecting and managing environmental data under this assistance agreement, it will protect the data by following all applicable State or Tribal law cybersecurity requirements.

(b) (1) EPA must ensure that any connections between the recipient's network or information system and EPA networks used by the recipient to transfer data under this agreement, are secure. For purposes of this Section, a connection is defined as a dedicated persistent interface between an Agency IT system and an external IT system for the purpose of transferring information. Transitory, user-controlled connections such as website browsing are excluded from this definition.

If the recipient's connections as defined above do not go through the Environmental Information Exchange Network or EPA's Central Data Exchange, the recipient agrees to contact the EPA Project Officer (PO) no later than 90 days after the date of this award and work with the designated Regional/Headquarters Information Security Officer to ensure that the connections meet EPA security requirements, including entering into Interconnection Service Agreements as appropriate. This condition does not apply to manual entry of data by the recipient into systems operated and used by EPA's regulatory programs for the submission of reporting and/or compliance data.

(2) The recipient agrees that any subawards it makes under this agreement will require the subrecipient to comply with the requirements in (b)(1) if the subrecipient's network or information system is connected to EPA networks to transfer data to the Agency using systems other than the Environmental Information Exchange Network or EPA's Central Data Exchange. The recipient will be in compliance with this condition: by including this requirement in subaward agreements; and during subrecipient monitoring deemed necessary by the recipient under 2 CFR 200.332(d), by inquiring whether the subrecipient has contacted the EPA Project Officer. Nothing in this condition requires the recipient to contact the EPA Project Officer on behalf of a subrecipient or to be involved in the negotiation of an Interconnection Service Agreement between the subrecipient and EPA.

**F. Competency Policy**

**Competency of Organizations Generating Environmental Measurement Data**

In accordance with Agency Policy Directive Number FEM-2012-02, Policy to Assure the Competency of Organizations Generating Environmental Measurement Data under Agency-Funded Assistance Agreements,

Recipient agrees, by entering into this agreement, that it has demonstrated competency prior to award, or alternatively, where a pre-award demonstration of competency is not practicable, Recipient agrees to demonstrate competency prior to carrying out any activities under the award involving the generation or use of environmental data. Recipient shall maintain competency for the duration of the project period of this agreement and this will be documented during the annual reporting process. A copy of the Policy is available online at https://www.epa.gov/sites/production/files/2015-03/documents/competency-policy-aaia-new.pdf or a copy may also be requested by contacting the EPA Project Officer for this award.

**G. Procurement Terms and Conditions**

**The recipient agrees to conduct all procurement actions under this assistance agreement in accordance with the procurement standards set forth in Title 2 CFR, Parts 200.317 through 200.327, 2 CFR Part 1500 and 40 CFR Part 33. EPA provides additional guidance on complying with these requirements in the Best Practice Guide for Procuring Services, Supplies, and Equipment Under EPA Assistance Agreements which is available at https://www.epa.gov/grants/best-practice-guide-procuring-services-supplies-and-equipment-under-epa-assistance. Any costs incurred by the recipient under contracts and/or small purchases that EPA determines to be in noncompliance with EPA procurement standards shall be unallowable for Federal reimbursement.**

**As provided by 2 CFR 200.310 recipients must ensure that subrecipients acquire insurance to protect against loss, damage and theft if a subaward includes cost for equipment. Costs for such insurance are allowable under this agreement.**

**H. Geospatial Data Standards**

All geospatial data created must be consistent with Federal Geographic Data Committee (FGDC) endorsed standards. Information on these standards may be found at https://www.fgdc.gov/.

**I. Quality Assurance**

Authority: Quality Assurance applies to all assistance agreements involving environmental information as defined in 2 C.F.R. § 1500.12 Quality Assurance.

The recipient shall ensure that subawards involving environmental information issued under this agreement include appropriate quality requirements for the work. The recipient shall ensure sub-award recipients develop and implement a Quality Assurance (QA) planning document in accordance with this term and condition; and/or ensure sub-award recipients implement all applicable approved QA planning documents. **In consultation with your Project Officer and the Regional Quality Assurance Manager, select the appropriate plan based on the following options to implement in the Subsequent Award:**

**NOTE: The following selections are example plans to be determined before the Subsequent Award is made.**

**1. Quality Management Plan (QMP)**

a. Prior to beginning environmental information operations, the recipient must:

Option 1

i. Develop a QMP,

ii. Prepare the QMP in accordance with the current version of EPA's Quality Management Plan (QMP) Standard. Submit the document for EPA review,

Iii. Complete required training for approving QAPPs in collaboration with the region or in place of the region, and

iv. Obtain EPA Quality Assurance Manager or designee (hereafter referred to as QAM) approval.

**OR**

Option 2:

i. Submit a previously EPA-approved and current QMP,

ii. The EPA Quality Assurance Manager or designee (hereafter referred to as QAM) will notify the recipient and EPA Project Officer (PO) in writing if the QMP is acceptable for this agreement.

b. The recipient must submit the QMP within [30] days after grant award, and/or no more than [90] days after grant award.

[QAM may specify both timeframes or specify only one timeframe and remove the other from statement above.]

c. The recipient must review their approved QMP at least annually. These documented reviews shall be made available to the sponsoring EPA organization if requested. When necessary, the recipient shall revise its QMP to incorporate minor changes and notify the EPA PO and QAM of the changes. If significant changes have been made to the Quality Program that affect the performance of environmental information operations, it may be necessary to re-submit the entire QMP for re-approval. In general, a copy of any QMP revision(s) made during the year should be submitted to the EPA PO and QAM in writing when such changes occur. Conditions requiring the revision and resubmittal of an approved QMP can be found in section 6 of EPA's Quality Management Plan (QMP) Standard.

d. The recipient must submit a QMP crosswalk with the QMP.

**2. Quality Assurance Project Plan (QAPP)**

a. Prior to beginning environmental information operations, the recipient must:

Option 1

i. Develop a QAPP template for subgrantee use,

ii. Prepare QAPP in accordance with the current version of EPA's Quality Assurance Project Plan (QAPP) Standard,

iii. Submit the document for EPA review, and

iv. Obtain EPA Quality Assurance Manager or designee (hereafter referred to as QAM) approval.

**OR**

Option 2

i. Submit a previously EPA-approved QAPP proposed to ensure the collected, produced, evaluated, or used environmental information is of known and documented quality for the intended use(s).

ii. The EPA Quality Assurance Manager or designee (hereafter referred to as QAM) will notify the recipient and EPA Project Officer (PO) in writing if the previously EPA-approved QAPP is acceptable for this agreement.

Option 3

i. Provide EPA a copy of the recipient-approved QAPP if the recipient has an EPA-approved Quality Management Plan and a current EPA delegation to review and approve QAPPs.

b. The recipient must submit the QAPP [Insert, e.g., 30] days after grant award, and/or no more than [Insert, e.g., 90/120/180] days after grant award.
(QAM may specify both timeframes or specify only one timeframe and remove the other for statement above.)

c. The recipient shall notify the PO and QAM when substantive changes are needed to the QAPP. EPA may require the QAPP be updated and re-submitted for approval.

d. The recipient must review their approved QAPP at least annually. The results of the QAPP review and any revisions must be submitted to the PO and the QAM at least annually and may also be submitted when changes occur

e. The recipient must submit a QAPP checklist with the QAPP.

**For Reference:**

• Quality Management Plan (QMP) Standard and EPA's Quality Assurance Project Plan (QAPP) Standard; contain quality specifications for EPA and non-EPA organizations and definitions applicable to these terms and conditions.

• EPA QA/G-5: *Guidance for Quality Assurance Project Plans*.

• (QAM and/or PO may insert QA references that inform or assist the recipient here).

• EPA's Quality Program website has a list of QA managers, and Non-EPA Organizations Quality Specifications.

• The Office of Grants and Debarment Implementation of Quality Assurance Requirements for Organizations Receiving EPA Financial Assistance.

**J. Use of Logos**

If the EPA logo is appearing along with logos from other participating entities on websites, outreach materials, or reports, it must **not** be prominently displayed to imply that any of the recipient or subrecipient's activities are being conducted by the EPA. Instead, the EPA logo should be accompanied with a statement indicating that Philanthropy Northwest received financial support from the EPA under an Assistance Agreement. More information is available at: https://www.epa.gov/stylebook/using-epa-seal-and-logo#policy

**K. Paperwork Reduction Act**

The scope of work for this cooperative agreement includes a survey or other information collection of identical information from 10 or more parties. As provided by 5 CFR 1320.3(d), EPA is a sponsor of the information collection for purposes of obtaining approval from the Office of Management and Budget for collecting information. The recipient agrees to assist EPA in complying with OMB procedures at 5 CFR Part 1320 for obtaining Information Collection Request authorization. The recipient may not collect information until EPA obtains OMB approval. The Project Officer will advise the recipient when information collection may begin.

**L. Substantial Involvement**

EPA will be substantially involved in this agreement. Substantial involvement by the EPA Project Officer may include:

1.) Monthly telephone calls and other monitoring,

2.) Reviewing project phases and providing approval to continue to the next phase,

3.) Reviewing and commenting on any documents, web content, or other materials developed under this agreement (the recipient will make final decisions on these matters),

4.) Approving substantive terms included in contracts or subawards (EPA's Project Officer will not suggest, recommend or direct the recipient to select any particular contractor or subrecipient except to the extent permitted in Section 10 of EPA's Subaward Policy).

5.) Reviewing and commenting on the programmatic progress reports.

6.) Consultation regarding the selection of key personnel (EPA's involvement is limited to reviewing the technical qualifications of key personnel and the recipient will make the final decisions on selection. EPA's Project Officer will not suggest, recommend or direct the recipient to select any individual).

7.) Collaboration with EPA on designing and implementing a project management process, which includes quality project oversight for funding subrecipients and a tracking and reporting process that reduces reporting burden on community recipients.

8.) Collaboration on the preliminary design of the subaward competition, the submission and evaluation process, and the development of evaluation criteria. However, final decisions on the submission, evaluation process/criteria, and selection of subrecipients will be made by the recipient, rather than by EPA, provided statutory, regulatory, and EPA's Subaward Policy requirements are met.

9.) EPA Project Officer must review and approve the subaward agreements with any Collaborating Entities that will assist in the direct development and implementation of the EJ Thriving Communities Subgrants program, including subawards to other nonprofits (non-Community Based Organizations), units of government, institutions of higher education, and/or medical service providers not covered by a statutory partnership to assist the Grantmaker by creating a local subaward competition or outreach to local communities.

10.) In addition to the requirements in EPA's General Term and Condition “Disclosing Conflict of Interests,” the recipient must submit a Conflict-of-Interest (COI) plan for approval by EPA's Project Officer for preventing, neutralizing, or mitigating conflicts of interest that may arise within the participatory governance framework of the project. The plan should describe controls for ensuring that representatives of community-based nonprofit organizations involved in the design and decision-making for the subawards program do not have relationships with organizations competing for subawards or receiving noncompetitive funding that create actual or apparent conflicts of interest. Example participatory governance activities could include advisory

bodies composed of community-based nonprofit organizations that oversee and provide thought partnership on the development of the subaward process.

11.) Joint operational involvement, participation, and/or collaboration between EPA and the recipient.

12.) Review of proposed procurements in accordance with the Procurement Standards in 2 CFR Part 200.

13.) EPA staff participation in monitoring performance and/or providing technical support for subrecipients that require additional technical assistance to meet project and/or workplan deliverables.

14.) Joint operational involvement, participation, and/or collaboration between EPA and the recipient.

**M. National Programmatic Term and Condition for Fellowship, Internship Programs and Similar Programs Supported by EPA Financial Assistance**

1. EPA funds for this program may only be used for participant support cost payments, scholarships, tuition remission and other forms of student aid for citizens of the United States, its territories, or possessions, or for individuals lawfully admitted to the United States for permanent residence.

2. The recipient and program participants are responsible for taxes, if any, on payments made to or on behalf of individuals participating in this program that are allowable as participant support costs under 2 CFR 200.1 or 2 CFR 200.456 and scholarships and other forms of student aid such as tuition remission under 2 CFR 200.466. EPA encourages recipients and program participants to consult their tax advisers, the U.S. Internal Revenue Service, or state and local tax authorities regarding the taxability of stipends, tuition remission and other payments. However, EPA does not provide advice on tax issues relating to these payments.

3. Participant support cost payments, scholarships, and other forms of student aid such as tuition remission are lower tiered covered Nonprocurement transactions for the purposes of 2 CFR 180.300 and EPA's Suspension and Debarment Term and Condition. Recipients, therefore, may not make participant support cost payments to individuals who are excluded from participation in Federal Nonprocurement programs under 2 CFR Part 180. Recipients are responsible for checking the eligibility of program participants in the System for Award Management (SAM) or obtaining eligibility certifications from the program participants.

See EPA Guidance on Participant Support Costs.

**N. Initial Award Statutory Partnership Agreements -**

**Note: Letters of Commitment submitted with the application needed to be finalized prior to the submission of the Subsequent Award.**

Statutory Partnerships (SP): EPA requires that applicants selected for funding consideration provide copies of the executed final statutory partnership agreement to EPA's Project Officer for submission to the EPA Award Official prior to Subsequent Award.

Partnering community-based organizations who submitted a signed Letter of Commitment during the application phase, as a policy matter, must also at a minimum specify their roles and responsibilities as a statutory partner (direct recipient and subrecipient) in the overall project, and finalize role and financial commitment from the direct recipient before receiving EPA funds. The statutory partnership agreement must be signed by both parties and specify which member of the partnership will enter into the assistance agreement with EPA for the purposes of accountability for the proper expenditure of federal funds, performance of the assistance agreement, liability for claims for recovery of unallowable costs incurred under the agreement and must specify roles in performing the proposed scope of work for the assistance agreement. Executed Statutory Partnership Agreements will be submitted to EPA's Project Officer, the EPA Grants Management Officer or the EPA Award Official will issue written notification that this condition has been satisfied and that the recipient is authorized to draw down TCGM funds for the Initial Award in accordance with the standards described in the EPA General Term and Condition for the Automated Standard Application Payments (ASAP) and Proper Payment Draw Down during the initial award.

END OF DOCUMENT

# Attachment B

# U.S. ENVIRONMENTAL PROTECTION AGENCY

## Cooperative Agreement

| | |
|---|---|
| **GRANT NUMBER (FAIN):** 02J63901<br>**MODIFICATION NUMBER:** 0<br>**PROGRAM CODE:** 5N | **DATE OF AWARD**<br>10/30/2024 |
| **TYPE OF ACTION**<br>New | **MAILING DATE**<br>11/04/2024 |
| **PAYMENT METHOD:**<br>ASAP | **ACH#**<br>PEND |

| | |
|---|---|
| **RECIPIENT TYPE:**<br>Not for Profit | **Send Payment Request to:**<br>rtpfc-grants@epa.gov |
| **RECIPIENT:** | **PAYEE:** |
| PHILANTHROPY NORTHWEST<br>600 UNIVERSITY ST STE 1725<br>SEATTLE, WA 98101-4120<br>**EIN:** 91-1110995 | PHILANTHROPY NORTHWEST<br>600 UNIVERSITY ST STE 1725<br>SEATTLE, WA 98101-4120 |

| PROJECT MANAGER | EPA PROJECT OFFICER | EPA GRANT SPECIALIST |
|---|---|---|
| Meredith Higashi<br>600 University St, Suite 1725<br>Seattle, WA 98101-3144<br>**Email:**<br>**Phone:** | Martha Tomlinson<br>1200 Sixth Ave, Suite 155<br>Seattle, WA 98101-3144<br>**Email:** Tomlinson.MarthaScott@epa.gov<br>**Phone:** 206-553-8696 | Lacey Davidson<br>1200 6th Ave., Suite 155<br>Seattle, WA 98101-3144<br>**Email:** davidson.lacey@epa.gov<br>**Phone:** 206-553-0758 |

**PROJECT TITLE AND DESCRIPTION**

Northwest Network for Environmental Justice-Subsequent Award

See Attachment 1 for project description.

| BUDGET PERIOD | PROJECT PERIOD | TOTAL BUDGET PERIOD COST | TOTAL PROJECT PERIOD COST |
|---|---|---|---|
| 11/01/2024 - 10/31/2027 | 11/01/2024 - 10/31/2027 | $ 42,000,000.00 | $ 42,000,000.00 |

## NOTICE OF AWARD

Based on your Application dated 02/28/2024 including all modifications and amendments, the United States acting by and through the US Environmental Protection Agency (EPA) hereby awards $ 42,000,000.00. EPA agrees to cost-share 100.00% of all approved budget period costs incurred, up to and not exceeding total federal funding of $ 42,000,000.00. Recipient's signature is not required on this agreement. The recipient demonstrates its commitment to carry out this award by either: 1) drawing down funds within 21 days after the EPA award or amendment mailing date; or 2) not filing a notice of disagreement with the award terms and conditions within 21 days after the EPA award or amendment mailing date. If the recipient disagrees with the terms and conditions specified in this award, the authorized representative of the recipient must furnish a notice of disagreement to the EPA Award Official within 21 days after the EPA award or amendment mailing date. In case of disagreement, and until the disagreement is resolved, the recipient should not draw down on the funds provided by this award/amendment, and any costs incurred by the recipient are at its own risk. This agreement is subject to applicable EPA regulatory and statutory provisions, all terms and conditions of this agreement and any attachments.

| ISSUING OFFICE (GRANTS MANAGEMENT OFFICE) | AWARD APPROVAL OFFICE |
|---|---|
| **ORGANIZATION / ADDRESS** | **ORGANIZATION / ADDRESS** |
| U.S. EPA, Region 10, EPA Region 10<br>Mail Code: 17-C04, 1200 Sixth Avenue, Suite 155<br>Seattle, WA 98101 | U.S. EPA, Region 10, MSD<br>OEJECR - Office of Environmental Justice and External Civil Rights<br>1200 Sixth Ave, Suite 155<br>Seattle, WA 98101-3144 |

**THE UNITED STATES OF AMERICA BY THE U.S. ENVIRONMENTAL PROTECTION AGENCY**

| | |
|---|---|
| **Digital signature applied by EPA Award Official** Andrea Manion - Grants Management Officer | **DATE**<br>10/30/2024 |

# EPA Funding Information

| FUNDS | FORMER AWARD | THIS ACTION | AMENDED TOTAL |
|---|---|---|---|
| EPA Amount This Action | $ 0 | $ 42,000,000 | $ 42,000,000 |
| EPA In-Kind Amount | $ 0 | $ 0 | $ 0 |
| Unexpended Prior Year Balance | $ 0 | $ 0 | $ 0 |
| Other Federal Funds | $ 0 | $ 0 | $ 0 |
| Recipient Contribution | $ 0 | $ 0 | $ 0 |
| State Contribution | $ 0 | $ 0 | $ 0 |
| Local Contribution | $ 0 | $ 0 | $ 0 |
| Other Contribution | $ 0 | $ 0 | $ 0 |
| Allowable Project Cost | $ 0 | $ 42,000,000 | $ 42,000,000 |

| Assistance Program (CFDA) | Statutory Authority | Regulatory Authority |
|---|---|---|
| 66.615 - Environmental Justice Thriving Communities Grantmaking Program (EJ TCGM) | Clean Air Act: Sec. 138 | 2 CFR 200, 2 CFR 1500 and 40 CFR 33 |

| Fiscal | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Site Name | Req No | FY | Approp. Code | Budget Organization | PRC | Object Class | Site/Project | Cost Organization | Obligation / Deobligation |
| - | 24124WB248 | 2226 | BSF5 | WF | 000W57XK1 | 4140 | - | - | $ 42,000,000 |
| | | | | | | | | | $ 42,000,000 |

Budget Summary Page

| Table A - Object Class Category (Non-Construction) | Total Approved Allowable Budget Period Cost |
|---|---|
| 1. Personnel | $ 520,830 |
| 2. Fringe Benefits | $ 119,789 |
| 3. Travel | $ 146,363 |
| 4. Equipment | $ 0 |
| 5. Supplies | $ 27,000 |
| 6. Contractual | $ 82,303 |
| 7. Construction | $ 0 |
| 8. Other | $ 40,040,671 |
| 9. Total Direct Charges | $ 40,936,956 |
| 10. Indirect Costs: 0.00 % Base | $ 1,063,044 |
| 11. Total (Share: Recipient 0.00 % Federal 100.00 %) | $ 42,000,000 |
| 12. Total Approved Assistance Amount | $ 42,000,000 |
| 13. Program Income | $ 0 |
| 14. Total EPA Amount Awarded This Action | $ 42,000,000 |
| 15. Total EPA Amount Awarded To Date | $ 42,000,000 |

# Attachment 1 - Project Description

This agreement provides funding under the Inflation Reduction Act (IRA) to Philanthropy Northwest (PNW) as a Regional Grantmaker. The purpose of this award is to fund the subsequent award for the pass-through entity, PNW. The recipient, along with partners, will use the subsequent award to ensure the equitable distribution of Environmental Justice Thriving Communities resources to historically underserved communities to improve environmental and community health and wellbeing through a pass-through subgrant program. Most of this award will be in the distribution and tracking of the Environmental Justice Thriving Communities Subgrants to eligible subrecipients. During the project period, PNW aims to distribute 200 subgrants of four different types: Assessment grants, Planning grants, Project Development grants, and noncompetitive fixed amount subawards for severely capacity-constrained organizations. PNW staff will implement a tracking and monitoring plan of the subgrantees that will include training, capacity building, and quarterly reporting to ensure compliance. Additionally, PNW will conduct a program evaluation and highlight successful subgrantee projects by sharing best practices, success stories, and lessons learned from the program. PNW's plan for EPA's Environmental Justice Thriving Communities Grantmaking Program is anchored in PNW's core goal to disburse program funds expeditiously and equitably through implementation of a simplified grantmaking process that: centers community voice and participatory grantmaking; leverages the knowledge and relationships of our partners; and addresses environmental justice issues for communities most in need.The activities in the Subsequent Award Phase include distribution and tracking of the Environmental Justice Thriving Communities Subgrants to eligible subrecipients, program evaluation, and grant close-out. The subsequent award will cover the eight months of program management following the end of the initial award which includes personnel, grant management systems, and travel. Prior to distribution of subgrants Philanthropy Northwest will have established policies, including conflict of interest and cap amount award policies, have an approved quality management plan and quality assurance processes in place, and have financial and grant management systems in place. The anticipated deliverables for the subsequent award only, include the distribution of over 200 Environmental Justice Thriving Communities Subgrants over 3 years. In Year 1 there will be around 16 Tier 1 grants, 20 Tier 2 grants, and 36 Tier 3 grants awarded. In Year 2 there will be 30 Tier 1 grants and 34 Tier 2 grants awarded plus 60 fixed amount awards to severely capacity constrained entities. The expected outcomes include equitable distribution of subgrants to disadvantaged communities. The majority of the outcomes will be dependent on the subgrants funded but will increase environmental and community health in disadvantaged communities. The intended beneficiaries include disadvantaged communities as defined by the U.S. EPA Inflation Reduction Act (IRA) Disadvantaged Communities Map in Region 10.

The subawards to the Affiliated Tribes of Northwest Indians (ATNI) and Native Americans in Philanthropy (NAP) will be used to support technical assistance to Philanthropy Northwest's program officers and grant administrators on culturally specific practices and protocols as they advise and assist with needs related to close-out activities.

The remainder of subawards will be distributed to eligible subrecipients of the Thriving Communities Subgrants which will cover a variety of projects that include but are not limited to: air quality, water quality, small cleanup projects, improving food access, stormwater issues, green infrastructure, lead contamination, pesticides, emergency preparedness and disaster resiliency, environmental job training, and environmental justice training for youth.

# Administrative Conditions

## General Terms and Conditions

The recipient agrees to comply with the current EPA general terms and conditions available at: https://www.epa.gov/grants/epa-general-terms-and-conditions-effective-october-1-2024-or-later.

These terms and conditions are in addition to the assurances and certifications made as a part of the award and the terms, conditions, or restrictions cited throughout the award.

The EPA repository for the general terms and conditions by year can be found at: https://www.epa.gov/grants/grant-terms-and-conditions#general.

## A. Correspondence Condition

The terms and conditions of this agreement require the submittal of reports, specific requests for approval, or notifications to EPA. Unless otherwise noted, all such correspondence should be sent to the following email addresses:

- Federal Financial Reports (SF-425): rtpfc-grants@epa.gov
- MBE/WBE reports (EPA Form 5700-52A): R10grants@epa.gov
- All other forms/certifications/assurances, Indirect Cost Rate Agreements, Requests for Extensions of the Budget and Project Period, Amendment Requests, Requests for other Prior Approvals, updates to recipient information (including email addresses, changes in contact information or changes in authorized representatives) and other notifications: R10grants@epa.gov
- Requests for Extensions of the Budget and Project Period, Quality Assurance documents, workplan revisions, equipment lists, programmatic reports and deliverables, Amendment Requests, Requests for other Prior Approvals: Tomlinson.MarthaScott@epa.gov
- Administrative questions and issues: davidson.lacey@epa.gov

# Programmatic Conditions

**Environmental Justice Thriving Communities Grantmaking (TCGM) Program Cooperative Agreement Terms and Conditions - SUBSEQUENT AWARD (UPDATED 10/07/24)**

**In addition to these programmatic Terms and Conditions, please refer to the General Terms and Conditions (in effect as of October 2024).**

**A. Eligibility Requirements for Subgrants**

Subgrant eligibility

Grantmakers have flexibility to determine certain priorities for eligible subrecipients and activities that best meet the needs of their respective regions, in consultation with EPA. However, eligibility must fall within the following statutory and policy parameters:

Eligible Subrecipients are as follows:

- Nonprofit organizations
- Community-based and grassroots nonprofit organizations
- Philanthropic and civic organizations with nonprofit status
- Tribal governments (both federally recognized and state-recognized) and intertribal consortia (i.e., a partnership between two or more tribes that work together to achieve a common objective.)
- Native American Organizations (includes Indian groups, cooperatives, nonprofit corporations, partnerships, and associations that have the authority to enter into legally binding agreements)
- Local governments (as defined by 2 CFR 200.1 – includes cities, towns, municipalities, and counties, public housing authorities and councils of government)
- Institutions of higher education (e.g., private and public universities and colleges, including community colleges)
- Puerto Rico
- US Territories

Ineligible Subrecipients include:

- Individuals
- For-profit businesses, unless EPA's Award Official makes an exception based on factors such as those described in Appendix A of EPA's Subaward Policy.
- State governments
- Foreign entities of concern.

The term "foreign entity of concern" means a foreign entity that is—

(A) designated as a foreign terrorist organization by the Secretary of State under section 1189(a) of Title 8;

(B) included on the list of specially designated nationals and blocked persons maintained by the Office of Foreign Assets Control of the Department of the Treasury (commonly known as the "SDN list");

(C) owned by, controlled by, or subject to the jurisdiction or direction of a government of a foreign country that is a covered nation (as defined in section 4872(d)(2) of Title 10); or

(D) alleged by the Attorney General to have been involved in activities for which a conviction was obtained under (i) chapter 37 of title 18 (commonly known as the “Espionage Act”); (ii) section 951 or 1030 of title 18; (iii) chapter 90 of title 18 (commonly known as the “Economic Espionage Act of 1996”); (iv) the Arms Export Control Act ( 22 U.S.C. 2751 et seq.); (v) section 224, 225, 226, 227, or 236 of the Atomic Energy Act of 1954 ( 42 U.S.C. 2274 , 2275, 2276, 2277, and 2284); (vi) the Export Control Reform Act of 2018 ( 50 U.S.C. 4801 et seq.); or (vii) the International Emergency Economic Powers Act ( 50 U.S.C. 1701 et seq.).

Eligible Beneficiaries

As required by Clean Air Act Section 138 (CAA 138), codified at 42 U.S.C. 7438, activities carried out by the Grantmaker or funded by Grantmaker subawards must benefit disadvantaged communities, defined by the EPA Administrator as any community that meets at least one of the following characteristics:

- Identified as disadvantaged by the Climate and Economic Justice Screening Tool (CEJST);
- Any census block group that is at or about the 90th percentile for any of EJScreen's Supplemental Indexes when compared to the nation or state; and / or
- Any geographic area within Tribal lands as included in EJScreen, which include:
  - Alaska Native Allotments
  - Alaska Native Villages
  - American Indian Reservations
  - American Indian Off-reservation Trust Lands
  - Oklahoma Tribal Statistical Areas

Eligible activities

Grantmakers may engage in and fund only those activities that are authorized by CAA 138, which include:

- Community-led air and other pollution monitoring, prevention, and remediation, and investments in low- and zero emission and resilient technologies and related infrastructure;
- Workforce development that help reduce greenhouse gas emissions and other air pollutants;
- Mitigating climate and health risks from urban heat islands, extreme heat, wood heater emissions, and wildfire events;
- Climate resiliency and adaptation;
- Reducing indoor toxics and indoor air pollution; or
- Facilitating engagement of disadvantaged communities in State and Federal advisory groups, workshops, rulemakings, and other public processes.

Ineligible activities

Ineligible activities include, but are not limited to:

- Any activity that violates applicable federal civil rights statutes prohibiting discrimination, including but not limited to Title VI of the Civil Rights Act of 1964, Section 504 of the Rehabilitation Act of 1973, the Age Discrimination Act of 1975, section 504 of the Rehabilitation Act of 1973, Title IX of the Education Amendments of 1972, Federal Water Pollution Control Act Amendments of 1972, and implementing EPA regulations.
- Lobbying, as defined at 2 CFR 200.450;
- Defense and prosecution of criminal and civil proceedings, claims, appeals and patent infringements, as defined at 2 CFR 200.435;
- Carrying out protests, demonstrations, boycotts, or disinvestment campaigns; and

- Any activity to encourage actions that violate Federal, state or local law including, but not limited to, provisions relating to unlawful assembly, trespass, inciting violence, and failing to obey the lawful orders of law enforcement personnel.

## B. Establishing and Managing Subawards

Grantmakers are required to distribute eighty percent of their fifty-million-dollar award in three years through competitive and non-competitive subgrants to be completed within the project period of the subsequent award. These awards should be to eligible subrecipients to carry out activities described in the Notice of Funding Opportunity that benefit disadvantaged communities as defined by the Administrator, in accordance with Clean Air Act 138(b)(1). Grantmakers making pass-through subawards must comply with applicable provisions of 2 CFR Part 200 and the EPA Subaward Policy. As a pass-through entity, the recipient agrees to:

1) Be responsible for selecting subrecipients and as appropriate conducting subaward competitions using a system for properly differentiating between subrecipients and procurement contractors under the standards at 2 CFR 200.331 and EPA's supplemental guidance in Appendix A of the EPA Subaward Policy.

(a) For-profit organizations and individual consultants, in almost all cases, are not eligible subrecipients under EPA financial assistance programs and the pass-through entity must obtain prior written approval from EPA's Award Official for subawards to these entities unless the EPA- approved budget and work plan for this agreement contain a precise description of such subawards.

(b) Stipends and travel assistance for trainees (including interns) and similar individuals who are not employees of the pass-through entity must be classified as participant support costs rather than subawards, as defined at 2 CFR 200.1 and described in EPA's Guidance on Participant Support Costs.

(c) Subsidies, rebates, and similar payments to participants in EPA funded programs to encourage environmental stewardship are also classified as participant support costs as provided in 2 CFR 1500.1 and EPA's Guidance on Participant Support Costs.

2) Establish and follow a system that ensures all subaward agreements are in writing and contain all of the elements required by 2 CFR 200.332(b). EPA has developed a template for subaward agreements that is available in Appendix D of the EPA Subaward Policy.

3) Prior to making subawards, ensure that each subrecipient has a “Unique Entity Identifier (UEI).” The UEI is required by 2 CFR Part 25 and 2 CFR 200.332(b)(1). Subrecipients are not required to complete full System for Award Management (SAM) registration to obtain a UEI. Information on how to obtain a UEI is available at the SAM Internet site: https://www.sam.gov/SAM/ and in EPA's General Term and Condition “System for Award Management and Universal Identifier Requirements” of the pass-through entity's agreement with the EPA.

4) Ensure that subrecipients are aware that they are subject to the same cross-cutting legal and policy requirements as the Grantmaker's award as required by 2 CFR 200.332(b)(2). These requirements include, among others:

(a) Title VI of the Civil Rights Act and other Federal statutes and regulations prohibiting discrimination in Federal financial assistance programs, as applicable.

(b) Reporting Subawards and Executive Compensation under Federal Funding Accountability and Transparency Act (FFATA) set forth in the General Condition passthrough entity's agreement with EPA entitled “Reporting Subawards and Executive Compensation.” Page 8 of 42

(c) Limitations on individual consultant fees as set forth in 2 CFR 1500.10 and the General Condition of the pass-through entity's agreement with EPA entitled “Consultant Fee Cap.”

(d) EPA's prohibition on paying management fees as set forth in General Condition of the pass-through entity's agreement with EPA entitled “Management Fees.”

(e) The Procurement Standards in 2 CFR Part 200 including those requiring competition when the subrecipient acquires goods and services from contractors (including consultants). EPA provides general information on other statutes, regulations and Executive Orders on the Grants internet site at www.epa.gov/grants. Many Federal requirements are agreement or program specific and EPA encourages pass-through entities to review the terms of their assistance agreement carefully and consult with their EPA Project Officer for advice if necessary.

5) Ensure, for states and other public recipients, that subawards are not conditioned in a manner that would disadvantage applicants for subawards based on their religious character.

6) Establish and follow a system for evaluating subrecipient's risks of noncompliance or fraud as required by 2 CFR 200.332 (c) and document the evaluation. When evaluating a subrecipient's risk, a passthrough entity should consider the following: (a) Prior experience with same or similar subawards (b) Results of previous audits; (c) Whether new or substantially changed personnel or systems, and; (d) Extent and results of any Federal agency or the pass-through entity's monitoring

7) Establish and follow a process for deciding whether to impose additional requirements on subrecipients based on risk factors as required by 2 CFR 200.332(d). Examples of additional requirements authorized by 2 CFR 200.208 include:

(a) Requiring payments as reimbursements rather than advance payments;

(b) Withholding authority to proceed to the next phase until receipt of evidence of acceptable performance within a given period of performance;

(c) Requiring additional, more detailed financial reports;

(d) Requiring additional project monitoring;

(e) Requiring the non-Federal entity to obtain technical or management assistance, and

(f) Establishing additional prior approvals

8) Establish and follow a system for monitoring subrecipient performance that includes the elements required by 2 CFR 200.332(e) and report the results of the monitoring in performance reports as provided in the reporting terms and conditions of this agreement.

9) Establish and maintain an accounting system which ensures compliance with the $50,000 limitation on Modified Total Direct Costs per subaward, if applicable, for the purposes of distributing indirect costs. Recipients with Federally approved indirect cost rates that use a different basis for distributing indirect costs to subawards must comply with their Indirect Cost Rate Agreement.

10) Work with EPA's Project Officer to obtain the written consent of EPA's Office of International and Tribal Affairs (OITA), prior to awarding a subaward to a foreign or international organization, or a subaward to be performed in a foreign country even if that subaward is described in a proposed scope of work.

11) Obtain written approval from EPA's Award Official for any subawards that are not described in the approved work plan in accordance with 2 CFR 200.308.

12) Obtain the written approval of EPA's Award Official prior to awarding a subaward to an individual if the EPA-approved scope of work does not include a description of subawards to individuals.

13) Establish and follow written procedures under 2 CFR 200.302(b)(7) for determining that subaward costs are allowable in accordance with 2 CFR Part 200, Subpart E and the terms and conditions of this award. These procedures may provide for allowability determinations on a pre-award basis, through ongoing monitoring of costs that subrecipients incur, or a combination of both approaches provided the pass-through entity documents its determinations.

14) Establish and maintain a system under 2 CFR 200.332(e)(3) and 2 CFR 200.521 for issuing management decisions for audits of subrecipients that relate to Federal awards. However, the recipient remains accountable to EPA for ensuring that

unallowable subaward costs initially paid by EPA are reimbursed or mitigated through offset with allowable costs whether the recipient recovers those costs from the subrecipient or not.

15) As provided in 2 CFR 200.333, pass-through entities must obtain EPA approval to make fixed amount subawards. EPA is restricting the use of fixed amount subawards to a limited number of situations that are authorized in official EPA pilot projects. Recipients should consult with their EPA Project Officer regarding the status of these pilot projects. By accepting this award, the recipient is certifying that it either has systems in place to comply with the requirements described in Items 1 through 14 above or will refrain from making subawards until the systems are designed and implemented.

## C. PERFORMANCE REPORTING AND FINAL PERFORMANCE REPORT

### Performance Reporting – Content

In accordance with 2 CFR 200.329, the recipient agrees to submit performance reports that include brief information on each of the following areas: 1) A comparison of actual accomplishments to the outputs/outcomes established in the assistance agreement work plan for the period; 2) The reasons why established outputs/outcomes were not met; and 3) other pertinent information, including, when appropriate, analysis and explanation of cost overruns or high unit costs. This description may include overall best practices and/or lessons learned over the project performance period, and attachments and links for materials that may be helpful to other Environmental Grants recipients or similar organizations (e.g., tip sheets, "how-to" sheets, communication materials, outreach materials, web tools, etc.).

These reports shall cover work status, work progress, difficulties encountered, preliminary data results and a statement of activity anticipated during the subsequent reporting period, including a description of equipment, techniques, and materials to be used or evaluated. A discussion of cumulative and period comparison of project budget and expenditures, coupled with a comparison of the percentage of the project completed and in relation to project schedule and an explanation(s) of significant discrepancies must be included in the report. The report shall also include any changes of key personnel concerned with the project.

Additionally, the recipient agrees to inform EPA within 30 calendar days about problems, delays, or adverse conditions that may materially impair the ability to meet the outputs/outcomes specified in the assistance agreement work plan.

### Performance Reporting - Frequency

The recipient agrees to submit quarterly performance reports electronically to the EPA Project Officer on the designated quarterly due date(s). If **due date falls on a federal holiday or weekend, it is due the following business day.** The period end and due dates are listed in the below table.

| PERIOD ENDING | QUARTERLY DUE DATES |
|---|---|
| September 30 | October 31 |
| December 31 | January 31 |
| March 31 | April 30 |
| June 30 | July 31 |

The first quarterly report is due at the end of the first full quarter following the execution of the agreement, unless the recipient has incurred pre-award costs. If the recipient is authorized to incur pre-award costs, the grant performance period begins on the date costs were first incurred, and the recipient would provide a quarterly performance report following the end of the first full quarter after that date. Quarterly reports will continue thereafter and throughout the remainder of the performance period. The recipient must submit the final performance report no later than 120 calendar days after the end date of the period of performance as identified in this agreement. The final report must document all project activities occurring during the Period of Performance and as outlined in the executed agreement. However, please be advised that the statutory three-year performance period for this grant program may not be extended. Any costs incurred after the end of the performance period are the responsibility of the recipient and may not be charged to the grant.

## Subaward Performance Reporting

The recipient must report on its subaward monitoring activities under 2 CFR 200.332(e). Pass-through entity monitoring of the subrecipient must include:

1. Review of financial and programmatic reports.

2. Follow-up on action plans noting findings/deficiencies identified from site visits and/or desk reviews to ensure effective subrecipient performance.

3. Quantitative environmental results the subrecipient achieved, the place of performance (eg. Census Tract ID, zip code, latitude / longitude) and a narrative discussion of any qualitative improvements of environmental conditions in the target community.

4. Summaries of audit findings and related pass-through-entity management decisions.

5. Any disagreements or potential challenges with subrecipients that may interfere with the completion of subgrant performance, and actions the pass-through entity has taken to mitigate them.

6. Actions the pass-through entity has taken to correct deficiencies such as those specified at 2 CFR 200.332(f), 2 CFR 200.208 and the 2 CFR Part 200.339 Remedies for Noncompliance.

7. Summaries of collaborative governance activities and impacts with communities, project partners, and Technical Assistance providers (TCTACs, contractors, etc.) including quantitative measures and place of performance of outreach, engagement, and implementation of feedback.

8. Quantity of, the place of performance and qualitative summaries of capacity building activities for severely capacity-constrained communities.

9. Summaries of reach in underserved communities, communities in urban, remote, and rural areas, and community stakeholders with the highest degree of burden and capacity constraints throughout the entire Geographic Area.

## Subaward Performance Reporting on Milestones of Activities for Fixed-Amount Awards

Grantmakers have limited reporting requirements for fixed-amount. The recipient must at minimum report on subrecipients' fixed-amount subaward milestones via the quarterly performance reports, as well as any other reporting requirements agreed upon by the Grantmaker and the fixed-amount subaward recipient, as described in the Fixed Amount Subaward memo. Fixed Amount Subaward Performance reporting will be in accordance with **applicable requirements specified in 2 CFR Parts 200 and 1500, which will apply to fixed-amount subawards absent a case-specific exception requested by a Grantmaker, concurred by the OEJECR Project Officer and approved by OGD. Note:** Each Grantmaker will define “Severely Capacity Constrained.” Grantmakers will also design policies and procedures to limit the number of EJ Thriving Communities Subgrants that a single entity may receive within a specified time period to maximize the diversity and breadth of subrecipients.

**Examples of Fixed Amount Subaward Performance reporting include but are not limited to:**

1. Monitoring plans paid on a milestone basis with an initial amount paid prior to the development of the plan, followed by a second payment upon completion of the draft plan, with a final payment when the plan is complete.

2. Lump sum payments for equipment purchases (e.g. air monitoring devices) based on invoices provided by the subrecipient.

3. Upfront costs of no more than 25%, except with permission of the Project Officer, with subsequent milestone-based payments. For example, sampling projects paid on a milestone basis with 25% for upfront expenses, 25% for data collection, 25% for data analysis, 25% for final report completion.

**Fixed-Amount Subaward Monitoring and Compliance**

**As provided in 2 CFR 200.102(c), the Award Official is authorized to waive or modify the following regulatory requirements for subrecipients receiving fixed-amount subawards:**

1. Competition requirements specified in 2 CFR Part 200 and Part 1500 with the exception of the statutory consultant fee cap implemented at 2 CFR 1500.10.

2. Records required to document personnel compensation under 2 CFR 200.430 and 2 CFR 200.431.

3. Financial requirements at 2 CFR 200.302(b) with the exception of accounting records and documentation required to demonstrate achievement of agreed upon milestones such as invoices for equipment or facility rental, fees paid, stipends earned, and similar fixed-amount transactions.

4. Internal controls described at 2 CFR 200.303 with the exception of an internal control protocol for ensuring that fixed-amount subrecipients only request payment from the pass-through entities upon completion of agreed upon milestones.

5. Property standards in 2 CFR Part 200 with the exception of 2 CFR 200.315 as implemented in EPA's General Term and Condition Data and Copyrighted Materials relating to EPA's "Federal Purpose" license in data and written materials produced with EPA funds.

6. Subrecipient and contractor determinations in 2 CFR 200.331 and corresponding provisions of the EPA Subaward Policy.

7. Indirect costs authorized by 2 CFR 200.332(b)(4). Fixed amount subrecipients do not incur indirect costs.

8. Reports on real or personal property required when closing out a subaward specified in 2 CFR 200.344(g).

**D. The pass-through entities must have pricing procedures that prevent subrecipients from "profiting" from fixed-amount subawards by precluding payments for "management fees" or other amounts in excess of anticipated costs for the activity.**

Grantmakers will use the following methods to ensure compliance for tracking and monitoring activities:

1. Establishing the content of periodic and final performance and financial reports for each fixed-amount subaward.

2. Obtaining a budget description of planned expenditures to be refunded if an activity or event does not take place, a report or analysis is not completed, or the subrecipient does not otherwise perform as promised.

3. Certification in writing to the pass-through entity at the end of the fixed-amount subaward that the project or activity was completed, or the level of effort was expended. If the required level of activity or effort was not carried out, the amount of the fixed-amount subaward must be adjusted and any excess funds refunded.

4. Requiring prior written approval of the pass-through entity for any changes in principal investigator, project leader, project partner, or scope of effort.

**E. Review and Oversight**

1. Work Product - The recipient agrees that any product (e.g., publication, outreach materials, training manuals) produced through this assistance agreement and made available for public view must be first reviewed by the EPA Project Officer for comment before release. The recipient shall make all final decisions on the product content.

2. Monthly Calls - The recipient shall consult with the EPA Project Officer on a monthly basis to obtain input on program activities and products produced. However, the recipient should make all final decisions on project implementation and product content. The EPA Project Officer has discretion to change the frequency with which calls are held.

3. Prior Approval - Any proposed changes to the project must be submitted in writing to the EPA Project Officer and Grant Specialist for EPA approval prior to implementation. The recipient incurs costs at its own risk if it fails to obtain written approval before implementing any changes.

**F. Post-Project Period Follow-up and Engagement**

For no less than one year after completion of the project, the recipient agrees to periodically update its designated EPA Project Officer on current community-based and environmental justice work the recipient is performing and how/if that work relates to its now completed EJ TCGM project. These periodic updates may include (but are not limited to) recent local media reports, additional grant funding received, new initiatives, and developing partnerships. The EPA EJ Grants program is invested in the long-term success of each EJ Grant recipient and its long-term impact on addressing the disproportionate environmental and public health impacts plaguing their communities. These post-project period updates allow the EJ Grants program to provide past recipients with additional guidance about applicable funding opportunities, potential collaborations, and technical assistance that may assist recipients in their future work. Periodic updates also allow the program to track best practices that lead to greater project sustainability and long-term community revitalization for impacted community residents. The frequency of these periodic updates will be by mutual agreement and will be discussed with the recipient before the end of the project period. Recipients are also encouraged to continue providing updates and engaging with their EPA Project Officers beyond the additional year after the end of the project.

*NOTE – Compliance with this term & condition will not give the recipient priority during future EPA EJ grant competitions and is not a guarantee for future EPA grant funding. Additionally, the recipient agrees not to submit a claim for compensation to EPA for providing these updates. Project Officers are encouraged to engage with their Grantmakers to fulfill post-period follow-up, but are not to document non-compliance.

**G. Cybersecurity Condition**

(a) The recipient agrees that when collecting and managing environmental data under this assistance agreement, it will protect the data by following all applicable State or Tribal law cybersecurity requirements.

(b) (1) EPA must ensure that any connections between the recipient's network or information system and EPA networks used by the recipient to transfer data under this agreement, are secure. For purposes of this Section, a connection is defined as a dedicated persistent interface between an Agency IT system and an external IT system for the purpose of transferring information. Transitory, user-controlled connections such as website browsing are excluded from this definition.

If the recipient's connections as defined above do not go through the Environmental Information Exchange Network or EPA's Central Data Exchange, the recipient agrees to contact the EPA Project Officer (PO) no later than 90 days after the date of this award and work with the designated Regional/Headquarters Information Security Officer to ensure that the connections meet EPA security requirements, including entering into Interconnection Service Agreements as appropriate. This condition does not apply to manual entry of data by the recipient into systems operated and used by EPA's regulatory programs for the submission of reporting and/or compliance data.

(2) The recipient agrees that any subawards it makes under this agreement will require the subrecipient to comply with the requirements in (b)(1) if the subrecipient's network or information system is connected to EPA networks to transfer data to the Agency using systems other than the Environmental Information Exchange Network or EPA's Central Data Exchange. The recipient will be in compliance with this condition: by including this requirement in subaward agreements; and during subrecipient monitoring deemed necessary by the recipient under 2 CFR 200.332(e), by inquiring whether the subrecipient has contacted the EPA Project Officer. Nothing in this condition requires the recipient to contact the EPA Project Officer on behalf of a subrecipient or to be involved in the negotiation of an Interconnection Service Agreement between the subrecipient and EPA.

**H. Competency Policy**

**Competency of Organizations Generating Environmental Measurement Data**

In accordance with Agency Policy Directive Number FEM-2012-02, Policy to Assure the Competency of Organizations Generating Environmental Measurement Data under Agency-Funded Assistance Agreements, Recipient agrees, by entering into this agreement, that it has demonstrated competency prior to award, or alternatively, where a pre-award demonstration of competency is not practicable, Recipient agrees to demonstrate competency prior to carrying out any activities under the award involving the generation or use of environmental data. Recipient shall maintain competency for the duration of the project period of this agreement and this will be documented during the annual reporting process. A copy of the Policy is available online at https://www.epa.gov/sites/production/files/2015-03/documents/competency-policy-aaia-new.pdf or a copy

may also be requested by contacting the EPA Project Officer for this award.

**I. Procurement Terms and Conditions**

The recipient agrees to conduct all procurement actions under this assistance agreement in accordance with the procurement standards set forth in Title 2 CFR, Parts 200.317 through 200.327, 2 CFR Part 1500 and 40 CFR Part 33. EPA provides additional guidance on complying with these requirements in the Best Practice Guide for Procuring Services, Supplies, and Equipment Under EPA Assistance Agreements which is available at https://www.epa.gov/grants/best-practice-guide-procuring-services-supplies-and-equipment-under-epa-assistance. Any costs incurred by the recipient under contracts and/or small purchases that EPA determines to be in noncompliance with EPA procurement standards shall be unallowable for Federal reimbursement.

As provided by 2 CFR 200.310 recipients or subrecipient must ensure that subrecipients acquire insurance equal to the amount of the purchased items to protect against loss, damage and theft if a subaward includes cost for equipment. Costs for such insurance are allowable under this agreement.

**J. Signage Required**

1. Signage Requirements

a. Investing in America Emblem: The recipient will ensure that a sign is placed at construction sites supported in whole or in part by this award displaying the official Investing in America emblem and must identify the project as a “project funded by President Biden's Inflation Reduction Act” as applicable. The sign must be placed at construction sites in an easily visible location that can be directly linked to the work taking place and must be maintained in good condition throughout the construction period. The recipient will ensure compliance with the guidelines and design specifications provided by EPA for using the official Investing in America emblem available at: https://www.epa.gov/invest/investingamerica-signage.

b. Procuring Signs: Consistent with section 6002 of RCRA, 42 U.S.C. 6962, and 2 CFR 200.323, recipients are encouraged to use recycled or recovered materials when procuring signs. Signage costs are considered an allowable cost under this assistance agreement provided that the costs associated with signage are reasonable. Additionally, to increase public awareness of projects serving communities where English is not the predominant language, recipients are encouraged to translate the language on signs (excluding the official Investing in America emblem or EPA logo or seal) into the appropriate non-English language(s). The costs of such translation are allowable, provided the costs are reasonable.

2. Public or Media Events EPA encourages the recipient to notify the EPA Project Officer listed in this award document of public or media events publicizing the accomplishment of significant events related to construction projects as a result of this agreement and provide the opportunity for attendance and participation by federal representatives with at least ten (10) working days' notice.

**K. Geospatial Data Standards**

All geospatial data created must be consistent with Federal Geographic Data Committee (FGDC) endorsed standards. Information on these standards may be found at https://www.fgdc.gov/.

**L. Quality Assurance**

Authority: Quality Assurance applies to all assistance agreements involving environmental information as defined in 2 C.F.R. § 1500.12 Quality Assurance.

The recipient shall ensure that subawards involving environmental information issued under this agreement include appropriate quality requirements for the work. The recipient shall ensure sub-award recipients develop and implement the Quality Assurance (QA) planning documents in accordance with this term and condition; and ensure sub-award recipients implement all applicable approved QA planning documents. In consultation with your Project Officer and the Regional Quality Assurance Manager, select the appropriate plan based on the following options to implement in the Subsequent Award:

**NOTE: The Grantmaker will need to develop a management strategy for receiving, reviewing and assisting sub-award recipients with QAPP needs.**

**1. Quality Management Plan (QMP)**

a. Prior to reviewing Thriving Communities subgrant applications, the recipient must:

i. Develop a QMP,

ii. Prepare the QMP in accordance with the current version of EPA's Quality Management Plan (QMP) Standard. Submit the document for EPA review,

iii. Obtain EPA Quality Assurance Manager or designee (hereafter referred to as QAM) approval.

b. The recipient must submit the QMP within 90 days after grant award

c. The recipient must review their approved QMP at least annually. These documented reviews shall be made available to the sponsoring EPA organization if requested. When necessary, the recipient shall revise its QMP to incorporate minor changes and notify the EPA PO and QAM of the changes. If significant changes have been made to the Quality Program that affect the performance of environmental information operations, it may be necessary to re-submit the entire QMP for re-approval. In general, a copy of any QMP revision(s) made during the year should be submitted to the EPA PO and QAM in writing when such changes occur. Conditions requiring the revision and resubmittal of an approved QMP can be found in section 6 of EPA's Quality Management Plan (QMP) Standard.

**2. Quality Assurance Project Plan (QAPP)**

a. Prior to beginning environmental information operations, the recipient and/or sub-award recipient must complete one of the following:

Option 1

i. Develop a QAPP,

ii. Prepare QAPP in accordance with the current version of EPA's Quality Assurance Project Plan (QAPP) Standard,

iii. Submit the document for EPA review, and

iv. Obtain EPA Quality Assurance Manager approval.

**OR**

Option 2

i. Submit a previously EPA-approved QAPP proposed to ensure the collected, produced, evaluated, or used environmental information is of known and documented quality for the intended use(s).

ii. The EPA Quality Assurance Manager will notify the recipient and EPA Project Officer (PO) in writing if the previously EPA-approved QAPP is acceptable for this agreement.

b. The sub-award recipient must review their approved QAPP at least annually. The recipient shall notify the PO and QAM when substantive changes are needed to the QAPP. EPA may require the QAPP be updated and re-submitted for approval.

**For Reference:**

• Quality Management Plan (QMP) Standard and EPA's Quality Assurance Project Plan (QAPP) Standard; contain quality specifications for EPA and non-EPA organizations and definitions applicable to these terms and conditions.

• EPA QA/G-5: *Guidance for Quality Assurance Project Plans*.

• (QAM and/or PO may insert QA references that inform or assist the recipient here).

• EPA's Quality Program website has a list of QA managers, and Non-EPA Organizations Quality Specifications.

• The Office of Grants and Debarment Implementation of Quality Assurance Requirements for Organizations Receiving EPA Financial Assistance.

**M. Human Subjects Research Review Process**

(a) *Applications involving human subjects.* (1) Protecting the rights, safety, and welfare of human subjects involved in research supported by EPA grants is the responsibility of the institution which receives or is accountable to EPA for the funds awarded for the support of the project.

(2) Institutions engaged in research involving human subjects, with the exception of research eligible for exemption under 40 CFR 26.104, must submit to EPA for review, approval, and official acceptance, written evidence of a Federal wide Assurance (FWA) on file with the U.S. Department of Health and Human Services (HHS) or other agency that their institution will comply with regulatory provisions in the Common Rule (codified by EPA at as 40 CFR 26 Part A).

(3) Applicants must provide documentation with each proposal of research involving human subjects that it has been reviewed in accordance with the institution's assurance and in compliance with the Common Rule. Review and approval by the EPA Human Subject Research Review Official (HSRRO) to determine compliance with 40 CFR 26 and EPA Order 1000.17 (series) must occur before research involving human subjects may commence.

**N. Program Income**

In accordance with 2 CFR 200.307(b) and 2 CFR 1500.8(b), the recipient is hereby authorized to retain program income earned during the project period.

Project Officers must choose one or more of the options below per their approval in the Finding Recommendation and delete the options not applicable. The default use of the program income under 2 CFR 1500.8(b) is "Addition."

The recipient agrees to use the following method for applying income:

1. Addition. Program income is added to the total allowable costs, increasing the overall total amount of the award. Program income must be used for the original purpose of the award and under the conditions of the assistance agreement.

The recipient must provide as part of its [Insert Quarterly, Semi-annual, or Annual and Final] performance report, a description of how program income is being used. Further, a report on the amount of program income earned during the award period must be submitted with the [Insert Quarterly, Semi-annual, or Annual and Final] Federal Financial Report, Standard Form 425.

Note: During budget negotiations program offices may authorize the recipient to deduct costs incurred in generating program income from gross program income to determine net program income as provided at 2 CFR 200.307(d). In these cases the program income T&C must include the following additional statement:

In accordance with 2 CFR 200.307(d) costs incidental to generating program income may be deducted from gross income to determine program income, provided these costs have not been charged to the EPA award. The recipient must retain adequate accounting records to document that any costs deducted from program income comply with regulatory requirements. Further, the recipient must report program income on the Federal Financial Report, SF425. The recipient should refer to the General Terms and Conditions "Federal Financial Reporting (FFR)" for more information on the SF 425.

**O. Use of Logos and Icons**

**Programmatic guidance for the appropriate use of the icons and logos either together, with other partner icons or individually will be provided.**

If the EPA logo is appearing along with logos from other participating entities on websites, outreach materials, or reports, it

must **not** be prominently displayed to imply that any of the recipient or subrecipient's activities are being conducted by the EPA. Instead, the EPA logo should be accompanied with a statement indicating that Philanthropy Northwest or a subrecipient received financial support from the EPA under an Assistance Agreement. More information is available at: https://www.epa.gov/stylebook/using-epa-seal-and-logo#policy

**Grantmaker Icon**

**The Thriving Communities Grantmaking Program (TCGM) Icon will be designed by the EPA with Grantmaker input and approved by the EPA PROTRAC process,** used to monitor the concept proposal, development, review and approval of EPA print, infographics, audio, video and social media content/products for internal and external release, as well as Esri Products (Story Maps and Hub sites) for external publishing only. PROTRAC ensures all content created is consistent, appropriate and in alignment with current agency messages, and follows EPA branding guidelines**. The icon will represent the "programmatic identity" of the Grantmaker program, and may be used alone or in conjunction with the EPA and grant recipient's logos' or individual Grantmaker's logo. The approved TCGM programmatic icon must remain intact and unmodified.** Modifying icons to specifically identify a program office or region are not permitted. NOTE: Icons must be updated or removed per current agency policy/ guidelines.

**P. Paperwork Reduction Act**

The scope of work for this cooperative agreement includes a survey or other information collection of identical information from 10 or more parties. As provided by 5 CFR 1320.3(d), EPA is a sponsor of the information collection for purposes of obtaining approval from the Office of Management and Budget for collecting information. The recipient agrees to assist EPA in complying with OMB procedures at 5 CFR Part 1320 for obtaining Information Collection Request authorization. The recipient may not collect information until EPA obtains OMB approval. The Project Officer will advise the recipient when information collection may begin.

**Q. Substantial Involvement**

EPA will be substantially involved in this agreement however, final decisions rest with the recipient. Substantial involvement by the EPA Project Officer may include:

1. Monthly telephone calls and other monitoring,

2. Review project phases and provide approval to continue to the next phase,

3. Review and comment on any documents, web content, or other materials developed under this agreement (the recipient will make final decisions on these matters),

4. Approve substantive terms included in contracts or subawards (EPA's Project Officer will not suggest, recommend, or direct the recipient to select any particular contractor or subrecipient except to the extent permitted in Section 10 of EPA's Subaward Policy).

5. Review and comment on the programmatic progress reports.

6. Consultation regarding the selection of key personnel (EPA's involvement is limited to reviewing the technical qualifications of key personnel and the recipient will make the final decisions on selection. EPA's Project Officer will not suggest, recommend, or direct the recipient to select any individual).

7. Collaboration with EPA on designing and implementing a project management process, which includes quality project oversight for funding subrecipients and a tracking and reporting process that reduces reporting burden on community recipients.

8. Collaboration on the preliminary design of the subaward competition, the submission and evaluation process, and the development of evaluation criteria. However, final decisions on the submission, evaluation process/criteria, and selection of subrecipients will be made by the recipient, rather than by EPA, provided statutory, regulatory, and EPA's Subaward Policy requirements are met.

9. EPA Project Officer must review and approve the subaward agreements with any Collaborating Entities that will assist in the direct development and implementation of the EJ Thriving Communities Subgrants program, including subawards to other nonprofits (non-Community Based Organizations), units of government, institutions of higher education, and/or medical service providers not covered by a statutory partnership to assist the Grantmaker by creating a local subaward competition or outreach to local communities.

10. In addition to the requirements in EPA's General Term and Condition "Disclosing Conflict of Interests," the recipient must submit a Conflict-of-Interest (COI) plan for approval by EPA's Project Officer for preventing, neutralizing, or mitigating conflicts of interest that may arise within the participatory governance framework of the project. The plan should describe controls for ensuring that representatives of community-based nonprofit organizations involved in the design and decision-making for the subawards program do not have relationships with organizations competing for subawards or receiving noncompetitive funding that create actual or apparent conflicts of interest. Example participatory governance activities could include advisory bodies composed of community-based nonprofit organizations that oversee and provide thought partnership on the development of the subaward process.

11. If a Conflict of Interest is Identified by the EPA, the Conflict-of-Interest Mitigation Plan will need to be approved by the Project Officer, in consultation with the Grant Specialist.

12. Joint operational involvement, participation, and/or collaboration between EPA and the recipient.

13. Review of proposed procurements in accordance with the Procurement Standards in 2 CFR Part 200.

14. EPA staff participation in monitoring performance and/or providing technical support for subrecipients that require additional technical assistance to meet project and/or workplan deliverables.

15. Joint operational involvement, participation, and/or collaboration between EPA and the recipient.

16. Informally referred to as the "Cap Amount Award Policy" and discussed on page 15 of the NOFO, Grantmakers should put policies in place that limit the number of times a particular Eligible Subrecipient can receive an EJ Thriving Communities Subgrant within a certain period of time. For example, a pass-through entity may decide that a recipient may not receive more than two EJ Thriving Communities Subgrants within the 3-year period of performance or a shorter interval as deemed appropriate by the pass-through entity. This plan will need to be approved by the Project Officer.

17. Prior to making subawards, Grantmakers can work with their Project Officers to identify instructions and guidance on subaward policies to ensure that the burden on the Tier 1-3 and fixed-amount award Subrecipients is minimized. This includes resources such as the gmc_subaward_policy_appendix_d_subaward_agreement_template.pdf (epa.gov) (EPA does not mandate the use of this template. Pass-through entities may use their own form of subaward agreements provided the requirements of 2 CFR 200.332(a) and 2 CFR 200.332(b) are met.) And requirements that flow down to subgrantees such as "Unique Entity Identifier" (UEI) as required by 2 CFR Part 25 and 2 CFR 200.332(b)(1).

**R. National Programmatic Term and Condition for Fellowship, Internship Programs and Similar Programs Supported by EPA Financial Assistance**

1. EPA funds for this program may only be used for participant support cost payments, scholarships, tuition remission and other forms of student aid for citizens of the United States, its territories, or possessions, or for individuals lawfully admitted to the United States for permanent residence.

2. The recipient and program participants are responsible for taxes, if any, on payments made to or on behalf of individuals participating in this program that are allowable as participant support costs under 2 CFR 200.1 or 2 CFR 200.456 and scholarships and other forms of student aid such as tuition remission under 2 CFR 200.466. EPA encourages recipients and program participants to consult their tax advisers, the U.S. Internal Revenue Service, or state and local tax authorities regarding the taxability of stipends, tuition remission and other payments. However, EPA does not provide advice on tax issues relating to these payments.

3. Participant support cost payments, scholarships, and other forms of student aid such as tuition remission are lower tiered covered Non-procurement transactions for the purposes of 2 CFR 180.300 and EPA's Suspension and Debarment Term and Condition. Recipients, therefore, may not make participant support cost payments to individuals who are excluded from

participation in Federal Non-procurement programs under 2 CFR Part 180. Recipients are responsible for checking the eligibility of program participants in the System for Award Management (SAM) or obtaining eligibility certifications from the program participants.

See EPA Guidance on Participant Support Costs.

**S. Subsequent Award Statutory Partnership Agreements Letters of Commitment submitted with the application needed to be finalized prior to the submission of the Subsequent Award.** EPA requires that applicants selected for funding consideration provide copies of the executed final statutory partnership agreement to EPA's Project Officer for submission to the EPA Award Official prior to issuance of the Subsequent Award.

Any letters of commitment submitted in the application should be finalized into a final signed statutory agreement, which should include any updated stakeholder roles and responsibilities or revised award amounts. The statutory partnership agreement must be signed by all relevant parties and specify which member of the partnership will enter into the assistance agreement with EPA for the purposes of accountability for the proper expenditure of federal funds, performance of the assistance agreement, liability for claims for recovery of unallowable costs incurred under the agreement and must specify roles in performing the proposed scope of work for the assistance agreement. Executed Statutory Partnership Agreements will be submitted to EPA's Project Officer. The EPA Grants Management Officer or the EPA Award Official will issue written notification that this condition has been satisfied and that the recipient is authorized to draw down TCGM funds for the Subsequent Award in accordance with the standards described in the EPA General Term and Condition for the Automated Standard Application Payments (ASAP) and Proper Payment Draw Down during the initial award.

**T. Record Retention**

In accordance with 2 CFR § 200.334, recipients and subrecipients must retain for a period of three years all programmatic, financial, statistical, and all other records required under the terms of the agreement, unless a dispute or lawsuit has ensued. If a dispute or lawsuit has been initiated, all records must be retained for the duration of the dispute, until the matter is resolved and dispositioned, and for three years thereafter.

**U. Environmental Justice Thriving Communities Grantmaking Program Davis-Bacon Labor Standards**

As provided in Section 314 of the Clean Air Act (42 USC § 7614) (DBRA), Davis-Bacon Act (42 USC §§ 3141-3144) labor standards apply to grants and cooperative agreements made under the Greenhouse Gas Reduction Fund. Accordingly, all laborers and mechanics employed by contractors or subcontractors on projects assisted under this award agreement shall be paid wages at rates not less than those prevailing for the same type of work on similar construction in the locality as determined by the Secretary of Labor in accordance with 40 USC Subtitle II, Part A, Chapter 31, Subchapter IV (Wage Rate Requirements).

Therefore, the pass-through entity must create a Davis-Bacon subgrant compliance plan to ensure that any entity that receives financial assistance complies with Davis-Bacon labor requirements where construction work is financed in whole or in part with such financial assistance.

If the recipient encounters a situation that presents uncertainties regarding DBRA applicability under this assistance agreement, the recipient must discuss the situation with the EPA Project Officer before authorizing work on the project.

In the event that a periodic project site visit, audit, or routine communication with subrecipient, program beneficiary, contractor, or subcontractor determines any instances of non-compliance or potential non-compliance with Davis-Bacon, the recipient agrees to discuss the situation with the EPA Project Officer for possible referral to DOL for guidance or enforcement action.

Note, the use of the term project in this term and condition is distinct from the use of the term project within the definition of qualified project under Clean Air Act Section 134(c)(3), which is broader and includes "any project, activity, or technology." 40 CFR 30.103 defines construction as "erection, alteration, or repair (including dredging, excavating, and painting) of buildings, structures, or other improvements to real property, and activities in response to a release or a threat of a release of a hazardous substance into the environment, or activities to prevent the introduction of a hazardous substance into a water supply."

**1. Program Applicability**

a. Program Name: Environmental Justice Thriving Communities Grantmaking Program

b. Statute requiring compliance with Davis-Bacon: Clean Air Act Section 314, Labor Standards, codified as 42 U.S.C. § 7614.

c. Activities subject to Davis-Bacon: Activities subject to Davis-Bacon include certain construction costs and contractual costs. Construction costs may include:

i. Building and / or upgrading existing structures and sites to improve community use while reducing GHG emissions and / or improving climate resilience;

ii. Implementing structural and non-structural retrofits to enhance the resilience of community-serving buildings (e.g., raise the building elevation to reduce flood risk, improve cooling systems and / or insulation to reduce extreme heat risk);

iii. Install energy efficiency measures such as insulation, double or triple glazed windows, "cool roofs" that reflect sunlight, and energy management systems in public buildings;

iv. Remediating or mitigating harmful substances in buildings, including lead, mercury, pesticides, radon, mold, PCBs (caulk, flooring, etc.), lead-based paint, asbestos, and other toxic substances;

v. Installing, upgrading, or replacing HVAC and / or filtration systems that improve indoor quality in schools, community-serving buildings, and single-and-multifamily homes;

vi. Targeted water infrastructure upgrades, including replacing private-side lead lines in homes, childcare facilities, schools, or other community-serving buildings; septic to sewer conversions; and installing water fountains at schools and parks; and

vii. Other activities described in the EPA Disadvantaged Business Enterprise (DBE) rule's definition of *Construction* at 40 CFR 33.103, as well as related architectural or engineering services.

With very few exceptions, recipients carry out construction projects by hiring contractors which typically include a general contractor and an architectural or engineering firm for design work and in some cases purchasing equipment for installation at the site. Hiring general contractors and other contractors performing activities described in the EPA Disadvantaged Business Enterprise (DBE) rule's definition of Construction at 40 CFR 33.103 will be categorized as "Construction."

d. Prevailing Wage Classification: Building

**2. Davis-Bacon and Related Acts**

Davis-Bacon and Related Acts (DBRA) is a collection of labor standards provisions administered by the Department of Labor, that are applicable to grants involving construction. These labor standards include the:

- Davis-Bacon Act, which requires payment of prevailing wage rates for laborers and mechanics on construction contracts of $2,000 or more;
- Copeland "Anti-Kickback" Act, which prohibits a contractor or subcontractor from inducing an employee into giving up any part of the compensation to which he or she is entitled; and
- Contract Work Hours and Safety Standards Act, which requires overtime wages to be paid for over 40 hours of work per week, under contracts in excess of $100,000.

**3. Recipient Responsibilities When Entering Into and Managing Contracts:**

a. Solicitation and Contract Requirements:

i. Include the Correct Wage Determinations in Bid Solicitations and Contracts: Recipients are responsible for complying with the procedures provided in 29 CFR 1.6 when soliciting bids and awarding contracts.

ii. Include DBRA Requirements in All Contracts: Include the following text on all contracts under this grant:

1. "By accepting this contract, the contractor acknowledges and agrees to the terms provided in the DBRA Requirements for Contractors and Subcontractors Under EPA Grants."

b. After Award of Contract:

i. Approve and Submit Requests for Additional Wages Rates: Work with contractors to request additional wage rates if required for contracts under this grant, as provided in 29 CFR 5.5(a)(1)(iii).

ii. Provide Oversight of Contractors to Ensure Compliance with DBRA Provisions: Ensure contractor compliance with the terms of the contract, as required by 29 CFR 5.6.

**4. Recipient Responsibilities When Establishing and Managing Additional Subawards:**

a. Include DBRA Requirements in All Subawards (including Loans):

i. Include the following text on all subawards under this grant:

1. "By accepting this award, the EPA subrecipient acknowledges and agrees to the terms and conditions provided in the DBRA Requirements for EPA Subrecipients."

b. Provide Oversight to Ensure Compliance with DBRA Provisions: Recipients are responsible for oversight of subrecipients and must ensure subrecipients comply with the requirements in 29 CFR 5.6.

**5.** The contract clauses set forth in this Term & Condition, along with the correct wage determinations, will be considered to be a part of every prime contract covered by Davis-Bacon and Related Acts (see 29 CFR 5.1), and will be effective by operation of law, whether or not they are included or incorporated by reference into such contract, unless the Department of Labor grants a variance, tolerance, or exemption. Where the clauses and applicable wage determinations are effective by operation of law under this paragraph, the prime contractor must be compensated for any resulting increase in wages in accordance with applicable law.

**V. Participation in an EPA-Sponsored Program Evaluation.**

As a condition of the receipt of the award under a NOFO, the recipient is required to cooperate with all EPA staff, contractors, or designated Recipients performing research or evaluation studies funded by EPA, if directed to do so by the Project Officer.

**W. Land Acquisition**

Land acquisition must comply with the Uniform Relocation Act and Federal Highway Administration's implementing regulations at 49 CFR Part 24 which requires grantees to follow certain procedures for acquiring property for grant purposes, such as notice, negotiation, and appraisal requirements.

**X. Termination**

Notwithstanding the General Term and Condition "Termination," EPA maintains the right to terminate the Assistance Agreement only as specified in 2 CFR 200.339 and the version of 2 CFR 200.340 applicable to EPA grants as of July 1, 2024 pursuant to 89 FR 55262 (July 3, 2024), when the noncompliance with the terms and conditions is substantial such that effective performance of the Assistance Agreement is materially impaired or there is adequate evidence of waste, fraud, or abuse, prompting adverse action by EPA per 2 CFR 200.339, through either a partial or full termination. In accordance with 2 CFR 200.341, EPA will provide the Recipient notice of termination.

If EPA partially or fully terminates the Assistance Agreement, EPA must (1) de-obligate uncommitted funds and re-obligate

them to another Eligible Recipient to effectuate the objectives of Section 138 of the Clean Air Act, 42 USC § 7434 within 90 days of the de-obligation and (2) amend the Recipient's Assistance Agreement to reflect the reduced amount, based on the de-obligation.

**END OF DOCUMENT**

# Attachment C

# U.S. ENVIRONMENTAL PROTECTION AGENCY

## Assistance Amendment

| | |
|---|---|
| GRANT NUMBER (FAIN): 02J63901<br>MODIFICATION NUMBER: 1<br>PROGRAM CODE: 5N | DATE OF AWARD<br>12/20/2024 |
| TYPE OF ACTION<br>Augmentation: Increase | MAILING DATE<br>12/26/2024 |
| PAYMENT METHOD:<br>ASAP | ACH#<br>PEND |

| | |
|---|---|
| **RECIPIENT TYPE:**<br>Not for Profit | **Send Payment Request to:**<br>rtpfc-grants@epa.gov |
| **RECIPIENT:**<br>PHILANTHROPY NORTHWEST<br>600 UNIVERSITY ST STE 1725<br>SEATTLE, WA 98101-4120<br>**EIN:** 91-1110995 | **PAYEE:**<br>PHILANTHROPY NORTHWEST<br>600 UNIVERSITY ST STE 1725<br>SEATTLE, WA 98101-4120 |

| PROJECT MANAGER | EPA PROJECT OFFICER | EPA GRANT SPECIALIST |
|---|---|---|
| Meredith Higashi<br>600 University St, Suite 1725<br>Seattle, WA 98101-3144<br>**Email:**<br>**Phone:** | Martha Tomlinson<br>1200 Sixth Ave, Suite 155<br>Seattle, WA 98101-3144<br>**Email:** Tomlinson.MarthaScott@epa.gov<br>**Phone:** 206-553-8696 | Lacey Davidson<br>1200 6th Ave., Suite 155<br>Seattle, WA 98101-3144<br>**Email:** davidson.lacey@epa.gov<br>**Phone:** 206-553-0758 |

**PROJECT TITLE AND EXPLANATION OF CHANGES**

Northwest Network for Environmental Justice-Subsequent Award

This amendment adds $10,000,000 in EPA supplemental funding, fully funds the award, and updates all administrative and programmatic terms and conditions. The updated conditions do not apply retroactively to funds already expended; they apply only to unexpended funds and the new monies added to the agreement.

| BUDGET PERIOD | PROJECT PERIOD | TOTAL BUDGET PERIOD COST | TOTAL PROJECT PERIOD COST |
|---|---|---|---|
| 11/01/2024 - 10/31/2027 | 11/01/2024 - 10/31/2027 | $ 52,000,000.00 | $ 52,000,000.00 |

## NOTICE OF AWARD

Based on your Application dated 02/28/2024 including all modifications and amendments, the United States acting by and through the US Environmental Protection Agency (EPA) hereby awards $ 10,000,000.00. EPA agrees to cost-share 100.00% of all approved budget period costs incurred, up to and not exceeding total federal funding of $ 52,000,000.00. Recipient's signature is not required on this agreement. The recipient demonstrates its commitment to carry out this award by either: 1) drawing down funds within 21 days after the EPA award or amendment mailing date; or 2) not filing a notice of disagreement with the award terms and conditions within 21 days after the EPA award or amendment mailing date. If the recipient disagrees with the terms and conditions specified in this award, the authorized representative of the recipient must furnish a notice of disagreement to the EPA Award Official within 21 days after the EPA award or amendment mailing date. In case of disagreement, and until the disagreement is resolved, the recipient should not draw down on the funds provided by this award/amendment, and any costs incurred by the recipient are at its own risk. This agreement is subject to applicable EPA regulatory and statutory provisions, all terms and conditions of this agreement and any attachments.

| ISSUING OFFICE (GRANTS MANAGEMENT OFFICE) | AWARD APPROVAL OFFICE |
|---|---|
| **ORGANIZATION / ADDRESS** | **ORGANIZATION / ADDRESS** |
| U.S. EPA, Region 10, EPA Region 10<br>Mail Code: 17-C04, 1200 Sixth Avenue, Suite 155<br>Seattle, WA 98101 | U.S. EPA, Region 10, MSD<br>OEJECR - Office of Environmental Justice and External Civil Rights<br>1200 Sixth Ave, Suite 155<br>Seattle, WA 98101-3144 |

**THE UNITED STATES OF AMERICA BY THE U.S. ENVIRONMENTAL PROTECTION AGENCY**

| | |
|---|---|
| **Digital signature applied by EPA Award Official** Andrea Manion - Grants Management Officer | **DATE**<br>12/20/2024 |

# EPA Funding Information

| FUNDS | FORMER AWARD | THIS ACTION | AMENDED TOTAL |
|---|---|---|---|
| EPA Amount This Action | $ 42,000,000 | $ 10,000,000 | $ 52,000,000 |
| EPA In-Kind Amount | $ 0 | $ 0 | $ 0 |
| Unexpended Prior Year Balance | $ 0 | $ 0 | $ 0 |
| Other Federal Funds | $ 0 | $ 0 | $ 0 |
| Recipient Contribution | $ 0 | $ 0 | $ 0 |
| State Contribution | $ 0 | $ 0 | $ 0 |
| Local Contribution | $ 0 | $ 0 | $ 0 |
| Other Contribution | $ 0 | $ 0 | $ 0 |
| Allowable Project Cost | $ 42,000,000 | $ 10,000,000 | $ 52,000,000 |

| Assistance Program (CFDA) | Statutory Authority | Regulatory Authority |
|---|---|---|
| 66.615 - Environmental Justice Thriving Communities Grantmaking Program (EJ TCGM) | Clean Air Act: Sec. 138 | 2 CFR 200, 2 CFR 1500 and 40 CFR 33 |

| Fiscal | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Site Name | Req No | FY | Approp. Code | Budget Organization | PRC | Object Class | Site/Project | Cost Organization | Obligation / Deobligation |
| - | 25125WB097 | 2226 | BSF5 | WF | 000W57XK1 | 4140 | - | - | $ 10,000,000 |
| | | | | | | | | | $ 10,000,000 |

Budget Summary Page

| Table A - Object Class Category (Non-Construction) | Total Approved Allowable Budget Period Cost |
|---|---|
| 1. Personnel | $ 800,352 |
| 2. Fringe Benefits | $ 184,079 |
| 3. Travel | $ 673,502 |
| 4. Equipment | $ 0 |
| 5. Supplies | $ 39,700 |
| 6. Contractual | $ 745,481 |
| 7. Construction | $ 0 |
| 8. Other | $ 48,083,671 |
| 9. Total Direct Charges | $ 50,526,785 |
| 10. Indirect Costs: 0.00 % Base | $ 1,473,215 |
| 11. Total (Share: Recipient 0.00 % Federal 100.00 %) | $ 52,000,000 |
| 12. Total Approved Assistance Amount | $ 52,000,000 |
| 13. Program Income | $ 0 |
| 14. Total EPA Amount Awarded This Action | $ 10,000,000 |
| 15. Total EPA Amount Awarded To Date | $ 52,000,000 |

# Administrative Conditions

## General Terms and Conditions

The General Terms and Conditions of this agreement are updated in accordance with the link below. However, these updated conditions apply solely to the funds added with this amendment and any previously awarded funds not yet disbursed by the recipient as of the award date of this amendment. The General Terms and Conditions cited in the original award or prior funded amendments remain in effect for funds disbursed by the recipient prior to the award date of this amendment.

The recipient agrees to comply with the current EPA general terms and conditions available at: https://www.epa.gov/grants/epa-general-terms-and-conditions-effective-october-1-2024-or-later.

These terms and conditions are binding for disbursements and are in addition to or modify the assurances and certifications made as a part of the award and the terms, conditions, or restrictions cited throughout the award.

The EPA repository for the general terms and conditions by year can be found at: https://www.epa.gov/grants/grant-terms-and-conditions#general.

## A. Correspondence Condition

The terms and conditions of this agreement require the submittal of reports, specific requests for approval, or notifications to EPA. Unless otherwise noted, all such correspondence should be sent to the following email addresses:

- Federal Financial Reports (SF-425): rtpfc-grants@epa.gov
- MBE/WBE reports (EPA Form 5700-52A): R10grants@epa.gov
- All other forms/certifications/assurances, Indirect Cost Rate Agreements, Requests for Extensions of the Budget and Project Period, Amendment Requests, Requests for other Prior Approvals, updates to recipient information (including email addresses, changes in contact information or changes in authorized representatives) and other notifications: R10grants@epa.gov
- Requests for Extensions of the Budget and Project Period, Quality Assurance documents, workplan revisions, equipment lists, programmatic reports and deliverables, Amendment Requests, Requests for other Prior Approvals: Tomlinson.MarthaScott@epa.gov
- Administrative questions and issues: davidson.lacey@epa.gov

# Programmatic Conditions

**Environmental Justice Thriving Communities Grantmaking (TCGM) Program Cooperative Agreement Terms and Conditions - SUBSEQUENT AWARD (UPDATED 10/07/24)**

**In addition to these programmatic Terms and Conditions, please refer to the General Terms and Conditions (in effect as of October 2024).**

**A. Eligibility Requirements for Subgrants**

Subgrant eligibility

Grantmakers have flexibility to determine certain priorities for eligible subrecipients and activities that best meet the needs of their respective regions, in consultation with EPA. However, eligibility must fall within the following statutory and policy parameters:

Eligible Subrecipients are as follows:

- Nonprofit organizations
- Community-based and grassroots nonprofit organizations
- Philanthropic and civic organizations with nonprofit status
- Tribal governments (both federally recognized and state-recognized) and intertribal consortia (i.e., a partnership between two or more tribes that work together to achieve a common objective.)
- Native American Organizations (includes Indian groups, cooperatives, nonprofit corporations, partnerships, and associations that have the authority to enter into legally binding agreements)
- Local governments (as defined by 2 CFR 200.1 – includes cities, towns, municipalities, and counties, public housing authorities and councils of government)
- Institutions of higher education (e.g., private and public universities and colleges, including community colleges)
- Puerto Rico
- US Territories

Ineligible Subrecipients include:

- Individuals
- For-profit businesses, unless EPA's Award Official makes an exception based on factors such as those described in Appendix A of EPA's Subaward Policy.
- State governments
- Foreign entities of concern.

The term “foreign entity of concern” means a foreign entity that is—

(A) designated as a foreign terrorist organization by the Secretary of State under section 1189(a) of Title 8;

(B) included on the list of specially designated nationals and blocked persons maintained by the Office of Foreign Assets Control of the Department of the Treasury (commonly known as the “SDN list”);

(C) owned by, controlled by, or subject to the jurisdiction or direction of a government of a foreign country that is a covered nation (as defined in section 4872(d)(2) of Title 10); or

(D) alleged by the Attorney General to have been involved in activities for which a conviction was obtained under (i) chapter 37 of title 18 (commonly known as the “Espionage Act”); (ii) section 951 or 1030 of title 18; (iii) chapter 90 of title 18 (commonly known as the “Economic Espionage Act of 1996”); (iv) the Arms Export Control Act ( 22 U.S.C. 2751 et seq.); (v) section 224, 225, 226, 227, or 236 of the Atomic Energy Act of 1954 ( 42 U.S.C. 2274 , 2275, 2276, 2277, and 2284); (vi) the Export Control Reform Act of 2018 ( 50 U.S.C. 4801 et seq.); or (vii) the International Emergency Economic Powers Act ( 50 U.S.C. 1701 et seq.).

Eligible Beneficiaries

As required by Clean Air Act Section 138 (CAA 138), codified at 42 U.S.C. 7438, activities carried out by the Grantmaker or funded by Grantmaker subawards must benefit disadvantaged communities, defined by the EPA Administrator as any community that meets at least one of the following characteristics:

- Identified as disadvantaged by the Climate and Economic Justice Screening Tool (CEJST);
- Any census block group that is at or about the 90th percentile for any of EJScreen's Supplemental Indexes when compared to the nation or state; and / or
- Any geographic area within Tribal lands as included in EJScreen, which include:
    - Alaska Native Allotments
    - Alaska Native Villages
    - American Indian Reservations
    - American Indian Off-reservation Trust Lands
    - Oklahoma Tribal Statistical Areas

Eligible activities

Grantmakers may engage in and fund only those activities that are authorized by CAA 138, which include:

- Community-led air and other pollution monitoring, prevention, and remediation, and investments in low- and zero emission and resilient technologies and related infrastructure;
- Workforce development that help reduce greenhouse gas emissions and other air pollutants;
- Mitigating climate and health risks from urban heat islands, extreme heat, wood heater emissions, and wildfire events;
- Climate resiliency and adaptation;
- Reducing indoor toxics and indoor air pollution; or
- Facilitating engagement of disadvantaged communities in State and Federal advisory groups, workshops, rulemakings, and other public processes.

Ineligible activities

Ineligible activities include, but are not limited to:

- Any activity that violates applicable federal civil rights statutes prohibiting discrimination, including but not limited to Title VI of the Civil Rights Act of 1964, Section 504 of the Rehabilitation Act of 1973, the Age Discrimination Act of 1975, section 504 of the Rehabilitation Act of 1973, Title IX of the Education Amendments of 1972, Federal Water Pollution Control Act Amendments of 1972, and implementing EPA regulations.
- Lobbying, as defined at 2 CFR 200.450;
- Defense and prosecution of criminal and civil proceedings, claims, appeals and patent infringements,

as defined at 2 CFR 200.435;

- Carrying out protests, demonstrations, boycotts, or disinvestment campaigns; and
- Any activity to encourage actions that violate Federal, state or local law including, but not limited to, provisions relating to unlawful assembly, trespass, inciting violence, and failing to obey the lawful orders of law enforcement personnel.

**B. Establishing and Managing Subawards**

Grantmakers are required to distribute eighty percent of their fifty-million-dollar award in three years through competitive and non-competitive subgrants to be completed within the project period of the subsequent award. These awards should be to eligible subrecipients to carry out activities described in the Notice of Funding Opportunity that benefit disadvantaged communities as defined by the Administrator, in accordance with Clean Air Act 138(b)(1). Grantmakers making pass-through subawards must comply with applicable provisions of 2 CFR Part 200 and the EPA Subaward Policy. As a pass-through entity, the recipient agrees to:

1) Be responsible for selecting subrecipients and as appropriate conducting subaward competitions using a system for properly differentiating between subrecipients and procurement contractors under the standards at 2 CFR 200.331 and EPA's supplemental guidance in Appendix A of the EPA Subaward Policy.

(a) For-profit organizations and individual consultants, in almost all cases, are not eligible subrecipients under EPA financial assistance programs and the pass-through entity must obtain prior written approval from EPA's Award Official for subawards to these entities unless the EPA- approved budget and work plan for this agreement contain a precise description of such subawards.

(b) Stipends and travel assistance for trainees (including interns) and similar individuals who are not employees of the pass-through entity must be classified as participant support costs rather than subawards, as defined at 2 CFR 200.1 and described in EPA's Guidance on Participant Support Costs.

(c) Subsidies, rebates, and similar payments to participants in EPA funded programs to encourage environmental stewardship are also classified as participant support costs as provided in 2 CFR 1500.1 and EPA's Guidance on Participant Support Costs.

2) Establish and follow a system that ensures all subaward agreements are in writing and contain all of the elements required by 2 CFR 200.332(b). EPA has developed a template for subaward agreements that is available in Appendix D of the EPA Subaward Policy.

3) Prior to making subawards, ensure that each subrecipient has a "Unique Entity Identifier (UEI)." The UEI is required by 2 CFR Part 25 and 2 CFR 200.332(b)(1). Subrecipients are not required to complete full System for Award Management (SAM) registration to obtain a UEI. Information on how to obtain a UEI is available at the SAM Internet site: https://www.sam.gov/SAM/ and in EPA's General Term and Condition "System for Award Management and Universal Identifier Requirements" of the pass-through entity's agreement with the EPA.

4) Ensure that subrecipients are aware that they are subject to the same cross-cutting legal and policy requirements as the Grantmaker's award as required by 2 CFR 200.332(b)(2). These requirements include, among others:

(a) Title VI of the Civil Rights Act and other Federal statutes and regulations prohibiting discrimination in Federal financial assistance programs, as applicable.

(b) Reporting Subawards and Executive Compensation under Federal Funding Accountability and Transparency Act (FFATA) set forth in the General Condition passthrough entity's agreement with EPA entitled "Reporting Subawards and Executive Compensation." Page 8 of 42

(c) Limitations on individual consultant fees as set forth in 2 CFR 1500.10 and the General Condition of

the pass-through entity's agreement with EPA entitled “Consultant Fee Cap.”

(d) EPA's prohibition on paying management fees as set forth in General Condition of the pass-through entity's agreement with EPA entitled “Management Fees.”

(e) The Procurement Standards in 2 CFR Part 200 including those requiring competition when the subrecipient acquires goods and services from contractors (including consultants). EPA provides general information on other statutes, regulations and Executive Orders on the Grants internet site at www.epa.gov/grants. Many Federal requirements are agreement or program specific and EPA encourages pass-through entities to review the terms of their assistance agreement carefully and consult with their EPA Project Officer for advice if necessary.

5) Ensure, for states and other public recipients, that subawards are not conditioned in a manner that would disadvantage applicants for subawards based on their religious character.

6) Establish and follow a system for evaluating subrecipient's risks of noncompliance or fraud as required by 2 CFR 200.332(c) and document the evaluation. When evaluating a subrecipient's risk, a passthrough entity should consider the following: (a) Prior experience with same or similar subawards (b) Results of previous audits; (c) Whether new or substantially changed personnel or systems, and; (d) Extent and results of any Federal agency or the pass-through entity's monitoring

7) Establish and follow a process for deciding whether to impose additional requirements on subrecipients based on risk factors as required by 2 CFR 200.332(d). Examples of additional requirements authorized by 2 CFR 200.208 include:

(a) Requiring payments as reimbursements rather than advance payments;

(b) Withholding authority to proceed to the next phase until receipt of evidence of acceptable performance within a given period of performance;

(c) Requiring additional, more detailed financial reports;

(d) Requiring additional project monitoring;

(e) Requiring the non-Federal entity to obtain technical or management assistance, and

(f) Establishing additional prior approvals

8) Establish and follow a system for monitoring subrecipient performance that includes the elements required by 2 CFR 200.332(e) and report the results of the monitoring in performance reports as provided in the reporting terms and conditions of this agreement.

9) Establish and maintain an accounting system which ensures compliance with the $50,000 limitation on Modified Total Direct Costs per subaward, if applicable, for the purposes of distributing indirect costs. Recipients with Federally approved indirect cost rates that use a different basis for distributing indirect costs to subawards must comply with their Indirect Cost Rate Agreement.

10) Work with EPA's Project Officer to obtain the written consent of EPA's Office of International and Tribal Affairs (OITA), prior to awarding a subaward to a foreign or international organization, or a subaward to be performed in a foreign country even if that subaward is described in a proposed scope of work.

11) Obtain written approval from EPA's Award Official for any subawards that are not described in the approved work plan in accordance with 2 CFR 200.308.

12) Obtain the written approval of EPA's Award Official prior to awarding a subaward to an individual if the

EPA-approved scope of work does not include a description of subawards to individuals.

13) Establish and follow written procedures under 2 CFR 200.302(b)(7) for determining that subaward costs are allowable in accordance with 2 CFR Part 200, Subpart E and the terms and conditions of this award. These procedures may provide for allowability determinations on a pre-award basis, through ongoing monitoring of costs that subrecipients incur, or a combination of both approaches provided the pass-through entity documents its determinations.

14) Establish and maintain a system under 2 CFR 200.332(e)(3) and 2 CFR 200.521 for issuing management decisions for audits of subrecipients that relate to Federal awards. However, the recipient remains accountable to EPA for ensuring that unallowable subaward costs initially paid by EPA are reimbursed or mitigated through offset with allowable costs whether the recipient recovers those costs from the subrecipient or not.

15) As provided in 2 CFR 200.333, pass-through entities must obtain EPA approval to make fixed amount subawards. EPA is restricting the use of fixed amount subawards to a limited number of situations that are authorized in official EPA pilot projects. Recipients should consult with their EPA Project Officer regarding the status of these pilot projects. By accepting this award, the recipient is certifying that it either has systems in place to comply with the requirements described in Items 1 through 14 above or will refrain from making subawards until the systems are designed and implemented.

## C. PERFORMANCE REPORTING AND FINAL PERFORMANCE REPORT

### Performance Reporting – Content

In accordance with 2 CFR 200.329, the recipient agrees to submit performance reports that include brief information on each of the following areas: 1) A comparison of actual accomplishments to the outputs/outcomes established in the assistance agreement work plan for the period; 2) The reasons why established outputs/outcomes were not met; and 3) other pertinent information, including, when appropriate, analysis and explanation of cost overruns or high unit costs. This description may include overall best practices and/or lessons learned over the project performance period, and attachments and links for materials that may be helpful to other Environmental Grants recipients or similar organizations (e.g., tip sheets, "how-to" sheets, communication materials, outreach materials, web tools, etc.).

These reports shall cover work status, work progress, difficulties encountered, preliminary data results and a statement of activity anticipated during the subsequent reporting period, including a description of equipment, techniques, and materials to be used or evaluated. A discussion of cumulative and period comparison of project budget and expenditures, coupled with a comparison of the percentage of the project completed and in relation to project schedule and an explanation(s) of significant discrepancies must be included in the report. The report shall also include any changes of key personnel concerned with the project.

Additionally, the recipient agrees to inform EPA within 30 calendar days about problems, delays, or adverse conditions that may materially impair the ability to meet the outputs/outcomes specified in the assistance agreement work plan.

### Performance Reporting - Frequency

The recipient agrees to submit quarterly performance reports electronically to the EPA Project Officer on the designated quarterly due date(s). If **due date falls on a federal holiday or weekend, it is due the following business day.** The period end and due dates are listed in the below table.

| PERIOD ENDING | QUARTERLY DUE DATES |
|---|---|
| September 30 | October 31 |
| December 31 | January 31 |

| | |
|---|---|
| March 31 | April 30 |
| June 30 | July 31 |

The first quarterly report is due at the end of the first full quarter following the execution of the agreement, unless the recipient has incurred pre-award costs. If the recipient is authorized to incur pre-award costs, the grant performance period begins on the date costs were first incurred, and the recipient would provide a quarterly performance report following the end of the first full quarter after that date. Quarterly reports will continue thereafter and throughout the remainder of the performance period. The recipient must submit the final performance report no later than 120 calendar days after the end date of the period of performance as identified in this agreement. The final report must document all project activities occurring during the Period of Performance and as outlined in the executed agreement. However, please be advised that the statutory three-year performance period for this grant program may not be extended. Any costs incurred after the end of the performance period are the responsibility of the recipient and may not be charged to the grant.

**Subaward Performance Reporting**

The recipient must report on its subaward monitoring activities under 2 CFR 200.332(e). Pass-through entity monitoring of the subrecipient must include:

1. Review of financial and programmatic reports.

2. Follow-up on action plans noting findings/deficiencies identified from site visits and/or desk reviews to ensure effective subrecipient performance.

3. Quantitative environmental results the subrecipient achieved, the place of performance (eg. Census Tract ID, zip code, latitude / longitude) and a narrative discussion of any qualitative improvements of environmental conditions in the target community.

4. Summaries of audit findings and related pass-through-entity management decisions.

5. Any disagreements or potential challenges with subrecipients that may interfere with the completion of subgrant performance, and actions the pass-through entity has taken to mitigate them.

6. Actions the pass-through entity has taken to correct deficiencies such as those specified at 2 CFR 200.332 (f), 2 CFR 200.208 and the 2 CFR Part 200.339 Remedies for Noncompliance.

7. Summaries of collaborative governance activities and impacts with communities, project partners, and Technical Assistance providers (TCTACs, contractors, etc.) including quantitative measures and place of performance of outreach, engagement, and implementation of feedback.

8. Quantity of, the place of performance and qualitative summaries of capacity building activities for severely capacity-constrained communities.

9. Summaries of reach in underserved communities, communities in urban, remote, and rural areas, and community stakeholders with the highest degree of burden and capacity constraints throughout the entire Geographic Area.

**Subaward Performance Reporting on Milestones of Activities for Fixed-Amount Awards**

Grantmakers have limited reporting requirements for fixed-amount. The recipient must at minimum report on subrecipients' fixed-amount subaward milestones via the quarterly performance reports, as well as any other reporting requirements agreed upon by the Grantmaker and the fixed-amount subaward recipient, as described in the Fixed Amount Subaward memo. Fixed Amount Subaward Performance reporting will be in accordance with **applicable requirements specified in 2 CFR Parts 200 and 1500, which will apply to**

**fixed-amount subawards absent a case-specific exception requested by a Grantmaker, concurred by the OEJECR Project Officer and approved by OGD. Note:** Each Grantmaker will define “Severely Capacity Constrained.” Grantmakers will also design policies and procedures to limit the number of EJ Thriving Communities Subgrants that a single entity may receive within a specified time period to maximize the diversity and breadth of subrecipients.

**Examples of Fixed Amount Subaward Performance reporting include but are not limited to:**

1. Monitoring plans paid on a milestone basis with an initial amount paid prior to the development of the plan, followed by a second payment upon completion of the draft plan, with a final payment when the plan is complete.

2. Lump sum payments for equipment purchases (e.g. air monitoring devices) based on invoices provided by the subrecipient.

3. Upfront costs of no more than 25%, except with permission of the Project Officer, with subsequent milestone-based payments. For example, sampling projects paid on a milestone basis with 25% for upfront expenses, 25% for data collection, 25% for data analysis, 25% for final report completion.

**Fixed-Amount Subaward Monitoring and Compliance**

**As provided in 2 CFR 200.102(c), the Award Official is authorized to waive or modify the following regulatory requirements for subrecipients receiving fixed-amount subawards:**

1. Competition requirements specified in 2 CFR Part 200 and Part 1500 with the exception of the statutory consultant fee cap implemented at 2 CFR 1500.10.

2. Records required to document personnel compensation under 2 CFR 200.430 and 2 CFR 200.431.

3. Financial requirements at 2 CFR 200.302(b) with the exception of accounting records and documentation required to demonstrate achievement of agreed upon milestones such as invoices for equipment or facility rental, fees paid, stipends earned, and similar fixed-amount transactions.

4. Internal controls described at 2 CFR 200.303 with the exception of an internal control protocol for ensuring that fixed-amount subrecipients only request payment from the pass-through entities upon completion of agreed upon milestones.

5. Property standards in 2 CFR Part 200 with the exception of 2 CFR 200.315 as implemented in EPA's General Term and Condition Data and Copyrighted Materials relating to EPA's “Federal Purpose” license in data and written materials produced with EPA funds.

6. Subrecipient and contractor determinations in 2 CFR 200.331 and corresponding provisions of the EPA Subaward Policy.

7. Indirect costs authorized by 2 CFR 200.332(b)(4). Fixed amount subrecipients do not incur indirect costs.

8. Reports on real or personal property required when closing out a subaward specified in 2 CFR 200.344(g).

**D. The pass-through entities must have pricing procedures that prevent subrecipients from “profiting” from fixed-amount subawards by precluding payments for “management fees” or other amounts in excess of anticipated costs for the activity.**

Grantmakers will use the following methods to ensure compliance for tracking and monitoring activities:

1. Establishing the content of periodic and final performance and financial reports for each fixed-amount

subaward.

2. Obtaining a budget description of planned expenditures to be refunded if an activity or event does not take place, a report or analysis is not completed, or the subrecipient does not otherwise perform as promised.

3. Certification in writing to the pass-through entity at the end of the fixed-amount subaward that the project or activity was completed, or the level of effort was expended. If the required level of activity or effort was not carried out, the amount of the fixed-amount subaward must be adjusted and any excess funds refunded.

4. Requiring prior written approval of the pass-through entity for any changes in principal investigator, project leader, project partner, or scope of effort.

**E. Review and Oversight**

1. Work Product - The recipient agrees that any product (e.g., publication, outreach materials, training manuals) produced through this assistance agreement and made available for public view must be first reviewed by the EPA Project Officer for comment before release. The recipient shall make all final decisions on the product content.

2. Monthly Calls - The recipient shall consult with the EPA Project Officer on a monthly basis to obtain input on program activities and products produced. However, the recipient should make all final decisions on project implementation and product content. The EPA Project Officer has discretion to change the frequency with which calls are held.

3. Prior Approval - Any proposed changes to the project must be submitted in writing to the EPA Project Officer and Grant Specialist for EPA approval prior to implementation. The recipient incurs costs at its own risk if it fails to obtain written approval before implementing any changes.

**F. Post-Project Period Follow-up and Engagement**

For no less than one year after completion of the project, the recipient agrees to periodically update its designated EPA Project Officer on current community-based and environmental justice work the recipient is performing and how/if that work relates to its now completed EJ TCGM project. These periodic updates may include (but are not limited to) recent local media reports, additional grant funding received, new initiatives, and developing partnerships. The EPA EJ Grants program is invested in the long-term success of each EJ Grant recipient and its long-term impact on addressing the disproportionate environmental and public health impacts plaguing their communities. These post-project period updates allow the EJ Grants program to provide past recipients with additional guidance about applicable funding opportunities, potential collaborations, and technical assistance that may assist recipients in their future work. Periodic updates also allow the program to track best practices that lead to greater project sustainability and long-term community revitalization for impacted community residents. The frequency of these periodic updates will be by mutual agreement and will be discussed with the recipient before the end of the project period. Recipients are also encouraged to continue providing updates and engaging with their EPA Project Officers beyond the additional year after the end of the project.

*NOTE – Compliance with this term & condition will not give the recipient priority during future EPA EJ grant competitions and is not a guarantee for future EPA grant funding. Additionally, the recipient agrees not to submit a claim for compensation to EPA for providing these updates. Project Officers are encouraged to engage with their Grantmakers to fulfill post-period follow-up, but are not to document non-compliance.

**G. Cybersecurity Condition**

(a) The recipient agrees that when collecting and managing environmental data under this assistance agreement, it will protect the data by following all applicable State or Tribal law cybersecurity requirements.

(b) (1) EPA must ensure that any connections between the recipient's network or information system and EPA

networks used by the recipient to transfer data under this agreement, are secure. For purposes of this Section, a connection is defined as a dedicated persistent interface between an Agency IT system and an external IT system for the purpose of transferring information. Transitory, user-controlled connections such as website browsing are excluded from this definition.

If the recipient's connections as defined above do not go through the Environmental Information Exchange Network or EPA's Central Data Exchange, the recipient agrees to contact the EPA Project Officer (PO) no later than 90 days after the date of this award and work with the designated Regional/Headquarters Information Security Officer to ensure that the connections meet EPA security requirements, including entering into Interconnection Service Agreements as appropriate. This condition does not apply to manual entry of data by the recipient into systems operated and used by EPA's regulatory programs for the submission of reporting and/or compliance data.

(2) The recipient agrees that any subawards it makes under this agreement will require the subrecipient to comply with the requirements in (b)(1) if the subrecipient's network or information system is connected to EPA networks to transfer data to the Agency using systems other than the Environmental Information Exchange Network or EPA's Central Data Exchange. The recipient will be in compliance with this condition: by including this requirement in subaward agreements; and during subrecipient monitoring deemed necessary by the recipient under 2 CFR 200.332(e), by inquiring whether the subrecipient has contacted the EPA Project Officer. Nothing in this condition requires the recipient to contact the EPA Project Officer on behalf of a subrecipient or to be involved in the negotiation of an Interconnection Service Agreement between the subrecipient and EPA.

**H. Competency Policy**

**Competency of Organizations Generating Environmental Measurement Data**

In accordance with Agency Policy Directive Number FEM-2012-02, Policy to Assure the Competency of Organizations Generating Environmental Measurement Data under Agency-Funded Assistance Agreements, Recipient agrees, by entering into this agreement, that it has demonstrated competency prior to award, or alternatively, where a pre-award demonstration of competency is not practicable, Recipient agrees to demonstrate competency prior to carrying out any activities under the award involving the generation or use of environmental data. Recipient shall maintain competency for the duration of the project period of this agreement and this will be documented during the annual reporting process. A copy of the Policy is available online at https://www.epa.gov/sites/production/files/2015-03/documents/competency-policy-aaia-new.pdf or a copy may also be requested by contacting the EPA Project Officer for this award.

**I. Procurement Terms and Conditions**

The recipient agrees to conduct all procurement actions under this assistance agreement in accordance with the procurement standards set forth in Title 2 CFR, Parts 200.317 through 200.327, 2 CFR Part 1500 and 40 CFR Part 33. EPA provides additional guidance on complying with these requirements in the Best Practice Guide for Procuring Services, Supplies, and Equipment Under EPA Assistance Agreements which is available at https://www.epa.gov/grants/best-practice-guide-procuring-services-supplies-and-equipment-under-epa-assistance. Any costs incurred by the recipient under contracts and/or small purchases that EPA determines to be in noncompliance with EPA procurement standards shall be unallowable for Federal reimbursement.

As provided by 2 CFR 200.310 recipients or subrecipient must ensure that subrecipients acquire insurance equal to the amount of the purchased items to protect against loss, damage and theft if a subaward includes cost for equipment. Costs for such insurance are allowable under this agreement.

**J. Geospatial Data Standards**

All geospatial data created must be consistent with Federal Geographic Data Committee (FGDC) endorsed standards. Information on these standards may be found at https://www.fgdc.gov/.

**K. Quality Assurance**

Authority: Quality Assurance applies to all assistance agreements involving environmental information as defined in 2 C.F.R. § 1500.12 Quality Assurance.

The recipient shall ensure that subawards involving environmental information issued under this agreement include appropriate quality requirements for the work. The recipient shall ensure sub-award recipients develop and implement the Quality Assurance (QA) planning documents in accordance with this term and condition; and ensure sub-award recipients implement all applicable approved QA planning documents. In consultation with your Project Officer and the Regional Quality Assurance Manager, select the appropriate plan based on the following options to implement in the Subsequent Award:

**NOTE: The Grantmaker will need to develop a management strategy for receiving, reviewing and assisting sub-award recipients with QAPP needs.**

**1. Quality Management Plan (QMP)**

a. Prior to reviewing Thriving Communities subgrant applications, the recipient must:

i. Develop a QMP,

ii. Prepare the QMP in accordance with the current version of EPA's Quality Management Plan (QMP) Standard. Submit the document for EPA review,

iii. Obtain EPA Quality Assurance Manager or designee (hereafter referred to as QAM) approval.

b. The recipient must submit the QMP within 90 days after grant award

c. The recipient must review their approved QMP at least annually. These documented reviews shall be made available to the sponsoring EPA organization if requested. When necessary, the recipient shall revise its QMP to incorporate minor changes and notify the EPA PO and QAM of the changes. If significant changes have been made to the Quality Program that affect the performance of environmental information operations, it may be necessary to re-submit the entire QMP for re-approval. In general, a copy of any QMP revision(s) made during the year should be submitted to the EPA PO and QAM in writing when such changes occur. Conditions requiring the revision and resubmittal of an approved QMP can be found in section 6 of EPA's Quality Management Plan (QMP) Standard.

**2. Quality Assurance Project Plan (QAPP)**

a. Prior to beginning environmental information operations, the recipient and/or sub-award recipient must complete one of the following:

Option 1

i. Develop a QAPP,

ii. Prepare QAPP in accordance with the current version of EPA's Quality Assurance Project Plan (QAPP) Standard,

iii. Submit the document for EPA review, and

iv. Obtain EPA Quality Assurance Manager approval.

**OR**

Option 2

i. Submit a previously EPA-approved QAPP proposed to ensure the collected, produced, evaluated, or used environmental information is of known and documented quality for the intended use(s).

ii. The EPA Quality Assurance Manager will notify the recipient and EPA Project Officer (PO) in writing if the previously EPA-approved QAPP is acceptable for this agreement.

b. The sub-award recipient must review their approved QAPP at least annually. The recipient shall notify the PO and QAM when substantive changes are needed to the QAPP. EPA may require the QAPP be updated and re-submitted for approval.

**For Reference:**

• Quality Management Plan (QMP) Standard and EPA's Quality Assurance Project Plan (QAPP) Standard; contain quality specifications for EPA and non-EPA organizations and definitions applicable to these terms and conditions.

• EPA QA/G-5: *Guidance for Quality Assurance Project Plans*.

• (QAM and/or PO may insert QA references that inform or assist the recipient here).

• EPA's Quality Program website has a list of QA managers, and Non-EPA Organizations Quality Specifications.

• The Office of Grants and Debarment Implementation of Quality Assurance Requirements for Organizations Receiving EPA Financial Assistance.

**L. Human Subjects Research Review Process**

(a) *Applications involving human subjects.* (1) Protecting the rights, safety, and welfare of human subjects involved in research supported by EPA grants is the responsibility of the institution which receives or is accountable to EPA for the funds awarded for the support of the project.

(2) Institutions engaged in research involving human subjects, with the exception of research eligible for exemption under 40 CFR 26.104, must submit to EPA for review, approval, and official acceptance, written evidence of a Federal wide Assurance (FWA) on file with the U.S. Department of Health and Human Services (HHS) or other agency that their institution will comply with regulatory provisions in the Common Rule (codified by EPA at as 40 CFR 26 Part A).

(3) Applicants must provide documentation with each proposal of research involving human subjects that it has been reviewed in accordance with the institution's assurance and in compliance with the Common Rule. Review and approval by the EPA Human Subject Research Review Official (HSRRO) to determine compliance with 40 CFR 26 and EPA Order 1000.17 (series) must occur before research involving human subjects may commence.

**M. Program Income**

In accordance with 2 CFR 200.307(b) and 2 CFR 1500.8(b), the recipient is hereby authorized to retain program income earned during the project period.

Project Officers must choose one or more of the options below per their approval in the Finding Recommendation and delete the options not applicable. The default use of the program income under 2 CFR 1500.8(b) is “Addition.”

The recipient agrees to use the following method for applying income:

1. Addition. Program income is added to the total allowable costs, increasing the overall total amount of the

award. Program income must be used for the original purpose of the award and under the conditions of the assistance agreement.

The recipient must provide as part of its [Insert Quarterly, Semi-annual, or Annual and Final] performance report, a description of how program income is being used. Further, a report on the amount of program income earned during the award period must be submitted with the [Insert Quarterly, Semi-annual, or Annual and Final] Federal Financial Report, Standard Form 425.

Note: During budget negotiations program offices may authorize the recipient to deduct costs incurred in generating program income from gross program income to determine net program income as provided at 2 CFR 200.307(d). In these cases the program income T&C must include the following additional statement:

In accordance with 2 CFR 200.307(d) costs incidental to generating program income may be deducted from gross income to determine program income, provided these costs have not been charged to the EPA award. The recipient must retain adequate accounting records to document that any costs deducted from program income comply with regulatory requirements. Further, the recipient must report program income on the Federal Financial Report, SF425. The recipient should refer to the General Terms and Conditions "Federal Financial Reporting (FFR)" for more information on the SF 425.

**N. Use of Logos and Icons**

**Programmatic guidance for the appropriate use of the icons and logos either together, with other partner icons or individually will be provided.**

If the EPA logo is appearing along with logos from other participating entities on websites, outreach materials, or reports, it must **not** be prominently displayed to imply that any of the recipient or subrecipient's activities are being conducted by the EPA. Instead, the EPA logo should be accompanied with a statement indicating that Philanthropy Northwest or a subrecipient received financial support from the EPA under an Assistance Agreement. More information is available at: https://www.epa.gov/stylebook/using-epa-seal-and-logo#policy

**Grantmaker Icon**

**The Thriving Communities Grantmaking Program (TCGM) Icon will be designed by the EPA with Grantmaker input and approved by the EPA PROTRAC process,** used to monitor the concept proposal, development, review and approval of EPA print, infographics, audio, video and social media content/products for internal and external release, as well as Esri Products (Story Maps and Hub sites) for external publishing only. PROTRAC ensures all content created is consistent, appropriate and in alignment with current agency messages, and follows EPA branding guidelines**. The icon will represent the "programmatic identity" of the Grantmaker program, and may be used alone or in conjunction with the EPA and grant recipient's logos' or individual Grantmaker's logo. The approved TCGM programmatic icon must remain intact and unmodified.** Modifying icons to specifically identify a program office or region are not permitted. NOTE: Icons must be updated or removed per current agency policy/ guidelines.

**O. Paperwork Reduction Act**

The scope of work for this cooperative agreement includes a survey or other information collection of identical information from 10 or more parties. As provided by 5 CFR 1320.3(d), EPA is a sponsor of the information collection for purposes of obtaining approval from the Office of Management and Budget for collecting information. The recipient agrees to assist EPA in complying with OMB procedures at 5 CFR Part 1320 for obtaining Information Collection Request authorization. The recipient may not collect information until EPA obtains OMB approval. The Project Officer will advise the recipient when information collection may begin.

**P. Substantial Involvement**

EPA will be substantially involved in this agreement however, final decisions rest with the recipient. Substantial involvement by the EPA Project Officer may include:

1. Monthly telephone calls and other monitoring,

2. Review project phases and provide approval to continue to the next phase,

3. Review and comment on any documents, web content, or other materials developed under this agreement (the recipient will make final decisions on these matters),

4. Approve substantive terms included in contracts or subawards (EPA's Project Officer will not suggest, recommend, or direct the recipient to select any particular contractor or subrecipient except to the extent permitted in Section 10 of EPA's Subaward Policy).

5. Review and comment on the programmatic progress reports.

6. Consultation regarding the selection of key personnel (EPA's involvement is limited to reviewing the technical qualifications of key personnel and the recipient will make the final decisions on selection. EPA's Project Officer will not suggest, recommend, or direct the recipient to select any individual).

7. Collaboration with EPA on designing and implementing a project management process, which includes quality project oversight for funding subrecipients and a tracking and reporting process that reduces reporting burden on community recipients.

8. Collaboration on the preliminary design of the subaward competition, the submission and evaluation process, and the development of evaluation criteria. However, final decisions on the submission, evaluation process/criteria, and selection of subrecipients will be made by the recipient, rather than by EPA, provided statutory, regulatory, and EPA's Subaward Policy requirements are met.

9. EPA Project Officer must review and approve the subaward agreements with any Collaborating Entities that will assist in the direct development and implementation of the EJ Thriving Communities Subgrants program, including subawards to other nonprofits (non-Community Based Organizations), units of government, institutions of higher education, and/or medical service providers not covered by a statutory partnership to assist the Grantmaker by creating a local subaward competition or outreach to local communities.

10. In addition to the requirements in EPA's General Term and Condition "Disclosing Conflict of Interests," the recipient must submit a Conflict-of-Interest (COI) plan for approval by EPA's Project Officer for preventing, neutralizing, or mitigating conflicts of interest that may arise within the participatory governance framework of the project. The plan should describe controls for ensuring that representatives of community-based nonprofit organizations involved in the design and decision-making for the subawards program do not have relationships with organizations competing for subawards or receiving noncompetitive funding that create actual or apparent conflicts of interest. Example participatory governance activities could include advisory bodies composed of community-based nonprofit organizations that oversee and provide thought partnership on the development of the subaward process.

11. If a Conflict of Interest is Identified by the EPA, the Conflict-of-Interest Mitigation Plan will need to be approved by the Project Officer, in consultation with the Grant Specialist.

12. Joint operational involvement, participation, and/or collaboration between EPA and the recipient.

13. Review of proposed procurements in accordance with the Procurement Standards in 2 CFR Part 200.

14. EPA staff participation in monitoring performance and/or providing technical support for subrecipients that require additional technical assistance to meet project and/or workplan deliverables.

15. Joint operational involvement, participation, and/or collaboration between EPA and the recipient.

16. Informally referred to as the "Cap Amount Award Policy" and discussed on page 15 of the NOFO,

Grantmakers should put policies in place that limit the number of times a particular Eligible Subrecipient can receive an EJ Thriving Communities Subgrant within a certain period of time. For example, a pass-through entity may decide that a recipient may not receive more than two EJ Thriving Communities Subgrants within the 3-year period of performance or a shorter interval as deemed appropriate by the pass-through entity. This plan will need to be approved by the Project Officer.

17. Prior to making subawards, Grantmakers can work with their Project Officers to identify instructions and guidance on subaward policies to ensure that the burden on the Tier 1-3 and fixed-amount award Subrecipients is minimized. This includes resources such as the gmc_subaward_policy_appendix_d_subaward_agreement_template.pdf (epa.gov) (EPA does not mandate the use of this template. Pass-through entities may use their own form of subaward agreements provided the requirements of 2 CFR 200.332(a) and 2 CFR 200.332(b) are met.) And requirements that flow down to subgrantees such as "Unique Entity Identifier" (UEI) as required by 2 CFR Part 25 and 2 CFR 200.332(b)(1).

**Q. National Programmatic Term and Condition for Fellowship, Internship Programs and Similar Programs Supported by EPA Financial Assistance**

1. EPA funds for this program may only be used for participant support cost payments, scholarships, tuition remission and other forms of student aid for citizens of the United States, its territories, or possessions, or for individuals lawfully admitted to the United States for permanent residence.

2. The recipient and program participants are responsible for taxes, if any, on payments made to or on behalf of individuals participating in this program that are allowable as participant support costs under 2 CFR 200.1 or 2 CFR 200.456 and scholarships and other forms of student aid such as tuition remission under 2 CFR 200.466. EPA encourages recipients and program participants to consult their tax advisers, the U.S. Internal Revenue Service, or state and local tax authorities regarding the taxability of stipends, tuition remission and other payments. However, EPA does not provide advice on tax issues relating to these payments.

3. Participant support cost payments, scholarships, and other forms of student aid such as tuition remission are lower tiered covered Non-procurement transactions for the purposes of 2 CFR 180.300 and EPA's Suspension and Debarment Term and Condition. Recipients, therefore, may not make participant support cost payments to individuals who are excluded from participation in Federal Non-procurement programs under 2 CFR Part 180. Recipients are responsible for checking the eligibility of program participants in the System for Award Management (SAM) or obtaining eligibility certifications from the program participants.

See EPA Guidance on Participant Support Costs.

**R. Subsequent Award Statutory Partnership Agreements Letters of Commitment submitted with the application needed to be finalized prior to the submission of the Subsequent Award.** EPA requires that applicants selected for funding consideration provide copies of the executed final statutory partnership agreement to EPA's Project Officer for submission to the EPA Award Official prior to issuance of the Subsequent Award.

Any letters of commitment submitted in the application should be finalized into a final signed statutory agreement, which should include any updated stakeholder roles and responsibilities or revised award amounts. The statutory partnership agreement must be signed by all relevant parties and specify which member of the partnership will enter into the assistance agreement with EPA for the purposes of accountability for the proper expenditure of federal funds, performance of the assistance agreement, liability for claims for recovery of unallowable costs incurred under the agreement and must specify roles in performing the proposed scope of work for the assistance agreement. Executed Statutory Partnership Agreements will be submitted to EPA's Project Officer. The EPA Grants Management Officer or the EPA Award Official will issue written notification that this condition has been satisfied and that the recipient is authorized to draw down TCGM funds for the Subsequent Award in accordance with the standards described in the EPA General Term and Condition for the Automated Standard Application Payments (ASAP) and Proper Payment Draw Down during the initial award.

**S. Record Retention**

In accordance with 2 CFR § 200.334, recipients and subrecipients must retain for a period of three years all programmatic, financial, statistical, and all other records required under the terms of the agreement, unless a dispute or lawsuit has ensued. If a dispute or lawsuit has been initiated, all records must be retained for the duration of the dispute, until the matter is resolved and dispositioned, and for three years thereafter.

**T. Environmental Justice Thriving Communities Grantmaking Program Davis-Bacon Labor Standards**

As provided in Section 314 of the Clean Air Act (42 USC § 7614) (DBRA), Davis-Bacon Act (42 USC §§ 3141-3144) labor standards apply to grants and cooperative agreements made under the Greenhouse Gas Reduction Fund. Accordingly, all laborers and mechanics employed by contractors or subcontractors on projects assisted under this award agreement shall be paid wages at rates not less than those prevailing for the same type of work on similar construction in the locality as determined by the Secretary of Labor in accordance with 40 USC Subtitle II, Part A, Chapter 31, Subchapter IV (Wage Rate Requirements).

Therefore, the pass-through entity must create a Davis-Bacon subgrant compliance plan to ensure that any entity that receives financial assistance complies with Davis-Bacon labor requirements where construction work is financed in whole or in part with such financial assistance.

If the recipient encounters a situation that presents uncertainties regarding DBRA applicability under this assistance agreement, the recipient must discuss the situation with the EPA Project Officer before authorizing work on the project.

In the event that a periodic project site visit, audit, or routine communication with subrecipient, program beneficiary, contractor, or subcontractor determines any instances of non-compliance or potential non-compliance with Davis-Bacon, the recipient agrees to discuss the situation with the EPA Project Officer for possible referral to DOL for guidance or enforcement action.

Note, the use of the term project in this term and condition is distinct from the use of the term project within the definition of qualified project under Clean Air Act Section 134(c)(3), which is broader and includes “any project, activity, or technology.” 40 CFR 30.103 defines construction as “erection, alteration, or repair (including dredging, excavating, and painting) of buildings, structures, or other improvements to real property, and activities in response to a release or a threat of a release of a hazardous substance into the environment, or activities to prevent the introduction of a hazardous substance into a water supply.”

**1. Program Applicability**

a. Program Name: Environmental Justice Thriving Communities Grantmaking Program

b. Statute requiring compliance with Davis-Bacon: Clean Air Act Section 314, Labor Standards, codified as 42 U.S.C. § 7614.

c. Activities subject to Davis-Bacon: Activities subject to Davis-Bacon include certain construction costs and contractual costs. Construction costs may include:

i. Building and / or upgrading existing structures and sites to improve community use while reducing GHG emissions and / or improving climate resilience;

ii. Implementing structural and non-structural retrofits to enhance the resilience of community-serving buildings (e.g., raise the building elevation to reduce flood risk, improve cooling systems and / or insulation to reduce extreme heat risk);

iii. Install energy efficiency measures such as insulation, double or triple glazed windows, “cool roofs” that reflect sunlight, and energy management systems in public buildings;

iv. Remediating or mitigating harmful substances in buildings, including lead, mercury, pesticides, radon, mold, PCBs (caulk, flooring, etc.), lead-based paint, asbestos, and other toxic substances;

v. Installing, upgrading, or replacing HVAC and / or filtration systems that improve indoor quality in schools, community-serving buildings, and single-and-multifamily homes;

vi. Targeted water infrastructure upgrades, including replacing private-side lead lines in homes, childcare facilities, schools, or other community-serving buildings; septic to sewer conversions; and installing water fountains at schools and parks; and

vii. Other activities described in the EPA Disadvantaged Business Enterprise (DBE) rule's definition of *Construction* at 40 CFR 33.103, as well as related architectural or engineering services.

With very few exceptions, recipients carry out construction projects by hiring contractors which typically include a general contractor and an architectural or engineering firm for design work and in some cases purchasing equipment for installation at the site. Hiring general contractors and other contractors performing activities described in the EPA Disadvantaged Business Enterprise (DBE) rule's definition of Construction at 40 CFR 33.103 will be categorized as "Construction."

d. Prevailing Wage Classification: Building

**2. Davis-Bacon and Related Acts**

Davis-Bacon and Related Acts (DBRA) is a collection of labor standards provisions administered by the Department of Labor, that are applicable to grants involving construction. These labor standards include the:

- Davis-Bacon Act, which requires payment of prevailing wage rates for laborers and mechanics on construction contracts of $2,000 or more;
- Copeland "Anti-Kickback" Act, which prohibits a contractor or subcontractor from inducing an employee into giving up any part of the compensation to which he or she is entitled; and
- Contract Work Hours and Safety Standards Act, which requires overtime wages to be paid for over 40 hours of work per week, under contracts in excess of $100,000.

**3. Recipient Responsibilities When Entering Into and Managing Contracts:**

a. Solicitation and Contract Requirements:

i. Include the Correct Wage Determinations in Bid Solicitations and Contracts: Recipients are responsible for complying with the procedures provided in 29 CFR 1.6 when soliciting bids and awarding contracts.

ii. Include DBRA Requirements in All Contracts: Include the following text on all contracts under this grant:

1. "By accepting this contract, the contractor acknowledges and agrees to the terms provided in the DBRA Requirements for Contractors and Subcontractors Under EPA Grants."

b. After Award of Contract:

i. Approve and Submit Requests for Additional Wages Rates: Work with contractors to request additional wage rates if required for contracts under this grant, as provided in 29 CFR 5.5(a)(1)(iii).

ii. Provide Oversight of Contractors to Ensure Compliance with DBRA Provisions: Ensure contractor compliance with the terms of the contract, as required by 29 CFR 5.6.

**4. Recipient Responsibilities When Establishing and Managing Additional Subawards:**

a. Include DBRA Requirements in All Subawards (including Loans):

i. Include the following text on all subawards under this grant:

1. "By accepting this award, the EPA subrecipient acknowledges and agrees to the terms and conditions provided in the DBRA Requirements for EPA Subrecipients."

b. Provide Oversight to Ensure Compliance with DBRA Provisions: Recipients are responsible for oversight of subrecipients and must ensure subrecipients comply with the requirements in 29 CFR 5.6.

**5.** The contract clauses set forth in this Term & Condition, along with the correct wage determinations, will be considered to be a part of every prime contract covered by Davis-Bacon and Related Acts (see 29 CFR 5.1), and will be effective by operation of law, whether or not they are included or incorporated by reference into such contract, unless the Department of Labor grants a variance, tolerance, or exemption. Where the clauses and applicable wage determinations are effective by operation of law under this paragraph, the prime contractor must be compensated for any resulting increase in wages in accordance with applicable law.

**U. Participation in an EPA-Sponsored Program Evaluation.**

As a condition of the receipt of the award under a NOFO, the recipient is required to cooperate with all EPA staff, contractors, or designated Recipients performing research or evaluation studies funded by EPA, if directed to do so by the Project Officer.

**V. Land Acquisition**

Land acquisition must comply with the Uniform Relocation Act and Federal Highway Administration's implementing regulations at 49 CFR Part 24 which requires grantees to follow certain procedures for acquiring property for grant purposes, such as notice, negotiation, and appraisal requirements.

**W. Termination**

Notwithstanding the General Term and Condition "Termination," EPA maintains the right to terminate the Assistance Agreement only as specified in 2 CFR 200.339 and the version of 2 CFR 200.340 applicable to EPA grants as of July 1, 2024 pursuant to 89 FR 55262 (July 3, 2024), when the noncompliance with the terms and conditions is substantial such that effective performance of the Assistance Agreement is materially impaired or there is adequate evidence of waste, fraud, or abuse, prompting adverse action by EPA per 2 CFR 200.339, through either a partial or full termination. In accordance with 2 CFR 200.341, EPA will provide the Recipient notice of termination.

If EPA partially or fully terminates the Assistance Agreement, EPA must (1) de-obligate uncommitted funds and re-obligate them to another Eligible Recipient to effectuate the objectives of Section 138 of the Clean Air Act, 42 USC § 7434 within 90 days of the de-obligation and (2) amend the Recipient's Assistance Agreement to reflect the reduced amount, based on the de-obligation.

**X. Statutory Partnership** (Added 11/25/24)

The recipient must seek prior written approval from the Award Official if it wants to change the statutory partner for this grant from the entity identified in the selected application documented in the Partnership Agreement.

Due to the competitve nature of the Thriving Communities Grantmaking program, EPA approval will only be provided in very limited circumstances at EPA's sole discretion, and will not be subject to dispute from the recipient. EPA approval is necessary to ensure that any proposed new statutory partner is an eligible

subrecipient with comparable qualifications/expertise/experience to the original statutory partner such that performance of the grant will not be adversely impacted.

Requests for approval must be sent, along with any requested documentation, to the EPA Award Official, who will consult with the EPA Project Officer. EPA decides in its sole discretion whether to consider and/or approve the request.

**END OF DOCUMENT**

# Attachment D

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY

**OFFICE OF MISSION SUPPORT**
WASHINGTON, D.C. 20460

February 22, 2025

**MEMORANDUM**

**SUBJECT:** Termination of EPA Assistance Agreement 5N 02J63801 under 2 CFR 200.340

**FROM:** Andrea Manion, Grants Management Officer

**TO:** Jill Nishi, CEO

The purpose of this communication is to notify you that the U.S. Environmental Protection Agency (EPA) is hereby terminating Assistance Agreement No. 5N 02J63801 awarded to Philanthropy Northwest. In accordance with 2 CFR 200.340(a)(2) (effective August 13, 2020 – September 30, 2024) and the Termination term and condition contained in the EPA General Terms and Conditions effective August 13, 2020 – September 30, 2024, EPA Assistance Agreement 5N 02J68301 is terminated in its entirety effective immediately on the grounds that the award no longer effectuates the program goals or agency priorities. The objectives of the award are no longer consistent with EPA funding priorities.

It is a priority of the EPA to eliminate discrimination in all programs throughout the United States. The EPA Administrator has determined that, per the Agency's obligations to the constitutional and statutory law of the United States, this priority includes ensuring that the Agency's grants do not support programs or organizations that promote or take part in diversity, equity, and inclusion ("DEI") initiatives, "environmental justice" initiatives, and conflict with the Agency's policy of prioritizing merit, fairness, and excellence in performing our statutory functions. In addition to complying with the civil rights laws, it is vital that the Agency assess whether all grant payments are free from fraud, abuse, waste, and duplication, as well as to assess whether current grants are in the best interests of the United States.

The grant specified above provides funding for programs that promote or take part in DEI initiatives or environmental justice initiatives or other initiatives that conflict with the Agency's policy of prioritizing merit, fairness, and excellence in performing our statutory functions; that are not free from fraud, abuse, waste, or duplication; or that otherwise fail to serve the best interests of the United States. The grant is therefore inconsistent with, and no longer effectuates, Agency priorities.

The process for closeout is generally outlined in 2 CFR 200.344. EPA is clarifying what reports are required and what reports are waived below. Other requirements are still in effect if applicable to your grant.

EPA is requiring the following closeout reports due within 120 days of closeout (2 CFR 200.344a:)

- Final Federal Financial Report, SF-425
- Final Technical Report
- Other programmatic reports identified in your terms and conditions

As part of this termination, EPA is waiving the following closeout reports:

- Property Report, SF-428
- Final Minority Business Enterprise/Woman Business Enterprise Utilization Under Federal Grants and Cooperative Agreements, EPA Form 5700-52A

The recipient may request payment from the Automated Standard Application Payments (ASAP) system for allowable costs incurred up to the date of this memo provided that such costs were contained in the approved workplan. Costs incurred by you after this termination are allowable only if (a) those costs were properly incurred by you before the effective date of this termination, and not in anticipation of it; and (b) those costs would be allowable if your federal award was not suspended or expired normally at the end of the period of performance in which the termination takes effect. *See* 2 C.F.R. § 200.343. You are encouraged to carefully review and discharge your closeout responsibilities set forth in 2 C.F.R. § 200.344-45 and your award agreement. Those responsibilities include, but are not limited to, your obligation to "promptly refund any unobligated funds" that have been paid out but "are not authorized to be retained." *See* 2 C.F.R. § 200.344(g).

Also, per 2 CFR 200.472, a recipient may use grant funds to properly closeout their grant including reasonable and necessary costs that might occur after the date of this memo. If the recipient drew down funds from ASAP for costs beyond the termination date or for costs that exceed the amount necessary to properly closeout their grant, the recipient must contact RTPFC at rtpfc-grants@epa.gov for instructions on how to return the excess funds.

The EPA Grants Management Office has issued an amendment to the agreement to document the termination.

If you wish to dispute this termination decision, the Disputes Decision Official (DDO), Micky Regan, Regan.Mickey@epa.gov must receive the Dispute no later than 30 calendar days from the date this termination notice is electronically sent to you. Disputes must be sent electronically by email to the DDO, with a copy to the EPA Award Official, Manion.Andrea.L@epa.gov within the 30-day period stated above. The Dispute submitted to the DDO must include: (1) A copy of the disputed Agency Decision; (2) A detailed statement of the specific legal and factual grounds for the Dispute, including copies of any supporting documents; (3) The specific remedy or relief you seek under the Dispute; and (4) The name and contact information, including email address, of your designated point of contact for the Dispute. *See* 2 CFR 1500.15

The requirements on post-closeout adjustments and continuing responsibilities, including audit and record retention requirements, at 2 CFR 200.345 remain in effect.

ATTACHMENT
Amendment Document

cc: Lacey Davidson
Martha Tomlinson

# U.S. ENVIRONMENTAL PROTECTION AGENCY

## Assistance Amendment

| | |
|---|---|
| **GRANT NUMBER (FAIN):** 02J63801<br>**MODIFICATION NUMBER:** 1<br>**PROGRAM CODE:** 5N | **DATE OF AWARD**<br>02/22/2025 |
| **TYPE OF ACTION**<br>No Cost Amendment | **MAILING DATE**<br>02/22/2025 |
| **PAYMENT METHOD:**<br>ASAP | **ACH#**<br>PEND |

| | |
|---|---|
| **RECIPIENT TYPE:**<br>Not for Profit | **Send Payment Request to:**<br>rtpfc-grants@epa.gov |
| **RECIPIENT:** | **PAYEE:** |
| PHILANTHROPY NORTHWEST<br>600 UNIVERSITY ST STE 1725<br>SEATTLE, WA 98101-4120<br>**EIN:** 91-1110995 | PHILANTHROPY NORTHWEST<br>600 UNIVERSITY ST STE 1725<br>SEATTLE, WA 98101-4120 |

| PROJECT MANAGER | EPA PROJECT OFFICER | EPA GRANT SPECIALIST |
|---|---|---|
| Meredith Higashi<br>600 University St, Suite 1725<br>Seattle, WA 98101-4120<br>**Email:** dcrystal@philanthropnw.org<br>**Phone:** 206-443-8436 | Martha Tomlinson<br>1200 Sixth Ave, Suite 155<br>Seattle, WA 98101-3144<br>**Email:** Tomlinson.MarthaScott@epa.gov<br>**Phone:** 206-553-8696 | Lacey Davidson<br>1200 6th Ave., Suite 155<br>Seattle, WA 98101-3144<br>**Email:** davidson.lacey@epa.gov<br>**Phone:** 206-553-0758 |

**PROJECT TITLE AND EXPLANATION OF CHANGES**

Northwest Network for Environmental Justice-Initial Award

This amendment is to stop work; terminate the agreement; reduce performance period duration; curtail scope of work; and waive certain reporting requirements. Administrative terms and conditions are added.

Per 2 CFR 200.340 and the Termination General Terms and Conditions of this agreement, EPA is terminating this award. Your organization shall immediately stop work and take all reasonable steps to minimize the incurrence of costs otherwise allocable to the assistance agreement. See terms and conditions.

| BUDGET PERIOD | PROJECT PERIOD | TOTAL BUDGET PERIOD COST | TOTAL PROJECT PERIOD COST |
|---|---|---|---|
| 02/22/2025 - 02/28/2027 | 03/01/2024 - 02/22/2025 | $ 8,000,000.00 | $ 8,000,000.00 |

## NOTICE OF AWARD

Based on your Application dated 06/28/2023 including all modifications and amendments, the United States acting by and through the US Environmental Protection Agency (EPA) hereby awards $ 0.00. EPA agrees to cost-share 100.00% of all approved budget period costs incurred, up to and not exceeding total federal funding of $ 8,000,000.00. Recipient's signature is not required on this agreement. The recipient demonstrates its commitment to carry out this award by either: 1) drawing down funds within 21 days after the EPA award or amendment mailing date; or 2) not filing a notice of disagreement with the award terms and conditions within 21 days after the EPA award or amendment mailing date. If the recipient disagrees with the terms and conditions specified in this award, the authorized representative of the recipient must furnish a notice of disagreement to the EPA Award Official within 21 days after the EPA award or amendment mailing date. In case of disagreement, and until the disagreement is resolved, the recipient should not draw down on the funds provided by this award/amendment, and any costs incurred by the recipient are at its own risk. This agreement is subject to applicable EPA regulatory and statutory provisions, all terms and conditions of this agreement and any attachments.

| ISSUING OFFICE (GRANTS MANAGEMENT OFFICE) | AWARD APPROVAL OFFICE |
|---|---|
| **ORGANIZATION / ADDRESS** | **ORGANIZATION / ADDRESS** |
| U.S. EPA, Region 10, EPA Region 10<br>Mail Code: 17-C04, 1200 Sixth Avenue, Suite 155<br>Seattle, WA 98101 | U.S. EPA, Region 10, Mission Support Division<br>R10 - Region 10<br>1200 Sixth Ave, Suite 155<br>Seattle, WA 98101-3144 |

**THE UNITED STATES OF AMERICA BY THE U.S. ENVIRONMENTAL PROTECTION AGENCY**

| | |
|---|---|
| **Digital signature applied by EPA Award Official** Andrea Manion - Grants Management Officer | **DATE**<br>02/22/2025 |

# EPA Funding Information

| FUNDS | FORMER AWARD | THIS ACTION | AMENDED TOTAL |
|---|---|---|---|
| EPA Amount This Action | $ 8,000,000 | $ 0 | $ 8,000,000 |
| EPA In-Kind Amount | $ 0 | $ 0 | $ 0 |
| Unexpended Prior Year Balance | $ 0 | $ 0 | $ 0 |
| Other Federal Funds | $ 0 | $ 0 | $ 0 |
| Recipient Contribution | $ 0 | $ 0 | $ 0 |
| State Contribution | $ 0 | $ 0 | $ 0 |
| Local Contribution | $ 0 | $ 0 | $ 0 |
| Other Contribution | $ 0 | $ 0 | $ 0 |
| Allowable Project Cost | $ 8,000,000 | $ 0 | $ 8,000,000 |

| Assistance Program | Statutory Authority | Regulatory Authority |
|---|---|---|
| 66.615 - Environmental Justice Thriving Communities Grantmaking Program (EJ TCGM) | Clean Air Act: Sec. 138 | 2 CFR 200, 2 CFR 1500 and 40 CFR 33 |

Budget Summary Page

| Table A - Object Class Category (Non-Construction) | Total Approved Allowable Budget Period Cost |
|---|---|
| 1. Personnel | $ 3,228,715 |
| 2. Fringe Benefits | $ 742,595 |
| 3. Travel | $ 639,075 |
| 4. Equipment | $ 0 |
| 5. Supplies | $ 28,700 |
| 6. Contractual | $ 897,698 |
| 7. Construction | $ 0 |
| 8. Other | $ 1,855,321 |
| 9. Total Direct Charges | $ 7,392,104 |
| 10. Indirect Costs: 0.00 % Base | $ 607,896 |
| 11. Total (Share: Recipient 0.00 % Federal 100.00 %) | $ 8,000,000 |
| 12. Total Approved Assistance Amount | $ 8,000,000 |
| 13. Program Income | $ 0 |
| 14. Total EPA Amount Awarded This Action | $ 0 |
| 15. Total EPA Amount Awarded To Date | $ 8,000,000 |

## Administrative Conditions

### UNILATERAL TERMINATION

1. The Agency is asserting its right under 2 CFR 200.340 and the Termination General Term and Condition of this agreement to unilaterally terminate this award. This amendment serves as required notice under 2 CFR 200.341.

2. Consistent with 2 CFR 200.343 Effect of suspension and termination, costs to the recipient or subrecipient resulting from financial obligations incurred by the recipient or subrecipient after the termination of a Federal award are not allowable. Costs after termination are allowable if:

a. The costs result from financial obligations which were properly incurred by the recipient or subrecipient before the effective date of suspension or termination, and not in anticipation of it; and

b. The costs would be allowable if the Federal award was not suspended or expired normally at the end of the period of performance in which the termination takes effect.

c. The costs are reasonable and necessary termination costs consistent with 2 CFR 200.472.

3. Federal Financial Reporting (FFR) General Terms and Conditions is still in full force and effect. EPA recipients must submit the SF-425 no later than 120 calendar days after the end date of the period of performance of the award.

4. Programmatic Terms and Conditions. Performance reporting is still in full force and effect. The recipient must submit the final report no later than 120 calendar days after the period of performance.

In accordance with 2 CFR 200.329, the recipient agrees to submit performance reports that include information on each of the following areas:

a. A comparison of accomplishments to the outputs/outcomes established in the assistance agreement work plan for the reporting period;

b. Explanations on why established outputs/outcomes were not met; and

c. Additional information, analysis, and explanation of cost overruns or high-than-expected-unit costs.

5. Waiver of Reports

The following reports are waived:

a. Utilization of Disadvantaged Business Enterprises General Terms and Conditions, EPA Form 5700-52A.

b. Tangible Personal Property Report, SF-428, General Terms and Conditions.

6. Record Retention

Access to Records, 2 CFR 200.337, is still in full force and effect. The termination of this award does not affect the right of EPA to disallow costs and recover funds on the basis of a later audit or other reviews. Information regarding record retention, property disposition in accordance with EPA regulations, and other frequently asked questions can be accessed at https://www.epa.gov/grants/frequent-questions-about-closeouts.

# Programmatic Conditions

END OF DOCUMENT

# Attachment E

USCA4 Appeal: 25-1808 Doc: 28-1 Filed: 02/23/2026 Pg: 436 of 608 Total Pages:(436 of 608)





# Attachment F

**Philanthropy Northwest**
**Thriving Communities Grantmaking Program**
**Unreimbursed Expenses Accrued as of March 15, 2025**

| **Cost Category** | **Unreimbursed Expenses** | |
|---|---|---|
| Salaries | $ 74,042.53 | |
| Fringe Benefits | 48,031.10 | |
| **Sub-Total: Personnel Expense** | | $ 122,073.63 |
| Travel | $ 9,715.11 | |
| Equipment | 0 | |
| Supplies | 0 | |
| Contractual | 87,057.25 | |
| Construction | 0 | |
| Other: Postage, Paid Media, Subscriptions | 1,418.28 | |
| Other: Honoraria (NO IDC) | 400.00 | |
| **Sub-Total: Non-Personnel Expenses** | | $ 98,590.64 |
| Indirect Cost (15%) | | $ 33,039.64 |
| **Total Unreimbursed Expenses** | - | **$ 253,703.91** |

# EXHIBIT 1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
(Northern Division)

| | | |
|---|---|---|
| **GREEN & HEALTHY HOMES INITIATIVE, INC.,** ***et al.*****,** | * | |
| | * | |
| Plaintiffs, | * | |
| v. | * | Case No.: 25-cv-1096 (ABA) |
| **ENVIRONMENTAL PROTECTION AGENCY,** ***et al.*****,** | * | |
| Defendants. | * | |

* * * * * * * * * * * *

**SECOND DECLARATION OF JILL T. NISHI**

I, JILL T. NISHI, declare as follows:

1. I am the Chief Executive Officer of Philanthropy Northwest. I submit this Second Declaration to supplement my first Declaration filed in these proceedings with Plaintiffs' Complaint, and in further support of Plaintiffs' Motion for Preliminary Injunction.

2. As a result of EPA's February 22, 2025, termination of our initial Thriving Communities grant and freezing of funds associated with our subsequent grant since March 7, 2025, Philanthropy Northwest's financial health, reputation, and ability to deliver on our organizational mission is increasingly tenuous. The EPA's unlawful and unsubstantiated actions continue to exacerbate multiple dimensions of harm to Philanthropy Northwest as discussed below.

3. **Increased Financial Harm**. As of April 11, 2025, Philanthropy Northwest has absorbed a cumulative total of $429,068.43 in direct and indirect costs to continue our

administration of the Thriving Communities Grantmaking Program using available cashflow that would otherwise be allocated to the general operations of our organization.

4. Philanthropy Northwest estimates that cashflow is available for three additional weeks (until the week of May 19, 2025) before we need to release six full-time staff dedicated to the program. Note that, since the submission of my first Declaration, one staff person has since resigned in part due to the uncertainty of the program, reducing our current staffing levels from seven to six staff. We estimate we will be burdened with a projected $856,440 of program-related expenditures by the end of May for which, at present, there is no source of reimbursement. Absorbing these costs will additionally require a downsizing of our core (non-Thriving Communities Program) operations, staffing, and delivery of other enterprise programs and services. Without immediate relief, the financial threat to my organization will require extraordinary actions inclusive of job loss, reduced programming, and significant duress to the organization.

5. **Increased Reputational Risk**. The reputational risk to Philanthropy Northwest with the current status of our funding is increasingly challenging to manage. As we seek to support our applicants and sub-recipients, many are questioning our ability to fulfill grant awards they were intended to receive following a robust application and selection process. We are placed in an increasingly untenable position with sub-recipients and applicants who deserve certainty in a process in which they have invested time and resources, and for which we can provide increasingly fewer assurances of its success. The stress on our front-line program officers is increasingly palpable as individuals who hold meaningful community relationships and for whom their own reputations are at risk.

6. **Increased Threats to Fulfillment of Organizational Mission**. Philanthropy Northwest's mission is in part to "…[move more] resources to historically underinvested communities in the Northwest." Our decision to respond to EPA's Request for Applications ("RFA") to serve as a Thriving Communities regional grant maker was an opportunity to advance our organizational mission and impact those communities who have historically had limited access to federal funding. Under this premise and since our selection as the Region 10 Grantmaker in December 2023, we have invested nearly 17 months in building out the infrastructure (staffing, systems, policies, and procedures) to implement the Thriving Communities Program and deliver meaningfully on our organizational mission and commitment to underinvested communities in the Northwest. EPA's unlawful actions over the last few months have severely compromised and undermined our ability to advance our organizational mission in meaningful and impactful ways for the communities we seek to serve. This includes adverse impact on the activities of these grants, as well as disrupting our ability to carry out other mission supporting activities by creating a tremendous strain on organizational finances and requiring excessive staff time to manage increasing uncertainty, support scenario planning, and financial analysis.

I declare under the penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Date: April 23, 2025

Jill T. Nishi

# EXHIBIT 2

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
(Northern Division)

**GREEN & HEALTH HOMES INITIATIVE, INC., ET AL.** *

Plaintiffs, *

v. *

**ENVIRONMENTAL PROTECTION AGENCY, ET AL.** *

Defendants. *

Case No.: 1:25-cv-01096

* * * * * * * * * * * *

**Supplemental Declaration of R.T. Rybak**
**President & Chief Executive Officer**
**The Minneapolis Foundation**

R.T. Rybak declares as follows:

1. I am the President and Chief Executive Officer of the Minneapolis Foundation. I have personal knowledge of the matters set forth in this declaration or have knowledge of the matters based on my review of information and records gathered by my staff at my direction.

2. I provided a Declaration in this case on April 2, 2025. *See* ECF 2-14. This Supplemental Declaration provides further information regarding the irreparable harm and adverse effects that have impacted the Minneapolis Foundation since the filing of the Complaint and Motion for Preliminary Injunction and articulates further the irreparable and significant organizational damage that will afflict the Minneapolis Foundation as a result of the termination of the $8 million initial grant and suspension of the $52 million grant under the Thriving Communities Grantmaking Program (the Program" or "Thriving Communities Program"). The

Program and the related grants represent a significant portion of our grant-making funds and reflect a critical expansion in our organizational mission scope.

3. As stated in my original Declaration, the Minneapolis Foundation has been using hundreds of thousands of its own reserve dollars to temporarily support its statutory partners in providing technical assistance to Program applicants and sub-recipients, and to retain key employees and independent contractors working on the Program across the Minneapolis Foundation and its partners. The Minneapolis Foundation has absorbed more than $310,000 in personnel expenses and other costs to continue our administration of the Program using limited reserve funds. It is not financially feasible for us to continue this type of funding support without access to the initial and subsequent grants, as we will be forced to issue notices of termination to five full-time staff dedicated to the program as early as next week without immediate relief.

4. The Minneapolis Foundation made a strategic decision several years ago to expand its mission to include work in the environmental sector, which is why it expressly pursued the Thriving Communities grant. Especially given its status as a community foundation, being designated a Thriving Communities regional grant maker allowed the Organization to gain status and bona fides in the sector and was part of a deliberate effort to expand the scope of our work to more significantly benefit state, regional, and national communities focused on environmental and related infrastructure development work. This in turn has opened up other avenues and inroads for collaboration with national foundations, states, and other funding organizations. We have used our Program status to position the Minneapolis Foundation to credibly pursue other environmental work and to establish ourselves as a thought leader in the sector, an initiative on which we have spent thousands of hours and significant financial resources. If the Thriving Communities grant is terminated, all of the environmental sector work

we have pursued will necessarily be compromised, if not disappear, as a result, causing long-term irreparable harm to the Minneapolis Foundation. As such, termination of the grant poses an existential threat to the Minneapolis Foundation.

5. Among other things, as a direct result of its work on the Program, the Minneapolis Foundation is now positioned to serve as a primary public grantmaking partner to the Minnesota Department of Natural Resources in its upcoming efforts to distribute millions of dollars supporting environmental projects focused on public health and safety across the state. Without the Thriving Communities Program grants, our credibility in the environmental sector will be substantially diminished and irreparably damaged. Indeed, it will be impossible for the Minneapolis Foundation to maintain the internal systems and institutional knowledge necessary to support initiatives like that in Minnesota going forward. The inability to take on additional large-scale public grantmaking projects portends a drastic shift in the positioning of the Minneapolis Foundation more broadly and poses a severe threat to the mission of the organization.

6. Given the role that the Program has played in helping to attract new sources of funding, the grant termination also poses a direct and imminent threat to the financial sustainability and well-being of the Minneapolis Foundation. As a community foundation, we rely on our diversified funding sources as opposed to donor-advised funds in order to operate. Over 90 percent of the Minneapolis Foundation's funding is sourced from fundholders, which has traditionally narrowed and limited the scope of the organization's programmatic initiatives. Through implementation of the Thriving Communities Program grant, however, the Minneapolis Foundation gained significant interest from other local and state governmental entities, in addition to new attention from large philanthropies and prospective donors seeking to support the

organization's environmental work. Our commitment to pursue environmental work helped us attract several million dollars to the Minneapolis Foundation, and we have been in talks to bring in additional funding because of the Thriving Communities Program. These types of donations would not have occurred without the Thriving Communities Program and may also be at risk if the grant is terminated.

7. Since being selected as a regional grantmaker, the Minneapolis Foundation has deepened its relationships with new and existing funding partners across the country, fundamentally enhancing the mission and financial outlook of the organization. For example, we are now engaged in a national environmental initiative with the McKnight and MacArthur Foundations for which we would not be considered absent our role in the Thriving Communities Program. This initiative is the result of hundreds of hours of work and the investment of substantial resources focused on positioning the Minneapolis Foundation to pursue regional and national environmental projects. We have succeeded in establishing the Minneapolis Foundation as a leader in environmental grant making, but participation in the Program is the linchpin to the success of these efforts, the financial sustainability of the Minneapolis Foundation, and the current and future expansion of the organization. Termination of our Program grant will undermine our current and planned efforts and, worst case, will completely destroy the ability of the Minneapolis Foundation to be accepted as a leader in the sector, without which our mission and strategic plan for expansion of that mission will be irreversibly and irreparably harmed resulting in permanent injury to the Minneapolis Foundation. Grant termination would directly threaten the organization's financial future and will undermine our ability to carry out our mission as a community foundation. The harms described here are not speculative, but rather are directly tied to an imminent loss in funding opportunities and contraction of the organization's

operational capacity. These harms will also flow to the communities that the Minneapolis Foundation strives to support, amplifying the impact of the termination and suspension.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on April 23, 2025

R.T. Rybak

# EXHIBIT 3

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
(Northern Division)

| | |
|---|---|
| GREEN & HEALTHY HOMES INITIATIVE, INC., *et al.*,<br>Plaintiffs,<br><br>v.<br><br>ENVIRONMENTAL PROTECTION AGENCY, *et al.*,<br><br>Defendants. | Civil Action No. 25-01096-ABA |

**SUPPLEMENTAL DECLARATION OF RUTH ANN NORTON**

I, Ruth Ann Norton, am over the age of 18 and am competent to testify. I declare as follows:

1. I am President and Chief Executive Officer of Green & Healthy Homes Initiative, Inc. ("GHHI").

2. As described in my Declaration submitted in connection with Plaintiffs' Motion for Preliminary Injunction, the EPA's termination and suspension of GHHI's Thriving Communities grants will force GHHI to imminently shut down its implementation of the Thriving Communities program and cause irreversible harms to GHHI, its partners, its subgrantee organizations, and the communities they serve. I submit this supplemental declaration to provide information regarding the harms that GHHI has experienced since the filing of this case, as well as additional information about the severe harms that we anticipate incurring if we do not obtain preliminary relief in this case.

3. Operationally, GHHI is now at a breaking point. Our organization cannot continue to cover salaries for employees who were to be funded over a three-year period from the Thriving Communities initial and subsequent grants.

4. Earlier today, GHHI sent letters to three employees informing them they will be laid off effective May 1, 2025, if the organization's Thriving Communities grants are not reinstated and access to grant funding not restored by April 30, 2025.

5. The letters were sent to our Program Administration Coordinator and two of our Program Officers who currently work full-time under the Thriving Communities program. The Program Administrator is the lead administrative employee for the program and is responsible for, among other tasks, coordinating events, preparing program materials, and handling the administration of communications related to the program. The Program Officers conduct grant application reviews and serve as the point-of-contact for the subgrantee organizations with responsibilities to oversee the development, implementation, and evaluation of the subgrantee projects.

6. GHHI will soon be forced to lay off additional employees if access to the Thriving Communities grant funding is not promptly restored.

7. GHHI's $8 million grant remains terminated, and GHHI has had no access to those funds since January 29, 2025.

8. GHHI's access to its $52 million Thriving Communities subsequent grant remains suspended. EPA has provided no concrete information about the nature of the suspension or whether it will ultimately be lifted.

9. The EPA's actions have also continued to damage GHHI's relationships. There has been widespread confusion among partner and subgrantee organizations regarding the status of

the Thriving Communities program and GHHI's access to the grant funding, which in turn has led these organizations to question GHHI's ability to fulfill its commitments. This reflects poorly on our organization.

10. The EPA's termination and suspension of the grants will severely impair GHHI's ability to pursue its organizational mission and objectives. The mission of GHHI is to create healthier communities and address social, economic, and environmental inequities. For more than 30 years, GHHI has been a national leader in spearheading effective and innovative work to improve the health, economic, and social outcomes of the nation's disadvantaged communities by breaking down barriers, building local capacity, and designing effective programs to reduce environmental health threats such as childhood lead poisoning, air pollution, and greenhouse gas emissions.

11. GHHI applied to be a Regional Grantmaker for the Thriving Communities program to further its mission. The program's scale and design fit well with GHHI's goals and capacities. Before the EPA's termination of the program, GHHI developed extensive additional subject matter expertise and cultivated new relationships across the Mid-Atlantic region, all to support local entities seeking to improve the health and safety of residents in their respective communities. If our Thriving Communities grants are not restored, this work will be lost. We will lose staff members whose knowledge and skills have become essential to the fulfillment of our mission, and we will lose the organizational ecosystem, linking us to partners, advisors, and subgrantees across the region, that we created over the past 18 months.

12. The EPA's abrupt termination and suspension of GHHI's Thriving Communities grants will result in the shuttering of the program and will cause significant and incalculable damage to GHHI's fulfillment of its organizational mission.

Date: April 23, 2025

DocuSigned by:
Ruth Ann Norton
6171FEFD32CD49A...

Ruth Ann Norton

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
NORTHERN DIVISION

GREEN & HEALTHY HOMES INITIATIVE, INC., Plaintiffs,

v.

ENVIRONMENTAL PROTECTION AGENCY, et al., Defendants.

CASE NUMBER: ABA-25-1096

TRANSCRIPT OF PROCEEDINGS
- MOTION FOR A PRELIMINARY INJUNCTION-
BEFORE THE HONORABLE ADAM B. ABELSON
UNITED STATES DISTRICT JUDGE
Tuesday, April 29, 2025
Courtroom 7D

A P P E A R A N C E S

FOR THE PLAINTIFFS:

On behalf of Green & Healthy Homes Initiative, Inc.
BY: JOSHUA AUERBACH, ESQUIRE
120 E. Baltimore Street, Suite 2500
Baltimore, Maryland 21202

On behalf of Philanthropy Northwest:
BY: JONATHAN A. DeMELLA, ESQUIRE
DAVIS WRIGHT TREMAINE, LLP
920 Fifth Avenue, Suite 3300
Seattle, Washington 98104-1610

On Behalf of The Minneapolis Foundation:
BY: JESSICA C. ABRAHAMS, ESQUIRE
LORA A. BRZEZYNSKI, ESQUIRE
FAEGRE, DRINKER, BIDDLE & REATH, LLP
1500 K St., NW, Suite 1100
Washington, DC 20005

***Proceedings Recorded by Mechanical Stenography***
Transcript Produced by Computer-Aided Transcription

FOR THE DEFENDANTS:

BY: MOLISSA FARBER, ESQUIRE
OFFICE OF THE UNITED STATES ATTORNEY
36 S. Charles Street, 4th Floor
Baltimore, Maryland 21201

P R O C E E D I N G S

**(1:07 p.m.)**

**THE COURTROOM DEPUTY:** The matter now pending before this Court is civil docket number ABA 25-0196, Green and Healthy Homes Initiative, Incorporated, et al, v. Environmental Protection Agency, et al. This matter now comes before the Court for the purpose of a Preliminary Injunction hearing.

Counsel for the plaintiff, please identify yourselves for the record.

**MR. AUERBACH:** Good afternoon, Your Honor. Joshua Auerbach from the firm Brown Goldstein & Levy for the plaintiffs.

**MR. DeMELLA:** Good afternoon, Your Honor. Jonathan DeMella from Davis Wright Tremaine, also for plaintiffs.

**MS. BRZEZYNSKI:** Good afternoon, Your Honor. Lora Brzezynski with the law firm Faegre Drinker Biddle & Reath for the plaintiff, Minneapolis Foundation. And with me today is my partner, Jessica Abrahams; and my colleague, Asher Young.

**THE COURTROOM DEPUTY:** Counsel for the defendant, please?

**MS. FARBER:** Good morning, Your Honor. Molissa Farber for the Government.

**THE COURT:** All right. Good afternoon, everyone. We are here as was stated on plaintiffs' Motion for a

Preliminary Injunction. I have so you all know, closely reviewed the briefing and exhibits and I appreciate all the attention that you have given to those filings and there's a lot.

That said, I'm happy to hear anything so don't hold back if you think that there's something in the papers that you want to highlight. I just wanted to make clear at the outset that I have closely reviewed all of those materials.

So this is the plaintiffs' motion. I don't know how you all have decided the sequence, but I'm happy to turn it over to the plaintiffs.

**MR. AUERBACH:** Thank you, Your Honor. A couple of preliminaries, if I may. First of all, I want the Court to know that all three of the plaintiff organizations are well represented. Here in the courtroom today is Chief Executive Officer of Philanthropy Northwest, Jill Nishi; Chief Executive Officer of the Minneapolis Foundation, R.T. Rybak; and the Chief Executive Officer of Green & Healthy Homes Initiative, Ruth Ann Norton.

The second preliminary, with the Court's permission, what we would propose to do is that I would speak principally to the merits of the claims and the other preliminary injunction factors; and my colleague, John DeMella, will address the Government's jurisdictional defense.

And so of course we want to do it in whatever way would

be most helpful to Your Honor. But as an opening bid, what we propose to do is I'll sort of talk for a minute or two here and then I'll turn it over to Mr. DeMella to talk about the jurisdictional defense. And then maybe I'll come back and talk about the merits and the other preliminary injunction factors.

**THE COURT:** That's fine. I appreciate your explaining the division so that it's clear.

**MR. AUERBACH:** Thank you, Your Honor.

We're here today, of course, to ask the Court to restore a status quo that existed prior to the termination and suspension of the grants at issue here. And in doing that, to ask the Court to preserve during the pendency of this case, the organizational and programatic infrastructure that these three organizations have worked very hard to create over the past 18 months as EPA designated regional grantmakers; infrastructure that will not survive if their grant funding is not restored.

We make this request in the context of EPA decisions concerning these grants that fail in just about every way to fulfill the Administrative Procedure Act's requirement of reasonable decision-making, that directly contradicts the statute under which EPA is operating and the amount on their face to view that discrimination in violation of the First Amendment.

And before I sit down, Your Honor, I wanted to give a couple of updates on the status of these grants. As Your Honor is aware, there are two sets of grants at issue here. We have been calling them as EPA calls them, the initial grants and the subsequent grants. The initial grants are terminated; the remainder remain. The subsequent grants have been suspended.

There is a case in Rhode Island that is discussed a bit in our papers called *Woonasquatucket*. We've all been learning our Rhode Island geography pronunciation. And in the *Woonasquatucket* case, there has been submitted a declaration from the deputy administrator of EPA, a Daniel Coogan. And in our read of that declaration, Mr. Coogan is saying that the subsequent grants are slated to be terminated.

We have copies of those declarations. I'm not proposing to submit those, but if it would be helpful to the Court we can. But I wanted to make the Court aware that's our understanding at this moment about the status of those grants.

**THE COURT:** Okay. And remind me, does the initial grant, do the initial grants and the subsequent grants line up with which funding goes to the plaintiffs as opposed to funding grants that plaintiffs issue? Or are these apples and oranges?

**MR. AUERBACH:** The initial grants are to fund both administrative costs for the plaintiffs and technical

assistance. So some of those funds go to partners. The subsequent grants are the ones that mostly go to subgrantees. But of the $52 million in the subsequent grants, $4 million is available to the plaintiffs for administrative costs.

And that brings me to the second update, Your Honor, which is this morning there has been, for reasons we don't know, restored access to the subsequent grants. That may also be related to relief that was granted in the *Woonasquatucket* case; we don't know that.

**THE COURT:** Say that again. So restored access, what is your understanding of what that means?

**MR. AUERBACH:** There is a portal through which the organizations can make draws on grant funding. For most of the period of the pendency of this case and before, the access to the portal has been suspended. Today, at least as of this morning, access is not suspended and each of the organizations has drawn some amounts on those grant funds.

In the case of my client, Green & Healthy Homes Initiative, there was a draw of about $330,000 and those funds will be used to pay staff. Of course we'll get into this in talking about irreparable harm. But to be clear, we've submitted -- Green & Healthy Homes Initiative has submitted a supplemental declaration in which the CEO, Ms. Norton, has said that there are three employees who will be terminated this week unless grant funding is restored. That's still the

case. But there are other employees, grant-funded employees at GHHI. And GHHI has made a draw that enables them to pay from grant funds those other employees who are working on the Thriving Communities Program. And how long grant access to the portal will be open, we have no idea. I know nothing more than what I've said, but I wanted the Court to be aware of that.

**THE COURT:** And do either of these updates from your perspective affect any of the analysis of any of the preliminary injunction factors? I understand it may affect some of the details with regard to irreparable harm. But just so I understand your perspective, do either of these updates change the analysis that's laid out in the briefs?

**MR. AUERBACH:** No, Your Honor, it doesn't. And to be very clear, it is essential that access to these funds be restored. And the fact that there is some access today doesn't tell us anything about where we're going to be -- I don't even know where we are right now, but certainly not tomorrow. And that's the relief that's necessary in order to prevent the erosion of this infrastructure that our clients have created.

So with that, if it would being helpful to the Court, I'll yield to Mr. DeMella to talk about the jurisdictional defense.

**THE COURT:** Sure. That makes sense logically.

**MR. DeMELLA:** Thank you, Your Honor.

So I thought I would begin the remarks on jurisdiction by focusing us in considering the question of why plaintiffs have filed for relief under the Administrative Procedure Act in this court, a Federal District Court. And as Mr. Auerbach mentioned, we are here because we're asking the Court to enjoin arbitrary and capricious Agency action violations of law, to enjoin the terminations of those initial $8 million grants, and to enjoin the improper freezing of the $52 million grants that were appropriated by Congress. These were funds that were authorized, approved, and mandated under the Inflation Reduction Act for both the initial and the subsequent grants.

Now we're going to need to spend some time looking back at the Administrative Procedure Act and particularly the waiver for sovereign immunity to understand this jurisdictional argument. And what the APA tells us is that that waiver is present where we have three prongs or three conditions. One, where plaintiffs are been adversely affected or aggrieved by Agency action within the meaning of a relevant statute or perhaps even the constitution as is the case here; second, where the plaintiffs are seeking relief other than money damages. And this is obviously going to be a point that's -- I won't say "obviously," but it's going to be a point where we will spend some time in a few moments; and then

third, where there is no other remedy in any other court. And, you know, here the other court that we're talking about is the Court of Federal Claims.

**THE COURT:** So the relief other than money damages comes from 702, the right of review. And 704 relates to reviewability and comes from -- and 704 addresses the requirement that there be no other adequate remedy in a court. So just so I understand it, those are the two statutory requirements for APA waiver of sovereign immunity that you're referring to?

**MR. DeMELLA:** That's correct. And those, as we'll talk about, those particular provisions are discussed at length, Your Honor, in the Supreme Court case of *Bowen.* And as I mentioned, we'll talk about that.

There are a couple of I suppose tests that we're going to be -- that I'd like to cover today. And one of them comes from a case, the *MegaPulse* case which you saw in our papers. And the first element of that particular test which is to really get to understand and identify what is the essence of a claim, meaning is the claim in its essence seeking injunctive relief or is that claim seeking some form of contractual relief. We look at two things. And the first thing that we look at is the source of the rights and whether those rights are based on a contract versus as we contend in this case, the Constitution or a statute.

Now the EPA is claiming here that this case should be heard in the Court of Federal Claims under the Tucker Act jurisdiction because there are -- simply because I would say, there are grant agreements between our clients and with EPA. But we believe that looking at that, ending the analysis there mischaracterizes the nature of our action and the grounds on which we're fundamentally relying.

The claims that we're advancing here -- and this is the important point -- do not turn on the terms and conditions of those cooperative agreements or those grants. Instead, they turn upon the statutes and the uniform guidance, the regulations that were placed by Congress.

**THE COURT:** Well, some of those -- some of the terms or some of the claims are that they violated regulations that are incorporated in or appear in the general conditions. Is that right?

**MR. DeMELLA:** That's correct.

**THE COURT:** So how does that affect the analysis, if at all?

**MR. DeMELLA:** It doesn't really affect the analysis other than -- well, I should say the fact that we have allegations of violation of EPA terms and conditions or uniform guidance that may be incorporated by reference into grants doesn't diminish the significance of the fact that we're claiming violations of the First Amendment, violations

of the Fifth Amendment, violations of the Clean Air Act, violations of the Inflation Reduction Act.

**THE COURT:** So let's say you only -- and I realize you've got five counts, only the fifth alleges that the basis for making the terminations unlawful is a violation of the regulations/conditions. But let's say if you had only brought Count Five alleging that there was a violation of the general conditions -- or I suppose that's a subpart of your Count Five. If you were only alleging -- because I want to understand the contours of this. And some of this analysis is murky in the case law. And frankly, in the last few weeks Courts have gone different directions in understanding where these lines get drawn.

So to drill down, if you had only alleged that what EPA did wrong was violate the conditions that are laid out in the grant, do you agree that case would appropriately go to the Court of Federal Claims?

**MR. DeMELLA:** Well, I would still, Your Honor, say that we apply the two-part test, right?

**THE COURT:** Fair.

**MR. DeMELLA:** You would look at the source first of those rights and we would look at the type of relief second. In the hypothetical you're posing, the case would certainly be stronger that we're dealing with a Tucker Act claim because there would be no constitutional claims, there would be no

statutory claims. So in that -- I mean, within the contours of that hypothetical I would go through the analysis and I would look at the source of the particular rights. And if they were exclusively contract rights, then I think it would tip toward you would certainly have an argument that that would fall within Tucker Act jurisdiction.

**THE COURT:** And there's no question your case is very different from that. But let's stick with that hypothetical for a minute. And I know you're on the first prong; you haven't reached the relief prong, but let's stick with that hypothetical. And let's say the sole remedy that you were seeking in that case was specific performance, prospective specific performance. Meaning that the EPA would continue to perform on those contracts. Would that be a remedy that would be subject to exclusive jurisdiction in the Court of Federal Claims?

**MR. DeMELLA:** I don't necessarily believe so because when we get into prospective, I mean, as we've seen from cases in *Bowen*, we need to consider the second prong which is the nature of this particular relief. And we have cases in which we've seen -- I mean, *Bowen*, for instance, was one of those cases where you're talking about a certain disallowance, right, of funding. And that could -- that could be an instance where someone could look at the requested relief and say you're looking at something that has happened in the past.

But in that particular case and in other cases like it where you have prospective relief, I think the answer is one needs to consider the nature of that relief and whether the Court of Federal Claims could actually -- or the Court of Federal Claims has the power to grant that form of equitable relief, understanding that that Court generally does not have that power with the exception of very limited circumstances when we are talking about the equitable relief being incidental to money damages.

So if I'm understanding --

**THE COURT:** And here, so that even in that hypothetical, none of the relief you'd be seeking would be money damages; it would entirely be prospective injunctive relief.

**MR. DeMELLA:** Right. And so for that hypothetical, Your Honor, if there is no money damages then what I would argue is that the specific relief that's being sought, if we're utilizing that language, is not incidental to what the Court would be doing. And if it's not incidental to what the Court would be doing we would not fall within Tucker Act jurisdiction. Instead, we would be discussing the type of relief that can only be afforded under the APA in the federal district courts.

**THE COURT:** All right, go ahead.

**MR. DeMELLA:** Okay. So getting back to the contours

of what we are claiming has occurred here by the Agency, here we are saying that the claims specifically address the Agency's failure to act in accordance with that statutory mandate under the Inflation Reduction Act. And importantly provide a rationale that is supported by evidence that you may have seen from our papers, there being sufficient evidence to justify or to sustain a termination here for a termination of what is very clearly a congressionally statutorily mandated program that EPA must follow.

**THE COURT:** So I have a lot of questions about that, but I understand those I should direct to Mr. Auerbach, right?

**MR. DeMELLA:** Yes. Well, I don't want to -- I don't want to load him up with the questions, but generally, yes, on the merits. But --

**THE COURT:** Yeah, I just want to make sure I understood the division of labor.

**MR. DeMELLA:** I think you've got it. Your Honor has it.

Okay, so just to emphasize what -- I think we've covered some of this in the questions so far. We're not seeking money damages here. We are seeking injunctive and declaratory relief here. We are seeking relief that is prospective concerned with a program that will be ongoing. And the administration of that program into the future, very different from what I do day to day which is Government contracts claims

where we're talking about looking back and looking at money damages for what is a breach of contract.

**THE COURT:** Is the -- so, for example, *Catholic Bishops* case, Judge McFadden's opinion. In that case the plaintiffs were seeking reimbursement of past expenses, but also prospective injunctive relief. With respect to the prospective component of the plaintiff's claim in that case, is that case distinguishable or did Judge McFadden just get it wrong?

**MR. DeMELLA:** Your Honor, respectfully I think that Judge McFadden got it wrong in that case. That case I would put alongside Judge Griggsby's case as one of two cases where, again, respectfully the Courts got it -- they simply got it wrong there. Because there is a request for prospective relief in that case. But it seemed to me, Your Honor, that in the *Catholic Bishops* case which I know the Government cited in its brief for the proposition that we have a request that the Government keep paying up, there are a couple things that I'd like to -- I think that distinguish that case.

First, that case, it seemed to me that the judge was looking to reach a particular conclusion. And I say this because there were a number of references there about how the plaintiffs had artfully crafted their Complaint in a way to avoid the jurisdiction that would fall under the APA. And in the balance what we've seen both in *Bowen* and its progeny and

in the more recent cases that we've seen in the last three or four weeks, I don't see the *Conference of Catholic Bishops* case being different from that perspective.

The second point I would like to make there is that there's heavy reliance by the judge in that case on the *Spectrum* case. And the *Spectrum* cases, that is a Contract Disputes Act case in which the plaintiff was seeking relief from liquidated damages. Very, very different. Relief from liquidated damages under a contract which again, is sort of typical sort of contract, the contract disputes act type of dispute. Very, very different from what plaintiffs in the *Conference of Catholic Bishops* were seeking and very, very different from what we are seeking here.

I suppose the other point that I will just make on the *Catholic Bishops* case as a distinction is that there was no analysis regarding whether the grants, specifically the cooperative agreements in that case constituted contracts, which is an argument that we make in our papers and I intend to address here for specifically the issue of whether they were in wanton consideration.

So short answer is yes, I do believe that the judge in that case got it wrong. But there are a number of other distinctions.

**THE COURT:** Okay.

**MR. DeMELLA:** Okay. The preliminary point I would

also like to make which is this: If we do not prevail here, if we are not -- if our plaintiffs do not prevail on the issues that -- on the claims that they're making, I think that under the case law it's clear we will not have a forum for a remedy.

And this emphasizes something that we just discussed, Your Honor, which is the Court of Federal Claims does not have the power to provide or to grant the equitable relief that we seek. And the limitations to that particular jurisdiction I think in the case law is almost universally recognized and it's discussed at length in *Bowen* and the cases that we see following.

I'd like to turn to one of two threshold issues that we'd like to cover, Your Honor. And this relates to the first -- the first issue relates to the Agency policy and priority that seems to be weaving its way through this case and through these pleadings.

The second sort of threshold issue that I'd like to address before I get to a deeper -- a deeper review of *MegaPulse* and *Bowen* is the argument that we have that these contracts are not subject to review because they lack the required element of consideration like I just mentioned.

So on this first threshold issue, the EPA despite having terminated these three grants as no longer consistent with EPA funding priorities -- and this is -- this is stated in the

termination letters which are nearly identical to each of the three plaintiffs here, has not identified in fact any priority that is inconsistent with the grants themselves.

**THE COURT:** I'm sorry, but how does this turn on whether I have jurisdiction or are you making a different point? Is this a jurisdictional point?

**MR. DeMELLA:** I would call this a jurisdictionally adjacent point because it bears upon the termination, the underlying propriety of the termination.

I know that my colleague, Mr. Auerbach, will be touching upon this as well. And I thought that it might be helpful to our understanding of the termination and in the context of jurisdiction to spend just a moment on this issue, with your indulgence, Your Honor.

**THE COURT:** Okay.

**MR. DeMELLA:** Okay.

To reiterate what we had said, Congress here issued a statutory mandate that appropriated $3 million to the EPA for climate and Environmental Justice block grants. And it specifically mandated that EPA, quote, "shall use those funds to support activities that monitor, prevent, and remediate pollution and mitigate climate risks in disadvantaged communities."

Now as we've said, Your Honor, in our papers, EPA has not identified any contrary or conflicting Agency priority. I

mean, what we have is instead an ambiguous and amorphous reference to certain priorities. And perhaps most significant just for this threshold point is that EPA in its papers do not explain and I don't think they can explain, how or why the priority underlying these particular grants could be inconsistent with what we've seen from Administrator Zeldin in his Powering the Great American Comeback Initiative Pillar 1 which is Clean Air, Land, and Water for Every American.

Now this was announced February -- excuse me, February 4th, as far as I can tell. And as I checked it last night, it's still up on the EPA website.

The point here, Your Honor, is that EPA must follow Congress' mandate. And until Congress alters that priority, EPA's obligation to implement the will of Congress must remain intact. And that EPA can't use the termination to turn back the clock on the IRA, or attempt to programatically as we have seen here, eradicate an entire program, the Thriving Communities Program through an illegal administration of grant action because it knows that it cannot achieve that end legislatively.

And that was just the summary or the opening of that point, Your Honor. As I mentioned, Mr. Auerbach will continue with that thread.

Now turning to the issue, Your Honor, of whether these grants are subject to review because they lack -- or if they

are subject to review because they have the element or lack the element of consideration. Here, Your Honor, we argue that of the four elements that a contract must have which is an offer, an acceptance, consideration, and proper government authority, these particular cooperative agreements lack the element of consideration.

And here, plaintiffs' grants are not contracts because they do not entail the crucial element of consideration which specifically is rendering a tangible and direct benefit to the government, and not merely a generalized benefit to advance policy interests or the Agency's overall mission.

And in the Government's papers as far as we've seen, there is no direct, tangible benefit to the EPA here. The benefits that will be conferred here --

**THE COURT:** So you lost me.

**MR. DeMELLA:** I'm sorry, Your Honor.

**THE COURT:** Your causes of action are under the APA.

**MR. DeMELLA:** Yes.

**THE COURT:** And then the Constitution. The APA is what creates the basis for judicial review of whether these terminations were proper, that is, unless I lack jurisdiction by virtue of the Tucker Act.

So where in the analysis on the review -- and I understand the Government has also said these terminations are unreviewable because there's not essentially a standard that

is concrete enough for a Court to analyze or to apply. Where does the elements of consideration come into that analysis or otherwise?

**MR. DeMELLA:** It fundamentally comes into the analysis because the Court of Federal Claims jurisdiction under the Tucker Act is --

**THE COURT:** You're saying the Tucker Act doesn't apply because these aren't contracts.

**MR. DeMELLA:** That is the point, Your Honor. And why are these not contracts? Because they lack that fundamental element of consideration. And why do they lack the fundamental element of consideration? Because these cooperative agreements which are by definition not contracts, including under the Contract Disputes Act, don't render a tangible and direct benefit to the Government.

And how do we know that they don't render a tangible and direct benefit to the Government? Because the purpose of these grants is essentially to direct funding to those disadvantaged communities that are identified in the amendments to the Inflation Reduction Act. And in the absence--

**THE COURT:** In other words, they're grants, sort of traditional grants, not contracts.

**MR. DeMELLA:** That's right.

**THE COURT:** In the bilateral sense of the term

"contract." I mean, there are two sides. Obviously there's the sender of these grants, the EPA; and the recipient, the grantmaking organizations. So under *MegaPulse* and the standard under *MegaPulse*, for the analysis of whether the Tucker Act applies turns on those two elements that you've discussed. But you're saying that -- is what you're saying even if applying those factors this case would end up in the Court of Federal Claims that -- or you don't even reach that analysis because these aren't contracts?

**MR. DeMELLA:** That's correct, Your Honor, yes. If we're looking under *MegaPulse* and we're looking at that first prong, the source, right? The source of these are these cannot -- they are not contracts, right, because they lack that required element of consideration.

**THE COURT:** I understand.

**MR. DeMELLA:** Okay, Your Honor. I'd like to turn to *MegaPulse* and *Bowen* and get into the meat of the tests that we've been talking about here.

As mentioned, *MegaPulse* is the test. Under that case the classification of a particular action as one which is or is not at its essence a contract action depends upon the source of the rights and upon the type of the relief sought.

We also have the *Bowen* case, as I've mentioned. In that case, the Government argued that APA § 704 should be construed to bar review of an Agency action in the District Court

because monetary relief against the United States was available in the Claims Court under the Tucker Act.

Now the Supreme Court in that case, in *Bowen*, rejected that argument as restrictive and unprecedented and, in part, reached that conclusion because the Court of Federal Claims does not have the general equitable powers of a District Court to grant prospective relief.

**THE COURT:** And the statute confirming jurisdiction on the Court of Federal Claims was subsequently amended, but you're saying *Bowen* still controls because the injunctive relief that's conferred on the Court of Federal Claims is limited to injunctive relief incidental to damages and that's -- and that's not what this case is.

**MR. DeMELLA:** That is not what this case is.

**THE COURT:** My understanding.

**MR. DeMELLA:** I'd like to take just a brief moment to address the EPA's position on these two cases as I've seen from the papers. I don't believe the EPA takes any issue with the application of *MegaPulse*. *Bowen*, however, is conspicuously absent from the EPA's response and I think the significance of that, that silence, is deafening.

There are, if we look at a number of the provisions -- of the holdings, excuse me, that we have or the findings that we have from the *Bowen* case, it's clear to me why EPA did not touch this in its papers.

For instance, on the question of whether federal courts retain jurisdiction regarding reimbursement of expenditure, Justice Stevens said all courts of appeal -- and this is as of 1988 when they were looking at this particular issue -- confronting the question agree that the federal district courts have jurisdiction. Justice Stevens confirmed that the consequence of a disallowance of money was prospective and that the disallowance decision affects far more than money past due. Justice Stevens concluded that the 1976 amendments to the APA were intended to broaden the avenues for judicial review of Agency action under the APA.

Justice Stevens said even monetary aspects of the relief that the state sought are not money damages as that term is used in the law and neither a disallowance decision, nor a reversal of a disallowance decision is properly characterized as an award of money damages.

And per Judge Borg and in his review of a Maryland case that had preceded it on which Justice Stevens relied significantly in that *Bowen* case, the decision states, "In the present case, Maryland is seeking funds to which a statute already entitles it, rather than money in compensation for losses, whatever that may be."

That case went back to the legislative history behind the APA. And importantly, under § 702 stated that it would--

**THE COURT:** So Mr. DeMella, let me just cut to the

chase. I think I'm convinced on jurisdiction. If there are particular -- why don't you hold the rest of the thoughts on the Tucker Act, see if there are specific points that the Government makes that you think you haven't addressed in the briefing. But I think I'd like to turn to the merits of the claims, unless there's anything else on the Tucker Act analysis and *MegaPulse* that you feel like hasn't been made in the briefs or that you've made so far.

**MR. DeMELLA:** Well, I suppose if I may reserve, I certainly if you'd like to get -- that would be fine, Your Honor.

**THE COURT:** Sure. Happy to come back to it, but I do think *Bowen* controls. There is that one sentence in the *California* case in the stay order from the Supreme Court. It's a little unclear what exactly that means, but I think there maybe are some distinctions. And in any event, this is a claim for injunctive relief brought under -- and the source of your right does appear to be and I'm going to hear from the Government, but it does appear to be Constitution, statute, the regulations, not the contracts themselves. So let's turn to the merits.

**MR. DeMELLA:** And on that point, Your Honor, on the *California* case I would just say that among those recent cases that we cited, there is a footnote in footnote 8 I believe in the *State of Maine* case that is particularly eloquent in

explaining why the Supreme Court's per curiam decision is of limited precedential value and should have limited impact in these proceedings.

**THE COURT:** I think it's footnote 8, I believe. If I remember correctly. I'm familiar with it.

**MR. DeMELLA:** Thank you, Your Honor.

**MR. AUERBACH:** Thank you again.

Your Honor, the merits in the preliminary injunction factors. I'd like to focus on three points on the merits.

First, EPA's decisions here are arbitrary and capricious, but they're not merely arbitrary and capricious. These decisions fall below the standard of reasoned decision-making in almost every possible way. In fact, EPA has failed here at job one, failing to provide a meaningful statement of its reasons for the actions it's taken.

Second point, EPA's actions are contrary to law on exceeded statutory authority. It's important to emphasize here that EPA is operating under a statute. And for purposes of our case, that statute, the Clean Air Act as amended by the IRA is quite clear. Congress directed EPA to award grants for Environmental Justice. Congress described with a fair amount of specificity, the types of projects that it intended to fund. EPA has no authority under the statute and no discretion to terminate or suspend congressionally mandated Environmental Justice grants on the grounds that the grantee

is promoting or taking part in Environmental Justice.

And third, EPA's actions are unconstitutional. The unconstitutional basis for these actions is not hidden. EPA's decisions on their face amount to viewpoint discrimination in violation of the First Amendment. EPA cannot, consistent with our Constitution, withhold grants from organizations or programs that promote or take part in viewpoints that it disfavors, including DEI, including Environmental Justice, whatever those terms might ultimately end up meaning.

There is a, if I may say, a deeply unserious quality to these memoranda that EPA sent to our clients: DEI, Environmental Justice, fraud waste abuse and duplication or best interest of the United States, one of those things. And I think there might be some risk though in the unserious quality of memos of losing sight of serious violations of law that are occurring here and the serious harms to the plaintiff organizations and the communities that they serve.

**THE COURT:** All right. If you don't mind, let's start with number two of your three items. So statutory authority. So the statute you're talking about is § 7438, right?

**MR. AUERBACH:** Correct, Your Honor.

**THE COURT:** And there's no other statute that is the basis of your contention that there's a statutory mandate here, right? This is the statute we're talking about?

**MR. AUERBACH:** This is the statute.

**THE COURT:** All right. So in 7438(b)(1), Congress -- well, in Section (a), that was the appropriation and (b)(1) is what I think is alleged to be the statutory mandate specifically that reference to the eligible activities in (b)(2), right?

**MR. AUERBACH:** Correct. (b)(1) says "shall use" and (b)(2) gives a great deal of illustrative language from which Congress' intentions can be inferred.

**THE COURT:** So Congress appropriated this money and directed the EPA using language that is inherently directive, "shall," shall use amounts made available under subsection (a)(1) to award grants for periods up to three years to eligible entities to carry out activities described in paragraph 2 that benefit disadvantaged communities as defined by the administrator.

We agree, correct, that this doesn't direct that these funds go to specific organizations, right?

**MR. AUERBACH:** That's correct, Your Honor.

**THE COURT:** Okay. At the other end of the spectrum this doesn't make -- it does not make optional whether these -- the program that these grants exist, that they be issued to somebody, right?

**MR. AUERBACH:** Yes, Your Honor.

**THE COURT:** The administrator, the EPA must.

**MR. AUERBACH:** That's also a proposition with which we agree.

**THE COURT:** All right. So I think the hard work is in between those two ends of the spectrum, if you will.

So tell me why this statute mandates that the funding continue to these plaintiff organizations.

**MR. AUERBACH:** We're here under the APA. And as is often or always the case under the APA, we're talking about what discretion does the Agency have. And the claim here and I think it's a hard claim to refute, is that EPA's discretion, whatever it may be, does not include authority to terminate a grant on the basis that the organizations participate in or take part in Environmental Justice. That is, to the extent there is an asserted basis and as Your Honor I think understands very well, there's a big problem about the kind of vacuousness of the decision here. But a reason among the grab bag asserted, probably the lead reason is we're not doing Environmental Justice.

And the very far here toward the second of Your Honor's two propositions cannot be that it's consistent with the authority that the administrator has been delegated, that the administrator can say you're ineligible for these administrative justice grants because you're doing Environmental Justice.

**THE COURT:** So under the APA, 7062(a) is the

arbitrary and capricious prohibition, for lack of a better term. 7062(c) is the in excess of statutory authority.

**MR. AUERBACH:** And I think that's the best, best descriptive, you could also say contrary to law, but I think best descriptive of this claim is that EPA is acting in excess of its statutory authority in saying those who do Environmental Justice can't get Environmental Justice grants.

**THE COURT:** Those that do Environmental Justice work can't get Environmental Justice grants. Ordinarily if what we're talking about in an APA case is that there was a lack of reasoned decision-making, failure to explain, et cetera, that's an arbitrary and capricious analysis.

**MR. AUERBACH:** And to be sure we're talking about here too, but yes.

**THE COURT:** And so can the EPA, consistent with the statute, all right, setting aside the reasoned decision-making component of the analysis. Consistent with the statute, can EPA pick different regional grantmaking organizations?

**MR. AUERBACH:** Yes. In the abstract, EPA has authority to decide who will be -- to designate regional grantmakers.

**THE COURT:** Right. And so there can be lots of problems and there may very well be with how EPA has -- what EPA has done to date. But to make sure that I understand the statutory mandate part of the analysis, are you asking me to

conclude that what EPA has done here is to abolish the program in its entirety and that because of the nature of this organization and -- sorry, the nature of the Thriving Communities Program and that it's done through these regional grantmaking organizations, that effectively EPA has taken steps to or, in fact, accomplished the end of abolishing the program that Congress mandated?

**MR. AUERBACH:** Let me say two things in response to that, Your Honor. The first is we're deeply concerned that that is what is happening. But the second thing is the Court doesn't have to go that far to rule in our favor. What we're asking the Court to do is to set aside these actions under the APA. And a stated reason for -- to the extent you call it a reason for these actions, maybe the lead stated reason is the agency priorities -- it is the Agency's priority, not priorities not to fund organizations that promote or take part in Environmental Justice. And to set aside these actions this Court need only conclude that that basis to the extent it's articulated -- and again, there are deep problems with its lack of clarity. But to the extent that's a reason, it is not a reason that's consistent with the EPA statutory authority and so these actions can be set aside.

**THE COURT:** Okay. But so I'm looking at your proposed order and you're asking me to do more than just set aside the terminations, but instead to issue an injunction

ordering that EPA restore access I guess both to the initial grants and subsequent grants which I suppose that can be interpreted a couple of different ways. But are you asking do you think -- are you asking for and what would be the basis for your entitlement to an order that prospectively all of the funding continue? Is it that declaring that the terminations violate the APA necessarily has that effect?

**MR. AUERBACH:** I want to unpack the question and make sure --

**THE COURT:** There was a lot in there, I apologize.

**MR. AUERBACH:** I think a declaration that these actions are unlawful has significant impact for the future. That is a ruling that would meaningfully impact what EPA can do going forward in terminating these grants. But yeah, we're requesting that the Court restore access to these grants as a consequence of setting aside the actions that EPA has taken. And that's the relief we're seeking.

**THE COURT:** So a ruling that -- I'm trying to make sure I've understood logically each step in the analysis between the argument that the statute mandates -- has violated a statutory mandate and the conclusion that these terminations were unlawful under the APA. So if -- and I suppose part of your point is we don't need to get there, that the APA, this statute, the Constitution all impose obligations that the Government must follow, including when they have policy

disagreements with particular programs and that those haven't been followed. And I guess I understand your argument as saying that's as far as the analysis needs to go at this time, at least.

**MR. AUERBACH:** I think that's right, Your Honor. It's important that grant access be restored. That is essential to avoid the irreparable harm that we're seeking and we've requested that in the proposed order and we think that setting aside these actions, declaring them to have been unlawful is protection against access being taken away again.

**THE COURT:** So part of your -- I think I recall in your briefs part of the statutory mandate component of your argument was that *In re Aiken County case*, the DC Circuit case opinion that now Justice Kavanaugh issued about essentially a new administration cannot -- I don't want to misstate the case, but essentially for the proposition that there can't be a -- that mere policy disagreement is not a basis for the president to fail to comply with the statute.

The regulation that includes the language about an award no longer effectuating program goals or Agency priorities I think was not put in place until 2020. That regulation even though OMB has said that an Agency can terminate an award that no longer effectuates program goals or Agency priorities, do I understand your reliance on *In re Aiken County* to be that here Congress has directed the president to have this program, it

must exist? And a mere disagreement or not mere, just a disagreement about Agency priorities is not a basis to fail to comply with the statutory mandate?

**MR. AUERBACH:** Correct. An Agency priority can't contradict a statute. And I think the response that certainly the Government says well, we've changed our priorities. And our response to that argument, and it has essentially three parts to it and it's the response to a lot of the Government's arguments here which is of course the Government can change its priorities. But that very general truism doesn't address this case. And a big reason why not is the reason Your Honor identified. We have statutes. And yes, an Agency can change its priorities, but it can't overrule a statute by changing its priorities.

"Priority" is not a magic word that allows an Agency to make decisions that are arbitrary, to make decisions that are contrary to a statute or that are unconstitutional.

**THE COURT:** So how about the statutory provision that authorizes the EPA to determine what constitute disadvantaged communities? Now I was just looking at the termination letter to confirm my recollection that that does not seem to have been the basis for the termination. But how does the fact that the EPA has authority under the statute to determine or redetermine who constitutes a disadvantaged community, how does that play into your statutory mandate

argument?

**MR. AUERBACH:** I think it's kind of the same response, Your Honor. Yes, it's true. But so what? It's not -- nobody is claiming that's even happened here. It's certainly not a basis that EPA has served it in its memoranda for taking this action.

And by the way, I don't know if we have to engage in this imaginative exercise, but Mr. DeMella started to talk about this. It's hard to imagine how you can redefine disadvantaged communities and somehow exclude the hundreds of communities that are going to benefit from the work that the plaintiff organizations are doing. I mean, in the abstract, sure you can redefine disadvantaged communities, but that doesn't seem to have anything to do with what's happened in this case.

**THE COURT:** And does the fact that this program is structured with the grantmaking organizations, the regional organizations, then as the intermediary I guess, the body in between EPA and the subgrantees affect this analysis? In other words, could EPA give direction to the regional, to the plaintiffs about a difference in where those subgrants should go and priorities and criteria?

**MR. AUERBACH:** I would think it could. I mean, there are cooperative agreements in place to whatever certain understandings are in place, but --

**THE COURT:** I guess part of what I'm trying to

understand is superimposing that two-level structure on this -- on the component of the statutory authority that is discretionary. In other words, maybe terminating the funds that allow the plaintiffs to be grantmaking organizations constitutes termination in violation of the statutory mandate, but I'm wondering whether a different analysis goes to the subgrants and whether some suspension is consistent with the discretionary component of the statute.

**MR. AUERBACH:** I don't know that I'm entirely following the question, but let me try and answer it and then I'm happy to be redirected. I'm thinking now of our *Woonasquatucket* decision which talked about the decisions at issue there which overlap with the ones at issue here as being arbitrary and capricious. And one of the things that the judge said in *Woonasquatucket* was there were reliance interests.

And so the first thought I have is if we're going to go down the road of reimagining some disadvantaged communities and how that might flow down to subgrantees is that I suspect if there were major disruption to the work that's been done already, that we or our subgrantees or both would have a pretty good argument that the decision was arbitrary and capricious to the extent that it didn't take on board the disruption that that would cause.

A lot has gone into bringing this all together over the

last 18 months. But having said that, in theory could there be a redefinition of the term "disadvantaged communities"? The statute says so; we certainly don't disagree with that.

**THE COURT:** Okay. So I took us straight to the statutory authority component of your argument. Was there anything else on that that you wanted to convey?

**MR. AUERBACH:** I don't think so, Your Honor. I think I've conveyed it. I'm certainly happy to answer any other questions about it.

Maybe I do have one more thing to say. This goes -- getting to the point about reliance that I was making. And at the staff level, even since the termination and suspension actions that are at issue here, EPA has continued to say you're doing a good job as regional grantmaker. And so yeah, a change in the program at this point, in the abstract theoretically possible; but would be enormously disruptive and might very well be arbitrary and capricious.

**THE COURT:** Okay.

**MR. AUERBACH:** I'll say a little bit, Your Honor, about our Constitution. EPA has announced here again as an Agency priority, a decision to discriminate against programs and organizations on the basis of what viewpoints they promote or take part in.

**THE COURT:** Well, the Government can, using the language of *Rust*, selectively fund a program to encourage

certain activities including based on selection of viewpoints, correct?

**MR. AUERBACH:** That's correct, Your Honor. And this is quite like -- our response on this point is quite like the response on redefining disadvantaged communities. The Government has not said, here is the expressive activity in which you are engaged that we no longer want to subsidize. Instead what the Government has said is we no longer are going to fund organizations that promote or take part in DEI or Environmental Justice. And so on its face that's not about we're not subsidizing certain activities; that's about suppressing viewpoints.

**THE COURT:** But is it about suppressing speech?

**MR. AUERBACH:** Yeah. Within the meaning of the First Amendment, yes. I think in the same way that the *Agency For International Development* case is a First Amendment case, in the same way that *Legal Services v. Velazquez* is a First Amendment case. To the extent that we know what this is about, again, we have to go back to the problem of the vacuousness of these decisions, but I think it's reasonably interpretative about being about expressive activity, for sure, protected by the First Amendment.

**THE COURT:** There's also the distinction, as you know, in the Government funding context that the Government can shape in some ways otherwise protected speech within the

contours of a grant or a contract program. It cannot and it is unconstitutional for the Government to use essentially the coercive lever of funding to control, suppress protected speech outside the contours of a program.

Is there any basis in the record here that this termination has the effect or intent of suppressing protected speech on content or viewpoint grounds outside the program, the funded program?

**MR. AUERBACH:** We would respectfully submit, Your Honor, that the termination memoranda say that. They say --

**THE COURT:** Which part?

**MR. AUERBACH:** They say "Our priority includes ensuring that the Agency's grants do not support programs or organizations--" again, we're not talking about activities. "Organizations that promote or take part in DEI or Environmental Justice.

So I think on the face of these memoranda, what the Government has said it is doing is deciding on the basis of activity -- of the activities that the organization does, whether it's eligible for grant funding.

The second thing I would say on that point, Your Honor, is that the Supreme Court has warned us in the *Agency for International Development* case from 2013, as well as in the *Velazquez* case from 2001, that this type of argument can't carry the day. As Chief Justice Roberts recognized in his

opinion from the Court in the AID case, and I'm going to quote: "The definition of a particular program can always be manipulated to subsume the challenged condition." And that can't be permitted," the Court explained, "because to permit it would allow" -- and again I'm go to quote, "The First Amendment to be reduced to a semantic exercise."

And at best that's where we are here. At best there's an assertion by EPA that we've redefined our program to exclude programs or organizations that promote or take part in DEI or Environmental Justice. Again, to say it only sends me back to our arbitrary and capricious and lack of reasoning problem. But at best that's what's happening here, the kind of semantic game that the Court warned us about in *Agency For International Development*.

I'm prepared to move on to irreparable harm, Your Honor, unless --

**THE COURT:** My only other question on the constitutional claim is you bring a Fifth Amendment claim.

**MR. AUERBACH:** Yes.

**THE COURT:** How is that different than -- it seems to be a recasting of the APA claim. Is there something different about the due process claim that you want to make sure I don't miss?

**MR. AUERBACH:** Well, we're not asserting it as a basis -- as a basis for the preliminary injunction. To be

clear, we focused on the First Amendment here. It goes to the vagueness of the action that's been taken, the vagueness of the source of the action and the explanation of the action.

**THE COURT:** Okay, so but --

**MR. AUERBACH:** We're relying on the First Amendment here.

**THE COURT:** So the Fifth Amendment is vagueness. I'm just looking at your paragraph 103 of your Complaint referred to a violation of due process rights. I just wanted to understand -- my question was going to be is this a procedural due process, *Matthews v. Eldridge* analysis? Is it vagueness or is it something else? But you're saying that's put on the shelf for now with respect to the request for a preliminary injunction.

**MR. AUERBACH:** Correct.

**THE COURT:** Okay.

Yes, go ahead.

**MS. ABRAHAMS:** Excuse me, Your Honor. Can we have a moment to confer before we move to the irreparable harm issue?

**THE COURT:** Sure.

**(Discussion was held off the record.)**

**MS. ABRAHAMS:** Good afternoon, Your Honor.

**THE COURT:** Good afternoon.

**MS. ABRAHAMS:** I just wanted to make a quick point. This goes I think back to the issue of the arbitrary and

capricious nature of all of this. You asked a question earlier as to whether or not the EPA, consistent with the statute, could pick another grantmaking organization. And Mr. Auerbach answered yes, and that is absolutely correct. But in order to do that, the Agency -- and to actually implement a proper termination of these grants, the Agency would have to follow the uniform guidance. It has not done that here.

You focused on the issue of a change in priority. And as Mr. DeMella indicated, the statute itself makes clear what the priority is. You know, and if you look to I believe it's paragraph 21 of our Complaint, we also talk further about what that priority is. It's a statutory priority. And to sort of I guess oversimplify it, it's a statutory priority for clean water, clean air.

And as Mr. DeMella also indicated, at least as of last night on the EPA's website as one of its pillars, the EPA has articulated the importance of clean air and clean water. So those priorities seem to remain in place.

What the Agency is essentially doing here or trying to do here which is why we believe that the action is arbitrary and capricious is it's essentially taking sort of I guess a position on the enforcement of existing law. Namely that the grantmakers comply with existing antidiscrimination law and also that they do not engage in fraud, waste, and abuse in the performance of these grants.

Asserting that is not a change in priority. And so it's really important here to focus on what exactly the priority is and what the change in priority would need to be in order for the proper termination to occur, you know, under the Agency priority prong. The Agency would have to demonstrate that it has decided that clean water, clean air, all of the things that this grant and that this statutory mandate were meant to impose are no longer priorities. There's been no evidence of that.

The other piece of it is I think it's really important to -- and in the similar vein this whole notion of can the Agency redefine thriving communities. Theoretically it could, but again, it must do that in accordance with the statute. And the statute makes clear -- and I would refer the Court to our paragraph 21 in our Complaint where the statute identifies specific activities: Community-led air and other pollution monitoring prevention and remediation. Investment in low and zero emissions and resilient technologies and related infrastructure, et cetera.

Perhaps -- currently the way the grants are written, discretion is accorded to the regional grantmakers to solicit applications from potential thriving communities to make determinations based on the statute what communities are appropriately deserving of these grants and to award grants on that basis. And that's all spelled out in the grant. So

theoretically I suppose the Agency could take issue with a particular subgrant or subrecipient and claim that it's not a thriving community. But A, that's now how the grants are currently structured; and B, again I think that there's limited wiggle room. It's identification of a specific community as opposed to the purpose and the priority of the grant.

And so I would also add that, you know, in terms of whether or not we can be terminated, yes. If we violate the law. If we violate the terms of the grant agreement. If we engage in illegal activity, there's a way to terminate a particular grant. But that's not terminating the program. It's terminating the grant and making an award to essentially an additional regional or another regional grantmaker.

You also asked the question about the language in the uniform guidance. It is from 2020. President Trump at the time during his first term he added that language. President Biden left the language in, but what he did say was that there had to be a specific analysis of that change in priority. There really is none here. There's been no offer or proffer of any sort of analysis as to why -- as to what the change in priority is, how the continuation of these grants is at odds with that change in priority.

And, you know, again as Mr. Auerbach has said, in order to effectuate a change in that priority given that this is a

statutory program, the Agency would have to go back to Congress one way, form, or another. And so essentially what it can't effectuate or accomplish legislatively it's trying to do here contractually.

**THE COURT:** Okay, thank you.

**MR. AUERBACH:** Thank you, Ms. Abrahams. Thank you, Your Honor.

Irreparable harm: GHHI, the Minneapolis Foundation, Philanthropy Northwest have each made the deepest possible organizational commitment to implement this program. They spent the last year-and-a-half building the structure of the program in each of their regions. And that has meant hiring a lot of new staff. That has meant acquiring new systems. That has meant developing many new partnerships with other organizations. That has meant creating advisory boards that didn't exist before. That has meant reaching out very broadly to organizations, agencies across their regions to publicize this program, to invite those organizations to develop projects, and to support them when applying for subgrants. And that has meant also standing up various processes to solicit, and accept, and evaluate applications for subgrants and then to provide oversight and support and technical assistance to subgrantees.

Over the past two months since the actions at issue here, plaintiff organizations have done everything they can to hold

all of that together. They've taken some extraordinary measures to keep those systems in place and to keep as many of those people as possible engaged. To take one very important example, they've been using non-grant funds to keep grant-funded staff members employed.

Already some of that infrastructure has begun to erode, notwithstanding the efforts I've just described. Our clients have had to tell advisory committee members and technical assistance partners that they don't have the money to pay them. And the time period in which the extraordinary measures can be sustained is running out, more or less, as we speak.

My client, GHHI as I mentioned at the outset, has already sent notices to several employees telling them that their employment will end this week if grant funds are not restored.

And so in short order, Your Honor, the infrastructure that these organizations have built will be gone and the communities of people being assembled will have dispersed, moved on to other things. Employees will be gone; partner organizations will move on to other work; many subgrantee organizations will decide not to proceed with their projects and to commit their efforts elsewhere.

And so I think the important point is we're not talking about a light switch that can be turned on again in a few months. A few months from now the switch may be turned on; but the picture around it will be gone.

And the Courts have often recognized that this type of programatic injury is irreparable injury. The *League of Women Voters* case from the DC Circuit is a good example. Without a preliminary injunction and restoration of grant fundings, the programs that the plaintiff organizations have created will begin to disappear.

There are a couple of other types of irreparable harm that are also very much worth emphasizing. One is constitutional injury, which the Fourth Circuit has said is, per se, irreparable. These organizations are faced with the dilemma that the Constitution is supposed to protect them from. Are they engaged in activities that might somehow offend the Government? Are they describing their missions in a way that might offend the Government? They shouldn't have to ask themselves those question. They shouldn't have to choose between fulfilling their missions and avoiding offense to the Government.

Another irreparable injury here is reputational injury. For the past 18 months the plaintiff organizations have gone out into the world and made a lot of commitments in hundreds of communities across their regions about the availability of funds for good works. A preliminary injunction here allows them to avoid deeply disappointing all of those partner organizations in all of these communities.

EPA in its argument will likely talk about a per curium

decision in *Department of Education v. California*. If I might say a word or two about that. The key point here, and this one is far from original because it's one that Courts around the country in the last few weeks have been recognizing including the *Woonasquatucket* Court is that these nonprofit organizations, the plaintiffs here, are very differently situated than the states in the *California* case. The Supreme Court was quite explicit in its per curiam in saying that the states have represented that case that they be able to continue with the programs at issue with or without a preliminary injunction. And the opposite is certainly true here.

Unlike the states in the California case, these are organizations that built themselves up in a meaningful way over the last 18 months to be able to serve as regional grantmakers under the Thriving Communities Program and they did that, of course, in reliance on EPA having awarded them grant funding and everything the EPA has communicated since then.

And again, unlike the states in the California case, these are organizations that cannot continue to run these programs without the grant funding that EPA awarded them.

On the third and fourth preliminary injunction factors which as Your Honor knows are merged here because the defendant is the Government, I'd like to emphasize three

points: First, what we're seeking is a true restoration of the status quo injunction. What we're asking is that the Court restore the status quo that existed as of early this year. And there's no significant harm to the Government in returning to that state of affairs, a state of affairs in which money will be spent on the very types of programs that Ms. Abrahams has described for which Congress appropriated funds in the Inflation Reduction Act.

Second point --

**THE COURT:** Why is -- status quo can mean a couple of different things. I understand your version of status quo is not just that the regional grantmaking organizations remain receiving a sufficient funding to keep operating. But I understand you're saying the status quo also means sufficient subsequent grants to continue not only selecting, but sending money out the door to subgrantees. Why is that status quo?

**MR. AUERBACH:** That's the status quo because that is the set of rules and understandings that were in place that governed everyone's conduct in January of 2025. That's what we're asking for.

**THE COURT:** Okay.

**MR. AUERBACH:** The harm from denying preliminary relief here, second point to emphasize, would extend well beyond these organizations and I think for reasons the Court can understand having heard about this and read about this

program. There are, to begin with, dozens of people in these organizations who will lose their jobs. There are literally hundreds of organizations in hundreds of communities that will have to abandon projects that they've been planning. And this will mean, among other things, in communities across these three regions, more exposure to lead paint and asbestos and toxic chemicals. More vulnerability to wild fires and extreme weather events, and air and drinking water that's less clean and less safe. That's what this program is about.

Third point, Your Honor, and this is one that's seen in many cases. There's no public interest whatsoever in permitting the public Agency to persist in defying the statutes that govern its work or in engaging in viewpoint discrimination in violation of the First Amendment.

And so sort of I think it's really summing up this part of the argument, Your Honor, the four factors here all point very much in one direction. And that is the granting of the preliminary injunction and the restoration of grant funding to these organizations.

**THE COURT:** All right, thank you.

Why don't we take a short break. We've been going about an hour-and-a-half, about a ten-minute break and we'll come back and reconvene, Ms. Farber, for your argument.

**(Recess was taken from 2:31 p.m. to 2:46 p.m.)**

**THE COURT:** Ms. Farber.

**MS. FARBER:** Good afternoon, Your Honor. With the Court's indulgence, would it be okay if I gave my argument from the --

**THE COURT:** Absolutely.

**MS. FARBER:** Thank you.

Your Honor, I'd like to start with the Tucker Act and I appreciate where the Court stands on this and I also appreciate the Court's indication that it would be willing to hear the Government's rebuttal argument on this.

My favorite kind of sledding is uphill sledding, so I am ready for the Court's questions on the Tucker Act here.

Where I want to start is with where Ms. Abrahams ended. Ms. Abrahams' remarks to this Court were that this case is about EPA trying to do what it can't accomplish legislatively, it's trying to do contractually. And that really gets at the core of what the true nature of this case actually is which is a contract case. This case turns on the terms and conditions of the specific contractual relationship between--

**THE COURT:** When you say "turns on," they're not saying EPA is violating the contract; they're saying EPA is violating the statutory mandate. EPA violated the APA in the way it went about these terminations.

**MS. FARBER:** I'd push back on that. They are casting it as an APA claim, but they've admitted that the statute in question allows EPA to define disadvantaged

communities how it wants, that the statute in question doesn't provide any extra limitations on EPA's ability to terminate. As Ms. Abrahams said, proper termination of these grants requires following the uniform guidance as incorporated by the grant terms and conditions.

So they're trying to make it an APA claim; I agree with you there, but when you actually look at what is giving them a source of relief, what does the Court have to interpret in order to understand whether a violative action was taken, we're actually looking at the terms and conditions of a contract. So that's where I really want to focus my Tucker argument. And I do have merits arguments, Your Honor, but we really do feel as though *Bowen* does not control. *Bowen* is distinguishable. And relying on *Bowen* in exercising jurisdiction in this case would be error.

**THE COURT:** How is *Bowen* distinguishable?

**MS. FARBER:** A couple ways, Your Honor. First, *Bowen* was about a Medicare statute and funding under Medicare. That statute specifically entitled the plaintiff states to the money that they were asking for. It was specific in the statute that these states get this money.

Here, plaintiffs concede that this statute does not require them to get money.

**THE COURT:** But that's a merits question. It's not a question of what source the source of the right is, right?

I mean, we're talking now and I think we're going to talk more about does § 7438 require the EPA to maintain this program.

**MS. FARBER:** Well, yes. And I can get to that in the merits. And to Your Honor's point about the source of the relief, the nature of the relationship, *Bowen* is distinguishable there as well.

As the Court might recall, in *Bowen* there was not actually any kind of specific contractual terms governing the relationship between the parties. We see that in the *Suburban* case that plaintiff cites in their reply. In *Suburban*, there are several ways that that Court distinguishes *Bowen;* namely that this is a dispute between sovereigns. It's a dispute between the Federal Government and a State Government. So *Bowen* is in a different category there.

And then most importantly for our case, there isn't a specific contract governing the relationship between the Federal Government and the State Government when it comes to Medicare. And that's from *Suburban* distinguishing *Bowen*.

So here, plaintiffs have conceded that there are terms and conditions that govern their relationship with the Federal Government, that govern these grant funds. So reliance on *Bowen* here for jurisdictional purposes is misplaced.

So that's the two biggest --

**THE COURT:** *Bowen* also said that the fact that a given dispute would require reference to consideration of

decision of entitlement, rights under a contract, that's not the question. It's relevant, but the question is what the source of the rights that are invoked by the plaintiffs are, and then this question of relief.

**MS. FARBER:** Yes. That's absolutely correct, Your Honor. And it goes both ways, right? Because on the one hand the fact that a contract exists doesn't mandate that it must be a contract action now. And on the other hand, the fact that there may be other claims like constitutional claims doesn't mean it's not a contract action. We have cases going both ways.

So I'd like to cut to sort of the heart of what Your Honor is getting at which is these two points: The MegaPulse analysis, what is the source of your right; and then what is the nature of the relief. And here the source of our right is the grant terms and conditions and the nature of the relief plaintiffs seek is money. I understand there is a prospective piece where they want the grants reinstated and there's a future relationship, but the core of what they seek is money.

**THE COURT:** But they're not seeking reimbursement.

**MS. FARBER:** That's incorrect actually, Your Honor. So plaintiffs in their filings have cited and listed down to the penny how much money EPA owes them that they have accumulated since the grant terminations. When the grants are turned on, they will be able to get -- file claims for all of

that money that they have accumulated, that they are keeping track of, that they put in the record here so that money -- I'm skipping ahead a little bit here, Your Honor, but this is a really important point. That money is located at ECF 26-1 at page 2. Philanthropy Northwest indicated that it's accumulated $429,068.43 in costs as of last week. Minneapolis has accumulated $310,000; that's ECF 26-2 at 3. And then Green and Healthy Homes is paying salaries that would be reimbursable under the grant, but they did not provide a cost. That's 26-3 at 3.

So here they are seeking monetary damages. They wisely did not explicitly say it, but the precedent that we see in dealing with Tucker Act cases is very clear that they don't have to explicitly say it. That's for the Court to look at what they're actually trying to do.

Now a case that's interesting and instructive here, Your Honor, is Coleman. That's a Fourth Circuit case that dealt with military benefits, I believe. There there were injunctive pieces and monetary pieces. And the Court was about to dismiss for lack of jurisdiction under the Tucker Act. And what the plaintiff there did was quite interesting. The plaintiff there said, I will disclaim any right to any monetary relief. I'm just seeking injunctive relief here. And even though maybe you could construe my claim as it's going to end up giving me monetary relief, I'm going to waive

my right to that because I'm focusing on injunctive relief.

Plaintiffs have given no indication that that's what they're doing and, in fact, have said the opposite, that we have all of these expenses, turn the grants back on which would allow them to get paid for those past expenses that have accumulated over the last month or so. Plaintiffs are here. We can ask them if they're willing to forgo --

**THE COURT:** Isn't that a product of the Government doing this the way it did? In other words, just turning flow of money off? In other words, if the Government had stated we're taking a different policy priority and giving notice of an intent to terminate in the future, then wouldn't that still present the Court a merits issue here which is does EPA have authority to do that?

**MS. FARBER:** I don't think the cases on Tucker Act distinguish in that fine of a way. I think the cases look at what kind of relief are you claiming.

Now if I may, I'd like to go through those two elements that Your Honor mentioned because I want to make sure that I cover those. And I'm not going to belabor these points but I do want to make sure we give this a fair hearing because the facts and law here are distinguishable from what we've -- where -- from what plaintiff discussed in their argument.

So first, the source of rights here is a contract. We all agree that grant terms and conditions govern the

relationship between these parties. And the grant, the Government argues, was a contract for Tucker Act purposes.

Now I think everyone agrees that grants can be contracts in the abstract, that there are cases that hold that grants can be contracts. And from what I understand of plaintiffs' argument, they only dispute one of the four sort of ways that we figure out whether something is a contract or not. So when plaintiffs' counsel was talking about consideration and Your Honor asked where does this fit into sort of the two-step analysis, I put that at step zero. So that's sort of do we have any kind of contract at all is what we're talking about, a contract at all.

**THE COURT:** So what is the authority that these are all contracts for Tucker Act purposes?

**MS. FARBER:** Yes. So the only one of the four elements of a contract that plaintiffs appear to dispute is consideration. So they agree that there's offer, acceptance, mutuality. The fourth one is slipping my mind, Your Honor. But where they dispute is that there's not adequate consideration sufficient to make a contract.

And so there I would point the Court to *Anchorage*, the *Anchorage* case, 119 Fed. Cl. at 709. So there the Court noted that it was -- what it was dealing with was a contract even though the term given to the agreement was not contract, but what they were actually looking at was a contract because

there was a reciprocal nature that went beyond a mere incidental benefit.

Now plaintiffs argue that the only benefit that EPA received in this contractual relationship was incidental, it was just a general advancement of Agency priorities and that is where we push back.

So *Anchorage* says that consideration can be something as basic as just "increased infrastructure" and that's a direct quote from the case. Increased infrastructure can be consideration sufficient to form a contract.

Here, the specific grants, the terms and conditions of these grants in this case with these plaintiffs contemplated increased infrastructure. That's at ECF 2-3 at page 4 and 11. The Complaint at paragraph 45 talks about how the grants would monitor or address environmental hazards.

Moreover, the grants provided for benefits to EPA in terms of real property purchases and tangible property purchases. So real property purchases are contemplated at ECF 2-3 at 13. There are dispositions regarding whether if plaintiffs acquire land using the grant funds then there are conditions where the Government gets that land, they get to buy it or they get an interest in it. The fact that these grants might include land purchases is contemplated at ECF 2-3 at 13. And then the disposition regulations that would give the Government a benefit from those land purchases are

incorporated at ECF 2-16 at page 16.

And then in addition, real property, the Government can get benefits from purchase of real property. So that is incorporated in the terms and conditions at ECF 2-13 at page 30. That references 2 CFR 200.313 which allows sale back to the Government or would give Government proceeds of a sale of tangible property. So that's contemplated in the agreement what these grantees would give to the Government.

Additionally, the grant contemplates that if through the execution of these grants, anybody comes up with any kind of invention, or a patent, or a process, that EPA gets the rights to those inventions. Any inventions or patents developed during this grant, EPA gets the rights to those. That's ECF 2-13 at 26 to 27.

So there we are seeing tangible real benefits that EPA is getting from these agreements that show that we have consideration here.

There are other factors I point to that I think are also instructive. There are performance measurements, unexpected outputs at ECF 2-3 at page 21 to 23. EPA can use grantee reports as models for future projects. That's ECF 2-3 at 50. Grantees have to share data with EPA that EPA can then use to track best practices and improve future projects' sustainability. That's ECF 2-5 at 8 to 9.

So ultimately when we're talking about step zero in this

analysis, we have consideration. We have a contract. So these -- the grant here, plaintiffs don't dispute three of the four contract requirements. And for that fourth one, consideration, when you look at the facts, when you look at what plaintiffs themselves submitted in the hundreds of pages of grant terms and conditions that they attached to their motion, those documents show that we have consideration. Here we have a contract.

So now we get to step one of the Tucker Act analysis which is does the contract provide the source of right here. And as Your Honor has noted, they've also mentioned well, we have the Clean Air Act, we have the Constitution and they have said those things, that is true. But what we see from the case law is that where you can decide a case just sort of entirely looking at the contract itself, then you have a contract case and everything else is sort of peripheral. That's from *Ingersoll Rand*.

I think the Court might have noticed this in the discussion of the merits when we were talking about well, what does the Clean Air Act actually say? What's allowed, where is EPA actually constrained? Where it's actually constrained is in the terms and conditions of the grant that govern how it is allowed to terminate these grants and when and why and under what circumstances.

**THE COURT:** The statute also imposes constraints,

yes?

**MS. FARBER:** The statute requires that funding be given to -- the title of the statute is Environmental and Climate Justice Block Grants. So the statute does require the funding go out. But the statute says nothing about who gets that funding, which plaintiffs agree. The statute does not entitle them to funding. That gets us --

**THE COURT:** Well, so in *MegaPulse* this source of rights, let's be precise. What the Court of Appeals in *MegaPulse* said is that the classification of a particular action is one which is not -- which is or is not --in essence, a contract action depends both on the source of the rights upon which the plaintiff bases its claims and upon the type of relief sought or appropriate.

**MS. FARBER:** Yes.

**THE COURT:** The plaintiffs here base their claims on the APA, regulations, the Constitution. The Government may dispute that they're entitled to relief, but the question of whether they're entitled to relief or not, in other words, what the basis of their claims is is outside that contract.

**MS. FARBER:** So that's where I'd disagree and respectfully push back, Your Honor. So what -- the plaintiffs have certainly framed their Complaint as an APA action. When we actually look at the statute, 42 U.S.C. 7438, everyone in this courtroom agrees, I believe, that this statute does not

give plaintiffs any money. Plaintiffs agreed when the Court questioned them that EPA could terminate their grants and give that money to another organization. This statute does not give them any source of relief at all and that's distinguishable from *Bowen* where the statute did.

**THE COURT:** Well, they brought an APA claim in Count Two saying that this termination, these terminations of these contracts -- of these grants are unlawful because the EPA has acted in excess of statutory authority. To decide whether there is a likelihood of success on the merits of Count Two, for example, requires me to decide does the mandatory language in 74-38 render these terminations improper.

**MS. FARBER:** I believe plaintiffs have already conceded that issue when they said that this -- that the language doesn't give them money. What gives them money is the grant terms and conditions and then what governs whether a termination was lawful or not is the grant terms and conditions that provides restrictions on when and how EPA can terminate the grants.

**THE COURT:** Okay, well so I've been focusing on 74 -38. But what about the APA itself? The APA requires that the Government not act arbitrary and capriciously, that it engage in reasoned decision-making, et cetera. The APA confers on entities like plaintiffs, the right to have the Government comply with those obligations. That's where the

right comes from.

**MS. FARBER:** So I think Ms. Abrahams said it better than I can which is that proper termination of these grants requires following the uniform guidance. Determining --

**THE COURT:** That's one source of rights, but I'm asking you about the APA.

**MS. FARBER:** Okay. So the APA, whether the Agency acted arbitrary and capriciously sort of necessarily requires looking at what were they allowed to do, right? What were they allowed to do? And how do we know what they're allowed to do by looking at the terms and conditions of the grants? And the terms and conditions of these grants allow EPA to terminate just because Agency priorities have changed.

Now I mentioned in my brief there seemed like some conflation about whether three conditions needed to be met or just one. The plain text of the terms and conditions of the grant is clear. They only need to show -- and this is just for the initial grants; the subsequent grants have a different -- have different language. But for the initial grants specifically, termination can be just because Agency priorities change.

Another important difference that we have here -- and I apologize, but I'm going back to 7438 for just a moment, but I think this is just an important thing to highlight is in a lot of the cases that we've seen in the last week or so following

the Supreme Court's California decision, we're looking at -- the Courts are looking at statutes that sort of specifically cabin or define terms for the Agency.

Here with EPA we have a statute that specifically defers to the administrator on however they want to define --

**THE COURT:** Well --

**MS. FARBER:** The groups getting the money.

**THE COURT:** --which disadvantaged communities are entitled to environmental and climate change block grants.

**MS. FARBER:** Right, exactly. So the question of is EPA trying to terminate this whole program, respectfully I would submit that's beyond the purview of these litigants in this case.

**THE COURT:** Well, so let's talk about the termination letter then. I mean, there's -- there are various words -- I'm looking at ECF 2-8. I guess it's -- or 2-9, attachment G.

**MS. FARBER:** Yes, at 2. I got it.

**THE COURT:** So one of the bases for terminating these grants is the EPA announcing that it will no longer engage in Environmental Justice initiatives.

**MS. FARBER:** And the words immediately following that, Your Honor, which plaintiffs skipped, "that conflict with the Agency's policy of prioritizing merit, fairness, and excellence in performing our statutory functions." It is not

Environmental Justice initiatives, period. We're not doing Environmental Justice initiatives, period. They say we're not doing Environmental Justice initiatives that conflict with the Agency's policy of prioritizing merit, fairness, and excellence in performing our statutory functions. And that is consistent with the terms and conditions of the grant that hold plaintiffs to the requirements of Title IX, of Title VII. Plaintiffs had to affirm and agree that they were not going to discriminate.

**THE COURT:** What possible factual evidentiary non-arbitrary and capricious basis would there be to say that these thriving community programs do not -- are not meritorious, fair or -- in other words, that this phrase, "merit fairness and excellence" is a basis to terminate this program?

**MS. FARBER:** So Your Honor, I'd point you to one example that might be illustrative and that's at ECF 2-3 at page 4. This goes into sort of the way some of these grants were conceived under the previous administration which specifically establishes that a certain percentage of the grants must flow to disadvantaged communities.

**THE COURT:** But this was not a new guidance to the plaintiffs to say let's tweak the criteria.

**MS. FARBER:** Well, I think that's where there's an interesting footnote right there, Your Honor, on that same

page, ECF 2-3 at page 4. Footnote 3 says EPA -- I'm sorry, footnote 22? Footnote 2 says EPA is currently in the process of defining the term "disadvantaged communities" which is consistent with the statute that EPA is allowed to define it. They're allowed to redefine it.

So here we have at least some indication in the record that there are some Environmental Justice programs that might, as the termination letter says, conflict with the Agency's priority of prioritizing merit, fairness, and excellence.

So I just would push back very hard on this conception that plaintiff is trying to create that the termination letter says we're ending Environmental Justice. It's not even a new sentence; it's the same sentence that just continues where EPA says, "that conflict with Agency priorities."

And the specific terms and conditions of these grants incorporate and require the plaintiffs to abide by federal antidiscrimination laws and policies.

**THE COURT:** So that's -- this is what we're talking about?

**MS. FARBER:** Well, Your Honor, respectfully, I'm pointing to one example. You asked where, is there any possible explanation for how some Environmental Justice initiatives might be okay and some not. How is this not terminating everything.

And ultimately, I think the bigger point is that the

question of whether -- this lawsuit doesn't reach the next grantees that are going to get this money. So what we're dealing with here is not this money vanishes, it's going nowhere, EPA is violating the requirement that it give this money to people it defines. This lawsuit does not get that far. This lawsuit gets to do these specific plaintiffs have a contractual entitlement to this money or something else.

I want to point to a couple other places respectfully, Your Honor, where the plaintiffs' complaint specifically incorporates the grant terms and conditions in a way that shows that the source of relief here is the contract. Just generally they attach the hundreds of pages of grant terms and conditions that govern their contractual relationship with the Government to their motion at ECF 2.

Paragraph 26 of the Complaint references the termination provision of the grant and the general terms and conditions that apply. Paragraphs 27 and 28 in trying to explain why EPA violated law references the conditions by which EPA can terminate the grants which come solely from the general grant terms and conditions.

Paragraph 30 of the Complaint alleges in reliance on their status as regional grantmakers and the terms of the initial grants, plaintiffs undertook substantial work. And then at paragraph 51 they say terminations were accompanied by an assistance amendment to the prior cooperative agreement

governing the organization's thriving communities' initial grant award.

Paragraphs 118 to 119, plaintiffs admit the regulations permit an Agency to terminate a grant award pursuant to the terms and conditions of the federal award which includes Agency priorities.

Paragraph 120, plaintiffs allege the procedure wasn't followed here because the applicable general terms and conditions require EPA to obtain evidence -- which is not true as I've mentioned in my brief -- or make a determination prior to terminating the grants on the basis of program goals or Agency priorities.

**THE COURT:** All subject to the Constitution and the Administrative Procedures Act.

**MS. FARBER:** All subject to the terms and conditions of the grants.

**THE COURT:** And the APA and the Constitution. Are you saying that -- are you saying that a Government contract or grant can be terminated in violation -- that the, for example, the First Amendment has no role in limiting the Government's ability to terminate a grant?

**MS. FARBER:** No, I'm not, Your Honor.

**THE COURT:** Okay, so that is a source of a right for whether there's been a violation of federal law.

**MS. FARBER:** I would disagree that that is decisive

of the Tucker Act issue. As Courts have said, where there's a peripheral claim, then that does not -- that does not make a contract action not a contract action.

And if I may transition to the second point and then we can move on to the merits, Your Honor. That brings up the second point of what kind of relief are they requesting, right? How do we figure this out. So what they are requesting here there can be no mistake that they are seeking monetary relief in this case. They want --

**THE COURT:** Hold on. Let's be precise. Monetary relief is not the question. Money damages is the question.

**MS. FARBER:** They are seeking money damages here.

**THE COURT:** And prospective injunctive relief, correct?

**MS. FARBER:** Yes. Yes. That as well, Your Honor. But the core of the Complaint, the core of the action is that money that they want and that they need. And the way that you can test whether that's really the core of the Complaint is ask them if they'll forgo it.

**THE COURT:** What -- do you have any case you can cite for the proposition that a request to reinstate a program and maintain it in effect prospectively constitutes an award of money damages?

**MS. FARBER:** Yes, Your Honor. So California, Judge Griggsby's case relying on California, of note --

**THE COURT:** When you say "California," the one sentence in the emergency stay order?

**MS. FARBER:** I'd call it a paragraph, but yes. California mentions that, Your Honor. Judge Griggsby who spent an extensive amount of time as a judge on the Court of Federal Claims held the same.

The Fourth Circuit in granting a stay in AACTE, American Association for Colleges of Teacher Education relied on *California* in finding that the Government was likely to succeed on the merits in its challenge to grant reinstatement in a case just a couple weeks ago.

So here in Maryland not only do we have, admittedly, a very short Supreme Court opinion, but we also have the Fourth Circuit indicating we're relying on this opinion. We fall in line here. We have a judge who is already -- her opinion has been stayed on that basis, explicitly on the basis of *California* in a very similar case here. Plaintiffs cite to AACTE in their motion.

So we're in the Fourth Circuit. The Fourth Circuit controls us and the Fourth Circuit has signalled we're following *California* and *California* applies to these cases.

**THE COURT:** Would the Court of Federal Claims have jurisdiction to enter an injunction mandating that EPA keep this program in place?

**MS. FARBER:** What the Court -- I don't -- as Your

Honor noted, since I believe it was after *Bowen,* the Court of Federal Claims' powers expanded. So what the Court of Federal Claims can do is it can hear constitutional claims. That's in 28 U.S.C. 1491(a)(1).

**THE COURT:** Would the Court of Federal claims have jurisdiction to grant the injunction that plaintiffs seek in this case? Yes or no?

**MS. FARBER:** I'm unclear on whether they can do injunctive relief. I can tell you that the Court of Federal Claims can issue orders that direct restoration to officer position, correction of applicable records. And so it's really speculative -- it's just speculation to say that the Court of Federal Claims wouldn't be able to grant the kind of relief that plaintiffs are seeking beyond the money damages.

And the standard here on a Motion for Preliminary Injunction where the plaintiffs basically are asking give us the win before we've even gotten an administrative record and briefed this case, the standard for preliminary injunction is likelihood, right? Likelihood of success on the merits. It's a very high standard because they just win. They win at the outset before we even get to produce the administrative record.

**THE COURT:** No, that's not what a preliminary injunction is. It's to maintain the status quo, avoid irreparable harm while the merits get decided.

**MS. FARBER:** That's fair, Your Honor. I didn't mean to overstate there. The effect it would have in this case would be, according to what plaintiffs have told us in their own filings, would be almost a million dollars in back claims that the Government now pays out. Plaintiffs have said -- in contesting whether they should post a bond in this amount or not have said, we don't have that money; we can't post it. That sort of goes to this point of like that money is not coming back if it goes out.

**THE COURT:** It establishes irreparable harm though, right?

**MS. FARBER:** It establishes irreparable harm for both sides I would say. Well, I would back off on that. We don't concede that plaintiffs have shown irreparable harm, but it certainly does show that the Government is not getting that money back.

And so I think that the cases are clear that the fact that there may be other claims doesn't change Tucker Act jurisdiction when the core is money. When the core is contract. And we see "contract" through and through in this Complaint. We see it through and through in this motion and frankly, we've heard it through and through in their argument.

Now I am going to move on to merits; but before I do, I want to take just one moment to point out a couple distinctions in these post *California* cases that I think are

important as the Court considers whether it wants to sort of go against Judge Griggsby and go against the Fourth Circuit and kind of --

**THE COURT:** To be clear, this is not a matter of going against. It's in reading the words of *Bowen* which is binding and precedent and has not been overturned and applying the analysis that flows from it.

**MS. FARBER:** Yes, sure. And I just would fall back there or reiterate my arguments about why *Bowen* actually does not control in this case.

But just a couple points here. In the *Climate* case, there the Court was dealing with a statute that specifically defined the recipients. Here, plaintiffs concede the statute does not specifically define -- does not specifically give them relief.

The *Chicago Women's* case dealt with threatened terminations and chilled speech. There was no, as far as I could tell, no kind of allegation that any grant terms and conditions had been violated. There wasn't a contractual relationship there as plaintiffs concede there is here.

In the *Maine* case, *Maine* dealt with a specific statute not applicable here that specifically provided for APA review. So the statute at issue in *Maine* says the APA governs here. We do not have that.

In *Pacito* the Court explicitly noted that there were no

-- there was no contract. There was no arrangement or agreement between the parties in *Pacito*. They were just sort of loose people without a contractual arrangement with the Government.

And then finally in *Woonasquatucket*, the Court repeatedly in that opinion notes that no party, neither the Government nor the plaintiffs, pointed to any terms and conditions of their grant agreement at any point in the litigation of that case. And we could not be more far afield from that case here where plaintiffs have provided the Court with hundreds of pages of grant terms and conditions, have referenced those throughout their Complaint and motion and have referenced those throughout their argument.

So Your Honor, I'd respectfully submit that the cases that do not follow *California* for those facts specific and case specific reasons are distinguishable from our case in very important ways that once again, plaintiffs have conceded as far as what the statute entitles them to and what the terms and conditions of their grants say and how those factor into their arguments.

So that's -- thank you for allowing me to go through all of that.

**THE COURT:** And let me just be clear, as I said before, Courts are trying to grapple with these questions, jurisdictional and merits, and I appreciate everyone's

attention to these issues.

**MS. FARBER:** Thank you. And certainly one of the difficulties here is so many of these cases get heard on this kind of Preliminary Injunction or Temporary Restraining Order status where everybody is acting quickly. Everybody is trying to move quickly. Normally Courts would have a little bit more time to flesh these things out which I think maybe is part of why --

**THE COURT:** You're not blaming plaintiffs for that, right?

**MS. FARBER:** No. Absolutely not, Your Honor. Absolutely not. They are entitled to pursue their rights as expeditiously as they care to. But just sort of to the point of it's a difficult task for everybody to brief these on such a short time frame and that is certainly not plaintiffs' fault. Thank you for giving me the chance to clarify that.

Okay, so I'd like to move on now to the merits argument, unless the Court has additional questions on Tucker Act.

One of the things that plaintiffs' counsel noted in their argument which I think is really important in sort of teasing out the difference between what the EPA did here and what might have perhaps violated an appropriation or been outside of statutory authority is plaintiffs said terminating the grant is not terminating the program. And we wholeheartedly agree with that.

So here what we are dealing with is discrete grant terminations that do not terminate the entire program --

**THE COURT:** When you say "discrete," you're not directing the grantmaking organizations to hold off or to forebear as to particular subgrantees or to apply different criteria? I think it's significant that this program has these two levels with these grantmaking organizations. By stripping the funding, how is that not necessarily abolishing the grantmaking organizations that constitute the program?

**MS. FARBER:** How is stripping the -- how is cancelling the funding not abolishing those specific grantmakers or not abolishing the Environmental Justice block grant program?

**THE COURT:** The latter.

**MS. FARBER:** Okay. These terminations terminate grants with people. There is no evidence in the record at all that EPA is throwing that money away, is sending that money to the ether, is not going to give that money to different grantees. The entire 100 percent complete full basis for plaintiffs' argument is that somehow EPA is terminating the entire Environmental Justice grants program in violation of 42 U.S.C. 7438. Their entire argument when Your Honor asked them is based on this one line in the termination agreement that isn't even about the specified grant.

So it's the second paragraph of the termination

agreement. I'm looking at ECF 29 at page 2 where EPA talks in general about its priority to eliminate discrimination in all programs and that it does not want to support programs or organizations that promote or take part in DEI, Environmental Justice initiatives and -- sorry, I just realized I talk really fast, Madam Reporter.

**THE COURT REPORTER:** No, you're fine.

**MS. FARBER:** And conflict with the Agency's policy of prioritizing merit, fairness, and excellence in performing our statutory functions.

**THE COURT:** So you want me to read that sentence as elements, essentially?

**MS. FARBER:** I'd like you to just read -- Your Honor, respectfully I ask you to just read the whole sentence.

**THE COURT:** Well, okay. I've read it multiple times and what that paragraph announces is that the EPA is announcing a policy that it does not support various types of programs or organizations. This includes ones that promote DEI, as EPA defines it, Environmental Justice initiatives, and ones that conflict with policy prioritizing merit, fairness, and excellence.

Why is this not an announcement that among other things that EPA is going to stop doing, is supporting Environmental Justice initiatives?

**MS. FARBER:** That's not a fair reading of what this

says, respectfully. So the plain language of what the letter says is that we are going to ensure that grants don't promote these types of programs that conflict with the Agency's policy of prioritizing merit, fairness, and excellence. And we see that again in the next paragraph. So the next paragraph that talks about the grant specific part --

**THE COURT:** Okay, so before you do that, though. So you're saying the basis for the termination of these contracts, of these grants is the third paragraph, not the second paragraph?

**MS. FARBER:** Yes.

**THE COURT:** Okay. So that's helpful for an APA analysis to know what the basis for the termination is.

**MS. FARBER:** So I think the second paragraph provides reasoning. The second paragraph provides what the agency's priorities are, what it cares about, why it's looking at this, how it's prioritizing things, how things -- what it values. So that paragraph as I read it provides some rationale.

And then when we get to the next paragraph it says, the grant specified above provides funding for programs that promote or take part in DEI initiatives or Environmental Justice initiatives, or other initiatives. And that's where plaintiffs stops, but the sentence continues, that conflict with the Agency's policy of prioritizing merit, fairness, and

excellence in performing our statutory functions.

**THE COURT:** How does this -- okay, a couple of questions.

**MS. FARBER:** Sure.

**THE COURT:** How does this paragraph possibly give notice or reflect a reasoned decision-making as required by the APA for why these programs conflict with the Agency's policy of prioritizing merit, fairness, and excellence?

**MS. FARBER:** So whether this is sufficient explanation or reasoned decision-making is a different question.

**THE COURT:** I'm asking -- okay, so let me ask that question now.

**MS. FARBER:** Okay. So Your Honor, what's required on that analysis, it's deferential to the Agency, is some explanation for why it's doing what it is and what the basis is. And so we would argue that this termination letter sets forth the terms and conditions of the grants that are applicable, the Agency priority of prioritizing merit, fairness, and excellence in performing our statutory functions. It references -- this is in the second paragraph now where it provides reasoning, in addition to complying with the civil rights laws which are repeatedly incorporated in the terms and conditions of plaintiffs' grants. It's vital that the agency assess whether all grant payments are free from

fraud, abuse, waste and duplication, as well as to assess whether current grants are in the best interest of the United States. So there we have rationale and we have the Agency's reasoning.

And then we have the grant specific, this specific grant is being terminated because it promotes or takes part in DEI initiatives or Environmental Justice initiatives or other initiatives that conflict with the Agency's policy of prioritizing merit, fairness, and excellence in performing our statutory functions.

It goes on to say, the grant is therefore inconsistent with and no longer effectuates Agency priorities which is specifically a condition under which by the terms and conditions governing these grants that the Agency is allowed to terminate the grants as if it no longer effectuates Agency priority.

So we have the rationale for why that is. We have this priority for prioritizing fairness and merit. These grants don't do that and so we're terminating them. And this termination letter does not say we're ending Environmental Justice.

**THE COURT:** Standing here today you are not in a position to articulate any basis on which these plaintiffs or their subgrantees do not prioritize merit and fairness?

**MS. FARBER:** Your Honor, I have the reference to the

general -- sort of the grant conditions that I discussed earlier, that 40 percent figure. But as of right now we don't have an administrative record. So no, I'm not in a position to say these are the specific aspects of this grant beyond --

**THE COURT:** Well, doesn't the administrative record exist that was the basis for these terminations?

**MS. FARBER:** Is there an administrative record? I believe there are documents. The Agency is pulling an administrative record together as part of this litigation.

**THE COURT:** Such as what? In other words, I see this form language that I know from other cases appears in many letters. So are you saying that there is, in fact, more behind this letter that exists that constitutes evidence of what the decision-making process was with respect to these plaintiffs?

**MS. FARBER:** I'm not in a position to attest to that. I just haven't seen, I haven't seen the administrative record yet. I am aware that there is an administrative record. I do not know what is in it so I could not say whether there -- I can't say what's in there, Your Honor, and I certainly couldn't make a representation that whatever is in there is a 100-page very specific line-by-line tone identifying everything. I just haven't seen it unfortunately so I can't make a representation on that, Your Honor.

**THE COURT:** Okay, so then a related question is you

say that there's a change in policy priority, but the statute is very specific. Hasn't Congress already decided what the policy priority is when it comes to these funds?

**MS. FARBER:** Yes. And this does not run afoul of that. The statute says you have to award funding for Environmental Justice. The statute says you can define who gets it and that's it.

**THE COURT:** What steps has EPA taken to determine who else, instead of these plaintiffs, is going to get these funds?

**MS. FARBER:** I don't know the answer to that. And I would also argue that that's outside of the scope of this case which is about whether these grant terminations specifically ran afoul of the terms and conditions of these grants. Whether EPA was allowed to terminate these grants. This is not a case about whether EPA is ending Environmental Justice completely. And if it were, plaintiffs haven't shown a likelihood of success on that because the only thing they have, the only thing they have to suggest that EPA is ending all Environmental Justice initiatives, that EPA is taking all of this money that Congress set forth and is pocketing it or giving it back or putting it towards something else is this one line in the termination letter, half of a sentence in the termination letter. That is speculative; that's not likelihood of success on the merits.

We all have to see what the administrative record says. I'm not saying they could never establish that, but based on what we have here, this one termination letter for these plaintiffs, that doesn't show a likelihood of proving that EPA is taking this money that plaintiffs are no longer getting and getting rid of it or putting it toward something that's not Environmental Justice.

**THE COURT:** So part of -- so you're saying that part of the analysis of whether these terminations were arbitrary and capricious or otherwise violated the APA would benefit and may necessarily require consultation of the administrative record and therefore this motion is premature?

**MS. FARBER:** I don't know if I'm saying that because I don't think the Court needs an administrative record to decide a preliminary injunction generally. So I don't think I'm going that far, Your Honor. I think that what I'm saying is that to the extent that plaintiffs are trying to argue sort of as they must because they concede that this statute doesn't give them any specific right to funding, so to the extent that plaintiff is trying to argue that what EPA did was not terminate their funding, but actually is ending Environmental Justice completely in violation of this statute, 42 U.S.C. 7438, there they do not show a likelihood of success on the merits on this record. And I think, Your Honor, when you push them on where are you getting this -- what are you basing this

argument on, it was just this.

**THE COURT:** So why isn't this an *In re Aiken County* situation? Congress has directed the executive branch, regardless of who sits at the top, to spend this money on programs like air and pollution monitoring, investments in low end zero emission, and resilient technologies. There's a program in place to do this and this administration says, we don't like this type of work.

So why isn't this the executive refusing to comply with Congress?

**MS. FARBER:** So where I push back is it's not the Agency saying we don't like this type of work. It's the Agency saying we don't like these grantees who provide funding for programs that conflict with the Agency's policy of prioritizing merit, fairness.

So it is not the Agency saying we're not supporting Environmental Justice period, end of sentence. Each sentence goes on to say, Environmental Justice that conflicts with these overall big picture policies. So based on this record and again, looking at that preliminary injunction standard which requires likelihood of success on the merits, what we have here is a very speculative conclusion to draw that based on this termination letter alone, that EPA is ending all Environmental Justice initiatives, that the money that is getting taken back from these grantees is not going to go to

other Environmental Justice programs that do not conflict with the Agency's policy of prioritizing merit, fairness, and excellence. And in this case distinguishable from a bunch of the other grant termination cases we have, we have a statute that explicitly gives the Agency the ability to define who gets the money. And that's 77438 (b)(1).

**THE COURT:** You agree that this termination, that no portion of the basis for this termination was the disadvantaged communities standard?

**MS. FARBER:** I agree that the letter does not say disadvantaged communities.

**THE COURT:** And that under the APA I have to consider the bases that were identified in the letter.

**MS. FARBER:** Yes. I certainly agree with that, Your Honor. And where I would point you to is the second half of those sentences that say that they're the -- what EPA is looking at is whether there's a conflict with policy of prioritizing merit, fairness, and excellence. And really just to -- I'm happy to talk more about this, but to sort of put a pin on our main point here is that it is a speculative stretch to take these termination letters and take from these letters that were addressed to specific grantees that qualify Environmental Justice initiatives that do this other thing that is bad, to take from that that all of the Environmental Justice money is vanishing, that no Environmental Justice

grantees are going to get money. That's where the Government would argue that is a speculative leap. That is not a likelihood of success on the merits based on the record that we have here now.

**THE COURT:** Okay, so on the part about the based on the record, how many days would it take the Government to file the administrative record with me?

**MS. FARBER:** I believe the parties have been in communication about whether we can produce that early and I believe that we have offered just after Memorial Day to put that together.

**THE COURT:** Memorial Day?

**MS. FARBER:** Yes.

**THE COURT:** It was awfully quick to get these terminations out. There can't be that many documents lying behind this letter.

**MS. FARBER:** I'm happy to check with EPA. That was sort of where we --

**THE COURT:** Oh, Memorial Day, I'm sorry. You said -- sorry. I heard Labor Day.

**MS. FARBER:** Oh gosh, no.

**THE COURT:** Yes, I apologize. Okay, so you're actively working on compiling the administrative record, but at this time you don't know what it comprises.

**MS. FARBER:** Yes, Your Honor. That's correct. And

I can't make any representations about what's in there and I hope that I haven't, since I'm not trying to say what's in there. I do not know. I do know that it exists and there are papers and it will contain documents. I just don't know what any of that will say. But the standard here on preliminary injunction is it's plaintiffs' burden to show a likelihood of success on the merits. So to the extent --

**THE COURT:** But it's EPA's obligation to give a reasoned explanation that is -- we don't need to go back over.

**MS. FARBER:** Right.

**THE COURT:** So anything else?

**MS. FARBER:** Yes, Your Honor. So sort of just on the -- to sort of close up the clean air piece, the Clean Air Act does not provide any limits on the definition of disadvantaged communities. It doesn't provide any extra limits on grant termination. All of those are in the terms and conditions of the grants.

**THE COURT:** What's an example of a different disadvantaged community that EPA now envisions these funds going to?

**MS. FARBER:** I'm not sure. I'm not sure how they're changing that. I would note that in the initial call for grants, that footnote that I pointed out to Your Honor, EPA didn't have a definition then either when it put out the call for grants. So I don't know that that's -- the Court can give

that whatever weight the Court deems fit.

The "shall" language in the statute, I believe plaintiffs' mentioned to the extent that the statute says "shall," the part that is mandated, the "shall" is that grant -- it should be used for grants up to three years. There's no restriction on grant -- like grants can be shorter than that. There's no restriction on how long the grants last. So there's no requirement that these plaintiffs keep their grants for three years. That's not what the statute says. And the statute is silent on who gets the money and gives EPA the discretion to define which populations are going to benefit from this.

And then there was one -- well, never mind. I'll move on to the First Amendment, unless the Court has further questions on the Government's argument about the Clean Air Act.

**THE COURT:** Sure.

**MS. FARBER:** Okay.

**THE COURT:** And now that I better understand your position about the basis for the denial, I want you to focus on why this doesn't implicate First Amendment concerns.

**MS. FARBER:** Yes, Your Honor. The main reason there is as the Supreme Court in the Fourth Circuit have noted, the main -- the main distinction that Courts need to figure out when they're looking at whether discretionary funding like this violates the First Amendment is whether it tries to reach

conduct that is outside the grant. I think the Court acknowledged this in discussion with plaintiffs' counsel that the First Amendment doesn't reach these sort of discretionary grant decisions. The Government is allowed to -- in some circumstances. In some that it does, but the Government is allowed to pick viewpoints that it favors. It doesn't have to fund everything if that doesn't align with its priority goals.

So the question, and the Court really honed in on this in your discussion with plaintiffs' counsel, is what facts in this record do we have to show that this grant termination had anything to do with outside activities, right? Not just the grant activities, but outside activities.

And in response to that, plaintiffs pointed to two words, I think it was two words in the second paragraph of the termination letter which again, is ECF 292. And that is where they -- where EPA says "or organizations." So the whole sentence or the relevant part of the sentence is this priority includes ensuring that the Agency grants do not support programs or organizations that promote or take part in diversity, equity, and inclusion initiatives, Environmental Justice initiatives -- and that's where plaintiff stops but I continue -- and conflict with the Agency's policy of prioritizing merit, fairness, and excellence in performing our statutory functions.

**THE COURT:** Okay, but if the basis for the denial

was not the fact that these organizations support Environmental Justice programs, but instead, allegedly, because they had some program that you're saying constituted a DEI program that was unlawful. What programs were they?

**MS. FARBER:** So that's where we look at these two paragraphs of the termination agreement at least. So the one--

**THE COURT:** So the answer is you don't know.

**MS. FARBER:** What we have in the termination letter is that the grants take part in DEI initiatives or Environmental Justice initiatives that conflict with the policy of prioritizing merit, fairness, and excellence.

**THE COURT:** But the full extent of the -- representing the Government today -- of your knowledge of any basis for that is what's on the face of the letter.

**MS. FARBER:** And I'd also point to other aspects of the record where the previous administration's definition of Environmental Justice was a bit more exclusive. And so that's not in the termination letter. And so it's that conflict about I don't want to run afoul of what's in the termination letter, but what we have in this record shows that the sort of previous definition of these terms may have unfairly prioritized some communities over others. That's what we see in the explanation of how these grants are going to operate and that's what we see in this explanation where it says that

these initiatives conflict with the Agency's policy of prioritizing merit, fairness, and excellence in performing our statutory functions.

So as far as -- the question for the First Amendment, the question for the First Amendment is does this reach outside conduct or not. Because if this is -- if we're just talking about what these grants do, then we're not in First Amendment territory. And again, the Government argues we're not even here because we're in the Tucker Act territory; but assuming we lose that argument and we're here in administrative procedure land, this is not -- it's not First Amendment if the termination was because of what the grants do, because of what the grants are. And that's what the letter says. So that's where we'd say this isn't -- there's not a First Amendment claim here. We don't think there's an APA claim here, but there's certainly not a First Amendment claim here because we have the reason for the termination as being what the grants themselves do. And if plaintiffs are trying to show a likelihood of success on the merits of this First Amendment claim, I'd put forth to the Court that they need to do a little more than to say the letter says "or organizations" in this one paragraph before it gets to the part that specifically references our grant. I don't -- I'd put forward, respectfully, to the Court that those two words don't carry the water of a likelihood of success on the merits of a

First Amendment claim here.

And then this point is relevant to a couple of the other things we were talking about too, Your Honor. But just to give you a citation, the terms and conditions of these grants and these plaintiffs do specifically require compliance with Title VII. So you can find that at ECF 213 at pages 9 and 34.

So I though that we -- I was here for NADOHE, but I wasn't speaking; I was sitting quietly. But that was one of the issues here as Your Honor remembers is this idea of *Students For Fair Admissions* sort of came in and changed our thought process about what's discrimination, what's not discrimination; what's allowed under Title VII and not allowed under Title VII. And so these terms and conditions that govern the relationship with these grantees do specifically require compliance with Title VII.

**THE COURT:** But you cannot point to any factual basis for an allegation that you seem to be making now that these plaintiffs have violated Title VII.

**MS. FARBER:** No. And where I'm hesitating is --

**THE COURT:** So you're not accusing them, you're not making a suggestion that they have violated Title VII.

**MS. FARBER:** I don't know that I am making a representation either way. I'm trying to hew to what's in the letter. And so what's in the letter says the grant -- I've read the sentence a million times; you know what it says by

heart, Your Honor. The letter specifically says why this grant was being terminated and it wasn't just because of Environmental Justice. There's this added piece.

I see evidence in the record where the Environmental Justice grants that kind of came under the previous administration might be -- could be seen by a new administration as violating Title VII. I don't think the letter says you violate -- the letter says what it says.

**THE COURT:** So why isn't the next step to issue guidance on the current administration's interpretation of disadvantaged communities? Why does the statute and the APA authorize termination?

**MS. FARBER:** Because that is the -- that's what is allowed in the terms and conditions of the grants. So certainly whether the administration, whether the Agency should issue detailed guidance on what's changing, what the definitions are, I think that's an important question and I think it's a slightly separate question from what we have here which is did EPA act arbitrary and capriciously when it terminated these grants. And for that we have to look at the terms and conditions of the grants which allow for termination on the basis of Agency priority.

Your Honor, on irreparable harm, I've mentioned that according to plaintiffs' own attestations in their declarations, nearly a million dollars already has accumulated

in the last month or so that this has been pending. Plaintiffs have said that they don't have funds to support these expenditures so if that money goes out, there's no indication that the Government is getting it back.

As the Court -- as the Supreme Court noted in the *California* case, the plaintiffs there did not promise to pay the money back in any way and the Court found that to be important in assessing the Government's irreparable harm. And we have the same situation here where plaintiffs not only haven't promised to pay the money back, but have said that they can't. So that's important for the Court to weigh as it goes through these factors as well.

And then as to the balance of the equities --

**THE COURT:** Well, but you skipped over the irreparable harm to that.

**MS. FARBER:** Yes, so --

**THE COURT:** So in the *California* case, on that prong the Supreme Court stated that the states had stated that they could cover all of the programs so that none of the programs would actually end.

You agree that this is a different situation, right?

**MS. FARBER:** In some respects, yes; and in some, no.

**THE COURT:** Because the plaintiffs have said they're running out of money and the programs will terminate.

**MS. FARBER:** Yes. I agree that plaintiffs have

presented evidence that they'll have to fire people. They have said that the programs might not continue in the same form. There is some sort of conflicting evidence about the existential future of these programs. But I do agree that plaintiffs here at least based on what we see in *California* in that Supreme Court opinion, plaintiffs here are making more of an argument of irreparable harm than the *California* plaintiffs have.

So I certainly would agree that it seems that these plaintiffs here have put forward more evidence. But for the reasons mentioned in the brief, the Government doesn't -- the Government argues that that evidence does not swing the -- does not swing the analysis.

And I rest on the arguments about balance of equities that I put forward in the brief.

And Your Honor, as we think about if I haven't convinced you on any of these points, Your Honor, and we were in a situation where we're looking at a preliminary injunction, the Government would ask that of course that it just be about these plaintiffs. And we'd ask the Court to consider --

**THE COURT:** They're not asking for anything else.

**MS. FARBER:** Yes, yes. We'd ask the Court to consider whether it's appropriate to, because this case should not be about money damages, either ask the plaintiffs to forgo that reimbursement or specifically carve that out that the

order is just for prospective relief going forward and not for money already incurred.

And then as we noted in our brief, we are asking for a bond in this case that would be meaningful given that plaintiffs have said that -- plaintiffs have not indicated any ability to pay back money if they ultimately are unsuccessful in this case.

Thank you, Your Honor.

**THE COURT:** Thank you, Ms. Farber.

Whoever is taking the rebuttal?

**MS. ABRAHAMS:** Your Honor, I'm going to speak for rebuttal as to the jurisdictional piece and also relating to harms and Mr. Auerbach is going to speak a little more to the merits.

I guess I should start by saying that I think it's lovely that Ms. Farber wanted to quote me and start her argument with my assertion. Unfortunately, I think that she has perhaps deliberately or otherwise twisted what I've said. Perhaps I should have used the word "administratively" accomplished. What they can't accomplish legislatively they want to accomplish administratively.

**THE COURT:** No, I understood the point.

**MS. ABRAHAMS:** The fact of the matter here is that there is no contract. And you asked the question of Mr. DeMella earlier as to whether or not if our case was just with

regard to our fifth allegation, our fifth count, whether we still would have an APA action and/or whether or not the COFC, the Court of Federal Claims would have jurisdiction of this matter. And I think the answer is there's no way that COFC has jurisdiction under the Tucker Act. This is not a contract -- the Government I think --

**THE COURT:** Is there a case though that said that a grant like this is not a contract for Tucker Act purposes?

**MS. ABRAHAMS:** I would direct the Court to I think *MegaPulse* and also the *Normandy Apartments* case. They speak to the issue of consideration. And, you know, yes we are seeking -- we are seeking, ultimately seeking monetary damages which the Government I believe concedes, but we are not seeking monetary relief. We are notwithstanding what was included in the declarations with regard to the spend that each of the various organizations have incurred, the costs that they've incurred so far in performance of their grants.

We use that spend really as an example of the irreparable harm. It goes to the harm. It doesn't go to any sort of either acknowledgement that this is a contract, nor does it go to any acknowledgement that we are actually claiming any sort of money damages and that we're asking to be reimbursed. We use that, you know, as I mentioned--

**THE COURT:** So you're not asking for those funds to be reimbursed?

**MS. ABRAHAMS:** No, we are not asking at this time for those funds to be reimbursed. You know, hypothetically if the grants are turned back on and reinstated and we are allowed to proceed and certain costs that are incurred under the grants are somehow disallowed for some reason, then perhaps maybe we'll be back at COFC under the Tucker Act, but that's not where we are now. We're not asking for that. We're simply identifying that spend as a basis for the support of our assertion with regard to irreparable harm.

And I think that, you know, the cases cited and not only the *California* case, but also Ms. Farber's assertions with regard to all of these potential benefits that the Government might get as a result of these grants I think are overstated. There's clearly no benefit as far as we understand it. To the extent that there's any benefit, it goes directly to the subrecipients. They are the beneficiaries here. We are not-- our clients, the regional grantmakers are not providing any intellectual property rights to the Government. They're not giving the Government any processes, procedures, anything. We're not providing them with real property, personal property or anything else. The money and the ultimate benefit is going to the communities who are the subrecipients and who will get grants.

So regardless of how the Government tries to present this, they're frankly, you know, under *MegaPulse* and the other

applicable cases, we don't reach the level of consideration for purposes of Tucker Act jurisdiction.

And I would also just -- they're certainly citing lots of cases. I would point to *Normandy Apartments* and also the Rhode Island case, the name of which I always--

**THE COURT:** Can you just explain your reliance on *Normandy*? I'm looking at it. It's about contracts between HUD and an apartment. Explicitly, they're explicitly called contracts with Normandy, but --

**MS. ABRAHAMS:** Let me back up and say that for purposes of the consideration I would direct the Court to the *Near E. Refugee v. USAID* case that Mr. Auerbach spoke of and also the *St. Bernard Parish* case that we cite which I think are much more on point and specific for purposes of the issue of consideration.

**THE COURT:** Okay, thank you.

**MS. ABRAHAMS:** With regard to *Normandy Apartments*, I think that even in that case, the Court decided that APA -- that the case could be brought in Federal District Court under APA jurisdiction, that because even when there are statutory and constitutional claims, whether or not they even depended on a contract action they still nonetheless could be brought in District Court.

And so, you know, whether or not there's a violation of the uniform guidance doesn't mean that any of our statutory

and constitutional claims are sort of incidental to jurisdiction. The uniform guidance governs the contractual relationship in some respects as it relates to the appropriateness of the termination. We talked about that earlier. There has to be a change in priority. We're conflating all of these various priorities, but it also seeks -- the way that the Government has presented this I think also seeks to sidestep the *MegaPulse* test. And here it's clear that the source of our rights is both statutory and constitutional. And so that the APA is appropriate.

To the extent that -- to the extent that there's some, you know, basis to suggest that other than what we are arguing and other than that this is really an APA case grounded in statute and constitutional law, there's been -- you know, other than this letter which Ms. Farber has read multiple times, there's no declaration presented here. There's no evidence. There's no justification and approval that would suggest that in fact these terminations are appropriate. And, you know, I think that asserting that and pointing to the uniform guidance doesn't change, doesn't address, doesn't sort of get us past -- get us past where we are in terms of that this Court has proper jurisdiction under the Administrative Procedure Act. This is not a Tucker Act case. There is absolutely no consideration.

I would just -- let me look at my notes quickly. And

going back to the benefit, I would also suggest that unlike the cases that the Government has cited, there's sort of no privity of any kind of arrangement between the subrecipients and the EPA. So to the extent that the subrecipients receive a benefit, it doesn't in any way revert back to the EPA. It is a benefit that goes directly to the subrecipients.

The Government points to the Supreme Court's per curiam case or decision, rather. You know, that is what it is. It's an emergency docket. There's limited briefing. There's no hearing. That decision does not have precedential -- binding precedential value.

To the extent that the Government points to Judge Griggsby's case, I would suggest to you that that case is an outlier. And even in that context, Judge Griggsby -- there were multiple plaintiffs; I forget the exact number, but there were probably seven or eight different plaintiffs. And Judge Griggsby did not dismiss the case as to all of the plaintiffs. She was very particular to who she dismissed it as to. And with regard to the plaintiffs she dismissed, she was also very specific that they pled in their Complaint a request for reimbursement of certain costs. That, again, is not the case here.

You asked a question of the Government as to whether or not the Court of Federal Claims has the ability to impose an injunction. It does, just not the type that we seek. The

Court has a limited ability to -- and I say this as someone who has been before that Court many times as a Government contracts lawyer, the Court has the ability to enjoin -- to issue injunctions, for example, in bid protest cases. It has the ability to issue injunctions in certain types of Contract Disputes Act cases. But it doesn't have the ability to issue an injunction that as we are seeking here where we are asking for the Court to reinstate the contract to maintain the status quo. It's a different type of injunction that the Court has jurisdiction to impose.

I'd like to just briefly chat about or speak to the irreparable harm issue. In his remarks, Mr. Auerbach spoke about the harm to GHHI. I think there is related harm, but also slightly different harm to Philanthropy Northwest and also to my client, the Minneapolis Foundation. I think if you consider the Minneapolis Foundation, for example, and as indicated in Mr. Rybak's declaration, supplemental declaration, the Minneapolis Foundation deliberately sought to expand the scope of its mission in this area, in the area of environmental infrastructure, whatever you want to call it. Some people like to call it Environmental Justice; I like to call it or think of it as sort of environmental infrastructure, developing infrastructure, making sure people have clean water, clean air, all of that kind of stuff.

And, you know, to use a like -- to use a vernacular, we

got street cred because we pursued this grant. We deliberately did it. We focused on it. We pursued the grant. And because of that, the Minneapolis Foundation, for example, has been able to expand, to use that as sort of a platform to position itself to get other work.

If this work were to disappear, there would be dramatic and immediate harm to the Minneapolis Foundation. And I think that that harm is also -- is also sort of to a factor of whatever, because as the Government has indicated which the Government claims that it's not going to get rid of this program, that it's going to keep the program, it just doesn't like the three plaintiffs here.

I would note that we have learned in the last week or so of the ten, there were ten regional grantmakers. We learned in the last week or so that the other seven grants have also been terminated.

Absent the reinstatement of the $8 million grant, the other grant goes away. There's no way to implement the other grant. Regardless of whether or not -- regardless of whether or not the IRA actually somehow provides money for this program to the plaintiffs is really irrelevant. But for that statute, there would be no grant program. In the same way that but for so many other statutory programs or appropriations, there wouldn't be any other Government contracts, grants, cooperative agreements or other funding

vehicles. Those are implemented at the Agency level pursuant to regulation and that's just sort of mechanically how it works typically.

But the Government has suggested here today that without any sort of scintilla of evidence that our clients have engaged in fraud, waste, and abuse that they have somehow not abided by the Agency priority to award grants on the basis of merit or have somehow engaged in illegal activity and it violated the federal antidiscrimination laws, there's no evidence of that. But that, you know, if this termination is allowed to stand, that's on the books and there's -- you know, and the Government has expressly stated that it doesn't like our clients.

So I don't -- you know, our clients, there's a direct and distinct harm that will inure to all three of our clients because they will not be able to get other grants, either Government grants or private grants. That will be sort of like a black mark on their records that somehow they've engaged in this unspecified illegal activity, are not to be trusted, shouldn't get these programs, shouldn't get grants. And I think that there's a real harm that is not speculative that will be immediate.

And as I mentioned with regard to my client, the Minneapolis Foundation, the termination of this grant will result in the termination of or the inability to move forward

with its stated mission. It's a mission that the Minneapolis Foundation and I and the other two plaintiffs here have taken very seriously since they were designated as regional grantmakers which I would remind everybody that that was, in fact, some period of time before the grants were actually awarded. That our clients have worked very specifically with EPA, including very recently and have gotten EPA approvals for every step of the way as things have moved forward.

**THE COURT:** So I have no doubt about that, that the plaintiffs have done incredible work. Why is that as a legal matter not circular in the sense of yes, they were awarded these grants and have performed the work and now it's being terminated. Why is the fact that they've done work, good work to date constitute irreparable harm? I mean, in other words I understood the thrust of your irreparable harm argument to be if we have to fire employees, there's no way to get back to where we are now essentially unless the funding stream is reinstated. I'm trying to understand how the reputational piece fits in.

**MS. ABRAHAMS:** I think the reputational piece, again, for each -- I think the different plaintiffs are sort of slightly differently situated because they are different. For example, my client is a community foundation, is a community grantmaker. You know, as opposed to Philanthropy Northwest and as opposed to GHHI. So they're situated

slightly differently, but in some measure it really doesn't matter if they've done good work to date or presumably done good work to date. According to the Government they've engaged in some improper and illegal activity which has resulted in this termination. So I guess sort of the good work to date is arguably in the eye of the beholder. And either way they have a black mark on them if their grants are terminated.

And so if you are, again, using my client as an example, the Minneapolis Foundation has positioned itself both in the region, in the state of Minnesota in the region and nationally with a number of different foundations, for example, to do this work. They get the credibility and the bona fides to do this work because they're doing it. And we're at such the very early stages of it.

While we have spent a year-and-a-half putting in place all of the infrastructure to accomplish this contract, we're still at the very beginnings of this. So even the suggestion that somehow we've awarded subgrants in the violation of something, the number of subgrants that have been awarded to date is so de minimis that it's, again, putting aside that the Government has failed to specify or articulate which of the subgrants is at odds with its view of its prioritization of merit and the rest of what's in the letter, we're put in a position where we have to explain that to others. And I think

that's the reputational harm. And that assumes that some of the plaintiffs even sort of survive this because they spent the last year-and-a-half so focused on this that they put -- I don't want to say put all their eggs in one basket; that is definitely an overstatement, but they prioritized this. This has been an issue for them. This is where they put their resources. They hired people --

**THE COURT:** Okay, I get it.

**MS. ABRAHAMS:** Thank you, Your Honor.

**THE COURT:** Go ahead, Mr. Auerbach.

**MR. AUERBACH:** Thank you again, Your Honor.

I'm going to start with a warning which is that I'm going to get back into the text of the termination memorandum. A warning, but I'm not going to apologize for it. I mean, that is the decision, the Agency decision at issue here. And I think a little bit of Ms. Farber's argument gets into the dynamic that I talked about earlier about this is not a serious decision, it's an unserious decision. But that doesn't mean that the Court can or should speculate about other grounds on which this decision might have been made. This is it. This is what they said.

And the record was not closed. The Government could have put it -- if the Government wanted to add color to what is stated in this memorandum, it certainly could have. And it didn't do that. So this is what we have. And this is all we

have and this is the decision.

And having said that, merit, fairness, and excellence. Those are empty terms. Those are empty terms. They mean good and fair. So those terms do not in any way add to the reasoned nature of this decision and that's just in the abstract. What could they possibly mean with respect to this program? What communities have merit, fairness, and excellence and which don't? It is meaningless.

It doesn't matter for our claims what the Government is doing with respect to other regional grantmakers. In fact, our best understanding is they are terminating all the grants of all the regional grantmakers. Our claim is that these three terminations exceed EPA's statutory authority for the reason -- because the reasons they said in this letter are not ones that Congress would permit them to utilize in terminating grants.

To bleed over a little bit into the other issue, that's why the source of rights here are statutory. Ms. Farber doesn't say EPA has plenary discretion to do whatever it wants under the Clean Air Act with respect to this program. Ms. Farber acknowledges that this statute imposes limits on what EPA can do. And our claim is that these actions run afoul of those limits, and patently so, to the grammar.

Paragraph 3 of this letter says, the grant specified up above provides funding for programs that promote or take part

in DEI initiatives or Environmental Justice initiatives or other initiatives that conflict with the Agency's policy in prioritizing merit, fairness, and excellence.

I'm going to in a minute miss the presence of my high school grammar teacher, but my understanding of grammar is that the term "that" conflicts with -- the term "that" modifies "other initiatives," other initiatives that conflict with the Agency's policy of prioritizing merit, fairness, and excellence. And what this sentence tells us is that EPA believes that Environmental Justice initiatives as a category are initiatives that conflict with the Agency's policy of prioritizing merit, fairness, and excellence.

I don't need this part to win this case, but even on the groundwork of this letter, what EPA is saying is it's not doing Environmental Justice initiatives because those initiatives aren't merit, fairness, and excellence, whatever that means.

Why do we think that EPA is terminating all of these grants? Beyond what the letter says about its views under Environmental Justice, the other best information we have is the affidavit with Mr. Coogan that I've referenced, and I just -- what Mr. Coogan says, and this is public record, that EPA has paused access to recipients of the following IRA grants. And then on the list of the types of grants that it's paused access to are Environmental Justice Thriving Communities

Grantmaking Program, period. No qualifications. Those are the types of grants that it has paused access to. And then Mr. Coogan says that those are the grants that are to be terminated. All of those Environmental Justice Thriving Communities Grantmaking Programs.

So again, I don't think we need to succeed on the merits here to show likelihood of success on the merits. I don't think we need to prove to Your Honor whether EPA is categorically wiping the map of the Environmental Justice Grantmaking Program or not. But the best information that we have is that it is. And the letter -- termination memorandum -- that termination memoranda that was sent to our clients is certainly consistent with that understanding.

On the First Amendment. What is the expressive activity within the contours of the grant that they no longer want to subsidize? We're back in the land of speculating the bases for this decision that aren't consistent with what the memorandum says.

**THE COURT:** Well, what is the evidence of restricting speech outside the scope of the organizations other than the phrase "or organizations" in paragraph 2?

**MR. AUERBACH:** It is this -- I mean, I don't think it's just the phrase "or organizations." I think the best reading of this memorandum which is the best evidence of what this decision is, the only evidence of what this decision is

is that that's what EPA is doing. And EPA had the opportunity here to say otherwise, to explain what -- to explain what speech it no longer wants to subsidize within the context of the grant. It hasn't done that.

By the way, most of the -- only a tiny number of subgrants have been awarded. So it's hard to know most of -- what he could possibly object to. There's several -- I don't know the exact number at this moment, dozens of subgrants, of hundreds anticipated.

**THE COURT:** Well, it might be interesting to see if there is any evidence in the administrative record. And if there's not any, that might be relevant.

**MR. AUERBACH:** Fair enough.

**THE COURT:** To the APA analysis.

**MR. AUERBACH:** Yeah.

What evidence has EPA presented that EPA is regulating conduct inside? Here is the evidence that it is regulating conduct outside. What evidence is there that the EPA is regulating conduct inside the grant? And it's hard to even imagine what it could be, what it could be inside that's doing inside --

**THE COURT:** Well, it's all the -- well, I think their argument is all the programs that would otherwise be funded. I mean, all the eligible activities. I mean, there's certainly tension between the Government's argument that they

have authority to terminate all of these grantmaking organizations and the position that they're not blocking congressional directive to continue these programs. But their position is we can do it in a different way through different organizations, redefining different disadvantaged communities and that's what we're either doing or about to do.

So why is that not at least consistent with the statute?

**MR. AUERBACH:** Picking new grantmakers, I mean, there's no evidence of any of that, let's be clear.

**THE COURT:** But I guess your point is we don't need to decide what the -- what such future actions might be or whether they would be consistent with the statute. Your point is these terminations violate the APA in part because of the way that the statute is structured.

**MR. AUERBACH:** That's correct, Your Honor. There would be enormous problem -- to be clear, there would be enormous problems with the course of action that Your Honor described. Likely we're picking new grantmakers, there are time limits in the statute. There are limits to EPA's discretion in the statute. There is a reliance issue that EPA would have to consider. So there are statements that the EPA has made about the way that our clients have undertaken these grants. And it would be -- those would be a total 180 in doing that. But that's right. What's before the Court are these actions as embodied in this letter, as unserious as it

is.

**THE COURT:** Okay.

**MR. AUERBACH:** With respect to the bond, in my understanding, all of the Courts that have issued an injunction under near analogous circumstances here over these last few weeks have recognized the following point: It would wholly undermine the purpose of the injunction to require a bond. All of the Courts have declined to impose a bond requirement. And that's certainly the case here. It would defeat the purpose of the relief that we're seeking and it's unnecessary.

**THE COURT:** All right, thank you.

**MS. FARBER:** May I be heard briefly on two points?

**THE COURT:** Sure.

**MS. FARBER:** Thank you, Your Honor.

Just one sentence on *Normandy*. The *Normandy* case dealt with the Little Tucker Act which is restricted to cases involving money damages of less than $10,000 and it gives district courts concurrent jurisdiction with the Court of Federal Claims. So *Normandy* is not instructive here as far as whether this Court has jurisdiction because this is not a Little Tucker Act case this is a Tucker Act case.

And then finally, I want to just highlight in closing that plaintiffs have conceded I think more than once that the statute at issue here, the Clean Air Act, does not require EPA

to give specifically them funds. So when it comes to what do they need to show to show that EPA violated the Clean Air Act, the fact that EPA terminated their grants, that fact alone I believe by their own concession does not establish a violation of the Clean Air Act.

That's all I have. Thank you.

**THE COURT:** All right, well thank you, everyone, for your detailed attention to preparing the briefs, compiling the evidence. I will not be issuing an oral ruling; these are complicated rulings. I will endeavor to get a decision out as quickly as possible.

I would ask that the Government as soon as possible compile the administrative record and get it filed ideally in the next week or two. I'm not going to issue an order greater than that, but I'd ask to meet and confer and I'd be surprised if it is voluminous. And so I would imagine that it is something that may help in deciding this question of whether there's a likelihood of success on the merits of the APA claim and I'll leave it at that.

Thank you, everybody.

**(Whereupon the proceeding was concluded at 4:29 p.m.)**

**CERTIFICATE OF OFFICIAL REPORTER**

**I, Nadine M. Bachmann, Certified Realtime Reporter and Registered Merit Reporter, in and for the United States District Court for the District of Maryland, do hereby certify, pursuant to 28 U.S.C. § 753, that the foregoing is a true and correct transcript of the stenographically-reported proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.**

**Dated this 16th day of May, 2025.**

***-S-***

**NADINE M. BACHMANN, CRR, RMR**
**FEDERAL OFFICIAL COURT REPORTER**

## $

**$10,000** [1] - 114:18
**$310,000** [1] - 56:7
**$330,000** [1] - 7:19
**$429,068.43** [1] - 56:6
**$52** [2] - 7:3, 9:9

## 1

**1** [1] - 20:7
**100** [1] - 77:19
**100-page** [1] - 82:22
**103** [1] - 42:8
**11** [1] - 59:13
**1100** [1] - 1:23
**118** [1] - 69:3
**119** [2] - 58:22, 69:3
**120** [2] - 1:16, 69:7
**13** [2] - 59:19, 59:24
**1491(a)(1)** [1] - 72:4
**1500** [1] - 1:23
**16** [1] - 60:1
**16th** [1] - 116:14
**18** [4] - 5:16, 38:1, 48:19, 49:15
**180** [1] - 113:23
**1976** [1] - 25:9
**1988** [1] - 25:4
**1:07** [1] - 3:2

## 2

**2** [8] - 29:15, 56:5, 60:5, 65:18, 67:2, 68:14, 78:1, 111:21
**2-13** [2] - 60:4, 60:14
**2-16** [1] - 60:1
**2-3** [7] - 59:13, 59:19, 59:23, 60:20, 60:21, 66:17, 67:1
**2-5** [1] - 60:24
**2-8** [1] - 65:16
**2-9** [1] - 65:16
**200.313** [1] - 60:5
**20005** [1] - 1:23
**2001** [1] - 40:24
**2013** [1] - 40:23
**2020** [2] - 34:21, 45:16
**2025** [3] - 1:11, 50:19, 116:14
**21** [3] - 43:11, 44:15, 60:20
**21201** [1] - 2:4
**21202** [1] - 1:17
**213** [1] - 93:6
**22** [1] - 67:2
**23** [1] - 60:20
**25-0196** [1] - 3:4
**2500** [1] - 1:16
**26** [2] - 60:14, 68:15
**26-1** [1] - 56:4
**26-2** [1] - 56:7
**26-3** [1] - 56:10
**27** [2] - 60:14, 68:17
**28** [3] - 68:17, 72:4, 116:8
**29** [2] - 1:11, 78:1
**292** [1] - 90:15
**2:31** [1] - 51:24
**2:46** [1] - 51:24

## 3

**3** [5] - 19:18, 56:7, 56:10, 67:1, 109:24
**30** [2] - 60:5, 68:21
**3300** [1] - 1:19
**34** [1] - 93:6
**36** [1] - 2:3
**38** [1] - 63:21

## 4

**4** [4] - 7:3, 59:13, 66:18, 67:1
**40** [1] - 82:2
**42** [3] - 62:24, 77:21, 84:22
**45** [1] - 59:14
**4:29** [1] - 115:21
**4th** [2] - 2:3, 20:10

## 5

**50** [1] - 60:21
**51** [1] - 68:24

## 7

**702** [2] - 10:5, 25:24
**704** [3] - 10:5, 10:6, 23:24
**7062(a** [1] - 30:25
**7062(c** [1] - 31:2
**709** [1] - 58:22
**74** [1] - 63:20
**74-38** [1] - 63:12
**7438** [6] - 28:20, 54:2, 62:24, 64:23, 77:22, 84:23
**7438(b)(1** [1] - 29:2
**753** [1] - 116:8
**77438** [1] - 86:6
**7D** [1] - 1:11

## 8

**8** [5] - 9:8, 26:24, 27:4, 60:24, 104:17

## 9

**9** [2] - 60:24, 93:6
**920** [1] - 1:19
**98104-1610** [1] - 1:20

## A

**a)(1** [1] - 29:13
**AACTE** [2] - 71:7, 71:18
**ABA** [1] - 3:4
**ABA-25-1096** [1] - 1:5
**abandon** [1] - 51:4
**ABELSON** [1] - 1:10
**abide** [1] - 67:16
**abided** [1] - 105:7
**ability** [9] - 53:2, 69:21, 86:5, 97:6, 102:24, 103:1, 103:3, 103:5, 103:6
**able** [6] - 49:9, 49:15, 55:25, 72:13, 104:4, 105:16
**abolish** [1] - 32:1
**abolishing** [4] - 32:6, 77:8, 77:11, 77:12
**above-entitled** [1] - 116:10
**Abrahams** [6] - 3:19, 46:6, 50:7, 52:12, 53:3, 64:2
**ABRAHAMS** [12] - 1:21, 42:18, 42:22, 42:24, 97:11, 97:23, 98:9, 99:1, 100:10, 100:17, 106:20, 108:9
**Abrahams'** [1] - 52:13
**absence** [1] - 22:21
**absent** [2] - 24:20, 104:17
**absolutely** [5] - 43:4, 55:5, 76:11, 76:12, 101:24
**Absolutely** [1] - 52:4
**abstract** [5] - 31:19, 36:12, 38:15, 58:4, 109:6
**abuse** [4] - 28:12, 43:24, 81:1, 105:6
**accept** [1] - 46:21
**acceptance** [2] - 21:4, 58:17
**access** [14] - 7:7, 7:10, 7:14, 7:16, 8:4, 8:15, 8:16, 33:1, 33:15, 34:6, 34:10, 110:23, 110:25, 111:2
**accompanied** [1] - 68:24
**accomplish** [5] - 46:3, 52:14, 97:20, 97:21, 107:17
**accomplished** [2] - 32:6, 97:19
**accordance** [2] - 15:3, 44:13
**accorded** [1] - 44:21
**according** [3] - 73:3, 94:24, 107:3
**accumulated** [6] - 55:24, 56:1, 56:6, 56:7, 57:6, 94:25
**accusing** [1] - 93:20
**achieve** [1] - 20:19
**acknowledged** [1] - 90:2
**acknowledgement** [2] - 98:20, 98:21
**acknowledges** [1] - 109:21
**acquire** [1] - 59:20
**acquiring** [1] - 46:13
**act** [4] - 15:3, 17:10, 63:22, 94:19
**Act** [53] - 9:4, 9:12, 9:15, 11:2, 12:1, 12:2, 12:24, 13:6, 14:20, 15:4, 17:7, 21:22, 22:6, 22:7, 22:14, 22:20, 23:5, 24:2, 26:3, 26:6, 27:19, 50:8, 52:6, 52:11, 56:13, 56:21, 57:15, 58:2, 58:14, 61:9, 61:12, 61:20, 69:14, 70:1, 73:18, 76:18, 88:14, 89:15, 92:9, 98:5, 98:8, 99:6, 100:2, 101:23, 103:6, 109:20, 114:17, 114:22, 114:25, 115:2, 115:5
**Act's** [1] - 5:21
**acted** [2] - 63:9, 64:8
**acting** [2] - 31:5, 76:5
**action** [26] - 9:7, 9:20, 11:6, 20:19, 21:17, 23:20, 23:21, 23:25, 25:11, 36:6, 42:2, 42:3, 43:20, 53:9, 55:8, 55:10, 62:11, 62:12, 62:23, 70:3, 70:16, 98:2, 100:22, 113:17
**actions** [16] - 27:15, 27:16, 28:2, 28:3, 32:12, 32:14, 32:17, 32:22, 33:12, 33:16, 34:9, 38:13, 46:24, 109:22, 113:11, 113:25
**actively** [1] - 87:23
**activities** [13] - 19:21, 29:5, 29:14, 39:1, 39:11, 40:14, 40:19, 44:16, 48:12, 90:11, 90:12, 112:24
**activity** [8] - 39:6, 39:21, 40:19, 45:11, 105:8, 105:19, 107:4, 111:14
**ADAM** [1] - 1:10
**add** [3] - 45:8, 108:23, 109:4
**added** [2] - 45:17, 94:3
**addition** [2] - 60:2, 80:22
**additional** [2] - 45:14, 76:18
**additionally** [1] - 60:9
**address** [8] - 4:23, 15:2, 17:19, 18:19, 24:17, 35:10, 59:15, 101:20
**addressed** [2] - 26:4, 86:22
**addresses** [1] - 10:6
**adequate** [2] - 10:7, 58:19
**adjacent** [1] - 19:8
**administration** [8] - 15:24, 20:18, 34:15, 66:19, 85:7, 94:6, 94:7, 94:15
**administration's** [2] - 91:17, 94:10
**administrative** [19] - 6:25, 7:4, 30:23, 72:17, 72:21, 82:3, 82:5, 82:7, 82:9, 82:17, 82:18, 84:1, 84:11, 84:14, 87:7, 87:23, 92:10, 112:11, 115:13
**Administrative** [5] - 5:21, 9:4, 9:15, 69:14, 101:22
**administratively** [2] - 97:19, 97:21
**Administrator** [1] - 20:6
**administrator** [6] - 6:12, 29:16, 29:25, 30:21, 30:22, 65:5
**Admissions** [1] -

93:10
**admit** [1] - 69:3
**admitted** [1] - 52:24
**admittedly** [1] - 71:12
**advance** [1] - 21:10
**advancement** [1] - 59:5
**advancing** [1] - 11:8
**adversely** [1] - 9:19
**advisory** [2] - 46:15, 47:8
**affairs** [2] - 50:5
**affect** [5] - 8:9, 8:10, 11:18, 11:20, 36:18
**affected** [1] - 9:19
**affects** [1] - 25:8
**affidavit** [1] - 110:21
**affirm** [1] - 66:8
**afforded** [1] - 14:22
**afield** [1] - 75:9
**afoul** [4] - 83:4, 83:14, 91:20, 109:22
**afternoon** [7] - 3:11, 3:14, 3:16, 3:24, 42:22, 42:23, 52:1
**agencies** [1] - 46:17
**Agency** [54] - 3:6, 9:7, 9:20, 15:1, 18:15, 19:25, 23:25, 25:11, 30:9, 34:20, 34:22, 34:23, 35:2, 35:4, 35:12, 35:15, 38:21, 39:15, 40:22, 41:13, 43:5, 43:6, 43:19, 44:4, 44:5, 44:11, 45:1, 46:1, 51:12, 59:5, 64:7, 64:13, 64:20, 65:3, 67:14, 69:4, 69:6, 69:12, 80:15, 80:19, 81:12, 81:14, 81:15, 82:8, 85:12, 85:13, 85:16, 86:5, 90:18, 94:15, 94:22, 105:1, 105:7, 108:15
**agency** [2] - 32:15, 80:25
**AGENCY** [1] - 1:6
**Agency's** [20] - 15:3, 21:11, 32:15, 40:13, 65:24, 66:4, 67:8, 78:8, 79:3, 79:25, 80:7, 81:3, 81:8, 85:14, 86:2, 90:22, 92:1, 110:2, 110:8, 110:11
**agency's** [1] - 79:16
**aggrieved** [1] - 9:20
**ago** [1] - 71:11
**agree** [17] - 12:16, 25:5, 29:17, 30:2, 53:6, 57:25, 58:17, 62:6, 66:8, 76:25, 86:7, 86:10, 86:14, 95:21, 95:25, 96:4, 96:9
**agreed** [1] - 63:1
**agreement** [9] - 45:10, 58:24, 60:7, 68:25, 75:2, 75:8, 77:23, 78:1, 91:6
**agreements** [8] - 11:4, 11:10, 17:17, 21:5, 22:13, 36:23, 60:16, 104:25
**agrees** [2] - 58:3, 62:25
**ahead** [4] - 14:24, 42:17, 56:3, 108:10
**AID** [1] - 41:1
**Aided** [1] - 1:25
**Aiken** [3] - 34:13, 34:24, 85:2
**air** [8] - 43:14, 43:17, 44:6, 44:16, 51:8, 85:5, 88:13, 103:24
**Air** [11] - 12:1, 20:8, 27:19, 61:12, 61:20, 88:13, 89:15, 109:20, 114:25, 115:2, 115:5
**al** [3] - 1:6, 3:5, 3:6
**align** [1] - 90:7
**allegation** [3] - 74:18, 93:17, 98:1
**allegations** [1] - 11:22
**allege** [1] - 69:7
**alleged** [2] - 12:14, 29:4
**allegedly** [1] - 91:2
**alleges** [2] - 12:4, 68:21
**alleging** [2] - 12:7, 12:9
**allow** [5] - 37:4, 41:5, 57:5, 64:12, 94:21
**allowed** [16] - 61:20, 61:23, 64:9, 64:10, 67:4, 67:5, 81:14, 83:15, 90:4, 90:6, 93:12, 94:14, 99:4, 105:11
**allowing** [1] - 75:21
**allows** [4] - 35:15, 48:22, 52:25, 60:5
**almost** [3] - 18:10, 27:13, 73:4
**alone** [2] - 85:23, 115:3
**alongside** [1] - 16:12
**alters** [1] - 20:13
**ambiguous** [1] - 20:1
**amended** [2] - 24:9, 27:19
**Amendment** [28] - 5:25, 11:25, 12:1, 28:5, 39:15, 39:16, 39:18, 39:22, 41:6, 41:18, 42:1, 42:5, 42:7, 51:14, 69:20, 89:14, 89:20, 89:25, 90:3, 92:4, 92:5, 92:7, 92:11, 92:14, 92:16, 92:19, 93:1, 111:14
**amendment** [1] - 68:25
**amendments** [2] - 22:20, 25:9
**American** [3] - 20:7, 20:8, 71:7
**amorphous** [1] - 20:1
**amount** [5] - 5:23, 27:21, 28:4, 71:5, 73:6
**amounts** [2] - 7:17, 29:12
**analogous** [1] - 114:5
**analysis** [34] - 8:9, 8:13, 11:5, 11:18, 11:20, 12:10, 13:2, 17:16, 21:23, 22:2, 22:5, 23:4, 23:9, 26:7, 31:12, 31:17, 31:25, 33:19, 34:3, 36:18, 37:6, 42:11, 45:19, 45:21, 55:14, 58:10, 61:1, 61:9, 74:7, 79:13, 80:15, 84:9, 96:13, 112:14
**analyze** [1] - 22:1
**Anchorage** [3] - 58:21, 58:22, 59:7
**Ann** [1] - 4:19
**announced** [2] - 20:9, 38:20
**announcement** [1] - 78:22
**announces** [1] - 78:16
**announcing** [2] - 65:20, 78:17
**answer** [7] - 14:2, 17:21, 37:10, 38:8, 83:11, 91:8, 98:4
**answered** [1] - 43:4
**anticipated** [1] - 112:9
**antidiscrimination** [3] - 43:23, 67:17, 105:9
**APA** [47] - 9:17, 10:9, 14:22, 16:24, 21:17, 21:19, 23:24, 25:10, 25:11, 25:24, 30:7, 30:8, 30:25, 31:10, 32:13, 33:7, 33:22, 33:23, 41:21, 52:21, 52:24, 53:6, 62:17, 62:23, 63:6, 63:21, 63:23, 64:6, 64:7, 69:17, 74:22, 74:23, 79:12, 80:7, 84:10, 86:12, 92:15, 94:11, 98:2, 100:18, 100:20, 101:10, 101:13, 112:14, 113:13, 115:18
**apartment** [1] - 100:8
**Apartments** [3] - 98:10, 100:4, 100:17
**apologize** [4] - 33:10, 64:23, 87:22, 108:14
**appeal** [1] - 25:3
**Appeals** [1] - 62:9
**appear** [4] - 11:15, 26:18, 26:19, 58:16
**apples** [1] - 6:22
**applicable** [5] - 69:8, 72:11, 74:22, 80:19, 100:1
**application** [1] - 24:19
**applications** [2] - 44:22, 46:21
**applies** [2] - 23:5, 71:21
**apply** [5] - 12:19, 22:1, 22:8, 68:17, 77:5
**applying** [3] - 23:7, 46:19, 74:6
**appreciate** [5] - 4:2, 5:7, 52:7, 52:8, 75:25
**appropriate** [4] - 62:14, 96:23, 101:10, 101:18
**appropriated** [4] - 9:10, 19:18, 29:10, 50:7
**appropriately** [2] - 12:16, 44:24
**appropriateness** [1] - 101:4
**appropriation** [2] - 29:3, 76:22
**appropriations** [1] - 104:24
**approval** [1] - 101:17
**approvals** [1] - 106:7
**approved** [1] - 9:11
**April** [1] - 1:11
**arbitrary** [17] - 9:7, 27:10, 27:11, 31:1, 31:12, 35:16, 37:14, 37:22, 38:17, 41:11, 42:25, 43:20, 63:22, 64:8, 66:11, 84:9, 94:19
**area** [2] - 103:19
**arguably** [1] - 107:6
**argue** [8] - 14:17, 21:2, 59:3, 80:17, 83:12, 84:17, 84:20, 87:2
**argued** [1] - 23:24
**argues** [3] - 58:2, 92:8, 96:12
**arguing** [1] - 101:12
**argument** [36] - 9:17, 13:5, 17:18, 18:20, 24:4, 33:20, 34:2, 34:13, 35:7, 36:1, 37:22, 38:5, 40:24, 48:25, 51:16, 51:23, 52:2, 52:9, 53:12, 57:23, 58:6, 73:22, 75:13, 76:17, 76:20, 77:20, 77:22, 85:1, 89:15, 92:10, 96:7, 97:16, 106:15, 108:16, 112:23, 112:25
**arguments** [5] - 35:9, 53:12, 74:9, 75:20, 96:14
**arrangement** [3] - 75:1, 75:3, 102:3
**artfully** [1] - 16:23
**articulate** [2] - 81:23, 107:22
**articulated** [2] - 32:19, 43:17
**asbestos** [1] - 51:6
**Asher** [1] - 3:19
**aside** [8] - 31:16, 32:12, 32:17, 32:22, 32:25, 33:16, 34:9, 107:21
**aspects** [3] - 25:12, 82:4, 91:16
**assembled** [1] - 47:17
**asserted** [2] - 30:14, 30:17
**asserting** [3] - 41:24, 44:1, 101:19
**assertion** [3] - 41:8, 97:17, 99:9
**assertions** [1] - 99:11
**assess** [2] - 80:25, 81:1
**assessing** [1] - 95:8
**assistance** [4] - 7:1, 46:23, 47:9, 68:25

**Association** [1] - 71:8
**assumes** [1] - 108:1
**assuming** [1] - 92:9
**attach** [1] - 68:12
**attached** [1] - 61:6
**attachment** [1] - 65:17
**attempt** [1] - 20:16
**attention** [3] - 4:3, 76:1, 115:8
**attest** [1] - 82:16
**attestations** [1] - 94:24
**ATTORNEY** [1] - 2:3
**AUERBACH** [46] - 1:16, 3:11, 4:12, 5:9, 6:24, 7:12, 8:14, 27:7, 28:22, 29:1, 29:7, 29:19, 29:24, 30:1, 30:7, 31:3, 31:13, 31:19, 32:8, 33:8, 33:11, 34:5, 35:4, 36:2, 36:22, 37:9, 38:7, 38:19, 39:3, 39:14, 40:9, 40:12, 41:19, 41:24, 42:5, 42:15, 46:6, 50:17, 50:22, 108:11, 111:22, 112:13, 112:15, 113:8, 113:15, 114:3
**Auerbach** [11] - 3:12, 9:5, 15:11, 19:10, 20:22, 43:4, 45:24, 97:13, 100:12, 103:12, 108:10
**authority** [19] - 21:5, 27:17, 27:23, 28:20, 30:11, 30:21, 31:2, 31:6, 31:20, 32:21, 35:23, 37:2, 38:5, 57:14, 58:13, 63:9, 76:23, 109:13, 113:1
**authorize** [1] - 94:12
**authorized** [1] - 9:11
**authorizes** [1] - 35:19
**availability** [1] - 48:21
**available** [3] - 7:4, 24:2, 29:12
**Avenue** [1] - 1:19
**avenues** [1] - 25:10
**avoid** [4] - 16:24, 34:7, 48:23, 72:24
**avoiding** [1] - 48:16
**award** [13] - 25:16, 27:20, 29:13, 34:19, 34:22, 44:24, 45:13, 69:2, 69:4, 69:5, 70:22, 83:5, 105:7
**awarded** [7] - 49:17, 49:22, 106:6, 106:11, 107:19, 107:20, 112:6
**aware** [4] - 6:3, 6:17, 8:6, 82:18
**awfully** [1] - 87:14

## B

**b)(1** [2] - 29:3, 29:7
**b)(1)** [1] - 86:6
**b)(2** [2] - 29:6, 29:8
**Bachmann** [1] - 116:5
**BACHMANN** [1] - 116:18
**bad** [1] - 86:24
**bag** [1] - 30:17
**balance** [3] - 16:25, 95:13, 96:14
**Baltimore** [3] - 1:16, 1:17, 2:4
**bar** [1] - 23:25
**base** [1] - 62:16
**based** [10] - 10:24, 39:1, 44:23, 77:23, 84:2, 85:19, 85:22, 87:3, 87:5, 96:5
**bases** [4] - 62:13, 65:19, 86:13, 111:16
**basic** [1] - 59:8
**basing** [1] - 84:25
**basis** [39] - 12:4, 21:20, 28:3, 28:24, 30:12, 30:14, 32:18, 33:4, 34:17, 35:2, 35:22, 36:5, 38:22, 40:5, 40:18, 41:25, 44:25, 62:20, 66:11, 66:14, 69:11, 71:16, 77:19, 79:8, 79:13, 80:16, 81:23, 82:6, 86:8, 89:19, 90:25, 91:15, 93:17, 94:22, 99:8, 101:12, 105:7
**basket** [1] - 108:4
**bears** [1] - 19:8
**BEFORE** [1] - 1:10
**begin** [3] - 9:2, 48:6, 51:1
**beginnings** [1] - 107:18
**begun** [1] - 47:6
**Behalf** [1] - 1:21
**behalf** [2] - 1:15, 1:18
**behind** [3] - 25:23, 82:13, 87:16
**beholder** [1] - 107:6
**belabor** [1] - 57:20
**believes** [1] - 110:10
**below** [1] - 27:12
**beneficiaries** [1] - 99:16
**benefit** [18] - 21:9, 21:10, 21:13, 22:15, 22:17, 29:15, 36:11, 59:2, 59:3, 59:25, 84:10, 89:11, 99:14, 99:15, 99:21, 102:1, 102:5, 102:6
**benefits** [6] - 21:14, 56:18, 59:16, 60:3, 60:15, 99:12
**Bernard** [1] - 100:13
**best** [14] - 28:13, 31:3, 31:5, 41:7, 41:12, 60:23, 81:2, 109:11, 110:20, 111:10, 111:23, 111:24
**better** [3] - 31:1, 64:2, 89:18
**between** [16] - 11:4, 30:4, 33:20, 36:18, 48:16, 52:18, 54:9, 54:12, 54:13, 54:16, 58:1, 75:2, 76:21, 100:7, 102:3, 112:25
**beyond** [6] - 50:24, 59:1, 65:12, 72:14, 82:4, 110:19
**bid** [2] - 5:1, 103:4
**Biddle** [1] - 3:17
**BIDDLE** [1] - 1:22
**Biden** [1] - 45:18
**big** [3] - 30:15, 35:11, 85:19
**bigger** [1] - 67:25
**biggest** [1] - 54:23
**bilateral** [1] - 22:25
**binding** [2] - 74:6, 102:10
**Bishops** [5] - 16:4, 16:16, 17:2, 17:12, 17:15
**bit** [7] - 6:8, 38:19, 56:3, 76:6, 91:18, 108:16, 109:17
**black** [2] - 105:18, 107:7
**blaming** [1] - 76:9
**bleed** [1] - 109:17
**Block** [1] - 62:4
**block** [3] - 19:19, 65:9, 77:12
**blocking** [1] - 113:2
**board** [1] - 37:23
**boards** [1] - 46:15
**body** [1] - 36:17
**bona** [1] - 107:13
**bond** [5] - 73:6, 97:4, 114:3, 114:8
**books** [1] - 105:11
**Borg** [1] - 25:17
**Bowen** [30] - 10:13, 13:19, 13:21, 16:25, 18:11, 18:20, 23:17, 23:23, 24:3, 24:10, 24:19, 24:24, 25:19, 26:13, 53:13, 53:14, 53:16, 53:18, 54:5, 54:7, 54:11, 54:14, 54:18, 54:22, 54:24, 63:5, 72:1, 74:5, 74:9
**branch** [1] - 85:3
**breach** [1] - 16:2
**break** [2] - 51:21, 51:22
**brief** [8] - 16:17, 24:16, 64:14, 69:10, 76:14, 96:11, 96:15, 97:3
**briefed** [1] - 72:18
**briefing** [3] - 4:2, 26:5, 102:9
**briefly** [2] - 103:11, 114:13
**briefs** [4] - 8:13, 26:8, 34:12, 115:8
**bring** [1] - 41:18
**bringing** [1] - 37:25
**brings** [2] - 7:5, 70:5
**broaden** [1] - 25:10
**broadly** [1] - 46:16
**brought** [5] - 12:6, 26:17, 63:6, 100:19, 100:22
**Brown** [1] - 3:12
**BRZEZYNSKI** [2] - 1:22, 3:16
**Brzezynski** [1] - 3:17
**building** [1] - 46:11
**built** [2] - 47:16, 49:14
**bunch** [1] - 86:3
**burden** [1] - 88:6
**buy** [1] - 59:22
**BY** [4] - 1:16, 1:18, 1:21, 2:2

## C

**cabin** [1] - 65:3
**California** [22] - 26:14, 26:23, 49:1, 49:7, 49:13, 49:20, 65:1, 70:24, 70:25, 71:1, 71:4, 71:9, 71:17, 71:21, 73:25, 75:15, 95:6, 95:17, 96:5, 96:7, 99:11
**cancelling** [1] - 77:11
**cannot** [8] - 20:19, 23:13, 28:5, 30:20, 34:15, 40:1, 49:21, 93:16
**capricious** [13] - 9:7, 27:10, 27:11, 31:1, 31:12, 37:14, 37:23, 38:17, 41:11, 43:1, 43:21, 66:11, 84:10
**capriciously** [3] - 63:22, 64:8, 94:19
**care** [1] - 76:13
**cares** [1] - 79:16
**carry** [3] - 29:14, 40:25, 92:25
**carve** [1] - 96:25
**case** [135] - 5:13, 6:8, 6:11, 7:9, 7:14, 7:18, 8:1, 9:21, 10:13, 10:17, 10:24, 11:1, 12:11, 12:16, 12:23, 13:7, 13:12, 14:1, 16:4, 16:7, 16:8, 16:11, 16:12, 16:15, 16:16, 16:19, 16:20, 17:3, 17:5, 17:6, 17:7, 17:15, 17:17, 17:22, 18:4, 18:10, 18:16, 23:7, 23:19, 23:23, 23:24, 24:3, 24:13, 24:14, 24:24, 25:17, 25:19, 25:20, 25:23, 26:14, 26:23, 26:25, 27:19, 30:8, 31:10, 34:13, 34:16, 35:11, 36:14, 39:16, 39:18, 40:23, 40:24, 41:1, 48:3, 49:7, 49:9, 49:13, 49:20, 52:13, 52:16, 52:17, 53:15, 54:10, 54:15, 56:16, 56:17, 58:22, 59:9, 59:12, 61:14, 61:16, 65:13, 70:9, 70:20, 70:25, 71:11, 71:17, 72:7, 72:18, 73:2, 74:10, 74:11, 74:16, 74:21, 75:9, 75:16, 83:12, 83:16, 86:3, 95:6, 95:17, 96:23, 97:4, 97:7, 97:25, 98:7, 98:10, 99:11, 100:5, 100:12, 100:13, 100:18, 100:19, 101:13, 101:23, 102:8, 102:13, 102:17, 102:21, 110:13, 114:9, 114:16, 114:22
**CASE** [1] - 1:5

**cases** [31] - 13:18, 13:20, 13:22, 14:1, 16:12, 17:1, 17:6, 18:11, 24:17, 26:23, 51:11, 55:10, 56:13, 57:15, 57:16, 58:4, 64:25, 71:21, 73:17, 73:25, 75:14, 76:3, 82:11, 86:4, 99:10, 100:1, 100:4, 102:2, 103:4, 103:6, 114:17
**casting** [1] - 52:24
**categorically** [1] - 111:9
**category** [2] - 54:14, 110:10
**Catholic** [5] - 16:3, 16:16, 17:2, 17:12, 17:15
**causes** [1] - 21:17
**CEO** [1] - 7:23
**certain** [9] - 13:22, 20:2, 36:23, 39:1, 39:11, 66:20, 99:4, 102:21, 103:5
**certainly** [23] - 8:18, 12:23, 13:5, 26:10, 35:5, 36:5, 38:3, 38:8, 49:11, 62:23, 73:15, 76:2, 76:15, 82:21, 86:14, 92:16, 94:15, 96:9, 100:3, 108:24, 111:13, 112:25, 114:9
**CERTIFICATE** [1] - 116:1
**Certified** [1] - 116:5
**certify** [1] - 116:8
**cetera** [3] - 31:11, 44:19, 63:23
**CFR** [1] - 60:5
**challenge** [1] - 71:10
**challenged** [1] - 41:3
**chance** [1] - 76:16
**change** [17] - 8:13, 35:9, 35:12, 38:15, 43:8, 44:1, 44:3, 45:19, 45:21, 45:23, 45:25, 64:21, 65:9, 73:18, 83:1, 101:5, 101:20
**changed** [3] - 35:6, 64:13, 93:10
**changing** [3] - 35:13, 88:22, 94:16
**characterized** [1] - 25:15
**Charles** [1] - 2:3
**chase** [1] - 26:1
**chat** [1] - 103:11
**check** [1] - 87:17
**checked** [1] - 20:10
**chemicals** [1] - 51:7
**Chicago** [1] - 74:16
**Chief** [4] - 4:15, 4:16, 4:18, 40:25
**chilled** [1] - 74:17
**choose** [1] - 48:16
**Circuit** [11] - 34:13, 48:3, 48:9, 56:17, 71:7, 71:14, 71:19, 71:20, 74:2, 89:22
**circular** [1] - 106:11
**circumstances** [4] - 14:7, 61:24, 90:5, 114:5
**citation** [1] - 93:4
**cite** [3] - 70:21, 71:17, 100:13
**cited** [5] - 16:16, 26:24, 55:22, 99:10, 102:2
**cites** [1] - 54:10
**citing** [1] - 100:3
**civil** [2] - 3:4, 80:23
**Cl** [1] - 58:22
**claim** [27] - 10:20, 10:21, 12:24, 16:7, 26:17, 30:9, 30:10, 31:5, 41:18, 41:21, 41:22, 45:2, 52:24, 53:6, 56:24, 63:6, 70:2, 92:15, 92:16, 92:20, 93:1, 109:12, 109:22, 115:18
**claiming** [6] - 11:1, 11:25, 15:1, 36:4, 57:17, 98:21
**claims** [23] - 4:22, 11:8, 11:14, 12:25, 13:1, 15:2, 15:25, 18:3, 26:6, 55:9, 55:25, 62:13, 62:16, 62:20, 72:3, 72:5, 73:4, 73:18, 100:21, 101:1, 104:10, 109:9
**Claims** [21] - 10:3, 11:2, 12:17, 13:16, 14:4, 14:5, 18:7, 22:5, 23:8, 24:2, 24:5, 24:9, 24:11, 71:6, 71:22, 72:3, 72:10, 72:13, 98:3, 102:24, 114:20
**Claims'** [1] - 72:2
**clarify** [1] - 76:16
**clarity** [1] - 32:20
**classification** [2] - 23:20, 62:10
**clean** [10] - 43:13, 43:14, 43:17, 44:6, 51:8, 88:13, 103:24
**Clean** [11] - 12:1, 20:8, 27:19, 61:12, 61:20, 88:13, 89:15, 109:20, 114:25, 115:2, 115:5
**clear** [18] - 4:7, 5:8, 7:21, 8:15, 18:4, 24:24, 27:20, 42:1, 43:9, 44:14, 56:13, 64:17, 73:17, 74:4, 75:23, 101:8, 113:9, 113:16
**clearly** [2] - 15:8, 99:14
**client** [6] - 7:18, 47:12, 103:15, 105:23, 106:23, 107:9
**clients** [12] - 8:20, 11:4, 28:11, 47:7, 99:17, 105:5, 105:13, 105:14, 105:15, 106:6, 111:12, 113:22
**Climate** [2] - 62:4, 74:11
**climate** [3] - 19:19, 19:22, 65:9
**clock** [1] - 20:16
**close** [1] - 88:13
**closed** [1] - 108:22
**closely** [2] - 4:1, 4:8
**closing** [1] - 114:23
**coercive** [1] - 40:3
**COFC** [3] - 98:2, 98:4, 99:6
**Coleman** [1] - 56:17
**colleague** [3] - 3:19, 4:23, 19:10
**Colleges** [1] - 71:8
**color** [1] - 108:23
**Comeback** [1] - 20:7
**coming** [1] - 73:9
**commit** [1] - 47:21
**commitment** [1] - 46:10
**commitments** [1] - 48:20
**committee** [1] - 47:8
**communicated** [1] - 49:18
**communication** [1] - 87:9
**Communities** [6] - 8:4, 20:18, 32:4, 49:16, 110:25, 111:5
**communities** [31] - 19:23, 22:19, 28:17, 29:15, 35:20, 36:10, 36:13, 37:18, 38:2, 39:5, 44:12, 44:22, 44:23, 47:17, 48:21, 48:24, 51:3, 51:5, 53:1, 65:8, 66:21, 67:3, 86:9, 86:11, 88:15, 91:23, 94:11, 99:22, 109:7, 113:5
**communities'** [1] - 69:1
**community** [8] - 35:25, 44:16, 45:3, 45:6, 66:12, 88:19, 106:23, 106:24
**community-led** [1] - 44:16
**compensation** [1] - 25:21
**compile** [1] - 115:13
**compiling** [2] - 87:23, 115:8
**complaint** [1] - 68:9
**Complaint** [13] - 16:23, 42:8, 43:11, 44:15, 59:14, 62:23, 68:15, 68:21, 70:16, 70:18, 73:21, 75:12, 102:20
**complete** [1] - 77:19
**completely** [2] - 83:17, 84:22
**compliance** [2] - 93:5, 93:15
**complicated** [1] - 115:10
**comply** [5] - 34:18, 35:3, 43:23, 63:25, 85:9
**complying** [1] - 80:22
**component** [6] - 16:7, 31:17, 34:12, 37:2, 37:8, 38:5
**comprises** [1] - 87:24
**Computer** [1] - 1:25
**Computer-Aided** [1] - 1:25
**concede** [5] - 53:22, 73:14, 74:13, 74:20, 84:18
**conceded** [4] - 54:19, 63:14, 75:17, 114:24
**concedes** [1] - 98:13
**conceived** [1] - 66:19
**conception** [1] - 67:10
**concerned** [2] - 15:23, 32:9
**concerning** [1] - 5:20
**concerns** [1] - 89:20
**concession** [1] - 115:4
**conclude** [2] - 32:1, 32:18
**concluded** [2] - 25:9, 115:21
**conclusion** [4] - 16:21, 24:5, 33:21, 85:22
**concrete** [1] - 22:1
**concurrent** [1] - 114:19
**condition** [2] - 41:3, 81:13
**conditions** [47] - 9:19, 11:9, 11:15, 11:22, 12:8, 12:15, 52:17, 53:5, 53:10, 54:20, 55:16, 57:25, 59:11, 59:21, 60:4, 61:6, 61:22, 63:16, 63:18, 64:11, 64:12, 64:15, 64:16, 66:6, 67:15, 68:10, 68:13, 68:16, 68:18, 68:20, 69:5, 69:9, 69:15, 74:19, 75:7, 75:11, 75:19, 80:18, 80:24, 81:14, 82:1, 83:14, 88:17, 93:4, 93:13, 94:14, 94:21
**conduct** [6] - 50:19, 90:1, 92:6, 112:17, 112:18, 112:19
**confer** [2] - 42:19, 115:15
**Conference** [3] - 17:2, 17:12, 116:12
**conferred** [2] - 21:14, 24:11
**confers** [1] - 63:24
**confirm** [1] - 35:21
**confirmed** [1] - 25:6
**confirming** [1] - 24:8
**conflating** [1] - 101:6
**conflation** [1] - 64:15
**conflict** [20] - 65:23, 66:3, 67:8, 67:14, 78:8, 78:20, 79:3, 79:24, 80:7, 81:8, 85:14, 86:1, 86:17, 90:22, 91:11, 91:19, 92:1, 110:2, 110:7, 110:11
**conflicting** [2] - 19:25, 96:3
**conflicts** [2] - 85:18, 110:6
**conformance** [1] - 116:11
**confronting** [1] - 25:5
**Congress** [18] - 9:10,

11:12, 19:17, 20:13, 20:14, 27:20, 27:21, 29:2, 29:10, 32:7, 34:25, 46:2, 50:7, 83:2, 83:21, 85:3, 85:10, 109:15
**Congress'** [2] - 20:13, 29:9
**congressional** [1] - 113:3
**congressionally** [2] - 15:8, 27:24
**consequence** [2] - 25:7, 33:16
**consider** [7] - 13:19, 14:3, 86:13, 96:20, 96:23, 103:16, 113:21
**consideration** [25] - 17:20, 18:22, 21:2, 21:4, 21:6, 21:8, 22:2, 22:11, 22:12, 23:14, 54:25, 58:8, 58:17, 58:20, 59:7, 59:10, 60:17, 61:1, 61:4, 61:7, 98:11, 100:1, 100:11, 100:15, 101:24
**considering** [1] - 9:3
**considers** [1] - 74:1
**consistent** [14] - 18:24, 28:5, 30:20, 31:15, 31:17, 32:21, 37:7, 43:2, 66:6, 67:4, 111:13, 111:17, 113:7, 113:12
**conspicuously** [1] - 24:20
**constitute** [3] - 35:19, 77:9, 106:14
**constituted** [2] - 17:17, 91:3
**constitutes** [4] - 35:24, 37:5, 70:22, 82:13
**Constitution** [11] - 10:25, 21:19, 26:19, 28:6, 33:24, 38:20, 48:11, 61:12, 62:17, 69:13, 69:17
**constitution** [1] - 9:21
**constitutional** [9] - 12:25, 41:18, 48:9, 55:9, 72:3, 100:21, 101:1, 101:10, 101:14
**constrained** [2] - 61:21
**constraints** [1] - 61:25
**construe** [1] - 56:24
**construed** [1] - 23:24
**consultation** [1] - 84:11
**contain** [1] - 88:4
**contemplated** [4] - 59:12, 59:18, 59:23, 60:7
**contemplates** [1] - 60:9
**contend** [1] - 10:24
**content** [1] - 40:7
**contention** [1] - 28:24
**contesting** [1] - 73:6
**context** [5] - 5:19, 19:12, 39:24, 102:14, 112:3
**continuation** [1] - 45:22
**continue** [10] - 13:14, 20:22, 30:6, 33:6, 49:10, 49:21, 50:15, 90:22, 96:2, 113:3
**continued** [1] - 38:13
**continues** [2] - 67:13, 79:24
**contours** [6] - 12:10, 13:1, 14:25, 40:1, 40:4, 111:15
**Contract** [3] - 17:6, 22:14, 103:5
**contract** [51] - 10:24, 13:4, 16:2, 17:9, 17:10, 21:3, 23:1, 23:21, 40:1, 52:17, 52:20, 53:11, 54:16, 55:1, 55:7, 55:8, 55:10, 57:24, 58:2, 58:7, 58:11, 58:12, 58:16, 58:20, 58:23, 58:24, 58:25, 59:10, 61:1, 61:3, 61:8, 61:10, 61:15, 61:16, 62:12, 62:20, 68:11, 69:18, 70:3, 73:20, 75:1, 97:24, 98:5, 98:8, 98:20, 100:22, 103:8, 107:17
**contracts** [21] - 13:14, 15:25, 17:17, 18:21, 21:7, 22:8, 22:10, 22:13, 22:23, 23:9, 23:13, 26:20, 58:3, 58:5, 58:14, 63:8, 79:9, 100:7, 100:9, 103:3, 104:25
**contractual** [9] - 10:21, 52:18, 54:8, 59:4, 68:7, 68:13, 74:19, 75:3, 101:2
**contractually** [2] - 46:4, 52:15
**contradict** [1] - 35:5
**contradicts** [1] - 5:22
**contrary** [4] - 19:25, 27:16, 31:4, 35:17
**control** [3] - 40:3, 53:13, 74:10
**controls** [3] - 24:10, 26:13, 71:20
**convey** [1] - 38:6
**conveyed** [1] - 38:8
**convinced** [2] - 26:1, 96:16
**Coogan** [5] - 6:12, 6:13, 110:21, 110:22, 111:3
**cooperative** [7] - 11:10, 17:17, 21:5, 22:13, 36:23, 68:25, 104:25
**copies** [1] - 6:15
**core** [7] - 52:16, 55:19, 70:16, 70:18, 73:19
**correct** [17] - 10:11, 11:17, 23:10, 28:22, 29:7, 29:17, 29:19, 35:4, 39:2, 39:3, 42:15, 43:4, 55:5, 70:14, 87:25, 113:15, 116:9
**correction** [1] - 72:11
**correctly** [1] - 27:5
**cost** [1] - 56:9
**costs** [6] - 6:25, 7:4, 56:6, 98:16, 99:4, 102:21
**counsel** [6] - 3:9, 3:20, 58:8, 76:19, 90:2, 90:9
**Count** [4] - 12:7, 12:8, 63:6, 63:10
**count** [1] - 98:1
**country** [1] - 49:4
**counts** [1] - 12:4
**County** [3] - 34:13, 34:24, 85:2
**couple** [14] - 4:12, 6:2, 10:15, 16:18, 33:3, 48:7, 50:10, 53:17, 68:8, 71:11, 73:24, 74:11, 80:2, 93:2
**course** [7] - 4:25, 5:10, 7:20, 35:9, 49:17, 96:19, 113:17
**court** [4] - 9:5, 10:1, 10:2, 10:7
**Court** [109] - 3:4, 3:7, 4:13, 5:10, 5:13, 6:16, 6:17, 8:6, 8:22, 9:5, 9:6, 10:3, 10:13, 11:2, 12:17, 13:16, 14:3, 14:4, 14:6, 14:19, 14:20, 18:7, 22:1, 22:5, 23:8, 23:25, 24:2, 24:3, 24:5, 24:6, 24:9, 24:11, 26:14, 32:10, 32:12, 32:18, 33:15, 40:22, 41:1, 41:4, 41:13, 44:14, 49:5, 49:8, 50:3, 50:24, 52:7, 52:13, 53:8, 54:7, 54:11, 56:14, 56:19, 57:13, 58:21, 58:22, 61:18, 62:9, 63:1, 71:5, 71:13, 71:22, 71:25, 72:1, 72:2, 72:5, 72:9, 72:13, 74:1, 74:12, 74:25, 75:5, 75:10, 76:18, 84:14, 88:25, 89:1, 89:14, 89:22, 90:1, 90:8, 92:20, 92:24, 95:5, 95:7, 95:11, 95:18, 96:6, 96:20, 96:22, 98:3, 98:9, 100:11, 100:18, 100:19, 100:23, 101:22, 102:24, 103:1, 103:2, 103:3, 103:8, 103:9, 108:19, 113:24, 114:19, 114:21, 116:7
**COURT** [162] - 1:1, 3:24, 5:7, 6:19, 7:10, 8:8, 8:25, 10:4, 11:13, 11:18, 12:3, 12:20, 13:7, 14:11, 14:24, 15:10, 15:15, 16:3, 17:24, 19:4, 19:15, 21:15, 21:17, 21:19, 22:7, 22:22, 22:25, 23:15, 24:8, 24:15, 25:25, 26:12, 27:4, 28:18, 28:23, 29:2, 29:10, 29:20, 29:25, 30:3, 30:25, 31:8, 31:15, 31:22, 32:23, 33:10, 33:18, 34:11, 35:18, 36:15, 36:25, 38:4, 38:18, 38:24, 39:13, 39:23, 40:11, 41:17, 41:20, 42:4, 42:7, 42:16, 42:20, 42:23, 46:5, 50:10, 50:21, 51:20, 51:25, 52:4, 52:19, 53:16, 53:24, 54:24, 55:20, 57:8, 58:13, 61:25, 62:8, 62:16, 63:6, 63:20, 64:5, 65:6, 65:8, 65:14, 65:19, 66:10, 66:22, 67:18, 69:13, 69:17, 69:23, 70:10, 70:13, 70:20, 71:1, 71:22, 72:5, 72:23, 73:10, 74:4, 75:23, 76:9, 77:3, 77:14, 78:7, 78:11, 78:15, 79:7, 79:12, 80:2, 80:5, 80:12, 81:22, 82:5, 82:10, 82:25, 83:8, 84:8, 85:2, 86:7, 86:12, 87:5, 87:12, 87:14, 87:19, 87:22, 88:8, 88:11, 88:18, 89:16, 89:18, 90:25, 91:8, 91:13, 93:16, 93:20, 94:9, 95:14, 95:17, 95:23, 96:21, 97:9, 97:22, 98:7, 98:24, 100:6, 100:16, 106:9, 108:8, 108:10, 111:19, 112:10, 112:14, 112:22, 113:10, 114:2, 114:12, 114:14, 115:7, 116:18
**Court's** [7] - 4:20, 27:1, 52:2, 52:8, 52:11, 65:1, 102:7
**Courtroom** [1] - 1:11
**courtroom** [2] - 4:15, 62:25
**COURTROOM** [2] - 3:3, 3:20
**courts** [5] - 14:23, 25:1, 25:3, 25:6, 114:19
**Courts** [11] - 12:12, 16:13, 48:1, 49:3, 65:2, 70:1, 75:24, 76:6, 89:23, 114:4, 114:8
**cover** [4] - 10:16, 18:14, 57:20, 95:19
**covered** [1] - 15:19
**crafted** [1] - 16:23
**create** [2] - 5:15, 67:11
**created** [2] - 8:21, 48:5
**creates** [1] - 21:20
**creating** [1] - 46:15
**cred** [1] - 104:1
**credibility** [1] - 107:13
**criteria** [3] - 36:21,

66:23, 77:6
**CRR** [1] - 116:18
**crucial** [1] - 21:8
**curiam** [3] - 27:1, 49:8, 102:7
**curium** [1] - 48:25
**current** [2] - 81:2, 94:10
**cut** [2] - 25:25, 55:12

## D

**damages** [21] - 9:23, 10:4, 14:9, 14:13, 14:16, 15:21, 16:2, 17:8, 17:9, 24:12, 25:13, 25:16, 56:11, 70:11, 70:12, 70:23, 72:14, 96:24, 98:12, 98:22, 114:18
**Daniel** [1] - 6:12
**data** [1] - 60:22
**date** [6] - 31:24, 106:14, 107:2, 107:3, 107:6, 107:21
**Dated** [1] - 116:14
**DAVIS** [1] - 1:19
**Davis** [1] - 3:15
**days** [1] - 87:6
**DC** [3] - 1:23, 34:13, 48:3
**de** [1] - 107:21
**deafening** [1] - 24:21
**deal** [1] - 29:8
**dealing** [6] - 12:24, 56:13, 58:23, 68:3, 74:12, 77:1
**dealt** [4] - 56:17, 74:16, 74:21, 114:16
**decide** [7] - 31:20, 47:20, 61:14, 63:9, 63:11, 84:15, 113:11
**decided** [5] - 4:10, 44:6, 72:25, 83:2, 100:18
**deciding** [2] - 40:18, 115:17
**decision** [33] - 5:22, 25:8, 25:14, 25:15, 25:19, 27:1, 27:12, 30:16, 31:11, 31:16, 37:12, 37:22, 38:21, 49:1, 55:1, 63:23, 65:1, 80:6, 80:10, 82:14, 102:8, 102:10, 108:15, 108:18, 108:20, 109:1, 109:5, 111:17, 111:25, 115:10
**decision-making** [8] - 5:22, 27:12, 31:11, 31:16, 63:23, 80:6, 80:10, 82:14
**decisions** [9] - 5:19, 27:10, 27:12, 28:4, 35:16, 37:12, 39:20, 90:4
**decisive** [1] - 69:25
**declaration** [7] - 6:11, 6:13, 7:23, 33:11, 101:16, 103:17, 103:18
**declarations** [3] - 6:15, 94:25, 98:15
**declaratory** [1] - 15:21
**declaring** [2] - 33:6, 34:9
**declined** [1] - 114:8
**deems** [1] - 89:1
**deep** [1] - 32:19
**deeper** [2] - 18:19
**deepest** [1] - 46:9
**deeply** [3] - 28:10, 32:9, 48:23
**defeat** [1] - 114:10
**defendant** [2] - 3:20, 49:25
**Defendants** [1] - 1:7
**DEFENDANTS** [1] - 2:1
**defense** [3] - 4:24, 5:4, 8:24
**deferential** [1] - 80:15
**defers** [1] - 65:4
**define** [8] - 52:25, 65:3, 65:5, 67:4, 74:14, 83:6, 86:5, 89:11
**defined** [2] - 29:15, 74:13
**defines** [2] - 68:5, 78:19
**defining** [1] - 67:3
**definitely** [1] - 108:5
**definition** [6] - 22:13, 41:2, 88:14, 88:24, 91:17, 91:22
**definitions** [1] - 94:17
**defying** [1] - 51:12
**DEI** [12] - 28:8, 28:11, 39:9, 40:15, 41:9, 78:4, 78:19, 79:22, 81:6, 91:4, 91:10, 110:1
**delegated** [1] - 30:21
**deliberately** [3] - 97:18, 103:18, 104:2
**DeMella** [38] - 1:18, 3:14, 3:15, 4:23, 5:3, 8:23, 9:1, 10:11, 11:17, 11:20, 12:18, 12:21, 13:17, 14:15, 14:25, 15:12, 15:17, 16:10, 17:25, 19:7, 19:16, 21:16, 21:18, 22:4, 22:9, 22:24, 23:10, 23:16, 24:14, 24:16, 25:25, 26:9, 26:22, 27:6, 36:8, 43:9, 43:15, 97:25
**demonstrate** [1] - 44:5
**denial** [2] - 89:19, 90:25
**denying** [1] - 50:22
**Department** [1] - 49:1
**depended** [1] - 100:21
**deputy** [1] - 6:12
**DEPUTY** [2] - 3:3, 3:20
**described** [5] - 27:21, 29:14, 47:7, 50:7, 113:18
**describing** [1] - 48:13
**descriptive** [2] - 31:4, 31:5
**deserving** [1] - 44:24
**designate** [1] - 31:20
**designated** [2] - 5:16, 106:3
**despite** [1] - 18:23
**detailed** [2] - 94:16, 115:8
**details** [1] - 8:11
**determination** [1] - 69:10
**determinations** [1] - 44:23
**determine** [3] - 35:19, 35:24, 83:8
**determining** [1] - 64:4
**develop** [1] - 46:18
**developed** [1] - 60:12
**developing** [2] - 46:14, 103:23
**Development** [3] - 39:16, 40:23, 41:14
**difference** [3] - 36:20, 64:22, 76:21
**different** [32] - 12:12, 13:8, 15:24, 17:3, 17:8, 17:11, 17:13, 19:5, 31:18, 33:3, 37:6, 41:20, 41:22, 50:11, 54:14, 57:11, 64:18, 64:19, 77:5, 77:18, 80:10, 88:18, 95:21, 102:16, 103:9, 103:14, 106:21, 106:22, 107:12, 113:4, 113:5
**differently** [3] - 49:6, 106:22, 107:1
**difficult** [1] - 76:14
**difficulties** [1] - 76:3
**dilemma** [1] - 48:11
**diminish** [1] - 11:24
**direct** [12] - 15:11, 21:9, 21:13, 22:15, 22:17, 22:18, 29:17, 59:8, 72:10, 98:9, 100:11, 105:14
**directed** [4] - 27:20, 29:11, 34:25, 85:3
**directing** [1] - 77:4
**direction** [2] - 36:19, 51:17
**directions** [1] - 12:12
**directive** [2] - 29:11, 113:3
**directly** [3] - 5:22, 99:15, 102:6
**disadvantaged** [20] - 19:22, 22:19, 29:15, 35:20, 35:24, 36:9, 36:13, 37:18, 38:2, 39:5, 52:25, 65:8, 66:21, 67:3, 86:9, 86:11, 88:15, 88:19, 94:11, 113:5
**disagree** [3] - 38:3, 62:21, 69:25
**disagreement** [3] - 34:17, 35:1, 35:2
**disagreements** [1] - 34:1
**disallowance** [5] - 13:22, 25:7, 25:8, 25:14, 25:15
**disallowed** [1] - 99:5
**disappear** [2] - 48:6, 104:6
**disappointing** [1] - 48:23
**disclaim** [1] - 56:22
**discrete** [2] - 77:1, 77:3
**discretion** [7] - 27:24, 30:9, 30:10, 44:21, 89:11, 109:19, 113:20
**discretionary** [4] - 37:3, 37:8, 89:24, 90:3
**discriminate** [2] - 38:21, 66:9
**discrimination** [6] - 5:24, 28:4, 51:14, 78:2, 93:11, 93:12
**discussed** [7] - 6:8, 10:12, 18:6, 18:11, 23:6, 57:23, 82:1
**discussing** [1] - 14:21
**discussion** [3] - 61:19, 90:2, 90:9
**Discussion** [1] - 42:21
**disfavors** [1] - 28:8
**dismiss** [2] - 56:20, 102:17
**dismissed** [2] - 102:18, 102:19
**dispersed** [1] - 47:17
**disposition** [1] - 59:24
**dispositions** [1] - 59:19
**dispute** [9] - 17:11, 54:12, 54:25, 58:6, 58:16, 58:19, 61:2, 62:18
**Disputes** [3] - 17:7, 22:14, 103:6
**disputes** [1] - 17:10
**disruption** [2] - 37:20, 37:24
**disruptive** [1] - 38:16
**distinct** [1] - 105:15
**distinction** [3] - 17:15, 39:23, 89:23
**distinctions** [3] - 17:23, 26:16, 73:25
**distinguish** [2] - 16:19, 57:16
**distinguishable** [8] - 16:8, 53:14, 53:16, 54:6, 57:22, 63:5, 75:16, 86:3
**distinguishes** [1] - 54:11
**distinguishing** [1] - 54:18
**District** [7] - 9:5, 23:25, 24:6, 100:19, 100:23, 116:7
**district** [3] - 14:23, 25:5, 114:19
**DISTRICT** [3] - 1:1, 1:1, 1:10
**diversity** [1] - 90:20
**division** [2] - 5:8, 15:16
**DIVISION** [1] - 1:2
**docket** [2] - 3:4, 102:9
**documents** [4] - 61:7, 82:8, 87:15, 88:4
**dollars** [2] - 73:4, 94:25
**done** [11] - 31:24, 32:1, 32:4, 37:20, 43:7, 46:25, 106:10, 106:13, 107:2, 112:4
**door** [1] - 50:16

**doubt** [1] - 106:9
**down** [5] - 6:1, 12:14, 37:18, 37:19, 55:22
**dozens** [2] - 51:1, 112:8
**dramatic** [1] - 104:6
**draw** [3] - 7:19, 8:2, 85:22
**drawn** [2] - 7:17, 12:13
**draws** [1] - 7:13
**drill** [1] - 12:14
**Drinker** [1] - 3:17
**DRINKER** [1] - 1:22
**drinking** [1] - 51:8
**due** [4] - 25:9, 41:22, 42:9, 42:11
**duplication** [2] - 28:12, 81:1
**during** [3] - 5:13, 45:17, 60:13
**dynamic** [1] - 108:17

## E

**early** [3] - 50:3, 87:9, 107:15
**ECF** [18] - 56:4, 56:7, 59:13, 59:18, 59:23, 60:1, 60:4, 60:13, 60:20, 60:21, 60:24, 65:16, 66:17, 67:1, 68:14, 78:1, 90:15, 93:6
**Education** [2] - 49:1, 71:8
**effect** [4] - 33:7, 40:6, 70:22, 73:2
**effectively** [1] - 32:5
**effectuate** [2] - 45:25, 46:3
**effectuates** [3] - 34:23, 81:12, 81:15
**effectuating** [1] - 34:20
**efforts** [2] - 47:7, 47:21
**eggs** [1] - 108:4
**eight** [1] - 102:16
**either** [9] - 8:8, 8:12, 88:24, 93:23, 96:24, 98:20, 105:16, 107:7, 113:6
**Eldridge** [1] - 42:11
**element** [9] - 10:18, 18:22, 21:1, 21:2, 21:6, 21:8, 22:11, 22:12, 23:14
**elements** [6] - 21:3, 22:2, 23:5, 57:18, 58:16, 78:12
**eligible** [4] - 29:5, 29:14, 40:20, 112:24
**eliminate** [1] - 78:2
**eloquent** [1] - 26:25
**elsewhere** [1] - 47:21
**embodied** [1] - 113:25
**emergency** [2] - 71:2, 102:9
**emission** [1] - 85:6
**emissions** [1] - 44:18
**emphasize** [4] - 15:19, 27:17, 49:25, 50:23
**emphasizes** [1] - 18:6
**emphasizing** [1] - 48:8
**employed** [1] - 47:5
**employees** [7] - 7:24, 8:1, 8:3, 47:13, 47:18, 106:16
**employment** [1] - 47:14
**empty** [2] - 109:3
**enables** [1] - 8:2
**encourage** [1] - 38:25
**end** [10] - 20:19, 23:7, 28:9, 29:20, 32:6, 47:14, 56:25, 85:6, 85:17, 95:20
**endeavor** [1] - 115:10
**ended** [1] - 52:12
**ending** [7] - 11:5, 67:12, 81:20, 83:16, 83:19, 84:21, 85:23
**ends** [1] - 30:4
**enforcement** [1] - 43:22
**engage** [5] - 36:7, 43:24, 45:11, 63:23, 65:21
**engaged** [7] - 39:7, 47:3, 48:12, 105:6, 105:8, 105:19, 107:4
**engaging** [1] - 51:13
**enjoin** [4] - 9:7, 9:8, 9:9, 103:3
**enormous** [2] - 113:16, 113:17
**enormously** [1] - 38:16
**ensure** [1] - 79:2
**ensuring** [2] - 40:13, 90:18
**entail** [1] - 21:8
**enter** [1] - 71:23
**entire** [5] - 20:17, 77:2, 77:19, 77:21, 77:22
**entirely** [3] - 14:13, 37:9, 61:15
**entirety** [1] - 32:2
**entities** [2] - 29:14, 63:24
**entitle** [1] - 62:7
**entitled** [6] - 53:19, 62:18, 62:19, 65:9, 76:12, 116:10
**entitlement** [3] - 33:5, 55:1, 68:7
**entitles** [2] - 25:21, 75:18
**ENVIRONMENTAL** [1] - 1:6
**environmental** [4] - 59:15, 65:9, 103:20, 103:22
**Environmental** [60] - 3:6, 19:19, 27:21, 27:25, 28:1, 28:8, 28:12, 30:13, 30:18, 30:24, 31:7, 31:8, 31:9, 32:17, 39:10, 40:16, 41:10, 62:3, 65:21, 66:1, 66:2, 66:3, 67:7, 67:12, 67:22, 77:12, 77:21, 78:4, 78:19, 78:23, 79:22, 81:7, 81:20, 83:6, 83:16, 83:20, 84:7, 84:21, 85:17, 85:18, 85:24, 86:1, 86:23, 86:24, 86:25, 90:20, 91:2, 91:11, 91:18, 94:3, 94:4, 103:21, 110:1, 110:10, 110:15, 110:20, 110:25, 111:4, 111:9
**envisions** [1] - 88:19
**EPA** [134] - 5:16, 5:19, 5:23, 6:4, 6:12, 11:1, 11:4, 11:22, 12:14, 13:13, 15:9, 18:23, 18:24, 19:18, 19:20, 19:24, 20:3, 20:11, 20:12, 20:15, 21:13, 23:2, 24:18, 24:24, 27:13, 27:18, 27:20, 27:23, 28:5, 28:11, 29:11, 29:25, 31:5, 31:15, 31:18, 31:19, 31:23, 31:24, 32:1, 32:5, 32:21, 33:1, 33:13, 33:16, 35:19, 35:23, 36:5, 36:18, 36:19, 38:13, 38:20, 41:8, 43:2, 43:16, 48:25, 49:17, 49:18, 49:22, 52:14, 52:20, 52:21, 52:25, 54:2, 55:23, 57:13, 59:3, 59:16, 60:11, 60:13, 60:15, 60:20, 60:22, 61:21, 63:2, 63:8, 63:18, 64:12, 65:4, 65:11, 65:20, 67:1, 67:2, 67:4, 67:13, 68:4, 68:17, 68:18, 69:9, 71:23, 76:21, 77:17, 77:20, 78:1, 78:16, 78:19, 78:23, 83:8, 83:15, 83:16, 83:19, 83:20, 84:4, 84:20, 85:23, 86:16, 87:17, 88:19, 88:23, 89:10, 90:16, 94:19, 102:4, 102:5, 106:7, 109:19, 109:22, 110:9, 110:14, 110:18, 110:22, 111:8, 112:1, 112:16, 112:18, 113:20, 113:21, 114:25, 115:2, 115:3
**EPA's** [13] - 20:14, 24:17, 24:20, 27:10, 27:16, 28:2, 28:3, 30:10, 43:16, 53:2, 88:8, 109:13, 113:19
**equitable** [4] - 14:5, 14:8, 18:8, 24:6
**equities** [2] - 95:13, 96:14
**equity** [1] - 90:20
**eradicate** [1] - 20:17
**erode** [1] - 47:6
**erosion** [1] - 8:20
**error** [1] - 53:15
**ESQUIRE** [5] - 1:16, 1:18, 1:21, 1:22, 2:2
**essence** [4] - 10:19, 10:20, 23:21, 62:11
**essential** [2] - 8:15, 34:7
**essentially** [12] - 21:25, 22:18, 34:14, 34:16, 35:7, 40:2, 43:19, 43:21, 45:13, 46:2, 78:12, 106:17
**establish** [2] - 84:2, 115:4
**establishes** [3] - 66:20, 73:10, 73:12
**et** [6] - 1:6, 3:5, 3:6, 31:11, 44:19, 63:23
**ether** [1] - 77:18
**evaluate** [1] - 46:21
**event** [1] - 26:16
**events** [1] - 51:8
**evidence** [23] - 15:5, 15:6, 44:8, 69:9, 77:16, 82:13, 94:4, 96:1, 96:3, 96:10, 96:12, 101:17, 105:5, 105:10, 111:19, 111:24, 111:25, 112:11, 112:16, 112:17, 112:18, 113:9, 115:9
**evidentiary** [1] - 66:10
**exact** [2] - 102:15, 112:8
**exactly** [3] - 26:15, 44:2, 65:10
**example** [15] - 16:3, 47:4, 48:3, 63:11, 66:17, 67:21, 69:20, 88:18, 98:18, 103:4, 103:16, 104:3, 106:23, 107:9, 107:12
**exceed** [1] - 109:13
**exceeded** [1] - 27:17
**excellence** [22] - 65:25, 66:5, 66:14, 67:9, 78:9, 78:21, 79:4, 80:1, 80:8, 80:20, 81:9, 86:3, 86:18, 90:23, 91:12, 92:2, 109:2, 109:8, 110:3, 110:9, 110:12, 110:16
**exception** [1] - 14:7
**excess** [3] - 31:2, 31:5, 63:9
**exclude** [2] - 36:10, 41:8
**exclusive** [2] - 13:15, 91:18
**exclusively** [1] - 13:4
**excuse** [3] - 20:9, 24:23, 42:18
**execution** [1] - 60:10
**executive** [2] - 85:3, 85:9
**Executive** [3] - 4:15, 4:16, 4:18
**exercise** [2] - 36:8, 41:6
**exercising** [1] - 53:14
**exhibits** [1] - 4:2
**exist** [4] - 29:22, 35:1, 46:16, 82:6
**existed** [2] - 5:11, 50:3
**existential** [1] - 96:4
**existing** [2] - 43:22, 43:23
**exists** [3] - 55:7, 82:13, 88:3
**expand** [2] - 103:19,

104:4
**expanded** [1] - 72:2
**expeditiously** [1] - 76:13
**expenditure** [1] - 25:2
**expenditures** [1] - 95:3
**expenses** [3] - 16:5, 57:4, 57:5
**explain** [8] - 20:4, 31:11, 68:17, 100:6, 107:25, 112:2
**explained** [1] - 41:4
**explaining** [2] - 5:8, 27:1
**explanation** [7] - 42:3, 67:22, 80:10, 80:16, 88:9, 91:24, 91:25
**explicit** [1] - 49:8
**explicitly** [7] - 56:12, 56:14, 71:16, 74:25, 86:5, 100:8
**exposure** [1] - 51:6
**expressive** [3] - 39:6, 39:21, 111:14
**expressly** [1] - 105:12
**extend** [1] - 50:23
**extensive** [1] - 71:5
**extent** [16] - 30:13, 32:13, 32:18, 32:20, 37:23, 39:18, 84:17, 84:19, 88:7, 89:3, 91:13, 99:15, 101:11, 102:4, 102:12
**extra** [2] - 53:2, 88:15
**extraordinary** [2] - 47:1, 47:10
**extreme** [1] - 51:7
**eye** [1] - 107:6

## F

**face** [5] - 5:24, 28:4, 39:10, 40:17, 91:15
**faced** [1] - 48:10
**fact** [23] - 8:16, 11:21, 11:24, 19:2, 27:13, 32:6, 35:23, 36:15, 54:24, 55:7, 55:8, 57:3, 59:22, 73:17, 82:12, 91:1, 97:23, 101:18, 106:5, 106:13, 109:10, 115:3
**factor** [2] - 75:19, 104:8
**factors** [9] - 4:23, 5:6, 8:10, 23:7, 27:9, 49:23, 51:16, 60:18, 95:12
**facts** [4] - 57:22, 61:4, 75:15, 90:9
**factual** [2] - 66:10, 93:16
**FAEGRE** [1] - 1:22
**Faegre** [1] - 3:17
**fail** [3] - 5:20, 34:18, 35:2
**failed** [2] - 27:13, 107:22
**failing** [1] - 27:14
**failure** [2] - 15:3, 31:11
**Fair** [1] - 93:10
**fair** [8] - 12:20, 27:21, 57:21, 66:13, 73:1, 78:25, 109:4, 112:13
**fairness** [25] - 65:24, 66:4, 66:14, 67:9, 78:9, 78:20, 79:4, 79:25, 80:8, 80:20, 81:9, 81:18, 81:24, 85:15, 86:2, 86:18, 90:23, 91:12, 92:2, 109:2, 109:7, 110:3, 110:8, 110:12, 110:16
**fall** [6] - 13:6, 14:20, 16:24, 27:12, 71:14, 74:8
**familiar** [1] - 27:5
**far** [18] - 15:20, 20:10, 21:12, 25:8, 26:8, 30:19, 32:11, 34:3, 49:3, 68:6, 74:17, 75:9, 75:18, 84:16, 92:4, 98:17, 99:14, 114:20
**Farber** [8] - 3:23, 51:23, 51:25, 97:9, 97:16, 101:15, 109:18, 109:21
**FARBER** [79] - 2:2, 3:22, 52:1, 52:5, 52:23, 53:17, 54:3, 55:5, 55:21, 57:15, 58:15, 62:2, 62:15, 62:21, 63:13, 64:2, 64:7, 65:7, 65:10, 65:18, 65:22, 66:16, 66:24, 67:20, 69:15, 69:22, 69:25, 70:12, 70:15, 70:24, 71:3, 71:25, 72:8, 73:1, 73:12, 74:8, 76:2, 76:11, 77:10, 77:15, 78:8, 78:13, 78:25, 79:11, 79:14, 80:4, 80:9, 80:14, 81:25, 82:7, 82:16, 83:4, 83:11, 84:13, 85:11, 86:10, 86:14, 87:8, 87:13, 87:17, 87:21, 87:25, 88:10, 88:12, 88:21, 89:17, 89:21, 91:5, 91:9, 91:16, 93:19, 93:22, 94:13, 95:16, 95:22, 95:25, 96:22, 114:13, 114:15
**Farber's** [2] - 99:11, 108:16
**fast** [1] - 78:6
**fault** [1] - 76:16
**favor** [1] - 32:11
**favorite** [1] - 52:10
**favors** [1] - 90:6
**February** [2] - 20:9
**Fed** [1] - 58:22
**FEDERAL** [1] - 116:18
**Federal** [27] - 9:5, 10:3, 11:2, 12:17, 13:16, 14:4, 18:7, 22:5, 23:8, 24:5, 24:9, 24:11, 54:13, 54:17, 54:20, 71:6, 71:22, 72:2, 72:5, 72:9, 72:13, 98:3, 100:19, 102:24, 114:20
**federal** [7] - 14:22, 25:1, 25:5, 67:16, 69:5, 69:24, 105:9
**few** [6] - 9:25, 12:11, 47:23, 47:24, 49:4, 114:6
**fides** [1] - 107:13
**fifth** [3] - 12:4, 98:1
**Fifth** [4] - 1:19, 12:1, 41:18, 42:7
**figure** [4] - 58:7, 70:7, 82:2, 89:23
**file** [2] - 55:25, 87:6
**filed** [2] - 9:4, 115:13
**filings** [3] - 4:3, 55:22, 73:4
**finally** [2] - 75:5, 114:23
**findings** [1] - 24:23
**fine** [4] - 5:7, 26:10, 57:16, 78:7
**fire** [2] - 96:1, 106:16
**fires** [1] - 51:7
**firm** [2] - 3:12, 3:17
**First** [25] - 5:24, 11:25, 28:5, 39:15, 39:16, 39:17, 39:22, 41:5, 42:1, 42:5, 51:14, 69:20, 89:14, 89:20, 89:25, 90:3, 92:4, 92:5, 92:7, 92:11, 92:14, 92:16, 92:19, 93:1, 111:14
**first** [17] - 4:13, 10:18, 10:22, 12:21, 13:9, 16:20, 18:14, 18:15, 18:23, 23:11, 27:10, 32:9, 37:17, 45:17, 50:1, 53:17, 57:24
**fit** [2] - 58:9, 89:1
**fits** [1] - 106:19
**five** [1] - 12:4
**Five** [2] - 12:7, 12:9
**flesh** [1] - 76:7
**Floor** [1] - 2:3
**flow** [3] - 37:19, 57:9, 66:21
**flows** [1] - 74:7
**focus** [4] - 27:9, 44:2, 53:11, 89:19
**focused** [4] - 42:1, 43:8, 104:2, 108:3
**focusing** [3] - 9:3, 57:1, 63:20
**follow** [5] - 15:9, 20:12, 33:25, 43:7, 75:15
**followed** [2] - 34:2, 69:8
**following** [9] - 18:12, 37:10, 53:4, 64:4, 64:25, 65:22, 71:21, 110:23, 114:6
**footnote** [8] - 26:24, 27:4, 66:25, 67:1, 67:2, 88:23
**FOR** [4] - 1:1, 1:9, 1:14, 2:1
**forebear** [1] - 77:5
**foregoing** [1] - 116:8
**forget** [1] - 102:15
**forgo** [3] - 57:7, 70:19, 96:24
**form** [6] - 10:21, 14:5, 46:2, 59:10, 82:11, 96:3
**format** [1] - 116:11
**forth** [3] - 80:18, 83:21, 92:20
**forum** [1] - 18:4
**forward** [7] - 33:14, 92:24, 96:10, 96:15, 97:1, 105:25, 106:8
**Foundation** [12] - 1:21, 3:18, 4:17, 46:8, 103:15, 103:16, 103:18, 104:3, 104:7, 105:24, 106:2, 107:10
**foundation** [1] - 106:23
**foundations** [1] - 107:12
**four** [6] - 17:2, 21:3, 51:16, 58:6, 58:15, 61:3
**fourth** [3] - 49:23, 58:18, 61:3
**Fourth** [9] - 48:9, 56:17, 71:7, 71:13, 71:19, 71:20, 74:2, 89:22
**frame** [1] - 76:15
**framed** [1] - 62:23
**frankly** [3] - 12:11, 73:22, 99:25
**fraud** [4] - 28:12, 43:24, 81:1, 105:6
**free** [1] - 80:25
**freezing** [1] - 9:9
**fulfill** [1] - 5:21
**fulfilling** [1] - 48:16
**full** [2] - 77:19, 91:13
**functions** [8] - 65:25, 66:5, 78:10, 80:1, 80:21, 81:10, 90:24, 92:3
**fund** [6] - 6:24, 27:23, 32:16, 38:25, 39:9, 90:7
**fundamental** [2] - 22:11, 22:12
**fundamentally** [2] - 11:7, 22:4
**funded** [4] - 8:1, 40:8, 47:5, 112:24
**funding** [33] - 5:17, 6:21, 6:22, 7:13, 7:25, 13:23, 18:25, 22:18, 30:5, 33:6, 39:24, 40:3, 40:20, 49:18, 49:22, 50:13, 51:18, 53:18, 62:2, 62:5, 62:6, 62:7, 77:8, 77:11, 79:21, 83:5, 84:19, 84:21, 85:13, 89:24, 104:25, 106:17, 109:25
**fundings** [1] - 48:4
**funds** [23] - 7:1, 7:17, 7:19, 8:3, 8:15, 9:10, 19:20, 25:20, 29:18, 37:3, 47:4, 47:14, 48:22, 50:8, 54:21, 59:20, 83:3, 83:10, 88:19, 95:2, 98:24, 99:2, 115:1

**future** [8] - 15:24, 33:12, 55:19, 57:12, 60:21, 60:23, 96:4, 113:11

## G

**game** [1] - 41:13
**general** [10] - 11:15, 12:7, 24:6, 35:10, 59:5, 68:16, 68:19, 69:8, 78:2, 82:1
**generalized** [1] - 21:10
**generally** [4] - 14:6, 15:13, 68:12, 84:15
**geography** [1] - 6:10
**GHHI** [6] - 8:2, 46:8, 47:12, 103:13, 106:25
**given** [7] - 4:3, 45:25, 54:25, 57:2, 58:24, 62:3, 97:4
**goals** [4] - 34:20, 34:23, 69:11, 90:7
**Goldstein** [1] - 3:12
**gosh** [1] - 87:21
**govern** [7] - 51:13, 54:20, 54:21, 57:25, 61:22, 68:13, 93:14
**governed** [1] - 50:19
**governing** [4] - 54:8, 54:16, 69:1, 81:14
**government** [2] - 21:4, 21:10
**Government** [83] - 3:23, 15:25, 16:16, 16:18, 21:24, 22:15, 22:17, 23:24, 26:4, 26:19, 33:25, 35:6, 35:9, 38:24, 39:6, 39:8, 39:24, 40:2, 40:18, 48:13, 48:14, 48:17, 49:25, 50:4, 54:13, 54:17, 54:21, 57:8, 57:10, 58:2, 59:21, 59:25, 60:2, 60:6, 60:8, 62:17, 63:22, 63:25, 68:14, 69:18, 71:9, 73:5, 73:15, 75:4, 75:6, 87:1, 87:6, 90:4, 90:5, 91:14, 92:8, 95:4, 96:11, 96:12, 96:19, 98:6, 98:13, 99:12, 99:18, 99:19, 99:24, 101:7, 102:2, 102:7, 102:12, 102:23, 103:2, 104:9, 104:10, 104:24, 105:4, 105:12, 105:17, 107:3, 107:22, 108:22, 108:23, 109:9, 115:12
**Government's** [8] - 4:24, 21:12, 35:8, 52:9, 69:21, 89:15, 95:8, 112:25
**governs** [3] - 63:16, 74:23, 101:2
**grab** [1] - 30:16
**grammar** [3] - 109:23, 110:5
**grant** [98] - 5:17, 6:20, 7:13, 7:17, 7:25, 8:1, 8:3, 8:4, 11:4, 12:16, 14:5, 18:8, 20:18, 24:7, 30:12, 34:6, 40:1, 40:20, 44:7, 44:25, 45:7, 45:10, 45:12, 45:13, 47:4, 47:5, 47:14, 48:4, 49:18, 49:22, 51:18, 53:5, 54:21, 55:16, 55:24, 56:9, 57:25, 58:1, 59:20, 60:9, 60:13, 61:2, 61:6, 61:22, 63:16, 63:17, 64:17, 66:6, 68:10, 68:12, 68:16, 68:19, 69:2, 69:4, 69:19, 69:21, 71:10, 72:6, 72:13, 74:18, 75:8, 75:11, 76:24, 77:1, 77:13, 77:24, 79:6, 79:21, 80:25, 81:5, 81:11, 82:1, 82:4, 83:13, 86:4, 88:16, 89:4, 89:6, 90:1, 90:4, 90:10, 90:12, 92:23, 93:24, 94:2, 98:8, 104:1, 104:2, 104:17, 104:18, 104:19, 104:22, 105:24, 109:24, 111:15, 112:4, 112:19
**grant-funded** [2] - 8:1, 47:5
**granted** [1] - 7:8
**grantee** [2] - 27:25, 60:20
**grantees** [9] - 60:8, 60:22, 68:2, 77:19, 85:13, 85:25, 86:22, 87:1, 93:14
**granting** [2] - 51:17, 71:7
**grantmaker** [3] - 38:14, 45:14, 106:24
**grantmakers** [14] - 5:16, 31:21, 43:23, 44:21, 49:16, 68:22, 77:12, 99:17, 104:14, 106:4, 109:10, 109:12, 113:8, 113:18
**Grantmaking** [3] - 111:1, 111:5, 111:10
**grantmaking** [11] - 23:3, 31:18, 32:5, 36:16, 37:4, 43:3, 50:12, 77:4, 77:7, 77:9, 113:1
**grants** [141] - 5:12, 5:20, 6:2, 6:3, 6:5, 6:6, 6:14, 6:18, 6:20, 6:22, 6:24, 7:2, 7:3, 7:7, 9:9, 9:10, 9:13, 11:10, 11:24, 17:16, 18:24, 19:3, 19:19, 20:5, 20:25, 21:7, 22:18, 22:22, 22:23, 23:2, 27:20, 27:25, 28:6, 29:13, 29:22, 30:23, 31:7, 31:9, 33:2, 33:14, 33:15, 40:13, 43:6, 43:25, 44:20, 44:24, 45:3, 45:22, 50:15, 53:3, 55:18, 55:24, 57:4, 58:3, 58:4, 59:11, 59:12, 59:14, 59:16, 59:23, 60:10, 61:23, 63:2, 63:8, 63:19, 64:3, 64:11, 64:12, 64:18, 64:19, 65:9, 65:20, 66:18, 66:21, 67:15, 68:19, 68:23, 69:11, 69:16, 75:19, 77:16, 77:21, 79:2, 79:9, 80:18, 80:24, 81:2, 81:14, 81:15, 81:18, 83:14, 83:15, 88:17, 88:23, 88:25, 89:5, 89:6, 89:7, 89:8, 90:18, 91:10, 91:24, 92:7, 92:12, 92:13, 92:17, 93:4, 94:5, 94:14, 94:20, 94:21, 98:17, 99:3, 99:5, 99:13, 99:23, 104:15, 104:25, 105:7, 105:16, 105:17, 105:20, 106:5, 106:12, 107:7, 109:11, 109:16, 110:19, 110:23, 110:24, 111:2, 111:3, 113:23, 115:3
**Grants** [1] - 62:4
**grapple** [1] - 75:24
**Great** [1] - 20:7
**great** [1] - 29:8
**greater** [1] - 115:14
**GREEN** [1] - 1:3
**Green** [6] - 1:15, 3:4, 4:18, 7:18, 7:22, 56:8
**Griggsby** [4] - 71:4, 74:2, 102:14, 102:17
**Griggsby's** [3] - 16:12, 70:25, 102:13
**grounded** [1] - 101:13
**grounds** [4] - 11:6, 27:25, 40:7, 108:20
**groundwork** [1] - 110:14
**groups** [1] - 65:7
**guess** [10] - 33:1, 34:2, 36:17, 36:25, 43:13, 43:21, 65:16, 97:15, 107:5, 113:10
**guidance** [12] - 11:11, 11:23, 43:7, 45:16, 53:4, 64:4, 66:22, 94:10, 94:16, 100:25, 101:2, 101:20

## H

**half** [6] - 46:11, 51:22, 83:23, 86:15, 107:16, 108:3
**hand** [2] - 55:6, 55:8
**happy** [7] - 4:5, 4:10, 26:12, 37:11, 38:8, 86:19, 87:17
**hard** [7] - 5:15, 30:3, 30:10, 36:9, 67:10, 112:6, 112:19
**harm** [31] - 7:21, 8:11, 34:7, 41:15, 42:19, 46:8, 48:7, 50:4, 50:22, 72:25, 73:10, 73:12, 73:14, 94:23, 95:8, 95:15, 96:7, 98:19, 99:9, 103:12, 103:13, 103:14, 104:7, 104:8, 105:15, 105:21, 106:14, 106:15, 108:1
**harms** [2] - 28:16, 97:13
**hazards** [1] - 59:15
**HEALTHY** [1] - 1:3
**Healthy** [6] - 1:15, 3:5, 4:18, 7:18, 7:22, 56:8
**hear** [4] - 4:5, 26:18, 52:9, 72:3
**heard** [6] - 11:2, 50:25, 73:22, 76:3, 87:20, 114:13
**hearing** [3] - 3:8, 57:21, 102:10
**heart** [2] - 55:12, 94:1
**heavy** [1] - 17:5
**held** [3] - 42:21, 71:6, 116:10
**help** [1] - 115:17
**helpful** [5] - 5:1, 6:16, 8:22, 19:11, 79:12
**hereby** [1] - 116:7
**hesitating** [1] - 93:19
**hew** [1] - 93:23
**hidden** [1] - 28:3
**high** [2] - 72:20, 110:4
**highlight** [3] - 4:7, 64:24, 114:23
**hired** [1] - 108:7
**hiring** [1] - 46:12
**history** [1] - 25:23
**hold** [7] - 4:5, 26:2, 46:25, 58:4, 66:7, 70:10, 77:4
**holdings** [1] - 24:23
**HOMES** [1] - 1:3
**Homes** [6] - 1:15, 3:5, 4:18, 7:18, 7:22, 56:8
**honed** [1] - 90:8
**Honor** [110] - 3:11, 3:14, 3:16, 3:22, 4:12, 5:1, 5:9, 6:1, 6:3, 7:5, 8:14, 9:1, 10:13, 12:18, 14:16, 15:17, 16:10, 16:15, 18:7, 18:14, 19:14, 19:24, 20:12, 20:22, 20:24, 21:2, 21:16, 22:9, 23:10, 23:16, 26:11, 26:22, 27:6, 27:8, 28:22, 29:19, 29:24, 30:14, 32:9, 34:5, 35:11, 36:3, 38:7, 38:19, 39:3, 40:10, 40:21, 41:15, 42:18, 42:22, 46:7, 47:15, 49:24, 51:10, 51:16, 52:1, 52:6, 53:12, 53:17, 55:6, 55:13, 55:21, 56:3, 56:17, 57:19, 58:9, 58:18, 61:11, 62:22, 65:23, 66:16, 66:25, 67:20, 68:9, 69:22,

70:5, 70:15, 70:24, 71:4, 72:1, 73:1, 75:14, 76:11, 77:22, 78:14, 80:14, 81:25, 82:20, 82:24, 84:16, 84:24, 86:15, 87:25, 88:12, 88:23, 89:21, 93:3, 93:9, 94:1, 94:23, 96:16, 96:17, 97:8, 97:11, 108:9, 108:11, 111:8, 113:15, 113:17, 114:15
**Honor's** [2] - 30:19, 54:4
**HONORABLE** [1] - 1:10
**hope** [1] - 88:2
**hour** [1] - 51:22
**hour-and-a-half** [1] - 51:22
**HUD** [1] - 100:8
**hundreds** [8] - 36:10, 48:20, 51:3, 61:5, 68:12, 75:10, 112:9
**hypothetical** [6] - 12:23, 13:2, 13:9, 13:11, 14:12, 14:15
**hypothetically** [1] - 99:2

**I**

**idea** [2] - 8:5, 93:9
**ideally** [1] - 115:13
**identical** [1] - 19:1
**identification** [1] - 45:5
**identified** [5] - 19:2, 19:25, 22:19, 35:12, 86:13
**identifies** [1] - 44:15
**identify** [2] - 3:9, 10:19
**identifying** [2] - 82:23, 99:8
**illegal** [5] - 20:18, 45:11, 105:8, 105:19, 107:4
**illustrative** [2] - 29:8, 66:17
**imaginative** [1] - 36:8
**imagine** [3] - 36:9, 112:20, 115:16
**immediate** [2] - 104:7, 105:22
**immediately** [1] - 65:22
**immunity** [2] - 9:16, 10:9
**impact** [3] - 27:2, 33:12, 33:13
**implement** [4] - 20:14, 43:5, 46:10, 104:18
**implemented** [1] - 105:1
**implicate** [1] - 89:20
**importance** [1] - 43:17
**important** [16] - 11:9, 27:17, 34:6, 44:2, 44:10, 47:3, 47:22, 56:4, 64:22, 64:24, 74:1, 75:17, 76:20, 94:17, 95:8, 95:11
**importantly** [3] - 15:4, 25:24, 54:15
**impose** [5] - 33:24, 44:8, 102:24, 103:10, 114:8
**imposes** [2] - 61:25, 109:21
**improper** [3] - 9:9, 63:12, 107:4
**improve** [1] - 60:23
**IN** [1] - 1:1
**inability** [1] - 105:25
**INC** [1] - 1:3
**Inc** [1] - 1:15
**incidental** [7] - 14:8, 14:18, 14:19, 24:12, 59:2, 59:4, 101:1
**include** [2] - 30:11, 59:23
**included** [1] - 98:15
**includes** [5] - 34:19, 40:12, 69:5, 78:18, 90:18
**including** [7] - 22:14, 28:8, 33:25, 39:1, 49:5, 106:7
**inclusion** [1] - 90:20
**inconsistent** [3] - 19:3, 20:6, 81:11
**incorporate** [1] - 67:16
**incorporated** [6] - 11:15, 11:23, 53:4, 60:1, 60:4, 80:23
**Incorporated** [1] - 3:5
**incorporates** [1] - 68:10
**incorrect** [1] - 55:21
**increased** [3] - 59:8, 59:9, 59:13
**incredible** [1] - 106:10
**incurred** [4] - 97:2, 98:16, 98:17, 99:4
**indicated** [6] - 43:9, 43:15, 56:5, 97:5, 103:17, 104:9
**indicating** [1] - 71:14
**indication** [4] - 52:8, 57:2, 67:6, 95:4
**indulgence** [2] - 19:14, 52:2
**ineligible** [1] - 30:22
**inferred** [1] - 29:9
**Inflation** [5] - 9:12, 12:2, 15:4, 22:20, 50:8
**information** [2] - 110:20, 111:10
**infrastructure** [13] - 5:14, 5:17, 8:20, 44:19, 47:6, 47:15, 59:8, 59:9, 59:13, 103:20, 103:23, 107:17
**Ingersoll** [1] - 61:17
**inherently** [1] - 29:11
**initial** [13] - 6:4, 6:5, 6:19, 6:20, 6:24, 9:8, 9:12, 33:1, 64:18, 64:19, 68:23, 69:1, 88:22
**INITIATIVE** [1] - 1:3
**Initiative** [6] - 1:15, 3:5, 4:18, 7:19, 7:22, 20:7
**initiatives** [31] - 65:21, 66:1, 66:2, 66:3, 67:23, 78:5, 78:19, 78:24, 79:22, 79:23, 81:7, 81:8, 83:20, 85:24, 86:23, 90:20, 90:21, 91:10, 91:11, 92:1, 110:1, 110:2, 110:7, 110:10, 110:11, 110:15, 110:16
**injunction** [26] - 4:22, 5:5, 8:10, 27:8, 32:25, 41:25, 42:14, 48:4, 48:22, 49:11, 49:23, 50:2, 51:18, 71:23, 72:6, 72:18, 72:24, 84:15, 85:20, 88:6, 96:18, 102:25, 103:7, 103:9, 114:5, 114:7
**INJUNCTION** [1] - 1:9
**Injunction** [4] - 3:7, 4:1, 72:16, 76:4
**injunctions** [2] - 103:4, 103:5
**injunctive** [12] - 10:20, 14:13, 15:21, 16:6, 24:10, 24:12, 26:17, 56:19, 56:23, 57:1, 70:13, 72:9
**injury** [5] - 48:2, 48:9, 48:18
**inside** [4] - 112:17, 112:19, 112:20, 112:21
**instance** [3] - 13:21, 13:24, 25:1
**instead** [7] - 11:10, 14:21, 20:1, 32:25, 39:8, 83:9, 91:2
**instructive** [3] - 56:16, 60:19, 114:20
**intact** [1] - 20:15
**intellectual** [1] - 99:18
**intend** [1] - 17:18
**intended** [2] - 25:10, 27:22
**intent** [2] - 40:6, 57:12
**intentions** [1] - 29:9
**interest** [4] - 28:13, 51:11, 59:22, 81:2
**interesting** [4] - 56:16, 56:21, 66:25, 112:10
**interests** [2] - 21:11, 37:16
**intermediary** [1] - 36:17
**International** [3] - 39:16, 40:23, 41:14
**interpret** [1] - 53:8
**interpretation** [1] - 94:10
**interpretative** [1] - 39:21
**interpreted** [1] - 33:3
**inure** [1] - 105:15
**invention** [1] - 60:11
**inventions** [2] - 60:12
**investment** [1] - 44:17
**investments** [1] - 85:5
**invite** [1] - 46:18
**invoked** [1] - 55:3
**involving** [1] - 114:18
**IRA** [4] - 20:16, 27:20, 104:20, 110:23
**irrelevant** [1] - 104:21
**irreparable** [23] - 7:21, 8:11, 34:7, 41:15, 42:19, 46:8, 48:2, 48:7, 48:10, 48:18, 72:25, 73:10, 73:12, 73:14, 94:23, 95:8, 95:15, 96:7, 98:18, 99:9, 103:12, 106:14, 106:15
**Island** [3] - 6:8, 6:10, 100:5
**issue** [40] - 5:12, 6:3, 6:22, 17:19, 18:15, 18:18, 18:23, 19:13, 20:24, 24:18, 25:4, 32:25, 37:13, 38:13, 42:19, 42:25, 43:8, 45:1, 46:24, 49:10, 57:13, 63:14, 70:1, 72:10, 74:23, 94:9, 94:16, 98:11, 100:14, 103:4, 103:5, 103:6, 103:12, 108:6, 108:15, 109:17, 113:20, 114:25, 115:14
**issued** [4] - 19:17, 29:22, 34:14, 114:4
**issues** [4] - 18:3, 18:13, 76:1, 93:9
**issuing** [1] - 115:9
**items** [1] - 28:19
**itself** [5] - 43:9, 61:15, 63:21, 104:5, 107:10
**IX** [1] - 66:7

**J**

**January** [1] - 50:19
**Jessica** [1] - 3:19
**JESSICA** [1] - 1:21
**Jill** [1] - 4:16
**job** [2] - 27:14, 38:14
**jobs** [1] - 51:2
**John** [1] - 4:23
**JONATHAN** [1] - 1:18
**Jonathan** [1] - 3:14
**JOSHUA** [1] - 1:16
**Joshua** [1] - 3:11
**Judge** [10] - 16:4, 16:8, 16:11, 16:12, 25:17, 70:24, 74:2, 102:12, 102:14, 102:16
**JUDGE** [1] - 1:10
**judge** [7] - 16:20, 17:5, 17:21, 37:15, 71:4, 71:5, 71:15
**Judicial** [1] - 116:12
**judicial** [2] - 21:20, 25:10
**jurisdiction** [29] - 9:2, 11:3, 13:6, 13:15, 14:21, 16:24, 18:9, 19:5, 19:13, 21:21, 22:5, 24:8, 25:2, 25:6, 26:1, 53:15, 56:20, 71:23, 72:6, 73:19, 98:3, 98:5, 100:2, 100:20, 101:2, 101:22, 103:10, 114:19, 114:21

USCA4 Appeal: 25-1808 Doc: 28-1 Filed: 02/23/2026 Pg: 580 of 608 Total Pages:(580 of 608)




**jurisdictional** [8] - 4:24, 5:4, 8:23, 9:17, 19:6, 54:22, 75:25, 97:12
**jurisdictionally** [1] - 19:7
**justice** [4] - 25:6, 25:9, 25:12, 30:23
**Justice** [63] - 19:19, 25:3, 25:18, 27:21, 27:25, 28:1, 28:8, 28:12, 30:13, 30:18, 30:24, 31:7, 31:8, 31:9, 32:17, 34:14, 39:10, 40:16, 40:25, 41:10, 62:4, 65:21, 66:1, 66:2, 66:3, 67:7, 67:12, 67:22, 77:12, 77:21, 78:5, 78:19, 78:24, 79:23, 81:7, 81:21, 83:6, 83:16, 83:20, 84:7, 84:22, 85:17, 85:18, 85:24, 86:1, 86:23, 86:25, 90:21, 91:2, 91:11, 91:18, 94:3, 94:5, 103:21, 110:1, 110:10, 110:15, 110:20, 110:25, 111:4, 111:9
**justification** [1] - 101:17
**justify** [1] - 15:7

**K**

**Kavanaugh** [1] - 34:14
**keep** [8] - 16:18, 47:2, 47:4, 50:13, 71:23, 89:8, 104:11
**keeping** [1] - 56:1
**key** [1] - 49:2
**kind** [16] - 30:15, 36:2, 41:12, 52:10, 54:8, 57:17, 58:11, 60:10, 70:6, 72:13, 74:3, 74:18, 76:4, 94:5, 102:3, 103:24
**knowledge** [1] - 91:14
**knows** [2] - 20:19, 49:24

**L**

**labor** [1] - 15:16
**Labor** [1] - 87:20
**lack** [13] - 18:21, 20:25, 21:1, 21:5, 21:21, 22:10, 22:11, 23:13, 31:1, 31:10, 32:20, 41:11, 56:20
**laid** [2] - 8:13, 12:15
**land** [6] - 59:20, 59:21, 59:23, 59:25, 92:11, 111:16
**Land** [1] - 20:8
**language** [14] - 14:18, 29:8, 29:11, 34:19, 38:25, 45:15, 45:17, 45:18, 63:11, 63:15, 64:19, 79:1, 82:11, 89:2
**last** [17] - 12:11, 17:1, 20:10, 38:1, 43:15, 46:11, 49:4, 49:15, 56:6, 57:6, 64:25, 89:7, 95:1, 104:13, 104:15, 108:3, 114:6
**latter** [1] - 77:14
**law** [17] - 3:17, 9:8, 12:11, 18:4, 18:10, 25:14, 27:16, 28:15, 31:4, 43:22, 43:23, 45:10, 57:22, 61:14, 68:18, 69:24, 101:14
**lawful** [1] - 63:17
**laws** [3] - 67:17, 80:23, 105:9
**lawsuit** [3] - 68:1, 68:5, 68:6
**lawyer** [1] - 103:3
**lead** [3] - 30:17, 32:14, 51:6
**League** [1] - 48:2
**leap** [1] - 87:2
**learned** [2] - 104:13, 104:14
**learning** [1] - 6:9
**least** [7] - 7:15, 34:4, 43:15, 67:6, 91:6, 96:5, 113:7
**leave** [1] - 115:19
**led** [1] - 44:16
**left** [1] - 45:18
**legal** [1] - 106:10
**Legal** [1] - 39:17
**legislative** [1] - 25:23
**legislatively** [4] - 20:20, 46:3, 52:14, 97:20
**length** [2] - 10:13, 18:11
**less** [4] - 47:11, 51:8, 51:9, 114:18
**letter** [35] - 35:21, 65:15, 67:8, 67:11, 79:1, 80:17, 81:20, 82:13, 83:23, 83:24, 84:3, 85:23, 86:10, 86:13, 87:16, 90:15, 91:9, 91:15, 91:19, 91:21, 92:13, 92:21, 93:24, 94:1, 94:8, 101:15, 107:24, 109:14, 109:24, 110:14, 110:19, 111:11, 113:25
**letters** [4] - 19:1, 82:12, 86:21
**level** [4] - 37:1, 38:12, 100:1, 105:1
**levels** [1] - 77:7
**lever** [1] - 40:3
**Levy** [1] - 3:12
**light** [1] - 47:23
**likelihood** [14] - 63:10, 72:19, 83:18, 83:25, 84:4, 84:23, 85:21, 87:3, 88:6, 92:19, 92:25, 111:7, 115:18
**likely** [3] - 48:25, 71:9, 113:18
**limitations** [2] - 18:9, 53:2
**limited** [7] - 14:7, 24:12, 27:2, 45:5, 102:9, 103:1
**limiting** [1] - 69:20
**limits** [6] - 88:14, 88:16, 109:21, 109:23, 113:19
**line** [6] - 6:20, 71:15, 77:23, 82:22, 83:23
**line-by-line** [1] - 82:22
**lines** [1] - 12:13
**liquidated** [2] - 17:8, 17:9
**list** [1] - 110:24
**listed** [1] - 55:22
**literally** [1] - 51:2
**litigants** [1] - 65:12
**litigation** [2] - 75:8, 82:9
**LLP** [2] - 1:19, 1:22
**load** [1] - 15:13
**located** [1] - 56:4
**logically** [2] - 8:25, 33:19
**look** [17] - 10:22, 10:23, 12:21, 12:22, 13:3, 13:24, 24:22, 43:10, 53:7, 56:14, 57:16, 61:4, 62:24, 91:5, 94:20, 101:25
**looking** [27] - 9:14, 11:5, 13:25, 16:1, 16:21, 23:11, 25:4, 32:23, 35:20, 42:8, 53:10, 58:25, 61:15, 64:9, 64:11, 65:1, 65:2, 65:16, 78:1, 79:16, 85:20, 86:17, 89:24, 96:18, 100:7
**loose** [1] - 75:3
**Lora** [1] - 3:16
**LORA** [1] - 1:22
**lose** [2] - 51:2, 92:10
**losing** [1] - 28:15
**losses** [1] - 25:22
**lost** [1] - 21:15
**lovely** [1] - 97:15
**low** [2] - 44:17, 85:5
**lying** [1] - 87:15

**M**

**Madam** [1] - 78:6
**magic** [1] - 35:15
**main** [4] - 86:20, 89:21, 89:23
**Maine** [4] - 26:25, 74:21, 74:23
**maintain** [4] - 54:2, 70:22, 72:24, 103:8
**major** [1] - 37:20
**mandate** [14] - 15:4, 19:18, 20:13, 28:24, 29:4, 31:25, 33:21, 34:12, 35:3, 35:25, 37:5, 44:7, 52:21, 55:7
**mandated** [6] - 9:11, 15:8, 19:20, 27:24, 32:7, 89:4
**mandates** [2] - 30:5, 33:20
**mandating** [1] - 71:23
**mandatory** [1] - 63:11
**manipulated** [1] - 41:3
**map** [1] - 111:9
**mark** [2] - 105:18, 107:7
**MARYLAND** [1] - 1:1
**Maryland** [6] - 1:17, 2:4, 25:17, 25:20, 71:12, 116:7
**materials** [1] - 4:8
**matter** [9] - 3:3, 3:6, 74:4, 97:23, 98:4, 106:11, 107:2, 109:9, 116:10
**Matthews** [1] - 42:11
**McFadden** [2] - 16:8, 16:11
**McFadden's** [1] - 16:4
**mean** [23] - 13:1, 13:18, 13:21, 20:1, 23:1, 36:12, 36:22, 50:10, 51:5, 54:1, 55:10, 65:15, 73:1, 100:25, 106:14, 108:14, 108:19, 109:3, 109:6, 111:22, 112:24, 113:8
**meaning** [5] - 9:20, 10:20, 13:13, 28:9, 39:14
**meaningful** [3] - 27:14, 49:14, 97:4
**meaningfully** [1] - 33:13
**meaningless** [1] - 109:8
**means** [4] - 7:11, 26:15, 50:14, 110:17
**meant** [7] - 44:7, 46:12, 46:13, 46:14, 46:15, 46:16, 46:20
**measure** [1] - 107:1
**measurements** [1] - 60:19
**measures** [2] - 47:2, 47:10
**meat** [1] - 23:17
**Mechanical** [1] - 1:25
**mechanically** [1] - 105:2
**Medicare** [3] - 53:18, 54:18
**meet** [1] - 115:15
**MegaPulse** [15] - 10:17, 18:20, 23:3, 23:4, 23:11, 23:17, 23:19, 24:19, 26:7, 55:13, 62:8, 62:10, 98:10, 99:25, 101:8
**members** [2] - 47:5, 47:8
**memoranda** [5] - 28:11, 36:5, 40:10, 40:17, 111:12
**memorandum** [5] - 108:13, 108:24, 111:11, 111:18, 111:24
**Memorial** [3] - 87:10, 87:12, 87:19
**memos** [1] - 28:15
**mentioned** [16] - 9:6, 10:14, 18:22, 20:22, 23:19, 23:23, 47:12, 57:19, 61:11, 64:14, 69:10, 89:3, 94:23, 96:11, 98:23, 105:23
**mentions** [1] - 71:4
**mere** [4] - 34:17, 35:1, 59:1
**merely** [2] - 21:10, 27:11

**merged** [1] - 49:24
**merit** [27] - 65:24, 66:4, 66:14, 67:9, 78:9, 78:20, 79:4, 79:25, 80:8, 80:19, 81:9, 81:18, 81:24, 85:15, 86:2, 86:18, 90:23, 91:12, 92:2, 105:8, 107:24, 109:2, 109:7, 110:3, 110:8, 110:12, 110:16
**Merit** [1] - 116:6
**meritorious** [1] - 66:13
**merits** [31] - 4:22, 5:5, 15:14, 26:5, 26:21, 27:8, 27:9, 53:12, 53:24, 54:4, 57:13, 61:19, 63:10, 70:5, 71:10, 72:19, 72:25, 73:23, 75:25, 76:17, 83:25, 84:24, 85:21, 87:3, 88:7, 92:19, 92:25, 97:14, 111:6, 111:7, 115:18
**met** [1] - 64:15
**might** [22] - 19:11, 28:9, 28:14, 37:19, 38:17, 48:12, 48:14, 49:1, 54:7, 59:23, 61:18, 66:17, 67:7, 67:23, 76:22, 94:6, 96:2, 99:13, 108:20, 112:10, 112:12, 113:11
**military** [1] - 56:18
**million** [9] - 7:3, 9:8, 9:9, 19:18, 73:4, 93:25, 94:25, 104:17
**mind** [3] - 28:18, 58:18, 89:13
**minimis** [1] - 107:21
**Minneapolis** [13] - 1:21, 3:18, 4:17, 46:8, 56:6, 103:15, 103:16, 103:18, 104:3, 104:7, 105:24, 106:1, 107:10
**Minnesota** [1] - 107:11
**minute** [4] - 5:2, 13:9, 51:22, 110:4
**mischaracterizes** [1] - 11:6
**misplaced** [1] - 54:22
**miss** [2] - 41:23, 110:4
**mission** [4] - 21:11, 103:19, 106:1
**missions** [2] - 48:13, 48:16
**misstate** [1] - 34:15
**mistake** [1] - 70:8
**mitigate** [1] - 19:22
**models** [1] - 60:21
**modifies** [1] - 110:7
**MOLISSA** [1] - 2:2
**Molissa** [1] - 3:22
**moment** [7] - 6:18, 19:13, 24:16, 42:19, 64:23, 73:24, 112:8
**moments** [1] - 9:25
**monetary** [10] - 24:1, 25:12, 56:11, 56:19, 56:23, 56:25, 70:9, 70:10, 98:12, 98:14
**money** [66] - 9:23, 10:4, 14:9, 14:13, 14:16, 15:20, 16:1, 25:7, 25:8, 25:13, 25:16, 25:21, 29:10, 47:9, 50:6, 50:16, 53:20, 53:21, 53:23, 55:17, 55:19, 55:23, 56:1, 56:2, 56:4, 57:10, 63:1, 63:3, 63:15, 65:7, 68:2, 68:3, 68:5, 68:7, 70:11, 70:12, 70:17, 70:23, 72:14, 73:7, 73:8, 73:16, 73:19, 77:17, 77:18, 83:21, 84:5, 85:4, 85:24, 86:6, 86:25, 87:1, 89:10, 95:3, 95:7, 95:10, 95:24, 96:24, 97:2, 97:6, 98:22, 99:21, 104:20, 114:18
**monitor** [2] - 19:21, 59:15
**monitoring** [2] - 44:17, 85:5
**month** [2] - 57:6, 95:1
**months** [7] - 5:16, 38:1, 46:24, 47:24, 48:19, 49:15
**moreover** [1] - 59:16
**morning** [3] - 3:22, 7:6, 7:16
**most** [6] - 5:1, 7:13, 20:2, 54:15, 112:5, 112:6
**mostly** [1] - 7:2
**Motion** [2] - 3:25, 72:15
**MOTION** [1] - 1:9
**motion** [7] - 4:9, 61:7, 68:14, 71:18, 73:21, 75:12, 84:12
**move** [9] - 41:15, 42:19, 47:19, 70:5, 73:23, 76:6, 76:17, 89:13, 105:25
**moved** [2] - 47:18, 106:8
**MR** [73] - 3:11, 3:14, 4:12, 5:9, 6:24, 7:12, 8:14, 9:1, 10:11, 11:17, 11:20, 12:18, 12:21, 13:17, 14:15, 14:25, 15:12, 15:17, 16:10, 17:25, 19:7, 19:16, 21:16, 21:18, 22:4, 22:9, 22:24, 23:10, 23:16, 24:14, 24:16, 26:9, 26:22, 27:6, 27:7, 28:22, 29:1, 29:7, 29:19, 29:24, 30:1, 30:7, 31:3, 31:13, 31:19, 32:8, 33:8, 33:11, 34:5, 35:4, 36:2, 36:22, 37:9, 38:7, 38:19, 39:3, 39:14, 40:9, 40:12, 41:19, 41:24, 42:5, 42:15, 46:6, 50:17, 50:22, 108:11, 111:22, 112:13, 112:15, 113:8, 113:15, 114:3
**MS** [90] - 3:16, 3:22, 42:18, 42:22, 42:24, 52:1, 52:5, 52:23, 53:17, 54:3, 55:5, 55:21, 57:15, 58:15, 62:2, 62:15, 62:21, 63:13, 64:2, 64:7, 65:7, 65:10, 65:18, 65:22, 66:16, 66:24, 67:20, 69:15, 69:22, 69:25, 70:12, 70:15, 70:24, 71:3, 71:25, 72:8, 73:1, 73:12, 74:8, 76:2, 76:11, 77:10, 77:15, 78:8, 78:13, 78:25, 79:11, 79:14, 80:4, 80:9, 80:14, 81:25, 82:7, 82:16, 83:4, 83:11, 84:13, 85:11, 86:10, 86:14, 87:8, 87:13, 87:17, 87:21, 87:25, 88:10, 88:12, 88:21, 89:17, 89:21, 91:5, 91:9, 91:16, 93:19, 93:22, 94:13, 95:16, 95:22, 95:25, 96:22, 97:11, 97:23, 98:9, 99:1, 100:10, 100:17, 106:20, 108:9, 114:13, 114:15
**multiple** [3] - 78:15, 101:15, 102:15
**murky** [1] - 12:11
**must** [11] - 15:9, 20:12, 20:14, 21:3, 29:25, 33:25, 35:1, 44:13, 55:7, 66:21, 84:18
**mutuality** [1] - 58:18

## N

**NADINE** [1] - 116:18
**Nadine** [1] - 116:5
**NADOHE** [1] - 93:7
**name** [1] - 100:5
**namely** [2] - 43:22, 54:11
**nationally** [1] - 107:11
**nature** [12] - 11:6, 13:20, 14:3, 32:2, 32:3, 43:1, 52:16, 54:5, 55:15, 55:16, 59:1, 109:5
**near** [1] - 114:5
**Near** [1] - 100:12
**nearly** [2] - 19:1, 94:25
**necessarily** [5] - 13:17, 33:7, 64:8, 77:8, 84:11
**necessary** [1] - 8:19
**need** [15] - 9:14, 13:19, 32:18, 33:23, 44:3, 64:17, 70:17, 88:9, 89:23, 92:20, 110:13, 111:6, 111:8, 113:10, 115:2
**needed** [1] - 64:15
**needs** [3] - 14:2, 34:3, 84:14
**never** [2] - 84:2, 89:13
**new** [9] - 34:15, 46:13, 46:14, 66:22, 67:12, 94:6, 113:8, 113:18
**next** [6] - 68:1, 79:5, 79:20, 94:9, 115:14
**night** [2] - 20:10, 43:16
**Nishi** [1] - 4:16
**nobody** [1] - 36:4
**non** [2] - 47:4, 66:11
**non-arbitrary** [1] - 66:11
**non-grant** [1] - 47:4
**none** [3] - 14:12, 45:20, 95:19
**nonetheless** [1] - 100:22
**nonprofit** [1] - 49:5
**normally** [1] - 76:6
**Normandy** [8] - 98:10, 100:4, 100:7, 100:9, 100:17, 114:16, 114:20
**NORTHERN** [1] - 1:2
**Northwest** [6] - 1:18, 4:16, 46:9, 56:5, 103:14, 106:25
**norton** [1] - 7:23
**Norton** [1] - 4:19
**note** [3] - 70:25, 88:22, 104:13
**noted** [8] - 58:22, 61:11, 72:1, 74:25, 76:19, 89:22, 95:5, 97:3
**notes** [2] - 75:6, 101:25
**nothing** [2] - 8:5, 62:5
**notice** [2] - 57:11, 80:6
**noticed** [1] - 61:18
**notices** [1] - 47:13
**notion** [1] - 44:11
**notwithstanding** [2] - 47:7, 98:14
**nowhere** [1] - 68:4
**NUMBER** [1] - 1:5
**number** [10] - 3:4, 16:22, 17:22, 24:22, 28:19, 102:15, 107:12, 107:20, 112:5, 112:8
**NW** [1] - 1:23

## O

**object** [1] - 112:7
**obligation** [2] - 20:14, 88:8
**obligations** [2] - 33:24, 63:25
**obtain** [1] - 69:9
**obviously** [3] - 9:23, 9:24, 23:1
**occur** [1] - 44:4
**occurred** [1] - 15:1
**occurring** [1] - 28:16
**odds** [2] - 45:22, 107:23
**OF** [4] - 1:1, 1:9, 2:3, 116:1
**offend** [2] - 48:13, 48:14
**offense** [1] - 48:16
**offer** [3] - 21:4, 45:20, 58:17

**offered** [1] - 87:10
**OFFICE** [1] - 2:3
**Officer** [3] - 4:16, 4:17, 4:18
**officer** [1] - 72:10
**OFFICIAL** [2] - 116:1, 116:18
**often** [2] - 30:8, 48:1
**OMB** [1] - 34:22
**once** [2] - 75:17, 114:24
**one** [45] - 9:19, 10:16, 13:21, 14:2, 16:12, 18:13, 23:20, 26:13, 27:14, 28:13, 37:14, 38:10, 43:16, 46:2, 47:3, 48:8, 49:3, 51:10, 51:17, 55:6, 58:6, 58:15, 58:18, 61:3, 61:9, 62:11, 64:5, 64:16, 65:19, 66:16, 67:21, 71:1, 73:24, 76:2, 76:19, 77:23, 83:23, 84:3, 89:13, 91:7, 92:22, 93:8, 108:4, 114:16
**ones** [5] - 7:2, 37:13, 78:18, 78:20, 109:15
**ongoing** [1] - 15:23
**open** [1] - 8:5
**opening** [2] - 5:1, 20:21
**operate** [1] - 91:24
**operating** [3] - 5:23, 27:18, 50:13
**opinion** [8] - 16:4, 34:14, 41:1, 71:13, 71:14, 71:15, 75:6, 96:6
**opportunity** [1] - 112:1
**opposed** [4] - 6:21, 45:6, 106:24, 106:25
**opposite** [2] - 49:11, 57:3
**optional** [1] - 29:21
**oral** [1] - 115:9
**oranges** [1] - 6:23
**order** [13] - 8:19, 26:14, 32:24, 33:5, 34:8, 43:5, 44:3, 45:24, 47:15, 53:9, 71:2, 97:1, 115:14
**Order** [1] - 76:4
**ordering** [1] - 33:1
**orders** [1] - 72:10
**ordinarily** [1] - 31:9
**organization** [4] - 32:3, 40:19, 43:3, 63:3
**organization's** [1] - 69:1
**organizational** [2] - 5:14, 46:10
**organizations** [56] - 4:14, 5:15, 7:13, 7:16, 23:3, 28:6, 28:17, 29:18, 30:6, 30:12, 31:18, 32:5, 32:16, 36:12, 36:16, 36:17, 37:4, 38:22, 39:9, 40:14, 40:15, 41:9, 46:15, 46:17, 46:18, 46:25, 47:16, 47:19, 47:20, 48:5, 48:10, 48:19, 48:24, 49:6, 49:14, 49:21, 50:12, 50:24, 51:2, 51:3, 51:19, 77:4, 77:7, 77:9, 78:4, 78:18, 90:16, 90:19, 91:1, 92:21, 98:16, 111:20, 111:21, 111:23, 113:2, 113:5
**original** [1] - 49:3
**otherwise** [6] - 22:3, 39:25, 84:10, 97:18, 112:2, 112:23
**outlier** [1] - 102:14
**outputs** [1] - 60:20
**outset** [3] - 4:7, 47:12, 72:21
**outside** [11] - 40:4, 40:7, 62:20, 76:22, 83:12, 90:1, 90:11, 90:12, 92:5, 111:20, 112:18
**overall** [2] - 21:11, 85:19
**overlap** [1] - 37:13
**overrule** [1] - 35:13
**oversight** [1] - 46:22
**oversimplify** [1] - 43:13
**overstate** [1] - 73:2
**overstated** [1] - 99:13
**overstatement** [1] - 108:5
**overturned** [1] - 74:6
**owes** [1] - 55:23
**own** [3] - 73:4, 94:24, 115:4

**P**

**p.m** [4] - 3:2, 51:24, 115:22
**Pacito** [2] - 74:25, 75:2
**page** [10] - 56:5, 59:13, 60:1, 60:4, 60:20, 66:18, 67:1, 78:1, 116:11
**pages** [4] - 61:5, 68:12, 75:11, 93:6
**paid** [1] - 57:5
**paint** [1] - 51:6
**papers** [11] - 4:6, 6:9, 10:17, 15:6, 17:18, 19:24, 20:3, 21:12, 24:18, 24:25, 88:4
**paragraph** [26] - 29:15, 42:8, 43:11, 44:15, 59:14, 68:15, 68:21, 68:24, 69:7, 71:3, 77:25, 78:16, 79:5, 79:9, 79:10, 79:14, 79:15, 79:18, 79:20, 80:5, 80:21, 90:14, 92:22, 109:24, 111:21
**paragraphs** [3] - 68:17, 69:3, 91:6
**Parish** [1] - 100:13
**part** [34] - 12:19, 24:4, 28:1, 28:7, 30:13, 31:25, 32:16, 33:22, 34:11, 34:12, 36:25, 38:23, 39:9, 40:11, 40:15, 41:9, 51:15, 76:7, 78:4, 79:6, 79:22, 81:6, 82:9, 84:8, 87:5, 89:4, 90:17, 90:19, 91:10, 92:22, 109:25, 110:13, 113:13
**participate** [1] - 30:12
**particular** [19] - 10:12, 10:18, 13:3, 13:20, 14:1, 16:21, 18:9, 20:5, 21:5, 23:20, 25:4, 26:2, 34:1, 41:2, 45:2, 45:12, 62:10, 77:5, 102:18
**particularly** [2] - 9:15, 26:25
**parties** [4] - 54:9, 58:1, 75:2, 87:8
**partner** [3] - 3:19, 47:18, 48:23
**partners** [2] - 7:1, 47:9
**partnerships** [1] - 46:14
**parts** [1] - 35:8
**party** [1] - 75:6
**past** [9] - 5:16, 13:25, 16:5, 25:9, 46:24, 48:19, 57:5, 101:21
**patent** [1] - 60:11
**patently** [1] - 109:23
**patents** [1] - 60:12
**paused** [3] - 110:23, 110:24, 111:2
**pay** [6] - 7:20, 8:2, 47:9, 95:6, 95:10, 97:6
**paying** [2] - 16:18, 56:8
**payments** [1] - 80:25
**pays** [1] - 73:5
**pendency** [2] - 5:13, 7:14
**pending** [2] - 3:3, 95:1
**penny** [1] - 55:23
**people** [10] - 47:3, 47:17, 51:1, 68:5, 75:3, 77:16, 96:1, 103:21, 103:23, 108:7
**per** [6] - 25:17, 27:1, 48:10, 48:25, 49:8, 102:7
**percent** [2] - 77:19, 82:2
**percentage** [1] - 66:20
**perform** [1] - 13:14
**performance** [5] - 13:12, 13:13, 43:25, 60:19, 98:17
**performed** [1] - 106:12
**performing** [8] - 65:25, 66:5, 78:9, 80:1, 80:20, 81:9, 90:23, 92:2
**perhaps** [7] - 9:21, 20:2, 44:20, 76:22, 97:17, 97:18, 99:6
**period** [7] - 7:14, 47:10, 66:1, 66:2, 85:17, 106:5, 111:1
**periods** [1] - 29:13
**peripheral** [2] - 61:16, 70:2
**permission** [1] - 4:20
**permit** [3] - 41:4, 69:4, 109:15
**permitted** [1] - 41:4
**permitting** [1] - 51:12
**persist** [1] - 51:12
**personal** [1] - 99:20
**perspective** [3] - 8:9, 8:12, 17:3
**Philanthropy** [6] - 1:18, 4:16, 46:9, 56:5, 103:14, 106:24
**phrase** [3] - 66:13, 111:21, 111:23
**pick** [3] - 31:18, 43:3, 90:6
**picking** [2] - 113:8, 113:18
**picture** [2] - 47:25, 85:19
**piece** [7] - 44:10, 55:18, 88:13, 94:3, 97:12, 106:19, 106:20
**pieces** [2] - 56:19
**Pillar** [1] - 20:7
**pillars** [1] - 43:16
**pin** [1] - 86:20
**place** [9] - 34:21, 36:23, 36:24, 43:18, 47:2, 50:18, 71:24, 85:7, 107:16
**placed** [1] - 11:12
**places** [1] - 68:8
**plain** [2] - 64:16, 79:1
**plaintiff** [19] - 3:9, 3:18, 4:14, 17:7, 28:16, 30:6, 36:11, 46:25, 48:5, 48:19, 53:19, 54:10, 56:21, 56:22, 57:23, 62:13, 67:11, 84:20, 90:21
**plaintiff's** [1] - 16:7
**Plaintiffs** [1] - 1:4
**plaintiffs** [98] - 3:13, 3:15, 4:11, 6:21, 6:22, 6:25, 7:4, 9:3, 9:19, 9:22, 16:5, 16:23, 17:11, 18:2, 19:2, 36:20, 37:4, 49:6, 53:22, 54:19, 55:3, 55:17, 55:22, 57:2, 57:6, 58:16, 59:3, 59:12, 59:20, 61:2, 61:5, 62:6, 62:16, 62:22, 63:1, 63:13, 63:24, 65:23, 66:7, 66:8, 66:23, 67:16, 68:6, 68:23, 69:3, 69:7, 71:17, 72:6, 72:14, 72:16, 73:3, 73:5, 73:14, 74:13, 74:20, 75:7, 75:10, 75:17, 76:9, 76:23, 79:24, 81:23, 82:15, 83:9, 83:17, 84:4, 84:5, 84:17, 89:8, 90:13, 92:18, 93:5, 93:18, 95:2, 95:6, 95:9, 95:23, 95:25, 96:5, 96:6, 96:7, 96:10, 96:20, 96:24, 97:5, 102:15, 102:16, 102:17, 102:19, 104:12, 104:21, 106:2,

106:10, 106:21, 108:2, 114:24
**PLAINTIFFS** [1] - 1:14
**plaintiffs'** [15] - 3:25, 4:9, 21:7, 58:5, 58:8, 68:9, 76:15, 76:19, 77:20, 80:24, 88:6, 89:3, 90:2, 90:9, 94:24
**planning** [1] - 51:4
**platform** [1] - 104:4
**play** [1] - 35:25
**pleadings** [1] - 18:17
**pled** [1] - 102:20
**plenary** [1] - 109:19
**pocketing** [1] - 83:21
**point** [51] - 9:23, 9:25, 11:9, 17:4, 17:14, 17:25, 19:6, 19:8, 20:3, 20:12, 20:22, 22:9, 26:22, 27:16, 33:23, 38:11, 38:15, 39:4, 40:21, 42:24, 47:22, 49:2, 50:9, 50:23, 51:10, 51:16, 54:4, 56:4, 58:21, 60:18, 66:16, 67:25, 68:8, 70:4, 70:6, 73:8, 73:24, 75:8, 76:13, 86:15, 86:20, 91:16, 93:2, 93:16, 97:22, 100:4, 100:14, 113:10, 113:12, 114:6
**pointed** [3] - 75:7, 88:23, 90:13
**pointing** [2] - 67:21, 101:19
**points** [10] - 26:3, 27:9, 50:1, 55:13, 57:20, 74:11, 96:17, 102:7, 102:12, 114:13
**policies** [2] - 67:17, 85:19
**policy** [25] - 18:15, 21:11, 33:25, 34:17, 57:11, 65:24, 66:4, 78:8, 78:17, 78:20, 79:3, 79:25, 80:8, 81:8, 83:1, 83:3, 85:14, 86:2, 86:17, 90:22, 91:12, 92:1, 110:2, 110:8, 110:11
**pollution** [3] - 19:22, 44:16, 85:5
**populations** [1] - 89:11
**portal** [3] - 7:12, 7:15, 8:5
**portion** [1] - 86:8
**posing** [1] - 12:23
**position** [11] - 24:17, 43:22, 72:11, 81:23, 82:3, 82:16, 89:19, 104:5, 107:25, 113:2, 113:4
**positioned** [1] - 107:10
**possible** [8] - 27:13, 38:16, 46:9, 47:3, 66:10, 67:22, 115:11, 115:12
**possibly** [3] - 80:5, 109:6, 112:7
**post** [3] - 73:6, 73:7, 73:25
**potential** [2] - 44:22, 99:12
**power** [3] - 14:5, 14:7, 18:8
**Powering** [1] - 20:7
**powers** [2] - 24:6, 72:2
**practices** [1] - 60:23
**preceded** [1] - 25:18
**precedent** [2] - 56:12, 74:6
**precedential** [3] - 27:2, 102:10, 102:11
**precise** [2] - 62:9, 70:10
**preliminaries** [1] - 4:13
**PRELIMINARY** [1] - 1:9
**preliminary** [20] - 4:20, 4:22, 5:5, 8:10, 17:25, 27:8, 41:25, 42:14, 48:4, 48:22, 49:11, 49:23, 50:22, 51:18, 72:18, 72:23, 84:15, 85:20, 88:5, 96:18
**Preliminary** [4] - 3:7, 4:1, 72:15, 76:4
**premature** [1] - 84:12
**prepared** [1] - 41:15
**preparing** [1] - 115:8
**presence** [1] - 110:4
**present** [4] - 9:18, 25:20, 57:13, 99:24
**presented** [4] - 96:1, 101:7, 101:16, 112:16
**preserve** [1] - 5:13
**president** [2] - 34:18, 34:25
**President** [2] - 45:16, 45:17
**presumably** [1] - 107:2
**pretty** [1] - 37:22
**prevail** [2] - 18:1, 18:2
**prevent** [2] - 8:20, 19:21
**prevention** [1] - 44:17
**previous** [4] - 66:19, 91:17, 91:22, 94:5
**principally** [1] - 4:21
**priorities** [23] - 18:25, 20:2, 32:15, 32:16, 34:20, 34:23, 35:2, 35:6, 35:10, 35:13, 35:14, 36:21, 43:18, 44:8, 59:5, 64:13, 64:21, 67:14, 69:6, 69:12, 79:16, 81:12, 101:6
**prioritization** [1] - 107:23
**prioritize** [1] - 81:24
**prioritized** [2] - 91:23, 108:5
**prioritizing** [21] - 65:24, 66:4, 67:9, 78:9, 78:20, 79:4, 79:17, 79:25, 80:8, 80:19, 81:9, 81:18, 85:15, 86:2, 86:18, 90:23, 91:12, 92:2, 110:3, 110:8, 110:12
**priority** [37] - 18:15, 19:2, 19:25, 20:5, 20:13, 32:15, 35:4, 35:15, 38:21, 40:12, 43:8, 43:10, 43:12, 43:13, 44:1, 44:2, 44:3, 44:5, 45:6, 45:19, 45:22, 45:23, 45:25, 57:11, 67:9, 78:2, 80:19, 81:16, 81:18, 83:1, 83:3, 90:7, 90:17, 94:22, 101:5, 105:7
**private** [1] - 105:17
**privity** [1] - 102:3
**problem** [4] - 30:15, 39:19, 41:11, 113:16
**problems** [3] - 31:23, 32:19, 113:17
**procedural** [1] - 42:11
**Procedure** [4] - 5:21, 9:4, 9:15, 101:23
**procedure** [2] - 69:7, 92:11
**procedures** [1] - 99:19
**Procedures** [1] - 69:14
**proceed** [2] - 47:20, 99:4
**proceeding** [1] - 115:21
**PROCEEDINGS** [1] - 1:9
**proceedings** [2] - 27:3, 116:10
**Proceedings** [1] - 1:25
**proceeds** [1] - 60:6
**process** [7] - 41:22, 42:9, 42:11, 60:11, 67:2, 82:14, 93:11
**processes** [2] - 46:20, 99:19
**produce** [2] - 72:21, 87:9
**Produced** [1] - 1:25
**product** [1] - 57:8
**proffer** [1] - 45:20
**progeny** [1] - 16:25
**Program** [6] - 8:4, 20:18, 32:4, 49:16, 111:1, 111:10
**program** [47] - 15:9, 15:23, 15:24, 20:17, 29:22, 32:1, 32:7, 34:20, 34:23, 34:25, 36:15, 38:15, 38:25, 40:1, 40:4, 40:7, 40:8, 41:2, 41:8, 45:12, 46:1, 46:10, 46:12, 46:18, 51:1, 51:9, 54:2, 65:11, 66:15, 69:11, 70:21, 71:24, 76:24, 77:2, 77:6, 77:9, 77:13, 77:21, 85:7, 91:3, 91:4, 104:11, 104:21, 104:22, 109:7, 109:20
**programatic** [2] - 5:14, 48:2
**programatically** [1] - 20:16
**Programs** [1] - 111:5
**programs** [33] - 28:7, 34:1, 38:21, 40:13, 41:9, 48:5, 49:10, 49:22, 50:6, 66:12, 67:7, 78:3, 78:18, 79:3, 79:21, 80:7, 85:5, 85:14, 86:1, 90:19, 91:2, 91:4, 95:19, 95:24, 96:2, 96:4, 104:23, 105:20, 109:25, 112:23, 113:3
**prohibition** [1] - 31:1
**projects** [5] - 27:22, 46:19, 47:20, 51:4, 60:21
**projects'** [1] - 60:23
**promise** [1] - 95:6
**promised** [1] - 95:10
**promote** [12] - 28:7, 32:16, 38:22, 39:9, 40:15, 41:9, 78:4, 78:18, 79:2, 79:22, 90:19, 109:25
**promotes** [1] - 81:6
**promoting** [1] - 28:1
**prong** [6] - 13:10, 13:19, 23:12, 44:5, 95:17
**prongs** [1] - 9:18
**pronunciation** [1] - 6:10
**proper** [7] - 21:4, 21:21, 43:6, 44:4, 53:3, 64:3, 101:22
**properly** [1] - 25:15
**property** [9] - 59:17, 59:18, 60:2, 60:3, 60:7, 99:18, 99:20
**propose** [2] - 4:21, 5:2
**proposed** [2] - 32:24, 34:8
**proposing** [1] - 6:15
**proposition** [4] - 16:17, 30:1, 34:16, 70:21
**propositions** [1] - 30:20
**propriety** [1] - 19:9
**prospective** [13] - 13:13, 13:18, 14:2, 14:13, 15:22, 16:6, 16:7, 16:14, 24:7, 25:7, 55:17, 70:13, 97:1
**prospectively** [2] - 33:5, 70:22
**protect** [1] - 48:11
**protected** [4] - 39:22, 39:25, 40:3, 40:6
**protection** [1] - 34:10
**PROTECTION** [1] - 1:6
**Protection** [1] - 3:6
**protest** [1] - 103:4
**prove** [1] - 111:8
**provide** [10] - 15:5, 18:8, 27:14, 46:22, 53:2, 56:9, 61:10, 85:13, 88:14, 88:15
**provided** [3] - 59:16, 74:22, 75:10
**provides** [8] - 63:18, 79:15, 79:18, 79:21, 80:22, 104:20,


**JA0578**

109:25
**providing** [2] - 99:17, 99:20
**proving** [1] - 84:4
**provision** [2] - 35:18, 68:16
**provisions** [2] - 10:12, 24:22
**public** [3] - 51:11, 51:12, 110:22
**publicize** [1] - 46:17
**pulling** [1] - 82:8
**purchase** [1] - 60:3
**purchases** [5] - 59:17, 59:18, 59:23, 59:25
**purpose** [5] - 3:7, 22:17, 45:6, 114:7, 114:10
**purposes** [8] - 27:18, 54:22, 58:2, 58:14, 98:8, 100:2, 100:11, 100:14
**pursuant** [3] - 69:4, 105:1, 116:8
**pursue** [1] - 76:12
**pursued** [2] - 104:1, 104:2
**purview** [1] - 65:12
**push** [6] - 52:23, 59:6, 62:22, 67:10, 84:24, 85:11
**put** [17] - 16:12, 34:21, 42:13, 56:2, 58:10, 86:19, 87:10, 88:24, 92:20, 92:23, 96:10, 96:15, 107:24, 108:3, 108:4, 108:6, 108:23
**putting** [4] - 83:22, 84:6, 107:16, 107:21

**Q**

**qualifications** [1] - 111:1
**qualify** [1] - 86:22
**quality** [2] - 28:10, 28:15
**questioned** [1] - 63:2
**questions** [9] - 15:10, 15:13, 15:20, 38:9, 52:11, 75:24, 76:18, 80:3, 89:14
**quick** [2] - 42:24, 87:14
**quickly** [4] - 76:5, 76:6, 101:25, 115:11
**quietly** [1] - 93:8
**quite** [5] - 27:20, 39:4, 49:8, 56:21
**quo** [10] - 5:11, 50:2, 50:3, 50:10, 50:11, 50:14, 50:16, 50:17, 72:24, 103:9
**quote** [5] - 19:20, 41:2, 41:5, 59:9, 97:16

**R**

**R.T** [1] - 4:17
**ran** [1] - 83:14
**Rand** [1] - 61:17
**rather** [2] - 25:21, 102:8
**rationale** [4] - 15:5, 79:19, 81:3, 81:17
**re** [3] - 34:13, 34:24, 85:2
**reach** [7] - 16:21, 23:8, 68:1, 89:25, 90:3, 92:5, 100:1
**reached** [2] - 13:10, 24:5
**reaching** [1] - 46:16
**read** [9] - 6:13, 50:25, 78:11, 78:13, 78:14, 78:15, 79:18, 93:25, 101:15
**reading** [3] - 74:5, 78:25, 111:24
**ready** [1] - 52:11
**real** [7] - 59:17, 59:18, 60:2, 60:3, 60:15, 99:20, 105:21
**realize** [1] - 12:3
**realized** [1] - 78:5
**really** [20] - 10:19, 11:20, 44:2, 44:10, 45:20, 51:15, 52:15, 53:11, 53:13, 56:4, 70:18, 72:12, 76:20, 78:6, 86:18, 90:8, 98:18, 101:13, 104:21, 107:1
**Realtime** [1] - 116:5
**reason** [13] - 30:16, 30:17, 32:13, 32:14, 32:20, 32:21, 35:11, 89:21, 92:17, 99:5, 109:14
**reasonable** [1] - 5:22
**reasonably** [1] - 39:20
**reasoned** [8] - 27:12, 31:11, 31:16, 63:23, 80:6, 80:10, 88:9, 109:5
**reasoning** [4] - 41:11, 79:15, 80:22, 81:4
**reasons** [6] - 7:6, 27:15, 50:24, 75:16, 96:11, 109:14
**REATH** [1] - 1:22
**Reath** [1] - 3:17
**rebuttal** [3] - 52:9, 97:10, 97:12
**recasting** [1] - 41:21
**receive** [1] - 102:4
**received** [1] - 59:4
**receiving** [1] - 50:13
**recent** [2] - 17:1, 26:23
**recently** [1] - 106:7
**recess** [1] - 51:24
**recipient** [1] - 23:2
**recipients** [2] - 74:13, 110:23
**reciprocal** [1] - 59:1
**recognized** [4] - 18:10, 40:25, 48:1, 114:6
**recognizing** [1] - 49:4
**recollection** [1] - 35:21
**reconvene** [1] - 51:23
**record** [31] - 3:10, 40:5, 42:21, 56:2, 67:6, 72:17, 72:22, 77:16, 82:3, 82:5, 82:7, 82:9, 82:18, 82:19, 84:1, 84:12, 84:14, 84:24, 85:19, 87:3, 87:6, 87:7, 87:23, 90:10, 91:17, 91:21, 94:4, 108:22, 110:22, 112:11, 115:13
**Recorded** [1] - 1:25
**records** [2] - 72:11, 105:18
**redefine** [4] - 36:9, 36:13, 44:12, 67:5
**redefined** [1] - 41:8
**redefining** [2] - 39:5, 113:5
**redefinition** [1] - 38:2
**redetermine** [1] - 35:24
**redirected** [1] - 37:11
**reduced** [1] - 41:6
**Reduction** [5] - 9:12, 12:2, 15:4, 22:20, 50:8
**refer** [1] - 44:14
**reference** [5] - 11:23, 20:2, 29:5, 54:25, 81:25
**referenced** [3] - 75:11, 75:12, 110:21
**references** [6] - 16:22, 60:5, 68:15, 68:18, 80:21, 92:23
**referred** [1] - 42:9
**referring** [1] - 10:10
**reflect** [1] - 80:6
**Refugee** [1] - 100:12
**refusing** [1] - 85:9
**refute** [1] - 30:10
**regard** [8] - 8:11, 98:1, 98:15, 99:9, 99:12, 100:17, 102:19, 105:23
**regarding** [3] - 17:16, 25:2, 59:19
**regardless** [4] - 85:4, 99:24, 104:19
**region** [2] - 107:11
**regional** [18] - 5:16, 31:18, 31:20, 32:4, 36:16, 36:19, 38:14, 44:21, 45:14, 49:15, 50:12, 68:22, 99:17, 104:14, 106:3, 109:10, 109:12
**regions** [4] - 46:12, 46:17, 48:21, 51:6
**Registered** [1] - 116:6
**regulating** [3] - 112:16, 112:17, 112:19
**regulation** [3] - 34:19, 34:21, 105:2
**regulations** [7] - 11:12, 11:14, 26:20, 59:24, 62:17, 69:3, 116:11
**regulations/conditions** [1] - 12:6
**reimagining** [1] - 37:18
**reimbursable** [1] - 56:9
**reimbursed** [3] - 98:22, 98:25, 99:2
**reimbursement** [5] - 16:5, 25:2, 55:20, 96:25, 102:21
**reinstate** [2] - 70:21, 103:8
**reinstated** [3] - 55:18, 99:3, 106:18
**reinstatement** [2] - 71:10, 104:17
**reiterate** [2] - 19:17, 74:9
**rejected** [1] - 24:3
**related** [4] - 7:8, 44:18, 82:25, 103:13
**relates** [4] - 10:5, 18:14, 18:15, 101:3
**relating** [1] - 97:12
**relationship** [12] - 52:18, 54:5, 54:9, 54:16, 54:20, 55:19, 58:1, 59:4, 68:13, 74:20, 93:14, 101:3
**relevant** [5] - 9:20, 55:2, 90:17, 93:2, 112:12
**reliance** [9] - 17:5, 34:24, 37:15, 38:11, 49:17, 54:21, 68:21, 100:6, 113:20
**relied** [2] - 25:18, 71:8
**relief** [60] - 7:8, 8:19, 9:4, 9:22, 10:4, 10:21, 10:22, 12:22, 13:10, 13:20, 13:24, 14:2, 14:3, 14:5, 14:8, 14:12, 14:14, 14:17, 14:22, 15:22, 16:6, 16:15, 17:7, 17:8, 18:8, 23:22, 24:1, 24:7, 24:11, 24:12, 25:12, 26:17, 33:17, 50:23, 53:8, 54:5, 55:4, 55:15, 55:16, 56:23, 56:25, 57:1, 57:17, 62:14, 62:18, 62:19, 63:4, 68:11, 70:6, 70:9, 70:11, 70:13, 72:9, 72:14, 74:15, 97:1, 98:14, 114:10
**relying** [5] - 11:7, 42:5, 53:14, 70:25, 71:14
**remain** [4] - 6:6, 20:14, 43:18, 50:12
**remainder** [1] - 6:6
**remarks** [3] - 9:2, 52:13, 103:12
**remediate** [1] - 19:21
**remediation** [1] - 44:17
**remedy** [5] - 10:1, 10:7, 13:11, 13:15, 18:5
**remember** [1] - 27:5
**remembers** [1] - 93:9
**remind** [2] - 6:19, 106:4
**render** [3] - 22:14, 22:16, 63:12
**rendering** [1] - 21:9
**repeatedly** [2] - 75:5, 80:23
**reply** [1] - 54:10
**reported** [1] - 116:9
**Reporter** [3] - 78:6,

116:5, 116:6
**REPORTER** [3] - 78:7, 116:1, 116:18
**reports** [1] - 60:21
**representation** [3] - 82:21, 82:24, 93:23
**representations** [1] - 88:1
**represented** [2] - 4:15, 49:9
**representing** [1] - 91:14
**reputational** [4] - 48:18, 106:18, 106:20, 108:1
**request** [6] - 5:19, 16:14, 16:17, 42:13, 70:21, 102:20
**requested** [2] - 13:24, 34:8
**requesting** [3] - 33:15, 70:6, 70:8
**require** [11] - 53:23, 54:2, 54:25, 62:4, 67:16, 69:9, 84:11, 93:5, 93:15, 114:7, 114:25
**required** [4] - 18:22, 23:14, 80:6, 80:14
**requirement** [5] - 5:21, 10:7, 68:4, 89:8, 114:9
**requirements** [3] - 10:9, 61:3, 66:7
**requires** [7] - 53:4, 62:2, 63:11, 63:21, 64:4, 64:8, 85:21
**reserve** [1] - 26:9
**resilient** [2] - 44:18, 85:6
**resources** [1] - 108:7
**respect** [7] - 16:6, 42:13, 82:14, 109:6, 109:10, 109:20, 114:3
**respectfully** [11] - 16:10, 16:13, 40:9, 62:22, 65:11, 67:20, 68:8, 75:14, 78:14, 79:1, 92:24
**respects** [2] - 95:22, 101:3
**response** [9] - 24:20, 32:8, 35:5, 35:7, 35:8, 36:3, 39:4, 39:5, 90:13
**rest** [3] - 26:2, 96:14, 107:24
**restoration** [4] - 48:4, 50:1, 51:18, 72:10
**restore** [4] - 5:10, 33:1, 33:15, 50:3
**restored** [7] - 5:18, 7:7, 7:10, 7:25, 8:16, 34:6, 47:14
**Restraining** [1] - 76:4
**restricted** [1] - 114:17
**restricting** [1] - 111:20
**restriction** [2] - 89:6, 89:7
**restrictions** [1] - 63:18
**restrictive** [1] - 24:4
**result** [2] - 99:13, 105:25
**resulted** [1] - 107:5
**retain** [1] - 25:2
**returning** [1] - 50:5
**reversal** [1] - 25:15
**revert** [1] - 102:5
**review** [11] - 10:5, 18:19, 18:21, 20:25, 21:1, 21:20, 21:23, 23:25, 25:11, 25:17, 74:22
**reviewability** [1] - 10:6
**reviewed** [2] - 4:2, 4:8
**Rhode** [3] - 6:8, 6:10, 100:5
**rid** [2] - 84:6, 104:10
**rights** [20] - 10:23, 12:22, 13:3, 13:4, 23:22, 42:9, 55:1, 55:3, 57:24, 60:11, 60:13, 62:9, 62:12, 64:5, 76:12, 80:23, 99:18, 101:9, 109:18
**risk** [1] - 28:14
**risks** [1] - 19:22
**RMR** [1] - 116:18
**road** [1] - 37:18
**Roberts** [1] - 40:25
**role** [1] - 69:20
**room** [1] - 45:5
**rule** [1] - 32:11
**rules** [1] - 50:18
**ruling** [3] - 33:13, 33:18, 115:9
**rulings** [1] - 115:10
**run** [4] - 49:21, 83:4, 91:20, 109:22
**running** [2] - 47:11, 95:24
**Rust** [1] - 38:25
**Ruth** [1] - 4:19
**Rybak** [1] - 4:17
**Rybak's** [1] - 103:17

## S

**safe** [1] - 51:9
**salaries** [1] - 56:8
**sale** [2] - 60:5, 60:6
**saw** [1] - 10:17
**school** [1] - 110:5
**scintilla** [1] - 105:5
**scope** [3] - 83:12, 103:19, 111:20
**se** [1] - 48:10
**Seattle** [1] - 1:20
**second** [22] - 4:20, 7:5, 9:22, 12:22, 13:19, 17:4, 18:18, 27:16, 30:19, 32:10, 40:21, 50:9, 50:23, 70:4, 70:6, 77:25, 79:10, 79:14, 79:15, 80:21, 86:15, 90:14
**Section** [1] - 29:3
**see** [16] - 17:2, 18:11, 26:3, 54:9, 56:12, 61:13, 73:20, 73:21, 79:4, 82:10, 84:1, 91:23, 91:25, 94:4, 96:5, 112:10
**seeing** [1] - 60:15
**seek** [5] - 18:9, 55:17, 55:19, 72:6, 102:25
**seeking** [28] - 9:22, 10:20, 10:21, 13:12, 14:12, 15:20, 15:21, 15:22, 16:5, 17:7, 17:12, 17:13, 25:20, 33:17, 34:7, 50:1, 55:20, 56:11, 56:23, 70:8, 70:12, 72:14, 98:12, 98:14, 103:7, 114:10
**seeks** [2] - 101:6, 101:8
**seem** [4] - 35:22, 36:13, 43:18, 93:17
**selecting** [1] - 50:15
**selection** [1] - 39:1
**selectively** [1] - 38:25
**semantic** [2] - 41:6, 41:12
**sender** [1] - 23:2
**sending** [2] - 50:15, 77:17
**sends** [1] - 41:10
**sense** [3] - 8:25, 22:25, 106:11
**sent** [3] - 28:11, 47:13, 111:12
**sentence** [15] - 26:13, 67:13, 71:2, 78:11, 78:14, 79:24, 83:23, 85:17, 90:17, 93:25, 110:9, 114:16
**sentences** [1] - 86:16
**separate** [1] - 94:18
**sequence** [1] - 4:10
**serious** [3] - 28:15, 28:16, 108:18
**seriously** [1] - 106:3
**serve** [2] - 28:17, 49:15
**served** [1] - 36:5
**Services** [1] - 39:17
**set** [6] - 32:12, 32:17, 32:22, 32:24, 50:18, 83:21
**sets** [2] - 6:3, 80:17
**setting** [3] - 31:16, 33:16, 34:9
**seven** [2] - 102:16, 104:15
**several** [3] - 47:13, 54:11, 112:7
**shall** [7] - 19:20, 29:7, 29:12, 89:2, 89:4
**shape** [1] - 39:25
**share** [1] - 60:22
**shelf** [1] - 42:13
**short** [5] - 17:21, 47:15, 51:21, 71:13, 76:15
**shorter** [1] - 89:6
**show** [12] - 60:16, 61:7, 64:17, 73:15, 84:4, 84:23, 88:6, 90:10, 92:18, 111:7, 115:2
**shown** [2] - 73:14, 83:17
**shows** [2] - 68:11, 91:21
**sides** [2] - 23:1, 73:13
**sidestep** [1] - 101:8
**sight** [1] - 28:15
**signalled** [1] - 71:20
**significance** [2] - 11:24, 24:21
**significant** [4] - 20:2, 33:12, 50:4, 77:6
**significantly** [1] - 25:19
**silence** [1] - 24:21
**silent** [1] - 89:10
**similar** [2] - 44:11, 71:17
**simply** [3] - 11:3, 16:13, 99:8
**sit** [1] - 6:1
**sits** [1] - 85:4
**sitting** [1] - 93:8
**situated** [3] - 49:7, 106:22, 106:25
**situation** [4] - 85:3, 95:9, 95:21, 96:18
**skipped** [2] - 65:23, 95:14
**skipping** [1] - 56:3
**slated** [1] - 6:14
**sledding** [2] - 52:10
**slightly** [4] - 94:18, 103:14, 106:22, 107:1
**slipping** [1] - 58:18
**sole** [1] - 13:11
**solely** [1] - 68:19
**solicit** [2] - 44:21, 46:21
**someone** [2] - 13:24, 103:1
**soon** [1] - 115:12
**sorry** [7] - 19:4, 21:16, 32:3, 67:1, 78:5, 87:19, 87:20
**sort** [47] - 5:2, 17:9, 17:10, 18:18, 22:22, 43:12, 43:21, 45:21, 51:15, 55:12, 58:6, 58:9, 58:10, 61:14, 61:16, 64:8, 65:2, 66:18, 73:8, 74:1, 75:2, 76:13, 76:20, 82:1, 84:17, 86:19, 87:18, 88:12, 88:13, 90:3, 91:21, 93:10, 96:3, 98:19, 98:21, 101:1, 101:20, 102:2, 103:22, 104:4, 104:8, 105:2, 105:5, 105:17, 106:21, 107:5, 108:2
**sought** [5] - 14:17, 23:22, 25:13, 62:14, 103:18
**source** [25] - 10:23, 12:21, 13:3, 23:12, 23:21, 26:17, 42:3, 53:8, 53:25, 54:4, 55:3, 55:14, 55:15, 57:24, 61:10, 62:8, 62:12, 63:4, 64:5, 68:11, 69:23, 101:9, 109:18
**sovereign** [2] - 9:16, 10:9
**sovereigns** [1] - 54:12
**speaking** [1] - 93:8
**specific** [29] - 13:12, 13:13, 14:17, 26:3, 29:18, 44:16, 45:5, 45:19, 52:18, 53:20, 54:8, 54:16, 59:11, 67:15, 68:6, 74:21, 75:15, 75:16, 77:11, 79:6, 81:5, 82:4,

**JA0580**

82:22, 83:2, 84:19, 86:22, 100:14, 102:20
**specifically** [25] - 15:2, 17:16, 17:19, 19:20, 21:9, 29:5, 53:19, 64:20, 65:2, 65:4, 66:20, 68:9, 74:12, 74:14, 74:22, 81:13, 83:13, 92:23, 93:5, 93:14, 94:1, 96:25, 106:6, 115:1
**specificity** [1] - 27:22
**specified** [3] - 77:24, 79:21, 109:24
**specify** [1] - 107:22
**Spectrum** [2] - 17:6
**spectrum** [2] - 29:20, 30:4
**speculate** [1] - 108:19
**speculating** [1] - 111:16
**speculation** [1] - 72:12
**speculative** [6] - 72:12, 83:24, 85:22, 86:20, 87:2, 105:21
**speech** [7] - 39:13, 39:25, 40:4, 40:7, 74:17, 111:20, 112:3
**spelled** [1] - 44:25
**spend** [7] - 9:14, 9:25, 19:13, 85:4, 98:15, 98:18, 99:8
**spent** [5] - 46:11, 50:6, 71:5, 107:16, 108:2
**St** [2] - 1:23, 100:13
**staff** [4] - 7:20, 38:12, 46:13, 47:5
**stages** [1] - 107:15
**stand** [1] - 105:11
**standard** [9] - 21:25, 23:4, 27:12, 72:15, 72:18, 72:20, 85:20, 86:9, 88:5
**standing** [2] - 46:20, 81:22
**stands** [1] - 52:7
**start** [6] - 28:19, 52:6, 52:12, 97:15, 97:16, 108:12
**started** [1] - 36:8
**State** [3] - 26:25, 54:13, 54:17
**state** [4] - 25:13, 50:5, 107:11
**statement** [1] - 27:14
**statements** [1] - 113:21
**States** [5] - 24:1, 28:13, 81:3, 116:6, 116:12
**states** [8] - 25:19, 49:7, 49:9, 49:13, 49:20, 53:19, 53:21, 95:18
**STATES** [3] - 1:1, 1:10, 2:3
**status** [14] - 5:11, 6:2, 6:18, 50:2, 50:3, 50:10, 50:11, 50:14, 50:16, 50:17, 68:22, 72:24, 76:5, 103:8
**statute** [74] - 5:23, 9:21, 10:25, 24:8, 25:20, 26:19, 27:18, 27:19, 27:23, 28:20, 28:23, 28:25, 29:1, 30:5, 31:16, 31:17, 33:20, 33:24, 34:18, 35:5, 35:13, 35:17, 35:23, 37:8, 38:3, 43:3, 43:9, 44:13, 44:14, 44:15, 44:23, 52:25, 53:1, 53:18, 53:19, 53:21, 53:22, 61:25, 62:2, 62:3, 62:4, 62:5, 62:6, 62:24, 62:25, 63:3, 63:5, 65:4, 67:4, 74:12, 74:13, 74:21, 74:23, 75:18, 83:1, 83:5, 83:6, 84:18, 84:22, 86:4, 89:2, 89:3, 89:9, 89:10, 94:11, 101:14, 104:22, 109:21, 113:7, 113:12, 113:14, 113:19, 113:20, 114:25
**statutes** [4] - 11:11, 35:12, 51:13, 65:2
**statutorily** [1] - 15:8
**statutory** [41] - 10:8, 13:1, 15:3, 19:18, 27:17, 28:19, 28:24, 29:4, 31:2, 31:6, 31:25, 32:21, 33:21, 34:12, 35:3, 35:18, 35:25, 37:2, 37:5, 38:5, 43:12, 43:13, 44:7, 46:1, 52:21, 63:9, 65:25, 66:5, 76:23, 78:10, 80:1, 80:20, 81:10, 90:24, 92:3, 100:20, 100:25, 101:9, 104:23, 109:13, 109:18
**stay** [3] - 26:14, 71:2, 71:7
**stayed** [1] - 71:16
**stenographically** [1] - 116:9
**stenographically-reported** [1] - 116:9
**Stenography** [1] - 1:25
**step** [7] - 33:19, 58:9, 58:10, 60:25, 61:9, 94:9, 106:8
**steps** [2] - 32:6, 83:8
**Stevens** [5] - 25:3, 25:6, 25:9, 25:12, 25:18
**stick** [2] - 13:8, 13:10
**still** [8] - 7:25, 12:18, 20:11, 24:10, 57:12, 98:2, 100:22, 107:18
**stop** [1] - 78:23
**stops** [2] - 79:24, 90:21
**straight** [1] - 38:4
**stream** [1] - 106:17
**Street** [2] - 1:16, 2:3
**street** [1] - 104:1
**stretch** [1] - 86:20
**stripping** [2] - 77:8, 77:10
**stronger** [1] - 12:24
**structure** [2] - 37:1, 46:11
**structured** [3] - 36:16, 45:4, 113:14
**Students** [1] - 93:10
**stuff** [1] - 103:24
**subgrant** [1] - 45:2
**subgrantee** [1] - 47:19
**subgrantees** [8] - 7:2, 36:18, 37:19, 37:21, 46:23, 50:16, 77:5, 81:24
**subgrants** [9] - 36:20, 37:7, 46:19, 46:21, 107:19, 107:20, 107:23, 112:6, 112:8
**subject** [6] - 13:15, 18:21, 20:25, 21:1, 69:13, 69:15
**submit** [4] - 6:16, 40:9, 65:12, 75:14
**submitted** [4] - 6:11, 7:22, 61:5
**subpart** [1] - 12:8
**subrecipient** [1] - 45:2
**subrecipients** [5] - 99:16, 99:22, 102:3, 102:4, 102:6
**subsection** [1] - 29:12
**subsequent** [11] - 6:5, 6:6, 6:14, 6:20, 7:2, 7:3, 7:7, 9:13, 33:2, 50:15, 64:18
**subsequently** [1] - 24:9
**subsidize** [3] - 39:7, 111:16, 112:3
**subsidizing** [1] - 39:11
**substantial** [1] - 68:23
**subsume** [1] - 41:3
**Suburban** [3] - 54:9, 54:10, 54:18
**succeed** [2] - 71:10, 111:6
**success** [12] - 63:10, 72:19, 83:18, 83:25, 84:23, 85:21, 87:3, 88:7, 92:19, 92:25, 111:7, 115:18
**sufficient** [6] - 15:6, 50:13, 50:14, 58:20, 59:10, 80:9
**suggest** [5] - 83:19, 101:12, 101:18, 102:1, 102:13
**suggested** [1] - 105:4
**suggestion** [2] - 93:21, 107:18
**Suite** [3] - 1:16, 1:19, 1:23
**summary** [1] - 20:21
**summing** [1] - 51:15
**superimposing** [1] - 37:1
**supplemental** [2] - 7:23, 103:17
**support** [10] - 19:21, 40:13, 46:19, 46:22, 78:3, 78:17, 90:18, 91:1, 95:2, 99:8
**supported** [1] - 15:5
**supporting** [2] - 78:23, 85:16
**suppose** [7] - 10:15, 12:8, 17:14, 26:9, 33:2, 33:22, 45:1
**supposed** [1] - 48:11
**suppress** [1] - 40:3
**suppressing** [3] - 39:12, 39:13, 40:6
**Supreme** [13] - 10:13, 24:3, 26:14, 27:1, 40:22, 49:7, 65:1, 71:13, 89:22, 95:5, 95:18, 96:6, 102:7
**surprised** [1] - 115:15
**survive** [2] - 5:17, 108:2
**suspect** [1] - 37:19
**suspend** [1] - 27:24
**suspended** [3] - 6:7, 7:15, 7:16
**suspension** [3] - 5:12, 37:7, 38:12
**sustain** [1] - 15:7
**sustainability** [1] - 60:24
**sustained** [1] - 47:11
**swing** [2] - 96:12, 96:13
**switch** [2] - 47:23, 47:24
**systems** [2] - 46:13, 47:2

## T

**talks** [3] - 59:14, 78:1, 79:6
**tangible** [7] - 21:9, 21:13, 22:15, 22:16, 59:17, 60:7, 60:15
**task** [1] - 76:14
**teacher** [1] - 110:5
**Teacher** [1] - 71:8
**teasing** [1] - 76:20
**technical** [3] - 6:25, 46:22, 47:8
**technologies** [2] - 44:18, 85:6
**Temporary** [1] - 76:4
**ten** [3] - 51:22, 104:14
**ten-minute** [1] - 51:22
**tension** [1] - 112:25
**term** [9] - 22:25, 25:13, 31:2, 38:2, 45:17, 58:24, 67:3, 110:6
**terminate** [22] - 27:24, 30:11, 34:22, 45:11, 53:2, 57:12, 61:23, 63:2, 63:19, 64:13, 65:11, 66:14, 68:19, 69:4, 69:21, 77:2, 77:15, 81:15, 83:15, 84:21, 95:24, 113:1
**terminated** [14] - 6:6, 6:14, 7:24, 18:24, 45:9, 69:19, 81:6, 94:2, 94:20, 104:16, 106:13, 107:8, 111:4, 115:3
**terminating** [14] - 33:14, 37:3, 45:12, 45:13, 65:19, 67:24, 69:11, 76:23, 76:24, 77:20, 81:19, 109:11, 109:15,

110:18
**termination** [58] - 5:11, 15:7, 19:1, 19:8, 19:9, 19:12, 20:15, 35:21, 35:22, 37:5, 38:12, 40:6, 40:10, 43:6, 44:4, 53:3, 63:7, 63:17, 64:3, 64:20, 65:15, 67:8, 67:11, 68:15, 77:23, 77:25, 79:8, 79:13, 80:17, 81:20, 83:23, 83:24, 84:3, 85:23, 86:4, 86:7, 86:8, 86:21, 88:16, 90:10, 90:15, 91:6, 91:9, 91:19, 91:20, 92:12, 92:17, 94:12, 94:21, 101:4, 105:10, 105:24, 105:25, 107:5, 108:13, 111:11, 111:12
**terminations** [22] - 9:8, 12:5, 21:21, 21:24, 32:25, 33:6, 33:21, 52:22, 55:24, 63:7, 63:12, 68:24, 74:17, 77:2, 77:15, 82:6, 83:13, 84:9, 87:15, 101:18, 109:13, 113:13
**terms** [52] - 11:9, 11:13, 11:22, 28:9, 45:8, 45:10, 52:17, 53:5, 53:10, 54:8, 54:19, 55:16, 57:25, 59:11, 59:17, 60:4, 61:6, 61:22, 63:16, 63:17, 64:11, 64:12, 64:16, 65:3, 66:6, 67:15, 68:10, 68:12, 68:16, 68:20, 68:22, 69:5, 69:8, 69:15, 74:18, 75:7, 75:11, 75:18, 80:18, 80:24, 81:13, 83:14, 88:16, 91:22, 93:4, 93:13, 94:14, 94:21, 101:21, 109:3, 109:4
**territory** [2] - 92:8, 92:9
**test** [5] - 10:18, 12:19, 23:19, 70:18, 101:8
**tests** [2] - 10:15, 23:17
**text** [2] - 64:16, 108:13
**THE** [168] - 1:1, 1:1, 1:10, 1:14, 2:1, 2:3, 3:3, 3:20, 3:24, 5:7, 6:19, 7:10, 8:8, 8:25, 10:4, 11:13, 11:18, 12:3, 12:20, 13:7, 14:11, 14:24, 15:10, 15:15, 16:3, 17:24, 19:4, 19:15, 21:15, 21:17, 21:19, 22:7, 22:22, 22:25, 23:15, 24:8, 24:15, 25:25, 26:12, 27:4, 28:18, 28:23, 29:2, 29:10, 29:20, 29:25, 30:3, 30:25, 31:8, 31:15, 31:22, 32:23, 33:10, 33:18, 34:11, 35:18, 36:15, 36:25, 38:4, 38:18, 38:24, 39:13, 39:23, 40:11, 41:17, 41:20, 42:4, 42:7, 42:16, 42:20, 42:23, 46:5, 50:10, 50:21, 51:20, 51:25, 52:4, 52:19, 53:16, 53:24, 54:24, 55:20, 57:8, 58:13, 61:25, 62:8, 62:16, 63:6, 63:20, 64:5, 65:6, 65:8, 65:14, 65:19, 66:10, 66:22, 67:18, 69:13, 69:17, 69:23, 70:10, 70:13, 70:20, 71:1, 71:22, 72:5, 72:23, 73:10, 74:4, 75:23, 76:9, 77:3, 77:14, 78:7, 78:11, 78:15, 79:7, 79:12, 80:2, 80:5, 80:12, 81:22, 82:5, 82:10, 82:25, 83:8, 84:8, 85:2, 86:7, 86:12, 87:5, 87:12, 87:14, 87:19, 87:22, 88:8, 88:11, 88:18, 89:16, 89:18, 90:25, 91:8, 91:13, 93:16, 93:20, 94:9, 95:14, 95:17, 95:23, 96:21, 97:9, 97:22, 98:7, 98:24, 100:6, 100:16, 106:9, 108:8, 108:10, 111:19, 112:10, 112:14, 112:22, 113:10, 114:2, 114:12, 114:14, 115:7
**themselves** [6] - 19:3, 26:20, 48:15, 49:14, 61:5, 92:18
**theoretically** [3] - 38:16, 44:12, 45:1
**theory** [1] - 38:1
**therefore** [2] - 81:11, 84:12
**they've** [10] - 47:1, 47:4, 51:4, 52:24, 61:11, 98:17, 105:18, 106:13, 107:2, 107:3
**thinking** [1] - 37:11
**third** [5] - 10:1, 28:2, 49:23, 51:10, 79:9
**thoughts** [1] - 26:2
**thread** [1] - 20:23
**threatened** [1] - 74:16
**three** [21] - 4:14, 5:15, 7:24, 9:18, 17:1, 18:24, 19:2, 27:9, 28:19, 29:13, 35:7, 49:25, 51:6, 61:2, 64:15, 89:5, 89:9, 104:12, 105:15, 109:13
**threshold** [4] - 18:13, 18:18, 18:23, 20:3
**thriving** [5] - 44:12, 44:22, 45:3, 66:12, 69:1
**Thriving** [6] - 8:4, 20:17, 32:3, 49:16, 110:25, 111:4
**throughout** [2] - 75:12, 75:13
**throwing** [1] - 77:17
**thrust** [1] - 106:15
**tiny** [1] - 112:5
**tip** [1] - 13:5
**Title** [9] - 66:7, 93:6, 93:12, 93:13, 93:15, 93:18, 93:21, 94:7
**title** [1] - 62:3
**today** [9] - 3:18, 4:15, 5:10, 7:15, 8:16, 10:16, 81:22, 91:14, 105:4
**together** [4] - 37:25, 47:1, 82:9, 87:11
**tomorrow** [1] - 8:19
**tone** [1] - 82:22
**took** [1] - 38:4
**top** [1] - 85:4
**total** [1] - 113:23
**touch** [1] - 24:25
**touching** [1] - 19:10
**toward** [3] - 13:5, 30:19, 84:6
**towards** [1] - 83:22
**toxic** [1] - 51:7
**track** [2] - 56:2, 60:23
**traditional** [1] - 22:23
**Transcript** [1] - 1:25
**transcript** [2] - 116:9, 116:11
**TRANSCRIPT** [1] - 1:9
**Transcription** [1] - 1:25
**transition** [1] - 70:4
**Tremaine** [1] - 3:15
**TREMAINE** [1] - 1:19
**tries** [2] - 89:25, 99:24
**true** [7] - 36:3, 49:11, 50:1, 52:16, 61:13, 69:9, 116:9
**truism** [1] - 35:10
**Trump** [1] - 45:16
**trusted** [1] - 105:20
**try** [1] - 37:10
**trying** [19] - 33:18, 36:25, 43:19, 46:3, 52:14, 52:15, 53:6, 56:15, 65:11, 67:11, 68:17, 75:24, 76:5, 84:17, 84:20, 88:2, 92:18, 93:23, 106:18
**Tucker** [32] - 11:2, 12:24, 13:6, 14:20, 21:22, 22:6, 22:7, 23:5, 24:2, 26:3, 26:6, 52:6, 52:11, 53:11, 56:13, 56:20, 57:15, 58:2, 58:14, 61:9, 70:1, 73:18, 76:18, 92:9, 98:5, 98:8, 99:6, 100:2, 101:23, 114:17, 114:22
**Tuesday** [1] - 1:11
**turn** [11] - 4:10, 5:3, 11:9, 11:11, 18:13, 19:4, 20:15, 23:16, 26:5, 26:20, 57:4
**turned** [4] - 47:23, 47:24, 55:25, 99:3
**turning** [2] - 20:24, 57:9
**turns** [3] - 23:5, 52:17, 52:19
**tweak** [1] - 66:23
**twisted** [1] - 97:18
**Two** [2] - 63:7, 63:10
**two** [29] - 5:2, 6:3, 10:8, 10:22, 12:19, 16:12, 18:13, 23:1, 23:5, 24:17, 28:19, 30:4, 30:20, 32:8, 37:1, 46:24, 49:2, 54:23, 55:13, 57:18, 58:9, 77:7, 90:13, 90:14, 91:5, 92:24, 106:2, 114:13, 115:14
**two-level** [1] - 37:1
**two-part** [1] - 12:19
**two-step** [1] - 58:9
**type** [11] - 12:22, 14:21, 17:10, 23:22, 40:24, 48:1, 62:13, 85:8, 85:12, 102:25, 103:9
**types** [8] - 27:22, 48:7, 50:6, 78:17, 79:3, 103:5, 110:24, 111:2
**typical** [1] - 17:10
**typically** [1] - 105:3

## U

**U.S.C** [5] - 62:24, 72:4, 77:22, 84:22, 116:8
**ultimate** [1] - 99:21
**ultimately** [5] - 28:9, 60:25, 67:25, 97:6, 98:12
**unclear** [2] - 26:15, 72:8
**unconstitutional** [4] - 28:2, 28:3, 35:17, 40:2
**under** [51] - 5:23, 9:4, 9:11, 11:2, 14:22, 15:4, 16:24, 17:9, 18:4, 21:17, 22:6, 22:14, 23:3, 23:4, 23:11, 23:19, 24:2, 25:11, 25:24, 26:17, 27:18, 27:23, 29:12, 30:7, 30:8, 30:25, 32:12, 33:22, 35:23, 44:4, 49:16, 53:18, 55:1, 56:9, 56:20, 61:23, 66:19, 81:13, 86:12, 93:12, 93:13, 94:5, 98:5, 99:4, 99:6, 99:25, 100:19, 101:22, 109:20, 110:19, 114:5
**underlying** [2] - 19:9, 20:5
**undermine** [1] - 114:7
**understandings** [2] - 36:24, 50:18
**understood** [4] - 15:16, 33:19, 97:22, 106:15
**undertaken** [1] - 113:22
**undertook** [1] - 68:23
**unexpected** [1] - 60:19
**unfairly** [1] - 91:22
**unfortunately** [2] - 82:23, 97:17

**uniform** [9] - 11:11, 11:23, 43:7, 45:16, 53:4, 64:4, 100:25, 101:2, 101:20
**United** [5] - 24:1, 28:13, 81:2, 116:6, 116:12
**UNITED** [3] - 1:1, 1:10, 2:3
**universally** [1] - 18:10
**unlawful** [6] - 12:5, 33:12, 33:22, 34:10, 63:8, 91:4
**unless** [7] - 7:25, 21:21, 26:6, 41:16, 76:18, 89:14, 106:17
**unlike** [3] - 49:13, 49:20, 102:1
**unnecessary** [1] - 114:11
**unpack** [1] - 33:8
**unprecedented** [1] - 24:4
**unreviewable** [1] - 21:25
**unserious** [4] - 28:10, 28:14, 108:18, 113:25
**unspecified** [1] - 105:19
**unsuccessful** [1] - 97:6
**up** [17] - 6:20, 15:13, 16:18, 20:11, 23:7, 28:9, 29:13, 46:20, 49:14, 51:15, 56:25, 60:10, 70:5, 88:13, 89:5, 100:10, 109:24
**update** [1] - 7:5
**updates** [3] - 6:2, 8:8, 8:12
**uphill** [1] - 52:10
**USAID** [1] - 100:12
**utilize** [1] - 109:15
**utilizing** [1] - 14:18

## V

**vacuousness** [2] - 30:16, 39:20
**vagueness** [4] - 42:2, 42:7, 42:12
**value** [2] - 27:2, 102:11
**values** [1] - 79:18
**vanishes** [1] - 68:3
**vanishing** [1] - 86:25
**various** [5] - 46:20, 65:15, 78:17, 98:16, 101:6
**vehicles** [1] - 105:1
**vein** [1] - 44:11
**Velazquez** [2] - 39:17, 40:24
**vernacular** [1] - 103:25
**version** [1] - 50:11
**versus** [1] - 10:24
**view** [2] - 5:24, 107:23
**viewpoint** [3] - 28:4, 40:7, 51:13
**viewpoints** [5] - 28:7, 38:22, 39:1, 39:12, 90:6
**views** [1] - 110:19
**VII** [8] - 66:7, 93:6, 93:12, 93:13, 93:15, 93:18, 93:21, 94:7
**violate** [6] - 12:15, 33:7, 45:9, 45:10, 94:8, 113:13
**violated** [11] - 11:14, 33:20, 52:21, 68:18, 74:19, 76:22, 84:10, 93:18, 93:21, 105:9, 115:2
**violates** [1] - 89:25
**violating** [4] - 52:20, 52:21, 68:4, 94:7
**violation** [15] - 5:24, 11:22, 12:5, 12:7, 28:5, 37:5, 42:9, 51:14, 69:19, 69:24, 77:21, 84:22, 100:24, 107:19, 115:4
**violations** [6] - 9:7, 11:25, 12:1, 12:2, 28:15
**violative** [1] - 53:9
**virtue** [1] - 21:22
**vital** [1] - 80:24
**voluminous** [1] - 115:16
**Voters** [1] - 48:3
**vulnerability** [1] - 51:7

## W

**waive** [1] - 56:25
**waiver** [3] - 9:16, 9:18, 10:9
**wanton** [1] - 17:20
**wants** [4] - 53:1, 74:1, 109:19, 112:3
**warned** [2] - 40:22, 41:13
**warning** [2] - 108:12, 108:14
**Washington** [2] - 1:20, 1:23
**waste** [4] - 28:12, 43:24, 81:1, 105:6
**Water** [1] - 20:8
**water** [6] - 43:14, 43:17, 44:6, 51:8, 92:25, 103:24
**ways** [8] - 33:3, 39:25, 53:17, 54:11, 55:6, 55:11, 58:6, 75:17
**weather** [1] - 51:8
**weaving** [1] - 18:16
**website** [2] - 20:11, 43:16
**week** [7] - 7:25, 47:14, 56:6, 64:25, 104:13, 104:15, 115:14
**weeks** [5] - 12:11, 17:2, 49:4, 71:11, 114:6
**weigh** [1] - 95:11
**weight** [1] - 89:1
**whatsoever** [1] - 51:11
**whole** [4] - 44:11, 65:11, 78:14, 90:16
**wholeheartedly** [1] - 76:24
**wholly** [1] - 114:7
**wiggle** [1] - 45:5
**wild** [1] - 51:7
**willing** [2] - 52:8, 57:7
**win** [4] - 72:17, 72:20, 110:13
**wiping** [1] - 111:9
**wisely** [1] - 56:11
**withhold** [1] - 28:6
**Women** [1] - 48:2
**Women's** [1] - 74:16
**wondering** [1] - 37:6
**Woonasquatucket** [7] - 6:9, 6:11, 7:8, 37:12, 37:15, 49:5, 75:5
**word** [3] - 35:15, 49:2, 97:19
**words** [15] - 22:22, 36:19, 37:3, 57:9, 57:10, 62:19, 65:16, 65:22, 66:13, 74:5, 82:10, 90:13, 90:14, 92:24, 106:14
**works** [2] - 48:22, 105:3
**world** [1] - 48:20
**worth** [1] - 48:8
**WRIGHT** [1] - 1:19
**Wright** [1] - 3:15
**written** [1] - 44:20

## Y

**year** [4] - 46:11, 50:4, 107:16, 108:3
**year-and-a-half** [3] - 46:11, 107:16, 108:3
**years** [3] - 29:13, 89:5, 89:9
**yield** [1] - 8:23
**Young** [1] - 3:19
**yourselves** [1] - 3:9

## Z

**Zeldin** [1] - 20:6
**zero** [4] - 44:18, 58:10, 60:25, 85:6

## §

**§** [5] - 23:24, 25:24, 28:20, 54:2, 116:8

**From:** MDD_CM-ECF_Filing@mdd.uscourts.gov
**To:** MDDdb_ECF@mdd.uscourts.gov
**Subject:** Activity in Case 1:25-cv-01096-ABA Green & Healthy Homes Initiative, Inc. et al v. Environmental Protection Agency et al Order
**Date:** Tuesday, May 6, 2025 4:14:12 PM

**This is an automatic e-mail message generated by the CM/ECF system. Please DO NOT RESPOND to this e-mail because the mail box is unattended.**
*****NOTE TO PUBLIC ACCESS USERS*** Judicial Conference of the United States policy permits attorneys of record and parties in a case (including pro se litigants) to receive one free electronic copy of all documents filed electronically, if receipt is required by law or directed by the filer. PACER access fees apply to all other users. To avoid later charges, download a copy of each document during this first viewing. However, if the referenced document is a transcript, the free copy and 30 page limit do not apply.**

**U.S. District Court**

**District of Maryland**

## Notice of Electronic Filing

The following transaction was entered on 5/6/2025 at 4:12 PM EDT and filed on 5/6/2025

| | |
|---|---|
| **Case Name:** | Green & Healthy Homes Initiative, Inc. et al v. Environmental Protection Agency et al |
| **Case Number:** | 1:25-cv-01096-ABA |
| **Filer:** | |
| **Document Number:** | 29(No document attached) |

**Docket Text:**
**PAPERLESS ORDER: As ordered at the April 29 hearing, Defendants shall file the administrative record no later than May 13, 2025. Signed by Judge Adam B Abelson on 5/6/2025. (sp6s, Chambers)**

**1:25-cv-01096-ABA Notice has been electronically mailed to:**

Charles M English, Jr chipenglish@dwt.com

Andrew David Freeman adf@browngold.com, LDyson@browngold.com, kgarvey@browngold.com

Jessica C Abrahams jessica.abrahams@faegredrinker.com

Joshua Neal Auerbach jauerbach@browngold.com

Lora A Brzezynski lora.brzezynski@faegredrinker.com, rita.simmons@faegredrinker.com

Molissa Heather Farber molissa.farber@usdoj.gov, CaseView.ECF@usdoj.gov, Tracy.Lichtel@usdoj.gov

Jonathan A DeMella jonathandemella@dwt.com, Lit-Docket@dwt.com, sarahschmitz@dwt.com

Neel Lalchandani nlalchandani@browngold.com, es@browngold.com, sduckworth@browngold.com

**1:25-cv-01096-ABA Notice will not be electronically delivered to:**

# EXHIBIT 1

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY

**OFFICE OF MISSION SUPPORT**

WASHINGTON, D.C. 20460

May 8, 2025

**MEMORANDUM**

**SUBJECT:** Termination of EPA Assistance Agreement 5N-02J63901 under 2 CFR 200.340

**FROM:** EPA Award Official

**TO:** Jill Nishi, CEO
(Recipient Authorized Organization Representative (AOR))

The purpose of this communication is to notify you that the U.S. Environmental Protection Agency (EPA) is hereby terminating Assistance Agreement No. 5N-02J63901 awarded to Philanthropy Northwest. This EPA Assistance Agreement is terminated effective immediately on the grounds that the remaining portion of the Federal award will not accomplish the EPA funding priorities for achieving program goals. The objectives of the award are no longer consistent with EPA funding priorities.

The EPA Administrator has determined that, per the Agency's obligations to the constitutional and statutory law of the United States, this priority includes ensuring that the Agency's grants do not conflict with the Agency's policy of prioritizing merit, fairness, and excellence in performing our statutory functions. In addition to complying with the law, it is vital that the Agency assess whether all grant payments are free from fraud, abuse, waste, and duplication, as well as to assess whether current grants are in the best interests of the United States.

The process for closeout is generally outlined in 2 CFR 200.344. EPA is clarifying what reports are required and what reports are waived below. Other requirements are still in effect if applicable to your grant.

EPA is requiring the following closeout reports due within 120 days of closeout (2 CFR 200.344a:)

- Final Federal Financial Report, SF-425
- Final Technical Report
- Other programmatic reports identified in your terms and conditions

As part of this termination, EPA is waiving the following closeout reports:

- Property Report, SF-428
- Final Minority Business Enterprise/Woman Business Enterprise Utilization Under Federal Grants and Cooperative Agreements, EPA Form 5700-52A

The recipient may request payment from the Automated Standard Application Payments (ASAP) system for allowable costs incurred up to the date of this memo provided that such costs were contained in the approved workplan. Costs incurred by you after this termination are allowable only if (a) those costs were properly incurred by you before the effective date of this termination, and not in anticipation of it; and (b) those costs would be allowable if your federal award was not suspended or expired normally at the end of the period of performance in which the termination takes effect. *See* 2 C.F.R. § 200.343. You are encouraged to carefully

review and discharge your closeout responsibilities set forth in 2 C.F.R. § 200.344-45 and your award agreement. Those responsibilities include, but are not limited to, your obligation to "promptly refund any unobligated funds" that have been paid out but "are not authorized to be retained." *See* 2 C.F.R. § 200.344(g).

Also, per 2 CFR 200.472, a recipient may use grant funds to properly closeout their grant including reasonable and necessary costs that might occur after the date of this memo. If the recipient drew down funds from ASAP for costs beyond the termination date or for costs that exceed the amount necessary to properly closeout their grant, the recipient must contact RTPFC at rtpfc-grants@epa.gov for instructions on how to return the excess funds.

The EPA Grants Management Office has issued an amendment to the agreement to document the termination.

If you wish to dispute this termination decision, the Disputes Decision Official (DDO) Emma Pokon, R10-Dispute@epa.gov, must receive the Dispute no later than 30 calendar days from the date this termination notice is electronically sent to you. Disputes must be sent electronically by email to the DDO, with a copy to the EPA Award Official, manion.andrea.l@epa.gov within the 30-day period stated above. The Dispute submitted to the DDO must include: (1) A copy of the disputed Agency Decision; (2) A detailed statement of the specific legal and factual grounds for the Dispute, including copies of any supporting documents; (3) The specific remedy or relief you seek under the Dispute; and (4) The name and contact information, including email address, of your designated point of contact for the Dispute. *See* 2 CFR 1500.15

The requirements on post-closeout adjustments and continuing responsibilities, including audit and record retention requirements, at 2 CFR 200.345 remain in effect.

ATTACHMENT
Amendment Document

cc: Lacey Davidson (EPA Grant Specialist)
Martha Tomlinson (EPA Project Officer)
Danielle Crystal (Grantee Program Manager)

# EXHIBIT 2

| U.S. ENVIRONMENTAL PROTECTION AGENCY<br>Assistance Amendment | GRANT NUMBER (FAIN): 02J63901<br>MODIFICATION NUMBER: 2<br>PROGRAM CODE: 5N | DATE OF AWARD<br>05/08/2025 |
|---|---|---|
| | TYPE OF ACTION<br>No Cost Amendment | MAILING DATE<br>05/08/2025 |
| | PAYMENT METHOD:<br>ASAP | ACH#<br>PEND |

| RECIPIENT TYPE: | Send Payment Request to: |
|---|---|
| Not for Profit | rtpfc-grants@epa.gov |
| **RECIPIENT:** | **PAYEE:** |
| PHILANTHROPY NORTHWEST<br>600 UNIVERSITY ST STE 1725<br>SEATTLE, WA 98101-4120<br>**EIN:** 91-1110995 | PHILANTHROPY NORTHWEST<br>600 UNIVERSITY ST STE 1725<br>SEATTLE, WA 98101-4120 |

| PROJECT MANAGER | EPA PROJECT OFFICER | EPA GRANT SPECIALIST |
|---|---|---|
| Danielle Crystal<br>600 University St, Suite 1725<br>Seattle, WA 98101-3144<br>**Email:** dcrystal@philanthroynw.org<br>**Phone:** 206-443-8436 | Martha Tomlinson<br>1200 Sixth Ave, Suite 155<br>Seattle, WA 98101-3144<br>**Email:** Tomlinson.MarthaScott@epa.gov<br>**Phone:** 206-553-8696 | Lacey Davidson<br>1200 6th Ave., Suite 155<br>Seattle, WA 98101-3144<br>**Email:** davidson.lacey@epa.gov<br>**Phone:** 206-553-0758 |

**PROJECT TITLE AND EXPLANATION OF CHANGES**

Northwest Network for Environmental Justice-Subsequent Award

This amendment is to stop work; terminate the agreement; reduce performance period duration; curtail scope of work; and waive certain reporting requirements. Administrative terms and conditions are added.

Per 2 CFR 200.340 and the Termination General Terms and Conditions of this agreement, EPA is terminating this award. Your organization shall immediately stop work and take all reasonable steps to minimize the incurrence of costs otherwise allocable to the assistance agreement. See terms and conditions.

| BUDGET PERIOD | PROJECT PERIOD | TOTAL BUDGET PERIOD COST | TOTAL PROJECT PERIOD COST |
|---|---|---|---|
| 11/01/2024 - 05/08/2025 | 11/01/2024 - 05/08/2025 | $ 52,000,000.00 | $ 52,000,000.00 |

## NOTICE OF AWARD

Based on your Application dated 02/27/2024 including all modifications and amendments, the United States acting by and through the US Environmental Protection Agency (EPA) hereby awards $ 0.00. EPA agrees to cost-share 100.00% of all approved budget period costs incurred, up to and not exceeding total federal funding of $ 52,000,000.00. Recipient's signature is not required on this agreement. The recipient demonstrates its commitment to carry out this award by either: 1) drawing down funds within 21 days after the EPA award or amendment mailing date; or 2) not filing a notice of disagreement with the award terms and conditions within 21 days after the EPA award or amendment mailing date. If the recipient disagrees with the terms and conditions specified in this award, the authorized representative of the recipient must furnish a notice of disagreement to the EPA Award Official within 21 days after the EPA award or amendment mailing date. In case of disagreement, and until the disagreement is resolved, the recipient should not draw down on the funds provided by this award/amendment, and any costs incurred by the recipient are at its own risk. This agreement is subject to applicable EPA regulatory and statutory provisions, all terms and conditions of this agreement and any attachments.

| ISSUING OFFICE (GRANTS MANAGEMENT OFFICE) | AWARD APPROVAL OFFICE |
|---|---|
| **ORGANIZATION / ADDRESS** | **ORGANIZATION / ADDRESS** |
| U.S. EPA, Region 10, EPA Region 10<br>Mail Code: 14-D12, 1200 Sixth Avenue, Suite 155<br>Seattle, WA 98101 | U.S. EPA, Region 10, MSD<br>OEJECR - Office of Environmental Justice and External Civil Rights<br>1200 Sixth Ave, Suite 155<br>Seattle, WA 98101-3144 |

**THE UNITED STATES OF AMERICA BY THE U.S. ENVIRONMENTAL PROTECTION AGENCY**

| Digital signature applied by EPA Award Official Andrea Manion - Grants Management Officer | DATE<br>05/08/2025 |
|---|---|

# EPA Funding Information

| FUNDS | FORMER AWARD | THIS ACTION | AMENDED TOTAL |
|---|---|---|---|
| EPA Amount This Action | $ 52,000,000 | $ 0 | $ 52,000,000 |
| EPA In-Kind Amount | $ 0 | $ 0 | $ 0 |
| Unexpended Prior Year Balance | $ 0 | $ 0 | $ 0 |
| Other Federal Funds | $ 0 | $ 0 | $ 0 |
| Recipient Contribution | $ 0 | $ 0 | $ 0 |
| State Contribution | $ 0 | $ 0 | $ 0 |
| Local Contribution | $ 0 | $ 0 | $ 0 |
| Other Contribution | $ 0 | $ 0 | $ 0 |
| Allowable Project Cost | $ 52,000,000 | $ 0 | $ 52,000,000 |

| Assistance Program | Statutory Authority | Regulatory Authority |
|---|---|---|
| 66.615 - Environmental Justice Thriving Communities Grantmaking Program (EJ TCGM) | Clean Air Act: Sec. 138 | 2 CFR 200, 2 CFR 1500 and 40 CFR 33 |

Budget Summary Page

| Table A - Object Class Category (Non-Construction) | Total Approved Allowable Budget Period Cost |
|---|---|
| 1. Personnel | $ 800,352 |
| 2. Fringe Benefits | $ 184,079 |
| 3. Travel | $ 673,502 |
| 4. Equipment | $ 0 |
| 5. Supplies | $ 39,700 |
| 6. Contractual | $ 745,481 |
| 7. Construction | $ 0 |
| 8. Other | $ 48,083,671 |
| 9. Total Direct Charges | $ 50,526,785 |
| 10. Indirect Costs: 0.00 % Base | $ 1,473,215 |
| 11. Total (Share: Recipient 0.00 % Federal 100.00 %) | $ 52,000,000 |
| 12. Total Approved Assistance Amount | $ 52,000,000 |
| 13. Program Income | $ 0 |
| 14. Total EPA Amount Awarded This Action | $ 0 |
| 15. Total EPA Amount Awarded To Date | $ 52,000,000 |

# Administrative Conditions

## UNILATERAL TERMINATION

1. The Agency is asserting its right under 2 CFR 200.340 and the Termination General Term and Condition of this agreement to unilaterally terminate this award. This amendment serves as required notice under 2 CFR 200.341.

2. Consistent with 2 CFR 200.343 Effect of suspension and termination, costs to the recipient or subrecipient resulting from financial obligations incurred by the recipient or subrecipient after the termination of a Federal award are not allowable. Costs after termination are allowable if:

a. The costs result from financial obligations which were properly incurred by the recipient or subrecipient before the effective date of suspension or termination, and not in anticipation of it; and

b. The costs would be allowable if the Federal award was not suspended or expired normally at the end of the period of performance in which the termination takes effect.

c. The costs are reasonable and necessary termination costs consistent with 2 CFR 200.472.

3. Federal Financial Reporting (FFR) General Terms and Conditions is still in full force and effect. EPA recipients must submit the SF-425 no later than 120 calendar days after the end date of the period of performance of the award.

4. Programmatic Terms and Conditions. Performance reporting is still in full force and effect. The recipient must submit the final report no later than 120 calendar days after the period of performance.

In accordance with 2 CFR 200.329, the recipient agrees to submit performance reports that include information on each of the following areas:

a. A comparison of accomplishments to the outputs/outcomes established in the assistance agreement work plan for the reporting period;

b. Explanations on why established outputs/outcomes were not met; and

c. Additional information, analysis, and explanation of cost overruns or high-than-expected-unit costs.

5. Waiver of Reports

The following reports are waived:

a. Utilization of Disadvantaged Business Enterprises General Terms and Conditions, EPA Form 5700-52A.

b. Tangible Personal Property Report, SF-428, General Terms and Conditions.

6. Record Retention

Access to Records, 2 CFR 200.337, is still in full force and effect. The termination of this award does not affect the right of EPA to disallow costs and recover funds on the basis of a later audit or other reviews. Information regarding record retention, property disposition in accordance with EPA regulations, and other frequently asked questions can be accessed at https://www.epa.gov/grants/frequent-questions-about-closeouts.

# Programmatic Conditions

All Programmatic Conditions Remain the Same

# EXHIBIT 3

**From:** Farber, Molissa (USAMD) <Molissa.Farber@usdoj.gov>
**Sent:** Tuesday, May 6, 2025 12:41 PM
**To:** Andrew D. Freeman
**Cc:** Micco, Megan (USAMD); Joshua Auerbach; Neel Lalchandani; DeMella, Jonathan; English, Chip; Abrahams, Jessica C.; Brzezynski, Lora A.
**Subject:** RE: GHHI, et al. v. EPA, et al. - Production of Administrative Record

**[EXTERNAL]**

Hi Andy,
From what I understand, there are not memoranda specific to each grant termination.

**Molissa H. Farber**
Assistant U.S. Attorney | Senior Litigation Counsel
U.S. Attorney's Office, District of Maryland
36 S. Charles Street | Baltimore, MD 21201
(410) 209-4862 (direct phone) | (410) 962-2310 (fax)
Molissa.Farber@usdoj.gov

**From:** Andrew D. Freeman <adf@browngold.com>
**Sent:** Friday, May 2, 2025 4:57 PM
**To:** Farber, Molissa (USAMD) <Molissa.Farber@usdoj.gov>
**Cc:** Micco, Megan (USAMD) <Megan.Micco@usdoj.gov>; Joshua Auerbach <JAuerbach@browngold.com>; Neel Lalchandani <NLalchandani@browngold.com>; DeMella, Jonathan <JonathanDeMella@dwt.com>; ChipEnglish@dwt.com; Abrahams, Jessica C. <jessica.abrahams@faegredrinker.com>; Brzezynski, Lora A. <lora.brzezynski@faegredrinker.com>
**Subject:** [EXTERNAL] RE: GHHI, et al. v. EPA, et al. - Production of Administrative Record

Hi Molissa. We appreciate your prompt response.

Plaintiffs are willing to wait until the end of the day on Tuesday for the EPA's production of the termination memoranda. However, if the EPA does not agree to produce those documents promptly or if the documents do not exist, we would appreciate an answer earlier in the day.

Thanks.

Andy
410-404-4888

**From:** Farber, Molissa (USAMD) <Molissa.Farber@usdoj.gov>
**Sent:** Friday, May 2, 2025 4:05 PM
**To:** Andrew D. Freeman <adf@browngold.com>
**Cc:** Micco, Megan (USAMD) <Megan.Micco@usdoj.gov>; Joshua Auerbach <JAuerbach@browngold.com>; Neel Lalchandani <NLalchandani@browngold.com>; DeMella, Jonathan <JonathanDeMella@dwt.com>; ChipEnglish@dwt.com; Abrahams, Jessica C. <jessica.abrahams@faegredrinker.com>; Brzezynski, Lora A. <lora.brzezynski@faegredrinker.com>
**Subject:** RE: GHHI, et al. v. EPA, et al. - Production of Administrative Record

**SECURITY ALERT:** This email is from an external source.

I will check with EPA on this. Please allow until the end of the day Tuesday for an answer regarding the memoranda you referenced. I spoke with my agency counsel today and I understand there will be a bunch of absences on Monday (including her) that will make your Monday deadline unworkable.

Thanks.

**Molissa H. Farber**
Assistant U.S. Attorney | Senior Litigation Counsel
U.S. Attorney's Office, District of Maryland
36 S. Charles Street | Baltimore, MD 21201
(410) 209-4862 (direct phone) | (410) 962-2310 (fax)
Molissa.Farber@usdoj.gov

---

**From:** Andrew D. Freeman <adf@browngold.com>
**Sent:** Friday, May 2, 2025 3:30 PM
**To:** Farber, Molissa (USAMD) <Molissa.Farber@usdoj.gov>
**Cc:** Micco, Megan (USAMD) <Megan.Micco@usdoj.gov>; Joshua Auerbach <JAuerbach@browngold.com>; Neel Lalchandani <NLalchandani@browngold.com>; DeMella, Jonathan <JonathanDeMella@dwt.com>; ChipEnglish@dwt.com; Abrahams, Jessica C. <jessica.abrahams@faegredrinker.com>; Brzezynski, Lora A. <lora.brzezynski@faegredrinker.com>
**Subject:** [EXTERNAL] RE: GHHI, et al. v. EPA, et al. - Production of Administrative Record

Hi Molissa.

It appears that the EPA gathered and produced documents in other pending litigation in 10 days from the court's order. *See The Sustainability Institute v. Trump* (D.S.C., Civil Action No. RMG-25-2152). Given the EPA's timeline in that matter, and considering that the EPA has already conducted a review of documents related to the cancellation of similar grants, we are unclear why it cannot produce the administrative record here by May 14th.

At the very least, while the EPA is compiling the full administrative record, we ask that it produce the justification and approval memoranda specific to the termination of Plaintiffs' grants. Given that at most there would be a total of six documents (relating to two grants for each of the three Plaintiffs), we request that the EPA produce those memoranda (if they exist) by the end of the day Monday, or confirm that they don't exist. Please let us know if EPA will do so.

Thanks.

Andy

**Andrew D. Freeman**
Attorney

**BROWN GOLDSTEIN & LEVY**
120 E. Baltimore Street, Suite 2500
Baltimore, MD 21202
T 410.962.1030 x1313
C 410.404.4888
F 410.385.0869
E adf@browngold.com

Pronouns: he/him/his

**About Brown, Goldstein & Levy, LLP**
Brown, Goldstein & Levy handles both civil and criminal litigation and has active practices in many other areas of the law, including family law, disability rights, and health care. For more information, visit browngold.com.

CONFIDENTIALITY: This email and any attachments are confidential, except where the email states it can be disclosed; it may also be privileged. If received in error, please do not disclose the contents to anyone, but notify the sender by return email and delete this email (and any attachments) from your system. Thank you.

---

**From:** Farber, Molissa (USAMD) <Molissa.Farber@usdoj.gov>
**Sent:** Friday, May 2, 2025 11:55 AM
**To:** Neel Lalchandani <NLalchandani@browngold.com>
**Cc:** Micco, Megan (USAMD) <Megan.Micco@usdoj.gov>; Andrew D. Freeman <adf@browngold.com>; Joshua Auerbach <JAuerbach@browngold.com>; DeMella, Jonathan <JonathanDeMella@dwt.com>; ChipEnglish@dwt.com; Abrahams, Jessica C. <jessica.abrahams@faegredrinker.com>; Brzezynski, Lora A. <lora.brzezynski@faegredrinker.com>
**Subject:** RE: GHHI, et al. v. EPA, et al. - Production of Administrative Record

**SECURITY ALERT:** This email is from an external source.

Hi everyone,
I'm being told May 21 is the earliest feasible date for the production of the administrative record. If that doesn't work for you all then unfortunately it looks like we will need court intervention.

**Molissa H. Farber**
Assistant U.S. Attorney | Senior Litigation Counsel
U.S. Attorney's Office, District of Maryland
36 S. Charles Street | Baltimore, MD 21201
(410) 209-4862 (direct phone) | (410) 962-2310 (fax)
Molissa.Farber@usdoj.gov

---

**From:** Neel Lalchandani <NLalchandani@browngold.com>
**Sent:** Thursday, May 1, 2025 11:49 AM
**To:** Farber, Molissa (USAMD) <Molissa.Farber@usdoj.gov>
**Cc:** Micco, Megan (USAMD) <Megan.Micco@usdoj.gov>; Andrew D. Freeman <adf@browngold.com>; Joshua Auerbach <JAuerbach@browngold.com>; DeMella, Jonathan <JonathanDeMella@dwt.com>; ChipEnglish@dwt.com; Abrahams, Jessica C. <jessica.abrahams@faegredrinker.com>; Brzezynski, Lora A. <lora.brzezynski@faegredrinker.com>
**Subject:** [EXTERNAL] RE: GHHI, et al. v. EPA, et al. - Production of Administrative Record

Hi Molissa:

4 p.m. today works. My colleague Andy will send a call-in number or Zoom link before then.

Best,
Neel

**Neel Lalchandani**
Attorney

**BROWN GOLDSTEIN & LEVY**
120 E. Baltimore Street, Suite 2500
Baltimore, MD 21202

T 410.962.1030 x9435
C 410.913.1055
F 410.385.0869
E nkl@browngold.com
Pronouns: he/him/his

**About Brown, Goldstein & Levy, LLP**
Brown, Goldstein & Levy handles both civil and criminal litigation and has active practices in many other areas of the law, including family law, disability rights, and health care. For more information, visit browngold.com.

CONFIDENTIALITY: This email and any attachments are confidential, except where the email states it can be disclosed; it may also be privileged. If received in error, please do not disclose the contents to anyone, but notify the sender by return email and delete this email (and any attachments) from your system. Thank you.

**From:** Farber, Molissa (USAMD) <Molissa.Farber@usdoj.gov>
**Sent:** Thursday, May 1, 2025 9:40 AM
**To:** Neel Lalchandani <NLalchandani@browngold.com>
**Cc:** Micco, Megan (USAMD) <Megan.Micco@usdoj.gov>; Andrew D. Freeman <adf@browngold.com>; Joshua Auerbach <JAuerbach@browngold.com>; DeMella, Jonathan <JonathanDeMella@dwt.com>; ChipEnglish@dwt.com; Abrahams, Jessica C. <jessica.abrahams@faegredrinker.com>; Brzezynski, Lora A. <lora.brzezynski@faegredrinker.com>
**Subject:** RE: GHHI, et al. v. EPA, et al. - Production of Administrative Record

**SECURITY ALERT:** This email is from an external source.

Hi Neel,
I am happy to meet and confer. I am available today between 10am and 11:45am, then again from 4pm to 5pm. I have an all-day meeting tomorrow but if we can't find a time today then I'm sure I can carve out 30 minutes as needed. I am also available on Monday between 10am and 3pm.

Please let me know what works best for you all.

**Molissa H. Farber**
Assistant U.S. Attorney | Senior Litigation Counsel
U.S. Attorney's Office, District of Maryland
36 S. Charles Street | Baltimore, MD 21201
(410) 209-4862 (direct phone) | (410) 962-2310 (fax)
Molissa.Farber@usdoj.gov

**From:** Neel Lalchandani <NLalchandani@browngold.com>
**Sent:** Wednesday, April 30, 2025 5:17 PM
**To:** Farber, Molissa (USAMD) <Molissa.Farber@usdoj.gov>
**Cc:** Micco, Megan (USAMD) <Megan.Micco@usdoj.gov>; Andrew D. Freeman <adf@browngold.com>; Joshua Auerbach <JAuerbach@browngold.com>; DeMella, Jonathan <JonathanDeMella@dwt.com>; ChipEnglish@dwt.com; Abrahams, Jessica C. <jessica.abrahams@faegredrinker.com>; Brzezynski, Lora A. <lora.brzezynski@faegredrinker.com>
**Subject:** [EXTERNAL] RE: GHHI, et al. v. EPA, et al. - Production of Administrative Record

Molissa,

We are trying to understand why your client believes the request is not reasonable. We would like to discuss the size of the record, the efforts the EPA is making to gather it, and your client's position that it cannot produce it within a week.

To that end, I reiterate our request for a meet and confer, which under the Local Rules requires more than just an e-mail exchange and, as I recall, Judge Abelson directed the parties to do if an agreement could not be reached.

Please let us know your (or Megan's) availability tomorrow or Friday. Or, if you are not agreeing to meet and confer, please confirm that instead.

--Neel

**Neel Lalchandani**
Attorney

**BROWN GOLDSTEIN & LEVY**
120 E. Baltimore Street, Suite 2500
Baltimore, MD 21202
T 410.962.1030 x9435
C 410.913.1055
F 410.385.0869
E nkl@browngold.com
Pronouns: he/him/his

**About Brown, Goldstein & Levy, LLP**
Brown, Goldstein & Levy handles both civil and criminal litigation and has active practices in many other areas of the law, including family law, disability rights, and health care. For more information, visit browngold.com.

CONFIDENTIALITY: This email and any attachments are confidential, except where the email states it can be disclosed; it may also be privileged. If received in error, please do not disclose the contents to anyone, but notify the sender by return email and delete this email (and any attachments) from your system. Thank you.

---

**From:** Farber, Molissa (USAMD) <Molissa.Farber@usdoj.gov>
**Sent:** Wednesday, April 30, 2025 2:43 PM
**To:** Neel Lalchandani <NLalchandani@browngold.com>; Micco, Megan (USAMD) <Megan.Micco@usdoj.gov>
**Cc:** Andrew D. Freeman <adf@browngold.com>; Joshua Auerbach <JAuerbach@browngold.com>
**Subject:** RE: GHHI, et al. v. EPA, et al. - Production of Administrative Record

**SECURITY ALERT:** This email is from an external source.

I have spoken with the agency, and one to two weeks is not reasonable. I am sorry. The earliest they believe they can send it to us is the week of May 19. We could likely produce by the end of that week, but not sooner.

**Molissa H. Farber**
Assistant U.S. Attorney | Senior Litigation Counsel
U.S. Attorney's Office, District of Maryland
36 S. Charles Street | Baltimore, MD 21201
(410) 209-4862 (direct phone) | (410) 962-2310 (fax)
Molissa.Farber@usdoj.gov

---

**From:** Neel Lalchandani <NLalchandani@browngold.com>
**Sent:** Wednesday, April 30, 2025 2:38 PM
**To:** Farber, Molissa (USAMD) <Molissa.Farber@usdoj.gov>; Micco, Megan (USAMD) <Megan.Micco@usdoj.gov>
**Cc:** Andrew D. Freeman <adf@browngold.com>; Joshua Auerbach <JAuerbach@browngold.com>
**Subject:** [EXTERNAL] Re: GHHI, et al. v. EPA, et al. - Production of Administrative Record

Hi Molissa:

I'm unclear whether you have a sense about the anticipated length of the record – could you clarify? There's a natural relationship between the length of the record and the time to produce. We are mindful of Judge Abelson's preference to have the record produced within a week or two and, given that we do not expect the administrative record to contain many documents, we think that timeframe is reasonable.

Could you please let us know when you are available to meet and confer either tomorrow or Friday? Plaintiffs reserve the right to seek a court order for production of the record within 10 days or 2 weeks of the hearing.

Best,
Neel

---

**From:** Farber, Molissa (USAMD) <Molissa.Farber@usdoj.gov>
**Sent:** Wednesday, April 30, 2025 11:29 AM
**To:** Neel Lalchandani <NLalchandani@browngold.com>; Micco, Megan (USAMD) <Megan.Micco@usdoj.gov>
**Cc:** Andrew D. Freeman <adf@browngold.com>; Joshua Auerbach <JAuerbach@browngold.com>
**Subject:** RE: GHHI, et al. v. EPA, et al. - Production of Administrative Record

**SECURITY ALERT:** This email is from an external source.

Hi Neel,
Without commenting on the length of the record, I do not think we can produce it within a week, but I will check. The agency is confident we can produce it the week of memorial day and maybe the week earlier.

**Molissa H. Farber**
Assistant U.S. Attorney | Senior Litigation Counsel
U.S. Attorney's Office, District of Maryland
36 S. Charles Street | Baltimore, MD 21201
(410) 209-4862 (direct phone) | (410) 962-2310 (fax)
Molissa.Farber@usdoj.gov

---

**From:** Neel Lalchandani <NLalchandani@browngold.com>
**Sent:** Wednesday, April 30, 2025 11:24 AM
**To:** Farber, Molissa (USAMD) <Molissa.Farber@usdoj.gov>; Micco, Megan (USAMD) <Megan.Micco@usdoj.gov>
**Cc:** Andrew D. Freeman <adf@browngold.com>; Joshua Auerbach <JAuerbach@browngold.com>
**Subject:** [EXTERNAL] GHHI, et al. v. EPA, et al. - Production of Administrative Record

Hi Molissa and Megan:

Nice seeing you both yesterday. We wanted to follow up on who in your office we should coordinate with regarding the administrative record. Given that it is not likely to be voluminous, will you be able to produce it within a week?

We are available to meet and confer pretty much any time today, tomorrow, or Friday.

Thank you,
Neel

**Neel Lalchandani**
Attorney

**BROWN GOLDSTEIN & LEVY**
120 E. Baltimore Street, Suite 2500
Baltimore, MD 21202
T 410.962.1030 x9435
C 410.913.1055
F 410.385.0869
E nkl@browngold.com
Pronouns: he/him/his

**About Brown, Goldstein & Levy, LLP**
Brown, Goldstein & Levy handles both civil and criminal litigation and has active practices in many other areas of the law, including family law, disability rights, and health care. For more information, visit browngold.com.
CONFIDENTIALITY: This email and any attachments are confidential, except where the email states it can be disclosed; it may also be privileged. If received in error, please do not disclose the contents to anyone, but notify the sender by return email and delete this email (and any attachments) from your system. Thank you.

## Disclaimer

The information contained in this communication from the sender is confidential. It is intended solely for use by the recipient and others authorized to receive it. If you are not the recipient, you are hereby notified that any disclosure, copying, distribution or taking action in relation of the contents of this information is strictly prohibited and may be unlawful.

This email has been scanned for viruses and malware, and may have been automatically archived by **Mimecast Ltd**, an innovator in Software as a Service (SaaS) for business. Providing a **safer** and **more useful** place for your human generated data. Specializing in; Security, archiving and compliance. To find out more Click Here.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

GREEN & HEALTHY HOMES INITIATIVE, INC., *et al.*,

*Plaintiffs*,

v.

ENVIRONMENTAL PROTECTION AGENCY, *et al.*,

*Defendants*

Case No. 25-cv-1096-ABA

**ORDER**

The Court held a status conference via Zoom today, and counsel for all parties were present. ECF No. 34. During the status conference, counsel for Defendants confirmed that the administrative record will be filed today pursuant to the Court's May 6, 2025 Order (ECF No. 29). For the reasons explained orally in the status conference, the Court hereby ORDERS as follows:

1. **Cross Motions for Summary Judgment** – The parties shall file cross motions for summary judgment on or before May 20, 2025. The parties may incorporate by reference arguments and sections from the briefing for the motion for preliminary injunction.
2. **Responses** – The parties shall file any responses to the cross motions for summary judgment on or before May 23, 2025.

Date: May 13, 2025

*/s/*
Adam B. Abelson
United States District Judge