**No. 25-1808**

## IN THE UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

U.S. Environmental Protection Agency, et al.,
Defendants-Appellants

v.

Green & Healthy Homes Initiative, Inc., et al.
Plaintiffs-Appellees

On Appeal from the United States District Court for the District of Maryland
Case No. 1:25-cv-01096 Hon. Adam B. Abelson

## BRIEF OF *AMICUS CURIAE* PROFESSOR STEVEN L. SCHOONER IN SUPPORT OF PLAINTIFFS-APPELLEES AND AFFIRMANCE

Nathaniel E. Castellano
Catherine G. Katz
Miguel E. Serrano
FRESHFIELDS US LLP
700 13th Street NW, 10th Floor
Washington, D.C. 20005
(202) 777-4500

Jayna Marie Rust
THOMPSON COBURN LLP
1909 K Street NW, Suite 600
Washington, D.C. 20006
(202) 585-6929

David Y. Livshiz
FRESHFIELDS US LLP
3 World Trade Center, 52nd Floor
175 Greenwich Street
New York, New York 10007
(212) 277-4000
david.livshiz@freshfields.com

*Counsel for Amicus Curiae*

# TABLE OF CONTENTS

TABLE OF CONTENTS ...................................................................................... ii

STATEMENT OF INTEREST .............................................................................v

SUMMARY OF ARGUMENT ............................................................................1

ARGUMENT ......................................................................................................4

    I. Despite Similarities, Federal Contracts And Federal Assistance Agreements Are Distinct Governance Tools. ....................................................4

        A. There are time-tested statutory, jurisprudential, and real-world distinctions between federal contracts, grants, and cooperative agreements. ...................................................4

        B. Any contractual analogy for Federal Assistance agreements is necessarily limited, because they derive from distinct statutory authorities. ..............................................9

        C. Fundamentally different dispute resolution regimes apply to procurement contracts and Federal Assistance agreements. ..............12

    II. The Court Of Federal Claim's Limited Tucker Act Jurisdiction Does Not Foreclose District Court Review Of Federal Assistance-Related Matters. ..........................................................14

        A. The Court of Federal Claims exercises only narrow, specialized jurisdiction over breach of contract claims for money damages. ..............................................................14

        B. District courts have an important role in Federal Assistance agreement disputes. ..........................................................19

    III. Allocating the Universe of Federal Assistance Disputes Between The District Courts And The Court Of Federal Claims Requires Matter-Specific, Claim-By-Claim Consideration Of The Relevant Rights And Remedies. ...........................................................22

CONCLUSION .................................................................................................26

CERTIFICATE OF COMPLIANCE ..................................................................28

# TABLE OF AUTHORITIES

## Judicial Decisions

*Am. Council of Learned Societies v. National Endowment for the Humanities,* No. 25-CV-3657, 2026 WL 1256545 (S.D.N.Y. May 7, 2026)........................20

*Bennett v. Ky. Dep't of Educ.*, 470 U.S. 656 (1985)................................................10

*Bowen v. Massachusetts*, 487 U.S. 879 (1988)......................................................*passim*

*Chamber of Com. of U.S. v. Reich*, 74 F.3d 1322 (D.C. Cir. 1996) ........................19

*City of El Centro v. United States*, 922 F.2d 816 (Fed. Cir. 1990)..........................17

*Crowley Gov't Servs. v. Gen. Servs. Admin.*, 38 F.4th 1099 (D.C. Cir. 2022)........................................................................21

*Del Rio v. United States*, 87 Fed. Cl. 536 (2009) ....................................................16

*Encino Motorcars, LLC v. Navarro*, 579 U.S. 211 (2016)......................................18

*Katz v. Cisneros*, 16 F.3d 1204 (Fed. Cir. 1994) ....................................................15

*Larson v. Domestic & Foreign Commerce Corp.*, 337 U.S. 682 (1949)................19

*Lee v. United States*, 895 F.3d 1363 (Fed. Cir. 2018) ............................................17

*LeBlanc v. United States*, 50 F.3d 1025 (Fed. Cir. 1995)........................................16

*Lynch v. United States*, 292 U.S. 571 (1934)..........................................................11

*Maine Comm. Health v. US Mod. Health Plan, Inc.*, 140 S.Ct. 1308 (2020)..................................................................................*passim*

*Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209 (2012)........................................................................................21, 25

*McGee v. Mathis,* 71 U.S. 143 (1866) ......................................................................9

*Md. Dep't of Hum. Res. v. Dep't of Health & Hum. Servs.*, 763 F.2d 1441 (D.C. Cir. 1985)......................................................................25

*Megapulse, Inc. v. Lewis*, 672 F.2d 959 (D.C. Cir. 1982)...............................*passim*

*Pacito v. Trump,* 169 F.4th 895 (9th Cir. 2026) ...........................................17, 24, 25

*Pasteur v. United States*, 814 F.2d 624 (Fed. Cir. 1978)........................................13

*Planned Parenthood S. Atl. v. Baker*, 941 F.3d 687 (4th Cir. 2019).......................18

*Res. Conserv. Grp., LLC v. United States*, 597 F.3d 1238 (Fed. Cir. 2010) ...........16

*Rick's Mushroom Serv., Inc. v. United States*,
    521 F.3d 1338 (Fed. Cir. 2008) ........................................................................17

*Sea-Land Serv., Inc. v. Danzig*, 211 F.3d 1373 (Fed. Cir. 2000) ............................13

*Strickland v. United States*, 32 F.4th 311 (4th Cir. 2022) ........................................19

*Tootle v. Sec'y of Navy*, 446 F.3d 167 (D.C. Cir. 2006)...........................................19

*Thermalon Indus., Ltd. v. United States*, 34 Fed. Cl. 411 (1995)............................17

*United States v. Testan*, 424 U.S. 392 (1976)...........................................................16

*United States v. J & E Salvage Co.,* 55 F.3d 985 (4th Cir. 1995) ...........................23

*Webster v. Doe*, 486 U.S. 592 (1988) .......................................................................20

*Zacharin v. United States*, 213 F.3d 1366 (Fed. Cir. 2000) ....................................17

**Legislation**

Administrative Procedures Act, 5 U.S.C. §§ 701–706 ....................................*passim*

Contract Disputes Act of 1978, 41 U.S.C. §§ 7101–7109................................12, 13

Federal Grant and Cooperative Agreements Act of 1977
    31 U.S.C. §§ 6303–6306.......................................................................................4

Federal Property and Administrative Services Act, 40 U.S.C. §§ 101, 121 ...........11

Tucker Act, 28 U.S.C. § 1491..........................................................................*passim*

**Secondary Sources**

Collin D. Swan, *Government Contracts and the Federal Circuit:*
    *A History of Judicial Remedies Against the Sovereign*,
    8 J. Fed. Cir. Hist. Soc'y 105 (2014)................................................................14

iii

Jonathan Shaffer & Daniel Ramish,
FEDERAL GRANTS PRACTICE (2025 ed.)......................................................*passim*

Loren A. Smith, *The Renovation of an Old Court:*
*A New Name and New Role for the Court of Federal Claims*,
40 Fed. B. News & J. 530, 531 (1993) ..............................................................15

Matthew H. Solomson, COURT OF FEDERAL CLAIMS:
JURISDICTION, PRACTICE, AND PROCEDURE (2016) .............................................14

REPORT OF THE COMMISSION ON GOVERNMENT PROCUREMENT (1972) ...........*passim*

Robert S. Catz, *Due Process and Federal Grant Termination:*
*Challenging Agency Discretion through a Reasons Requirement*,
59 Wash. U.L.Q. 1067 (1982) ....................................................................*passim*

U.S. Government Accountability Office,
PRINCIPLES OF FEDERAL APPROPRIATIONS LAW (3d ed. 2006)...........................10

**STATEMENT OF INTEREST**

Steven L. Schooner is the Nash & Cibinic Professor of Government Procurement Law at The George Washington University Law School. He is interested in ensuring that contractors, grantees, and others who do business with the Government and/or participate in Government funded programs are treated fairly when pursuing their rights and remedies.  He is also interested in ensuring that public institutions—particularly the courts—appreciate and account for the many ways that Congressional mandates, public contracts, grants, cooperative agreements, and other funding mechanisms impact the trajectory of our nation and the public's quality of life.

 A former senior public policy official (Associate Administrator for Procurement Law and Legislation within the U.S. Office of Management and Budget's Office of Federal Procurement Policy) and U.S. Department of Justice litigator, Professor Schooner is one of the world's leading experts in public procurement law and policy.  He has written extensively in this area; his scores of publications include the co-authored *Government Contracts Reference Book: A Comprehensive Guide to the Language of Procurement*.

No counsel for a party authored this brief in whole or in part, and no person or entity other than Professor Schooner, or his counsel, made any contribution toward preparation or submission of this brief.

## SUMMARY OF ARGUMENT

Federal grants and cooperative agreements—collectively "Federal Assistance" agreements—are funding vehicles through which the Government exercises Congress' power and judgment for the benefit of their ultimate beneficiaries, the American people. Through the allocation of Federal Assistance, Congress uses an arms-length approach to partner with a broad range of experts, institutions, and organizations best placed to tackle some of the most significant community- and society-level challenges facing the American public. These federal partnerships have funded breakthroughs in treatment for cancer, Alzheimer's disease, and diabetes. They have provided millions of nutritious school meals to children who would otherwise go hungry, struggling to concentrate, learn, and thrive in the classroom. They have aided critical infrastructure improvements to maintain the nation's highways and to clean up Flint, Michigan's severely contaminated water supply. And they have provided support to nursing homes for veterans and helped displaced American workers acquire marketable skills in our modern economy.

Altogether, Congress designates "over a $1 trillion a year through Federal grants, cooperative agreements, and other Federal Assistance agreements, issued by more than 30 different awarding agencies" and "has established upwards of

1,800 grant programs." [1]  Through this dynamic system of Federal Assistance via grants and cooperative agreements, "these programs support activities that touch every American[.]"[2]  Simply put, federal grants and cooperative agreements provide the foundations for many of the load-bearing pillars of American life.

Recent wholesale attempts by certain Executive branch officials to terminate hundreds of such essential Federal Assistance programs are unprecedented.  The ripple effects of such terminations, today and for generations to come, will harm millions of Americans whose lives are materially improved—or even saved— thanks to these essential programs that will almost certainly falter without the support Congress has long designated to them.

Against that backdrop, the Government's threshold position in this appeal is as untenable as the remedies available at the Court of Federal Claims are inadequate.  The Government grievously errs and does a disservice to the public interest in cynically suggesting that *any challenge* relating to the termination of a

---

[1] Jonathan Shaffer & Daniel Ramish, FEDERAL GRANTS PRACTICE § 1:1 (2025 ed.). Indeed, throughout this Millennium, with rare exceptions, grants have exceeded procurement spending, as consistently reflected on *USASpending.gov*.

[2] *See* Robert S. Catz, *Due Process and Federal Grant Termination: Challenging Agency Discretion through a Reasons Requirement*, 59 Wash. U.L.Q. 1067, 1069 (1982) ("Grant programs have come to represent the preferred *modus operandi* of the federal Government in carrying out most of its education, health, social welfare, housing, environmental, and transportation programs.") (internal quotations omitted).

federal grant or cooperative agreement is necessarily a garden-variety breach of contract claim that must be pigeon-holed within the cramped jurisdiction of the U.S. Court of Federal Claims

To understand the flaws in the Government's position, the Court should have and consider context for both (I) the relationship and distinction between federal contracts and Federal Assistance agreements, and (II) the limited scope of the Court of Federal Claim's jurisdiction under the Tucker Act.  With that context, (III) it is abundantly clear that not every dispute arising from the termination of a grant or cooperative agreement can be categorized as a breach of contract claim.

Rather than a bright line rule for every dispute relating to a federal grant or cooperative agreement, it is necessary to examine the specific nature of the plaintiff's claims to determine whether they belong in federal district court or the Court of Federal Claims.  In many matters, parties must have the opportunity to be heard in federal district courts, which are uniquely capable of granting the particular relief Appellees here seek.  Thankfully, this conclusion does not require breaking any new legal ground.  On the contrary, it follows longstanding precedent from the U.S. Supreme Court and the Courts of Appeals—principally *Bowen v. Massachusetts*[3] and *Megapulse, Inc. v. Lewis*.[4]

---

[3] 487 U.S. 879, 908 n.46 (1988).

[4] 672 F.2d 959, 968 (D.C. Cir. 1982).

3

## ARGUMENT

**I. Despite Similarities, Federal Contracts And Federal Assistance Agreements Are Distinct Governance Tools.**

**A. There are time-tested statutory, jurisprudential, and real-world distinctions between federal contracts, grants, and cooperative agreements.**

For more than 50 years, Congress has explicitly distinguished between federal contracts (typically designated "procurement contracts") and Federal Assistance agreements (most prominently grants and cooperative agreements). Recognizing that these distinctions are not immediately apparent, in 1969 Congress tasked the bipartisan Commission on Government Procurement to study (among many other topics) how contracts and Federal Assistance agreements were used in practice. The Commission's Report conceded that procurement contracts were often confused with Federal Assistance agreements, particularly grants and cooperative agreements. Following the Commission's clarifying recommendations, Congress codified the distinctions between federal contracts, grants, and cooperative agreements in the *Federal Grant and Cooperative Agreements Act* of 1977 (FGCAA).

The FCGAA provides that procurement contracts are used when the "principal purpose of the instrument is to acquire (by purchase, lease, or barter)

4

property or services ***for the direct benefit or use***" of the U.S. Government.[5]  By contrast, grants and cooperative agreements are used when  "the principal purpose of the relationship is to transfer a thing of value to the State or local government or other recipient ***to carry out a public purpose of support or stimulation*** authorized by a law of the United States."[6]

Within the broad category of Federal Assistance agreements, there is a subtler distinction between grants and cooperative agreements.  The principal difference between grants and cooperative agreements is the degree of Government involvement.  Grants are used when the Government is not expected to be involved in the grant recipient's performance of the project.  Cooperative agreements are used when the Government and the grant recipient are expected to work closely together to serve the ultimate beneficiary.[7]

---

[5] 31 U.S.C. § 6303(1) (emphasis added).

[6] 31 U.S.C. § 6304(1) (emphasis added); *see also* 31 U.S.C. § 6305(1).

[7] *See* 31 U.S.C. §§ 6304(2), 6305(2).

The Commission graphically illustrated this now-codified framework:



Source: Developed by Commission Staff.

Figure 1. Proposed model for selection of instrument.

[8]

---

[8] 3 REPORT OF THE COMMISSION ON GOVERNMENT PROCUREMENT 166 fig. 1 (1972).

6

As the Commission explained, Congress exercises discretion—articulated in authorizing and appropriations legislation—in determining which of these alternative methods best help the Government achieve its policy aims.  Certain objectives and functions can be "performed 'in-house' by Government personnel," and "[n]eeded goods and services are often purchased under contract with non-Federal sources," *i.e.* via procurement contracts.[9]  Meanwhile, Congress relies on Federal Assistance programs when  "Federal objectives are attained by supporting or stimulating certain activities of State and local governments, other organizations, and individuals."[10]  "These activities relate to functions which historically have been performed and can be best undertaken by non-Federal Governments, organizations, and individuals" (*e.g.*, local governments, educational institutions, non-profits). [11]

All this is to say that Federal Assistance is used to accomplish objectives when Congress determines that federal resources are best provided to a non-federal entity in the first instance, at which point the non-federal entity accepts responsibility for using the federal resources to deliver aid to the ultimate

---

[9] *Id.* at 161.

[10] *Id.*

[11] *Id.*

beneficiaries. The Commission further articulated how these features of Federal Assistance differ from traditional procurement contracting:

> ***Assistance, while similar to procurement in some respects, is significantly different from procurement***. Assistance is intended to:
>
> > • Help a recipient carry out its functions or meet a particular need, the support or stimulation of which accords with prevailing public policy; or
> >
> > • Bring about social, administrative, or technological change by the provision of Federal funds or other resources to help or encourage recipients to pursue recognized objectives.
>
> Congress normally has preferred that the assistance . . . be carried out by State and local governments, educational institutions, other nonprofit organizations, and individuals rather than by or under the direct control of the Government. ***One reason for this policy is the belief that the meaningful participation of organizations and individuals tends to [e]nsure that the programs consider and serve local or public requirements, values, and needs in the most desirable and direct manner, while accomplishing the broader purposes or objectives of Congress***.[12]

In the half-century since the Commission's 1972 report, its findings and recommendations were broadly accepted across both Democratic and Republican Congresses and administrations. In that time, Congress has authorized and appropriated trillions of dollars across tens of thousands of Federal Assistance programs that have aided virtually every American.

---

[12] *Id.* (emphasis added).

**B.**    **Any contractual analogy for Federal Assistance agreements is necessarily limited, because they derive from distinct statutory authorities.**

There is no doubt that federal grants and cooperative agreements *can* create a contractual relationship between the United States and the recipient. The Supreme Court has long characterized federal grants as creatures of contract, particularly in the context of a state choosing to assent to the conditions that the federal Government demands in return for federal funding.[13]

Yet, contract principles alone cannot fully capture the nature of federal grant and cooperative agreement programs, which are, by statutory definition and historical practice, designed to benefit *third-party public beneficiaries*— distinguished from the federal agency and non-federal recipients that implement the programs.[14] Indeed, the Supreme Court has recognized that Federal Assistance agreements "cannot be viewed in the same manner as a bilateral contract governing a discrete transaction," because "[u]nlike normal contractual undertakings, federal

---

[13] *E.g.*, *McGee v. Mathis*, 71 U.S. 143, 154 (1866).

[14] Catz, *Due Process and Federal Grant Termination*, 59 Wash. U.L.Q. at 1085 ("The obligations between the grantor and grantee differ substantially from those customary in federal contracts. The obligation of the grantee in the use of the grant is to act as the agent of the public interest rather than solely in the service of his own self interest.").

9

grant programs originate in and remain governed by statutory provisions expressing the judgment of Congress concerning desirable public policy."[15]

This highlights one of the most relevant distinctions between federal contracts and Federal Assistance agreements: the nature of a federal agency's authority to enter into those agreements. Federal agencies have inherent authority to enter into contracts, which is why federal procurement contracts are more amenable to Government-wide standards.[16] But no such inherent authority exists for Federal Assistance agreements.[17] Rather, grants and cooperative agreements must be traced to authorizing and appropriating legislation.[18] As a consequence, it is more difficult to formulate generalized rules that apply across Federal Assistance programs, because every grant and cooperative agreement program is associated with authorizing legislation, which typically leads to program-specific regulations and administrative guidance. And, unlike procurement contracts, which are generally governed by terms within the four-corners of a written agreement, the rights and obligations that apply to Federal Assistance programs are often not

---

[15] *Bennett v. Ky. Dep't of Educ.,* 470 U.S. 656, 669 (1985) (citation omitted).

[16] *See* 3 REPORT OF THE COMMISSION ON GOVERNMENT PROCUREMENT 161.

[17] U.S. Government Accountability Office, 2 PRINCIPLES OF FEDERAL APPROPRIATIONS LAW 10–17 (3d ed. 2006).

[18] Authorization and appropriation may occur in the same legislation, but for long-standing programs, authorization and appropriation may occur in different pieces of legislation.

10

compiled in the Federal Assistance agreement, but rather established by program-specific statutes, regulations, and guidance.[19]  Further, although Congress has delegated significant authority to the President to issue "policies and directives" that the President deems necessary for procurements and Government property,[20] Congress has delegated no such authority in the context of Federal Assistance.

In sum: while Federal Assistance agreements share some common features with traditional contracts, they cannot be distilled to an arms-length bilateral relationship between buyer and seller.  Rather, grants and cooperative agreements arise from a more nuanced resource-sharing relationship that begins with Congress, extends from a federal agency to one or more non-federal recipients, and eventually reaches Congress' intended beneficiary.

---

[19] *See* Catz, *Due Process and Federal Grant Termination*, 59 Wash. U.L.Q. at 1085 ("This contrasts with an ordinary contract situation in which the written instrument will normally contain all the terms and conditions defining the relationship.  The grant agreement plays only the limited role of signaling the start of the relationship and fixing terms such as the project period, the grant amount, and the budget.").  *C.f. Lynch v. United States*, 292 U.S. 571, 579 (1934) ("When the United States enters into contract relations, its rights and duties therein are governed generally by the law applicable to contracts between private individuals.").

[20] *See Federal Property and Administrative Services Act*, 40 U.S.C. §§ 101, 121.

11

**C.      Fundamentally different dispute resolution regimes apply to procurement contracts and Federal Assistance agreements.**

The impacts of disrupted Federal Assistance programs often ripple far and wide, generating unpredictable second- and third-order effects, triggering a variety of disputes.  Certainly, *some* of those disputes *may* manifest as breach of contract claims between a federal agency and non-federal recipient.  But that is just one type of dispute that may arise from abrupt, significant disruption to a Federal Assistance program.  A broad range of plaintiffs (states, local governments, educational institutions, non-profits, industry associations, and individual beneficiaries) may suffer myriad injuries tied to a host of alleged legal violations (constitutional, statutory, administrative, and contractual).  Many of those disputes bear no resemblance to a garden-variety breach of contract claim.  Occasionally, as here, tribunals must grapple with vexing procedural questions of  sovereign immunity, jurisdiction, venue, and remedy.

Those complexities rarely arise in the world of federal procurement contracts, because Congress created a uniform, proven, battle-tested procedural framework to deal with most disputes arising from procurement contracts: the *Contract Disputes Act of 1978* (CDA).  Following recommendations from the afore-mentioned Commission on Government Procurement, Congress enacted the CDA to provide a definitive, effective, and efficient process for resolving disputes arising under procurement contracts.  That process generally results in procurement

contract disputes being litigated at the Court of Federal Claims or an administrative Board of Contract Appeals, subject to appeal in the Court of Appeals for the Federal Circuit. Thus, when procurement contract disputes arise, the CDA typically provides a clear answer as to the available fora and procedures.[21] As discussed further in the following Section, the CDA's designation of fora also reflects the clear Congressional intent to limit the remedies for contractors to those available in the Court of Federal Claims or Boards of Contract Appeals, an intent which all parties are aware of when they enter into procurement contracts.

But the CDA does not apply to non-procurement agreements like grants and cooperative agreements;[22] nor has Congress provided a CDA-equivalent for disputes arising from such Federal Assistance agreements.[23] Thus, courts nationwide must parse the authority of federal district courts and the Court of Federal Claims to determine the correct forum (potentially, fora) for any given dispute arising from a Federal Assistance agreement.[24]

---

[21] There are, however, still scenarios where disputes relating to procurement contracts are exempt from the CDA and must be heard in district court, as may ultimately be the case for many mass-terminations arising from this Administration. *E.g.*, *Crowley Gov't Servs. v. Gen. Servs. Admin.*, 38 F.4th 1099 (D.C. Cir. 2022); *Sea-Land Serv., Inc. v. Danzig*, 211 F.3d 1373 (Fed. Cir. 2000).

[22] *Pasteur v. United States*, 814 F.2d 624, 627 (Fed. Cir. 1987).

[23] Shaffer & Ramish, FEDERAL GRANTS PRACTICE § 1:14.

[24] A comparable disparity arises in the context of termination disputes. Whereas the procuring agency's right to unilaterally terminate Federal Assistance

13

**II. The Court Of Federal Claim's Limited Tucker Act Jurisdiction Does Not Foreclose District Court Review Of Federal Assistance-Related Matters.**

Given the many complex features inherent in Federal Assistance agreements, and the fact that Congress has not passed a Federal Assistance disputes act, it can be complicated to determine the correct jurisdiction for any given dispute arising from a Federal Assistance agreement. The Tucker Act gives the Court of Federal Claims important and exclusive—yet narrow—jurisdiction to resolve most breach of contract actions (and some constitutional claims) against the United States. For the many claims that do not fall within the Court of Federal Claims' limited Tucker Act jurisdiction, federal district courts provide the balance.

**A. The Court of Federal Claims exercises only narrow, specialized jurisdiction over breach of contract claims for money damages.**

Through piecemeal legislation in the nineteenth century, in order to address a growing number of claims for money that Congress was forced to evaluate and fund through individual legislation (including contract-based claims), Congress

---

agreements is far from certain and can generate questions of constitutional proportions—a procuring agency's right to terminate procurement contracts for "convenience" is uniformly established within the contractual documents. The now-boilerplate termination provision grew from the understanding that once a war or similar event concluded, the Government should not be forced to continue purchasing items or services it no longer needs, subject to a fair payment for work already completed. *See G. L. Christian & Assocs. v. United States*, 312 F.2d 418, 426 (Ct. Cl. 1963); *Torncello v. United States,* 681 F.2d 756, 772 (Ct. Cl. 1982).

14

established the U.S. Court of Claims and enacted the Tucker Act.[25]  In the decades

since, the Court of Claims was eventually split into (i) the Article I trial court that

is now known as the Court of Federal Claims, and (ii) the Article III Court of

Appeals for the Federal Circuit (with a docket dominated by patent cases).[26]

The Tucker Act waives sovereign immunity and provides the Court of

Federal Claims jurisdiction over "any claim against the United States founded

either upon the Constitution, or any Act of Congress or any regulation of an

executive department, or upon any express or implied contract with the United

States, or for liquidated or unliquidated damages in cases not sounding in tort."[27]

The Tucker Act has been interpreted to provide the Court of Federal Claims with

jurisdiction that is limited in several critical respects.

**First**, the Court of Federal Claims has no authority to issue injunctive relief;

the court's authority is limited to awards of money damages.[28]  The sole exception

---

[25] *See* Matthew H. Solomson, COURT OF FEDERAL CLAIMS: JURISDICTION, PRACTICE, AND PROCEDURE, ch. 1 (2016); Collin D. Swan, *Government Contracts and the Federal Circuit: A History of Judicial Remedies Against the Sovereign*, 8 J. Fed. Cir. Hist. Soc'y 105 (2014).

[26] *See Bowen*, 487 U.S. at 908 n.46; *see also* Loren A. Smith, *The Renovation of an Old Court: A New Name and New Role for the Court of Federal Claims*, 40 Fed. B. News & J. 530, 531 (1993).

[27] 28 U.S.C. § 1491(a).

[28] *Bowen*, 487 U.S. at 905 ("The Claims Court does not have the general equitable powers of a district court to grant prospective relief. Indeed, we have stated categorically that the Court of Claims has no power to grant equitable relief."

proves the rule, because it only applies in the narrow context of a specialized "bid protest" proceeding brought by a disappointed competitor in connection with a **procurement contract**.[29]  Indeed, the Federal Circuit has long held that such "bid protest" review is not available in connection with non-procurement agreements, which could only be heard in district court.[30]

**Second**, the Tucker Act only permits actions based on a "money mandating" source of authority.  The Court of Federal Claims has no jurisdiction over constitutional claims except those that guarantee the claimant some form of compensation.[31]  Thus, the Court of Federal Claims lacks jurisdiction over claims under the First Amendment, the Equal Protection Clause of the Fourteenth Amendment, and the Due Process Clause of the Fifth and Fourteenth Amendments.[32]

---

(internal quotations omitted)); *Katz v. Cisneros*, 16 F.3d 1204, 1209 (Fed. Cir. 1994) ("An adjudication of the lawfulness of HUD's regulatory interpretation will have future impact on the ongoing relationship between the parties.  The Court of Federal Claims cannot provide this relief.").

[29] 28 U.S.C. § 1491(b) (emphasis added).

[30] *See Res. Conserv. Grp., LLC v. United States*, 597 F.3d 1238, 1246 n.12 (Fed. Cir. 2010) ("Thus, a disappointed bidder in a nonprocurement case could also theoretically bring its bid protest challenge in a federal district court, since the [Administrative Dispute Resolution Act] only repealed jurisdiction over procurement cases.").

[31] *See LeBlanc v. United States*, 50 F.3d 1025, 1028 (Fed. Cir. 1995).

[32] Nor has the Court of Federal Claims suggested a willingness to grant a mandamus remedy where the underlying claim was not already based on a money-

16

**Third,** while traditional procurement contracts are presumed to be money mandating and provide a viable cause of action, the "Government's consent to suit under the Tucker Act *does not extend to every contract*," and on this basis the Federal Circuit has rejected claims based on alleged breach of a cooperative agreement.[33] As a result, when the recipient of a non-procurement agreement attempts to pursue a breach claim under the Tucker Act, the Department of Justice will often dispute Tucker Act jurisdiction, when doing so suits its purposes.[34]

**Fourth,** even where a breach of contract claim is cognizable under the Tucker Act, the Court of Federal Claims' jurisdiction does not permit relief under many traditional contract theories based on equity, estoppel, or quantum meruit.[35]

---

mandating source of law. *See Del Rio v. United States*, 87 Fed. Cl. 536, 540 (2009) (citing *United States v. Testan*, 424 U.S. 392, 403 (1976)).

[33] *Rick's Mushroom Serv., Inc. v. United States*, 521 F.3d 1338, 1343 (Fed. Cir. 2008) (emphasis added).

[34] *E.g.*, *Pacito v. Trump*, 169 F.4th 895, 927 (9th Cir. 2026) ("The Government cannot have its cake and eat it too by insisting that cooperative agreements *are not* Tucker Act contracts when it does not want to litigate in the CFC but that they *are* Tucker Act contracts when—as in this case—it would rather be there.") (emphasis in original); *Thermalon Indus., Ltd. v. United States*, 34 Fed. Cl. 411, 416 (1995) ("[D]efendant argues that even if the terms and conditions of the grant agreement satisfy the traditional requirements for a binding contract with the United States, the circumstances surrounding the grant do not involve the type of agreement that Congress intended to fall within the scope of this court's Tucker Act jurisdiction.").

[35] *E.g.*, *Lee v. United States*, 895 F.3d 1363, 1373 (Fed. Cir. 2018); *Zacharin v. United States*, 213 F.3d 1366, 1371 (Fed. Cir. 2000); *City of El Centro v. United States*, 922 F.2d 816, 823 (Fed. Cir. 1990).

Not only is the court's jurisdiction limited in this respect, but compared to district courts, the Court of Federal Claims has little experience addressing the issues of public interest and reliance interests that can arise when resolving constitutional and administrative law questions relating to Federal Assistance agreements.[36]

**Finally**, the Court of Federal Claims only has jurisdiction in civil cases—so the court does not see criminal cases involving federal contracts. But not even all civil cases are within the Court of Federal Claims' jurisdiction. A host of other civil cases that involve federal contracts—particularly the Federal Tort Claims Act, the Civil False Claims Act, and suspension and debarment proceedings—are litigated in district courts around the country, not the Court of Federal Claims.

To be sure, the Court of Federal Claims and the Tucker Act play important roles in many disputes arising under grants and cooperative agreements,[37] particularly where the non-federal recipient claims that a federal agency breached the explicit terms of their agreement and seeks sums of past due money. These

---

[36] *Cf. Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221 (2016) ("Agencies are free to change their existing policies, but in explaining its changed position, an agency must be cognizant that longstanding policies may have engendered serious reliance interests that must be taken into account." (citation and internal quotations omitted)); *Planned Parenthood S. Atl. v. Baker*, 941 F.3d 687, 707 (4th Cir. 2019) ("[I]njunction would serve the public interest . . . ensuring affordable access to competent health care by some of South Carolina's neediest citizens, whose health challenges are every bit as real as those of citizens of greater means." (citation and internal quotations omitted)).

[37] *E.g.*, *San Juan City Coll. v. United States*, 391 F.3d 1357, 1361 (Fed. Cir. 2004).

disputes fall squarely within Tucker Act's "heartland."[38]  However, not all disputes arising from Federal Assistance agreements fit in the Tucker Act's rigid borders.

### B.    District Courts have an important role in Federal Assistance agreement disputes.

Plaintiffs with claims relating to Federal Assistance agreements that cannot be heard within the limited bounds of the Tucker Act and the Court of Federal Claims must look to federal district courts for recourse.[39]  For free-standing constitutional claims alleging that federal officers have acted beyond their authority, sovereign immunity poses no obstacle, and Article III district courts enjoy power to provide equitable relief.[40]  Moreover, beyond those constitutional

---

[38] *Maine Comty. Health Options v. United States*, 590 U.S. 296, 327 (2020) ("Petitioners do not ask for prospective, nonmonetary relief to clarify future obligations; they seek specific sums already calculated, past due, and designed to compensate for completed labors . . . .  Petitioners' suit thus lies in the Tucker Act's heartland.").

[39] "The Tucker Act yields . . . when the [APA] provides an avenue for relief." *Maine*, 590 U.S. at 324; *Tootle v. Sec'y of Navy*, 446 F.3d 167, 176 (D.C. Cir. 2006) (courts have "categorically reject[ed] the suggestion that a federal district court can be deprived of jurisdiction by the Tucker Act when no jurisdiction lies in the Court of Federal Claims").

[40] *Strickland v. United States*, 32 F.4th 311, 363–64 (4th Cir. 2022) ("[S]uits for specific relief against officers of the sovereign allegedly acting beyond statutory authority or unconstitutionally are not barred by sovereign immunity." (citations and internal quotations omitted) (discussing *Larson v. Domestic & Foreign Com. Corp.*, 337 U.S. 682 (1949)); *Chamber of Com. of U.S. v. Reich*, 74 F.3d 1322, 1329 (D.C. Cir. 1996) ("[I]f the federal officer, against whom injunctive relief is sought, allegedly acted in excess of his legal authority, sovereign immunity does not bar a suit . . . .  So, there is no sovereign immunity to waive—it never attached

claims, parties to Federal Assistance agreements must turn to the Administrative

Procedures Act (APA).

Through the APA, Congress broadly waived immunity to confirm that "final

agency action for which there is no other adequate remedy in a court [is] subject to

judicial review."[41]  In *Bowen*, the Supreme Court explained that Congress intended

for the APA's "generous review provisions" to reach "a broad spectrum of

administrative actions," and "must be given a 'hospitable' interpretation."[42]

Critically here, *Bowen* **emphasized legislative history confirming that**

**Congress specifically intended for amendments made in the 1970s to permit APA**

**review of federal "grant-in-aid" disputes**—*i.e.*, disputes arising from Federal

Assistance agreements:

> [B]oth the House and Senate Committee Reports indicate that Congress
> understood that § 702, as amended, would authorize judicial review of
> the "administration of Federal grant-in-aid programs."[28] The fact that
> grant-in-aid programs were expressly included in the list of proceedings
> in which the Committees wanted to be sure the sovereign-immunity
> defense was waived is surely strong affirmative evidence that the

---

in the first place." (citations omitted)); *Am. Council of Learned Soc'ys v. Nat'l Endowment for the Humans.*, 2026 WL 1256545, at *24 (S.D.N.Y. May 7, 2026) ("[T]he Government's position—that all claims arising from the challenged grant terminations must be brought, if at all, in the [Court of Federal Claims]—would raise a 'serious constitutional question' identified by the Supreme Court in *Webster v. Doe*, 486 U.S. 592 (1988).").

[41] 5 U.S.C. § 704.

[42] *Bowen*, 487 U.S. at 904 (citations omitted).

20

members did not regard judicial review of an agency's disallowance decision as an action for damages.[43]

The APA "generally waives the Federal Government's immunity from a suit 'seeking relief other than money damages and stating a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity or under color of legal authority.'"[44]  While that waiver "does not apply 'if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought' by the plaintiff,'"[45] this exception only precludes APA review in district court for claims that the plaintiff could actually bring under the Tucker Act.[46]

Accordingly, the Court in *Bowen* rejected the Government's argument that a state's APA claim seeking prospective injunctive relief in connection with a Federal Assistance program was implicitly prohibited by the Tucker Act.  The Court concluded that the Court of Federal Claims' limited Tucker Act jurisdiction

---

[43] *Bowen*, 487 U.S. at 898 ("[T]hey cited cases involving challenges to federal grant-in-aid programs as examples of the Government's reliance on a sovereign-immunity defense that should be covered by the proposed legislation[.]").

[44] *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 215 (2012) (quoting 5 U.S.C. § 702).

[45] *Id.* (quoting 5 U.S.C. § 702).

[46] *Id.* at 216 ("When a statute 'is not addressed to the type of grievance which the plaintiff seeks to assert,' then the statute cannot prevent an APA suit.") (citation omitted); *see also Crowley*, 38 F.4th at 1109 ("Because a plaintiff could not bring this type of tort action in Claims Court in the first place, that court would not have exclusive jurisdiction of them.  And the same goes for Crowley's analogous statutory claims.").

21

could not provide adequate relief to address the state's claims and injury.[47]  The Court added that "it seems highly unlikely that Congress intended to designate an Article I court as the primary forum for judicial review of agency action that may involve questions of policy that can arise in cases such as these."[48]

**III.  Allocating The Universe of Federal Assistance Disputes Between The District Courts And The Court Of Federal Claims Requires Matter-Specific, Claim-By-Claim Consideration Of The Relevant Rights And Remedies.**

With the context above, it should be clear that (I) disputes arising in connection with a Federal Assistance program may raise a diverse range of claims warranting a variety of remedies, and (II) some of those claims will be properly heard in the Court of Federal Claims under the Tucker Act, while others can only be resolved in district court.  For decades, parties and courts have determined the appropriate forum for each claim through the tried-and-true (albeit cumbersome) process of matter- and claim-specific consideration.

The most widely adopted, long-standing approach derives from the D.C. Circuit's seminal decision in *Megapulse*.[49]  As the Fourth Circuit has articulated,

---

[47] *Bowen*, 487 U.S. at 905 ("We are not willing to assume, categorically, that a naked money judgment against the United States will always be an adequate substitute for prospective relief fashioned in the light of the rather complex ongoing relationship between the parties.").

[48] *Bowen*, 487 U.S. at 908 n.46.

[49] 672 F.2d at 968.

*Megapulse* provides a two-part test "to make rational distinctions between actions sounding genuinely in contract and those based on truly independent legal grounds[,]" and thereby "determine if the claim so clearly presents a disguised contract action that jurisdiction over the matter is properly limited[.]"[50]  The *Megapulse* test depends on both "the source of the rights upon which the plaintiff bases its claims, and upon the type of relief sought (or appropriate)."[51]  Given the distinct sources of authority from which procurement contracts and Federal Assistance agreements arise, embracing the *Megapulse* approach makes good sense.

    *Megapulse* recognizes that "it is important on the one hand to preserve the Tucker Act's limited and conditioned waiver of sovereign immunity in contract actions," without doing so in a way that improperly denies "a court jurisdiction to consider a claim that is validly based on grounds other than a contractual relationship with the Government."[52]  In other words, the "mere fact that a court may have to rule on a contract issue does not, by triggering some mystical metamorphosis, automatically transform an action based on trespass or conversion

---

[50] *United States v. J & E Salvage Co.,* 55 F.3d 985, 988 (4th Cir. 1995) (quoting *Megapulse*, 672 F.2d at 969–70).

[51] 672 F.2d at 968.

[52] *Id.*

into one on the contract and deprive the court of jurisdiction it might otherwise have."[53]

The dual focus on the source of rights underlying the plaintiffs' claims *and* the type of relief sought is consistent with the Supreme Court's precedential analysis of questions relating to the boundary between Court of Federal Claims and district court jurisdiction.[54]  It is also consistent with the Court's two recent interim orders examining grant termination disputes.

The interim order in *Department of Education v. California* confirms that district court jurisdiction over APA claims "does not extend to orders 'to enforce a contractual obligation to pay money' along the lines of what the District Court

---

[53] *Id.*; *see also Crowley*, 38 F.4th at 1109 ("We find Crowley's claim against the GSA to fall within that category of cases identified in *Megapulse* in which '[c]ontract issues may arise' but 'the action itself is not founded on a contract.'" (quoting *Megapulse*, 672 F.2d at 967)); *Pacito v. Trump*, 169 F.4th 895, 925 (9th Cir. 2026) ("[I]f the rights and remedies are *statutorily* or *constitutionally* based, then the district courts have jurisdiction; if rights and remedies are *contractually* based, then only the Court of Federal Claims does, even if the plaintiff formally seeks injunctive relief." (emphasis in original) (citation and internal quotations omitted)).

[54] *E.g.*, *Bowen*, 487 U.S. at 891–906; *Maine*, 590 U.S. at 326 (discussing *Bowen* and looking to the source of plaintiff's rights and relief requested to determine whether claims could be resolved under the Tucker Act, confirming that a suit seeking prospective relief governing grant-in-aid program is not appropriate in Court of Federal Claims where there is no availability of equitable relief); *Patchak*, 567 U.S. at 216 n.3 (emphasizing the nature of the claim asserted to determine whether an APA claim is implicitly prohibited by another statute).

24

ordered[.]"[55]  That is consistent with the settled principle that contract-related claims seeking "specific sums already calculated, past due, and designed to compensate for completed labors" fall within "the Tucker Act's heartland."[56]  And the interim order in *National Institutes of Health v. American Public Health Association* (*NIH*) provides additional nuance, confirming that courts must examine the true nature of each claim and parse between matters (a) that are contractual in essence and belong in the Court of Federal Claims (*e.g.*, claims seeking specific performance of improperly terminated grant agreements), and those (b) that belong in district court under the APA (*e.g.*, traditional administrative law challenges to agency policy directives that lead to grant terminations).[57]

Neither interim order disturbs the familiar and binding precedent of *Bowen* that some Federal Assistance-related claims may be heard and remedied in district court, even if the "judicial remedy may require [the Government] to pay money to

---

[55] 604 U.S. 650, 651 (2025) (quoting *Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 212 (2002)).

[56] *Maine*, 590 U.S. at 326–27.

[57] 145 S. Ct. 2658, 2661 (2025) (Barrett, J., concurring); *see also Pacito*, 169 F.4th at 928 ("[W]here 'claims arise under a federal grant program and turn on the interpretation of statutes and regulations rather than on the interpretation of an agreement negotiated by the parties,' the plaintiff's claims are generally 'not contract claims for Tucker Act purposes.'" (quoting *Md. Dep't of Hum. Res. v. Dep't of Health & Hum. Servs.*, 763 F.2d 1441, 1449 (D.C. Cir. 1985)).

25

another[.]"[58]  Nor do they address the many Federal Assistance-related cases where plaintiffs seek to preserve freestanding constitutional rights that can only be heard and remedied by an Article III district court.[59]

## CONCLUSION

As recent events confirm, abrupt disruption to Federal Assistance programs can (1) sow chaos across the country, (2) severely harm the lives of those who rely on the interrupted Federal Assistance programs, and (3) lead plaintiffs from all walks of life straight to the courthouse steps.  It serves neither justice nor the public interest for the courts to blindly divert those plaintiffs to the Court of Federal Claims every time a terminated grant or cooperative agreement is involved.  The Court of Federal Claims possesses neither the authority, nor the expertise or resources, to remedy the universe of harms that foreseeably follow from widespread, wholesale termination of federal grants and cooperative agreements.  Such an approach would unconsciously sacrifice constitutional rights at the altar of administrative convenience, permitting Executive agents to blatantly violate the law while barring true relief for those who need it most.

---

[58] 87 U.S. at 893.

[59] *Megapulse*, 672 F.2d at 969–70 ("This court retains the power to make rational distinctions between actions sounding genuinely in contract and those based on truly independent legal grounds.").

26

Dated:  May 19, 2026

/s/    David Y. Livshiz

Nathaniel E. Castellano
Catherine G. Katz
Miguel E. Serrano
FRESHFIELDS US LLP
700 13th Street NW, 10th Floor
Washington, D.C. 20005
(202) 777-4500

David Y. Livshiz
FRESHFIELDS US LLP
3 World Trade Center, 52nd Floor
175 Greenwich Street
New York, New York 10007
(212) 277-4000
david.livshiz@freshfields.com

Jayna Marie Rust
THOMPSON COBURN LLP
1909 K Street NW, Suite 600
Washington, D.C. 20006
(202) 585-6929

*Counsel for Amicus Curiae*

27

## CERTIFICATE OF COMPLIANCE

I hereby certify that the forgoing *amicus* brief complies with the word limit of Federal Rules of Appellate Procedure 29(a)(5) and 32(a)(7) because the brief contains 6,193 words.  The word count excludes words in the figure that appears at page 6.  The brief complies with the typeface and type-style requirements of the Federal Rules of Appellate Procedure 32(a)(5) and (6) because it has been prepared using Microsoft word in proportionally spaced 14-point Times New Roman font.

/s/    David Y. Livshiz

David Y. Livshiz

28